Nicole Lavallee (SBN 165755)
Kristin Moody (SBN 206326)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
kmoody@bernantabacco.con
avahdat@bermantabacco.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE OUTSET MEDICAL, INC. SECURITIES LITIGATION | Case No. 5:24-cv-06124-EJD |
| | **CLASS ACTION** |
| This Document Relates to: ALL ACTIONS | **CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | Ctrm: 4 – 5th Floor<br>Judge: Hon. Edward J. Davila |

# TABLE OF CONTENTS

I. SUMMARY OF THE ACTION ..... 1

II. JURISDICTION AND VENUE ..... 5

III. INTRADISTRICT ASSIGNMENT ..... 6

IV. PARTIES ..... 6

- A. Lead Plaintiff – The Pension Fund Group ..... 6
- B. Defendants ..... 7

V. OVERVIEW OF HEMODIALYSIS AND OUTSET AND ITS PRODUCT OFFERINGS ..... 8

- A. Hemodialysis Treatment ..... 8
- B. FDA Regulatory Overview ..... 10
- C. The Company and Its Reliance on Tablo, Its Primary Product ..... 11

VI. DURING THE CLASS PERIOD, OUTSET ENGAGED IN WIDESPREAD AND PERVASISVE OFF-LABEL MARKETING OF TABLO FOR CRRT AND ALSO PROMOTED AND DISTRIBUTED TABLOCART WITHOUT FDA CLEARANCE ..... 13

- A. The FDA Warning Letter Evidences Outset's Off-Label Marketing ..... 14
- B. Witness Accounts Further Demonstrate Outset's Pervasive Off-Label Marketing ..... 17
- C. Outset's Value Proposition Marketing Strategy ..... 22
- D. Outset Markets and Distributes TabloCart Without FDA Authorization ..... 23
- E. While Defendants Publicly Downplay the Importance of the FDA Warning Letter, Internally, Outset Modifies Its Marketing Practices for Tablo ..... 23

VII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ..... 24

- A. Defendants' 2020 Through January 2023 Misrepresentations ..... 25
- B. Defendants' 2020 Through January 2023 Statements Were False and Misleading When Made ..... 42
- C. Defendants' Misrepresentations in February 2023 Through June 2023 ..... 45
- D. Defendants' February 2023 Through June 2023 Statements Were False and Misleading When Made ..... 48
- E. While the Truth Begins to Be Revealed, Defendants Continue to Mislead the Market ..... 51

F. Defendants' July 2023 Through May 2024 Statements Were False and Misleading When Made ... 61

G. The Truth is Finally Revealed ... 65

VIII. ADDITONAL SCIENTER ALLEGATIONS ... 68

A. The Consistent Accounts by Former Outset Employees and Outset Customers Evidence a Strong Inference of Scienter ... 68

B. The FDA Warning Letter and Defendants' Knowledge of the FDA Investigation Leading Up to the FDA Warning Letter Further Supports Scienter. ... 70

C. Defendant CEO Trigg's Direct Involvement with the Sales Team and Marketing to Customers Evidences Scienter ... 71

D. Scienter is Established by the Fact That the Misconduct Related to Outset's Core Business and Product ... 72

E. Defendants' Knowledge of the Lack of FDA Clearance Evidences Scienter ... 73

F. Defendants' Knowledge of the Value Proposition Marketing Evidences Scienter ... 74

G. The Fact That Defendants Violated the Company's Own Policy Further Supports Scienter ... 74

H. The Massive Insider Selling on Outset's Artificially Inflated Stock Price Supports Scienter ... 74

IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR ... 78

X. LOSS CAUSATION ... 79

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE ... 81

XII. CLASS ACTION ALLEGATIONS ... 83

XIII. COUNTS AGAINST DEFENDANTS ... 84

XIV. PRAYER FOR RELIEF ... 88

XV. JURY DEMAND ... 88

Court-appointed Lead Plaintiff the Pension Fund Group, which is comprised of Plymouth County Retirement Association ("Plymouth County") and Sheet Metal Workers' Pension Plan of Southern California, Arizona and Nevada ("SMWPP"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Lead Plaintiff, which are alleged upon personal knowledge, against Defendants Outset Medical ("Outset" or the "Company"), Chief Executive Officer Leslie Trigg, former Chief Financial Officer Nabeel Ahmed, and former Chief Financial Officer Rebecca Chambers ("Defendants"). Lead Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Outset with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, earnings and other conference calls, and other public statements; (c) discussions with Outset former employees and Outset customers; and (d) review and analysis of securities analyst reports, news and media reports, published insights about the Company, and Outset's website.

## I. SUMMARY OF THE ACTION

1. Lead Plaintiff brings this federal securities class action for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. (the "Exchange Act") and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), on behalf of all persons or entities who purchased or otherwise acquired Outset securities between September 15, 2020 and August 7, 2024, inclusive (the "Class Period") against the Defendants.

2. At its core, this securities fraud class action involves widespread and pervasive off-label marketing of the Company's primary product and revenue driver, the Tablo Hemodialysis System ("Tablo"), for continuous renal replacement therapy ("CRRT"), an indication for which it is expressly ***not*** cleared by the U.S. Food & Drug Administration ("FDA").

3. Outset first received clearance from the FDA for Tablo in 2014 for use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility. On April 1, 2020, Tablo was first cleared for home use by the FDA. Significantly, at no

point has Tablo received clearance for CRRT, which use must be expressly cleared by the FDA. As the FDA has stated:

> Patients who require CRRT are typically hospitalized with acute illness resulting in acute kidney injury and possible severe hemodynamic instability, and the devices that provide CRRT treatment have unique features to enable continuous treatment (> 24 hours) for this patient population. Systems that cannot safely and reliably perform CRRT raise serious public health concerns when used for CRRT treatment, because failure of dialysis systems performing CRRT may result in fluid and electrolyte imbalances, inadequate ultrafiltration, infection, and patient harm/death.

4. The Class Period begins with the Company's Initial Public Offering ("IPO") on September 15, 2020. At that time, and leading up to the IPO, there was little demand for Tablo in the home market. With a product with a limited market for home use and no FDA clearance for CRRT, Defendants devised a scheme to illegally market Tablo for CRRT. Because Tablo was significantly less expensive to operate than machines cleared for CRRT, health systems would purportedly achieve significant cost savings. Outset's marketing strategy for Tablo relied significantly on marketing the Tablo for CRRT.

5. Indeed, the consistent accounts of former Outset employees and Outset customers from various time periods, locations, and roles, and who are familiar with Outset's marketing of Tablo, confirm Outset's pervasive off-label marketing throughout the Class Period. For example, several former employees relay that Outset marketed Tablo for CRRT and that Outset management directed and instructed the sales staff to market Tablo for CRRT, including at sales training sessions, calls, and meetings. Indeed, former Outset employees relay that Outset "aggressively" marketed Tablo for CRRT, the instruction from management was always to sell Tablo for CRRT, and that Outset did, in fact, sell Tablo for CRRT. Moreover, many Outset customers relay that Outset personnel told them that Tablo could perform CRRT and further relay that they were not aware that Tablo did not have FDA clearance for CRRT. Outset customers also relay that marketing materials and sales proposals provided by Outset for Tablo reference CRRT and that the customers bought Tablo for use for CRRT.

6. TabloCart, the Company's second device, was first released for sale in October 2022 without the requisite FDA authorization. TabloCart is a water purification system that is used with the Tablo console. Outset promoted and sold TabloCart as a "non-medical accessory"

and without FDA authorization, despite the FDA expressly classifying "water purification systems for hemodialysis" as medical devices that require premarket notification.

7. Yet, during the Class Period, Defendants, *inter alia*, repeatedly and falsely touted that Outset did not engage in off-label promotion and repeatedly touted revenue, growth, and demand for Tablo, including specifically in the acute care market, without disclosing that the illicit off-label marketing scheme was driving Tablo's results and demand.

8. Moreover, and unknown to investors, (a) no later than January 17, 2023, the FDA began an inspection of Outset during which it found evidence of Outset's off-label promotion of Tablo for CRRT and of TabloCart without the required FDA approval or clearance; (b) Outset had a meeting with the FDA on March 13, 2023 at which they discussed the fact that Tablo was not cleared for CRRT; and (c) in May 2023, the FDA reviewed Outset's website and found marketing materials promoting Tablo for CRRT.

9. Then, on Friday, July 7, 2023, almost four months after Outset and the FDA expressly discussed Tablo's lack of clearance for CRRT, Outset disclosed that it had received a warning letter from the FDA (the "FDA Warning Letter"). Specifically, the Company stated the following and attempted to downplay the issues and their impact:

> The first observation asserts that certain materials reviewed by the FDA and found on the Company's website promote continuous renal replacement therapy (CRRT), a modality outside of the current indications for the Tablo® Hemodialysis System. The Company believes this concern has been effectively addressed through labeling and promotional changes already underway.
>
> The second observation asserts that the TabloCart with Prefiltration (the "TabloCart"), requires prior 510(k) clearance for marketing authorization. TabloCart, an accessory to the Tablo System, launched in the third quarter of 2022 and sales to date have not been material to the Company's financial results. The Company intends to work collaboratively with the FDA to resolve this observation, including potentially submitting a 510(k) on TabloCart.

10. In fact, FDA Warning Letter states that Outset was marketing Tablo off-label for CRRT and was marketing and distributing TabloCart without the requisite FDA clearance. Specifically, as to Tablo, the FDA Warning Letter states that "evidence reviewed at the [January 17, 2023 through February 10, 2023] inspection and marketing materials found on [Outset's] website [www.outsetmedical.com] on May 11, 2023 show promotion of the Tablo

Hemodialysis System for continuous renal replacement therapy (CRRT) treatment," and also states that, "you confirmed that CRRT is distinct from the cleared indications for use" at the March 13, 2023 meeting. As just an example of such off-label marketing, the FDA Warning Letter quotes certain materials from Outset's website. The FDA Warning Letter also highlights the serious health and safety risks that Outset's off-label marketing raised. As to TabloCart, the FDA Warning Letter states that Outset was marketing TabloCart without the requisite clearance or premarket approval.

11. Defendants misrepresented and attempted to downplay the significance of the FDA Warning Letter, including stating that the Tablo off-label marketing issues were limited to a few materials on the Outset website and would have no real impact on the Company. Defendants also announced that Outset would pause distribution of TabloCart while it sought FDA clearance for TabloCart and lowered revenue expectations for full year 2023, but stressed that the reason for the lowered guidance was that customers may defer purchasing Tablo until TabloCart becomes available again and that growth would resume once TabloCart received FDA clearance. Thereafter, on October 12, 2023, Outset lowered its 2023 revenue guidance to $130 million and, on November 7, 2023, the Company announced initial 2024 guidance below consensus expectations, each time attributing the lower guidance to TabloCart not being available.

12. However, in truth, the off-label marketing for CRRT had permeated Outset's marketing and, now that it was uncovered by the FDA, Outset needed to systemically change its marketing practices to fix the illegal marketing. Indeed, internally, as relayed by former employees, after Outset received the FDA Warning Letter, Outset held meetings instructing its sales staff to stop referring to CRRT while marketing Tablo and to purge all prior marketing materials, both hard copy and electronic, that existed prior to the FDA Warning Letter.

13. Thus, while Outset downplayed the import of the violations publicly, it had to significantly change its marketing and no longer instructed its sales staff to market for CRRT, a key element of its marketing strategy, now that the FDA was aware of Outset's off-label marketing for CRRT.

14. On May 6, 2024, Outset received FDA clearance for TabloCart, which Defendants had previously promised would result in increased Tablo sales. Yet, just days later, Outset revealed it could still face a negative impact and reduced demand for Tablo due to the FDA Warning Letter and the pause on TabloCart distribution, even though the pause had ended.

15. Finally, at the end of the Class Period, on August 7, 2024, Outset announced its financial results for the second quarter of 2024, a quarter during which TabloCart was cleared, and (a) significantly missed consensus estimates for the quarter, (b) lowered guidance for fiscal year ("FY") 2024 significantly, and (c) announced an entire sales team and process restructuring. Thus, it was not the lack of availability of TabloCart that impacted sales after the FDA Warning Letter, but Outset's inability to continue to aggressively and unlawfully market Tablo for CRRT.

16. As a result of Defendants' false and misleading statements, Outset shares were artificially inflated during the Class Period, trading as high as $64.00 per share. On August 8, 2024, the day after the Class Period ends, Outset shares closed at $1.07 per share, causing Lead Plaintiff and the Class to suffer substantial losses. To date, Outset's share price has not recovered.

17. Moreover, while the Class lost hundreds of millions of dollars, insiders, including the Individual Defendants, reaped almost $50 million in proceeds on their Class Period trading. In fact, the vast majority – 85% – of the Class Period insider trading was done before Outset disclosed that it received the FDA Warning Letter. Indeed, Trigg alone reaped proceeds of over $30 million during the Class Period, almost all of which was prior to the disclosure of the FDA Warning Letter. Had Defendant Trigg retained the shares she sold during the Class Period, they would have been worth approximately $1 million the day after the Class Period ends and today, far less than the over $30 million she reaped during the Class Period.

## II. JURISDICTION AND VENUE

18. Lead Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

19. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. In connection with the acts,

transactions, conduct, and other wrongs alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of national securities markets.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because many of the acts and practices that give rise to this Complaint, including the preparation and dissemination of materially false and misleading statements, substantially occurred in this District. Additionally, Defendant Outset's principal place of business is located in this District at 3052 Orchard Drive, San Jose, California.

## III. INTRADISTRICT ASSIGNMENT

21. Pursuant to Northern District of California Civil Local Rules 3-2(c) and 3-5(b), assignment to the San Jose Division of this District is proper because a substantial part of the events or omissions that give rise to the claims asserted herein occurred in Santa Clara County, California and Outset's principal place of business is located, in San Jose, California.

## IV. PARTIES

### A. Lead Plaintiff – The Pension Fund Group

22. Established in 1937, Plymouth County Retirement Association is the retirement system for the benefit of employees of cities, towns, districts, and authorities within Plymouth County, Massachusetts. As of January 1, 2024, Plymouth County had assets under management with a market value of over $1.4 billion. As set forth in its Certification previously submitted in support of the motion for lead plaintiff (ECF No. 18-3), Plymouth County purchased Outset's common stock during the Class Period and was damaged as a result.

23. Established in 1958, Sheet Metal Workers' Pension Plan of Southern California, Arizona and Nevada is a union pension fund that provides pension benefits to thousands of sheet metal workers. As of December 31, 2023, SMWPP had assets with a market value of approximately $1.3 billion. As set forth in its Certification previously submitted in support of the motion for lead plaintiff (ECF No. 18-3), SMWPP purchased Outset's common stock during the Class Period and was damaged as a result.

**B. Defendants**

24. Defendant Outset is a medical device company originally founded as HD+ in 2003 and incorporated under the laws of Delaware with its headquarters and principal executive offices in San Jose, California. In 2015, the Company changed its name to Outset Medical. Outset engages in the development and sale of the Tablo Hemodialysis System. Outset's common stock trades on the Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "OM." The Company was taken public at the beginning of the Class Period on September 15, 2020, selling 10.29 million shares of common stock to the public at a price of $27. On April 13, 2021, the Company held a secondary public offering ("SPO"), selling approximately 2.95 million shares of common stock to the public at a price of $53.50 per share.

25. Defendant Leslie L. Trigg ("Defendant Trigg") has served as Outset's Chief Executive Officer ("CEO") at all relevant times and was elected as Chair of Outset's Board of Directors in 2022. Throughout the Class Period, Defendant Trigg made materially false and misleading statements and signed filings with the SEC, including every Form 10-Q, Form 10-K, and Prospectus.

26. Defendant Nabeel Ahmed ("Defendant Ahmed") served as Outset's Chief Financial Officer ("CFO") from August 2021 until June 3, 2025. Defendant Ahmed joined Outset in May 2020 and served as a Vice President and Controller. On July 1, 2021, the Company filed with the SEC a Form 8-K reporting Defendant Ahmed had been appointed as the Company's Interim CFO. In a subsequent Form 8-K filed with the SEC on August 5, 2021, the Company announced Defendant Ahmed had transitioned to the permanent role of CFO, Principal Financial Officer, and Principal Accounting Officer, effective July 30, 2021. From then on, Defendant Ahmed made materially false and misleading statements and signed filings with the SEC, including every Form 10-Q, Form 10-K, and Prospectus from July 30, 2021 through the end of the Class Period.

27. Defendant Rebecca Chambers ("Defendant Chambers") was Outset's CFO at all relevant times until July 16, 2021. In a Form 8-K filed with the SEC on July 1, 2021, the Company announced that Defendant Chambers notified the Company on June 28, 2021, of her decision to

resign from Outset effective July 16, 2021. Until her resignation, Defendant Chambers made materially false and misleading statements and signed filings with the SEC, including every Form 10-Q, Form 10-K, and Prospectus from September 15, 2020 through July 16, 2021.

28. Defendants Trigg, Ahmed, and Chambers are collectively referred to as the "Individual Defendants." The Company and the Individual Defendants are collectively referred to as the "Defendants."

29. The Individual Defendants' wrongdoing during the Class Period alleged herein violated their specific responsibilities and obligations regarding the accuracy of the public reports, releases, and other statements. Accordingly, each of the Individual Defendants is liable, directly and as control persons, for the dissemination of the materially false and misleading statements alleged herein that deceived purchasers of Outset's common stock during the Class Period.

30. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. The Individual Defendants were in possession of and had access to material non-public information and documents. Each was a senior executive officer and/or director of Outset and, thus, controlled the information disseminated to the investing public in the Company's press releases and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

31. In engaging in the wrongdoing alleged herein, including making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Outset, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## V. OVERVIEW OF HEMODIALYSIS AND OUTSET AND ITS PRODUCT OFFERINGS

### A. Hemodialysis Treatment

32. Dialysis is a medical procedure to treat kidney disease and kidney failure that filters the blood when the kidneys are unable to function properly, removing waste, excess fluid,

and minerals from the blood. It acts as a replacement for kidney function, helping to maintain a balance in the body's chemical makeup when kidneys are failing.

33. Hemodialysis, which is what Tablo is used for, is the most common form of dialysis treatment. It is a process by which waste products and excess fluid are directly removed from a patient's blood using an external dialysis machine. Blood from the patient is routed to a dialyzer, also known as an artificial kidney, where toxins are removed by diffusion across the dialyzer's semipermeable membrane into a dialysate solution, usually comprised of purified water and electrolytes, also known as dialysate concentrate. Cleansed blood from the dialyzer is then returned to the patient. The specific type of dialysis treatment utilized for a patient varies depending on the patient's level of acuity and the care setting.

34. There are multiple types of hemodialysis treatments, which differ both in terms of how they operate and the types of patients they treat. CRRT differs from intermittent hemodialysis ("IHD") by utilizing lower dialysate and blood flow rates, typically 1-2 liters per hour ("L/h") and 100-250 milliliters per minute ("mL/min"), respectively, and can run continuously for 24 hours a day or more but can be performed for less than 24 hours. IHD treatments, on the other hand, generally last for approximately 3-4 hours at a time utilizing higher dialysate and blood flow rates, typically 30 L/h and 300-400 mL/min, respectively. There are also "hybrid" treatments, such as prolonged intermittent renal replacement therapy ("PIRRT") and sustained low-efficiency dialysis ("SLEDD" or "SLED"), that operate at flow rates lower than IHD but higher than CRRT and run for longer durations, but not continuously like CRRT. For example, SLEDD treatments generally last 6-12 hours per day and utilize a dialysate flow rate of 6-12 L/h and a blood flow rate of 100-150 mL/min. Different machines are used for the different treatments with a separate machine used for CRRT versus other treatments.

35. The FDA requires dialysis machines marketed for CRRT to be specifically approved or cleared for use for CRRT. Such devices have unique features that enable them to perform the treatment. Two of the most commonly used machines for CRRT are the Baxter International, Inc. ("Baxter") Prismaflex and the Fresenius SE & Co. KGaA ("Fresenius") MultiFiltratePro, both of which are cleared for use for CRRT.

36. CRRT is also the only treatment option for certain patients who are hemodynamically unstable, such as patients with unstable blood pressure, low blood flow, or other circulatory problems, and patients who do not respond to other treatments as higher flow rates can exacerbate patient instability. Thus, CRRT is generally used in acute settings and intensive care units ("ICU").

37. CRRT is expensive, resource-intensive, and complex, whether a healthcare system insources or outsources the treatment. Traditional hemodialysis machines, including those that are expressly cleared for CRRT, generally require a healthcare center to operate a separate water treatment system to produce dialysate for patient use, which can be very expensive. For example, building and maintaining a water treatment room costs approximately $250,000 to build and $25,000 to $50,000 per year to maintain. CRRT is also labor intensive and complex, requiring those administering it to have specific expertise and requiring multiple bags to hold and transport the dialysate fluid. CRRT costs over three times more to perform per day compared with IHD. The cost for CRRT treatment is approximately $900 – $1200 a day compared to approximately $300 for IHD treatment on a traditional machine.

**B. FDA Regulatory Overview**

38. As a manufacturer of dialysis machines, Outset functions in a highly regulated industry and must comply with, *inter alia*, the Federal Food, Drug, and Cosmetic Act (the "FDCA,") 21 U.S.C. § 301 *et seq.*, and the FDA's rules promulgated thereunder, 21 C.F.R. § 800.10, *et seq*. The FDA plays a critical role in protecting public health by ensuring the safety, efficacy, and quality of regulated products. Under the FDCA, to commercially distribute a new medical device or introduce a significantly modified device, a company must obtain approval or clearance from the FDA through one of three main pathways: a premarket authorization ("PMA"), a de novo classification request, or a premarket notification ("510(k) Clearance").

39. The 510(k) Clearance process, which is what Outset used for Tablo and ultimately utilized for TabloCart, is somewhat analogous to the generic drug concept in that it is used to obtain marketing clearance for a device that is substantially equivalent in safety and effectiveness to another lawfully marketed device or to a standard recognized by the FDA when used for the

same intended purpose(s). In order to be eligible for 510(k) Clearance, the new device must exhibit roughly the same safety and effectiveness characteristics as the comparison or "predicate" device. It is not an "approval" process. Rather, because of the nature of the laws underlying this process, a successful submission is deemed to be "cleared" and granted permission to market the new device – but ***only for the cleared indications for use***.

40. Indeed, it is illegal to market, promote, or advertise a medical device for any use other than its FDA-approved or cleared use. 21 U.S.C. § 331(a)-(b). For example, 21 C.F.R. § 801.6 and 21 U.S.C. § 352(a) provide that making any false or misleading statements in the labeling of a device constitutes improper "misbrand[ing]." A device is also considered "misbranded" under 21 U.S.C. § 352(o) if the device is introduced into the marketplace for a particular use for which it has not received either a 510(k) Clearance or a PMA, as required by 21 U.S.C. § 360(k). Any such marketing is considered illegal "off-label" marketing or promotion. Off-label marketing includes any promotional, educational, and training materials, activities or representations for anything beyond the cleared uses. While off-label marketing is illegal, off-label use is not.

41. If the FDA determines that a company has engaged in off-label marketing, it may request that a company modify its training, educational, or promotional materials and activities, or subject the company to regulatory or enforcement actions, including the issuance of warning letters, fines, penalties, injunctions or seizures, including banning the product from the market. A company engaging in off-label promotion may also be subject to other federal, state, or foreign enforcement, including criminal prosecution, which could result in additional significant fines or penalties.

42. Off-label marketing is also associated with increased risk of adverse effects, including death, in patient populations, increased harm to third-party payers like Medicare and Medicaid, and reduced innovation in the marketplace.

**C. The Company and Its Reliance on Tablo, Its Primary Product**

43. Since its founding, Outset has focused solely on developing and marketing Tablo, a hemodialysis machine which is the Company's primary revenue source. Outset first received

510(k) Clearance for Tablo in 2014 for use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility. On April 1, 2020, Tablo was first cleared for home use by the FDA. Significantly, at no point has Tablo received clearance for CRRT. To this day, Tablo is still not cleared for CRRT. Instead, its clearance is limited as follows:

> The Tablo Hemodialysis System is indicated for use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility or in the home. Treatments must be administered under a physician's prescription and observed by a trained individual who is considered competent in the use of the device. Treatment types available include Intermittent Hemodialysis (IHD), Sustained Low Efficiency Dialysis (SLED/ SLEDD), Prolonged Intermittent Renal Replacement Therapy (PIRRT), and Isolated Ultrafiltration.

44. Since the third quarter of 2020, Tablo has offered an optional software upgrade called Tablo XT allowing Tablo to run for up to 24 hours at a lower dialysate flow rate. In the second half of 2023, after the FDA issued its Warning Letter, Outset rebranded the Tablo XT upgrade to Tablo Pro+.

45. Unlike traditional dialysis machines, including CRRT machines, Tablo does not require industrial water treatment rooms, separate water purification machines, or pre-filled bags of dialysate. It produces dialysate "on demand" through its integrated water purification system that purifies water directly from the water source connected to Tablo, typically a simple tap water faucet. Then, the purified water is mixed with the dialysate concentrate contained in a disposable cartridge to produce dialysate specific to a patient's prescription. Because Tablo does not require a separate water purification system or bagged dialysate, it is less expensive, costing on average $100-200 for treatments. However, Tablo is not cleared for CRRT or for use for longer than 24 hours.

46. Importantly, and despite Outset aggressively marketing Tablo for CRRT during the Class Period, Tablo has never been cleared for CRRT, which use must be expressly cleared by the FDA. Indeed, from the start of the Class Period and continuing throughout it, Outset's SEC filings acknowledge that Tablo "is not cleared by the FDA for CRRT."[1]

---

[1] *See, e.g.*, September 16, 2020 Prospectus.

47. The TabloCart with Prefiltration ("TabloCart"), the Company's second device, was released in October 2022 without FDA clearance. TabloCart is a water purification system that is used with the Tablo hemodialysis system to filter and remove carbon, sediment, and minerals from water before it enters Tablo for dialysate production. TabloCart enhanced Tablo's usage in areas that suffer from water quality issues.

48. Despite TabloCart being a medical device that requires premarket FDA clearance, the Company did not seek either a PMA or 510(k) Clearance from the FDA prior to marketing and selling TabloCart. Indeed, TabloCart qualifies as a Class II device requiring FDA clearance as it is a "water purification system for hemodialysis" which is defined as "a device that is intended for use with a hemodialysis system and that is intended to remove organic and inorganic substances and microbial contaminants from water used to dilute dialysate concentrate to form dialysate." 21 C.F.R. § 876.5665.

## VI. DURING THE CLASS PERIOD, OUTSET ENGAGED IN WIDESPREAD AND PERVASISVE OFF-LABEL MARKETING OF TABLO FOR CRRT AND ALSO PROMOTED AND DISTRIBUTED TABLOCART WITHOUT FDA CLEARANCE

49. During the Class Period, Defendants engaged in pervasive off-label marketing of Tablo and promoted and distributed TabloCart without FDA clearance.

50. When Outset conducted its IPO, there was little demand for Tablo in the home market. With a product with a limited market for home use and no FDA clearance for CRRT, Outset devised a scheme to illegally market Tablo for CRRT as a product that could handle all dialysis treatments and replace all dialysis machines. The focus of this scheme was to get health systems to replace their outsourced dialysis contracts and in-house dialysis machines, including CRRT machines, with Tablo. Because Tablo was significantly less expensive to operate, health systems would purportedly achieve significant cost savings. This became known as Outset's "value proposition" marketing strategy to market the Tablo for CRRT and convince health systems to replace all of their dialysis machines, including CRRT machines, and outsourcing with Tablo, despite the fact that Tablo has never been cleared for CRRT. Indeed, Outset's marketing strategy for Tablo relied significantly on marketing the Tablo for CRRT.

51. Outset also marketed and distributed the Tablo attachment device, the TabloCart, despite the fact that Outset had not received, or even sought, the required FDA clearance to do so.

52. Yet, during the Class Period, Defendants, *inter alia*, repeatedly falsely touted that Outset did not engage in off-label promotion when, in fact, it engaged in pervasive off-label promotion of Tablo for CRRT and TabloCart without clearance and repeatedly falsely touted that its financial results were driven by strong demand for Tablo in the acute care market, but failed to disclose that these results were based on illegal off-label marketing of Tablo for CRRT.

**A. The FDA Warning Letter Evidences Outset's Off-Label Marketing**

53. Beginning no later than January 17, 2023 and continuing through February 10, 2023, the FDA conducted an inspection at Outset's facility located in San Jose, California. Thereafter, and unknown to investors, Outset held at least one meeting with the FDA, on March 13, 2023, which included a discussion of Tablo's FDA clearance at which Defendant Trigg "***confirmed that CRRT is distinct from the cleared indications for use, device specifications, and treatment modalities for the Tablo.***" On July 5, 2023, the FDA sent its Warning Letter to Defendant Trigg, asserting that Tablo and TabloCart were misbranded and adulterated.

54. Then, on Friday, July 7, 2023, after the market closed, almost four months after Outset and the FDA had a call during which they discussed Tablo's lack of clearance for CRRT, Outset filed a Form 8-K disclosing that it had received the FDA Warning Letter. Specifically, the Company stated the following and attempted to downplay the issues and their impact:

> The first observation asserts that certain materials reviewed by the FDA and found on the Company's website promote continuous renal replacement therapy (CRRT), a modality outside of the current indications for the Tablo® Hemodialysis System. The Company believes this concern has been effectively addressed through labeling and promotional changes already underway.
>
> The second observation asserts that the TabloCart with Prefiltration (the "TabloCart"), requires prior 510(k) clearance for marketing authorization. TabloCart, an accessory to the Tablo System, launched in the third quarter of 2022 and sales to date have not been material to the Company's financial results. The Company intends to work collaboratively with the FDA to resolve this observation, including potentially submitting a 510(k) on TabloCart.

55. In fact, the FDA Warning Letter, which is addressed to Defendant Trigg, states that "[d]uring an inspection of your firm located at 3052 Orchard Drive in San Jose, CA on ***January 17, 2023 through February 10, 2023***, investigators from the United States Food and Drug Administration (FDA) determined that your firm is ***a medical device manufacturer of the Tablo Hemodialysis System and TabloCart with Prefiltration***." The letter further states that:

> Under section 201(h) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. § 321(h), [both of] ***these products are devices*** because they are instruments, apparatuses, implements, machines, contrivances, implants, in vitro reagents, or other similar or related articles, including any component, part, or accessory, which are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body.

56. Specifically, as to TabloCart, the FDA Warning Letter states that TabloCart was both ***"adulterated" and "misbranded"*** as it was being marketed and distributed without FDA clearance or premarket approval stating that Tablo is a water purification system for hemodialysis under 21 C.F.R. § 876.5665, a Class II medical device subject to premarket notification:

> A water purification system for hemodialysis is a device that is intended for use with a hemodialysis system and that is intended to remove organic and inorganic substances and microbial contaminants from water used to dilute dialysate concentrate to form dialysate. This generic type of device may include a water softener, sediment filter, carbon filter, and water distillation system.
>
> TabloCart with Prefiltration appears to meet this definition because:
> - It is intended to be used with a Hemodialysis System
> - It is intended to remove organic and inorganic substances from water used to dilute dialysate concentrate to form dialysate…
>
> As noted above, ***your firm is marketing this device without clearance or premarket approval.***

57. As to Tablo, the FDA Warning Letter states that Tablo was both ***"misbranded" and "adulterated"*** because "***evidence reviewed at the [January 17, 2023 through February 10, 2023] inspection and marketing materials found on [Outset's] website [www.outsetmedical.com] on May 11, 2023 show promotion of the Tablo Hemodialysis System for continuous renal replacement therapy (CRRT) treatment,***" which is not included in Tablo's indications for use. The letter states that Tablo's clearance is limited to:

> use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility or in the home. Treatments must be administered under a physician's prescription and observed by a trained

> individual who is considered competent in the use of the device. Treatment types available include Intermittent Hemodialysis (IHD), Sustained Low Efficiency Dialysis (SLED/ SLEDD), Prolonged Intermittent Renal Replacement Therapy (PIRRT), and Isolated Ultrafiltration.

58. As an example of such off-label marketing, the FDA Warning Letter discusses certain materials from Outset's website, stating:

> [M]aterials on your website state that two large hospitals converted to a program consisting solely of the Tablo Hemodialysis System and state, 'This major conversion eliminated the need for several types of dialysis machines for different clinical needs, including intermittent hemodialysis (IHD) in the dialysis unit and continuous renal replacement therapy (CRRT) in critical care.'
>
> Other materials on your website state that multiple hospitals who had established CRRT treatment programs 'converted those CRRT programs over to Tablo with Extended Therapy' and states, 'They also replaced their CRRT machines with Tablo with XT...'"

59. The FDA Warning Letter to Defendant Trigg also states that "***you confirmed that CRRT is distinct from the cleared indications for use***, ***device specifications, and treatment modalities for the Tablo,***" citing to both meeting minutes and presentation slides from a ***March 13, 2023*** teleconference between Outset and the FDA and statements in Outset's 510(k) submission for Tablo.

60. In the FDA Warning Letter, the FDA also emphasizes the ***serious health and safety risks*** that Outset's off-label marketing raised:

> Patients who require CRRT are typically hospitalized with acute illness resulting in acute kidney injury and possible severe hemodynamic instability, and the ***devices that provide CRRT treatment have unique features*** to enable continuous treatment (> 24 hours) for this patient population.
>
> ***Systems that cannot safely and reliably perform CRRT raise serious public health concerns when used for CRRT treatment, because failure of dialysis systems performing CRRT may result in fluid and electrolyte imbalances, inadequate ultrafiltration, infection, and patient harm/death***.
>
> This change represents a significant modification outside the scope of the K223248 clearance that ***could significantly affect safety or effectiveness,*** resulting in a new device such that a separate, additional 510(k) premarket notification must be submitted [see 21 CFR 807.81(a)(3)(i)]. ***Thus, the sale of the Tablo Hemodialysis System for CRRT is unlawful.***

### B. Witness Accounts Further Demonstrate Outset's Pervasive Off-Label Marketing

61. The consistent accounts of former Outset employees and Outset customers from various time periods, locations, and roles who are familiar with Outset's marketing of Tablo, confirm that Outset's pervasive off-label marketing throughout the Class Period went far beyond the examples identified in the FDA Warning Letter.

62. **Witness 1**[2] was employed by Outset as a Northeast Area Sales Manager from before the Class Period until Spring 2021 and was responsible for marketing and business development in the New York Metro, Northern New Jersey, and Upstate New York areas.

63. Witness 1 said that Witness 1 and other sales staff members were instructed by Outset to market Tablo for CRRT. Witness 1 attended sales calls and meetings with Outset leadership where the instructions were always to promote and sell Tablo for CRRT. Witness 1 said Jamie Lewis, Senior Vice President Global Sales, and Micheal Aragon, Chief Medical Adviser, led these meetings. Witness 1 further relayed that Outset marketed Tablo as a "Swiss Army Knife" of dialysis that could be used for all applications, including for CRRT. According to Witness 1, neither the FDA nor FDA approval of Tablo was ever discussed on these calls or meetings, and they were just told to market Tablo for CRRT.

64. Witness 1 also discussed Tablo's "value proposition." Witness 1 said it was based on pitching Tablo as being the only equipment on the market that can be used in all dialysis markets and for all dialysis procedures, including CRRT, because CRRT on traditional machines is more expensive and complex to set up than Tablo. CRRT requires different equipment and different skills and/or staff than other dialysis.

65. Witness 1 explained that the infrastructure required to source the water for CRRT on traditional machines is extremely expensive. Healthcare centers usually require a built-in water room with reverse osmosis and filters to purify the water, and these rooms are very expensive to build and maintain.

---

[2] Witness 1 was interviewed by AlphaSense Expert Insights, a subscription-based system, on February 4, 2022, and their interview was published on the AlphaSense platform on February 8, 2022. This account includes information from that interview.

66. Witness 1 further explained that CRRT machines are also extremely complex to set up and require more supplies, including 5-liter bags of dialysis. Nurses have to hang anywhere from eight to 15 of those bags throughout the course of CRRT on traditional machines. Witness 1 noted that it is extremely complex to string the lines on the machine and can take about an hour to accomplish for someone who is skilled at it.

67. Witness 1 relayed that Witness 1 marketed and sold Tablo for CRRT to the New York City Medical Center, the Nassau University Medical Center, and the Brooklyn Veterans Administration Hospital.

68. Witness 1 also stated that Tablo consoles were prone to issues, including unpredictable flow rates.

69. **Witness 2** was employed by Outset as a Key Account Representative Home/Chronic from the beginning of 2022 through the end of the Class Period. Witness 2's territory covered several southern states including Texas, Florida, Alabama, Louisiana, Missouri, and Arkansas.

70. Witness 2 relayed that, prior to contacting customers, Witness 2 received sales and operational training from Outset consisting of two training sessions, one in San Diego, California and another in Columbus, Ohio. The marketing training Witness 2 received was to say that Tablo was okay for CRRT. Witness 2 said that Outset marketed Tablo as an extended care option capable of CRRT.

71. Witness 2 said that, after receiving the FDA Warning Letter, Outset sent out a companywide email and an all-hands call was conducted instructing everyone to stop referring to CRRT while marketing Tablo. Witness 2 was on the all-hands call which was led by several members of Outset's management group, including Jen Buchan Sipe, former Senior Director, Marketing, and Jennifer Schuler, former Senior Director of Product Management. Witness 2 said the instruction from Outset management was to stop using the term CRRT when selling and marketing Tablo. The staff was also instructed to purge all prior marketing materials, both hard copy and electronic, that existed prior to the FDA Warning Letter. Witness 2 does not recall any

instance during the all-hands call when Outset management stated, or even inferred, the FDA Warning Letter was wrong or inaccurate concerning Tablo and CRRT.

72. Witness 2 further relayed that following the all-hands call, Tablo XT, or Extended Therapy, was rebranded as Tablo Pro+.

73. Witness 2 said that Defendant Trigg made misleading statements about revenue and growth.

74. Witness 2 also relayed that Tablo had problems functioning in acute facilities, including problems with patient blood extraction and replacement.

75. **Witness 3** worked at Outset from before the Class Period through the end of the Class Period. Witness 3 worked as a clinical trainer, a role which included training customers and sales, until early 2023. Witness 3 was then in sales as a territory manager in the Dallas-Ft. Worth metroplex, New Mexico, and Arizona areas through the end of the Class Period.

76. Witness 3 said that right around the time Outset received the FDA Warning Letter, a colleague told Witness 3 that Outset was specifically marketing Tablo for CRRT in Florida. Before that, Witness 3 did not know that representing that Tablo could be used for CRRT was wrong. Witness 3 also said that in selling the XT/Extended Therapy upgrade for Tablo, some sales staff referred to it as performing CRRT. Witness 3 said that, before the FDA Warning Letter, Outset was "too aggressive" in marketing for CRRT, which is what led to the FDA Warning Letter.

77. Witness 3 said that it was not until after the FDA Warning Letter that Outset began training personnel on what could not be represented to customers about the Tablo, including about CRRT. Consistent with Witness 2's account, Witness 3 relayed that, shortly after the FDA Warning Letter, a meeting was held in which attendees were told not to use the term CRRT.

78. **Witness 4** has been the President & CEO of a large health care system in New York since 2023 and was previously its Executive Vice President and Chief Business Development Officer and held this position since before the Class Period. Witness 4 relayed that the health care system looked into Tablo as a cost saving measure for dialysis. As part of this exploration, Witness 4 relayed that Outset employees stated that Tablo could be used for CRRT

but it required an upgrade to do so. Witness 4 also relayed that the marketing materials from the Company for Tablo indicated that Tablo could be used for CRRT. Witness 4 said the health system received a proposal for the Tablo units from Outset in 2020 and Witness 4 believes there was language contained in the proposal about upgrading the Tablo for CRRT. Witness 4 stated that no one from Outset ever mentioned that Tablo was not approved by the FDA for CRRT. In fact, Witness 4 believed "100%," based on information received from Outset, that Tablo was FDA approved for CRRT. Witness 4 said Witness 4 had several calls with Michael Aragon, Chief Medical Officer of Outset, about how the system was going to use Tablo and Aragon never said the unit was not FDA approved for CRRT. Witness 4 also had discussions with Defendant Trigg about Tablo, including an in person visit from Defendant Trigg at Witness 4's healthcare system. The system ultimately bought Tablo units to replace other machines, including those that were used for CRRT for ICU patients in the hospital. They disposed of the prior CRRT machines and used Tablo for CRRT exclusively. Since then, the system has experienced issues with the Tablo units breaking down.

79. **Witness 5** a Nurse Manager, critical care unit ("CCU")/ICU with a hospital in New York from prior to the start of the Class Period until early 2024. Witness 5 said that the hospital had eight Tablo machines, six of which were used in medical surgery and two were used in the CCU. Witness 5 said all Tablo units were used for CRRT and that Tablo replaced the traditional CRRT machines. Witness 5 said that the Tablo units were seen as a cost reduction measure.

80. Witness 5 said that Outset personnel provided training to Witness 5 on the operation of the units for CRRT. Witness 5 said the training was described as "Training the Trainers." Outset trained Witness 5 who then was responsible for training other personnel at the hospital.

81. Witness 5 was unaware that Outset had not received FDA clearance for Tablo to be used for CRRT.

82. Witness 5 stated that, when running the Tablo for CRRT, Tablo would stop running, and Witness 5's hospital would need to bring in different dialysis machines to replace Tablo.

83. **Witness 6** was employed at a nationwide healthcare system in Massachusetts from before the Class Period through early 2024. Witness 6 started with the facility as a licensed practical nurse and then from Summer 2022 and thereafter, Witness 6 was the Director of Nursing.

84. Witness 6 said that Witness 6 believed that the facility that Witness 6 worked at was the first location within the system to receive the Tablo. Sometime in 2021 the facility received four Tablo units. These units were a capital purchase made by the healthcare system's headquarters. Outset also sold Tablo units to other locations within the system. Witness 6 recalled Outset technicians and other Outset employees stating that Tablo was capable of CRRT.

85. **Witness 7** was interviewed by TD Cowen[3] analysts, as reflected in an April 25, 2023 TD Cowen report. As stated in the report, Witness 7 worked for a not-for-profit community health system that has a corporate base in Evansville, Indiana. The system serves patients in Illinois, Indiana, and Kentucky, covering approximately 51 counties and comprising 20 hospitals. Witness 7 stated that she transitioned her hospital system from outsourced dialysis to an in-sourced model with Tablo.

86. Witness 7 said that her hospital had been using DaVita, Inc., a nationwide company that provides dialysis services, to outsource dialysis, but when its contract came up for renewal, the cost was going to increase significantly, so the system looked at other options for dialysis, including Outset. During this process, Outset made presentations to her system's board of decision-makers. Thereafter, the system opted to purchase 27 Tablo units, seven of which were dedicated to CRRT.

87. Witness 7 further stated that she "is inclined to increase her use of [Tablo] for the system's other dialysis needs. These potentially include greater utilization in CRRT, where Tablo

[3] "TD Cowen" refers to both TD Cowen and its predecessor firm Cowen, Inc.

has replaced [Baxter's] PrisMax," a traditional CRRT machine. Witness 7 further stated that expanding use for CRRT was to be done either in the fourth quarter of 2023 or the first quarter of 2024.

88. **Witness 8**[4] has been the Chief of Nephrology at South Shore Health since July 2022 and has been a nephrologist in the Greater Boston Area since November 2017. Witness 8, who uses Tablo at some of the hospitals that Witness 8 works in, relayed that Witness 8 believes that Outset was marketing Tablo for CRRT.

89. **Witness 9**[5] is a physician who submitted a complaint regarding Tablo to the FDA in April 2024 stating that problems, such as numerous alarms going off, the need for filter changes, and the machines shutting down, occurred with Tablo when running dialysis treatments longer than eight hours. According to the physician's complaint, prior to the disclosure of the FDA Warning Letter, Outset told their institution that Tablo could be used for CRRT:

> ***Outset medical initially sold tablo hemodialysis devices to our institution with the statement that they could be used for*** intermittent, pirt (prolonged intermittent renal replacement therapy)/sledd (sustained low-efficiency dialysis) ***or crrt (continuous renal replacement therapy).*** We stopped using traditional crrt and replaced with tablo xt for 22 hours under this pretense and based on their statements regarding its successful use in the icu (intensive care unit) setting. When the fda (food and drug administration) warning stating that tablo could not be used for crrt came out, we raised concerns but were told that it is pirt when used for 22 hours.[6]

**C. Outset's Value Proposition Marketing Strategy**

90. During the Class Period, the Company explained its "value proposition" as Tablo costing less than traditional machines and/or outsourcing and the only machine necessary because it could purportedly perform all dialysis treatments. Indeed, Outset promoted Tablo's cost

---

[4] Witness 8 was interviewed by AlphaSense Expert Insights on January 11, 2024, and their interview was published on the AlphaSense platform on July 9, 2024.

[5] MAUDE Adverse Event Report: Outset Medical, Inc. Tablo Hemodialysis System; Dialyzer, High Permeability With or Without Sealed Dialysate System, accessdata.fda.gov, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/detail.cfm?mdrfoi__id=19152767&pc=KDI (last visited Jun 5, 2025).

[6] In fact, however, as discussed above, CRRT has different flow rates and other features that make it different from PIRRT and other forms of dialysis beyond just being able to run for over 24 hours.

savings to hospitals by insourcing dialysis care and the conversion of all dialysis treatments and all dialysis machines to Tablo.

91. For example, from the IPO Offering Documents and thereafter, Outset touted "***Tablo is an all-in-one device***" and emphasized Tablo's "***compelling value proposition***" in the ICU "by ***eliminating the need for multiple dialysis machines***."[7]

92. However, what Defendants failed to disclose to investors, and as discussed herein and consistent with numerous witness accounts and the FDA's findings, this value proposition relied on off-label marketing of Tablo for CRRT. Indeed, Witness 1 relayed that Outset's "value proposition" included marketing for CRRT.

### D. Outset Markets and Distributes TabloCart Without FDA Authorization

93. Beginning in October 2022, Outset marketed and distributed the TabloCart, a water purification system for hemodialysis, without receiving, or even seeking prior to the FDA Warning Letter, FDA clearance for doing so. Defendants did so despite TabloCart being a medical device requiring such clearance. Indeed, Defendants repeatedly touted TabloCart as a "non-medical accessory" despite it clearly fitting the definition of a medical device requiring FDA authorization.

### E. While Defendants Publicly Downplay the Importance of the FDA Warning Letter, Internally, Outset Modifies Its Marketing Practices for Tablo

94. After Outset was forced to disclose the FDA Warning Letter regarding its improper marketing, Defendants attempted to downplay the significance of it, including suggesting that the Tablo marketing issues were limited to a few materials on the Outset website and would have no real impact. For example, in August, 2023, as to the FDA's concern that Outset was promoting Tablo for CRRT, Defendant Trigg stated that the Company removed the materials from its website that the FDA believed promoted CRRT and that the Company's "action plan has addressed this finding and [they] expect no impact with the customers from this remediation." Defendants also advised the market that Outset's FY 2023 results were expected to come in at the

[7] Emphasis in quotations added unless otherwise stated.

low end of guidance but blamed this on the TabloCart pause as Outset sought FDA clearance and that growth would resume once the Company received clearance for TabloCart.

95. However, in truth, the off-label marketing for CRRT had permeated Outset's marketing and, now that the FDA had uncovered it, Outset needed to systemically change its marketing practices to fix the illegal marketing. Indeed, internally, as described above in the accounts of Witnesses 2 and 3, after Outset received the FDA Warning Letter, Outset held an all-hands call, sent out a companywide email, and held a meeting where management instructed everyone to ***stop referring to CRRT while marketing Tablo***. Further, as relayed by Witness 2, the staff was also instructed to ***purge all prior marketing materials***, both hard copy and electronic, that existed prior to the FDA Warning Letter.

96. Moreover, after being forced to disclose that it received the FDA Warning Letter, Outset added the following disclosure to its website and marketing materials: "The Tablo Hemodialysis System is not indicated for continuous renal replacement therapy (CRRT) and is cleared for use for up to 24 hours."

97. Thus, while Outset downplayed the import of the violations publicly, it had to significantly change its marketing and no longer instructed its sales staff to market for CRRT, a key element of its marketing strategy, now that the FDA was focused on this off-label marketing.

98. On May 6, 2024, Outset received clearance for TabloCart. Yet, on August 7, 2024, when it announced its Q2 2024 financial results, a quarter during which TabloCart was cleared for most of the quarter, Outset significantly missed consensus estimates and lowered guidance for FY 2024 substantially. Thus, it was not the lack of availability of TabloCart that impacted sales after the FDA Warning Letter, but Outset's inability to aggressively and unlawfully market Tablo for CRRT, leading Defendants, at the end of the Class Period, to disclose the need for an entire sales team and process restructuring.

## VII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

99. During the Class Period, Defendants issued materially false and misleading statements that deceived the investing public, including: (a) representing that the Company did not engage in off-label promotion when, in fact, it engaged in pervasive off-label promotion of

Tablo for CRRT, for which it was not cleared, and marketed the TabloCart without any FDA clearance (b) touting Tablo's strong revenue, growth, and demand without disclosing that they were based on off-label marketing; (c) touting Tablo's strong "value proposition" and that Tablo could perform all dialysis treatments and was the only device a health system needed, without disclosing that this value proposition was being fueled by off-label marketing of Tablo for CRRT; (d) touting TabloCart without prior 510(k) Clearance as a non-medical accessary; and (e) downplaying and misrepresenting the issues raised by the FDA Warning Letter and their impact on the Company.

### A. Defendants' 2020 Through January 2023 Misrepresentations

100. The Class Period begins on September 15, 2020, when Outset's common stock began trading on the NASDAQ pursuant to the Company's IPO of 10,293,777 shares at the IPO price of $27 per share. In connection with the IPO, the Company filed with the SEC a Registration Statement on Form S-1 on August 21, 2020, Amendment No. 1 to the Registration Statement on Form S-1/A on September 9, 2020, and a Form S-1MEF on September 14, 2020 (together, the "IPO Registration Statement"). On September 16, 2020, the Company filed a Prospectus on Form 424B4 (the "IPO Prospectus") (together, the IPO Registration Statement and IPO Prospectus are the "IPO Offering Documents"). Defendants Trigg and Chambers signed the IPO Offering Documents.

101. On September 15, 2020, the day of its IPO, Outset's share price rose $33.68, or 124.7%, to close at $60.68 per share.

102. In the IPO Offering Documents and throughout the Class Period, the Company represented that it did not engage in off-label marketing, stating that "[a]lthough ***our policy is to refrain from statements that could be considered off-label promotion of Tablo,*** the FDA or another regulatory agency could disagree and conclude that we have engaged in off-label promotion." This statement was repeated throughout the Class Period in the following documents: the Q3 2020 Form 10-Q, the FY 2020 Form 10-K, the SPO Offering Documents, the FY 2021 Form 10-K, the FY 2022 Form 10-K, and the FY 2023 Form 10-K.

103. In the IPO Offering Documents and throughout the Class Period, the Company touted "that "***Tablo is an all-in-one device***" and emphasized Tablo's "compelling value proposition" in the ICU "by ***eliminating the need for multiple dialysis machines***," a that "Tablo's clinical flexibility enables providers to standardize to ***a single platform across all care settings***" and that:

> We designed Tablo from the ground up to be ***a single enterprise solution that can be utilized across the continuum of care, allowing dialysis to be delivered anytime, anywhere and by anyone.***
>
> ***
>
> Unlike existing hemodialysis machines, which have limited clinical versatility across care settings and are generally burdened by specialized and expensive infrastructure, ***Tablo is a single enterprise dialysis solution that can be seamlessly utilized across different care settings and for multiple clinical needs.***
>
> ***
>
> Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and ***allows providers to standardize to a single technology platform from the hospital to the home***.

104. The Company repeated these statements throughout the Class Period. One or more of these statements appeared in the SPO Offering Documents and every Form 10-Q, Form 10-K, and press release throughout the Class Period.

105. The statements had their desired effect. For example, in an October 11, 2020 note, investment firm Goldman Sachs initiated coverage with a "buy" rating and highlighted Defendants representations about Tablo's ability to allow hospitals to "standardiz[e] to one dialysis system."

106. On November 11, 2020, the Company issued a press release announcing third quarter results and stating that it had "[r]ecorded net revenue of $13.8 million in the third quarter of 2020, a 423% increase compared to $2.6 million in the third quarter of 2019." In touting these results, the press release quoted Defendant Trigg stating, "[o]ur commercial momentum continued to accelerate in the third quarter as we signed new contracts with some of the largest

national and regional health systems in the country," yet failed to disclose the results were driven by the off-label marketing scheme.

107. Later the same day, the Company held an earnings call to discuss its third quarter 2020 results. Defendant Trigg touted the Q3 2020 results, stating "our traction in the acute market continues to grow and we are really pleased with the pace and the scale of commercial adoption. New contracts with national and regional health systems in addition to expansion within our existing customer base drove our strong Q3 results." Defendant Trigg similarly stated, "[o]ur revenue achievement exceeded our initial expectations for the quarter as Tablo adoption continues to accelerate within the acute market."

108. During the call, Defendant Trigg emphasized Tablo's ability to provide ***all dialysis treatments*** in the hospital setting, stating that Tablo "was designed as ***a complete enterprise solution*** to enable dialysis to be done by anyone, anytime, anywhere" and "Tablo uniquely enables the management of dialysis across ***the entire care continuum from the hospital to the home with a single device platform***, which has never been done before."

109. As part of the earnings call, Outset presented a slide deck in which it displayed a graphic exhibiting various dialysis machines being replaced by Tablo and claiming "Tablo is an enterprise solution that delivers easier, lower-cost dialysis." ***One of the machines shown being replaced by Tablo was the Baxter Prismaflex, a device that is only indicated for CRRT***:



110. The Company used the same slide and image during a March 2021 investor presentation, an April 2021 investor presentation, a May 5, 2021 earnings call, a August 6, 2021 earnings call, and a November 2021 investor presentation.

111. Analysts and the market again relied on these representations. On November 11, 2020, in a note to investors, SVB Leerink started coverage of Outset at an "outperform" rating and highlighted Outset's "unique value proposition." In a November 11, 2020 report, Goldman Sachs discussed the "positive" quarter and Outset's "accelerating momentum" in the acute market. The firm maintained its "buy" rating.

112. On November 12, 2020, the Company filed with the SEC its Form 10-Q for the third quarter ("Q3 2020 Form 10-Q") signed by Defendants Trigg and Chambers confirming the financial results reported in its November 11, 2020 press release.

113. On November 12, 2020, Outset presented at the Morgan Stanley Life After COVID Thematic Conference, where Defendant Trigg claimed that Tablo could be the only hemodialysis machine in a hospital despite not being cleared for CRRT. She touted Tablo as enabling hospitals to "***down select to one machine Tablo,*** because Tablo is so mobile and also Tablo does not require any infrastructure to use it." She touted Tablo as an "***Enterprise Solution, Value Proposition*** … ***we uniquely offer health systems, one device platform across the spectrum of care***. So that's what we do uniquely well."

114. Defendant Trigg made similar claims during the November 19, 2020 Stifel Virtual Healthcare Conference:

> And so that intrigued us, and to us created an opportunity or a question. Could we design ***one machine that could really do it all? Could you allow health systems to down select [ph] just to one device platform that would deliver all of this functionality***, whether that treatment was being done in the hospital or the ICU? Why would you want to manage a bunch of different things, all of which do one narrow slice of what a health system has to deliver, which is enterprise-wide dialysis?
>
> ***
>
> So we set out to deliver an ***enterprise-wide solution***, and that's the device we call Tablo. Our mantra is anywhere, anytime, anyone. This should be and is a device that could be used anywhere.

115. On March 9, 2021, the Company issued a press release announcing fourth quarter and full-year results and stating that it had "[r]ecorded net revenue of $17.2 million in the fourth quarter and $49.9 million for the full year of 2020, representing 143% and 231% increases respectively, over the corresponding periods of 2019." In the press release, Defendant Trigg emphasized the Company's growth without disclosing that the growth was attributable to a marketing strategy dependent on off-label promotion of Tablo stating, "[i]n the fourth quarter our team continued to outperform while building a solid foundation for growth through 2021 and beyond."

116. On the same day, the Company held an earnings call to discuss the quarter's results and again emphasized the large year-over-year revenue growth due, in part, to higher Tablo sales, but failed to disclose that those higher sales were driven by the off-label promotion of Tablo. Defendant Chambers touted Outset's quarterly results and the Company's growth drivers, including the launch of Tablo XT, without disclosing their reliance on off-label marketing:

> [F]ourth quarter revenue grew 143% year-over-year to $17.2 million, driven by the impact of our HHS lease agreement, higher console shipments, ***the launch of our Tablo XT products*** and continued growth in consumables and services tied to our larger installed base. Our full-year revenue equaled $49.9 million, an increase of 231% over the prior-year period.
>
> ***
>
> Console revenue grew 96% year-over-year to $10.6 million, driven by an increase in Console shipments, higher HHS leasing revenue and recognition of XT upgrade revenue.

117. Defendant Trigg also highlighted specifically Outset's performance in the acute care space: "[d]uring the fourth quarter, ***we continued to build commercial momentum, particularly within the acute market, with total revenue exceeding our expectations***" without disclosing that that growth was driven by off-label marketing.

118. Defendant Trigg also maintained that Tablo could serve all of a health system's dialysis needs:

> But the common denominator is ***the interest in an enterprise solution***. That's the driver here. And so it starts with the economic efficiencies, the operational efficiencies of a ***health system being able to down select to one device***, managing that patient from the acute setting all the way to the home. Whereas today, when they deliver dialysis across their enterprise it's requiring them to buy and maintain

a number of different machines which obviously is more cumbersome and more costly.

119. Defendant Chambers added that the Company was "***really excited about the acute market and the value proposition of Tablo*** and the success we have had and the success we continue to plan to have."

120. Analysts and the market continued to positively react to these representations. On March 10, 2021, the next trading day, Outset's stock price rose $4.37, or 9.02%, to close at $52.81.

121. Further, in a March 10, 2021 note to investors, SVB Leerink reiterated its "outperform" rating and stated "OM's Tablo Hemodialysis System is ***a game-changer from a technology perspective, with a unique value proposition to both healthcare providers and patients***." Similarly, in a March 10, 2021 report, Goldman Sachs was "encourage[ed]" by Outset's transactions with health systems opting for a "whole house conversion" to Tablo.

122. On March 22, 2021, Outset filed its Form 10-K for FY 2020 ("FY 2020 Form 10-K") signed by Defendants Trigg and Chambers confirming the financial results reported in its March 9, 2021 press release.

123. In April 2021, in connection with Outset's SPO, the Company filed with the SEC a Registration Statement on Form S-1 on April 6, 2021, and a Form S-1MEF on April 8, 2021 (together the "SPO Registration Statement"). On April 12, 2021, the Company filed a Prospectus on Form 424B4 (the "SPO Prospectus") (together, the SPO Registration Statement and SPO Prospectus are the "SPO Offering Documents"). Defendants Trigg and Chambers signed the SPO Offering Documents.

124. On May 5, 2021, the Company issued a press release announcing first quarter results and stating, "[r]ecorded net revenue of $22.9 million in the first quarter of 2021, a 219% increase compared to $7.2 million in the first quarter of 2020." Outset again touted its strong revenue performance and growth without disclosing its off-label promotion of Tablo. Defendant Trigg stated, "[o]ur first quarter was marked by strong revenue performance, continued operational execution, and substantial progress across our strategic initiatives, … ***With strong interest in Tablo, a robust backlog and clear visibility on the timing of console placements, we are confident in our positioning for consistent strong performance in 2021 and beyond***."

125. On the same day, Outset held an earnings call to discuss its first quarter 2021 results. Defendant Chambers discussed the Company's staggering yearly revenue growth: "[c]onsole revenue equaled $14.8 million or 194% year-over-year growth, ***driven by higher placement to our acute customers as well as the recognition of XT upgrade revenue***." Again, the Company failed to discuss its off-label promotion of Tablo for CRRT drove the "higher placement" with acute care clients.

126. Defendant Trigg further noted that the installed base in both the acute and sub-acute markets show that Tablo's "***value proposition is resonating quickly following console deployment.***" Defendant Trigg also touted Tablo's ability to be a single enterprise solution:

> the way that we design Tablo and ***our design goal from a technology standpoint from the beginning, really was the notion of an enterprise solution that health systems would no longer need to buy and maintain two, three, four different types of machines***, each of which did only one type of dialysis. And so the design vision was, 'Hey, ***could we build a single hardware platform that really could perform the functionality of all these machines for all types of acuity patients***.'
>
> And so in delivering on that promise – that design promise, ***we're able to approach a health system – a given health system and talk to them about down selecting now to Tablo for use anywhere from the ICU to home. So that's kind of part one and the idea behind the enterprise solution.***

127. On May 6, 2021, the Company filed with the SEC its Form 10-Q for the first quarter ("Q1 2021 Form 10-Q") signed by Defendants Trigg and Chambers confirming the financial results reported in its May 5, 2021 press release.

128. On May 11, 2021, the Company presented at the Bank of America Securities Virtual Health Care Conference. Defendant Trigg falsely touted Tablo's ability to serve the entire acute market, ignoring its lack of FDA clearance for CRRT: "[t]he engineering team here has been busy and worked hard to actually add incremental features that enables ***Tablo's use really across any and all patient populations served anywhere in the hospital***, again, bedside dialysis maybe with short treatments all the way to long treatments in the ICU. So we ***don't see any limit to our ability to penetrate that full $2.2 billion acute market here in the U.S***."

129. Defendant Trigg made the same claims at the June 9, 2021 Goldman Sachs 42nd Annual Global Healthcare Virtual Conference:

> ***a single device hardware platform that can deliver dialysis anywhere anytime and virtually by anyone***… And so, our technology vision really became one of a classic technology rollout. ***Could we design a single hardware platform that could perform the functionalities of all of those different types of dialysis machines plus could we also integrate a thousand square foot water treatment room in a box and that's exactly what we did***.

130. On August 5, 2021, the Company issued a press release announcing second quarter results and stating it "[r]ecorded net revenue of $25.2 million in the second quarter of 2021, a 115% increase compared to $11.7 million in the second quarter of 2020." In the press release, Defendant Trigg stated:

> [i]n the first half of 2021***, we delivered best-in-class revenue growth and steady gross margin improvement driven by a team that is dedicated to, and united around, transforming the dialysis experience for patients and providers***, … With new home console bookings up substantially in the second quarter, and both current and new customers purchasing Tablo for acute use, ***our integrated commercial strategy is working as expected***. We remain confident in our ability to execute on each of our key strategic initiatives for 2021 and in our long-term growth prospects."

131. On the same day, the Company held an earnings call to review these results during which Defendant Trigg emphasized Tablo's "value proposition" to health systems and touted it as "an enterprise solution that reduces the cost and complexity of dialysis and helps hospitals expand their margin. . . . And that's the ***value proposition*** that we saw up through 2020, both the highs and the lows of the pandemic, to be just as resonant with health system executives."

132. Defendant Trigg again discussed the Company's "strong revenue growth and substantial progress in achieving our top strategic initiatives for 2021" and attributed the growth, in part, to "***expansion within the acute setting***."

133. Defendant Ahmed, Outset's new CFO, stated that the Company's "second quarter revenue grew 115% year-over-year to $25.2 million, ***driven primarily by increased console shipments to acute customers***, higher consumable shipments, our HHS lease agreements, and increased services to support our growing installed base." The Individual Defendants' comments came without disclosing these growth figures were driven by Outset's off-label promotion of Tablo.

134. On August 6, 2021, the Company filed with the SEC its Form 10-Q for the second quarter ("Q2 2021 Form 10-Q") signed by Defendants Trigg and Ahmed confirming the financial results reported in its August 5, 2021 press release.

135. The Company's false and misleading statements influenced analysts to maintain their positive coverage. On August 18, 2021, TD Cowen also maintained an "outperform" rating on the Company citing Tablo's ability to function as a "***single dialysis solution for every care setting***."

136. Outset continued touting Tablo for its ability to handle all dialysis treatments in the acute care setting and lower costs at the September 13, 2021 19th Annual Morgan Stanely Healthcare Conference. There, Defendant Trigg discussed results of a data analysis in touting that Tablo could perform ***100% of all dialysis treatments***:

> ***We specifically designed Tablo, as we say, kind of like as an enterprise solution where we can – that same device platform can be used for dialysis on the floor or in the ICU.***
>
> About 85% of the treatments performed in the acute setting are actually kind of run-of-the-mill regular dialysis 3 or 4 hour treatments done bedside at the floor, we can do those. The 15% are much sicker patients, much more complicated patients in the ICU, running longer, slower dialysis up to 24 hours, Tablo also can serve those patients. ***And so we have the ability to capture 100% of all the treatment volume*** that any given hospital across the country is doing on an annual basis. And so that's what leads to such a big opportunity specific to Outset and our technology.

137. Defendant Trigg made clear the significance of Tablo as the "***only device*** on the market or coming that can treat from 0 to 24 hours. ***You absolutely need that to be an enterprise solution in the hospital***."

138. On November 3, 2021, the Company issued a press release announcing third quarter financial results and stating, "[r]ecorded net revenue of $26.3 million in the third quarter of 2021, a 91.3% increase compared to $13.8 million in the third quarter of 2020." In the press release, Defendant Trigg stated, "***[o]ur strong third quarter performance further reinforces our confidence in our business and in our expectations for growth.***"

139. The Company held an earnings call on the same day to discuss the quarter's results. Defendant Trigg touted that much of the Company's revenue growth was due to acute care

customers, stating that "top line growth continues to be driven by our commercial success in the acute market."

140. Defendant Trigg also praised the "***continued strength in our XT attachment rate in the third quarter.***"

141. Defendant Ahmed, further commented that:

> ***[R]evenue grew 91.3% year-over-year in the third quarter to $26.3 million, driven primarily by increased console shipments to acute customers***, higher consumable shipments, ***the impact of XT upgrades***, increased services to support our growing installed base and our HHS lease agreements.
>
> ***
>
> "[c]onsole revenue grew by 71% year-over-year to $15.4 million driven by higher console placements and increased [average selling price] ***given the availability of and demand for Tablo XT***."

142. On November 4, 2021, the Company filed with the SEC its Form 10-Q for the third quarter ("Q3 2021 Form 10-Q") signed by Defendants Trigg and Ahmed confirming the financial results reported in its November 3, 2021 press release.

143. On November 8, 2021, Outset issued its inaugural Environmental, Social, and Governance ("ESG") report to discuss the Company's "ESG-related programs, priorities, goals, and performance" ("2021 ESG Report"). The 2021 ESG Report discussed the regulatory framework with which Outset must comply and claimed the Company was in compliance. The Company's 2021 ESG Report stated:

> Outset has adopted a promotional material procedure to define acceptable and unacceptable advertising, sales support, training, and other promotional practices for Outset medical devices in the United States. Included in this procedure is Outset's policy that ***all claims with respect to Outset products must be consistent with approved labeling, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence (i.e., instructions-for-use, verification and validation testing, clinical study report, or any other report requiring a similar rigorous process of review and approval). In addition, without exception, promotional material may be neither false nor misleading (either in terms of a specific product claim or the overall net impression conveyed by the promotional material) and must comply with all specific conditions of approval for the product being promoted. Furthermore, promotional materials for a cleared or approved product may not promote, discuss, or refer to uncleared, unapproved, or off-label use***.

144. On February 16, 2022, the Company issued a press release reporting fourth quarter results and stating, "[r]ecorded net revenue of $28.2 million in the fourth quarter of 2021, a 63.2% increase compared to $17.2 million in the fourth quarter of 2020, and $102.6 million for the full year of 2021, representing an increase of 105.5% compared to $49.9 million for 2020." In the press release, Defendant Trigg stated:

> ***[o]ur entire team contributed to an exceptional 2021, driving record revenue growth, meaningful progress toward our long-term gross margin goal and excellent visibility into 2022… Our established relationships with 7 of the 8 largest national health systems and one-third of the largest 100 regional health systems puts us in a strong position for growth this year in both the acute and home settings***.

145. The Company held an earning call with analysts the same day during which Defendants Trigg and Ahmed tied the Company's past and future revenue growth to its acute care business, which was influenced by Outset's off-label promotion of Tablo. Defendant Trigg discussed Outset's continued ability for growth stating, "[a]s we look to 2022, ***we have clarity and conviction around the growth drivers that will continue to distinguish Outset Medical, namely, expanding our acute care business from the beachhead we established last year***."

146. Defendant Trigg specifically noted Tablo XT's impact on the Company's growth that quarter noting the "strong XT attachment rate."

147. Defendant Ahmed touted the purported reasons for Outset's results:

> Our fourth quarter revenue grew 63% year-over-year to $28.2 million, driven primarily by increased console shipments to acute customers, higher consumable shipments, increased services to support our growing installed base ***and the impact of XT upgrades.***"
>
> ***
>
> Console revenue grew by 70% year-over-year to $18.l million, driven by higher console placements and increased ASP given the availability of and demand for Tablo XT. Similar to prior quarters, we continue to see better uptake of our XT upgrade than we had initially projected.

148. On February 17, 2022, the next trading day, Outset's stock price rose $4.72, or 13.79%, to close at $38.94.

149. On February 18, 2022, during market hours, the Company presented at the 11th Annual SVB Leerink Global Healthcare Conference during which Defendant Trigg touted again that Tablo could replace all dialysis machines in a health system:

> . . . I think what's really, really different about the way we're approaching the acute market is that ***we are going after the whole thing***. Companies that have talked about acute dialysis in the past, their devices can only be used in the ICU. ***They can only be used for these longer treatments called SLED or CRRT, or they have a device that can only be used for short treatments***.
>
> ***
>
> . . . Tablo is the only device available that can treat across the entire spectrum, sort of from zero to 24 hours. And therefore, we can go after all of the different types of treatments that are delivered in a hospital.
>
> ***
>
> . . . [the hospital] start[s] offering dialysis, those longer treatments, and they didn't before because the device is so easy . . .With a simpler device, now they're doing dialysis in the ICU for longer -- treating more critical patient. . . decide to do what we would call ***whole house conversion*** . . . over time, when they're more comfortable with it, confident and everybody's trained, ***they'll go to a whole house conversion where they're only using the Tablo machines to deliver treatment.*** And that could be another reason why utilization grows.

150. That day, Outset's stock price rose $2.27, or 5.83%, to close at $41.21.

151. On February 23, 2022, after the market closed, the Company filed with the SEC its Form 10-K for FY 2021 ("FY 2021 Form 10-K") signed by Defendants Trigg and Ahmed confirming the financial results reported in its February 16, 2022 press release.

///

///

///

152. In the FY 2021 Form 10-K, Outset included a graphic indicating that the Tablo could replace three "traditional hemodialysis machines," one of which was the Fresenius MultiFiltrate Pro, a dialysis machine indicated for only CRRT.



153. On February 24, 2022, the next trading day, Outset's stock price rose $3.99, or 10.13%, to close at $43.39.

154. During a March 8, 2022 TD Cowen Healthcare Conference, the Company touted that Tablo could replace all acute care dialysis machines and thus reduce health system costs. Defendant Trigg emphasized "***the core value proposition of Tablo that I think continues to fuel and did fuel the backlog coming into 2022 and continues to fuel our pipeline***."

155. On May 4, 2022, the Company issued a press release reporting first quarter results and stating, "[r]ecorded net revenue of $30.6 million in the first quarter of 2022, a 33.3% increase compared to $22.9 million in the first quarter of 2021 and an 8.5% increase compared to $28.2 million in the fourth quarter of 2021." In the press release, Defendant Trigg stated:

> [t]he first quarter of 2022 was marked by strong revenue growth and gross margin expansion, ***which resulted from the momentum we see among both acute care customers*** and providers expanding access to Tablo at Home . . . As interest for Tablo accelerates across all market segments, we continued to expand gross margins, invest in innovation, and deliver consistent and predictable financial and operational results, increasing our confidence for sustained strong performance through 2022 and beyond.

156. Outset held an earnings call the same day to further discuss the quarter's results, during which Defendant Ahmed lauded the results:

> ***Our first quarter revenue grew 33% year-over-year to $30.6 million, driven primarily by higher consumable shipments, increased console shipments to acute and home customers,*** and increased services to support our growing installed base.
>
> Product revenue grew 41% year-over-year to $25.7 million.
>
> We continue to see better uptake of our XT upgraded than we had initially projected, ***which highlights Tablo's clinical versatility and the clinical communities recognition of Tablo's ability that capably treat the very sickest population of patients in the ICU***."

157. Defendant Trigg also stated that:

> ***the strength that we saw in the quarter leading to strong performance on the top-line revenue side, really came again from the core Tablo value proposition in the acute*** around significant cost reduction. Those supplies cost reduction, labor cost reduction and operating efficiencies for the hospital customers that are choosing to adopt it.

158. On May 5, 2022, the Company filed with the SEC its Form 10-Q for the first quarter ("Q1 2022 Form 10-Q") signed by Defendants Trigg and Ahmed confirming the financial results reported in its May 4, 2022 press release.

159. Analysts maintained their bullish outlook on the Company and Outset's representations, including Tablo's "value proposition." In a May 5, 2022 report, TD Cowen analysts remarked on the Company's "strong momentum in the Acute market," due to Tablo's "clinical and economic value proposition" and maintained an "outperform" rating on the Company.

160. On May 24, 2022, Outset presented at the UBS Global Healthcare Conference. Defendant Ahmed touted Tablo's ability to be the only dialysis machine a hospital would need:

> in the acute setting, today, pre-Tablo, a hospital may need multiple dialysis devices to do ICU training or floor training, meaning bedside training rather or treatment rather. ***And with Tablo, you can have one device that will do dialysis in the ICU. It will do dialysis at the bed side. It will do dialysis sort of everywhere you need.***

161. On August 1, 2022, the Company issued a press release reporting "[r]evenue for the second quarter totaled $25.1 million, in line with guidance provided on June 13, 2022." In

the press release, Defendant Trigg praised that the Company's off-label marketing of Tablo as having the desired effect: "[a]s we look to the second half of the year, we see no change in ***underlying demand for Tablo***."

162. On August 2, 2022, the Company filed with the SEC its Form 10-Q for the second quarter ("Q2 2022 Form 10-Q") signed by Defendants Trigg and Ahmed confirming the financial results reported in its August 1, 2022 press release.

163. On November 8, 2022, after the market closed, the Company issued a press release reporting third quarter financial results and stating:

> Recorded net revenue of $27.8 million in the third quarter of 2022, a 5.5% increase compared to $26.3 million in the third quarter of 2021 and a 10.8% increase compared to $25.1 million in the second quarter of 2022

164. In the press release, Defendant Trigg attributed these results to strong demand in the acute market, stating that:

> third quarter results reflect ***the value Tablo is delivering in both the acute and home settings, with console shipments exceeding our initial expectations***… we believe our continued expansion in the acute setting and our strong start to rebuilding the home patient pipeline ***reflects patient preference for Tablo and strong demand across end markets.***

165. During an earnings call the same day regarding the Company's third quarter 2022 financial results, Defendant Trigg again discussed the Company's growth, attributing it, in part, to the acute care business. She stated:

> In summary, our strong ***Q3 was driven by significant expansion in the acute setting*** and a home pipeline that is rebuilding ahead of expectations. It is clear to us that Tablo remains a highly differentiated solution in one of the largest, most expensive recession-proof areas of healthcare.
>
> ***
>
> In summary, ***we had a strong Q3 that demonstrated Tablo's value proposition*** in our large acute and home end markets and we have a high degree of confidence in our team's ability to execute as we round out 2022 and set ourselves up for 2023, to continue to deliver on our promise to dialysis patients and providers

166. During the call, Defendant Ahmed touted Tablo XT's strong uptake, stating that "[w]e saw console ASPs increase again year-over-year, driven primarily by the demand for Tablo XT which continues to exceed our initial projections."

167. During the call, Defendant Trigg also announced the release of the TabloCart to Outset's line of products, ignoring its lack of FDA clearance, stating:

> To that end, we are pleased to introduce ***TabloCart, which is a new accessory for Tablo***. TabloCart provides additional maneuverability around the hospital and incremental pre-filtration capabilities for sites that suffer from water quality that is far worse than the national drinking water standards. TabloCart will be sold separately at an expected margin accretive ASP. We closed Q3 exceeding our internal projections for TabloCart orders indicating strong early demand for this innovative accessory.

168. On November 9, 2022, the Company filed with the SEC its Form 10-Q for the third quarter ("Q3 2022 Form 10-Q") signed by Defendants Trigg and Ahmed confirming the previously reported financial results in Outset's November 8, 2022 press release.

169. On the same day, Outset's stock price rose $3.43, or 29.90%, to close at $14.90.

170. On November 15, 2022, the Company presented at the Stifel Healthcare Conference. There, Defendant Ahmed claimed that Tablo's "v***alue proposition remain[ed] strong***, and we have a lot of confidence in our ability to grow as we move forward in time."

171. On November 17, 2022, the Company presented at the Jefferies LLC London Healthcare Conference. Defendant Ahmed repeated the Company's typical – yet, false – refrain that Tablo could serve every patient in the acute care setting. "***On the clinical and operational benefits, Tablo is one device that can do dialysis from the ICU to the bedside. Where today a hospital may have multiple devices, a couple in the ICU, a different one at the bedside, and potentially different devices to do long treatment***."

172. On January 9, 2023, the Company issued a press release announcing preliminary financial results for fourth quarter and fiscal year ended December 31, 2022, as well as guidance for fiscal 2023, stating in relevant part:

- Revenue in the fourth quarter is expected to be approximately $31.5 million, a 13% increase compared to $27.8 million in the third quarter of 2022
- Revenue for 2022 is expected to be approximately $115 million, a 12% increase compared to $102.6 million in 2021

173. The press release quoted Defendant Trigg as stating that the prior year was "an important year for Outset," and touted revenue growth noting the Company "***significantly increased the number of Tablo consoles in hospitals and homes.***"

174. On January 11, 2023, the Company presented at the J.P. Morgan 41st Annual Healthcare Conference. Defendant Trigg again claimed that Tablo could treat any patient in the acute care setting:

> It is the first single hardware platform, same device, whether you're using it in the ICU or whether you're using it in the home, that's never been done before.
>
> ***
>
> That really enabled the healthcare provider to, again down select operational efficiency, ***down select to 1 device that their nurses and their clinicians can use in the ICU*** that, folks can use in the subacute space and that consumers can use in the home . . . It is an opportunity for 1 device across multiple markets.

175. During the conference, Outset presented a slide touting Tablo as "an all-in-one solution that replaces multiple machines and a water treatment room with a single device" and ***displayed a graphic with Tablo superimposed over a variety of dialysis machines that it would replace including the Baxter Prismaflex, which is only indicated for CRRT***.




176. The Company used the same slide and image during the FY 2022 earnings call, the Q1 2023 earnings call, Q2 2023 earnings call, the October 12, 2023 earnings call, the November 7, 2023 earnings call, January 8, 2024 42nd Annual J.P. Morgan Healthcare Conference, and the February 21, 2024 earnings call.

### B. Defendants' 2020 Through January 2023 Statements Were False and Misleading When Made

177. The statements above in ¶¶ 102 and 143, that the Company did not engage in off-label promotion were materially false and misleading when made because the Company did, in fact, engage in pervasive off-label marketing, including expressly directing its sales force to market Tablo for CRRT, which resulted in widespread marketing of Tablo for CRRT, for which Tablo is not cleared, and marketing TabloCart without FDA clearance. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on sales of Tablo. Therefore, its marketing and legal compliance regarding the product are of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, further demonstrates the materiality of the statements.

178. The statements above in ¶¶ 106-107, 115-117, 119, 124-126, 130-133, 138-141, 144-147, 155-157, 161, 163-166, and 172-173, where defendants touted their Tablo revenue and the strong demand and growth for Tablo were materially false and misleading when made because they failed to disclose that the results and strong demand and growth for Tablo were dependent on the Company's undisclosed pervasive off-label promotion of Tablo for CRRT. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on sales of Tablo. In addition, sales to acute care facilities – where CRRT is performed – made up the vast majority of Outset's sales of Tablo. As such, the source of its revenue, growth, and demand are of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, further demonstrates the materiality of the statements.

179. The statements above in ¶¶ 103-104, 108-110, 113-114, 118-119, 126, 128-131, 136-137, 149, 152, 154, 156-157, 160, 165, 170-171, and 174-176, touting, *e.g.*, Tablo's strong "value proposition" and that Tablo could perform all dialysis treatments and was the only device a health system would need were materially false and misleading when made because they failed to disclose that this value proposition was being fueled by off-label marketing of Tablo for CRRT. These statements are material because Tablo was Outset's primary product and source of revenue,

and, thus, the Company is heavily dependent on Tablo. Therefore, these statements are of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, below, further demonstrates the materiality of the statements.

180. The statements above in ¶ 167, touting the launch of TabloCart and that it just an accessory were materially false and misleading when made because TabloCart is a medical device that required prior FDA approval or clearance, and Outset never sought FDA clearance prior to unlawfully marketing and distributing TabloCart. These statements are material because TabloCart was important in promoting and selling Tablo in areas that suffered from poor water quality and such marketing also exposed the Company to regulatory action. As such, these statements are of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, below, further demonstrates the materiality of the statements.

181. The truth that Outset was engaged in widespread and pervasive off-label promotion is evidenced by the following former Outset employee accounts:

a. Statements from Witnesses 1, 2, and 3 that Outset sales personnel marketed Tablo for CRRT;

b. Witness 1's statement that Outset's "value proposition" marketing strategy included marketing Tablo for CRRT;

c. Statements from Witnesses 1 and 2 that Outset management directed and instructed the sales staff to market Tablo for CRRT, including at sales training sessions and calls and meetings;

d. Statements from Witness 3 that Outset was overly aggressive in its marketing for CRRT, that they were told Outset was marketing Tablo for CRRT in Florida, and that in selling the XT/Extended Therapy upgrade for Tablo, sales staff referred to it as performing CRRT.

e. Statements from Witnesses 2 and 3 that at an all-hands call, a meeting, and in a companywide email after the FDA issued the FDA Warning Letter, Outset instructed sales personnel to stop using the term CRRT; and

f. Statements from Witness 2 that at the all-hands meeting, Outset management instructed employees to purge any marketing materials that existed prior to the FDA Warning Letter.

182. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the following Outset customer accounts:

a. Witness 4's account that the marketing materials received for Tablo included references to CRRT and the proposal from Outset for the Tablo referenced using Tablo for CRRT;

b. Statements from Witnesses 4, 5, 6, and 9 that Outset personnel told them Tablo could perform CRRT. Witnesses 4 and 5 further stated they were unaware that Tablo did not have FDA clearance for CRRT;

c. Witness 8's account that Outset was marketing Tablo for CRRT;

d. Statements from Witness 5 that Outset trained Witness 5 on how to use Tablo for CRRT; and

e. Statements from Witnesses 4 and 7 that their health system employers purchased Tablo for use for CRRT and replaced CRRT machines.

183. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the July 5, 2023 FDA Warning Letter, which followed an inspection of Outset's facilities and website and discussion with Outset management, and which stated the FDA findings that Outset was engaged in off-label marketing, including that:

a. Tablo was "adulterated" and "misbranded" under the FDCA because Tablo was not cleared for CRRT and Outset's sale of Tablo for CRRT is unlawful;

b. The FDA's inspection of Outset beginning in January 2023 and review of the Company's website found evidence and marketing that show promotion of Tablo for CRRT, including, by way of example, certain marketing material on Outset's website;

c. TabloCart is a medical device that requires FDA approval or clearance;

d. TabloCart was "adulterated" and "misbranded" under the FDCA because Outset failed to obtain 510(k) Clearance for the device; and

e. Outset was "marketing [TabloCart] without clearance or premarket authorization."

184. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by Outset's own disclosures:

a. The Company's August 2, 2023 disclosure that it had paused distribution of TabloCart while it sought FDA clearance and that it was lowering revenue expectations as a result of the FDA Warning Letter;

b. The Company's November 7, 2023 disclosure that it lowered revenue guidance due to the recent FDA Warning Letter and the pause in distribution of TabloCart;

c. The Company's May 9, 2024 disclosure, just after it received clearance for TabloCart, that despite such clearance, it could still face fallout from the FDA Warning Letter despite the Company's previous representations that it had fully addressed the FDA's concerns, and that it expected sales to recover once TabloCart was cleared; and

d. The Company's August 7, 2024 disclosure that it missed revenue expectations, lowered FY 2024 guidance, and sales had not recovered despite TabloCart's FDA clearance and Defendants' prior representations that lower Tablo sales were simply due to TabloCart's unavailability.

**C. Defendants' Misrepresentations in February 2023 Through June 2023**

185. On February 13, 2023, after the FDA began the inspection of Outset that led to the FDA Warning Letter, the Company issued a press release announcing the Company's financial results for the fourth quarter and year ended December 31, 2022 and issuing full year guidance, stating in relevant part:

> Recorded net revenue of $32.0 million in the fourth quarter, a 15.3% increase compared to $27.8 million in the third quarter, and a 14.0% increase compared to $28.2 million in the fourth quarter of 2021. Revenue for the full year was $115.4 million, an increase of 12.4% compared to $102.6 million in 2021
>
> ***
>
> Full Year 2023 Financial Guidance
>
> Outset reaffirmed its previously provided guidance for 2023, including revenue of $140 million to $150 million, growing approximately 22% to 30% over 2022.

Defendant Trigg further stated that "***[g]rowth in the fourth quarter exceeded our expectations as we saw Tablo's economic and clinical advantages continue to gain traction with dialysis providers and their patients across our end markets.***"

186. On the same day, the Company held its earnings call, during which Defendant Trigg elaborated on the Company's growth figures:

> Turning now to our results in the acute end market, the fourth quarter was also marked by strong growth, including sequential revenue growth each quarter from Q2 through Q4. ***Broadly, we saw the macro acute care environment largely stable over the course of the fourth quarter and through the first several weeks of this year.***
>
> ***

> ***And we're also keeping a close watch on hospital capital spending, which can affect the timing of deals, but to-date has not proven to be a meaningful headwind for us given Tablo's strong value proposition.***

187. Defendant Ahmed also touted the strong demand for both Tablo and TabloCart in the acute care setting without disclosing that the demand was driven by Outset's off-label promotion strategy:

> Our fourth quarter revenue increased approximately 15.3% sequentially and 13.7% year-over-year to $32 million.
>
> Product revenue was up 21.3% from the prior quarter and increased 11.5% year-over-year to $26.4 million. Console revenue grew 22.8% from the third quarter and increased by 1.5% year-over-year to $18.4 million. ***We saw console ASPs increase again year-over-year, driven primarily by the ongoing demand for Tablo XT and by demand for TabloCart***, our new accessory launched in the fourth quarter of 2022.

188. On February 13, 2023, the Company filed its Form 10-K for FY 2022 ("FY 2022 Form 10-K") signed by Defendants Trigg and Ahmed confirming the financial results reported in its February 13, 2023 press release.

189. Outset described TabloCart as a "non-medical accessory" in the FY 2022 Form 10-K.

190. Outset repeated this statement in its April 13, 2023 Proxy Statement to shareholders.

191. On May 3, 2023, after the Company's undisclosed March 2023 meeting with the FDA attended by Defendant Trigg and at which the fact that Tablo is not cleared for CRRT was discussed, the Company issued a press release announcing financial results for the first quarter ended March 31, 2023 and updated guidance for the full year, stating in relevant part:

> - Recorded net revenue of $33.5 million in the first quarter, a 9.5% increase compared to $30.6 million in the first quarter of 2022, and a 4.6% increase compared to $32.0 million in the fourth quarter of 2022
>
> ***
>
> Full Year 2023 Financial Guidance
>
> Outset now projects revenue for 2023 to range from $144 million to $150 million, which represents approximately 25% to 30% growth over the Company's fiscal year 2022 revenue. This updated guidance compares to prior 2023 revenue guidance of $140 million to $150 million.

Defendant Trigg attributed these results to the Company's sales and marketing strategy, stating that the "momentum we had exiting 2022 carried through the first quarter of 2023 ***with the benefits of Tablo continuing to resonate with acute-care*** and home providers.*"*

192. On May 3, 2023, the Company held an earnings call to review these results. Defendant Trigg touted Outset's financial performance, especially in the acute care setting, without disclosing that the Company achieved these results through off-label promotion of Tablo for CRRT:

> ***Our acute progress is a direct testament to the strong economic value proposition of Tablo.*** In any climate, direct, measurable cost reduction is valuable to hospitals, but never more so than it is today.
>
> ***
>
> Another important element of our commercial strategy is to ***drive utilization across the installed base***, and we were pleased to see positive trends in treatment volume during the quarter, in line with our expectations. We also saw ASPs rise, both on consoles and consumables, which ***serves as strong validation of Tablo's clinical and economic value proposition versus our competitors***. Our ASPs benefited again from better-than-expected uptake of Tablo add-ons, including ***good early demand for our TabloCart new product accessory.***
>
> ***
>
> Just in terms of the – the cumulative number of conversations that our team is now having with health systems that want to look ***at a full enterprise solution, as we call it, using Tablo from the ICU all the way to home***. We are having many, many, many more conversations than we had, let's say, this time last year, about deploying a home program, in tandem with an acute program.

193. Defendant Trigg also discussed the TabloCart product launch and its strong demand:

> From a product innovation standpoint, we are very ***pleased with demand for TabloCart, a new product accessory*** we introduced in Q3 of last year that provides additional maneuverability around the hospital, and ***incremental water prefiltration capabilities.*** TabloCart is sold separately and is gross margin accretive ASP and is proving to be a valuable solution to many of our acute care customers.

194. Analysts continued to react positively and highlighted Defendants' statements regarding the "value proposition." In a May 3, 2023 note, TD Cowen analysts stated that Outset did not face "headwinds from hospital capital spending slowdowns, likely due to Tablo's value proposition." The firm maintained its "outperform" rating.

195. On May 4, 2023, the Company filed with the SEC its Form 10-Q for the first quarter ("Q1 2023 Form 10-Q") signed by Defendants Trigg and Ahmed confirming the financial results reported in its May 3, 2023 press release.

196. On June 30, 2023, the Company released its ESG report ("2023 ESG Report"). In it, Outset detailed the complex regulatory framework to which it was subject and claimed to be in compliance:

> Outset has adopted an ***ethical marketing procedure*** that defines acceptable and unacceptable advertising, sales support, training, and other promotional practices for Outset medical devices in the United States. Included in this procedure is Outset's policy that ***all claims with respect to Outset products must be consistent with approved labeling, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence*** (*i.e.*, instructions-for-use, verification and validation testing, clinical study report, or any other report requiring a similar rigorous process of review and approval).
>
> In addition, without exception, promotional material or statements made by Outset sales representatives may not promote, discuss, or refer to uncleared, unapproved, or off-label use. This means that all promotional activities may be neither false nor misleading (either in terms of a specific product claim or the overall net impression conveyed by the promotional material) and must comply with all specific conditions of approval for the product being promoted.

### D. Defendants' February 2023 Through June 2023 Statements Were False and Misleading When Made

197. The statements above in ¶¶ 102 and 196, that the Company did not engage in off-label promotion were materially false and misleading when made because the Company did, in fact, engage in pervasive off-label marketing, including expressly directing its sales force to market Tablo for CRRT which resulted in widespread marketing of Tablo for CRRT, for which Tablo is not cleared, and marketing TabloCart without FDA clearance. These statements are also false because, at this time, the Company was being inspected by the FDA who found evidence of off-label promotion and, as of no later than March 13, 2023, Outset was expressly having conversations with the FDA about Tablo not being cleared for CRRT. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on sales of Tablo. Therefore, its marketing and legal compliance regarding the product are of significant importance to investors. The declines in Outset's stock

price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, further demonstrates the materiality of the statements.

198. The statements above in ¶¶ 185-187, and 191-192, where defendants touted their Tablo revenue and the strong demand and growth for Tablo were materially false and misleading when made because they failed to disclose that results and strong demand and growth for Tablo were dependent on the Company's undisclosed pervasive off-label promotion of Tablo for CRRT. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on sales of Tablo. In addition, sales to acute care facilities – where CRRT is performed – made up the vast majority of Outset's sales of Tablo. As such, the source of its revenue, growth, and demand are of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, further demonstrates the materiality of the statements.

199. The statements above in ¶¶ 103-104, 175-176, 186, and 192, touting, *e.g.*, Tablo's strong "value proposition" and that Tablo could perform all dialysis treatments and was the only device a health system would need were materially false and misleading when made because they failed to disclose that this value proposition was being fueled by off-label marketing of Tablo for CRRT. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on Tablo. Therefore, these statements are of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, below, further demonstrates the materiality of the statements.

200. The statements above in ¶¶ 189-190, and 193, touting TabloCart and that it is a non-medical accessory and not a medical device were materially false and misleading when made because TabloCart is a medical device that required prior FDA approval or clearance, and Outset never sought FDA clearance prior to unlawfully marketing and distributing TabloCart. These statements are material because TabloCart was particularly important in promoting and selling Tablo in areas that suffered from poor water quality and such marketing also exposed the Company to regulatory action. As such, these statements are of significant importance to

investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, below, further demonstrates the materiality of the statements.

201. The truth that Outset was engaged in widespread and pervasive off-label promotion is evidenced by the following former Outset employee accounts:

a. Statements from Witnesses 1, 2, and 3 that Outset sales personnel marketed Tablo for CRRT;

b. Witness 1's statement that Outset's "value proposition" marketing strategy included marketing Tablo for CRRT;

c. Statements from Witnesses 1 and 2 that Outset management directed and instructed the sales staff to market Tablo for CRRT, including at sales training sessions and calls and meetings;

d. Statements from Witness 3 that Outset was overly aggressive in its marketing for CRRT, that they were told Outset was marketing Tablo for CRRT in Florida, and that in selling the XT/Extended Therapy upgrade for Tablo, sales staff referred to it as performing CRRT.

e. Statements from Witnesses 2 and 3 that at an all-hands call, a meeting, and a companywide email after the FDA issued the FDA Warning Letter, Outset instructed sales personnel to stop using the term CRRT; and

f. Statements from Witness 2 that at the same all-hands meeting Outset management instructed employees to purge any marketing materials that existed prior to the FDA Warning Letter.

202. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the following Outset customer accounts:

a. Witness 4's account that the marketing materials received for Tablo included references to CRRT and the proposal from Outset for Tablo referenced using Tablo for CRRT;

b. Statements from Witnesses 4, 5, 6, and 9 that Outset personnel told them Tablo could perform CRRT. Witnesses 4 and 5 further stated they were unaware that Tablo did not have FDA clearance for CRRT;

c. Witness 8's account that Outset was marketing Tablo for CRRT;

d. Statements from Witness 5 that Outset trained Witness 5 on how to use Tablo for CRRT; and

e. Statements from Witnesses 4 and 7 that their health system employers purchased Tablo for use for CRRT and replaced CRRT machines.

203. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the July 5, 2023 FDA Warning Letter, which followed an inspection of Outset's facilities and website and discussion with Outset management, and which stated the FDA findings that Outset was engaged in off-label marketing, including that:

a. Tablo was "adulterated" and "misbranded" under the FDCA because Tablo was not cleared for CRRT and Outset's sale of Tablo for CRRT is unlawful;

b. The FDA's inspection of Outset beginning in January 2023 and review of the Company's website found evidence and marketing that show promotion of Tablo for CRRT, including, by way of example, certain marketing material on Outset's website;

c. TabloCart is a medical device that requires FDA approval or clearance;

d. TabloCart was "adulterated" and "misbranded" under the FDCA because Outset failed to obtain 510(k) Clearance for the device; and

e. Outset was "marketing [TabloCart] without clearance or premarket authorization."

204. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by Outset's own disclosures:

a. The Company's August 2, 2023 disclosure that it had paused distribution of TabloCart while it sought FDA clearance and that it was lowering revenue expectations as a result of the FDA Warning Letter;

b. The Company's November 7, 2023 disclosure that it lowered revenue guidance due to the recent FDA Warning Letter and the pause in distribution of TabloCart;

c. The Company's May 9, 2024 disclosure, just after it received clearance for TabloCart, that despite such clearance, it could still face fallout from the FDA Warning Letter despite the Company's previous representations that it had fully addressed the FDA's concerns, and that it expected sales to recover once TabloCart was cleared; and

d. The Company's August 7, 2024 disclosure that it missed revenue expectations, was lowering FY 2024 guidance, and sales had not recovered despite TabloCart's FDA clearance and Defendants' prior representations that lower Tablo sales were simply due to TabloCart's unavailability.

**E. While the Truth Begins to Be Revealed, Defendants Continue to Mislead the Market**

205. On Friday July 7, 2023, after the market closed, Outset filed a Form 8-K with the SEC and disclosed for the first time that it received a warning letter from the FDA that it was

engaged in off-label marketing of both Tablo and the TabloCart, while it also attempted to downplay these issues raised by the FDA Warning Letter and their impact on the Company:

> The Warning Letter raises two additional observations. The first observation asserts that certain materials reviewed by the FDA and found on the Company's website promote continuous renal replacement therapy (CRRT), a modality outside of the current indications for the Tablo® Hemodialysis System. The Company believes this concern has been effectively addressed through labeling and promotional changes already underway.
>
> The second observation asserts that the TabloCart with Prefiltration (the "TabloCart"), requires prior 510(k) clearance for marketing authorization. TabloCart, an accessory to the Tablo System, launched in the third quarter of 2022 and sales to date have not been material to the Company's financial results. The Company intends to work collaboratively with the FDA to resolve this observation, including potentially submitting a 510(k) on TabloCart.

206. The Company repeated these statements attempting to minimize the issues raised in the FDA Warning Letter hereafter in its Q2 2023 Form 10-Q, Q3 2023 Form 10-Q, FY 2023 10-K, Q1 2024 Form 10-Q, and Q2 2024 Form 10-Q.

207. The Company further stated that "it intends to fully cooperate with the FDA, including by responding within 15 business days, to expeditiously and completely resolve the Warning Letter."

208. Thus, while Outset began to reveal the truth, it also falsely portrayed the FDA Warning Letter and its off-label marketing as narrow in scope, tying it only to specific content on the Company's website cited in the letter. However, this overly restrictive view ignored that the FDA cited not only materials on the Company's website but also referred to other evidence found at the FDA's inspection in January through February 2023 in demonstrating that the Company promoted Tablo for CRRT. The marketing materials cited in the FDA Warning Letter were but one example of Outset's pervasive off-label promotion as further evidenced by the witness accounts discussed herein.

209. On news of this partial disclosure, Outset's stock price fell $1.20, or 5.9%, to close at $19.26 per share on Monday July 10, 2023, the next trading day, on heavy volume.

210. On August 2, 2023, after the market closed, the Company issued a press release and disclosed that due to the FDA Warning Letter and as the TabloCart had never received FDA clearance to be marketed, "it ha[d] paused the shipment of TabloCart with Prefiltration, an

accessory for the Tablo System, pending the Food and Drug Administration's clearance of a 510(k) the Company plans to submit later this month." In the press release the Company also announced lowered expectations for FY 2023 telling investors that it "now expects to be at the low end of [revenue guidance] as a result of the shipment pause."

211. While the press release continued to partially reveal the truth, it also continued to mislead the market. The press release touted that Outset: "[r]ecorded net revenue of $36.0 million in the second quarter, a 44% increase compared to $25.1 million in the second quarter of 2022, and an 8% increase compared to $33.5 million in the first quarter of 2023." The press release quoted Defendant Trigg highlighting the Company's "momentum entering 2023 carried through the second quarter, ***led by the strong demand from hospitals due to the value realized from insourcing dialysis with Tablo***" and that Defendants "expect our strong momentum both in the acute and home end markets to continue to drive the business."

212. The Company held an earnings call the same day, during which Defendant Trigg again touted their results and growth without revealing their reliance on off-label marketing:

> On the acute side, we've been encouraged to see more customers recognizing Tablo's strong economic value proposition and make the decision to in-source inpatient dialysis with Tablo.
>
> ***
>
> With the first half of 2023 now behind us, we retain our strong conviction in the fundamentals of our business with confidence grounded particularly by a healthy pipeline and backlog with interest in and demand for Tablo is strong and growing.
>
> ***
>
> In terms of end market performance, beginning with acute care, we were pleased to see strong console growth, once again driven predominantly by momentum with insourcing initiatives. Through 2023, we have seen more and more customers recognizing the cost savings associated with bringing Tablo in-house, and this continues to be a driving factor for health system administrators.

213. After Outset received the FDA Warning Letter, it rebranded "Tablo XT" to "Tablo Pro+." During the earnings call, the Company began referring to the software as Tablo Pro+. Moreover, Defendant Ahmed touted Pro+ as being in the "substantial majority of our acute consoles" for the prior quarter.

214. In regard to the FDA Warning Letter, during the call, Defendant Trigg portrayed the letter, the issues raised, Outset's remediation of it, and its impact as narrow or non-existent in scope, stating that the:

> first observation pertained ***to content on our website*** that referenced to a Continuous Renal Replacement Therapy, or a CRRT, a modality not currently included in Tablo's indications for use. To be fully reflective of our most recently cleared indications for use, we've ***removed these materials***. ***We believe that our action plan has addressed this finding and expect no impact with the customers from this remediation***.

215. Defendant Trigg went on to state that the FDA Warning Letter and the issues it flagged did not raise safety and other concerns stating, "I want to emphasize that neither of these two additional observations pertain to safety, efficacy or quality," despite the fact that the letter itself states that "[s]ystems that cannot safely and reliably perform CRRT raise serious public health concerns when used for CRRT treatment, because failure of dialysis systems performing CRRT may result in fluid and electrolyte imbalances, inadequate ultrafiltration, infection, and patient harm/death" and that the off-label marketing for CRRT could "could significantly affect safety or effectiveness of the device."

216. Further, when questioned by analyst Travis Steed about the lowered expectations based on the TabloCart, specifically, "why there was a reason that you can't kind of offset that within the guidance range. And also understand like why would Tablo orders actually be deferred here when they could probably upgrade to get the Cart post the approval," Defendant Trigg responded, in part, "as we look at the second half, we're just thinking about, hey, if there are any new customers in these really bad water areas, they might choose to push back their console purchase until TabloCart is available. And so, for that reason, we contemplated that in the guidance that we talked about today."

217. Defendants also tried to assure investors that Tablo sales would ramp up once TabloCart received FDA clearance. Defendant Ahmed stated:

> our expectation is that sales of both TabloCart with prefiltration will resume once we get our clearance and that any Tablo orders that may defer will also come back once we get our 510(k) clearance. So, as we think about 2024, nothing has structurally changed.

218. On August 3, 2023, Outset filed with the SEC its Form 10-Q for the second quarter ("Q2 2023 Form 10-Q") signed by Defendants Trigg and Ahmed confirming the previously announced financial results in its August 2, 2023 press release.

219. In the Q2 2023 Form 10-Q, Outset discussed and downplayed the FDA's findings:

> We timely submitted a response to the FDA in late July 2023. As communicated in our response, we believe we have taken or committed to take appropriate measures to resolve the matters raised in the Warning Letter. We believe the concern raised by the first observation regarding CRRT promotion has been effectively addressed through labeling and promotional changes that have already been completed. With regard to the second observation, we have agreed to submit a 510(k) application for TabloCart with Prefiltration.

220. While Outset continued to mislead the market, the market reacted negatively to the further details of the fraud. Outset's stock price dropped $1.97, or 10.2%, to close at $17.39 per share on August 3, 2023, on heavy volume.

221. In initiating coverage, C.L. King & Associates found "the Warning Letter to be problematic" in an August 17, 2023 report to investors.

222. On September 12, 2023, Outset presented at the Morgan Stanley 21st Annual Global Healthcare Conference. Defendant Trigg further minimized the FDA Warning Letter and suggested that Outset's issues with the FDA were over:

> And our response effectively was strategically, yes, and so we -- I don't foresee that there's anything controversial in our response which we are choosing to take a very, very collaborative approach. They had some commentary about some customer testimonials on our website. Those have been long removed. And then we did choose to take the step of filing on TabloCart and then voluntarily said, hey, what we'll just push the pause button on the cart to continue to be a good corporate citizen and a good partner to FDA. ***So all of that is now behind us.***

223. In fact, rather than "choos[ing]" to file a 510(k) application and "voluntarily" pausing shipment of TabloCart, the Company had to take these actions as the FDA had discovered that the Company was unlawfully promoting TabloCart. Moreover, despite the reference to "some commentary about some customer testimonials on our website," neither the FDA's findings regarding Outset's off-label marketing for CRRT nor the true state of Outset's off-label marketing, were not limited to some customer commentary on Outset's website.

224. In conjunction with attempting to minimize the issues, Defendants continued to tout the "value proposition" to investors. For example, at the same conference, Defendant Trigg

stated that Tablo's "***value proposition remains very much intact***." Yet, in truth, it had to significantly change its marketing and no longer instructed its sales staff to market for CRRT, a key element of its marketing strategy.

225. On October 12, 2023, after the market closed, Outset issued a press release preannouncing third quarter financial results, disclosing that the FDA issues had a bigger impact than previously disclosed. The Company announced "[p]reliminary revenue for the third quarter was $30.4 million" and lowered FY 2023 guidance, stating it "expects revenue for 2023 to be approximately $130 million."

226. In the press release, Defendant Trigg disclosed that the "[g]rowth in the quarter was dampened by a larger-than-expected impact in the field from the recent FDA warning letter, and early signs of a more cautious outlook on capital spending that we see as a headwind continuing through the fourth quarter."

227. Still, Defendant Trigg maintained that Tablo's "***economic value proposition remains resonant and differentiated.***"

228. At the earnings call the same day, Defendants further expanded on the disclosures but attempted to blame the shortfall on the TabloCart shipment hold, stating that:

> the shortfall to the guidance we provided in August was driven by ***a larger-than expected impact in the field from the recent FDA warning letter***, which served to elongate our sales cycle in several ways. First, ***we observed more customers than we anticipated, choosing to defer their Tablo console purchasing and installation until TabloCart with prefiltration is available again***. Second, we experienced a strong competitive response, which served to create marketplace confusion, particularly regarding Tablo's use in the ICU.

229. Yet Defendant Trigg still claimed that Outset's "***customers are not turning away from Tablo and its value proposition***. In fact, they continue to embrace Tablo's proven financial and operational benefits and move towards the advantages of an in-source model."

230. On the further disclosures, the Company's share price fell $3.38, or 49.9%, to close at $3.39 per share on October 13, 2023, on heavy volume.

231. Analysts reacted strongly to the additional disclosures regarding the FDA issues. In an October 13, 2023 note, C.L. King & Associates still viewed the "Warning Letter to be problematic." On the same day, TD Cowen also lowered its revenue estimates and price target to

$9 per share due, in part, to the "larger-than-anticipated impact in the field from the FDA warning letter."

232. On November 7, 2023, after the market closed, the Company issued a press release reporting revenue for the third quarter of $30.4 million and reiterating its revised full year 2023 guidance of approximately $130 million.

233. The Company held an earnings call the same day where Defendant Trigg also revealed initial 2024 guidance calling for mid-teens revenue growth versus consensus expectations of 17.8%.

234. Defendant Trigg attributed these results to the FDA Warning Letter while still misrepresenting and attempting to downplay the issues raised in the FDA Warning Letter and again blaming the results and low guidance on TabloCart not being available, stating that, "competitive activity around TabloCart not being available by our choice and some competitive noise making around the other aspect of the warning letter around some case studies that were on our website. We feel that we have fully satisfied the FDA's concerns around the website."

235. Yet, Defendant Trigg also claimed that Outset's "pipeline continues to expand and ***our value proposition remains compelling***." The "value proposition" to "save[] health care providers money, simplify their operations and improve the quality of living for patients" ***remained "evergreen.***"

236. During the earnings call, Defendant Ahmed also stated that Outset's business would grow once it received clearance for TabloCart:

> grow at a high-teens rate annually after 2024 as we gain scale, adjusted to capital spending environment, and achieve TabloCart with pre-filtration clearance.
>
> ***
>
> [G]iven that we expect TabloCart with prefiltration to get cleared in the second half, this first half-second half effects will be a little bit more pronounced and ***you'll see more growth in the back half of the year.***

237. On November 8, 2023, Outset filed with the SEC its Form 10-Q for the third quarter ("Q3 2023 Form 10-Q") signed by Defendants Trigg and Ahmed confirming the financial results reported in its November 7, 2023 press release.

238. The Company further disclosed the impact of the FDA Warning Letter, while continuing to place blame for the impact on sales on other issues including the halt of the TabloCart, rather than Outset's dialing back its aggressive off-label marketing:

> During the third quarter of 2023, several factors served to elongate our sales cycle and the timing of delivery and installations which, in turn, had an adverse impact on our bookings and revenues for the quarter. ***These factors related to our recent Warning Letter, our distribution pause on TabloCart with Prefiltration and certain macroeconomic impacts on our customers. We observed more customers than we anticipated choosing to defer their Tablo console purchasing and installation until TabloCart with Prefiltration becomes available again. In addition, the Warning Letter created a certain amount of marketplace confusion (exacerbated, we believe, in some cases by our competitors) particularly regarding Tablo's use in the intensive care unit (ICU). We anticipate that the negative impacts from the Warning Letter and our distribution pause will continue through at least the end of 2023.*** If the FDA's review of our pending 510(k) application for TabloCart with Prefiltration and the current distribution pause continues for an extended period of time, if the FDA ultimately does not grant clearance of our 510(k) application, or if we are otherwise unable to overcome the adverse impact in the field from the Warning Letter and our distribution pause for a prolonged period of time, our revenues could be materially and adversely impacted. Finally, during the third quarter of 2023, we began to observe an increasing number of our existing and prospective customers deferring their decisions to purchase Tablo in an environment of rising interest rates and more cautious capital spending. These deferrals served to further elongate our sales cycle and the timing of delivery and installations, which we expect to continue into 2024.

239. Similar statements were repeated in the Company's FY 2023 10-K.

240. While Outset continued to mislead the market, the market reacted negatively to the further details of the fraud. On this news, the Company's share price fell $0.62, or 14.4%, to close at $3.69 per share on November 8, 2023, on heavy volume.

241. Analysts noted that the FDA issues continued to plague the Company even while Defendants tried to downplay them. In a November, 8, 2023 report, RBC Capital noted the Company's commentary that the "FDA Warning Letter is having a greater impact on sales than it originally expected."

242. At the November 16, 2023 Jefferies London Healthcare Conference, Defendant Ahmed asserted the Company would "accelerate to high teens" growth in 2024 because, in part, the Company was "expecting approval on one of our products, TabloCart with prefiltration."

243. On February 21, 2024, the Company issued a press release announcing financial results for the year ending December 31, 2023, touting "2023 revenue [of] $130.4 million, a 13%

increase compared to $115.4 million in 2022" and "***reflect[ing] the scale we have built in the acute setting*** and progress we are making to expand Tablo's use at home, with our growth in both end markets contributing to a 34% increase in the Tablo installed base and nearly 50% growth in consumable revenue."

244. Outset held an earnings call the same day to discuss its results. Defendant Trigg provided an update on the status of the FDA's review of TabloCart: "Additionally, on the regulatory submission front, we remain in interactive review with FDA on the TabloCart 510(K) submission and continue to forecast sales of TabloCart with pre filtration resuming during the second-half of 2024," suggesting that Tablo sales would ramp up once TabloCart received FDA clearance, which would serve as a "positive catalyst" for the Company.

245. The same day, Outset also filed its Form 10-K with the SEC for FY 2023 ("FY 2023 Form 10-K") signed by Defendants Trigg and Ahmed confirming the financial results reported in its February 21, 2024 press release.

246. In the FY 2023 Form 10-K, the Company also stated that it "provided monthly updates to the FDA as to the status of these Warning Letter-related workstreams since July 2023 and ***believe we have taken appropriate measures to resolve the matters raised in the Warning Letter.***"

247. At the March 5, 2024 TD Cowen Healthcare Conference, Defendant Trigg again characterized the potential TabloCart clearance as a "***clear catalyst***" for the Company's growth.

248. Defendant Ahmed also characterized Outset's customers as simply "waiting for [Tablo]Cart" to finalize their purchases. He went on to note that "***those customers are still very much in our pipeline. They are still very much waiting for [Tablo]Cart. What we're really pleased with is that nobody has dropped out. Nobody has said, look, I don't want the product anymore.***"

249. Defendant Trigg concluded by noting that "when [TabloCart's] back and we have a benefit of offering it to customers, yeah, ***we expect it to be nicely adopted***."

250. Ahead of its first quarter results for 2024, on May 6, 2024, the Company issued a press release announcing that the FDA "has granted 510(k) clearance of TabloCart with

prefiltration," and "Outset has resumed distribution of TabloCart with prefiltration and has product available to ship to customers," the event that Defendants had promised would result in Tablo sales ramping up.

251. On this news, Outset's stock price rose $0.65, or 20.70%, to close at $3.79.

252. In connection with Outset's Q1 2024 results, Defendants further revealed the truth while continuing to mislead the market.

253. On May 8, 2024, after the market closed, Outset issued a press release announcing its first quarter financial results, stating "[r]evenue for the first quarter of 2024 was $28.2 million compared to $33.5 million in the first quarter of 2023."

254. During the Company's earnings call the same day, Defendant Trigg touted the clearance that Outset received for TabloCart just days earlier as driving demand for Tablo stating, "[w]ith our most challenging recent headwind now behind us with the FDA clearance of TabloCart, ***demand for Tablo that has never been higher***." Defendant Trigg also characterized the TabloCart clearance as "finally putting wind in the sales of Tablo again."

255. On May 9, 2024, the Company filed with the SEC its Form 10-Q for the first quarter ("Q1 2024 Form 10-Q") signed by Defendants Trigg and Ahmed confirming the financial results reported in its May 8, 2024 press release.

256. The Q1 2024 Form 10-Q cautioned that, despite FDA clearance of TabloCart, the Company may still experience ongoing issues as a result of the FDA Warning Letter:

> ***While we recently resumed distribution of TabloCart with Prefiltration following the FDA's clearance of our 510(k) submission, we may continue to experience disruptions as a result of the warning letter and our prior distribution pause on TabloCart with Prefiltration.***
>
> ***
>
> Even as we resume distribution of TabloCart with Prefiltration following its FDA clearance, if we are unable to sufficiently recover from these disruptions and any reputational harm at the levels or on the timeframes we anticipate, we may experience further disruptions ***which could include adverse impacts on our backlog, our ability to expand customer relationships or attract new customers, as well as reduced demand for TabloCart and/or, potentially, Tablo***.

257. On this news, Outset's stock price fell $0.86, or 20.82%, to close at $3.27.

### F. Defendants' July 2023 Through May 2024 Statements Were False and Misleading When Made

258. The statements above in ¶¶ 102, that the Company did not engage in off-label promotion were materially false and misleading when made because the Company did, had been engaged in pervasive off-label marketing, including expressly directing its sales force to market Tablo for CRRT which resulted in widespread marketing of Tablo for CRRT, for which Tablo is not cleared. These statements are also false because, as detailed in the FDA Warning Letter to Defendant Trigg, the FDA who found evidence of Outset's off-label promotion. Yet, Defendants minimized and misrepresented the FDA's findings and Outset's illicit off-label marketing publicly, while internally attempting to change its off-label marketing after it received the FDA Warning Letter. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on sales of Tablo. Therefore, its marketing and legal compliance regarding the product are of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, further demonstrates the materiality of the statements.

259. The statements above in ¶¶ 211-212 and 243, where defendants touted their Tablo revenue and the strong demand and growth for Tablo were materially false and misleading when made because they failed to disclose that results and strong demand and growth for Tablo were dependent on the Company's undisclosed pervasive off-label promotion of Tablo for CRRT, particularly in the first two quarters of 2023 before the FDA issued its Warning Letter leading to internal marketing changes. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on sales of Tablo. In addition, sales to acute care facilities – where CRRT is performed – made up the vast majority of Outset's sales of Tablo. As such, the source of its revenue, growth, and demand are of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, further demonstrates the materiality of the statements.

260. The statements above in ¶¶ 103-104, 175-176, 212, 224, 227, 229, and 235, touting, *e.g.*, Tablo's strong "value proposition" and that Tablo could perform all dialysis

treatments and was the only device a health system would need were materially false and misleading when made because they failed to disclose that this value proposition had been fueled by off-label marketing of Tablo for CRRT, particularly before the FDA issued its Warning Letter uncovering off-label promotion for CRRT that led to significant, internal marketing changes to its value proposition marketing that the Company also failed to disclose. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on Tablo. Therefore, these statements are of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, further demonstrates the materiality of the statements.

261. The statements above in ¶¶ 205-207, 213-217, 219, 222, 228, 234, 236, 238-239, 242, 244, 246-250, and 254, regarding the FDA Warning Letter and the issues it raised as well as their impact on the Company were materially false and misleading when made because they significantly downplayed and misrepresented the FDA's findings, Outset's pervasive off-label marketing, the Company's internal reaction and changes to its marketing practices, and the impact on the Company and sales of Tablo. In truth, the FDA's findings and Outset's marketing were not limited to a few materials on Outset's website, the issues did implicate safety as expressly stated in the FDA Warning Letter, and Outset had to significantly change its marketing which relied on off-label marketing Tablo for CRRT, which it did internally rather than publicly. Ultimately, it was the change in marketing strategy that impacted the company's financial results and demand for Tablo, not the temporary shipment pause on TabloCart. Thus, Tablo sales would not increase, as Defendants stated, once Outset received clearance for TabloCart. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on Tablo. Therefore, these statements are of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section X, *infra*, further demonstrates the materiality of the statements.

262. The truth that Outset was engaged in widespread and pervasive off-label promotion is evidenced by the following former Outset employee accounts:

a. Statements from Witnesses 1, 2, and 3 that Outset sales personnel marketed Tablo for CRRT;

b. Witness 1's statement that Outset's "value proposition" marketing strategy included marketing Tablo for CRRT;

c. Statements from Witnesses 1 and 2 that Outset management directed and instructed the sales staff to market Tablo for CRRT, including at sales training sessions and calls and meetings;

d. Statements from Witness 3 that Outset was overly aggressive in its marketing for CRRT, that they were told Outset was marketing Tablo for CRRT in Florida, and that in selling the XT/Extended Therapy upgrade for Tablo, sales staff referred to it as performing CRRT.

e. Statements from Witnesses 2 and 3 that at an all-hands call, a meeting, and a companywide email after the FDA issued the FDA Warning Letter, Outset instructed sales personnel to stop using the term CRRT; and

f. Statements from Witness 2 that at the all-hands meeting Outset management instructed employees to purge any marketing materials that existed prior to the FDA Warning Letter.

263. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the following Outset customer accounts:

a. Witness 4's account that the marketing materials received for Tablo included references to CRRT and the proposal from Outset for the Tablo referenced using Tablo for CRRT;

b. Statements from Witnesses 4, 5, 6, and 9 that Outset personnel told them Tablo could perform CRRT. Witnesses 4 and 5 further stated they were unaware that Tablo did not have FDA clearance for CRRT;

c. Witness 8's account that Outset was marketing Tablo for CRRT;

d. Statements from Witness 5 that Outset trained Witness 5 on how to use Tablo for CRRT; and

e. Statements from Witnesses 4 and 7 that their health system employers purchased Tablo for use for CRRT and replaced CRRT machines.

264. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the July 5, 2023 FDA Warning Letter, which followed an inspection of Outset's facilities and website and discussion with Outset management and which stated the FDA findings that Outset was engaged in off-label marketing, including that:

a. Tablo was "adulterated" and "misbranded" under the FDCA because Tablo was not cleared for CRRT and Outset's sale of Tablo for CRRT is unlawful;

b. The FDA's inspection of Outset beginning in January 2023 and review of the Company's website found evidence and marketing that show promotion of Tablo for CRRT, including, by way of example, certain marketing material on Outset's website;

c. TabloCart is a medical device that requires FDA approval or clearance;

d. TabloCart was "adulterated" and "misbranded" under the FDCA because Outset failed to obtain 510(k) Clearance for the device; and

e. Outset was "marketing [TabloCart] without clearance or premarket authorization."

265. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by Outset's own disclosures:

a. The Company's August 2, 2023 disclosure that it had paused distribution of TabloCart while it sought FDA clearance and that it was lowering revenue expectations for as a result of the FDA Warning Letter;

b. The Company's November 7, 2023 disclosure that it lowered revenue guidance due to the recent FDA Warning Letter and the pause in distribution of TabloCart;

c. The Company's May 9, 2024 disclosure, just after it received clearance for TabloCart, that despite such clearance, it could still face fallout from the FDA Warning Letter despite the Company's previous representations that it had fully addressed the FDA's concerns, and that it expected sales to recover once TabloCart was cleared; and

d. The Company's August 7, 2024 disclosure that it missed revenue expectations, was lowering FY 2024 guidance, and sales had not recovered despite TabloCart's FDA clearance and Defendants' prior representations that lower Tablo sales were simply due to TabloCart's unavailability.

266. The truth that the findings in the FDA Warning Letter and Outset's off-label marketing, as well as their impact on the Company and its sales and marketing practices, were much more significant than Defendants relayed is evidenced by the following:

a. Statements from Witnesses 2 and 3 that at an all-hands meeting after the FDA issued the FDA Warning Letter, Outset management began instructing sales personnel to stop promoting Tablo for use for CRRT;

b. Statements from Witness 2 that at the same all-hands meeting, and in a companywide email, Outset management instructed employees to purge any marketing materials that existed prior to the FDA Warning Letter;

c. The findings in the July 5, 2023 FDA Warning Letter, which followed an inspection of Outset's facilities and website and discussion with Outset management, which found Outset was engaged in off-label marketing and cited to the marketing materials on the website only as an example and which highlighted the "serious public health concerns" the off-label marketing implicated;

d. Outset rebranded the Tablo XT upgrade to Tablo Pro+ right after receiving the FDA Warning Letter without explanation;

e. Likewise, Outset added the following disclosure to its website and marketing materials: "The Tablo Hemodialysis System is not indicated for continuous renal replacement therapy (CRRT) and is cleared for use for up to 24 hour" after receiving the FDA Warning Letter;

f. The Company's May 9, 2024 disclosure that despite the FDA's clearance of TabloCart, it could still face fallout from the FDA Warning Letter despite the Company's previous representations that it had fully addressed the FDA's concerns, and that it expected sales to recover once TabloCart was cleared; and

g. The Company's August 7, 2024 disclosure that it missed revenue expectations, was lowering FY 2024 guidance, and sales had not recovered despite TabloCart's FDA clearance on May 6, 2024, and its prior representations that lower Tablo sales were simply due to TabloCart's unavailability.

## G. The Truth is Finally Revealed

267. On August 7, 2024, after the market closed, Outset released its second quarter 2024 financial results, significantly missing consensus estimates and lowering its full year 2024 outlook by $39 million at the midpoint. This is despite the fact that TabloCart now had FDA clearance during most of Q2 2023 and Tablo could now lawfully market and sell it. The press release disclosed that the Company would be forced to take "clear steps to improve our execution." Specifically, the press release reported, in relevant part:

> ***[N]ew console placements were below our expectations and will be lower than we originally forecasted for the year***. We are taking clear steps to improve our execution and grow the business over the long term to bring the benefits of Tablo to even more providers and dialysis patients.
>
> ***
>
> Second Quarter 2024 Financial Results
>
> ***Revenue for the second quarter was $27.4 million compared to $36.0 million in the second quarter of 2023, driven by a decline in product revenue to $19.2 million***.
>
> ***

> Full Year 2024 Financial Guidance
>
> ***Outset now expects 2024 revenue to be approximately $110 million, revised from a prior range of $145 million to $153 million.***

268. On that same date, the Company held its second quarter 2024 earnings conference call announcing the Company's financial results for the quarter. During that earnings call, Defendant Trigg disclosed the Company would have to undergo "sales team and process restructuring" and would be unable to deliver on a ramp of TabloCart as previously stated. Specifically, during the earnings call, Defendant Trigg stated:

> What we're experiencing is a temporary dislocation of converting the pipeline to revenue on our timeline due to the ***changes in customer profile and process and the improvements needed in our own sales execution.***
>
> ***
>
> We have also ***restructured our sales organization and trained them on our new enterprise sales approach.*** Given the depth and breadth of the sales team and process restructuring, we expect it to take several quarters to fully implement and realize the many benefits that will come from it. As we look ahead to the second half of the year, we now know it will not be possible to execute this transformation given the expected accompanying disruption while simultaneously delivering on the ramp we previously forecasted. As a result, we expect the second half of 2024 will look similar to the first half with expected revenue for the year of approximately $110 million.
>
> ***
>
> While the return of TabloCart was helpful in advancing some of the acute deals in our pipeline, ***the ship hold masks what we now recognize, which is the need for commercial execution changes to better position ourselves to capitalize on enterprise opportunities that typically come with a longer sales cycle.***

269. Analyst Rick Wise questioned the Company on this news, including its inconsistency with its prior message, including just three months prior, stating:

> ***Looking back at your comments last quarter, it felt like with TabloCart in hand orders that had been delayed could now be sold… and we would see an acceleration.*** Help us transition from what you were thinking and understanding about where you were in early mid-May and where we are now sort of like what happened -- what didn't materialize that you thought was materializing? … Just trying to understand how we got here …

270. In response, Defendant Trigg stated, "[w]e did expect more of the sort of the TabloCart occluded deals for lack of better term to advance and to close in the second quarter.

When they didn't, it really became pretty apparent that there probably was something more going on here."

271. On this news, the Company's share price fell $2.33, or 68.5%, to close at $1.07 per share on August 8, 2024, on heavy volume.

272. The August 7, 2024 disclosure revealed that the Company's inability to market Tablo for CRRT was a bigger issue than Defendants portrayed to investors. Had the drop in sales and revenue truly been a result of the temporary unavailability of TabloCart, Outset's sales would have rebounded immediately after the FDA granted 510(k) Clearance for TabloCart. Yet, even after TabloCart received clearance for TabloCart on May 6, 2024, Outset again was forced to lower guidance, as it was not the lack of availability of TabloCart that impacted sales after the FDA Warning Letter, but Outset's inability to continue to aggressively and unlawfully market Tablo for CRRT now that the FDA had cracked down on the practice.

273. In an August 7, 2024 report, RBC Capital stated "operational execution remains challenging at [Outset] as evident in recent quarters, and ***Q2 disappointed once again even as Tablo Cart [sic] is now approved***" and noted the ***"[l]ack of execution and low visibility."*** RBC Capital downgraded the stock to "perform" from "outperform" and lowered its price target to $3 per share from $6.

274. On the same day, BTIG released a report noting that it was ***"disappointed and wary"*** and lowered its price target to $4 per share.

275. Outset's business still has not recovered. For example, the Company's Q2 2023 revenue, the quarter ending immediately before disclosure of the FDA Warning Letter, was $36.04 million. Now, Outset's most recent revenue for Q1 2025 was $29.80 million, a 17.31% decline. Likewise, Outset's stock price has not recovered from the fraud perpetrated by Defendants during the Class Period. On June 2, 2025, Outset shares closed at $1.19 per share.[8]

---

[8] On March 20, 2025, well after the Class Period ended, Outset completed a 15-for-1 reverse stock split. All share prices cited in the Complaint, including the June 2, 2025 closing share price, reflect the pre-stock split pricing.

## VIII. ADDITONAL SCIENTER ALLEGATIONS

276. As alleged herein, Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

277. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of Outset and, thus, controlled the information disseminated to the investing public in the Company's press releases and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

278. During the Class Period, each of the Individual Defendants acted intentionally or recklessly and participated in and orchestrated the fraud alleged herein to conceal the truth, including the nature and extent of the Company's off-label marketing. Such actions allowed Outset to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to Outset as the Individual Defendants were among Outset's most senior management and were acting within the scope of their employment.

### A. The Consistent Accounts by Former Outset Employees and Outset Customers Evidence a Strong Inference of Scienter

279. The consistent accounts of both former Outset employees whose employment spanned various time periods, locations, and roles, and Outset customers, including nephrologists, nurses, and hospital administrators from different health systems and various time periods and geographic locations, detailed in Section VI.B, *supra*, confirm that Outset aggressively and pervasively promoted Tablo off-label for CRRT prior to receiving the FDA Warning Letter.

280. For example, according to former employees Witness 1 (an Outset Northeast Area Sales Manager from before the Class Period until Spring 2021 who was responsible for marketing

and business development in the New York Metro, northern New Jersey and parts of Upstate New York areas), Witness 2 (an Outset Key Account Representative Home/Chronic from the beginning of 2022 through the end of the Class Period covering several southern states including Texas, Florida, Alabama, Louisiana, Missouri, and Arkansas), and Witness 3 (a territory manager for the Dallas-Ft. Worth metroplex, New Mexico, and Arizona areas from Fall 2022 through the end of the Class Period and an Outset Senior Clinical Sales Representative from before the Class Period until the end of 2022), Outset marketed Tablo for CRRT prior to the FDA Warning Letter. Indeed, Witnesses 1 and 2 consistently describe the training and instructions the sales team received from Outset management to promote Tablo for CRRT. Likewise, Witnesses 2 and 3 consistently describe that it was not until after the FDA Warning Letter that the sales staff was instructed not to market Tablo for CRRT. Witness 2 further details how Outset employees were also instructed to purge all marketing materials after the FDA Warning Letter was issued.

281. Similarly, Witness 4 (the President & CEO of a large health care system in New York since 2023 who previously served as Executive Vice President and Chief Business Development Officer since before the Class Period), Witness 6 (a licensed practical nurse with a nationwide healthcare system at a Massachusetts facility from before the Class Period through early 2024, including serving as Director of Nursing from Summer 2022 through early 2024), and Witness 9 (a physician who filed a complaint with the FDA) who are Outset customers familiar with Outset's marketing of Tablo, relayed that they were told by Outset employees that Tablo could be used for CRRT. Witness 8 (a nephrologist in the Greater Boston Area since prior to the Class Period), also believes that Outset was marketing Tablo for CRRT. Likewise, Witness 5 (a was a Nurse Manager, critical care unit ("CCU")/ICU with a hospital in New York from prior to the start of the Class Period until early 2024) was trained by Outset on how to use Tablo for CRRT.

282. Witness 4 also relayed that their health system received marketing materials from the Company for Tablo that referenced CRRT and Outset's proposal for the Tablo units referenced using Tablo for CRRT. Witness 4 also had several calls with Michael Aragon, Chief Medical Officer of Outset about how the system was going to use Tablo and Aragon never said

the unit was not FDA cleared for CRRT. Witness 4 also had discussions with Defendant Trigg about Tablo, including an in person visit from Defendant Trigg at Witness 4's health care system.

283. Moreover, Witness 7 (who works for a not-for-profit community health system that system serves patients in three states – Illinois, Indiana, and Kentucky – covering approximately 51 counties and 20 hospitals) relayed that she transitioned her hospital system from outsourced dialysis to an in-sourced model with Tablo. She further relayed that during the process of selecting a new dialysis model, Outset made presentations to her system's board of decision-makers and, thereafter, the system opted for 27 Tablo units, seven of which are dedicated to CRRT, suggesting that Outset, in its presentation and elsewhere, marketed Tablo for CRRT to her hospital system.

284. The fact that these practices occurred nationwide and were attested to and confirmed by the consistent accounts of numerous witnesses supports that these were not isolated instances, but a widespread pattern of illicit activity. Further, these practices were the result of training and were done at the direction by management.

285. The witness accounts support a strong inference that Defendants were either aware of or recklessly disregarded the fact that their Class Period statements were materially false and misleading when made.

### B. The FDA Warning Letter and Defendants' Knowledge of the FDA Investigation Leading Up to the FDA Warning Letter Further Supports Scienter.

286. The FDA Warning Letter addressed to Defendant Trigg further supports a strong inference of scienter. The FDA Warning Letter makes clear that, during the Class Period, and at least until the date of the letter, evidence from the FDA's onsite inspection of Outset and the Company's website[9] demonstrate that Outset was promoting Tablo for CRRT and that TabloCart is a medical device that Tablo was marketing and distributing without FDA clearance.

[9] Suspiciously, archived versions of the Company's website do not exists on the Internet Archive's Wayback Machine, which is a digital archive of the Internet that allows users to explore past versions of websites.

287. Both Defendants Trigg and Ahmed were aware of the FDA's investigation of Outset prior to disclosure of the FDA Warning Letter and that the FDA was focused on Outset's off-label promotion of Tablo for CRRT and the marketing and distribution of TabloCart without authorization.

288. As detailed in the FDA Warning Letter, from January 17, 2023 through February 10, 2023, investigators from the FDA inspected Outset's premises and thereafter had at least one teleconference with Outset on March 13, 2023 and reviewed materials on Outset's website in May 2023. The FDA found evidence of off-label marketing of Tablo for CRRT and of TabloCart without the requisite authorization during this inspection. Moreover, during the March 13, 2023 teleconference between Outset and the FDA and statements in the Company's 510(k) submission for Tablo, Defendant Trigg "confirmed that CRRT is distinct from the cleared indications for use, device specifications, and treatment modalities for the Tablo."

### C. Defendant CEO Trigg's Direct Involvement with the Sales Team and Marketing to Customers Evidences Scienter

289. Defendant Trigg was also directly and intimately involved with the sales team in the field in pitching Tablo to hospitals and healthcare systems.

290. **Witness 10**[10] is a former Director at Outset from August 2020 until June 2021 who worked directly with Defendant Trigg. Regarding Defendant Trigg, Witness 10 relayed that, "She does call herself a commercial focus CEO. I would put a little spin on it. She's a customer-focused CEO. She would hop out. I'd call her and say, 'Leslie, we've got a big meeting.' She's like, 'Tell me what airport to fly into and pick me up at the airport.' Without any baggage around her, she'd show up and she would do anything." Witness 10 further relayed that Defendant Trigg would say, "'Let's go walk a patient floor' or "We need to present to CEOs? All right. I'm ready to go.'"

291. Further, Witness 4, the President & CEO and former Executive Vice President and Chief Business Development Officer of a large health care system had discussions with Defendant

[10] Witness 10 was interviewed by AlphaSense Expert Insights on January 20, 2023, and their interview was published on the AlphaSense platform on January 24, 2023.

Trigg about Tablo, including an in person visit from Defendant Trigg at Witness 4's health care system.

292. Indeed, Defendant Trigg herself has attested to this. For example, during the March 8, 2023 TD Cowen Healthcare Conference, Defendant Trigg stated:

> When a hospital is -- now, they've moved past stage one and our sales cycle is giving them -- we have a really nice ROI tool, and we get through the financials, kind of the before and after picture, and everybody loves that. I tend to go to those meetings, because I know they're going to go really well. So, everybody gets it fun. They're fun meeting. Like, oh, my gosh, we're going to save millions, and everybody is super excited.

293. Likewise, during an August 7, 2024 earnings call, she relayed that, "I have spent a lot of time in the field."

294. Defendant Trigg's hands-on, direct involvement in marketing Tablo in the field further evidences her scienter.

### D. Scienter is Established by the Fact That the Misconduct Related to Outset's Core Business and Product

295. A strong inference of scienter is also established by the fact that the misconduct related to Outset's core business and product — the Tablo (and TabloCart, a device attached to the Tablo) — which was Outset's primary product and revenue driver during the Class Period.

296. Indeed, throughout the Class Period, the Company emphasized its dependence on Tablo. In the IPO Offering Documents, and in every Form 10-K during the Class Period, Outset emphasized it "***derive[s] substantially all of [its] revenue from the sale of Tablo and associated consumables and [is] therefore highly dependent on Tablo for [its] success.***"

297. Moreover, the sales to acute care facilities insourcing dialysis in the ICU, where CRRT is performed, was the principal source of the Company's revenue. For example, the number of Tablo consoles placed in acute facilities as a percentage of total Tablo installs, was 81% and 77% in 2020 and 2021, respectively.[11]

[11] Beginning in 2022, Outset no longer separated out acute and sub-acute installs.

298. Underscoring Outset's reliance on Tablo, the Company stated that "[d]riving adoption of Tablo in the acute care setting ***has been our primary focus*** to date." Indeed, this focus never changed as the Company made this claim in each Form 10-K and Form 10-Q during the Class Period.

299. Thus, Tablo essentially was the Company, and promotion and marketing of the Tablo and TabloCart are of critical importance to its operations. Indeed, Defendants expressly stated that the Company's policy was to refrain from off-label promotion. The Individual Defendants also directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to information regarding Tablo and Outset's marketing and promotion of Tablo. Facts that are critical to Outset would have been known by its executive officers.

**E. Defendants' Knowledge of the Lack of FDA Clearance Evidences Scienter**

300. Throughout the Class Period, the Individual Defendants knew that Tablo was not cleared for CRRT, and that TabloCart was a medical device that did not have the requisite FDA clearance.

301. The Individual Defendants acknowledged in SEC filings from the beginning of the Class Period and thereafter acknowledge that Tablo "is not cleared by the FDA for CRRT." Indeed, as revealed in the FDA Warning letter to Defendant Trigg, during a March 13, 2023 teleconference between Outset and the FDA and statements in the 510(k) submission for Tablo, Defendant Trigg "confirmed that CRRT is distinct from the cleared indications for use, device specifications, and treatment modalities for the Tablo."

302. Likewise, as senior executives at a medical device company, the Individual Defendants were aware of or recklessly disregarded that TabloCart is a medical device requiring FDA approval or clearance. Indeed, the FDA expressly classifies a "water purification system for hemodialysis" "that is intended for use with a hemodialysis system and that is intended to remove organic and inorganic substances and microbial contaminants from water used to dilute dialysate concentrate to form dialysate," which is exactly what TabloCart is, as a Class II medical device.

### F. Defendants' Knowledge of the Value Proposition Marketing Evidences Scienter

303. As detailed, above, during the Class Period, the Individual Defendants were aware of, and each touted, Outset's "value proposition" marketing strategy which, unknown to investors, relied on off-label marketing of the Tablo for CRRT.

304. The Individual Defendants were fully aware that Tablo was not indicated for CRRT but approved and employed a marketing strategy premised on the promotion of Tablo off-label for CRRT.

### G. The Fact That Defendants Violated the Company's Own Policy Further Supports Scienter

305. The Company's IPO Prospectus and subsequent Class Period SEC filings state that Outset's "***policy is to refrain from statements that could be considered off-label promotion of Tablo.***" Moreover, the Company's ESG Reports stated, e.g., "Outset's policy [is] that ***all claims with respect to Outset products must be consistent with approved labeling***, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence" and "***without exception***, ***promotional material or statements made by Outset sales representatives may not promote, discuss, or refer to uncleared, unapproved, or off-label use***."

306. The fact that the Individual Defendants acted contrary to the Company's own stated policies against off-label marketing is additional evidence of Defendants' scienter, as it establishes a consciousness of wrongdoing. In other words, Defendants cannot plead ignorance of the policy or FDA regulations against off-label marketing set forth above.

### H. The Massive Insider Selling on Outset's Artificially Inflated Stock Price Supports Scienter

307. Outset's senior executives, including the Individual Defendants, engaged in insider trading during the Class Period. Trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter.

308. Here, the amount of insider trading, including, *inter alia*, massive sales by Defendant Trigg, is indicative of scienter. Indeed, these senior executives reaped ***almost $50 million in proceeds*** on their Class Period trading. The timing of the insider stock sales is also

suspicious, as the sales were made when the stock was trading at inflated prices due to the Defendants' false and misleading statements, including that the ***vast majority - 85%*** - of the Class Period insider trading was done before the first corrective disclosure. Indeed, these insiders engaged in significant trading during the six months beginning in January 2023 when Outset was first being inspected by the FDA and engaged in discussions with the FDA regarding the fact that Tablo was not cleared for CRRT as detailed in the FDA Warning Letter, but before Outset publicly disclosed these issues in July 2023.

309. In addition, these insiders all traded shares pursuant to trading plans that were suspiciously adopted during the Class Period. Indeed, these plans were all adopted prior to the disclosure that Outset had received the FDA Warning Letter. Further, in the case of Defendants Ahmed and Trigg and General Counsel Brottem, certain of their trades were pursuant to trading plans that were adopted in February 2023, just after the FDA began inspecting the Company in January 2023.

310. The following chart shows the insider trading during the Class Period:[12]

| Insider | Total CP Shares Sold Class Period 9/15/2020-8/7/2024 (1422 Days) | Total CP Gross Proceeds Class Period 9/15/2020-8/7/2024 (1422 Days) |
|---|---|---|
| **Trigg, Leslie (Director, Officer: President & CEO)** | (883,240) | $30,366,470.71 |
| **Vazquez, Martin (Officer: Chief Operating Officer)** | (232,913) | $9,555,829.92 |
| **Brottem, John L. (Officer: General Counsel)** | (149,908) | $4,507,578.13 |
| **Chambers, Rebecca (Officer: Chief Financial Officer)** | (66,908) | $3,385,037.92 |
| **Williamson, Steven S. (Officer: Chief Commercial Officer)** | (37,337) | $671,321.65 |
| **Ahmed, Nabeel (Officer: Interim CFO)** | (52,670) | $573,814.56 |
| **Racine, Jean-Olivier (Officer: Chief Technology Officer)** | (21,632) | $192,697.15 |
| **Porter Stacey L. (Officer: Chief People Officer)** | (11,288) | $161,151.06 |
| **Nash, Marc (Officer: SVP, Operations and R&D)** | (6,603) | $27,866.77 |
| **Totals:** | **(1,462,499)** | **$49,441,767.87** |

[12] There was no insider trading prior to the start of the Class Period because the Class Period begins with the Company's IPO.

Defendant CEO Trigg

311. During the Class Period, Defendant Trigg engaged in insider trading that is suspicious in both magnitude and timing. Indeed, Defendant Trigg sold 883,240 shares of Outset common stock for proceeds of ***$30,366,470.71***. The bulk of these sales were from April 1, 2021 through July 3, 2023, right before the first partial corrective disclosure revealing that Outset had received the FDA Warning Letter, when Defendant Trigg sold a total of 778,628 shares of Outset stock for proceeds of ***$29,581,539.88***.

312. For example, Defendant Trigg sold a large number of shares during the six months beginning when Outset was being inspected by the FDA and engaged in discussions with the FDA regarding off-label promotion of Tablo for CRRT and for the distribution and promotion of TabloCart without any authorization, which began no later than January 17, 2023 but before the Company's disclosure of the FDA Warning Letter on July 7, 2023. During this six-month period, Defendant Trigg sold a combined 152,258 shares of Outset stock for proceeds of ***$ 3,464,094.34***.

313. Moreover, one of the largest dispositions of shares during this time period came on March 1, 2023, less than two weeks before it had a call with FDA about Tablo not being cleared for CRRT, unbeknownst to investors. On that day, Defendant Trigg sold 30,000 shares of Outset stock for proceeds of $674,487. Thereafter, in a two-month window between May 3, 2023 and July 3, 2023, right before the first corrective disclosure revealing the FDA Warning Letter, Defendant Trigg sold 82,962 shares of Outset stock for a total of $1,699,017.42.

314. While Defendant Trigg's stock sales during this two-month window were made pursuant to a 10b-5 trading plan, this plan was suspiciously adopted on February 23, 2023, one month after the FDA began its inspection of Outset.

315. On August 1, 2023, Defendant Trigg sold another 20,000 shares of Outset stock for proceeds of $404,462, the day before the Company disclosed it would pause shipments of TabloCart until it resolved the FDA Warning Letter with a new 510(k) Clearance application. Defendant Trigg thus avoided the ensuing 10.2% decline in the Company's share price.

316. Had Defendant Trigg retained the shares she sold during the Class Period, they would have been worth approximately $1 million the day after the Class Period ends and today, far less than the over $30 million she reaped during the Class Period.

Defendant Former CFO Chambers

317. Defendant Chambers also engaged in suspicious insider trading. In less than three months, from March 25, 2021 through June 24, 2021, Defendant Chambers sold 66,908 shares of Outset stock for proceeds of $3,385,037.92.

Defendant Former CFO Ahmed

318. During the Class Period, Defendant Ahmed likewise engaged in suspicious insider trading. Defendant Ahmed sold 52,670 shares of Outset common stock for proceeds of $573,814.56 during the Class Period and at suspicious times. For example, Defendant Ahmed sold a large number of shares after the FDA began its inspection of Outset in January 2023 and prior to the Company's disclosure of the receipt of the FDA Warning Letter on July 7, 2023. In that period, Defendant Ahmed sold a combined 10,999 shares of Outset stock for proceeds of $268,255.71. In fact, Defendant Ahmed's largest sale of Outset stock during the Class Period occurred on January 27, 2023, 10 days after the FDA's first inspection of Outset, when he sold 4,938 shares of Outset stock for proceeds of $137,868.96.

319. Like Defendant Trigg, Defendant Ahmed also adopted a revised 10b-5 trading plan on February 17, 2023, one month after the FDA began its inspection. After adopting the trading plan, he disposed of 7,602 shares of Outset stock for proceeds of $143,325.07 in a four-month window from May 3, 2023 to September 1, 2023.

General Counsel ("GC") Brottem

320. Insider and GC John Brottem also engaged in suspicious insider trading. He disposed of 149,908 shares of Outset common stock for proceeds of $4,507,578.13 during the Class Period. Indeed, most of these sales occurred before Outset revealed the FDA Warning Letter on July 7, 2023, selling 119,992 shares for proceeds of $4,332,264.06.

321. Moreover, like other insiders, Mr. Brottem also sold a large number of shares during the six months after the FDA began its inspection of Outset in January 2023 but before the

FDA Warning Letter was disclosed. From January 27, 2023 through June 20, 2023, Mr. Brottem sold a total of 25,291 shares of Outset stock for proceeds of $572,851.78. He also suspiciously adopted a revised 10b-5 trading plan on February 17, 2023, subject to which he sold 11,025 shares of Outset stock for proceeds of $226,770.69 from March 20, 2023 to just before the Company disclosed to the market that it had received the FDA Warning Letter. During that period, Mr. Brottem sold a combined 4,130 shares of Outset stock for proceeds of $85,986.60 on March 20, 2023, just one week after Outset had a call with FDA about Tablo not being cleared for CRRT.

Chief Operating Officer ("COO") Vazquez

322. During the Class Period, COO Martin Vazquez likewise engaged in insider trading that is suspicious in both magnitude and timing. During the Class Period, sold 232,913 shares for proceeds of $9,555,829.92. Like Defendant Trigg, Defendant Ahmed, and Mr. Brottem, Mr.Vazquez sold a large number of shares just after the FDA began its inspection of Outset in January 2023. Indeed, from January 27, 2023 through March 1, 2023, Mr. Vazquez sold 36,105 shares of Outset stock for proceeds of $1,013,743.88.

323. In sum, the sale of large amounts of Company shares at suspicious times constitutes strong evidence of scienter.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

324. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and/or misleading statements pleaded in this Complaint. The statements alleged to be false and/or misleading herein all relate to historical or then-existing facts and conditions.

325. In addition, to the extent certain of the statements alleged to be false and/or misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

326. Alternatively, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false and/or misleading forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Outset who knew that the statement was false when made. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

## X. LOSS CAUSATION

327. As detailed herein, at all relevant times, Defendants issued materially false and misleading statements or omissions that: (a) represented that the Company did not engage in off-label promotion when, in fact, it engaged in pervasive off-label promotion of Tablo for CRRT, for which it was not cleared, and marketed the TabloCart without any FDA clearance; (b) touted the financial results and strong demand and growth for Tablo without disclosing that it was based on off-label marketing; (c) touted Tablo's strong "value proposition" and that Tablo could perform all dialysis treatments and was the only device a health system needed, without disclosing that this value proposition was being fueled by off-label marketing of Tablo for CRRT; (d) marketed and promoted TabloCart without prior 510(k) Clearance; and (e) misrepresented and downplayed the issues in the FDA Warning Letter and their impact on the Company.

328. As detailed above, as the truth was revealed, the Company's common stock declined as the prior artificial inflation came out of its common stock price. The declines in Outset's common stock price were a direct result of the nature and extent of the fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price declines negate any inference that the losses suffered by Lead Plaintiff and other members of the Class was caused solely by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. Accordingly, these false

and misleading statements directly or proximately caused Lead Plaintiff and other Class members to suffer damages.

329. The truth was revealed to the market in a series of disclosures which only partially revealed the truth until the end of the Class Period, including the following:

a. On Friday July 7, 2023, after the market closed, Outset disclosed that it received the FDA Warning Letter. The Company stated that the FDA Warning Letter stated that the FDA reviewed certain materials found on the Company's website that promote CRRT, a modality outside of Tablo's current clearance and that TabloCart "requires prior 510(k) clearance for marketing authorization." On this news, Outset's stock price fell $1.20, or 5.9%, to close at $19.26 per share on Monday July 10, 2023, the next trading day, on heavy volume.

b. On August 2, 2023, after the market closed, the Company issued a press release and disclosed that due to the FDA Warning Letter and as the TabloCart had never received FDA clearance to be marketed, it "chose" to pause the shipment of TabloCart pending its intended submission to the FDA for 510(k) clearance, which it also "chose" to do. The Company also lowered expectations telling investors that it "now expects to be at the low end of [$144 million to $150 million revenue guidance] as a result of the shipment pause." On this news, Outset's stock price dropped $1.97, or 10.2%, to close at $17.39 per share on August 3, 2023, on heavy volume.

c. On October 12, 2023, after the market closed, Outset preannounced third quarter financial results, stating the Company had revenue of $30.4 million for the third quarter and lowered revenue guidance for 2023 to approximately $130 million. Defendant Trigg characterized the "dampened" growth as due, in part, to "a larger-than-expected impact in the field from the recent FDA warning letter." On this news, the Company's share price fell $3.38, or 49.9%, to close at $3.39 per share on October 13, 2023, on heavy volume.

d. On November 7, 2023, after the market closed, the Company announced initial 2024 guidance calling for mid-teens revenue growth versus consensus expectations of 17.8% and reported revenue for the third quarter of $30.4 million. Defendant Trigg attributed these figures to "competitive activity around TabloCart not being available…and some competitive noise making around the other aspect of the warning letter around some case studies that were on our website." Outset further expanded on the issues facing the Company in its November 8, 2023 filed Form 10-Q, which discussed "several factors" that elongated the Company's sales cycle leading to an adverse effect on bookings and revenue. These factors included the "recent Warning Letter and our distribution pause on TabloCart with Prefiltration.…" The Company stated further that it "anticipate[d] that the negative impacts from the Warning Letter and our distribution pause will continue through at least the end of 2023." On this news, the Company's share price fell $0.62, or 14.4%, to close at $3.69 per share on November 8, 2023, on heavy volume.

e. On May 9, 2024, before the market opened, the Company filed its Q1 2024 Form 10-Q and disclosed that despite TabloCart's recent FDA clearance,

"[Outset] may continue to experience disruptions as a result of the warning letter and our prior distribution pause on TabloCart with Prefiltration." The Company further disclosed that "[e]ven as we resume distribution of TabloCart with Prefiltration following its FDA clearance, if we are unable to sufficiently recover from these disruptions and any reputational harm at the levels or on the timeframes we anticipate, we may experience further disruptions which could include adverse impacts on our backlog, our ability to expand customer relationships or attract new customers, as well as reduced demand for TabloCart and/or, potentially, Tablo." On this news, Outset's stock price fell $0.86, or 20.82%, to close at $3.27.

f. On August 7, 2024, after the market closed, Outset released its second quarter 2024 financial results, significantly missing consensus estimates and lowering its full year 2024 outlook. It lowered full year 2024 guidance by $39 million at the midpoint and stated the Company needed to "improve our execution." Later that same day during the Company's conference call to discuss results, Defendant Trigg stated Outset would undergo "sales team and process restructuring" and would be unable to deliver on its previously promised ramp up of Tablo sales. On this news, the Company's share price fell $2.33, or 68.5%, to close at $1.07 per share on August 8, 2024, on heavy volume.

330. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' false and misleading statements and fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when the true facts started to be revealed.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE

331. Lead Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine. At all times, the market for Outset securities was an open, well-developed, and efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities.

332. Throughout the Class Period:

a. Outset was listed and actively traded on NASDAQ, a highly efficient and automated market;

b. The market price of Outset securities reacted promptly to the determination of public information regarding the Company;

c. As a regulated issuer, Outset filed periodic public reports with the SEC and/or the NASDAQ during the Class Period;

d. Outset regularly communicated with public investors via established market communication mechanisms, including through regular

dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e. During the Class Period, Outset was followed by between six and eight securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

f. The average weekly trading volume for Outset stock during the Class Period was approximately 209,334.80 shares; and

g. During the Class Period, the Company's market capitalization was as high as $2.75 billion, and the Company had between 42.7 million and 52.1 million shares outstanding.

333. Throughout the Class Period, the Company was consistently followed by the market, including securities analysts. The market relies upon the Company's statements and management to accurately present the Company. During this period, Defendants continued to pump materially false and misleading information into the marketplace regarding the Company. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of the Company's securities.

334. As a result of the misconduct alleged herein, the market for Outset's common stock was artificially inflated. Thus, the presumption of reliance available under the "fraud-on-the-market" theory applies and Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are each responsible.

335. Lead Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Outset's common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

336. Lead Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose. Had Lead Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants or been aware of the truth behind

Defendants' material misstatements, they would not have purchased Outset's common stock at artificially inflated prices.

## XII. CLASS ACTION ALLEGATIONS

337. Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired Outset common stock during the Class Period, including shares sold in the August 2019 Offering, and were damaged as a result (the Class). Excluded from the Class are: (a) Defendants, (b) members of the immediate families of Defendants, (c) the subsidiaries and affiliates of Defendants, (d) any person who is an officer, director, or controlling person of Outset, (e) any entity in which any Defendant has a controlling interest, (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof, and (g) the legal representatives, heirs, successors, or assigns of any such excluded party.

338. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Indeed, during the Class Period, Outset had between 42.7 million and 52.1 million outstanding shares of common stock.

339. Members of the Class may be identified from records maintained by Outset or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

340. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

a. whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

b. whether the statements made were materially false or misleading, or omitted material facts;

c. whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

d. whether the prices of Outset's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

e. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

341. Lead Plaintiff's claims are typical of the claims of other members of the Class and the other members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as alleged in this Complaint.

342. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

343. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

344. Lead Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine. All purchasers of Outset's securities during the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices. A presumption of reliance therefore applies.

## XIII. COUNTS AGAINST DEFENDANTS

### COUNT I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)

345. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

346. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (a) deceived the investing public, including Lead Plaintiff and other Class members, as alleged herein; (b) artificially

inflated and maintained the market price of Outset securities; and (c) caused Lead Plaintiff and other members of the Class to purchase Outset stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, made the false statements and engaged in other unlawful acts as alleged herein.

347. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Outset's business, operations and prospects, as specified herein.

348. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of Outset's business, operations and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Outset and its business, operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

349. Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (a) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's business, operations, and prospects; (c) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (d) each of the

Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

350. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

351. Lead Plaintiff and other members of the Class relied upon Defendants' statements and/or on the integrity of the market in purchasing shares of Outset's common stock during the Class Period.

352. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Outset securities was artificially inflated during the Class Period.

353. In ignorance of the fact that market prices of Outset's publicly traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements disseminated by analysts following Outset, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants named in this count but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Outset securities during the Class Period at artificially inflated prices and were damaged thereby.

354. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the truth, Lead Plaintiff and other members of the Class would not have purchased their Outset securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

355. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

356. By virtue of the foregoing, Outset and the Individual Defendants each violated Section § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Lead Plaintiff and the Class members who have been damaged as a result of such violations.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

357. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

358. The Individual Defendants acted as controlling persons of Outset within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

359. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the actions giving rise to the securities violations as alleged herein, and exercised that power.

360. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

361. As set forth above, Outset and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

362. By reason of the conduct of Defendants alleged in this Complaint, and by virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

a. Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and appointing Lead Plaintiff's counsel as Class Counsel;

b. Awarding compensatory and/or rescissionary damages in favor of Lead Plaintiff and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

c. Granting equitable and/or injunctive relief as permitted by law, equity and federal law;

d. Awarding Lead Plaintiff and the Class their reasonable fees and expenses incurred in this action, including counsel fees and expert fees; and

e. Awarding such other and further relief as the Court may deem just and proper.

## XV. JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff hereby demands trial by jury of all issues that may be so tried.

///

///

///

Dated: June 6, 2025

Respectfully submitted,

**BERMAN TABACCO**

By: *_/s/ Kristin Moody_*
Kristin Moody

Nicole Lavallee
Alexander Vahdat
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
kmoody@bernantabacco.con
avahdat@bermantabacco.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*