1   Sara B. Brody (SBN 130222)
    sbrody@sidley.com
2   Jaime A. Bartlett (SBN 251825)
    jbartlett@sidley.com
3   Sarah E. Gallo (SBN 335544)
    sgallo@sidley.com
4   SIDLEY AUSTIN LLP
    555 California Street, Suite 2000
5   San Francisco, CA 94104
    Telephone: (415) 772-1200
6
7   *Attorneys for Defendants*
    *Outset Medical, Inc., Leslie Trigg,*
    *Nabeel Ahmed, and Rebecca Chambers*
8

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| IN RE OUTSET MEDICAL, INC. SECURITIES LITIGATION | Case No.  5:24-cv-06124-EJD<br>Assigned to: Hon. Edward J. Davila<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Date:   January 22, 2026<br>Time:  9:00 a.m.<br>Place:  Courtroom 4, 5th Floor<br><br>AC Filed: June 6, 2025 |
|---|---|

**TABLE OF CONTENTS**                                        **Page**

STATEMENT OF ISSUES ...........................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................2

INTRODUCTION ....................................................................................................2

ALLEGATIONS & PROCEDURAL HISTORY....................................................................4

    I.      TRADITIONAL DIALYSIS TREATMENT IN THE UNITED STATES ..............4

    II.     OUTSET & THE TABLO TECHNOLOGY.......................................................5

    III.    OUTSET'S DISCLOSURES DURING THE CLASS PERIOD...............................6

         A.     Outset Made Extensive Disclosures About How Tablo Operated, Its Value Proposition, And The Uses For Which It Was Being Sold. ........6

         B.     Outset Disclosed That TabloCart Was Not An FDA Cleared Device...8

         C.     Disclosures About Outset's Financial Performance Reflected The Importance Of The Acute Market And Tablo XT To Revenue............8

         D.     Disclosures About Outset's Compliance With FDA Marketing Rules .8

    IV.    FDA INSPECTION, WARNING LETTER AND RELATED DISCLOSURES ......9

    V.     PLAINTIFF'S LAWSUIT ..........................................................................10

ARGUMENT..........................................................................................................11

    I.      PLAINTIFF FAILS TO ADEQUATELY CHALLENGE ANY STATEMENT AS FALSE OR MISLEADING.........................................................................11

         A.     Plaintiff Does Not Allege Widespread Off-Label Marketing Over The Class Period. ..................................................................................12

             1.     The Court Should Disregard CWs 1, 7, 8 & 9. .......................12

             2.     Plaintiff Does Not Plead With Sufficient Particularity That Outset Employees Were Told To Promote Tablo For Off-Label Use. .......................................................................................13

             3.     The CW Allegations Do Not Show That Outset Actually Engaged In Systematic Off-Label Marketing. .........................14

             4.     No Allegations Show That Outset Knew Its Promotion Of Tablo Constituted Off-Label Marketing Or Intended To Mislead Investors By Concealing That Conduct. ....................15

         B.     Plaintiff Fails to Allege Falsity as to the Risk, Revenue, and Value Proposition Statements.........................................................................16

i

1.    Outset Did Not Conceal How It Marketed Tablo To Customers. ......................................................................................16

2.    Plaintiff Has Not Pled A Material Omission From The Value Proposition And Revenue Statements.....................................17

3.    Plaintiff Has Not Pled The Risk Statements Were Knowingly False When Made. ...............................................................18

C.    Plaintiff Relies Solely On Improper Hindsight In Arguing That The Tablo Cart Statements Were False Or Misleading When Made..........19

D.    Plaintiff Has Failed to Allege Investors Were Misled By the FDA Statements. .........................................................................19

E.    Plaintiff Improperly Challenges Inactionable Puffery and Opinion Statements. .........................................................................21

1.    Value Proposition Statements ...................................................22

2.    Revenue, Demand, and Growth Statements ...........................23

3.    FDA Letter Statements ...........................................................24

F.    Certain of the Challenged Statements Are Non-Actionable Forward-Looking Statements Under the PSLRA's Safe Harbor.......................25

1.    Many of the Growth and FDA Letter Statements Are Forward-Looking. .......................................................................................25

2.    These Statements Were Accompanied by Meaningful Cautionary Language And Were Not Made with Actual Knowledge. ...............................................................................26

II.    PLAINTIFF FAILS TO PLEAD SCIENTER .......................................................27

A.    Plaintiff Fails To Plead Scienter As To Defendant Trigg....................28

B.    Plaintiff Fails To Plead Scienter As To Defendants Ahmed And Chambers. ...........................................................................................32

C.    Scienter Is Not Pled Under A Holistic Analysis Or As To Defendant Outset. .................................................................................................33

III.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION ..........................................33

IV.    PLAINTIFF FAILS TO PLEAD A CLAIM FOR VIOLATION OF SECTION 20(a) BY ANY INDIVIDUAL DEFENDANT.................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021) ...................................................................................22

*In re Amgen Inc. Sec. Litig.*,
   544 F. Supp. 2d 1009 (N.D. Cal. 2008) .................................................................14

*In re Apache Corp. Sec. Litig.*,
   2024 WL 532315 (S.D. Tex. Feb. 9, 2024) ...........................................................35

*Applestein v. Medivation, Inc.*,
   861 F. Supp. 2d 1030 (N.D. Cal, 2012) .................................................................13

*Bodri v. GoPro*,
   252 F. Supp. 3d 912 (N.D. Cal. 2017) .............................................................25, 27

*In re BofI Holding, Inc. Sec. Litig.*,
   2017 WL 2257980 (S.D. Cal. May 23, 2017).........................................................36

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) .................................................................................22

*City of Royal Oak. Ret. Sys. v. Juniper Networks, Inc.*,
   880 F. Supp. 2d 1045 (N.D. Cal. 2012) .....................................................22, 24, 25

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) .......................................................................24, 25, 28

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)................................................................................................34

*Elias v. Hewlett-Packard Co.*,
   950 F. Supp. 2d 1123 (N.D. Cal. 2013) .................................................................23

*Espy v. J2 Global, Inc.*,
   99 F.4th 527 (N.D. Cal. 2024) ...............................................................................36

*Ferraro Family Found, Inc. v. Corcept Therapeutics, Inc.*,
   501 F.Supp.3d 735 (N.D. Cal. 2020) ...............................................................12, 13

*In re Fusio-io, Inc. Sec. Litig.*,
   2015 WL 661869 (N.D. Cal. Feb. 12, 2015) .........................................................24

*In re FVC.COM Sec. Litig.*,
   32 F. App'x 338 (9th Cir. 2002) .............................................................................32

*In re Gilead Scis. Sec. Litig.*,
   2005 WL 181885 (N.D. Cal. Jan 26, 2005) .................................................14, 16, 18

*In re Gupta Corp. Sec. Litig.*,
   900 F. Supp. 1217 (N.D. Cal. 1994) ......................................................................36

*Hollinger v. Titan Capital Corp.*,
   914 F.2d 1564 (9th Cir. 1990) (en banc) ..............................................................36

*Immanuel Lake v. Zogenix, Inc.*,
   2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) .......................................................19

*Inchen Huang v. Higgins*,
   443 F. Supp. 3d 1031 (N.D. Cal. 2020) ....................................................12, 13, 15

*Iron Workers Local 580 Joint Funds v. Nvidia Corp.*,
   2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) ......................................................29

*In re Kalobios Pharms, Inc. Sec. Litig.*,
   258 F. Supp. 3d 999 (N.D. Cal. 2017) ...................................................................16

*Kipling v. Flex Ltd.*,
   2020 WL 2793463 (N.D. Cal. May 29, 2020) .......................................................27

*Knollenberg v. Harmonic, Inc.*,
   152 F. App'x 674 (9th Cir. 2005) ..........................................................................30

*Lomingkit v. Apollo Educ. Grp. Inc.*,
   275 F. Supp. 3d 1139 (D. Ariz. 2017) ...................................................................23

*Loos v. Immersion Corp.*,
   762 F.3d 880 (9th Cir. 2014) .................................................................................34

*Macomb Cty. Emps. Ret. Sys. v. Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022) ..........................................................................11, 12

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ....................................................................28, 30, 31

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ....................................................................2, 20, 34, 36

*Murphy v. Precision Castparts Corp.*,
   2020 WL 4040827 (D. Or. July 17, 2020) .............................................................36

*In re Nektar Therapeutics*,
   2020 WL 3962004 (N.D. Cal. July 13, 2020)........................................................29

*No. 84 Emp'r-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) .................................................................................26

iv

*Oestreicher v. Alienware Corp.*,
  544 F. Supp. 2d 964 (N.D. Cal. 2008) ..................................................................23

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)...........................................................................................22, 25

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
  774 F.3d 598 (9th Cir. 2014) .......................................................................11, 22, 25

*Pirani v. Netflix, Inc.*,
  2024 WL 4894291 (N.D. Cal. Nov. 26, 2024) ....................................................26

*Plumley v. Sempra Energy*,
  2017 WL 2712297 (S.D. Cal. June 20, 2017).......................................................32

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
  759 F.3d at 1051 (9th Cir. 2014)...................................................................29, 31

*Prodanova v. H.C. Wainwright & Co.*,
  LLC, 993 F.3d 1097 (9th Cir. 2021) ..................................................................29

*In re Radian Sec. Litig.*,
  612 F. Supp. 2d 594 (E.D. Pa. 2009) ..................................................................32

*In re Rigel Pharms., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ............................................................................12

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) .............................................................................30

*Rubin v. Trimble*,
  1997 WL 227956 (N.D. Cal. Apr. 28, 1997) .......................................................16

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
  2006 WL 648683 (N.D. Cal. Mar. 10, 2006)........................................................30

*In re Taleo Corp. Sec. Litig.*,
  2010 WL 597987 (N.D. Cal. Feb. 17, 2010) .......................................................31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................11

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) ..........................................................................31

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) ................................................................30

*In re Verifone Sec. Litig.*,
  11 F.3d 865 (9th Cir. 1993) ..............................................................................19

v

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prod. Liab. Litig.*,
    2017 WL 6041723 (N.D. Cal. Dec. 6, 2017)...........................................................34

*Weston v. DocuSign, Inc.*,
    669 F. Supp. 3d 849 (N.D. Cal. 2023) ..................................................................26

*Wochos v. Tesla*,
    985 F.3d 1180 (9th Cir. 2021) ..............................................................................26

*Wozniak v. Align Tech., Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ................................................................24

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...........................................................................13, 28

**Statutes**

17 C.F.R. § 240.10b-5.............................................................................................1, 11, 22

15 U.S.C. § 78j(b)
    (Section 10(b) of the Securities Exchange Act of 1934) ....................................11, 36

15 U.S.C. § 78t(a)
    (Section 20(a) of the Securities Exchange Act of 1934)....................................1, 36

15 U.S.C. § 78u-4(b)
    (Private Securities Litigation Reform Act ("PSLRA")................................1, 11, 28

15 U.S.C. § 78u-5 .................................................................................................1, 26, 27

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on January 22, 2026, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 4 of the above entitled Court, located on the 5th Floor, 280 South First Street, San Jose, California 95113, before the Honorable Edward J. Davila, Defendants hereby do move the Court for an order dismissing the Amended Consolidated Complaint ("AC") filed by Lead Plaintiff Plymouth County Retirement Association ("Plaintiff"). ECF 50. This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Request for Judicial Notice and Consideration of Documents Incorporated by Reference, the Declaration of Jaime A. Bartlett in support thereof and the attached exhibits, the record in this action, and any oral argument permitted by the Court.

## STATEMENT OF ISSUES

1. Whether Plaintiff's Section 10(b) and Rule 10b-5 claim should be dismissed for failure to allege with particularity facts showing that Defendants made actionable false or misleading statements of material fact, 15 U.S.C. § 78u-4(b)(1), insofar as the eighty-seven purported misstatements and omissions challenged in the AC (the "challenged statements") (a) are not plausibly alleged to have been false or misleading; (b) are forward looking statements protected by the PSLRA's safe harbor, 15 U.S.C. § 78u-5; (c) are nonactionable statements of opinion; and/or (d) are nonactionable corporate puffery.

2. Whether the Section 10(b) and Rule 10b-5 claim should be dismissed for failure to allege with particularity facts giving rise to a strong inference that Defendants made any of the challenged statements with scienter, 15 U.S.C. § 78u-4(b)(2).

3. Whether the Section 10(b) and Rule 10b-5 claim should be dismissed for failure to allege with particularity facts showing that the Defendants' alleged misstatements caused the Plaintiff's claimed losses, 15 U.S.C. §78u-4(b)(4).

4. Whether the Section 20(a) claim should be dismissed because Plaintiff has failed to plead a primary violation of Section 10(b).

## MEMORANDUM OF POINTS AND AUTHORITIES

### <u>INTRODUCTION</u>

Outset Medical, Inc. ("Outset" or the "Company") is a medical technology company that developed Tablo, a product designed to administer a range of dialysis treatments, in any care setting, through a single advanced platform. In 2014, the FDA cleared Tablo for use in hospital and clinical settings for a category of dialysis treatments referred to as "intermittent." In 2020, the FDA cleared Tablo for use in the home. The Company also developed an accessory called TabloCart, which gives users in areas with poor water quality the option to extend the life of the filters inside Tablo.

In this case Plaintiff alleges that Outset, its CEO, Leslie Trigg, and its two former CFOs, Rebecca Chambers and Nabeel Ahmed (collectively, "Defendants") violated the federal securities laws by misleading investors about Outset's marketing of, and revenue drivers for, Tablo and TabloCart. At the core of Plaintiff's claims is the allegation that Defendants secretly engaged in off-label promotion: purportedly marketing Tablo for a "continuous" dialysis treatment (rather than intermittent treatments) for which it was not cleared by the FDA, and selling TabloCart as a non-medical accessory when it actually required FDA clearance.

Plaintiff challenges eighty-seven statements made between August 21, 2020 and May 8, 2024—a nearly four year period—as false or misleading under this theory of concealed off-label promotion.[1] Notwithstanding the bloated and repetitive amended complaint, Plaintiff fails to adequately plead the elements of a securities fraud claim for any of the challenged statements.

***First***, the underpinning of Plaintiff's theory is an alleged widespread off-label marketing scheme. But Plaintiff does not sufficiently plead such a scheme. Plaintiff fails to allege facts showing Outset's leadership directed a campaign to promote the off-label use throughout the Class Period, and that there was widespread conduct to effectuate that campaign. The AC fails to allege either direction from leadership with the requisite specificity, or facts showing widespread conduct.

---

[1] The eighty-seven challenged statements are quoted and numbered in Appendix A with cross reference to the applicable AC paragraphs. For ease of reference, the challenged statements may be referred to herein by statement number or "Stmt."

*Second*, there was no concealment. Outset was transparent with investors about its commercial strategy for Tablo and TabloCart. The challenged statements themselves demonstrate that Outset was marketing Tablo with TabloCart to hospitals to administer a range of dialysis treatment for up to 24 hours based on its FDA-cleared functions. Outset also told investors that the Tablo revenue was growing because of the Company's successful commercial strategy.

*Third*, Plaintiff has not pled facts showing that concealment of such a hypothetical scheme rendered any challenged statement materially false or misleading when made. This independently warrants dismissal. Moreover, the vast majority of the 87 challenged statements are non-actionable puffery or opinion, or are forward looking statements protected by the safe harbor. These statements cannot form the basis of Plaintiff's claims.

*Fourth*, the AC does not set forth facts to support a compelling inference of scienter as to any Defendant. There are no allegations that the Individual Defendants (Trigg, Chambers or Ahmed) engaged in, knew of, or concealed from investors a marketing strategy constituting off-label promotion. Plaintiff's other allegations about the Company's core operations and Defendants' stock sales are unremarkable and insufficient to create a compelling inference of scienter.

*Finally*, Plaintiff overreaches with the alleged corrective disclosures. The FDA issued a warning letter in July 2023 identifying certain conduct as off-label promotion and observing that TabloCart should obtain FDA clearance as a medical device. Outset disclosed the letter three days later and thereafter discussed openly the negative impact on its revenue. Plaintiff, however, alleges corrective disclosures spanning a full year after the FDA warning letter, but cannot identify what new information was disclosed or tie those disclosures to the alleged concealed off-label marketing.

Plaintiff tries—in over 360 paragraphs—to tell a story of securities fraud. But even viewed in the light most favorable to Plaintiff, these allegations describe a far simpler, and legal, series of events: Outset marketed Tablo and TabloCart as an innovative alternative treatment system that could deliver treatment for up to 24 hours and openly told investors it was doing so. More than three years later, the FDA found some aspects of that strategy to be off-label promotion. Outset promptly disclosed the FDA's finding to investors, immediately stopped the purportedly wrongful conduct, and sought FDA clearance for TabloCart. Outset experienced some negative financial repercussions

1  following these disclosures, which it also promptly disclosed to investors, clearly explaining what it

2  understood to be the drivers of its decline in revenue. This set of facts, alleged in the AC, simply

3  doesn't add up to securities fraud. These claims should be dismissed.

**ALLEGATIONS & PROCEDURAL HISTORY**

4

5  **I.     TRADITIONAL DIALYSIS TREATMENT IN THE UNITED STATES**

6          To understand Plaintiff's allegations of off-label marketing, it's necessary to first understand

7  how hemodialysis has traditionally been administered to treat kidney failure. In 2020—the year that

8  Outset held its IPO— kidney failure affected an estimated 810,000 people in the United States. Ex. 1

9  at 96. Kidney failure is commonly managed with hemodialysis— a procedure by which waste

10 products and excess fluid are directly removed from a patient's blood using an external dialysis

11 machine. ¶ 33. The administration of this procedure traditionally varies in a number of ways that are

12 relevant to Tablo and the claims in this case:

13         ***Different Treatment Modalities.*** There are several different types of hemodialysis treatments

14 most of which fall into two broad categories: intermittent or continuous (¶ 34), shown here:

15

16

17  

18

19

20

21

22         Intermittent hemodialysis operates for a pre-determined period of time that can be

23 administered for up to, but not beyond, 24 hours. *Id.* Intermittent treatments include Intermittent

24 Hemodialysis (IHD), Prolonged Intermittent Real Replacement Therapy (PIRRT) and Sustained

25 Low-Efficiency Dialysis (SLED). *Id.* In contrast, continuous hemodialysis will run, without

26 interruption, until discontinued by the medical care provider and is not constrained by a time limit.

27 *Id.* CRRT is a form of continuous hemodialysis, and thus operates without a defined time limit. *Id.*

28 Alternative treatment options may be available and effective for a patient.

4

1    ***Different Care Settings.*** Just as there are different types of hemodialysis treatments, there are

2    also multiple care settings in which hemodialysis can be performed. Ex. 1 at 97; Ex. 22 at 10. Acute

3    settings, which include hospitals, long term acute care facilities commonly administer IHD,

4    SLED/PIRRT and CRRT treatments. Central to Outset's disclosed commercial strategy was to sell

5    Tablo to hospitals that outsourced their inpatient dialysis treatments to a third-party dialysis

6    provider, and enable these hospitals to change their service model and deliver dialysis treatments in

7    house with their own nursing staff, in order to realize financial, clinical and operational benefits. *See,*

8    *e.g.*, Ex. 2 at 101, Ex. 4 at 4, 9-10. Throughout the Class Period, Outset's revenue was primarily

9    driven by sales to customers operating in the acute setting.

10    ***Different Treatment Technology.*** Dialysis is one of the largest, most expensive, and stagnant

11    areas of healthcare. Ex. 1 at 96. Traditional hemodialysis is burdensome and expensive to

12    administer, but the market had seen little evolution leading up to Outset's development of Tablo. Ex.

13    1 at 96-101. Often, acute settings need several different types of machines to administer the full

14    range of hemodialysis treatment that might be needed for the range of patients experiencing kidney

15    failure. *Id.* Operation of these different traditional machines is complicated, requiring special

16    training. *Id.* These traditional dialysis machines also require industrial water treatment rooms,

17    separate water purification machines, or pre-filled bags of dialysate to operate. ¶ 45.

18    **II.    OUTSET & THE TABLO TECHNOLOGY**

19    Outset was formed to develop new and more advanced dialysis treatment technology. ¶ 24.

20    Tablo, Outset's dialysis machine, was cleared by the FDA in September 2014 for use in both acute

21    and chronic care facilities to provide intermittent hemodialysis treatment (i.e., IHD, SLED/SLEDD,

22    PIRRT, and Isolated Ultrafiltration). ¶ 43. Subsequently, on April 1, 2020, Tablo was cleared by the

23    FDA for patient use in the home. *Id.*

24    What differentiates Tablo in the hemodialysis market is its "all in one" capability. Tablo is a

25    single technology platform that can perform any of the treatment modalities for which it has FDA

26    clearance, in acute or chronic care facilities or in the home. In other words, Tablo can run dialysis

27    for different lengths of prescribed treatment time up to 24 hours, at different speeds of blood and

28    dialysate flow, and it produces dialysate "on demand" through its own integrated water purification

1    system, which can be used with tap water, and does not require the costly and complicated water

2    treatment room infrastructure or pre-filled bags of dialysate. ¶ 45.[2] Tablo was designed to reduce the

3    cost and complexity of dialysis care for hospitals, and to provide patients with the freedom to choose

4    where, when, and how they dialyze by making home dialysis easier and more accessible.

5        Outset sells two optional enhancements for Tablo: Tablo XT (now Tablo Pro+), a software

6    upgrade that operates Tablo at a lower dialysate flow rate for up to 24 hours, expanding the length of

7    time that intermittent treatments such as SLED and PIRRT can be administered, launched in Q3

8    2020. ¶ 44. TabloCart with Prefiltration removes carbon, sediment, and minerals from water before it

9    enters the Tablo system in order to extend the life of the filters inside Tablo, which can become

10   quickly saturated in areas with poor water quality. ¶ 47. TabloCart launched in October 2022. *Id.*

11   **III.    OUTSET'S DISCLOSURES DURING THE CLASS PERIOD**

12       **A.    Outset Made Extensive Disclosures About How Tablo Operated, Its Value
            Proposition, And The Uses For Which It Was Being Sold.**
13

14       In disclosures made throughout the Class Period, Outset said that Tablo was not cleared by

15   the FDA for use in CRRT treatment. ¶ 46; Ex. 2 at 136; Ex. 3 at 47; Ex. 4 at 20. The AC does not

16   allege that Outset falsely stated that Tablo had FDA clearance to perform CRRT treatments.

17       When Tablo XT was released it offered Tablo customers the ability to both slow the dialysate

18   flow rate in Tablo and extend Tablo's use up to 24 hours. Trigg carefully distinguished that

19   functionality from CRRT, stating:

20           on the XT front, maybe let me take a step back and maybe just talk about what this new
             feature does. So the XT provides a new functionality. It enables Tablo mechanically to
21           run for up to 24 hours. Now CRRT, which you mentioned, that is a specific clinical
             treatment that often involves therapies such as CVVHDF or CVVH or [indiscernible]
22           that Tablo does not provide. ***So Tablo is not a CRRT machine. The new feature just
             allows users in the acute setting to run regular dialysis at lower flow rates for a longer
23           period of time***.

24   Ex. 18 at 10 (emphasis added).

25       Throughout the Class Period, Outset discussed Tablo's functions and value in the acute care

26   setting. For example, in its Prospectus, Outset described the "compelling value proposition" of Tablo

27   _____

28   [2] A detailed contrast of Tablo's functions to traditional dialysis is set out in Exhibit 1 at 97-112.

in the acute care setting to include "[increasing] hospital operating margins by lowering the overall cost of dialysis-related supplies, infrastructure and labor by up to 80% in the ICU" and "[reducing] operational complexity by eliminating the need for multiple dialysis machines and streamlining documentation and compliance." Ex. 1 at 99. Tablo was further described as offering clinical flexibility ("Tablo can accommodate a wide range of treatment modalities, durations and flow rates, allowing for broad clinical applications") and operational versatility ("Tablo is an all-in-one device with integrated water purification and on-demand dialysate production, eliminating the need for industrial water treatment rooms required to operate traditional hemodialysis machines. Tablo's independence from this infrastructure enables bedside dialysis in the acute setting, saving the time and expense of transporting patients elsewhere for dialysis."). Ex. 1 at 3.

Outset transparently conveyed its belief that providers could use the single Tablo platform to achieve the same or improved patient care at lower cost across dialysis treatments up to 24 hours. *See, e.g.*, ¶¶ 109-110, 113-14, 118, 126, 149, 152, 154, 175. As Plaintiff notes, Outset's investor materials included graphics showing Tablo replacing numerous dialysis machines, including those used for CRRT, and referenced customers making "whole house conversions" to Tablo. ¶¶ 109, 149. In September 2021, at the Morgan Stanley Conference, Trigg summarized the opportunity presented by Tablo: "About 85% of the treatments performed in the acute setting are actually kind of run-of-the-mill regular dialysis 3 or 4 hour treatments done bedside at the floor, we can do those. The 15% are much sicker patients, much more complicated patients in the ICU, running longer, slower dialysis up to 24 hours, Tablo also can serve those patients. And so we have the ability to capture 100% of all the treatment volume that any given hospital across the country is doing on an annual basis." ¶ 136 (emphasis omitted). Similarly, in February 2022 at the Leerink Conference, Trigg said "we are going after the whole thing. Companies that have talked about acute dialysis in the past, their devices can only be used in the ICU. They can only be used for these longer treatments called SLED or CRRT, or they have a device that can only be used for short treatments…Tablo is the only device available that can treat across the entire spectrum, sort of from zero to 24 hours. And therefore, we can go after all of the different types of treatments that are delivered in a hospital." ¶ 149; Ex. 21 at 7 (emphasis omitted). Outset never described Tablo as offering continuous treatment,

1    but rather described it with reference to its ability to run up to 24 hours. *Id. See also*, Appendix A.

2        And, Outset's website featured testimonials from acute customers who had successfully

3    transitioned to Tablo to meet their treatment needs, reflecting its success in the acute market. ¶ 223.

4        **B.    Outset Disclosed That TabloCart Was Not An FDA Cleared Device.**

5        In November 2022, Outset introduced TabloCart to investors stating: "we are pleased to

6    introduce TabloCart, which is a new accessory for Tablo. TabloCart provides additional

7    maneuverability around the hospital and incremental pre-filtration capabilities for sites that suffer

8    from water quality that is far worse than the national drinking water standards." ¶ 167 (emphasis

9    omitted). In two subsequent SEC filings, TabloCart was described as "a non-medical accessory for

10    the Tablo Hemodialysis System that provides added maneuverability and optional prefiltration

11    storage." ¶¶ 189-90; Ex. 5 at 4; Ex. 8 at 31. There is no allegation that Outset ever falsely stated or

12    implied that TabloCart had received FDA clearance.

13        **C.    Disclosures About Outset's Financial Performance Reflected The Importance Of
14             The Acute Market And Tablo XT To Revenue.**

15        Each quarter in the Class Period starting in March 2021 with the revenue results for the

16    fourth quarter of  2020, Outset announced its financial results and attributed its positive performance

17    to expansion within the acute setting and demand for Tablo XT (the software upgrade that allowed

18    providers to use Tablo with a slower dialysate flow rate and up to 24 hours). *See, e.g.*, Stmt. 10

19    ("[F]ourth quarter revenue grew 143% year-over-year to $17.2 million, driven by the impact of our

20    HHS lease agreement, higher console shipments, ***the launch of our Tablo XT products*** and

21    continued growth in consumables and services tied to our larger installed base"). The AC does not

22    allege that false revenue was reported or that Outset did not experience high demand for Tablo XT

23    or see expansion within the acute setting when it made any of these statements.

24        **D.    Disclosures About Outset's Compliance With FDA Marketing Rules**

25        In several of its disclosures during the Class Period, Outset acknowledged the FDA's

26    authority over how Outset promoted Tablo and TabloCart. Specifically, Outset stated:

27    • "Our educational and promotional activities and training methods must comply with FDA
       and other applicable laws, including the prohibition of the promotion of a medical device for
28     a use that has not been cleared or approved by the FDA." Ex. 1 at 43.

8

- "Although our policy is to refrain from statements that could be considered off-label promotion of Tablo, the FDA or another regulatory agency could disagree and conclude that we have engaged in off-label promotion."

- "If the FDA determines that our educational and promotional activities or training constitutes promotion of an off-label use, it could request that we modify our training or promotional materials or subject us to regulatory or enforcement actions, including the issuance of warning letters, untitled letters, fines, penalties, injunctions, or seizures, which could have an adverse impact on our reputation and financial results."

Ex. 1 at 43. Outset also recognized and disclosed that promotional requirements applicable to Outset did not apply to how customers used Tablo: "Physicians may use Tablo off-label in their professional medical judgment, as the FDA does not restrict or regulate a physician's choice of treatment within the practice of medicine." *See, e.g.*, Ex. 4 at 55.

## IV.    FDA INSPECTION, WARNING LETTER AND RELATED DISCLOSURES

In the first quarter of 2023, the FDA conducted its first quality system inspection of Outset's San Jose, California facility. The FDA issued a Form FDA-483, which Outset disclosed on February 13, 2023 in its Form 10-K, identifying four observations, relating to: (i) a single medical device report (MDR) that was not submitted within the required time period, (ii) completeness of software validation documentation, (iii) procedures defining escalation of nonconforming product to Corrective and Preventive Action (CAPA), and (iv) procedures connecting actions in customer complaints and the CAPA system. Ex. 5 at 15. Four months later, on July 5, 2023, the FDA issued a Warning Letter to Outset, which made two new observations. Ex. 17. The Letter was publicly available on the FDA's website and Outset disclosed its receipt of the Letter on July 7, 2023.

On August 2, 2023, Outset explained: "We timely submitted a response to the FDA in late July 2023. As communicated in our response, we believe we have taken or committed to take appropriate measures to resolve the matters raised in the Letter. We believe the concern raised by the first observation regarding CRRT promotion has been effectively addressed through labeling and promotional changes that have already been completed." ¶ 219. Changes made included removal of the customer testimonials that the FDA identified and "Outset added the following statement to its website and marketing materials: 'The Tablo Hemodialysis System is not indicated for continuous renal replacement therapy (CRRT) and is cleared for use for up to 24 hours.'" ¶ 96.

In each quarter between July 2023 and July 2024, Outset disclosed that its business was

9

negatively impacted by the Letter. *See, e.g.*, Stmts. 72, 74, 78. Outset explained that it believed the decrease in sales was the result of "more customers than we anticipated, choosing to defer their Tablo console purchasing and installation until TabloCart with prefiltration is available again" and "a strong competitive response [to the FDA Warning Letter], which served to create marketplace confusion, particularly regarding Tablo's use in the ICU." Stmt. 72; *see also* Stmt. 78.

## V.    PLAINTIFF'S LAWSUIT

On August 7, 2024, Outset released disappointing second quarter 2024 financial results, stating that "new console placements were below [] expectations." Ex. 16 at 4. In the earnings call, Trigg explained the hold on TabloCart had masked a larger issue: Outset needed to revise its sales process to better target mainstream enterprise adopters, who, as Trigg discussed "are deliberate, consensus-driven and process-oriented" customers. Ex. 19 at 4. For these prospective customers, as opposed to the early adopters on which Outset had grown its business to date, Trigg explained "We've learned that success with mainstream enterprise adopters requires a change in how we sell, who we sell and the process we use to get there. For example, we've identified the need to sell more broadly within the C-suite and established commitment across a larger base of stakeholders deeper within the system to gain buy-in. We've also recognized that our team needs to demonstrate exceptional consultative and change management skills as they work with large health systems on potential enterprise conversions." *Id.* at 5. Trigg then describe in detail the three major changes that Outset would be making to its commercial approach to meet these newly identified needs. *Id.*

Following the announcement of the second quarter results, Outset's stock price fell 68.5% to close on August 8, 2024 at $1.07. The first shareholder class action was filed soon after on August 29, 2024. Plaintiff filed this AC on June 6, 2025, challenging 87 statements made between Outset's IPO in September 2020 and its August 7, 2024 Q2 2024 earnings announcement. *See* Appendix A. Plaintiff's challenged statements fall into five categories:

- Statements made throughout the Class Period that Outset did not engage in off-label promotion of Tablo (the "**Risk Statements**"). *See, e.g.*, Stmt. 1 ("our policy is to refrain from statements that could be considered off-label promotion of Tablo"); *see also* ¶¶ 102, 177, 197.

10

- Statements made throughout the Class Period that disclosed the Tablo revenue and strong demand and growth in demand for Tablo (the "**Revenue Statements**"). *See, e.g.*, Stmt. 4 (discussing third-quarter financial results, "our traction in the acute market continues to grow and we are really pleased with the pace and the scale of commercial adoption."); *see also* ¶¶ 107, 178.

- Statements made throughout the Class Period that discussed the value proposition of Tablo (the "**Value Proposition Statements**"). *See, e.g.*, Stmt. 2 describing Tablo as an "all-in-one" device and as offering a "single platform across all settings"); *see also* ¶¶ 103-04, 179.

- Statements made on November 8, 2022, February 13, 2023, May 3, 2023 that described TabloCart as a "non-medical accessory" (the "**TabloCart Statements**"). *See, e.g.*, Stmt. 55; *see also* ¶¶ 189-90, 200.

- Statements made between July 7, 2023 and May 8, 2024 concerning the FDA Warning Letter and its impact on the Company (the "**FDA Statements**"). *See, e.g.*, Stmt. 60; *see also* ¶¶ 205, 207, 261.

In addition to naming Outset as a defendant, the AC also names Outset's CEO, Leslie Trigg, its former CFO, Rebecca Chambers (who departed Outset in August 2021) and its subsequent CFO, Nabeel Ahmed (who also departed Outset after the Class Period). In only 19 of the challenged statements were either Chambers or Ahmed the speaker.

## <u>ARGUMENT</u>

### I.     PLAINTIFF FAILS TO ADEQUATELY CHALLENGE ANY STATEMENT AS FALSE OR MISLEADING

A claim for securities fraud under Section 10(b) and Rule 10b-5 of the Securities Exchange Act is subject to the "[e]xacting pleading requirements" of both Rule 9(b) and the PSLRA. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). These "heightened pleading requirements . . . present no small hurdle," *Macomb Cty. Emps. Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1096 (9th Cir. 2022) (citation omitted), and plaintiffs must plead each element with particularity. *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014). Where, as here, statements are challenged for a purported omission, Plaintiffs must first plead facts demonstrating a failure to disclose material information. *See Inchen Huang v. Higgins*, 443 F. Supp. 3d 1031, 1052-54 (N.D. Cal. 2020). And, that alone is not enough: Plaintiff must also allege facts showing that concealment of the information rendered its statements to investors demonstrably false or misleading at the time they were made. *Id.*; *see also In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d

11

1    869, 876 (9th Cir. 2012). As to the challenged statements themselves, Plaintiff must identify

2    statements that are "capable of objective verification," and are not merely corporate puffery, opinion

3    or protected forward looking statements. *Macomb Cty.*, 39 F.4th at 1097–99. As set forth in Sections

4    A through F, below, the AC fails to meet these pleading standards in every respect.

5         **A.  Plaintiff Does Not Allege Widespread Off-Label Marketing Over The Class Period.**

6         As a threshold matter, Plaintiff's falsity theory depends on—and he must plead—knowing

7    and widespread off-label marketing during the Class Period. *Ferraro Family Found, Inc. v. Corcept*

8    *Therapeutics, Inc.*, 501 F. Supp. 3d 735, 755 (N.D. Cal. 2020); *Huang*, 443 F. Supp. 3d at 1052-54.

9    "In cases from this circuit where courts have determined that an off-label marketing scheme was

10   plausibly alleged, plaintiffs pled particularized facts illustrating that sales representative were

11   instructed by leadership within the company to engage in off-label marketing." *Ferraro*, 501 F.

12   Supp. 3d at 755. Alleged individual representatives engaging in off-label sales are not sufficient to

13   plausibly plead a company-wide scheme. *Id.* a 758-59.

14        In an effort to stitch together an alleged scheme, Plaintiff relies on two groups of confidential

15   witnesses— Outset customers (CWs 4-9) and former employees (CWs 1-3)—and the July 5, 2023

16   FDA Warning Letter. Even considered together, the allegations of unreliable confidential witnesses

17   and a narrow FDA Warning Letter are not sufficient for the Court to infer a knowing widespread off-

18   label marketing scheme over three years. This fundamental hole dooms Plaintiff's claim that Outset

19   omitted material information from any Challenged Statement. *Huang*, 443 F. Supp. 3d at 1052-54.

20              ***1.   The Court Should Disregard CWs 1, 7, 8 & 9.***

21        To rely on statements from confidential witnesses Plaintiff must "provide[ ] sufficient detail"

22   in order to "provide a basis for attributing the facts reported by that witness to the witness'[s]

23   personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).

24   Plaintiff must plead indicia of credibility to support the facts attributed to the CWs and the CW

25   statements must also support the conclusions Plaintiff seeks to draw from them. *Huang*, 443 F. Supp.

26   3d at 1045; *Ferraro*, 501 F. Supp. 3d at 755. This group of CWs do not meet the indicia of

27   credibility. They are unnamed persons quoted in interviews not conducted by Plaintiff's counsel, for

28   unknown purposes. *See Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1038-39 (N.D. Cal,

1   2012) ("the Court finds that the confidential witness statements are further rendered unreliable

2   because Plaintiffs' counsel and investigators never actually spoke to CW–1 or CW–3"). For this

3   reason alone, the Court should give no weight to any statements attributed to CWs 1, 7, 8 or 9. *See* ¶

4   62 n.5 (CW 1 "was interviewed by AlphaSense Experts Insights" on February 4, 2022); ¶ 85 (CW 7

5   "was interviewed by TD Cowen analysts"); ¶ 88 n.4 (CW 8 "was interviewed by AlphaSense

6   Experts Insights on January 11, 2024"); ¶ 89 (CW 9 "submitted a complaint regarding Tablo to the

7   FDA in April 2024").

8                    **2.  *Plaintiff Does Not Plead With Sufficient Particularity That Outset Employees
9                        Were Told To Promote Tablo For Off-Label Use.***

10          The customer CWs (CW 4-9) have no basis to know about the internal workings of Outset.

11  Accordingly, Outset leadership's instructions to its sales teams regarding the promotion of Tablo

12  cannot be inferred from any customer CW allegations. *Ferraro*, 501 F. Supp. 3d at 756.

13          The former employee CWs' allegations (CW 1-3) also lack sufficient detail for the Court to

14  infer a company-wide, multi-year scheme. CW 3 does not contend to have ever been told to market

15  Tablo as a CRRT treatment. ¶¶ 75-76. CW 2 was a "Key Account Representative Home/Chronic"

16  who would not have sold Tablo to hospitals for use in the acute setting (where CRRT was used) and

17  would not have been trained on sales to that market. ¶ 69. Not surprisingly, CW 2 does not specify

18  when they were purportedly told Tablo was "ok for CRRT," by whom, or to what group (if any) that

19  statement was directed. *Id.* In any event, someone describing Tablo as "ok for CRRT" is not

20  sufficient for the Court to infer systemic instruction to employees to sell Tablo as a CRRT machine.

21  CW 1's allegation that they were instructed to promote and sell Tablo for CRRT are also inadequate

22  for several reasons. CW 1 was only employed by Outset in the start of the Class Period (until

23  "Spring 2021") for marketing and business development in the New York Metro, North New Jersey,

24  and Upstate New York areas, and thus admittedly lacks knowledge of the Company's practices for

25  the vast majority of the Class Period across the vast majority of the country. ¶ 62. CW 1 does not

26  provide details about when purported "sales calls and meetings" took place or what group of "other

27  sales staff members" were present and instructed. ¶ 63.

28

The former employee CW allegations do not evidence who directed the scheme or when, to whom off-label directives were given, or how any systematic effort to promote Tablo for CRRT was carried out. As a result, the allegations are readily distinguishable from instances where the courts have found CW allegations sufficient to infer an off-label marketing scheme. *See, e.g.*, *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009 (N.D. Cal. 2008) (CWs described details of information provided to sales representative to help them promote the off-label use and other actions the company took to advance off-label sales); *In re Gilead Scis. Sec. Litig.*, 2005 WL 181885, at *8 (N.D. Cal. Jan 26, 2005) (CWs detailed dates of meetings where defendants were in attendance and specific instructions were given to use off-label information to promote drug).

Finally, the FDA Warning Letter does not fill the pleading gap left by the CWs. The Letter refers to a few customer testimonials that the FDA found on Outset's website on May 11, 2023, in which customers stated that they replaced their CRRT treatment programs with Tablo. Ex. 17. It does not identify any other promotional materials or instances of Outset sales representatives promoting off-label use of Tablo as a CRRT machine. It also does not find any instances of improper training or instruction of Outset sales representatives to encourage off-label promotion. And, the Letter is narrow as to time period. The testimonials at issue were identified on May 11, 2023 and the Letter is silent as to the duration of time those testimonials were available on Outset's website and does not otherwise observe a time period of off-label marketing conduct. *Id.*

Even taken together, the CW allegations and FDA Warning Letter are insufficient for the Court to infer that for over three years Outset directed its employees to engage in an off-label marketing campaign.

### 3. The CW Allegations Do Not Show That Outset Actually Engaged In Systematic Off-Label Marketing.

Plaintiff must also allege facts to show off-label marketing actually took place in a systematic manner; allegations of a handful of instances of off-label marketing are inadequate to plead a scheme. *Huang*, 443 F. Supp. 3d at 1053. Plaintiff also does not satisfy this pleading requirement.

First, allegations that customers were replacing their CRRT machines with Tablo or using Tablo "for CRRT" do not evidence that Outset was selling Tablo for an off-label use. As Plaintiff

14

admits, customers are allowed to use Tablo for an off-label purpose. ¶ 40. Plaintiff conflates the customer's use with Outset's promotion and does not otherwise offer facts sufficient to infer a campaign of off-label promotion. *See* ¶78 (CW 4 "believes" there was language about CRRT in Outset materials from 2020 – before the Class Period); ¶¶ 79-81, 84 (CWs 5 & 6 do not allege they spoke to Outset sales representatives before their hospitals purchased Tablo); ¶ 86 (CW 7 does not state that the Outset presentation was made to her or that it promoted Tablo for CRRT in that presentation); ¶ 88 & Ex. 24 (CW 8 states he "believes Outset was marketing Tablo for CRRT," CW 8's hospital used Baxter Prismaflex, and not Tablo for CRRT); ¶¶ 89, 89 n.5 & Ex. 26 (CW 9's complaint to the FDA does not include any facts to demonstrate that CW 9 spoke with Outset or the basis for their allegations about the sale of Tablo, including that it does not allege who at Outset engaged in off-label promotion or when it occurred).

Similarly, the former employee CWs do not evidence a campaign of off-label promotion. Neither CW 2 or 3 purport to have ever sold Tablo for CRRT. ¶¶ 69-77. CW 1 (who, again, was only employed by Outset at the start of the Class Period) refers to just three instances where they sold Tablo for CRRT (¶ 67) and admits "the acute dialysis for me was an extremely challenging market to penetrate…We had a lot of challenges in that regard across the New York metro area. We ended up really abandoning that market." Ex. 24 at 4. Even with regard to the "interesting value proposition" of training CRRT nurses how to do the long, slow run on Tablo, CW 1 admitted "It didn't work out as well as we envisioned." *Id.* Read in full, CW 1's interview establishes them as an employee with limited success in selling Tablo and with limited knowledge about Outset's practices for two-thirds of the Class Period.

### 4. *No Allegations Show That Outset Knew Its Promotion Of Tablo Constituted Off-Label Marketing Or Intended To Mislead Investors By Concealing That Conduct.*

Plaintiff's allegations of a scheme fail for the additional reason that he has not pled any facts from which the Court can infer scienter. *See* § II, *infra*.

There are no allegations that any of the Individual Defendants engaged in off-label promotion of Tablo. Nothing whatsoever is said about Chambers or Ahmed. As to Trigg, CW 4— who claims to have met with Trigg—does not contend that she promoted Tablo for CRRT. ¶78.

15

1      There are also no allegations that anyone at Outset knew the Company's promotion of Tablo

2 was illegal off-label promotion or even had the belief that it could be illegal until the FDA Warning

3 Letter was sent on July 5, 2023. As Plaintiff admits, Outset disclosed the Letter just three days later

4 and made changes to its website and promotion of Tablo. ¶ 205. In this way, the AC is clearly

5 deficient and readily distinguishable from cases such as *Gilead* where a scheme was adequately pled

6 based on allegations that the individual defendants themselves instructed or engaged in the off-label

7 promotion, knew the FDA believed the conduct was illegal off-label promotion, and spoke to

8 investors without disclosing the FDA warning letters. *See Gilead*, 2005 WL 181885, at *8-9.

9     **B.**    **Plaintiff Fails to Allege Falsity as to the Risk, Revenue, and Value Proposition Statements.**

10

11         ***1.  Outset Did Not Conceal How It Marketed Tablo To Customers.***

12      Where a plaintiff alleges that defendants omitted material information from their statements

13 to investors, the Court may consider facts that show the information investors had. *E.g.*, *In re*

14 *Kalobios Pharms, Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1007-08 (N.D. Cal. 2017) (dismissing under

15 truth-on-the-market doctrine based on credible and widely-circulated news articles); *Rubin v.*

16 *Trimble*, 1997 WL 227956, at *7 (N.D. Cal. Apr. 28, 1997) ("a truth-on-the-market defense can be

17 granted on a motion to dismiss where the company's SEC filings disclose the very information

18 necessary to make their public statements not misleading"). Here, the AC and judicially noticeable

19 facts show that Outset did not conceal its marketing strategy for Tablo.

20      Throughout the Class Period, Outset disclosed to investors that Tablo did not have FDA

21 clearance for CRRT. *See, e.g.*, Ex. 2 at 136; Ex. 3 at 47; Ex. 4 at 20. Trigg even corrected an analyst

22 in November 2021, stating that "Tablo is not a CRRT machine." As explained in detail above (*see* §

23 III.A, *supra*), Outset also described Tablo to investors as an "all-in-one device" (¶ 103), a "complete

24 enterprise solution" (¶ 108), having the ability to "capture 100% of all treatment volume" (¶ 136), a

25 device that can do dialysis "from the ICU to the bedside" (¶ 171), and a replacement for CRRT (¶¶

26 149, 152, 175-76). Outset even visually depicted Tablo supplanting a CRRT machine in investor

27 presentations. ¶ 109. Investors were informed that Outset was marketing Tablo as a unique machine

28 that could meet acute treatment needs, for up to 24 hours and allow hospitals to effectively provide

these treatments in-house, with their own nursing staff. *See, e.g.*, Ex. 2 at 101, Ex. 4 at 4, 9.

Investors also were told that Outset's financial growth was driven by the success of this strategy. The very testimonials that the FDA found problematic were statements published on Outset's website by customers who were using Tablo to meet all their treatment needs. ¶ 222; Ex. 17 at 2-3. Indeed, CW 7's statements are taken from a TD Cowen analyst report published on April 25, 2023, which used CW 7's experience as an example for its investment thesis for Outset. ¶ 85, Ex. 25. In other words, CW 7 demonstrates that investors knew how Outset was marketing and successfully selling Tablo. And each quarter, in reporting its financial results, Outset stated that expansion in the acute market and purchases of the Tablo XT software were key drivers of revenue growth. *See* § III.C, *supra*. These disclosures conveyed that customers were being marketed and sold Tablo to use in the acute setting, for treatments that required lower flow rates and that could run up to 24 hours, and that some customers were choosing Tablo to replace their CRRT machines.

Finally, investors were informed that there was risk that the FDA could find that Outset's promotion strategy constituted improper off-label marketing and that such a finding by the FDA could materially impact the Company's financial performance. *See, e.g.*, Stmt. 1. And, as Plaintiff must admit, Outset timely disclosed the FDA Warning letter just days after receipt.

In other words, the very statements that Plaintiff challenges demonstrate Outset's candor with investors about its intent to sell Tablo as an alternative to traditional dialysis machines for use in the acute setting for up to 24 hours, its success with that commercial strategy, and the subsequent decision by the FDA that certain promotional efforts constituted off-label marketing. Outset's disclosures thus belie the notion that it concealed anything.

### 2. Plaintiff Has Not Pled a Material Omission From The Value Proposition (Stmts. 2, 5-8, 12-13, 16-20, 23-24, 34-36, 38-40, 43, 46-47, 50, 53, 57, 62, 70-71, 73, 75) and Revenue Statements (Stmts. 3-4, 9-11, 13-15, 19-22, 25-28, 30-33, 37-39, 41-44, 48-49, 52, 54, 56-57, 61-62, 80).

Even if the Court finds Plaintiff's allegations sufficient to plead the existence of a concealed off-label marketing scheme—which it should not—that alone is still insufficient to plead that the Value Proposition or Revenue Statements were materially misleading. As explained in *Gilead*, 2005 WL 181885, at *9:

1
2
3
4

this conclusion does not end the Court's inquiry. Plaintiffs must also establish a connection between the company's off label marketing activities and the 2003 second quarter reports that Plaintiffs allege were false and misleading. In other words, Plaintiffs must allege that Gilead's off-label marketing scheme was a "material fact" that needed to be disclosed to investors along with the 2003 second quarter sales reports.

5

Here, as in *Gilead*, Plaintiff has failed to meet its burden to allege that an off-label marketing

6

scheme was a material fact that had to be disclosed. Plaintiff has not alleged for a single quarter

7

(across the 16 challenged quarters) anything about the revenue generated by sales of Tablo from

8

alleged off label marketing versus the revenue generated from sales for use of Tablo in its cleared

9

modalities. The Court is not permitted to "simply assume" that the off-label marketing resulted in

10

increased sales; Plaintiff "must allege facts to bridge this logical gap." *Id.* Enough must be alleged to

11

show a relationship between the undisclosed marketing and a material impact on the Company's

12

reported financials to adequately plead the Company's Value Proposition or Revenue Statements

13

were materially misleading when made. *Id.*

14

Plaintiff cannot fill this pleading gap with Outset's change in guidance announced in October

15

2023 and failure to meet revenue expectations in August 2024. Plaintiff contends the revenue decline

16

was the result of customers no longer purchasing Tablo to use it for CRRT after the FDA Warning

17

Letter was issued. But, Plaintiff alleges no facts to support that contention. And, even if there were

18

such facts, it is purely speculative to infer backwards from customer decisions after the FDA

19

Warning Letter (post July 2023) that a material portion of Outset's sales in 2020, 2021, 2022 or early

20

2023 were derived from undisclosed off-label marketing based sales. The Court can and should

21

disregard such speculative and conclusory assertions. *See, e.g.*, *Immanuel Lake v. Zogenix, Inc.*,

22

2020 WL 3820424, at *8 (N.D. Cal. Jan. 27, 2020) (rejecting "fraud-by-hindsight reasoning").

23

For this reason as well, Plaintiff fails to plead the Revenue and Value Proposition Statements

24

were materially false or misleading.

25
26

> **3. Plaintiff Has Not Pled The Risk Statements Were Knowingly False When Made. (Stmts. 1, 29, 59)**

27

Plaintiff's challenge of the Risk Statements fails because he has not plausibly alleged that

28

Defendants knew they were engaged in off-label marketing at the time statements were made. The

18

1   Risk Statements all pre-date the FDA Warning Letter. *See* ¶¶ 102, 143 (statements made on August

2   21, 2020 and November 8, 2021); ¶ 53 (alleging the FDA Warning Letter was dated July 5, 2023).

3   Plaintiff does not allege any other facts to show that Defendants believed at the time they spoke that

4   Outset's conduct constituted off-label marketing or had any knowledge that the FDA would reach

5   such a conclusion.

6       **C.    Plaintiff Relies Solely On Improper Hindsight In Arguing That The Tablo Cart
            Statements Were False Or Misleading When Made. (Stmts. 45, 55, 58)**

7

8           Purely hindsight-based attacks are inadequate to support a claim of securities fraud. *In re*

9   *Verifone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993) ("The fact that [a] prediction proves to be

10  wrong in hindsight does not render the statement untrue when made."). Yet here, Plaintiff relies

11  solely on hindsight to argue the TabloCart Statements were materially false or misleading. The

12  TabloCart product was launched in October 2022. The Company disclosed that it did not consider

13  TabloCart to be a medical device requiring FDA clearance. *See, e.g.*, Stmts. 55. Plaintiff does not

14  allege that investors misunderstood this and believed TabloCart to have FDA clearance. Rather,

15  Plaintiff asserts the TabloCart statements were false or misleading because in July 2023, *subsequent*

16  *to the TabloCart Statements being made*, the FDA observed that it believed TabloCart required FDA

17  clearance. *See, e.g.*, ¶¶ 180, 200. Even if Outset was wrong not to seek FDA clearance for TabloCart,

18  absent facts showing that Outset knew this at the time it made the challenged statements, Plaintiff

19  has not pled securities fraud. No such knowledge is alleged at any point before the FDA Warning

20  Letter was issued.

21      **D.    Plaintiff Has Failed to Allege Investors Were Misled By the FDA Statements.
            (Stmts. 60, 63-69, 72, 74, 77-79, 81-87)**

22

23          The final category of challenged statements—the FDA Statements—are comments

24  Defendants made to investors from July 2023 through May 2024, which Plaintiff contends were

25  materially false and misleading because they "significantly downplayed and misrepresented the

26  FDA's findings, Outset's pervasive off-label marketing, the Company's internal reaction and

27  changes to its marketing practices, and the impact on the Company and sales of Tablo." ¶ 261.

28  Plaintiff alleges no facts to support these broad accusations and, indeed, facts available to the Court

1    demonstrate that these accusations lack merit.

2        *First*, the FDA Statements do not misrepresent the findings of the Letter. Indeed, the Letter

3    was public—investors could look at what it said and draw their own conclusions. In any event, Trigg

4    spoke consistently with the Letter's observations regarding the Company's website content. *See,*

5    *e.g.*, Stmt. 64. Nor did Trigg mislead the market about any purported FDA safety concerns. The

6    FDA stated in the Warning Letter, that use of Tablo for CRRT "could significantly affect safety or

7    effectiveness" but it did not find that Tablo was in fact being used for CRRT or that Tablo was

8    operating unsafely or ineffectively. Ex. 18.

9        *Second*, as noted above, Outset was candid about its promotion plan for Tablo. Plaintiff

10   alleges no facts to show investors failed to understand how the Company promoted Tablo or the

11   relationship of the Letter to that conduct.

12       *Third,* Plaintiff has also not alleged any facts to support its contention that the market was

13   misled as to Company's "internal reaction [to the Letter] and changes to its marketing practices."

14   Investors were told that Outset was taking steps necessary to satisfy the FDA following the Letter.

15   *See, e.g.*, Stmts. 64, 68. Less than a month after Outset received the Letter, the Company explained it

16   responded to the Letter "***through labeling and promotional changes*** that have already been

17   completed" (¶ 219, emphasis added) and which included adding a statement to its website and

18   marketing materials that "The Tablo Hemodialysis System is not indicated for continuous renal

19   replacement therapy (CRRT) and is cleared for use for up to 24 hours.'" ¶ 96. Outset also removed

20   the customer testimonials referencing CRRT from its website. ¶ 222. Plaintiff does not explain what

21   additional material information about Outset's reaction to the Letter was withheld from investors.

22       *Finally*, Plaintiff contends that the FDA Statements misled investors as to the impact on the

23   Company and sales of Tablo of the Letter. Again, this is undermined by the challenged statements

24   themselves. Between July 2023 and August 2024, Outset admitted quarter after quarter that its

25   business was negatively impacted by the Letter. *See, e.g.*, Stmts. 72, 78, 84. Outset explained that it

26   believed the decrease in sales was the result of "more customers than we anticipated, choosing to

27   defer their Tablo console purchasing and installation until TabloCart with prefiltration is available

28   again" and "a strong competitive response [to the FDA Warning Letter], which served to create

                                                20

1   marketplace confusion, particularly regarding Tablo's use in the ICU." Stmt. 72. Plaintiff does not

2   allege any facts refuting that competitors took advantage of the Letter to attack Tablo's market

3   position in the acute/ICU market. And, Plaintiff's sole "evidence" that customers were not delaying

4   Tablo purchases for TabloCart clearance is that sales failed to go up after the FDA clearance of

5   TabloCart. This is once again improper hindsight-based pleading. Plaintiff does not allege any facts

6   to show that these statements were inaccurate when made or that Outset, Trigg or Ahmed had

7   information that was inconsistent with these statements.[3] According to Plaintiff, the market should

8   have been told that customers were not buying Tablo because they had only wanted to use it for

9   CRRT treatment. ¶ 261. But, as with the deficient challenge to the Revenue Statements, Plaintiff has

10  not alleged any facts to show any revenue loss (let alone a material loss) derived from customers

11  who did not purchase Tablo after the Letter because they had intended to use it in CRRT treatment.

12  Once again, this is wholly speculative on Plaintiff's part.

13          **E.      Plaintiff Improperly Challenges Inactionable Puffery and Opinion Statements.**

14          In this Circuit, "vague, generalized assertions of corporate optimism or statements of 'mere

15  puffing' are not actionable material" representations and are regularly dismissed. *City of Royal Oak.*

16  *Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063 (N.D. Cal. 2012). These "mildly

17  optimistic, subjective assessment[s]" express opinions—not facts—and aren't "capable of objective

18  verification." Thus, no reasonable investor would rely on them. *Apollo*, 774 F.3d at 606; *see also In*

19  *re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 708 (9th Cir. 2021) ("[V]ague and generalized corporate

20  commitments, aspirations, or puffery . . . cannot support statement liability under Section 10(b) and

21  Rule 10b-5(b).").

22          Similarly, Plaintiffs cannot challenge opinion statements, which are actionable only: (1)

23  when the stated belief was "objectively incorrect," and also subjectively, the speaker did not

24  "honestly hold the stated belief"; (2) when plaintiff challenges an embedded statement of fact within

25  _____

26  [3] Because Chambers was not employed at Outset when the FDA Statements were made, Plaintiff's

27  claims against her cannot rely on these statements and must be dismissed even if the Court finds that

28  Plaintiff has adequately pled falsity as to FDA Statements.

1    an opinion as untrue; and (3) where "omitted material facts" about the speaker's "inquiry into or

2    knowledge concerning" the stated opinion "conflict with what a reasonable investor would take from

3    the statement itself." *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech.,*

4    *Inc.*, 856 F.3d 605, 615-16 (9th Cir. 2017) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr.*

5    *Indus. Pension Fund*, 575 U.S. 175 (2015)).

6          *1.  Value Proposition Statements*

7          Plaintiff challenges thirty-two statements by the Company and the three Individual

8    Defendants about Tablo's "value proposition," of which twenty-seven are non-actionable corporate

9    puffery or opinions (2, 5-8, 12-13, 16-18, 23-24, 34, 36, 38-40, 43, 46, 50, 51, 57, 62, 70, 71, 73, and

10   75), and the other five are not alleged with sufficient facts to show they were false or misleading.

11   These statements generally describe Tablo as a "single enterprise solution" offering "easier, lower-

12   cost dialysis" in a variety of modalities across the continuum of dialysis care in both the home and

13   acute setting. *See, e.g.*, ¶¶ 103-104. Each of these statements make similar claims to the below

14   Statement 5, made by Trigg on a November 11, 2020 earnings call:

15          "[Tablo] was designed as a ***complete enterprise solution*** to enable dialysis to be done
            by anyone, anytime, anywhere" and "Tablo uniquely enables the management of
16          dialysis across ***the entire care continuum from the hospital to the home with a***
            ***single device platform***, which has never been done before." ¶ 108 (emphasis in
17          original).

18         Compounding the pleading deficiencies,  Plaintiff  fails to specify which parts of the lengthy

19   quotations it is challenging. Nevertheless, these statements consist mainly of puffery and vague,

20   positive opinions about Outset's performance based on Tablo's value proposition and the supposed

21   superiority of the device itself: "that's what we do uniquely well," "[we are] really excited," "we

22   don't see any limit to our ability," "all-in-one solution," 'single enterprise solution," and "allowing

23   dialysis to be delivered anytime, anywhere, and by anyone." ¶¶ 103-04, 113, 119, 128, 175-76.  *See,*

24   *e.g., Elias v. Hewlett-Packard Co.,* 950 F. Supp. 2d 1123, 1132 (N.D. Cal. 2013) (finding statements

25   about a product's "ultra-reliable performance" and "versatile, reliable system" were non-actionable

26   puffery and "did not rise to the level of affirmative representations about a verifiable fact");

27   *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008) (holding claims of

28   product superiority such as being "faster, more powerful, and more innovative," having "higher

1  performance," or "longer battery life" are non-actionable puffery). The value proposition statements

2  also highlight the operational "efficiencies" of the Tablo system—language that is classic puffery.

3  *See Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1158 (D. Ariz. 2017) (terms and

4  phrases like "efficient" are "classic examples of puffery.").

5        Moreover, Plaintiff has not pleaded facts showing any Defendant did not believe their

6  statements about Tablo's versatility or capabilities. Plaintiff's own allegations support Trigg's

7  sincerity; at a September 13, 2021 conference, Trigg clearly explained why she believed what she

8  said: Tablo could perform traditional three-to-four-hour bedside dialysis (about 85% of treatments),

9  and longer, slower dialysis sessions lasting up to 24 hours for sicker patients. ¶ 136. Thus, Plaintiff's

10  own allegations confirm Trigg honestly believed that Tablo could "capture 100% of all treatment

11  volume" and could be used "anywhere, anytime, and by anyone." ¶¶ 129, 136; Ex. 20 at 6.

12              *2.  Revenue, Demand, and Growth Statements*

13        Plaintiff also challenges numerous statements praising Tablo's revenue growth and strong

14  demand, alleging these were false or misleading because Defendants did not disclose "pervasive off-

15  label promotion of Tablo for CRRT" purportedly underlying these financial results. ¶ 178. In

16  addition to the fundamental failure of the AC to allege facts supporting the assertion of "pervasive

17  off-label promotion" twenty of these statements (3-4, 9, 11, 13-14, 19, 20, 25, 30-31, 37, 42-43, 49,

18  56-58, 61-62) are non-actionable puffery or corporate optimism and should be dismissed. [4] Examples

19  include: "we are really pleased with the pace and the scale of commercial adoption," "we are

20  confident in our positioning for consistent strong performance in 2021 and beyond," and "our

21  established relationships with 7 of the 8 largest national health systems…put[] us in a strong position

22  for growth." ¶¶ 106, 107, 117, 124, 144. *See, e.g.*, *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d

23  1029, 1036 (N.D. Cal. 2012) (expressions of pride that "we are very pleased" are puffery); *In re*

24  _____

25  [4] Of the additional allegedly misleading statements Plaintiff pleads belonging in this category (*see*

26  AC ¶¶ 178, 198, 259), several others are inactionable because they consist of forward-looking

27  statements (*see* § I.F, *infra*), and the remainder should be dismissed because Plaintiff fails to allege

28  the off-label marketing scheme upon which Plaintiff's omission theory relies. *See* § III.C, *supra* .

1    *Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("we're doing well and I think we have a

2    great future," and "business will be good this year" are nonactionable puffing); *Juniper Networks,*

3    *Inc.*, 880 F. Supp. 2d at 1064 ("our demand indicators are strong" and "our product portfolio is

4    robust" are corporate optimism); *In re Fusio-io, Inc. Sec. Litig.*, 2015 WL 661869, at *15 (N.D. Cal.

5    Feb. 12, 2015) ("[G]eneralized statements… concern[ing] a company's relationships with important

6    customers" are non-actionable corporate optimism).

7         Plaintiff alleges six statements (3, 11, 37, 56, 61, 62) referring to Tablo's "momentum" as to

8    demand or revenue—such as "our commercial momentum continued to accelerate" or "strong

9    revenue growth…which resulted from the momentum we see"—are misleading. ¶¶ 106, 155. But

10   courts have consistently treated similarly abstract statements as non-actionable puffery. *See Bodri v.*

11   *GoPro*, 252 F. Supp. 3d 912, 924 (N.D. Cal. 2017) (statements regarding whether a product was

12   "enjoying momentum" and had "momentum" "out of the gates" were corporate puffery); *Juniper*

13   *Networks, Inc.*, 880 F. Supp. 2d at 1064 (statement that company has "strong demand metrics and

14   good momentum" non-actionable statement of corporate optimism). Plaintiff pleads no facts

15   explaining why the Court should reach a different conclusion in this case.

16        Moreover, none of these opinion statements are actionable under the framework set forth in

17   *Omnicare*. 575 U.S. 175. First, statements that one is "confident" or "pleased" are not "capable of

18   objective verification." *Apollo*, 774 F.3d at 606. Second, Plaintiff again pleads no facts showing

19   Defendants did not honestly believe their assessment of Outset's growth, revenue, and prospects.

20   The Court should dismiss all claims based on these statements.

21                          ***3.  FDA Letter Statements***

22        Several of the statements (64, 68, 74, 82, 85, 87) by Defendants Trigg and Outset following

23   receipt of the July 7, 2023 FDA Warning Letter regarding Outset's response and the ensuing

24   impact—which Plaintiff alleges are actionable—are textbook puffery or opinion.

25        First, Trigg's optimistic statements that demand for TabloCart would recover once it received

26   FDA 510(k), such as "when [TabloCart's] back … yeah, ***we expect it to be nicely adopted***," use the

27   type of vague language ("nicely adopted") frequently held to be puffery. ¶ 249; *see, e.g.*, *Cutera*, 610

28   F.3d at 1111 ("[w]hen valuing corporations,...investors do not rely on vague statements of optimism

                                            24

1    like 'good,' 'well-regarded,' or other feel good monikers").

2          Second, Trigg and Outset's statements regarding whether the Company's remediation steps

3    had been sufficient, such as, "we believe that our action plan has addressed this finding," "we

4    believe we have taken or committed to take appropriate measures," and "we feel that we have fully

5    satisfied the FDA's concerns around the website," are non-actionable opinions. Moreover, Plaintiff

6    has failed to allege the facts required to challenge opinion statements: that Trigg did not subjectively

7    believe her opinion or that she omitted material facts about the basis of the opinion that differed

8    from what reasonable investors would expect. *Omnicare*, 575 U.S. 175.

9    **F.    Certain of the Challenged Statements Are Non-Actionable Forward-Looking**
           **Statements Under the PSLRA's Safe Harbor.**
10

11          Twenty-one statements (9, 13-14, 19, 25, 30-31, 37, 41, 43, 46, 61-62, 64, 67, 77-79, 81, 83,

12   85) are separately non-actionable forward-looking statements protected by the PSLRA's safe harbor,

13   as they were either "accompanied by cautionary language" or "made without actual knowledge that

14   [the statement] is false or misleading." *Wochos v. Tesla*, 985 F.3d 1180, 1190 (9th Cir. 2021).

15          *1.   Many of the Growth and FDA Letter Statements Are Forward-Looking.*

16          A forward-looking statement is any regarding "(1) financial projections, (2) plans and

17   objectives of management for future operations, (3) future economic performance, or (4) the

18   assumptions 'underlying or related to' any of these issues." *No. 84 Emp'r-Teamster Joint Council*

19   *Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003).

20          Statements forecasting growth or sales are by definition forward-looking as "statement[s] of

21   future economic performance." 15 U.S.C. § 78u-5(i)(1)(C). Here, Plaintiff incorrectly challenges

22   clearly forward-looking statements about future growth and demand for Tablo (9, 13, 14, 19, 25, 30-

23   31, 37, 41, 43, 46, 61, 62), such as, "[a]s we look to the second half of the year, we see no change in

24   underlying demand for Tablo" (¶ 161), and "we are confident in our positioning for consistent strong

25   performance in 2021 and beyond" (¶ 124). Courts routinely treat similar statements as forward-

26   looking. *See, e.g.*, *Pirani v. Netflix, Inc.*, 2024 WL 4894291, at *6 (N.D. Cal. Nov. 26, 2024)

27   (finding "[w]e continue to anticipate a strong second half" and "we're optimistic about our long-term

28   growth prospects" were forward-looking). Plaintiff also challenges Trigg and Ahmed's post-FDA

1  Letter statements forecasting recovery in TabloCart sales upon receiving FDA clearance (67, 77-79,

2  81, 83, 85), and that Outset would see "more growth in the back half of [2024]," (¶ 236), which

3  courts similarly classify as forward-looking. *See Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 875

4  (N.D. Cal. 2023) (finding statements predicting customer behavior and forecasting demand based

5  upon an as-yet-unpredictable end to the COVID-19 pandemic were forward-looking).

6  ### 2.  *These Statements Were Accompanied by Meaningful Cautionary Language And Were Not Made with Actual Knowledge.*

7

8       The safe harbor applies because these challenged statements were accompanied by

9  disclosures of "meaningful cautionary" language. 15 U.S.C. § 78u-5(c)(1)(A)(i). Meaningful

10 cautionary language need not warn of the "exact risk" that transpires (*Bodri*, 252 F. Supp. 3d at 931)

11 and need not follow or immediately precede the forward-looking statements. Rather, the language

12 need only "identify[] important factors that could cause actual results to differ materially from those

13 in the forward-looking statement[s]," or for oral statements state that the "actual results might differ

14 materially." 15 U.S.C. § 78u-5(c)(1)(A)(i), (c)(2)(A)-(B). Outset's earnings calls and press releases,

15 from which the majority of these statements come, repeatedly do so, cautioning that

16         "Forward-looking statements are based on management's current assumptions and
           expectations of future events and trends…and actual results and other events may differ
17         materially, from those expressed or implied in such statements due to numerous risks and
           uncertainties…[and as a result] you should not rely on these forward-looking statements as
18         predictions of future events." *E.g.*, Ex. 10 at 2.

19 These disclosures also expressly refer to and incorporate the "Risk Factors" identified in Outset's

20 then-recent SEC filings. *Id.* The "Risk Factors" in those filings include several that specifically warn

21 of the possibility of the events that gave rise to Plaintiff's allegations:

22    • "Our revenue is derived, and we expect it to continue to be derived, primarily from sales of
         Tablo, its associated consumables and related services." Ex. 1 at 13.
23
24    • "Tablo and our operations are subject to extensive government regulation and oversight in
         the United States. If we fail to obtain or maintain necessary regulatory approvals for Tablo
25       and related products, or if approvals or clearances for future products are delayed or not
         issued, it will negatively affect our business, financial condition and results of operations."
26       *Id.* at 36.

27    • "Our future success depends on our ability to develop, receive regulatory clearance or
         approval for, and introduce new products that will be accepted by the market in a timely
28       manner. There is no guarantee that the FDA will grant 510(k) clearance or PMA approval of
         our future products on a timely basis, if at all, and failure to obtain necessary clearances or

1    approvals for our future products would adversely affect our ability to grow our business." *Id.* at 39.

2

3    - "It is also possible that other federal, state or foreign enforcement authorities might take action if they consider our educational and promotional activities or training methods to constitute promotion of an off-label use, which could result in significant fines or penalties under other statutory authorities, such as laws prohibiting false claims for reimbursement. In that event, our reputation could be damaged, and adoption of the products could be impaired. Although our policy is to refrain from statements that could be considered off-label promotion of Tablo, the FDA or another regulatory agency could disagree and conclude that we have engaged in off-label promotion." *Id.* at 43.

4

5

6

7    These types of specific risk factor disclosures routinely trigger the safe harbor. *See, e.g.*, *Kipling v.*

8    *Flex Ltd.*, 2020 WL 2793463, at *11–12 (N.D. Cal. May 29, 2020) (Statements in SEC filings

9    warning about operational difficulties constituted meaningful cautionary language where they were

10   "of the same nature" as Plaintiffs' allegations). Accordingly, the forward-looking statements are

11   protected by the PSLRA's safe harbor because of this meaningful cautionary language.

12       As noted above, Plaintiff has not pled that the speakers had "actual knowledge" that their

13   forward-looking positive statements about Outset's prospects were false or misleading, or even that

14   they were aware of the alleged off-label marketing scheme, making these statements subject to

15   dismissal on that basis as well. *Cutera*, 610 F.3d at 1112. *See* § II, *infra*.

16   **II.    PLAINTIFF FAILS TO PLEAD SCIENTER**

17       To plead scienter, Plaintiff must plead particularized facts creating a strong inference that

18   Defendants intentionally defrauded investors as to each allegedly misleading statement in the Class

19   Period. 15 U.S.C. § 78u-4(b); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1066

20   (9th Cir. 2008) (plaintiffs "must [allege] specific contemporaneous statements or conditions that

21   demonstrate the intentional or the deliberately reckless false or misleading nature of the statements

22   when made.") (citations omitted). As explained above, Plaintiff does not allege any facts showing

23   that Trigg, Chambers, or Ahmed directed conduct they knew to be illegal off-label promotion,

24   sought to conceal that conduct from investors, or had fact contrary to the challenged statements

25   when made. This leaves the Court to infer scienter, which analysis is "inherently comparative"; a

26   court must "compare the malicious and innocent inferences cognizable from facts pled in the

27   complaint and only allow the complaint to survive a motion to dismiss if the malicious inference is

28   at least as compelling as any opposing innocent inference." *Zucco*, 552 F.3d at 991. Here, Plaintiff

1    utterly fails to plead a compelling malicious inference as to Trigg, Chambers, or Ahmed.

2          **A.**      **Plaintiff Fails To Plead Scienter As To Defendant Trigg.**

3          Plaintiff makes its strongest effort to allege scienter against Trigg. But despite this effort,

4    Plaintiff's scattershot approach to pleading scienter does not support an inference that she knew—or

5    was reckless in failing to know—her statements were false when made.

6          *Core Operations.* Plaintiff first invokes a core operations theory—that because Trigg's

7    alleged misstatements related to the sale and marketing of the Tablo system, Outset's "core"

8    business, Trigg as CEO must have known they were false or misleading at the time they were made.

9    ¶¶ 295-99. But merely alleging that a particular product or area of business is centrally important to

10   a company does not give rise to an inference of scienter. *E.g.*, *Iron Workers Local 580 Joint Funds v.*

11   *Nvidia Corp.*, 2020 WL 1244936, at *12 (N.D. Cal. Mar. 16, 2020) ("Simply alleging that gaming is

12   [the company's] core business does not give rise to an inference of scienter."). Otherwise, courts

13   would be required to infer scienter whenever the allegations involve a company's core business.

14   Rather, Plaintiffs must either allege specific admissions by executives of their "detailed involvement

15   in the minutia of a company's operations" or witness accounts asserting the same. *See Police Ret.*

16   *Sys. of St. Louis v. Intuitive Surgical*, *Inc.*, 759 F.3d at 1051, 1062 (9th Cir. 2014); *Prodanova v.*

17   *H.C. Wainwright & Co.*, LLC, 993 F.3d 1097, 1111 (9th Cir. 2021). Plaintiffs have alleged neither.

18         Plaintiff identifies no admission or witness statement demonstrating Trigg's detailed

19   involvement in Outset's day-to-day sales operations with a level of specificity sufficient to infer

20   scienter under a core operations theory, failing to bridge the gap between the CWs' statements about

21   off-label marketing of Tablo and Trigg's actual knowledge of the same. Trigg's statement that she

22   had "spent a lot of time in the field" (¶ 293) isn't the type of "specific admission" required to convey

23   "detailed involvement in the minutiae" of Outset's operations. *In re Nektar Therapeutics*, 2020 WL

24   3962004, at *12 (N.D. Cal. July 13, 2020) (applying *Intuitive Surgical* to state the same). Nor does

25   Trigg's statement that she enjoys attending late-stage sales meetings where hospitals are "super

26   excited" about their ROI and she expects things to "go really well" (¶ 292), without more, support a

27   core operations inference, as "[p]roof under this theory is not easy." *Intuitive Surgical*, 759 F.3d at

28   1062. Plaintiff's vague allegation that Trigg recalled attending unspecified meetings late in the sales

1  cycle, with no allegations as to Trigg's role in the preparation for—or during—these meetings, does

2  not advance Plaintiff's theory of scienter and in fact only underscores that she was not immersed in

3  day-to-day details. Similarly, CW 10's statement that Trigg described herself as a "commercial focus

4  CEO" eager to travel for big meetings, "walk patient floor[s]," and present to other CEOs (¶ 290)

5  does not demonstrate close involvement in sales or marketing operations. Indeed, scienter "cannot be

6  established based on 'general awareness' and 'hands-on management style.'" *Veal v. LendingClub*

7  *Corp.*, 423 F. Supp. 3d 785, 814 (N.D. Cal. 2019) (citing *Knollenberg v. Harmonic, Inc.*, 152 F.

8  App'x 674, 681–82 (9th Cir. 2005)). Plaintiff has not alleged specific facts showing Trigg's direct,

9  day-to-day involvement in Outset's sales and marketing to support a core operations inference.

10      ***Stock Sales.*** Plaintiff next attempts to conjure an inference of scienter from Trigg's stock

11  sales pursuant to her 10b5-1 trading plan. This too fails. Sales pursuant to such plans do not support

12  an inference of scienter – although they may refute it. *See Metzler Inv. GmbH*, 540 F.3d at 1067 n.11

13  (stock sales made under trading plans weigh against an inference of scienter).

14      Even if the Court disregarded Trigg's trading plan, Plaintiff must show that Trigg's stock

15  sales were suspicious in timing or amount, typically by comparing class-period to pre-class-period

16  sales. *E.g.*, *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001); *In re Silicon Storage Tech., Inc.*

17  *Sec. Litig.*, 2006 WL 648683, at *18 (N.D. Cal. Mar. 10, 2006). Here, Plaintiff cannot make such a

18  comparison because it pleads a Class Period beginning with Outset's IPO and thus has no pre-class-

19  period sales. ¶ 310 n.12. Unable to avoid that Trigg's sales were made under trading plans and

20  hamstrung by its own pleading strategy, Plaintiff baselessly sows suspicion as to the timing of when

21  Trigg adopted her plan and subsequently sold shares pursuant to that plan. But conclusory

22  allegations of "suspicious" timing and "massive" sales do not support an inference of fraud.

23      To start, Plaintiff alleges that the timing of Trigg's purported insider sales was "suspicious,

24  as the sales were made when the stock was trading at inflated prices due to Defendants' false and

25  misleading statements." ¶ 308. But this assertion flows from Plaintiff's pleading tactics and is not an

26  indication of fraud. Plaintiff set the purported Class Period to begin with Outset's September 2020

27  IPO. ¶ 4. Because stock sales can only occur when stock is publicly traded, Trigg literally could not

28  have made any such sales before the stock was "trading at inflated prices"—at least according to

1   Plaintiff's theory, under which the stock price was inflated from the moment of its first public trade.

2       Plaintiff's attempt to cast suspicion because Trigg adopted a trading plan during the Class

3   Period fails for the same reasons: because Plaintiff defined the nearly four-year Class Period to begin

4   with Outset's IPO, making it impossible for Trigg to adopted a plan before that period began. ¶ 308.

5   Courts in this District have rejected arguments as to similarly lengthy Class Periods. *See, e.g.*, *In re*

6   *Taleo Corp. Sec. Litig.*, 2010 WL 597987, at *12 (N.D. Cal. Feb. 17, 2010) (holding that "the fact

7   that [defendants] may have entered into the [10b5-1 trading] plans during the [three-year] Class

8   Period is not inherently suspicious, given its length").

9       Second, Plaintiff suggests that it was suspicious that Trigg adopted a new trading plan on

10  February 23, 2023, a month after the FDA began its inspection of Outset. ¶ 314. But Plaintiff relies

11  only on a conclusory assertion that Trigg possessed some unspecified material non-public

12  information about Outset after the FDA inspection. This claim fails: Outset disclosed the FDA's

13  inspection observations to the market in its Form 10-K filed February 13, 2023, ten days before

14  either plan was adopted. Ex. 5 at 13. Plaintiffs do not identify any material non-public information

15  Trigg was aware of at the time she adopted her plan that would indicate scienter.

16      Finally, Plaintiff attempts to plead that Trigg's sales were suspiciously "massive" and thus

17  indicative of scienter. ¶ 308. Ignoring Trigg's trading plan, Plaintiff misleadingly combines multiple

18  months of transactions to inflate the appearance of suspicious activity, claiming that Trigg sold

19  82,962 shares in the two months before the FDA warning letter. ¶ 313. In fact, the largest single

20  transaction Plaintiff identifies is only 30,000 shares. *Id.* These sales must be viewed in context:

21  during the Class Period, Trigg held between approximately 960,000 and 1.3 million shares. Ex. 6 at

22  30; Ex. 7 at 54; Ex. 8 at 65; Ex. 9 at 62. Even Trigg's largest sale represents only a small fraction of

23  her holdings. This is not suspicious. *See Intuitive Surgical*, 759 F.3d at 1064 (large profits from stock

24  sales do not support an inference of scienter without allegations showing those sales departed

25  significantly from previous trading patterns). Even considering Trigg's total Class Period sales,

26  courts in this Circuit have held sales of a similar volume not "astronomical," and have held that even

27  high percentages sold—where alleged—do not, by themselves, support a strong inference of

28  scienter. *Metzler*, 540 F.3d at 1067 (finding $33 million in sales not "astronomical" and placing great

30

1  weight on the percentage of stock sold); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th

2  Cir. 2002) (sale of 74% of stock during Class Period was insufficient to support scienter on its own).

3        Sales were made for a variety of purposes, including non-discretionary payment of taxes.

4  Those sales are also not indicative of scienter. *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 611

5  (E.D. Pa. 2009) (stock sales made to cover tax liability weigh against an inference of scienter) (citing

6  authorities); *Plumley v. Sempra Energy*, 2017 WL 2712297, at *12 (S.D. Cal. June 20, 2017) (stock

7  sales made to pay tax withholding liability do not support an inference of scienter).

8        ***Scienter by Hindsight.*** Having failed to allege scienter under traditional theories, Plaintiff

9  now offer three miscellaneous arguments untethered to scienter pleading requirements, hoping

10 something will stick: (1) Defendants knew Tablo wasn't cleared for CRRT and that TabloCart lacked

11 510(k) clearance (¶¶ 300–302); (2) Defendants knew about Outset's "value proposition" marketing

12 strategy (¶¶ 303–304); and (3) Defendants violated Outset's internal policies against off-label

13 marketing (¶¶ 305–306).[5] First, Plaintiff's claim about FDA clearance fails because Tablo's

14 approved uses and TabloCart's clearance were regularly publicly disclosed. For example, when

15 Tablo XT launched, Trigg specifically stated that Tablo ran regular dialysis at a lower flow rate up to

16 24 hours, but did ***not*** perform CRRT. Ex. 18 at 10. Trigg could not have intentionally misled the

17 public about facts she openly disclosed in her capacity as CEO. Plaintiff's argument that Trigg's

18 knowledge of Outset's "value proposition" marketing strategy fails for the same reasons. Finally, as

19 discussed *supra* § I.A, Trigg did not engage in, or conceal, an off-label marketing scheme, and

20 certainly did not believe she was doing so prior to receiving the FDA Warning Letter. The fact that

21 the FDA later characterized certain customer testimonials on Outset's website as off-label marketing

22 does not compel a finding that Trigg knowingly engaged in wrongdoing in her earlier statements

23 about Tablo—especially since those testimonials mirrored Outset's public statements to investors.

24 Courts routinely reject that kind of bare inference by hindsight. *See In re FVC.COM Sec. Litig.*, 32

25 F. App'x 338, 341 (9th Cir. 2002) (rejecting the notion that "because the defendants admit that they

26 _____

27 [5] Although these allegations are directed at Defendants Trigg, Ahmed, and Chambers, only Trigg is
28 the subject of individualized allegations. *See, e.g.*, ¶ 301.

1    knew something later and the 'something' is important, they must have known it earlier").

2    **B.    Plaintiff Fails To Plead Scienter As To Defendants Ahmed And Chambers.**

3    Plaintiff's slipshod allegations of scienter as to Ahmed and Chambers are even less credible.

4    Plaintiff pleads no individualized facts to support a core operations inference as to Ahmed and

5    Chambers, only weakly adding that the "Individual Defendants also directly participated in the

6    management of the Company" and "were privy to information regarding Tablo and Outset's

7    marketing and promotion of Tablo." ¶ 299. These allegations come nowhere close to the level of

8    specificity required to adequately plead scienter. *See supra* § II.A.

9    Plaintiff makes no unique allegations regarding Ahmed and Chambers's stock trades, which

10   also fail. Additionally, Plaintiff seeks to cast suspicion on the timing of the officers' trades as a

11   whole by asserting that the 85% of the Class Period trading by certain Outset officers (consisting of

12   a group selected by a method not disclosed in the AC) occurred before the first corrective disclosure.

13   ¶ 308. Yet that disclosure of the FDA Warning Letter on July 7, 2023 came nearly three years into a

14   four-year Class Period. In that context, it is unremarkable that 85% of stock sales occurred during

15   the initial 72% of the alleged Class Period, especially since Plaintiff includes trades by officers like

16   Chambers, who ceased to be an insider (and thus no longer a Form 4 reporter) upon leaving Outset

17   less than one year into the purported Class Period in July 2021. *See* ¶ 317. Nor do these allegations

18   include any specific reference to Ahmed or Chambers. Similar to Trigg, Plaintiff suggests that it was

19   suspicious that Ahmed adopted a new trading plan on February 17, 2023, a month after the FDA's

20   inspection of Outset. ¶ 319. But, as with Trigg, Plaintiff makes no specific allegations of any

21   material non-public information that Ahmed was individually aware of at that time he adopted this

22   plan, and thus these allegations fail for the same reasons. *See supra* § II.A.

23   Plaintiff's miscellaneous scienter allegations—regarding Defendants' supposed knowledge

24   about the lack of FDA clearance, marketing of Tablo's value proposition, and Outset's off-label

25   marketing policy—are asserted broadly against the "Individual Defendants." ¶¶ 300-306. These

26   hindsight-based allegations contain no specific facts to support the inference that Ahmed or

27   Chambers knowingly or recklessly concealed an off-label marketing scheme. For these reasons, as

28   well as those discussed above as to Trigg, these allegations to fail to support an inference of scienter.

**C.      Scienter Is Not Pled Under A Holistic Analysis Or As To Defendant Outset.**

Plaintiff's scienter allegations against the Individual Defendants remain equally weak when viewed holistically. Plaintiff cites no confidential witness statement alleging with the requisite degree of particularity any Defendant's knowledge of, or participation in, an off-label marketing scheme. Of the three Individual Defendants, Plaintiff only attempts to actually connect Trigg to Outset's daily operations, but those allegations are vague and unpersuasive. Plaintiff's effort to support scienter using the Individual Defendants' stock sales fails, given the lengthy Class Period and the fact that the allegedly suspicious sales were made pursuant to stock trading plans. Finally, Plaintiff's last-ditch attempt to plead fraud by hindsight does not create a strong inference that the Individual Defendants knowingly or recklessly misled investors by failing to disclose a widespread off-label marketing scheme. Plaintiff simply has not alleged scienter.

Having failed to plead scienter as to Defendants Trigg, Ahmed, and Chambers, the AC also fails in this regard as to Outset. The Individual Defendants are the only executives to whom Plaintiff attributes the allegedly misleading statements. ¶¶ 25-27; *In re Volkswagen "Clean Diesel" Mktg., Sales Practices & Prod. Liab. Litig.*, 2017 WL 6041723, at *8 (N.D. Cal. Dec. 6, 2017) ("[L]iability for fraud cannot be imputed to a corporation without evidence that an agent of the corporation who participated in making the challenged statements did so with scienter.").

**III.      PLAINTIFF FAILS TO PLEAD LOSS CAUSATION**

To adequately plead loss causation, a plaintiff must allege that a company's stock price "fell significantly after the truth became known." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The relevant "truth" must relate to the allegedly false statement or deceptive conduct: Securities plaintiffs must "show a causal connection between the fraud and the loss . . . by tracing the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (internal quotation marks and citations omitted). Moreover, the mere disclosure of negative financial results is insufficient to plead loss causation in the absence of specific allegations connecting those financial results to the alleged misstatements. *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014) (rejecting plaintiff's allegation of a causal link between a disappointing earnings disclosure and alleged revenue accounting fraud

1    stating, "our precedent requires a securities fraud plaintiff to allege that the market learned of and

2    reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial

3    health generally") (citations omitted). And, when a plaintiff alleges a series of purported corrective

4    disclosures over time, they must show that each subsequent alleged disclosure revealed new

5    information to the market. *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *9 (S.D. Tex. Feb. 9,

6    2024) (memorandum and recommendation) ("revealing the depths of [the company's] financial

7    struggles did not shed any new light on [its] alleged misrepresentations" about a particular issue and

8    thus was not a corrective disclosure). Under this legal framework, Plaintiff has failed to adequately

9    plead that the alleged disclosures on November 7-8, 2023, May 8, 2024, and August 7, 2024

10   corrected any of the Challenged Statements because it has not pled that any new information was

11   disclosed to the market on these dates regarding the alleged material omissions.

12       Outset disclosed on July 7, 2023, August 2, 2023 and October 12, 2023, that (a) the FDA had

13   identified off-label promotional conduct, (b) the FDA had found that TabloCart is a device not an

14   accessory and that Outset had determined to halt sales of Tablo Cart while it sought FDA clearance,

15   and (c) Outset's revenue was negatively impacted to a degree greater than expected by the FDA

16   Warning Letter. *See* ¶¶ 205, 210, 225. Exs. 11, 12, 13. If the Court finds—which it should not—that

17   Plaintiff has adequately pled the challenged statements were materially misleading because Outset

18   did not disclose off-label marketing and concealed from investors that its revenue growth was due to

19   Tablo purchases for its off-label use, Outset's disclosures in July, August, and October 2023 fully

20   correct those purported omissions. The subsequent disclosures of disappointing Tablo Sales on

21   November 7-8, 2023, May 8, 2024, and August 7, 2024 at most merely reaffirm information the

22   market already had. *See* ¶¶ 232, 253, 267; Exs. 14-15.

23       Moreover, Plaintiff alleges no facts in support of its conclusory assertion that the August 7,

24   2024 disclosure had anything to do with off-label marketing. In that disclosure, Trigg explained the

25   hold on TabloCart had masked a different issue: Outset needed to revise its sales process to better

26   target mainstream enterprise adopters. Ex. 16 at 5; § V, *supra*. Plaintiff concludes, but does not

27   allege any supporting facts, that the restructuring Trigg described was a result of Outset ending it

28   off-label marketing scheme. ¶ 98. But Plaintiff is not entitled to substitute its own story for the

1  explanation Outset provided and the Court need not accept such conclusory and speculative

2  assertions as facts. *See Espy v. J2 Global, Inc.*, 99 F.4th 527, 541 (N.D. Cal. 2024) (loss causation

3  inadequately pled where information disclosed not tethered to alleged misrepresentation). Plaintiff

4  has not pled that the August 7, 2024 disclosure corrected any of the Challenged Statements.

5  **IV.    PLAINTIFF FAILS TO PLEAD A CLAIM FOR VIOLATION OF SECTION 20(a) BY**
   **ANY INDIVIDUAL DEFENDANT.**

6

7          Plaintiff alleges that Trigg, Chambers and Ahmed are each a controlling person under

8  Section 20(a). ¶¶ 357-62. Section 20(a) is "intended to prevent evasion of the law by organizing

9  dummies who will undertake the actual things forbidden." *Hollinger v. Titan Capital Corp.*, 914

10  F.2d 1564, 1577 (9th Cir. 1990) (en banc) (cleaned up). The statute imposes liability on any "person

11  who, directly or indirectly, controls any person liable" for a Section 10(b) or other Exchange Act

12  violation. 15 U.S.C. § 78t(a). The applicable test is whether the allegedly controlling person

13  "actually" exercised control—not whether the person had a theoretical right to do so. *See In re BofI*

14  *Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *23 (S.D. Cal. May 23, 2017) (plaintiffs must

15  "proffer allegations demonstrating that the defendant exercised actual power or control over the

16  primary violator such that that defendant, too, can be held accountable for the primary violation").

17          As an initial matter, several courts have recognized that control person liability does not

18  extend to oral statements. *E.g.*, *Murphy v. Precision Castparts Corp.*, 2020 WL 4040827, at *25 (D.

19  Or. July 17, 2020) (CFO not liable under Section 20(a) where plaintiffs fail to show that she "had

20  any meaningful control over what words came out of [the CEO's] mouth during [earnings] calls");

21  *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1242-43 (N.D. Cal. 1994). And, even if it were

22  theoretically possible for one person to be liable under Section 20(a) for the oral statements of

23  another, Plaintiff's allegations here are deficient in two different ways: *First*, Plaintiff has not

24  alleged anything but bare conclusory assertions about control (¶¶ 358-59) against the Individual

25  Defendants, collectively, which do not demonstrate any basis to hold a defendant accountable for the

26  statements of another. *Second*, neither Chambers nor Ahmed served in the role of CFO for the

27  entirety of the Class Period. Section 20(a) is inapplicable to each of them for statements made when

28  they were not employed as Outset's CFO.

Date:  August 14, 2025

Respectfully submitted,

**SIDLEY AUSTIN LLP**


By: */s/ Jaime A. Bartlett*
    Sara B. Brody (SBN 130222)
    Jaime A. Bartlett (SBN 251825)
    Sarah E. Gallo (SBN 335544)

    *Attorneys for Defendants*
    *Outset Medical, Inc., Leslie Trigg,*
    *Nabeel Ahmed, and Rebecca Chambers*