# Exhibit 2

S-1 1 d941853ds1.htm S-1

**Table of Contents**

As filed with the Securities and Exchange Commission on August 21, 2020.

Registration No. 333-

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**
## FORM S-1
### REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

# Outset Medical, Inc.
*(Exact name of Registrant as specified in its charter)*

| **Delaware** | **3845** | **20-0514392** |
|---|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(Primary Standard Industrial Classification Code Number)* | *(I.R.S. Employer Identification Number)* |

**3052 Orchard Dr.**
**San Jose, California 95134**
**(669) 231-8200**
*(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)*

**Leslie Trigg**
**Chief Executive Officer**
**Outset Medical, Inc.**
**3052 Orchard Dr.**
**San Jose, California 95134**
**(669) 231-8200**
*(Name, address, including zip code, and telephone number, including area code, of agent for service)*

*Copies to:*

| Frank F. Rahmani | John L. Brottem | Nathan Ajiashvili |
|---|---|---|
| Robert A. Ryan | General Counsel | Brian Cuneo |
| Helen Theung | Outset Medical, Inc. | Salvatore Vanchieri Jr. |
| Sidley Austin LLP | 3052 Orchard Dr. | Latham & Watkins LLP |
| 555 California Street, Suite 2000 | San Jose, California 95134 | 885 Third Avenue |
| San Francisco, CA 94104 | (669) 231-8200 | New York, NY 10022 |
| (650) 565-7000 | | (212) 906-1200 |

**Approximate date of commencement of proposed sale to the public**: As soon as practicable after the effective date of this Registration Statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| Emerging growth company | ☒ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities To Be Registered | Proposed Maximum Aggregate Offering Price(1)(2) | Amount of Registration Fee(3) |
|---|---|---|
| Common Stock, $0.001 par value per share | $100,000,000 | $12,980 |

(1) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(o) under the Securities Act of 1933, as amended.
(2) Includes the aggregate offering price of additional shares that the underwriters have the option to purchase.
(3) Calculated pursuant to Rule 457(o) based on an estimate of the proposed maximum aggregate offering price.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission, acting pursuant to said Section 8(a), may determine.**

**Table of Contents**

The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is declared effective. This prospectus is not an offer to sell these securities and we are not soliciting offers to buy these securities in any jurisdiction where the offer or sale is not permitted.

Subject to Completion
Preliminary Prospectus dated August 21, 2020

**PROSPECTUS**

# Shares



# Common Stock

This is the initial public offering of shares of common stock of Outset Medical, Inc. We are selling          shares of our common stock.

We expect the initial public offering price will be between $          and $          per share. Currently, no public market exists for our shares. We have applied to list our common stock on The Nasdaq Global Select Market under the symbol "OM."

**We are an "emerging growth company" under the federal securities laws and are subject to reduced public company disclosure standards. See "Prospectus Summary—Implications of Being an Emerging Growth Company."**

**Investing in our common stock involves risks that are described in the "Risk Factors" section beginning on page 14 of this prospectus.**

|  | Per share | Total |
|---|---|---|
| Initial public offering price | $ | $ |
| Underwriting discount(1) | $ | $ |
| Proceeds, before expenses, to us | $ | $ |

(1)    We refer you to "Underwriting" beginning on page 188 for additional information regarding underwriting compensation.

The underwriters may also exercise their option to purchase up to an additional          shares from us, at the public offering price, less underwriting discount, for 30 days after the date of this prospectus.

Neither the Securities and Exchange Commission, any state securities commission nor any other regulatory body has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

The shares will be ready for delivery on or about          , 2020.

| **BofA Securities** | **Morgan Stanley** | **Goldman Sachs & Co. LLC** |
|---|---|---|
| **SVB Leerink** | | **Stifel** |

The date of this prospectus is          , 2020










**TABLE OF CONTENTS**

| | Page |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 14 |
| Cautionary Note Regarding Forward-Looking Statements | 65 |
| Market, Industry and Other Data | 67 |
| Use of Proceeds | 68 |
| Dividend Policy | 69 |
| Capitalization | 70 |
| Dilution | 73 |
| Selected Financial and Other Data | 76 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 78 |
| Business | 98 |
| Management | 144 |
| Executive Compensation | 154 |
| Certain Relationships and Related Party Transactions | 165 |
| Principal Stockholders | 169 |
| Description of Capital Stock | 173 |
| Shares Eligible for Future Sale | 180 |
| Material U.S. Federal Income Tax Consequences to Non-U.S. Holders of Our Common Stock | 184 |
| Underwriting | 188 |
| Legal Matters | 196 |
| Experts | 196 |
| Where You Can Find Additional Information | 196 |
| Index to Financial Statements | F-1 |

**You should rely only on the information contained in this document or to which we have referred you. Neither we nor any of the underwriters has authorized anyone to provide you with information that is different. This document may only be used in jurisdictions where it is legal to sell these securities. The information in this document may only be accurate as of the date of this document or such other date set forth in this document, regardless of the time of delivery of this prospectus or of any sale of shares of our common stock, and the information in any free writing prospectus that we may provide you in connection with this offering is accurate only as of the date of that free writing prospectus. Our business, financial condition, results of operations and future growth prospects may have changed since those dates.**

Through and including                    , 2020 (the 25th day after the date of this prospectus), all dealers effecting transactions in the Common Stock, whether or not participating in this offering, may be required to deliver a prospectus. This delivery requirement is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.

**For investors outside the United States**: Neither we, nor the underwriters have done anything that would permit this offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about, and observe any restrictions relating to, the offering of the common stock and the distribution of this prospectus outside of the United States.

i

Table of Contents

**PROSPECTUS SUMMARY**

*This summary highlights selected information contained elsewhere in this prospectus. This summary does not contain all of the information you should consider before buying shares in this offering. Therefore, you should read this entire prospectus carefully, including the sections titled "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes included elsewhere in this prospectus, before deciding whether to purchase our common stock. Unless the context requires otherwise, the words "we," "us," "our," "Outset" and "the Company" refer to Outset Medical, Inc.*

**Overview**

Outset is a rapidly growing medical technology company pioneering a first-of-its-kind technology to reduce the cost and complexity of dialysis. We believe the Tablo Hemodialysis System (Tablo) represents a significant technological advancement enabling novel, transformational dialysis care in acute and home settings. We designed Tablo from the ground up to be a single enterprise solution that can be utilized across the continuum of care, allowing dialysis to be delivered anytime, anywhere and by anyone.

Our technology is designed to elevate the dialysis experience for patients, and help providers overcome traditional care delivery challenges. Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows providers to standardize to a single technology platform from the hospital to the home. Tablo is also intelligent and connected, with automated documentation and the ability to integrate with electronic medical record reporting, along with streamlined remote machine management to maximize device uptime. We have generated meaningful evidence to demonstrate that providers can realize significant operational efficiencies, including reducing the cost of their dialysis programs by up to 80% in the intensive care unit (ICU). In addition, Tablo has been shown to deliver robust clinical care. In studies and surveys we have conducted, patients have reported experiencing fewer symptoms and better quality sleep while on Tablo. We believe Tablo empowers patients, who have traditionally been passive recipients of care, to regain agency and ownership of their treatment. Tablo is currently cleared by the United States Food and Drug Administration (FDA) for use in the hospital, clinic or home setting.

In the United States, dialysis is a large, expensive sector of healthcare that has seen little technology innovation in the last 30 years. We estimate annual spending on dialysis in the United States is approximately $74 billion of which an estimated $44 billion is Medicare spending. Kidney failure affects a large and growing number of individuals; we estimate kidney failure will affect approximately 810,000 people in the United States alone in 2020. We expect multiple pre-existing conditions and demographic factors such as diabetes, hypertension, obesity and an aging population to drive the prevalence of kidney failure to one million individuals by 2030. Kidney failure can be temporary and occur spontaneously due to an underlying medical condition, as is the case in acute kidney injury (AKI), or can worsen gradually over time, as is the case in chronic kidney disease (CKD), which may result in end-stage renal disease (ESRD). Approximately 40% of ESRD patients begin their dialysis journey in a chronic setting, either in a dialysis clinic or at home, and approximately 60% of dialysis patients "crash" into dialysis, meaning they have little to no clinical care in advance.

Kidney failure is commonly managed with hemodialysis, a procedure by which waste products and excess fluid are directly removed from a patient's blood using an external dialysis machine. ESRD patients require complex management and the cost burden of administering dialysis is significant. Hemodialysis can be performed in multiple care settings, including the hospital, outpatient clinic or the patient's home. Typically, different types of dialysis machines are used in different care settings and for different clinical needs. Tablo is an enterprise dialysis solution that allows providers to standardize to a single technology platform.

1

Table of Contents

Driving adoption of Tablo in the acute setting has been our primary focus to date. We have invested in growing our economic and clinical evidence, and built a veteran sales and clinical support team with significant expertise, along with a comprehensive training and customer experience program. Our experience in the acute market has demonstrated Tablo's clinical flexibility and operational versatility, while also delivering meaningful cost savings to the providers. We believe that the COVID-19 pandemic has highlighted the limitations of traditional machines and the benefits of Tablo, which has driven an increase in demand.

Tablo was initially cleared by the FDA for use in an acute or chronic care facility in September 2014. Subsequently, on March 31, 2020, Tablo was cleared by the FDA for patient use in the home, and we are in the early stages of commercializing in the home market.

Our total revenue grew from $2.0 million for the year ended December 31, 2018 to $15.1 million for the year ended December 31, 2019, and from $5.4 million for the six months ended June 30, 2019 to $18.9 million for the six months ended June 30, 2020. For the years ended December 31, 2018 and 2019, we incurred net losses of $49.8 million and $68.3 million, respectively, and for the six months ended June 30, 2019 and 2020, we incurred net losses of $33.5 million and $47.2 million, respectively.

**Our Market Opportunity**

We estimate that annual spending on dialysis in the United States is approximately $74 billion of which an estimated $44 billion is Medicare spending. In 2017, Medicare spending on dialysis accounted for 7% of the total Medicare budget despite ESRD patients only representing 1% of the Medicare population. Dialysis is performed in the acute care setting, which includes hospitals and sub-acute facilities, an outpatient dialysis clinic or the patient's home based on the patient's condition and preference.

To date, we have focused primarily on the acute care setting, which we estimate represents a total addressable market opportunity in the United States for Tablo of approximately $2.2 billion. We are expanding our focus to the home setting, which we estimate represents a total addressable market opportunity of approximately $8.9 billion. As a result of an aging population and the growing incidence of diabetes, hypertension, and obesity, based on historical rates of growth, we estimate the ESRD patient population will grow 30% over the next ten years, thereby increasing our opportunity across both settings.

The majority of ESRD patients are treated in outpatient facilities. However, recently, several factors including the COVID-19 pandemic, changing patient preferences, government initiatives, and reimbursement changes are supporting a long-anticipated shift toward home dialysis. We believe the benefits of our Tablo system are well positioned to address the shortcomings in the acute market and to help accelerate this shift to home-based hemodialysis therapy.

**Limitations of Traditional Machines**

Traditional hemodialysis machines are burdensome to use and require connection to an industrial water treatment room to operate. In settings where large water treatment rooms are unavailable, as is often the case in hospitals, traditional machines must be connected to an additional piece of equipment that purifies water for dialysis and feeds it into the hemodialysis machine. Because the design of traditional dialysis machines has changed little in the last 30 years, the set-up and management process is mostly manual, and is burdensome for users to master.

Dialysis machines available in the home also have seen minimal innovation. Most patients using the incumbent home machine are required to spend 16 to 24 hours per week manually making dialysate in advance of their treatments using a separate machine. In addition, patients are required to dialyze more frequently than

2

Table of Contents

they do in dialysis clinics due to limitations with the incumbent device. Lastly, set-up and take-down are manual, requiring users to memorize dozens of steps, making training difficult and lengthy.

**Our Solution**

We designed Tablo from the ground up to be a single enterprise solution that can be utilized across the continuum of care, allowing dialysis to be delivered anytime, anywhere and by anyone. Unlike existing hemodialysis machines, which have limited clinical versatility across care settings and are generally burdened by specialized and expensive infrastructure, Tablo is a single enterprise solution that can be seamlessly utilized across different care settings and for multiple clinical needs.

The Tablo System is comprised of:

- *Tablo Console*: A compact console with integrated water purification, on-demand dialysate production and a simple-to-use touchscreen interface.

- *Tablo Cartridge*: A proprietary, disposable single-use pre-strung cartridge that easily clicks into place, minimizing steps, touch points and connections.

- *Tablo Connectivity and Data Ecosystem*: With Tablo, we are bringing data to dialysis. Tablo is built to live in a connected setting with cloud-based system monitoring, patient analytics and clinical recordkeeping.

We believe that Tablo's unique individual features combine to provide a significantly differentiated hemodialysis solution, offering the following benefits:

- *Simplicity*: Tablo's intuitive touchscreen interface makes it easy to learn and use, guiding users through treatment from start to finish using step-by-step instructions with simple words and animation.

- *Clinical Flexibility*: Tablo can accommodate a wide range of treatment modalities, durations and flow rates, allowing for broad clinical applications.

- *Operational Versatility*: Tablo is an all-in-one device with integrated water purification and on-demand dialysate production, eliminating the need for industrial water treatment rooms required to operate traditional hemodialysis machines. Tablo's independence from this infrastructure enables bedside dialysis in the acute setting, saving the time and expense of transporting patients elsewhere for dialysis.

- *Progressive Intelligence*: Tablo's two-way wireless connectivity and data analytics provide the ability to continuously activate new capabilities and enhancements through wireless software updates, while also enabling predictive preventative maintenance to maximize machine uptime.

**What Sets Us Apart**

At Outset, we are reimagining the future of dialysis. Our culture of innovation and design permeates all aspects of our organization and informs our approach to transforming the experience of dialysis. We are focused on changing a historically stagnant space, driving widespread adoption of our new technology, and delivering on the promise of improved experience for patients while also creating cost-reducing value for healthcare providers. We believe the following strengths sets us apart:

- **First-of-its kind enterprise dialysis solution, offering significant advantages over traditional machines.** Tablo is the first and only fully integrated hemodialysis system that can be used to

3

Table of Contents

deliver treatment across all care settings from the ICU to home. Tablo provides real time water purification and dialysate production, eliminating the need for industrial water treatment room infrastructure. Tablo simplifies training and operation through advanced software, sensor technology and a consumer-friendly touchscreen design, enabling ease of use.

- **Tablo's unique features offer a compelling value proposition across both acute and home settings.** In the acute care setting, Tablo lowers the cost of dialysis by up to 80% in the ICU by reducing treatment supplies cost and enabling labor cost reduction. Tablo also reduces complexity by eliminating the need for multiple dialysis machines and by streamlining documentation and compliance. For providers offering home dialysis, Tablo offers a new level of operational simplicity aimed at improving patient adoption, experience, retention and the economics of home hemodialysis.

- **Our early and continued investment in software, data science and machine learning**. We have constructed a powerful, two-way, wireless data ecosystem around Tablo that delivers significant value to our healthcare customers while enabling the Company to efficiently scale. We have highly experienced software, data science and machine learning engineers who deliver cutting-edge solutions.

- **Dialysis is a large recession-proof market, supporting our recurring revenue model.** Dialysis is a highly predictable life-sustaining therapy with established reimbursement. Dialysis patients must receive dialysis at least three times per week, 52 weeks per year. We have high visibility into the utilization and maintenance of each Tablo unit. Additionally, customers purchase an annual service agreement which also provides an associated recurring revenue stream.

- **Our sales organization advantages us in executing our strategy.** Our commercial leadership team has experience scaling high growth medical technology companies. We believe the profile and strong track record of our capital and clinical sales teams set us apart from other dialysis equipment manufacturers with specific skills and competencies to drive Tablo adoption top-down through C-suite buy-in and bottom-up through clinical staff support, respectively.

- **An invention mindset that permeates our design and execution.** Within Outset, we take a crowd-sourcing approach to problem-solving in order to leverage our diversity of thinking and collective creativity. This invention mindset informs one of our core competencies—hardware and software design. We believe in the power of a single hardware platform with software used to fuel continuous upgrades and improvements.

**Growth Strategies**

We intend to continue building a high growth business that is sustainable, predictable and profitable over time. In order to achieve this goal, we plan to employ the following strategies:

- **Further penetrate the acute care market through new customer acquisition and current customer fleet expansion.** We plan to broaden our installed base by continuing to target Integrated Delivery Networks (IDNs) and health systems, Veteran Affairs (VA) and sub-acute long-term acute care hospital (LTACH) and skilled nursing facility (SNF) providers. In addition, we plan to focus on driving utilization and fleet expansion with existing customers. We plan to do so by providing exceptional user experience through our commercial team and continuously releasing product enhancements that amplify Tablo's operational simplicity and clinical versatility.

4

Table of Contents

**BUSINESS**

**Business Overview**

Outset is a rapidly growing medical technology company pioneering a first-of-its-kind technology to reduce the cost and complexity of dialysis. We believe Tablo represents a significant technological advancement enabling novel, transformational dialysis care in acute and home settings. We designed Tablo from the ground up to be a single enterprise solution that can be utilized across the continuum of care, allowing dialysis to be delivered anytime, anywhere and by anyone.

Our technology is designed to elevate the dialysis experience for patients, and help providers overcome traditional care delivery challenges. Our relentless focus on flexibility, ease of use and user experience translates to meaningfully reduced training times and fixed infrastructure requirements. Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows providers to standardize to a single platform from the hospital to the home. Tablo is also intelligent and connected, with automated documentation and the ability to integrate electronic with medical record reporting, along with streamlined remote machine management to maximize device uptime. We have generated meaningful evidence to demonstrate that providers can realize significant operational efficiencies, including reducing the cost of their dialysis programs by up to 80% in the ICU. In addition, Tablo has been shown to deliver robust clinical care. In studies and surveys we have conducted, patients have reported clinical and quality of life benefits on Tablo compared to other dialysis machines. We believe Tablo empowers patients, who have traditionally been passive recipients of care, to regain agency and ownership of their treatment. Tablo is currently cleared by the FDA for use in the hospital, clinic or home setting.

In the United States, dialysis is a large, expensive sector of healthcare that has seen little technology innovation in the last 30 years. We estimate annual spending on dialysis in the United States is approximately $74 billion of which an estimated $44 billion is Medicare spending. Kidney failure affects a large and growing number of individuals; we estimate kidney failure will affect approximately 810,000 people in the United States alone in 2020. We expect multiple pre-existing conditions and demographic factors such as diabetes, hypertension, obesity and an aging population to drive the prevalence of kidney failure to one million individuals by 2030. Kidney failure can be temporary and occur spontaneously due to an underlying medical condition, as is the case in AKI, or can worsen gradually over time, as is the case in CKD, which may result in ESRD. Approximately 40% of ESRD patients begin their dialysis journey in a chronic setting, either in a dialysis clinic or at home, and approximately 60% of dialysis patients "crash" into dialysis, meaning they have little to no clinical care in advance.

Kidney failure is commonly managed with hemodialysis, a procedure by which waste products and excess fluid are directly removed from a patient's blood using an external dialysis machine. ESRD patients require complex management and the cost burden of administering dialysis is significant. Hemodialysis can be performed in multiple care settings, including the hospital, clinic or the patient's home. Typically, different types of dialysis machines are used in different care settings and for different clinical needs. Tablo is an enterprise dialysis solution that allows providers to standardize to a single technology platform.

We estimate that annual spending on dialysis in the United States is approximately $74 billion of which an estimated $44 billion is Medicare spending. In 2017, Medicare spending on dialysis accounted for 7% of the total Medicare budget despite ESRD patients only representing 1% of the Medicare population. Dialysis is performed in the acute care setting, which includes hospitals and sub-acute facilities, an outpatient dialysis clinic or the patient's home based on the patient's condition and preference.

To date, we have focused primarily on the acute care setting, which we estimate represents a total addressable market opportunity for Tablo of approximately $2.2 billion. We are expanding our focus to the home

Table of Contents

setting, which we estimate represents a total addressable market opportunity of approximately $8.9 billion. As a result of an aging population and the growing incidence of diabetes, hypertension, and obesity, based on historical rates of growth, we estimate the ESRD patient population will grow 30% over the next ten years, thereby increasing our opportunity across both settings.

The majority of ESRD patients are treated in outpatient facilities. However, recently, several factors including the COVID-19 pandemic, changing patient preferences, government initiatives, and reimbursement changes are supporting a long-anticipated shift toward home dialysis. We believe the benefits of our Tablo system are well positioned to address the shortcomings in the acute market and to help accelerate this shift to home-based hemodialysis therapy.

Traditional hemodialysis machines are burdensome to use and require connection to an industrial water treatment room to operate. In settings where large water treatment rooms are unavailable, as is often the case in hospitals, traditional machines must be connected to an additional piece of equipment that purifies water for dialysis and feeds it into the hemodialysis machine. Because the design of traditional dialysis machines has changed little in the last 30 years, the set-up and management process is mostly manual, and is burdensome for users to master.

Dialysis machines available in the home also have seen minimal innovation. Most patients using the incumbent home machine are required to spend 16 to 24 hours per week manually making dialysate in advance of their treatments using a separate machine. In addition, patients are required to dialyze more frequently than they do in dialysis clinics due to limitations with the incumbent device. Lastly, set-up and take-down are manual, requiring users to memorize dozens of steps, making training difficult and lengthy.

We designed Tablo from the ground up to be a single enterprise solution that can be utilized across the continuum of care, allowing dialysis to be delivered anytime, anywhere and by anyone. Tablo is comprised of a compact console with integrated water purification, on-demand dialysate production and a simple-to-use touchscreen interface. With Tablo, we are bringing data to dialysis. Tablo is built to live in a connected setting with cloud-based system monitoring, patient analytics and clinical recordkeeping and the ability to activate new capabilities and enhancements through wireless software updates. Tablo's data analytics and connectivity also enable predictive preventative maintenance to maximize machine uptime. Unlike existing hemodialysis machines, which have limited clinical versatility across care settings and are generally burdened by specialized and expensive infrastructure, Tablo is a single enterprise solution that can be seamlessly utilized across different care settings and for multiple clinical needs.

We believe that Tablo's unique individual features combine to provide a significantly differentiated hemodialysis solution, offering the following benefits:

- Simplicity. Tablo's intuitive touchscreen interface makes it easy to learn and easy to use, guiding users through treatment from start to finish using step-by-step instructions with simple words and animation. Embedded sensors simplify the setup and takedown process by providing validation of each step, reducing the chance of user error. During treatment, sensors automatically alert the user of any problems and provide instructions to resolve the issues on the screen. Our proprietary pre-strung cartridge clicks into place and features color-coded, easy-to-follow connections, allowing users to setup the treatment supplies in less than five minutes. Tablo's simplicity can also reduce the training time required to operate the machine by roughly two thirds compared to traditional machines.

- Clinical Flexibility. Tablo can accommodate a wide range of treatment modalities, durations and flow rates, allowing broad clinical applications. In combination with its compact size and ease-of-use, Tablo's clinical flexibility enables providers to standardize to a single platform across all care settings.

99

**Table of Contents**

- Operational Versatility. Tablo is an all-in-one device with integrated water purification and on-demand dialysate production, eliminating the need for the industrial water treatment rooms required to operate traditional dialysis machines. Instead, Tablo only needs an electrical outlet and access to tap water. Tablo's independence from this infrastructure enables bedside dialysis in the acute setting, saving the time and expense of transporting patients elsewhere for dialysis. By eliminating the need for separate infrastructure, Tablo can practically and cost-efficiently provide patients with access to treatment in additional care settings that previously have not been feasible with traditional dialysis machines.

- Progressive Intelligence. Tablo's two-way wireless connectivity and data ecosystem connects providers and patients through a cloud-based integrated data platform, which enables real-time treatment monitoring, centralizes and automates treatment documentation and simplifies compliance and record-keeping requirements. Tablo's connectivity also streamlines machine management and maintenance and allows for feature enhancements through remote software updates.

Driving adoption of Tablo in the acute setting has been our primary focus to date. We have invested in growing our economic and clinical evidence, built a veteran sales and clinical support team with significant expertise, along with a comprehensive training and customer experience program. Our experience in the acute market has demonstrated Tablo's clinical flexibility and operational versatility, while also delivering meaningful cost savings to the providers. We plan to continue leveraging our commercial infrastructure to broaden our installed base in the acute care market as well as driving utilization and fleet expansion with our existing customers. We believe that the COVID-19 pandemic has highlighted the limitations of traditional machines and the benefits of Tablo, which has driven an increase in demand.

Tablo is also well suited for home-based dialysis. Tablo was cleared by the FDA for use in patients with acute and/or chronic renal failure in September 2014. Subsequently, on March 31, 2020, Tablo was cleared by the FDA for patient use in the home. Our ability to reduce training time, patient dropout, and supplies and infrastructure required to deliver dialysis in the home can drive efficiency and economic improvements to the home care model. Patients in the trial reported specific quality of life improvements compared to their experience on the incumbent home dialysis machine. To penetrate this market successfully, we are focused on refining our home distribution, logistics and support systems to ensure they are ready for rapid scale. We are also working with providers, patients and payors to increase awareness and adoption of TCUs as a bridge to home based therapy. To demonstrate the cost advantages of Tablo in the home setting, we will also be collecting additional patient clinical experience and outcomes data.

Tablo has a compelling business model consisting of an upfront capital purchase and recurring consumable revenue. We generate revenue primarily from the initial sale of Tablo and recurring sales of per-treatment consumables. The frequent utilization of Tablo generates significant revenue over the life of the console. We generate additional revenue via annual service contracts. Our total revenue grew from $2.0 million for the year ended December 31, 2018 to $15.1 million for the year ended December 31, 2019, and from $5.4 million for the six months ended June 30, 2019 to $18.9 million for the six months ended June 30, 2020. For the years ended December 31, 2018 and 2019, we incurred net losses of $49.8 million and $68.3 million, respectively, and for the six months ended June 30, 2019 and 2020, we incurred net losses of $33.5 million and $47.2 million, respectively.

**What Sets Us Apart**

At Outset, we are reimagining the future of dialysis. Our culture of innovation and design permeates all aspects of our organization and informs our approach to transforming the experience of dialysis. We are focused on changing a historically stagnant space, driving widespread adoption of our new technology, and delivering on

100

Table of Contents

the promise of improved experience for patients while also creating cost-reducing value for healthcare providers. We believe the following strengths sets us apart:

**First-of-its kind enterprise dialysis solution, offering significant advantages over traditional machines.** Tablo is the first and only fully integrated hemodialysis system that can be used to deliver treatment across all care settings from the ICU to home. Tablo provides real time water purification and dialysate production, eliminating the need for industrial water treatment room rooms. Tablo simplifies training and operation using advanced software, sensor technology and a consumer-friendly touchscreen design, enabling ease of use. Tablo is clinically versatile, allowing clinicians to prescribe treatments for everything from high acuity ICU patients to routine at home care. Tablo is compact and mobile, enabling use in confined environments such as ICUs and living rooms.

**Tablo's unique features offers a compelling value proposition across both acute and home care settings.**

*We believe Tablo offers the following advantages in the acute care setting:*

- Increases hospital operating margins by lowering the overall cost of dialysis-related supplies, infrastructure and labor by up to 80% in the ICU.

  - Reduces the average supplies cost associated with ICU dialysis treatments from approximately $300 per treatment to below $100.

  - Reduces reliance on specialized dialysis staff.

  - Increases productivity by shortening turnaround times and multi-system remote monitoring.

  - Enables hospitals to take dialysis back in-house, which including supplies cost reduction, reduces the total cost per treatment by $300 to $500.

- Reduces operational complexity by eliminating the need for multiple dialysis machines and streamlining documentation and compliance.

  - Standardizing reduces need to maintain clinical staff competency on multiple machines.

  - Eliminates need for specialized infrastructure, easing operational workflow and enhancing productivity and staffing flexibility.

  - Automated treatment documentation and fleet management and maintenance.

*We believe Tablo offers the following advantages in the home setting:*

- Improves provider home dialysis economics.

  - Offers flexible treatment frequency that can be aligned with payor reimbursement policies as medically appropriate.

  - Reduces home program staffing costs by reducing total training time and providing a novel learning curriculum that is largely patient-managed.

  - Enables providers to cost efficiently build TCUs in previously inaccessible locations since specialized infrastructure, such as a water treatment facility, is no longer needed.

101

Table of Contents

- Improves the accessibility and sustainability of home dialysis for patients.

  - Increases patient adoption through a shorter, less burdensome training process.

  - Enables longer retention and higher treatment compliance by giving patients the option of flexible treatment frequency and less burdensome set up and management.

  - Reduces patients' symptoms during treatment and offers quality of life improvements.

**Our early investment in software, data science and machine learning**. We have constructed a powerful two-way wireless data ecosystem around Tablo that delivers significant value to our healthcare customers while enabling us to efficiently scale the company itself. We have highly experienced software, data science and machine learning engineers who deliver cutting-edge solutions.

*Tablo Data Ecosystem value to our providers:*

- Reduces cost and increases compliance by centralizing and automating documentation and all cloud based medical record-reporting from treatment flowsheets to machine management.

- Increases uptime through machine-learning algorithms that feed continuous software improvements and predictive analytics.

- Reduces administrative time and cost through emergency medical record (EMR) integration.

*Tablo Data Ecosystem value to Outset:*

- Reinforces customer loyalty through access to a functionally rich data ecosystem.

- Improves speed and cost efficiency of design and manufacturing.

- Increases efficiency through remote real-time monitoring, diagnostics, and predictive analytics lowering servicing costs.

- Accelerates delivery of new features and improvements to customers through continuous in-field data analytics.

**Dialysis is a large recession-proof market, supporting our recurring therapy revenue model.** Dialysis is a highly predictable life-sustaining therapy with established reimbursement. Dialysis patients must receive dialysis at least three times per week, 52 weeks per year. We have high visibility into utilization and maintenance of each Tablo unit. Additionally, customers purchase an annual service agreement, which also provides an associated recurring revenue stream.

**Our sales organization advantages us in executing our strategy.** Our commercial leadership team has experience scaling high growth medical technology companies. We believe the profile and strong track record of our capital and clinical sales teams set us apart from other dialysis equipment manufacturers, with specific skills and competencies to drive Tablo adoption top-down through C-suite buy-in and bottom-up through clinical staff support, respectively.

**An invention mindset that permeates our design and execution.** Within Outset, we take a crowd-sourcing approach to problem-solving in order to leverage our diversity of thinking and collective creativity. This invention mindset informs one of our core competencies—hardware and software design. We believe in the power of a single hardware platform with software used to fuel continuous upgrades and improvements. We

102

Table of Contents

Pursuant to the terms of our manufacturing services agreement with Tacna (the Tacna Agreement), Tacna will provide support services in connection with our manufacturing activities in Mexico. Under the Tacna Agreement, Tacna will hire employees as requested and will be responsible for human resource functions including maintenance of employee files and reports. Tacna will also perform internal statutory accounting and payroll services, and will be responsible for payables processing. Additional services that Tacna is obligated to provide under the Tacna Agreement include interfacing with both Mexican and U.S. governmental agencies, preparing import-export documentation, coordinating shipment of equipment, raw materials and finished products, and obtaining necessary permits and licenses required in Mexico. Under the Tacna Agreement, Tacna's services are generally performed under a pass through cost model under which costs incurred are approved by us. We are also obligated to pay Tacna fees based on the number of employees under the Tacna Agreement. The Tacna Agreement has an initial three year term and will continue thereafter until terminated by us or Tacna in accordance with the terms of the Tacna Agreement.

### Tablo Cartridge

Currently, the Tablo cartridge is manufactured by Infus Medical Co. Ltd. (Infus), a contract manufacturer with two facilities in Thailand that produces dialysis supplies for a number of leading global companies. As part of our agreement, we direct the oversight of the raw materials sourcing, selection and planning while Infus takes receipt of the Tablo cartridge components, and performs assembly, testing and Ethylene Oxide sterilization before shipment. The various components for the Tablo cartridge are manufactured by approximately 50 different suppliers located in various countries including Singapore, Italy and the United States, some of which are single-source suppliers. The Tablo cartridges are shipped primarily via ocean freight, though in times of peak demand, we may ship by air freight. Our team inspects the product before releasing it for shipment.

We are also establishing a second source manufacturing site in Tijuana, Mexico in partnership with Providien Medical (Providien) and expect to begin production in the second quarter of 2021. Providien, part of Carlisle Companies Incorporated, offers expertise in high volume disposable assembly services. Through enhanced product design, high capacity tooling and simplified freight and logistics, we expect this site will be able to produce cartridges at a lower cost, increase our supply capacity and mitigate against global supply chain interruption.

In addition to the Tablo cartridge, each treatment requires a concentrated container of bicarbonate and a concentrated container of acid, and two small plastic straws that draw the appropriate amount of the concentrates into the Tablo console in order to produce dialysate on demand.

### Government Regulation

### United States Food and Drug Administration

In the U.S., our products are subject to regulation by the FDA as medical devices pursuant to the FDCA. The FDA regulates the development, design, non-clinical and clinical research, manufacturing, safety, efficacy, labeling, packaging, storage, installation, servicing, recordkeeping, premarket clearance or approval, adverse event reporting, advertising, promotion, marketing and distribution, and import and export of medical devices to ensure that medical devices distributed domestically are safe and effective for their intended uses and otherwise meet the requirements of the FDCA.

#### FDA Premarket Clearance and Approval Requirements

Unless an exemption applies, each medical device commercially distributed in the United States requires either FDA clearance of a 510(k) premarket notification, approval of a de novo application, or approval of a PMA. Under the FDCA, medical devices are classified into one of three classes—Class I, Class II or Class III—depending on the degree of risk associated with each medical device and the extent of manufacturer and regulatory control needed to ensure its safety and effectiveness. Class I includes devices with the lowest risk

131

Table of Contents

to the patient and are those for which safety and effectiveness can be assured by adherence to the FDA's General Controls for medical devices, which include compliance with the applicable portions of the QSR facility registration and product listing, reporting of adverse medical events, and truthful and non-misleading labeling, advertising, and promotional materials. Class II devices are subject to the FDA's General Controls, and special controls as deemed necessary by the FDA to ensure the safety and effectiveness of the device. These special controls can include performance standards, post-market surveillance, patient registries and FDA guidance documents.

While most Class I devices are exempt from the 510(k) premarket notification requirement, manufacturers of most Class II devices are required to submit to the FDA a premarket notification under Section 510(k) of the FDCA requesting permission to commercially distribute the device. The FDA's permission to commercially distribute a device subject to a 510(k) premarket notification is generally known as 510(k) clearance. Devices deemed by the FDA to pose the greatest risks, such as life sustaining, life supporting or some implantable devices, or devices that have a new intended use, or use advanced technology that is not substantially equivalent to that of a legally marketed device, are placed in Class III, requiring approval of a PMA. Some pre-amendment devices are unclassified, but are subject to FDA's premarket notification and clearance process in order to be commercially distributed. Our currently marketed product is a Class II device subject to 510(k) clearance.

*510(k) Clearance Marketing Pathway*

Our current products are subject to premarket notification and clearance under section 510(k) of the FDCA. To obtain 510(k) clearance, we must submit to the FDA a premarket notification submission demonstrating that the proposed device is "substantially equivalent" to a predicate device already on the market. A predicate device is a legally marketed device that is not subject to PMA, i.e., a device that was legally marketed prior to May 28, 1976 (pre-amendments device) and for which a PMA is not required, a device that has been reclassified from Class III to Class II or I, or a device that was found substantially equivalent through the 510(k) process. The FDA's 510(k) clearance process usually takes from three to twelve months, but often takes longer. The FDA may require additional information, including clinical data, to make a determination regarding substantial equivalence. In addition, the FDA collects user fees for certain medical device submissions and annual fees for medical device establishments.

If the FDA agrees that the device is substantially equivalent to a predicate device currently on the market, it will grant 510(k) clearance to commercially market the device. If the FDA determines that the device is "not substantially equivalent" to a previously cleared device, the device is automatically designated as a Class III device. The device sponsor must then fulfill more rigorous PMA requirements, or can request a risk-based classification determination for the device in accordance with the "de novo" process, which is a route to market for novel medical devices that are low to moderate risk and are not substantially equivalent to a predicate device.

After a device receives 510(k) marketing clearance, any modification that could significantly affect its safety or effectiveness, or that would constitute a major change or modification in its intended use, will require a new 510(k) clearance or, depending on the modification, PMA approval. The FDA requires each manufacturer to determine whether the proposed change requires submission of a 510(k) or a PMA in the first instance, but the FDA can review any such decision and disagree with a manufacturer's determination. If the FDA disagrees with a manufacturer's determination, the FDA can require the manufacturer to cease marketing and/or request the recall of the modified device until 510(k) marketing clearance or PMA approval is obtained. Also, in these circumstances, the manufacturer may be subject to significant regulatory fines or penalties.

Over the last several years, the FDA has proposed reforms to its 510(k) clearance process, and such proposals could include increased requirements for clinical data and a longer review period, or could make it more difficult for manufacturers to utilize the 510(k) clearance process for their products. For example, in November 2018, FDA officials announced forthcoming steps that the FDA intends to take to modernize the premarket notification pathway under Section 510(k) of the FDCA. Among other things, the FDA announced that it planned to develop proposals to drive manufacturers utilizing the 510(k) pathway toward the use of newer

132

**Table of Contents**

predicates. These proposals included plans to potentially sunset certain older devices that were used as predicates under the 510(k) clearance pathway, and to potentially publish a list of devices that have been cleared on the basis of demonstrated substantial equivalence to predicate devices that are more than 10 years old. The FDA also announced that it intends to finalize guidance to establish a premarket review pathway for "manufacturers of certain well-understood device types" as an alternative to the 510(k) clearance pathway and that such premarket review pathway would allow manufacturers to rely on objective safety and performance criteria recognized by the FDA to demonstrate substantial equivalence, obviating the need for manufacturers to compare the safety and performance of their medical devices to specific predicate devices in the clearance process.

In May 2019, the FDA solicited public feedback on its plans to develop proposals to drive manufacturers utilizing the 510(k) pathway toward the use of newer predicates, including whether the FDA should publish a list of devices that have been cleared on the basis of demonstrated substantial equivalence to predicate devices that are more than 10 years old. The FDA requested public feedback on whether it should consider certain actions that might require new authority, such as whether to sunset certain older devices that were used as predicates under the 510(k) clearance pathway. These proposals have not yet been finalized or adopted, and the FDA may work with Congress to implement such proposals through legislation. More recently, in September 2019, the FDA finalized the aforementioned guidance to describe an optional "safety and performance based" premarket review pathway for manufacturers of "certain, well-understood device types" to demonstrate substantial equivalence under the 510(k) clearance pathway, by demonstrating that such device meets objective safety and performance criteria established by the FDA, obviating the need for manufacturers to compare the safety and performance of their medical devices to specific predicate devices in the clearance process. The FDA intends to maintain a list device types appropriate for the "safety and performance based pathway" and develop product-specific guidance documents that identify the performance criteria for each such device type, as well as the testing methods recommended in the guidance documents, where feasible.

*PMA Approval Pathway*

Class III devices require PMA approval before they can be marketed, although some pre-amendment Class III devices for which the FDA has not yet required a PMA are cleared through the 510(k) process. The PMA process is more demanding than the 510(k) premarket notification process. In a PMA, the manufacturer must demonstrate that the device is safe and effective, and the PMA must be supported by extensive data, including data from preclinical studies and human clinical trials. The PMA must also contain a full description of the device and its components, a full description of the methods, facilities, and controls used for manufacturing, and proposed labeling. Following receipt of a PMA, the FDA determines whether the application is sufficiently complete to permit a substantive review. If the FDA accepts the application for review, it has 180 days under the FDCA to complete its review of a PMA, although in practice, the FDA's review often takes significantly longer, and can take up to several years. An advisory panel of experts from outside the FDA may be convened to review and evaluate the application and provide recommendations to the FDA as to the approvability of the device. The FDA may or may not accept the panel's recommendation. In addition, the FDA will generally conduct a pre-approval inspection of the applicant or its third-party manufacturers' or suppliers' manufacturing facility or facilities to ensure compliance with the QSR. PMA devices are also subject to the payment of user fees.

The FDA will approve the new device for commercial distribution if it determines that the data and information in the PMA constitute valid scientific evidence and that there is reasonable assurance that the device is safe and effective for its intended use(s). The FDA may approve a PMA with post-approval conditions intended to ensure the safety and effectiveness of the device, including, among other things, restrictions on labeling, promotion, sale and distribution, and collection of long-term follow-up data from patients in the clinical study that supported PMA approval or requirements to conduct additional clinical studies post-approval. The FDA may condition PMA approval on some form of post-market surveillance when deemed necessary to protect the public health or to provide additional safety and efficacy data for the device in a larger population or for a longer period of use. In such cases, the manufacturer might be required to follow certain patient groups for a number of years and to make periodic reports to the FDA on the clinical status of those patients. Failure to comply with the conditions of approval can result in material adverse enforcement action, including withdrawal of the approval.

Table of Contents

Certain changes to an approved device, such as changes in manufacturing facilities, methods, or quality control procedures, or changes in the design performance specifications, which affect the safety or effectiveness of the device, require submission of a PMA supplement. PMA supplements often require submission of the same type of information as a PMA, except that the supplement is limited to information needed to support any changes from the device covered by the original PMA and may not require as extensive clinical data or the convening of an advisory panel. Certain other changes to an approved device require the submission of a new PMA, such as when the design change causes a different intended use, mode of operation, and technical basis of operation, or when the design change is so significant that a new generation of the device will be developed, and the data that were submitted with the original PMA are not applicable for the change in demonstrating a reasonable assurance of safety and effectiveness. None of our products are currently marketed pursuant to a PMA.

*Clinical Trials*

Clinical trials are almost always required to support a PMA and are sometimes required to support a 510(k) submission. All clinical investigations of devices to determine safety and effectiveness must be conducted in accordance with the FDA's IDE regulations which govern investigational device labeling, prohibit promotion of the investigational device, and specify an array of recordkeeping, reporting and monitoring responsibilities of study sponsors and study investigators. If the device presents a "significant risk," to human health, as defined by the FDA, the FDA requires the device sponsor to submit an IDE application to the FDA, which must become effective prior to commencing human clinical trials. A significant risk device is one that presents a potential for serious risk to the health, safety or welfare of a patient and either is implanted, used in supporting or sustaining human life, substantially important in diagnosing, curing, mitigating or treating disease or otherwise preventing impairment of human health, or otherwise presents a potential for serious risk to a subject. An IDE application must be supported by appropriate data, such as animal and laboratory test results, showing that it is safe to test the device in humans and that the testing protocol is scientifically sound. The IDE will automatically become effective 30 days after receipt by the FDA unless the FDA notifies the company that the investigation may not begin. If the FDA determines that there are deficiencies or other concerns with an IDE for which it requires modification, the FDA may permit a clinical trial to proceed under a conditional approval.

In addition, the study must be approved by, and conducted under the oversight of, an IRB for each clinical site. The IRB is responsible for the initial and continuing review of the IDE, and may pose additional requirements for the conduct of the study. If an IDE application is approved by the FDA and one or more IRBs, human clinical trials may begin at a specific number of investigational sites with a specific number of patients, as approved by the FDA. If the device presents a non-significant risk to the patient, a sponsor may begin the clinical trial after obtaining approval for the trial by one or more IRBs without separate approval from the FDA, but must still follow abbreviated IDE requirements, such as monitoring the investigation, ensuring that the investigators obtain informed consent, and labeling and record-keeping requirements. Acceptance of an IDE application for review does not guarantee that the FDA will allow the IDE to become effective and, if it does become effective, the FDA may or may not determine that the data derived from the trials support the safety and effectiveness of the device or warrant the continuation of clinical trials. An IDE supplement must be submitted to, and approved by, the FDA before a sponsor or investigator may make a change to the investigational plan that may affect its scientific soundness, study plan or the rights, safety or welfare of human subjects.

During a study, the sponsor is required to comply with the applicable FDA requirements, including, for example, trial monitoring, selecting clinical investigators and providing them with the investigational plan, ensuring IRB review, adverse event reporting, record keeping and prohibitions on the promotion of investigational devices or on making safety or effectiveness claims for them. The clinical investigators in the clinical study are also subject to FDA's regulations and must obtain patient informed consent, rigorously follow the investigational plan and study protocol, control the disposition of the investigational device, and comply with all reporting and recordkeeping requirements. Additionally, after a trial begins, we, the FDA or the IRB could suspend or terminate a clinical trial at any time for various reasons, including a belief that the risks to study subjects outweigh the anticipated benefits.

134

**Table of Contents**

*Post-market Regulation*

After a device is cleared or approved for marketing, numerous and pervasive regulatory requirements continue to apply. These include:

- establishment registration and device listing with the FDA;

- QSR requirements, which require manufacturers, including third-party manufacturers, to follow stringent design, testing, control, documentation and other quality assurance procedures during all aspects of the design and manufacturing process;

- labeling regulations and FDA prohibitions against the promotion of investigational products, or the promotion of "off-label" uses of cleared or approved products;

- requirements related to promotional activities;

- clearance or approval of product modifications to 510(k)-cleared devices that could significantly affect safety or effectiveness or that would constitute a major change in intended use of one of our cleared devices, or approval of certain modifications to PMA-approved devices;

- medical device reporting regulations, which require that a manufacturer report to the FDA if a device it markets may have caused or contributed to a death or serious injury, or has malfunctioned and the device or a similar device that it markets would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur;

- correction, removal and recall reporting regulations, which require that manufacturers report to the FDA field corrections and product recalls or removals if undertaken to reduce a risk to health posed by the device or to remedy a violation of the FDCA that may present a risk to health;

- the FDA's recall authority, whereby the agency can order device manufacturers to recall from the market a product that is in violation of governing laws and regulations; and

- post-market surveillance activities and regulations, which apply when deemed by the FDA to be necessary to protect the public health or to provide additional safety and effectiveness data for the device.

Our manufacturing processes are required to comply with the applicable portions of the QSR, which cover the methods and the facilities and controls for the design, manufacture, testing, production, processes, controls, quality assurance, labeling, packaging, distribution, installation and servicing of finished devices intended for human use. The QSR also requires, among other things, maintenance of a device master file, device history file, and complaint files. As a manufacturer, we are subject to periodic scheduled or unscheduled inspections by the FDA. Our failure to maintain compliance with the QSR requirements could result in the shut-down of, or restrictions on, our manufacturing operations and the recall or seizure of our products, which would have a material adverse effect on our business. The discovery of previously unknown problems with any of our products, including unanticipated adverse events or adverse events of increasing severity or frequency, whether resulting from the use of the device within the scope of its clearance or off-label by a physician in the practice of medicine, could result in restrictions on the device, including the removal of the product from the market or voluntary or mandatory device recalls.

The FDA has broad regulatory compliance and enforcement powers. If the FDA determines that we failed to comply with applicable regulatory requirements, it can take a variety of compliance or enforcement actions, which may result in any of the following sanctions:

- untitled letters, warning letters, fines, injunctions, consent decrees and civil penalties;

135

Table of Contents

- unanticipated expenditures to address or defend such actions;

- customer notifications or repair, replacement, refunds, recall, detention or seizure of our products;

- operating restrictions, partial suspension or total shutdown of production;

- refusing or delaying our requests for regulatory approvals or clearances of new products or modified products;

- withdrawing a PMA application that has already been granted;

- refusal to grant export approval for our products; or

- criminal prosecution.

### Current FDA Regulatory Status

We currently have regulatory clearances required to market the Tablo Hemodialysis System in the U.S. for use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility. The Tablo Hemodialysis System is also indicated for use in the home and observed by a trained individual. The Tablo Hemodialysis System is not cleared by the FDA for CRRT. Treatments must be administered under physician's prescription and observed by a trained individual who is considered competent in the use of the device. FDA's authorizations for the Tablo System and Tablo Cartridge have thus far been granted as 510(k) clearances.

While the Tablo Hemodialysis System is indicated for use in the home, FDA recently notified us that the Tablo System is subject to a mandatory post-market surveillance order under Section 522 of the Federal Food Drug and Cosmetic Act (FDCA). FDA has required that we conduct a human factors study, as well as conduct a detailed analysis of adverse events and complaints from home users. In response to the 522 order, we have submitted a simulated human factors test protocol to the agency. We had previously committed to FDA to conduct this study as a validation activity while the Tablo 510(k) was under review by FDA. The study was designed in accordance with FDA human factors guidance. By the time that the 522 Order was issued, we had already begun and completed a substantial portion of this simulated use human factors validation testing. Because the study design also is consistent with the types of postmarket surveillance that can be used to respond to a 522 Order per FDA's 522 guidance, we believe that the existing study sufficiently addresses FDA's 522 Order. Study enrollment was halted due to the COVID-19 pandemic and regional shelter-in-place orders. Once we are able to complete our study, a final report will be provided to the FDA.

We continue to seek opportunities for product improvements and feature enhancements, which will, from time to time, require FDA clearance or approval before commercial launch.

### Healthcare Fraud and Abuse Laws

Certain U.S. federal healthcare fraud and abuse laws apply by virtue of the fact that our customers will submit claims for our products and services that are reimbursed, in whole or in part, by Medicare, Medicaid, or other federal health care programs (as that term is defined at 42 U.S.C. § 1320a-7b(f)). The principal federal fraud and abuse laws that apply in these circumstances are discussed below.

The federal Anti-Kickback Statute is a broad criminal statute that, among other things, prohibits the knowing and willful offer, solicitation, receipt, or payment of any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, for the purpose of inducing or rewarding the order, purchase, use or recommendation of items or services that may be paid for, or reimbursed by, in whole or in part, a federal health care program,

136