# Exhibit 4

**UNITED STATES**

# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM            TO**

**Commission File Number 001-39513**

# Outset Medical, Inc.

**(Exact name of Registrant as specified in its Charter)**

| | |
|---|---|
| **Delaware** | **20-0514392** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **3052 Orchard Dr.** | |
| **San Jose, California** | **95134** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (669) 231-8200**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | OM | The Nasdaq Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☒ NO ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.  YES ☐ NO ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  YES ☒ NO ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files).  YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.  ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report.  ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  YES ☐ NO ☒

Aggregate market value of registrant's common stock held by non-affiliates of the registrant, based upon the closing price of a share of the registrant's common stock on June 30, 2021 (the last business day of the registrant's most recently completed second quarter) as reported by Nasdaq Global Market on that date was $1.7 billion.

The number of shares of the registrant's common stock, par value $0.001 per share, outstanding as of February 16, 2022 was 47,406,856.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's Proxy Statement for its 2022 Annual Meeting of Stockholders, which is to be filed with the Securities and Exchange Commission within 120 days of the registrant' fiscal year ended December 31, 2021, are incorporated by reference into Part III of this Annual Report on Form 10-K to the extent stated herein.

|  |  | Page |
|---|---|---|
| **PART I** | | |
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 31 |
| Item 1B. | Unresolved Staff Comments | 72 |
| Item 2. | Properties | 73 |
| Item 3. | Legal Proceedings | 73 |
| Item 4. | Mine Safety Disclosures | 73 |
| | | |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 74 |
| Item 6. | [Reserved] | 75 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 76 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 88 |
| Item 8. | Financial Statements and Supplementary Data | 89 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 116 |
| Item 9A. | Controls and Procedures | 116 |
| Item 9B. | Other Information | 117 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 117 |
| | | |
| **PART III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 118 |
| Item 11. | Executive Compensation | 118 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 118 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 118 |
| Item 14. | Principal Accounting Fees and Services | 118 |
| | | |
| **PART IV** | | |
| Item 15. | Exhibits, Financial Statement Schedules | 119 |
| Item 16 | Form 10-K Summary | 119 |

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K (this Annual Report) contains forward-looking statements within the meaning of the federal securities laws. All statements other than statements of historical fact contained in this Annual Report are forward-looking statements. In some cases, you can identify forward-looking statements by terms such as "may," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these terms or other similar expressions. These forward-looking statements include, but are not limited to, statements about:

- our future results of operations and financial position, including our expectations and projections regarding our revenues and revenue growth rate, sales into the home market and such sales as a percentage of revenues, cost of revenues, operating expenses (including as a percentage of revenues), gross margin, capital expenditures and our ability to achieve and maintain future profitability;

- our business strategy;

- plans and objectives of management for future operations;

- key factors we believe affect our performance, including our beliefs about the opportunities presented by these factors, our ability to successfully address each of these factors and the anticipated impacts on our business, financial condition and result of operations;

- our expectations regarding the market sizes and growth potential for Tablo, including our estimates of annual spending on dialysis and the number of people affected by kidney failure in the United States, and the total addressable market opportunities for Tablo in the acute care and home settings;

- our planned expansion within the home dialysis market and our assumptions about the home market, including regarding adoption of Tablo by home dialysis patients and patient retention;

- the impact of the ongoing COVID-19 pandemic on our business and results of operations, and on our customers, suppliers and vendors;

- our intent to explore opportunities for international expansion;

- continued execution of our initiatives designed to reduce the cost of producing and shipping Tablo devices and our ability to achieve projected cost reductions at the levels or within the timeframe we estimate;

- our plans to expand our manufacturing capabilities to support our growth including by expanding our manufacturing workforce;

- our plans to continue to invest in our research and development efforts to enhance existing products and develop new products;

- our plans to invest in continued expansion of our sales and marketing infrastructure; and

- our expectations regarding the uses and sufficiency of our capital resources.

The forward-looking statements in this Annual Report are only predictions and are based largely on our current expectations and projections about future events and financial trends that we believe may affect our business, financial condition and results of operations. These forward-looking statements are subject to a number of known and unknown risks, uncertainties and assumptions that may cause our actual results, performance or achievements to be materially different from those expressed or implied by the forward-looking statements. Such risks and uncertainties include those described throughout this Annual Report, including in the sections titled "Risk Factors" under Part I, Item 1A below and "Management's Discussion and Analysis of Financial Condition and Results of Operations" under Part II, Item 7 below.

The forward-looking statements in this Annual Report are based upon information available to us as of the date of this Annual Report and, while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These forward-looking statements, like all statements in this Annual Report, speak only as of their date, and except as required by applicable law, we undertake no obligation to update or revise these statements, whether as a result of any new information, future developments or otherwise. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements.

Unless the context requires otherwise, all references in this Annual Report to "we," "us," "our," "Outset" and "the "Company" refer to Outset Medical, Inc.

We have proprietary rights to trademarks, trade names and service marks appearing in this Annual Report that are important to our business. Solely for convenience, the trademarks, service marks, logos and trade names referred to in this Annual Report are without the ® and ™ symbols, but such references are not intended to indicate that we will not assert our rights or the rights of the applicable licensors in these trademarks, service marks and trade names. All trademarks, trade names and service marks appearing in this Annual Report are the property of their respective owners.

2

PART I

**Item 1. Business.**

**Our Company**

Outset is a medical technology company pioneering a first-of-its-kind technology to reduce the cost and complexity of dialysis. We believe the Tablo® Hemodialysis System, cleared by the U.S. Food and Drug Administration (FDA) for use from the hospital to the home, represents a significant technological advancement that transforms the dialysis experience for patients and operationally simplifies it for providers. We designed Tablo from the ground up to be a single enterprise solution that can be utilized across the continuum of care, allowing dialysis to be delivered anytime, anywhere, and by virtually anyone.

Our technology is designed to elevate the dialysis experience for patients, and help providers overcome traditional care delivery challenges. Our focus on flexibility, ease of use and user experience translates to meaningfully reduced training times and fixed infrastructure requirements. Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production in a single 35-inch compact console enables Tablo to serve as a dialysis clinic on wheels. With a simple-to-use touchscreen interface, two-way wireless data transmission and a proprietary data analytics platform, Tablo is a new holistic approach to dialysis care. Unlike traditional hemodialysis machines, which have limited clinical versatility across care settings, Tablo can be used seamlessly across multiple care settings and a wide range of clinical applications.

Tablo leverages cloud technology, making it possible for providers to monitor devices and treatments remotely, perform patient and population analytics, and automate clinical recordkeeping, while also enabling us to release features and enhancements through over-the-air (OTA) updates. Tablo's connectedness also allows it to continually stream more than 500,000 device performance data points after every treatment. We use this data, in conjunction with our diagnostic and predictive algorithms, to determine failure types and, in some instances, predict failures before they occur. In effect, this contributes to a reduction in service hours and an increase in device uptime.

We have generated meaningful evidence to demonstrate that providers can realize significant operational efficiencies, including reducing the cost of their dialysis programs by up to 80% in the intensive care unit (ICU). In addition, Tablo has been shown to deliver robust clinical care. In studies and surveys we have conducted, patients have reported clinical and quality of life benefits on Tablo compared to other dialysis machines. We believe Tablo empowers patients, who have traditionally been passive recipients of care, to regain agency and ownership of their treatment. Tablo is currently cleared by the FDA for use in the hospital, clinic or home setting.

Kidney failure can be temporary and occur spontaneously due to an underlying medical condition, as is the case in acute kidney injury (AKI), or can worsen gradually over time, as is the case in chronic kidney disease (CKD), which may result in end stage renal disease (ESRD). Kidney failure is commonly managed with hemodialysis, a procedure by which waste products and excess fluid are directly removed from a patient's blood using an external dialysis machine. ESRD patients require complex management and the cost burden of administering dialysis is significant. Hemodialysis can be performed in multiple care settings, including the hospital, clinic or the patient's home. Typically, different types of dialysis machines are used in different care settings and for different clinical needs. Tablo is an enterprise dialysis solution that allows providers to standardize to a single technology platform.

Driving adoption of Tablo in the acute setting has been our primary focus to date. We have invested in growing our economic and clinical evidence, built a veteran sales and clinical support team with significant expertise, and implemented a comprehensive training and customer experience program. Our experience in the acute market has demonstrated Tablo's clinical flexibility and operational versatility, while also delivering meaningful cost savings to the providers. We plan to continue leveraging our commercial infrastructure to broaden our installed base in the acute care market as well as driving utilization and fleet expansion with our existing customers. While the ongoing COVID-19 pandemic has presented opportunities to demonstrate the real-world benefits of Tablo over traditional machines, we believe these benefits, in addition to the other advantages of Tablo, are continuing to drive customer purchasing decisions.

Tablo is also well suited for home-based dialysis. Tablo was cleared by the FDA for use in an acute or chronic care facility in September 2014. Subsequently, in March 2020, Tablo was cleared by the FDA for patient use in the home. Our ability to reduce training time, patient dropout, and supplies and infrastructure required to deliver dialysis in the home can drive efficiency and economic improvements to the home care model. In our home investigational device exemption (IDE) trial, patients reported specific quality of life improvements compared to their experience on the incumbent home dialysis machine. To penetrate this market successfully, we are focused on refining our home distribution, logistics and support systems to help ensure they are ready for rapid

3

scale. We are also working with providers, patients and payors to increase awareness and adoption of transitional care units (TCUs) as a bridge to home based therapy. To demonstrate the cost advantages of Tablo in the home setting, we are continuing to collect additional patient clinical experience and outcomes data.

We completed our initial public offering in September of 2020. Our common stock is listed on the Nasdaq Global Select Market under the symbol "OM."

**Our Market Opportunity**

In the United States, dialysis is a large, expensive sector of healthcare that has seen little technology innovation in the last 30 years. We estimate that annual spending on ESRD in the United States is approximately $73 billion, of which an estimated $41 billion is Medicare spending. In 2019, this spending represented 7% of the total Medicare budget despite ESRD patients only representing 1% of the Medicare population. Dialysis is performed in the acute care setting, outpatient dialysis clinics and the patient's home based on the patient's condition and preference. As a result of an aging population and the growing incidence of diabetes, hypertension and obesity, based on historical rates of growth, we estimate the ESRD patient population will continue to grow around 3% annually, roughly 30% compounded growth, over the next ten years in the United States, thereby increasing our opportunity in both markets. We believe that any decrease in the size of the ESRD patient population due to COVID-related deaths may be offset by an increase in the population due to COVID-related AKI and delayed diagnosis of advanced stage CKD. As a result, although we cannot predict the full impact of the COVID-19 pandemic on the ESRD patient population with certainty, we do not anticipate that the pandemic will significantly impact the long-term growth rate of the population. We estimate the total annual addressable market opportunity in the United States for Tablo is approximately $2.5 billion in the acute care setting and approximately $8.9 billion in the home setting.

*Acute Care*

The acute care market includes short-term acute care hospitals, sub-acute long-term acute care hospitals (LTACHs) and skilled nursing facilities (SNFs). As of 2019, there were approximately 4,500 acute care hospitals and approximately 17,000 LTACHs and SNFs facilities in the United States, of which we believe 3,700 hospitals and 1,600 LTACHs and SNFs facilities are included in our acute care addressable market. We expect acute care hospitals to support higher treatment volumes per facility than LTACHs and SNFs and thus represent a greater proportion of the total market opportunity. The cost of managing a dialysis program is high, typically requiring complex equipment, separate infrastructure and specialized staff. We believe the majority of hospitals currently outsource the management of their dialysis programs to a third party, which is costly and may limit their ability to control the quality of patient care. For hospitals that manage their own dialysis programs, we believe that aggressive cost containment measures are motivating administrators to assess technology alternatives in order to lower the overall cost of care.

*Home Care*

At the end of 2019, there were approximately 570,000 patients in the United States receiving some sort of dialysis in the clinic or home setting. The majority of these patients were treated in dialysis clinics, although a large and growing number of treatments are transitioning to the patient's home. In 2019, approximately 13% of patients (75,000 individuals), received dialysis treatment at home through peritoneal dialysis or home hemodialysis. From 2009-2019, the home hemodialysis patient population grew 131%, resulting in approximately 12,200 patients on home hemodialysis therapy, and we estimate that there are approximately 13,500 patients on home hemodialysis therapy today. We believe that the dynamics in the non-acute care market will continue to shift towards more home-based treatments as a result of several factors including the recent Executive Order on Advancing American Kidney Health, the expansion of Medicare Advantage to patients with ESRD and increasing commercial payor focus on reducing the total cost of ESRD care. We believe the recent COVID-19 global pandemic will accelerate the need for and adoption of technologies that enable care closer to and within the patient's home, such as home-based dialysis therapies and telemedicine.

**Overview of Kidney Function and Disease**

A healthy human kidney removes waste and excess water from the blood on a continuous basis. Without a properly functioning kidney, byproducts and fluids build up in the body, which leads to progressive toxicity, electrolyte imbalance and fluid overload. There are two primary types of kidney disease: CKD and AKI. CKD is the gradual loss of kidney function over many years. CKD is typically irreversible and eventually leads to ESRD, which is the final stage of CKD. AKI is generally shorter in onset and can be reversible or lead to ESRD.

*End Stage Renal Disease (ESRD)*

ESRD is most often the result of chronic diseases, such as diabetes or high blood pressure, and is diagnosed when a patient's kidneys no longer have sufficient function to avoid critical buildup of toxins and fluid in the body. If left untreated, ESRD will result

4

in death. The prevalence of ESRD in the United States has increased significantly over the last 40 years, driven in part by the growing rates of diabetes, hypertension, obesity and the overall aging of the population. At the end of 2019, there were approximately 810,000 patients with ESRD in the United States, of which, approximately 570,000 were treated with dialysis and the remainder of whom were living with a kidney transplant. The total ESRD figure is approximately 40% higher than the number reported ten years prior. We expect multiple pre-existing conditions and demographic factors such as diabetes, hypertension, obesity and an aging population to drive the prevalence of kidney failure to one million individuals by 2030.

*Acute Kidney Injury (AKI)*

AKI is the temporary loss of kidney function. AKI frequently occurs as a result of other medical conditions or treatment, including loss of other organ functions, severe infection, drug toxicity or post-surgical trauma. Patients experiencing AKI may require some form of dialysis in order to survive. Based on data from Centers for Medicare and Medicaid Services (CMS), the rate of beneficiaries experiencing a hospitalization complicated by AKI doubled from 2006-2016, with an approximate one third probability of these patients being newly diagnosed with CKD within the following 12 months. We estimate that there are over 450,000 admissions for AKI in the United States each year.

**Kidney Disease Treatment Alternatives and Care Settings**

Treatment of kidney disease typically depends on the type and stage of the disease. Approximately 20-25% of patients admitted to the ICU with a diagnosis of AKI may require dialysis treatment until their kidneys recover. If they fail to recover, AKI patients may need to remain on dialysis or receive a kidney transplant. For CKD, early stages of kidney disease can be managed with education, lifestyle changes and drug-based therapies. As kidney function continues to deteriorate and progress towards ESRD, the patient must either obtain a kidney transplant or receive dialysis for the rest of their life. Although transplantation is usually the most desirable option, a shortage of available organs and patient risk factors limit the use of this option. In 2019, only approximately 25,000 transplant procedures were performed in the United States compared to a total dialysis patient population of approximately 570,000. As a result, the vast majority of patients rely on dialysis to survive. While early CKD education and management can slow the progression of disease and help with a patient's transition to dialysis, the Centers for Disease Control estimates that 90% of patients with CKD do not know they have kidney disease.

Additionally, the United States Renal Data Systems 2021 Annual Report indicates approximately 30% of new ESRD patients receive little or no pre-ESRD care at the time of dialysis initiation and "crash" into dialysis, initiating dialysis in an unplanned fashion.

Hemodialysis, the most common form of dialysis treatment, is a process by which waste products and excess fluid are directly removed from a patient's blood using an external dialysis machine. Blood from the patient is routed to a dialyzer, also known as an artificial kidney, through plastic tubes where toxins are removed by diffusion across the dialyzer's semipermeable membrane into a dialysate solution usually comprised of purified water and electrolytes. Excess fluid within the blood is removed in the dialyzer by the movement of water from higher pressure (blood) to lower pressure (dialysate). Cleansed blood from the dialyzer is then returned to the patient. A physician's dialysis prescription can vary significantly depending on the patient's level of acuity and the care setting. Key elements of a prescription include treatment duration, treatment frequency, blood flow rate, dialysate flow rate, ultrafiltration rate and dialysate electrolyte composition. After treatment, the patient is disconnected from the machine, which is disinfected before the next use.

Dialysis treatments are performed in the acute care setting, outpatient dialysis clinics and the patient's home. The most common treatment option for ESRD patients, representing approximately 88% of ESRD dialysis patients in the United States, is treatments in a dialysis clinic. Most dialysis clinics are outpatient, freestanding facilities designed to treat on average 18 patients at a time. There are approximately 7,500 clinics in the United States that typically are open six days per week, treating patients on two to three shifts per day. In-clinic treatment typically lasts three to four hours and is usually performed three times per week. Outset's commercial efforts are focused on the acute and home care settings where we believe Tablo is most needed and offers the most compelling value proposition based on product-market fit, price tolerance and competitive differentiation
.

*Acute Care.* The acute care market includes the treatment of AKI and ESRD patients in the hospital setting, or in sub-acute care settings such as LTACHs or SNFs. There are generally three subtypes of hemodialysis treatments that are used in the acute care settings. The decision of which treatment option to use is usually driven by the patient's level of acuity. However, the decision can also be influenced by the availability of the treatment modality and whether the nurses are trained to use the specific type of dialysis machine.

*Home.* In 2019, approximately 13% of ESRD dialysis patients in the United States were dialyzing at home, with home hemodialysis patients representing 2% and peritoneal dialysis patients representing 11%.The decision on whether the patient stays in

5

clinic or moves to home-based dialysis is made by the provider and patient based on several factors, including the patient's condition and level of independence. Clinics are mandated by CMS to inform patients of all available treatment alternatives, although surveys show that many patients are unaware of their care setting options. In recent years, there has been a growing trend of delivering dialysis closer to the patient as health systems, dialysis clinic providers and payors are recognizing the opportunity to improve the patient outcomes and lower the total cost of care through home dialysis. In an effort toward moving more patients to home dialysis, some health systems and dialysis providers have established TCUs. TCUs are oriented around educating ESRD patients as they transition into ongoing dialysis care with an emphasis on increasing the percentage of patients who select a home dialysis modality. In addition, there are currently approximately 2,200 clinics with specific home dialysis programs. We expect both TCUs and clinic-based home dialysis programs to grow. Regardless of whether ESRD patients are treated at home or remain in a clinic, they remain under the care of a dialysis provider that purchases their dialysis equipment and treatment supplies. Home dialysis patients receive ongoing clinical support from their nephrologist and the clinic's care team in their home base clinic.

Patients have two modality choices for home therapy—hemodialysis or peritoneal dialysis. The decision between home hemodialysis and peritoneal dialysis is based on several factors, including patient eligibility, the patient's level of independence and the clinic's training capacity.

- *Home Hemodialysis*. A treatment using a hemodialysis machine that stays in the patient's home. Due to the inherent complexity associated with traditional home hemodialysis machines, patients must first undergo several weeks of intensive training from a nurse in their dialysis clinic before beginning to perform treatments in their home. The incumbent home hemodialysis machine requires more frequent dialysis, sometimes up to six times per week, and significant setup and prep time before each treatment. Patients are responsible for manually logging and submitting detailed information about each treatment to their dialysis care team to enable the provider to submit for reimbursement. This manual administrative work adds to patient fatigue and compliance issues.

- *Peritoneal Dialysis (PD)*. A self-administered, at-home treatment option that involves infusing sterile dialysate fluid through a surgically implanted catheter into the patient's abdomen, or peritoneal cavity manually or via a peritoneal dialysis device, known as a cycler. The body's natural internal lining acts as a semipermeable membrane which can eliminate toxins and remove fluid from the blood. After four to six hours, the dialysate fluid is drained from the patient's body through the catheter, disposed of and replaced with fresh dialysate. These exchanges are performed four to five times per day. Peritoneal dialysis is clinically limited due to patients with certain pre-existing conditions such as congestive heart failure and obesity. Additionally, peritoneal dialysis is regarded as a "temporary" modality since approximately 80% of patients are on the therapy for less than three years.

**Limitations and Challenges of Current Hemodialysis Machines**

Hemodialysis is the most common form of dialysis for both AKI and ESRD patients and is used across multiple care settings. Nevertheless, we believe that limitations of traditional hemodialysis machines create significant operational complexities and challenges to administering dialysis, which ultimately contribute to a higher cost of care. These limitations include:

- Operational challenges. Traditional hemodialysis machines are technically complex and require extensive training for both specialized staff and patients. Additionally, traditional machines require incremental equipment and separate water treatment rooms, which is not always practical depending on the care setting. These machines lack intuitive software, integrated data analytics and two-way wireless connectivity resulting in manual treatment set-up, documentation, reporting and machine management.

- Clinical challenges. Traditional hemodialysis machines are typically used to deliver a single modality of treatment, requiring multiple machines for different types of treatment types across different care settings, therefore reducing clinical versatility.

- Financial challenges. Traditional hemodialysis machines are expensive to operate with high fixed investment in infrastructure, significant recurring supply costs and expensive dialysis-specific labor. In the acute care setting, this very often results in specialized in-house teams or outsourcing to a third-party dialysis provider.

Additionally, we believe there are specific challenges in each individual care setting.

***Challenges in the Hospital***. In general, the cost of delivering dialysis in the hospital is not reimbursed as a standalone service, so the expense of providing dialysis care, whether managed in-house or outsourced to a third party, has a significant impact on hospital operating margins. In 2018, dialysis was performed across roughly 600 diagnosis-related groups, of which 60% of the inpatient stays with dialysis had negative operating margins, including 30% of inpatient stays that lost more than $10,000 per visit.

6

Given the complexity of managing dialysis programs with traditional equipment, many hospital administrators choose to outsource their dialysis program, which can be costly and may limit their ability to control patient care quality. The key challenges of delivering dialysis in the hospital include:

- <u>Limited clinical versatility of traditional machines</u>. Hospitals require multiple machines for different treatment modalities to care for patients with varying degrees of acuity. Specifically, patients in the ICU require treatment with machines that deliver lower flow rates for longer durations, while stable patients are typically treated outside of the ICU on devices that deliver higher flow rates for shorter durations. Traditional dialysis machines are typically used to deliver a single modality, requiring different machines for different types of treatment types across care settings. This adds cost, complexity and inefficiency.

- <u>Specialized, dialysis-specific labor</u>. Traditional dialysis machines are complicated to learn and use, and therefore require specially trained clinical staff who are in short supply or may not always be readily available for patient care. Training a dialysis nurse on a traditional dialysis machine typically takes weeks, limiting hospitals' ability to flex their resources on-demand and potentially limiting patient access to prompt care.

- <u>Specialized infrastructure, equipment, and expensive supplies</u>. Traditional dialysis machines require industrial water treatment rooms or separate mobile water filtration systems to generate the purified water necessary for dialysate production, which adds significant cost and space requirements to a hospital-based dialysis program. For machines that rely on sterile-packed dialysate bags in lieu of a separate water treatment and dialysate production area, the cost of purchasing and storing these supplies can be high.

***Challenges in the Home***. The limited adoption of home hemodialysis is largely a result of suboptimal existing technologies that make it operationally complex and expensive to manage, and consequently an undesirable treatment alternative for providers and patients. We believe the key challenges are:

*Challenges for Providers*

- <u>Time required to train new patients</u>. The most commonly used home hemodialysis machine requires approximately 100 hours of nurse-led training, which translates into several weeks of commitment, unreimbursed expense and can result in a backlog of patients waiting to be trained due to capacity constraints. This time commitment required of patients and their care partners limits the adoption of home hemodialysis.

- <u>Low retention of patients</u>. The incumbent home hemodialysis machine requires patients to dialyze frequently, sometimes up to six times per week. This involves cumbersome setup procedures requiring up to eight hours of prep work several times per week, to prepare batches of dialysate ahead of treatment. This is impractical and ultimately contributes to patient burnout. The patient drop-out rate for home hemodialysis on the incumbent machine is up to 45% within the first year.

- <u>Manual process of reporting</u>. The incumbent machine requires patients to manually log their treatment regimen for reporting. Additionally, any machine errors impacting a patient's treatment go unnoticed unless reported by the patient. This lack of visibility impacts compliance and reduces quality of care. Since clinics require proof of treatment in order to receive reimbursement, the lag created by manual reporting delays reimbursement timing to the provider.

*Challenges for Patients*

- <u>Complicated and time-consuming to learn</u>. The incumbent home dialysis machine is technically complex and unintuitive to operate requiring patients to memorize setup procedures and refer to a paper manual for alarm resolution. As noted above, achieving competency requires approximately 100 hours of nurse-led training, which translates into weeks of commitment creating a significant hurdle to adoption.

- <u>Cumbersome setup and burdensome treatment frequency</u>. The incumbent home dialysis machine is limited in its ability to sufficiently remove toxins, which as a result typically requires up to six treatments per week. The requirement of increased treatment frequency intensifies the burden placed on the patient, their care partner and clinical staff. In addition, the need for clean treated water requires significant time to batch and prepare dialysate before treatments. While not required prior to every treatment, this process can range from 16 to 24 hours per week and contributes to lower patient retention on the incumbent machine.

- <u>Manual documentation and reporting</u>. Patients are responsible for reporting the details of each treatment, including vital signs, treatment time and ultrafiltration volumes, to their provider manually given the incumbent machine does not offer integrated wireless connectivity capabilities, or through the purchase of additional hardware, which is not reimbursed. This lack of connectivity limits the ability to remotely assess and troubleshoot any issues with the device, which often results in the machine being sent back to the manufacturer and replaced with a new machine, potentially delaying patient treatment.

**Our Solution**

We have purposefully designed a dialysis solution to address the limitations and challenges faced by using traditional dialysis systems. In doing so, we sought to completely reinvent the traditional concept of dialysis delivery. We believe Tablo represents meaningful technological advancements in dialysis care, a market which has lacked significant innovation for decades.

*Tablo vs. Traditional Hemodialysis Machines.*



***The Tablo Hemodialysis System (Tablo)***

Tablo is an FDA-cleared single enterprise solution for hemodialysis, comprised of a compact console with integrated water purification, on-demand dialysate production and advanced software and connectivity capabilities. We designed Tablo from the ground up to be a single enterprise solution that can be utilized across the continuum of care, allowing dialysis to be delivered anytime, anywhere, and by virtually anyone. Unlike traditional hemodialysis machines, Tablo can be used seamlessly across multiple care settings and a wide range of clinical applications, all with the benefit of remote system management, monitoring and maintenance through two-way wireless data transmission capabilities.

The Tablo system is comprised of the following components:

- <u>Tablo Console</u>. A compact, mobile and versatile machine consisting of an integrated water purification, on-demand dialysate production system and simple-to-use touchscreen interface. Using advanced sensors, the console automates much of treatment setup and management and can automatically self-diagnose for potential machine issues.

- <u>Tablo Cartridge</u>. A proprietary, disposable single use pre-strung cartridge that easily clicks into place, minimizing steps, touch points and connections, allowing for set up of treatment supplies in less than 12 minutes. The Tablo cartridge was designed to simplify and streamline treatment setup to minimize the potential for user error.

- <u>Tablo Data Ecosystem</u>. With Tablo, we are bringing data to dialysis. Tablo is built to live in a connected setting with cloud-based system monitoring, patient analytics and clinical recordkeeping.

*Benefits of Tablo*

We believe that Tablo's unique features combine to provide a meaningfully differentiated hemodialysis solution, offering the following benefits:

- Simplicity. Tablo's intuitive, simple and appealing touchscreen interface makes it easy to learn and easy to use, guiding users through treatment from start to finish with 3D animations illustrating each step. Embedded sensors simplify the setup and takedown process by providing validation of each step, reducing the chance of user error. During treatment, sensors automatically alert the user of any problems and provide instructions to resolving the issues on the screen. Our proprietary pre-strung cartridge clicks into place and features color-coded, easy-to-follow connections, allowing users to set up the treatment supplies in less than twelve minutes. Tablo's simplicity can also reduce the training time necessary to operate the machine by roughly two thirds compared to training for traditional machines.

- Clinical Flexibility. Tablo can accommodate a wide range of treatment modalities, durations and flow rates, allowing for broad clinical applications. In combination with its compact size and ease-of-use, Tablo's clinical flexibility enables providers to standardize to a single solution across multiple care settings.

- Operational Versatility. Tablo is an all-in-one device with integrated water purification and on-demand dialysate production, eliminating the need for industrial water treatment rooms required to operate traditional hemodialysis machines. Instead, Tablo only needs an electrical outlet and access to tap water. Tablo's independence from this infrastructure enables bedside dialysis in the acute setting, saving the time and expense of transporting patients elsewhere for dialysis. By eliminating the need for separate infrastructure, Tablo can practically and cost-efficiently provide patients with access to treatment in additional care settings that previously has not been feasible with traditional dialysis machines.

- Progressive Intelligence. Tablo's two-way wireless connectivity and data ecosystem connects providers and patients through a cloud-based integrated data platform which enables real-time treatment monitoring, centralizes and automates treatment documentation, thereby simplifying compliance and record-keeping requirements. It streamlines machine management while allowing for feature enhancements through remote software upgrades.

Tablo's clinically differentiated features were specifically designed to address the economic and operational challenges faced by stakeholders across multiple care settings. In addition, patients have reported clinical and quality of life benefits on Tablo compared to other dialysis machines.

In the acute care market, we believe Tablo offers the following benefits:

- Increasing hospital operating margins by lowering the total cost of dialysis-related supplies, infrastructure and labor by up to 80% in the ICU.

- Enabling hospitals to take dialysis back in-house which, including supplies cost reduction, reduces the total cost per treatment by $300 to $500.

- Standardizing to a single, easy-to-learn machine that can deliver multiple dialysis modalities and reduce the cost, complexity and training burden of managing multiple different machines.

- Allowing dialysis to be delivered anywhere across the hospital without the need for additional specialized equipment, infrastructure or specialized dialysis staff, easing operational workflow and enhancing productivity and staffing flexibility.

- Enabling less expensive labor models, for example the insourcing of dialysis service using existing hospital nursing staff and eliminating expensive, fixed dialysis outsourcing contracts.

- Automating data documentation and machine management to increase regulatory compliance.

In the home market, we believe Tablo offers the following benefits for clinics and their patients:

- Improving provider home dialysis economics, including reducing home program staffing costs by reducing total training time and providing a novel learning curriculum that is largely patient managed, resulting in increased patient adoption through a shorter, less burdensome training process.

- Offering flexible treatment frequency that can be aligned with payor reimbursement policies as medically appropriate, overcoming a key limitation to home adoption.

- Reducing the time and nursing resources needed to train new patients and improving remote management and monitoring of home patients, resulting in higher productivity.

- Enabling providers to cost efficiently build TCUs in previously inaccessible locations since specialized infrastructure, such as a water treatment facility, is no longer needed.

- Enabling remote machine maintenance, troubleshooting and software updating.

- Enabling longer retention and higher treatment compliance by giving patients the option of flexible treatment frequency and potentially fewer treatments, as well as less burdensome setup and management.

- Improving treatment experience with fewer headaches, increased energy, less cramping, and a quieter more relaxed experience contributing to improved quality of life.

- Improving the accessibility and sustainability of home dialysis for patients. We believe Tablo's compact size, and its ability to operate with a standard electrical outlet, tap water, and less supplies storage, makes it an accessible option for patients regardless of the size of their living space.

**Our Product**

*Tablo*

Tablo is a mobile integrated hemodialysis solution for acute and home hemodialysis therapy. We designed Tablo from the inside out to offer a superior experience for patients and providers across multiple care settings. Tablo features an integrated water purification system, the ability to produce dialysate on demand, and an intuitive user interface and two-way wireless connectivity powered by an ecosystem of cloud-connected and intelligent software.

10

*The Tablo Hemodialysis System.*



Tablo is the only dialysis technology with a fully integrated water treatment system that allows for dialysate to be produced on demand in real time using bicarbonate and acid concentrates. The Tablo console requires only a standard electrical outlet and tap water to operate. This eliminates the need for industrial water treatment rooms, separate water purification machines and pre-filled bags of dialysate associated with traditional dialysis machines.

The Tablo cartridge is a single use consumable intended to facilitate extracorporeal blood purification for patients. We engineered our unique, one-push cartridge design to reduce set up and take down time and avoid contamination by minimizing manual connections and user touchpoints. One cartridge is used per treatment, except in the case of extended therapy, where multiple cartridges can be used if needed.

The Tablo cartridge consists of a user-friendly pre-configured blood, saline, and infusion tubing. The Tablo cartridge requires only two connections to operate as compared to other machines that require stringing, hanging, snapping and tapping multiple lines. Our proprietary cartridge clicks into place and features color-coded, easy-to-follow connections. In our home IDE trial, patients were able to set up the Tablo cartridge and dialysate concentrates in less than 12 minutes, on average. With an average prime period of approximately eight minutes, an uninterrupted patient can initiate therapy in as little as around 20 minutes, representing a significant improvement over traditional machines, which can take approximately 45 minutes to set up.

Tablo's simple setup and intuitive touchscreen interface combined with sensor-based automation are designed to enhance the user experience by accelerating the training process, expediting device set up, and streamlining the treatment process. For example, Tablo includes an integrated blood pressure monitor, and 70 embedded sensors, which enable features such as automated air removal, priming, and blood return which minimize user errors and save time. Tablo's touchscreen panel guides the user through the treatment with 3D animations and conversational instructions, making Tablo easy to learn and use for both professional and non-professional users. The screen can be used to change or manage treatment parameters, add patient information, enter treatment notes as well as set reminders for future actions.

During treatment, should any issues arise, Tablo's touchscreen panel guides the user through an explanation for the alarm and provides intuitive resolution instructions. Traditional machines provide no video guidance and generally require users to memorize or

11

reference numerical alarm codes from a separate user manual. Post-treatment, Tablo's touchscreen interface guides the user through treatment takedown.

The Tablo console is compact, self-contained, and mobile. We designed Tablo with the home in mind to look more like a consumer product than a piece of medical equipment in order to increase patient comfort with having it in their living room. The console can be closed completely when not in use, which lowers the intimidation threshold and makes it ideally suited to a home environment. Tablo's design allows the user to transport the unit easily throughout the hospital or home setting for storage. The console's 35-inch height was designed to make it easy for patients, especially those with limited mobility, to engage with the touchscreen during treatment to view progress, resolve alarms and adjust functions as needed. For example, a patient can interact with the touchscreen to adjust the flow rate if they feel the onset of cramping.

***Tablo Data Ecosystem***

Tablo is the first hemodialysis system on the market with FDA clearance for two-way wireless data transmission. Tablo's connectedness helps reduce maintenance costs and enables ongoing system improvements. This is all made possible by our growing team of experienced software, data science, and machine learning engineers.

Tablo leverages cloud technology to make it possible for providers to monitor devices and treatments remotely, perform patient and population analytics, and automate clinical recordkeeping. Due to Tablo's wireless connectivity, we can release new features and enhancements through OTA updates, without requiring hardware changes or interventions from field service engineers (FSEs). We also release user trainings this way, which means that customers can train and upgrade their device on their own schedule. Over the past two years, we have used these OTA updates to add important new features that extend Tablo's clinical applicability in addition to updates that enhance device uptime by enabling remote diagnostics and support. These OTA updates help Tablo get smarter over time.

Tablo's connectedness also allows it to continually stream to the cloud over 500,000 device performance data points after every treatment. We use this data, in conjunction with our diagnostic and predictive algorithms, to determine failure types and, in some instances, predict failures before they occur. Equipped with this information, our FSEs can confidently visit sites knowing they have the correct parts and consumables to address the issues reported, and those that are yet to come. In effect, this contributes to a reduction in service hours and an increase in device uptime.

The above functionality is enabled through two key platforms: TabloHub, a customer-facing portal; and TabloDash, an internal data analytics platform.

*TabloHub*

TabloHub is designed to be a one-stop shop for providers that allows customers to monitor treatments in real-time across their fleet, visualize historical treatment records and statistics, see system disinfection and service records, search documentation, read news about Tablo, and perform various trainings. It is accessible from virtually anywhere, using a phone, tablet, or a web browser.

Through the Tablo application programming interface (API), providers can integrate Tablo with their Electronic Medical Records (EMR) to receive treatment data and flowsheets automatically to reduce manual record keeping, which in turn, helps reduce record-entry errors and auditing risks. Tablo's two-way wireless transmission delivers data intended to be compliant with the federal Health Insurance Portability and Accountability Act (HIPAA) to the provider without any need for additional equipment. It connects to the cloud using a standard Ethernet or Wi-Fi connection. TabloHub strengthens care, simplifies meeting documentation requirements, and makes system management easy.

*TabloDash*

TabloDash is a powerful data analytics platform used by Outset team members to analyze diagnostic data produced by connected devices across all fleets, data from our customer relationship management system, and various other sources. Tablo captures more than 500,000 machine performance data points during every treatment, which is then used to fuel data analytics and machine learning algorithms that drive our research and development pipeline.

Through TabloDash, data can be visualized, graphed, aggregated, and queried to answer complex business intelligence questions, and build performance monitoring dashboards. For example, our service team uses TabloDash to analyze field response times, categorize failures by types, diagnose specific device issues, and monitor customer fleet performance.

12

The real-time nature of TabloDash allows our FSEs to troubleshoot and adjust a device remotely during a call with a customer and avoid the need to send FSEs to a site unnecessarily. If it is necessary to dispatch an FSE, we can use TabloDash to help ensure they arrive with the correct parts to complete the repair, and are also able to address any preventive maintenance predicted by our algorithms, all during the same visit.

TabloDash is the linchpin that helps us optimize the cost of service while increasing the quality of service by reducing unnecessary visits, time spent on-site, and device downtime.

**Tablo Data Ecosystem**

<u>**Value to Outset**</u>

- Reinforces customer loyalty through access to a functionally rich data ecosystem.

- Improves speed and cost efficiency of design and manufacturing.

- Increases efficiency through remote real-time system monitoring, diagnostics, and predictive analytics, lowering servicing costs.

- Accelerates delivery of new features and improvements to customers through continuous in-field data analytics.

<u>**Value to Our Providers**</u>

- Reduces cost and increases compliance by centralizing and automating documentation and all cloud based medical record reporting from treatment flowsheets to machine management.

- Increases uptime through machine-learning algorithms that feed continuous software improvements and predictive analytics.

- Increases flexibility and efficiency through remote monitoring of patient treatment data.

- Reduces administrative time and cost through EMR integration.

**Clinical Outcomes and Studies**

We have generated significant evidence to demonstrate that Tablo is safe and effective, clinically versatile and produces robust clinical outcomes, both in acute and non-acute settings. Tablo's evidence base also indicates that its patient centric design, focused on simplicity and ease of use, provides a favorable clinical experience for both patients and providers. We have invested in building a robust Tablo evidence base that captures both patient and provider experience with Tablo.

**Research and Development**

We invest in research and development efforts that advance our Tablo system with the goal to expand and improve upon our existing product and solutions. Our research and development expenses totaled $36.7 million and $28.9 million for the years ended December 31, 2021 and 2020, respectively.

Our research and development team includes hardware and software engineers with deep expertise in mechanical and electrical engineering, fluidics, embedded software design, and cloud-based data and security architecture. Their collective efforts are applied to three key areas: (1) engineering and cost reduction initiatives that continually enhance device performance and lower our cost of product revenue, (2) expansion of the Tablo data ecosystem to extend economic, operational and clinical benefits to our customers, and (3) advancing our innovation pipeline, which is directed toward broadening Tablo's value in the home, chronic, and acute environments for patients and providers. We intend to continue investing significant resources to maintain and strengthen our technological competitive advantage in order to deliver a steady stream of inventive solutions that provide clinical and operational simplicity, versatility and efficiency.

**Competition**

There are a number of dialysis machine manufacturers in the United States, Europe and Asia. Notable competitors in the United States include Fresenius Medical Care AG & Co. KGaA (Fresenius), Baxter International, Inc. (Baxter) and B. Braun. Medical Inc. (B. Braun). In addition, Quanta Dialysis Technologies Ltd's (Quanta) dialysis system recently received FDA 510(k) clearance for use in acute and/or chronic settings. Of these competitors, Fresenius is the largest, and is vertically integrated, both manufacturing dialysis products and operating dialysis clinics along with providing inpatient dialysis services to hospitals and health systems. Additionally, companies with dialysis machine development programs include Medtronic and CVS. With the exception of Quanta, our competitors are significantly larger than us with greater financial, marketing, sales and personnel resources, greater brand recognition and longer operating histories. We believe our ability to compete effectively will be dependent on our ability to build the commercial

13

infrastructure necessary to effectively demonstrate the value of Tablo, maintain and improve product quality and feature functionality, build the infrastructure to support the operating needs of the business and achieve cost reductions.

*Acute Care*

While historically customers in this market have focused on machine functionality and price, we believe they are increasingly focused on the total cost of patient care, which favors technology that can provide clinical versatility and improve operational efficiency. In the acute care setting, our competitors are Fresenius, Baxter and B. Braun. We compete primarily on the basis that Tablo is designed to drive operational efficiency through ease of use and cost reduction by reducing infrastructure and supplies cost.

*Home Care*

We believe competition in the home setting is based on a system's clinical performance, its cost efficiency, its ease of use and patient preference. In the home hemodialysis setting, competitors include Fresenius (through its acquisition of NxStage). We believe through Tablo's unique advantages it is easier and faster for patients to learn, and simpler for patients to operate at home, which may position us well against existing competitors. We believe these factors will reduce patient burn-out, thereby extending patient retention, increasing home hemodialysis growth and improving associated margin for providers. We do not consider PD to be competitive to our products given the differences in treatment modality, that PD is clinically limited due to patients with certain pre-existing conditions such as congestive heart failure and obesity and that PD is regarded as a "temporary" modality since approximately 80% of patients are on the therapy for less than three years.

**Intellectual Property**

Our success depends in part on our ability to protect our proprietary technology and intellectual property rights. We rely on a combination of federal, state, common law and international rights, as well as contractual restrictions, to protect our intellectual property.

We seek patent protection for certain of our key innovations, processes and other inventions. We pursue the registration of our trademarks, service marks and domain names in the United States and in certain other locations. We control access to our proprietary technology by entering into confidentiality and invention assignment agreements with our employees and contractors, and confidentiality agreements with third parties. Our intellectual property includes specific algorithms for the Tablo console, including those related to pressure sensors, blood leakage and pump control loops.

*Patents*

As of December 31, 2021, we had 19 issued U.S. patents, as well as nine pending U.S. patent applications, including 12 patents and patent applications previously exclusively licensed to us from Oregon State University (OSU), which OSU assigned to us upon termination of our license agreement with OSU. We had an aggregate of 40 issued patents in Australia, Canada, China, France, Germany, Hong Kong, Japan, Spain and the United Kingdom, as well as 18 pending patent applications in Japan, the European Patent Office and under the Patent Cooperation Treaty, including 22 patents previously exclusively licensed to us from OSU, which OSU assigned to us upon termination of our license agreement with OSU. Some of our patents and other intellectual property cover aspects of Tablo that enable it to be used by anyone, including the patient, through the automation of functions formerly performed by dialysis center technicians using traditional dialysis systems. Our proprietary data ecosystem provides what we believe is a unique way of connecting providers and patients for real-time treatment monitoring, automated treatment documentation, and simplified compliance and record-keeping.

Our patents expire between October 2025 and November 2041. The term of individual patents depends upon the legal term for patents in the countries in which they are granted. In most countries, including the United States, the patent term is 20 years from the earliest claimed filing date of a non-provisional patent application in the applicable country. In the United States, a patent's term may, in certain cases, be lengthened by patent term adjustment, which compensates a patentee for administrative delays by the United States Patent and Trademark Office (USPTO) in examining and granting a patent, or it may be shortened if a patent is terminally disclaimed over a commonly owned patent or a patent naming a common inventor and having an earlier expiration date. We cannot be sure that our pending patent applications or future patent applications will result in issued patents or that any patents that have issued or might issue in the future will protect our current or future products, provide us with any competitive advantage or will not be challenged, invalidated, or circumvented.

Various aspects of Tablo, including, without limitation, sensor technology, connectivity, automation, analytics and interface are covered by software, algorithms, processes, trade secret or other proprietary rights. We protect our trade secrets through a variety of measures, including confidentiality agreements and proprietary information agreements with suppliers, employees, consultants and

14

others who may have access to our proprietary information. Trade secrets and proprietary information can be difficult to protect, however. While we have confidence in the measures we take to protect and preserve our trade secrets and proprietary information, such measures can be breached, and we may not have adequate remedies for any such breach. In addition, our trade secrets and proprietary information may otherwise become known or be independently discovered by competitors.

There is no active patent litigation involving any of our patents, and we have not received any notices claiming that our activities infringe a third party's patent.

## Manufacturing, Supply Chain and Logistics

We direct the manufacturing and supporting supply chain, distribution and logistics for the Tablo console, the Tablo cartridge and other consumables (electrolyte concentrates and plastic tubing that transports the concentrates into Tablo to enable on-demand dialysate production). We partner with several different contract manufacturers in the assembly and testing of our products and operate under a Quality Management System that has been certified to ISO 13485 Medical Device Quality Management System standard.

### Tablo Console

Until early 2021, we exclusively relied on our contract manufacturing partner, Paramit Corporation (Paramit), based in Morgan Hill, California, for the production of the Tablo console. Tablo consoles manufactured by Paramit at their facility in Morgan Hill, California underwent extensive in-process and integrated system testing protocols designed by us. Consoles were then transported to our headquarters in San Jose, California, where our test engineers performed final testing, and then direct-shipped the consoles to our customers. We used a network of short-haul and long-haul freight forwarders optimized for time and cost efficiency.

In order to help ensure a high level of console production capacity through rapid scale, and to help lower our costs, we established a console manufacturing facility in Tijuana, Mexico, enabling us to insource Tablo console manufacturing beginning in early 2021. We are operating in Mexico in collaboration with TACNA Services (TACNA), a well-known outsourced business administration service provider that provides all the back-office and facility infrastructure support, allowing us to focus on our core competencies – design and high-volume manufacturing for reliability and cost reduction. Tablo consoles manufactured in our Mexico facility are tested at the facility using the same integrated system testing protocols designed by us, and then direct-shipped to our distribution centers, using a network of short-haul and long-haul freight forwarders optimized for time and cost efficiency. We terminated our contract with Paramit.

Pursuant to the terms of our manufacturing services agreement with TACNA (the TACNA Agreement), TACNA provides support services in connection with our manufacturing activities in Mexico. Under the TACNA Agreement, TACNA hires employees as requested by us and is responsible for human resource functions including maintenance of employee files and reports. TACNA is also responsible for performing internal statutory accounting and payroll services, as well as payables processing. Additional services that TACNA is obligated to provide under the TACNA Agreement include interfacing with both Mexican and U.S. governmental agencies, preparing import-export documentation, coordinating shipment of equipment, raw materials and finished products, and obtaining necessary permits and licenses required in Mexico. Under the TACNA Agreement, TACNA's services are generally performed under a pass-through cost model under which costs incurred are approved by us. We are also obligated to pay TACNA fees based on the number of employees under the TACNA Agreement. The TACNA Agreement has an initial three-year term and will continue thereafter until terminated by us or TACNA in accordance with the terms of the TACNA Agreement.

The number of suppliers feeding into Tablo console production is in excess of 250 worldwide. We consider approximately 9% of these suppliers, located in the United States, Europe and China, as critical providers of components such as pumps, motors, valves and PCBA boards. We are undertaking a second source qualification process for the majority of these critical components. Where second sourcing is unavailable or infeasible, we have sought to mitigate supply interruption risks with increased levels of safety stock.

### Tablo Cartridge

Until recently, the Tablo cartridge was manufactured exclusively by Infus Medical Co. Ltd. (Infus), a contract manufacturer with two facilities in Thailand. As part of our arrangement, we direct the oversight of the raw materials sourcing, selection and planning while Infus takes receipt of the Tablo cartridge components, and performs assembly, testing and Ethylene Oxide sterilization before shipment. The various components for the Tablo cartridge are manufactured by approximately 50 different suppliers located in various countries including Singapore, Italy and the United States, some of which are single-source suppliers. The Tablo cartridges have shipped primarily via ocean freight, though in times of peak demand or other supply chain constraints, we have shipped by air freight. Our team inspects the product before releasing it for shipment.

15

We recently moved production of a majority of Tablo cartridges to a manufacturing site in Tijuana, Mexico in partnership with Providien Medical (Providien). Providien, part of Carlisle Companies Incorporated, offers expertise in high volume disposable assembly services. Through enhanced product design, high capacity tooling and simplified freight and logistics, we expect this site will be able to produce cartridges at a lower cost, increase our supply capacity and help mitigate against global supply chain interruption. Tablo cartridges produced at this new facility undergo sterilization using electronic beam (e-beam) technology, which is an environmentally friendly sterilization method. Following our receipt of 510(k) clearance from the FDA for the new cartridge sterilization method in November 2021, we began manufacturing and commercially distributing Tablo cartridges manufactured at this new facility.

In addition to the Tablo cartridge, each treatment requires a concentrated container of bicarbonate and a concentrated container of acid, and two small plastic straws that draw the appropriate amount of the concentrates into the Tablo console in order to produce dialysate on demand.

**Government Regulation**

***United States Food and Drug Administration***

In the United States, our products are subject to regulation by the FDA as medical devices pursuant to the Federal Food Drug and Cosmetic Act (FDCA). The FDA regulates the development, design, non-clinical and clinical research, manufacturing, safety, efficacy, labeling, packaging, storage, installation, servicing, recordkeeping, premarket clearance or approval, adverse event reporting, advertising, promotion, marketing and distribution, and import and export of medical devices to ensure that medical devices distributed domestically are safe and effective for their intended uses and otherwise meet the requirements of the FDCA.

*FDA Premarket Clearance and Approval Requirements*

Unless an exemption applies, each medical device commercially distributed in the United States requires either FDA clearance of a 510(k) premarket notification, approval of a de novo application, or approval of a premarket approval (PMA). Under the FDCA, medical devices are classified into one of three classes—Class I, Class II or Class III—depending on the degree of risk associated with each medical device and the extent of manufacturer and regulatory control needed to ensure its safety and effectiveness. Class I includes devices with the lowest risk to the patient and are those for which safety and effectiveness can be assured by adherence to the FDA's General Controls for medical devices, which include compliance with the applicable portions of the Quality System Regulation (QSR) facility registration and product listing, reporting of adverse medical events, and truthful and non-misleading labeling, advertising, and promotional materials. Class II devices are subject to the FDA's General Controls, and special controls as deemed necessary by the FDA to ensure the safety and effectiveness of the device. These special controls can include performance standards, post-market surveillance, patient registries and FDA guidance documents.

While most Class I devices are exempt from the 510(k) premarket notification requirement, manufacturers of most Class II devices are required to submit to the FDA a premarket notification under Section 510(k) of the FDCA requesting permission to commercially distribute the device. The FDA's permission to commercially distribute a device subject to a 510(k) premarket notification is generally known as 510(k) clearance. Devices deemed by the FDA to pose the greatest risks, such as life sustaining, life supporting or some implantable devices, or devices that have a new intended use, or use advanced technology that is not substantially equivalent to that of a legally marketed device, are placed in Class III, requiring approval of a PMA. Some pre-amendment devices are unclassified, but are subject to FDA's premarket notification and clearance process in order to be commercially distributed. Tablo is a Class II device subject to 510(k) clearance.

*510(k) Clearance Marketing Pathway*

To obtain 510(k) clearance, we must submit to the FDA a premarket notification submission demonstrating that the proposed device is "substantially equivalent" to a predicate device already on the market. A predicate device is a legally marketed device that is not subject to PMA, i.e., a device that was legally marketed prior to May 28, 1976 (pre-amendments device) and for which a PMA is not required, a device that has been reclassified from Class III to Class II or I, or a device that was found substantially equivalent through the 510(k) process. The FDA's 510(k) clearance process usually takes from three to twelve months, but often takes longer. The FDA may require additional information, including clinical data, to make a determination regarding substantial equivalence. In addition, the FDA collects user fees for certain medical device submissions and annual fees for medical device establishments.

If the FDA agrees that the device is substantially equivalent to a predicate device currently on the market, it will grant 510(k) clearance to commercially market the device. If the FDA determines that the device is "not substantially equivalent" to a previously cleared device, the device is automatically designated as a Class III device. The device sponsor must then fulfill more rigorous PMA requirements, or can request a risk-based classification determination for the device in accordance with the "de novo" process, which

16

is a route to market for novel medical devices that are low to moderate risk and are not substantially equivalent to a predicate device. If a de novo request is granted, the device may be legally marketed and a new classification is established. If the device is classified as Class II, the device may serve as a predicate for future 510(k) submissions. If the device is not approved through de novo review, then it must go through the standard PMA process for Class III devices.

After a device receives 510(k) marketing clearance, any modification that could significantly affect its safety or effectiveness, or that would constitute a major change or modification in its intended use, will require a new 510(k) clearance or, depending on the modification, PMA approval. The FDA requires each manufacturer to determine whether the proposed change requires submission of a 510(k) or a PMA in the first instance, but the FDA can review any such decision and disagree with a manufacturer's determination. If the FDA disagrees with a manufacturer's determination, the FDA can require the manufacturer to cease marketing and/or request the recall of the modified device until 510(k) marketing clearance or PMA approval is obtained. Also, in these circumstances, the manufacturer may be subject to significant regulatory fines or penalties.

*PMA Approval Pathway*

Class III devices require approval of a PMA before they can be marketed, although some pre-amendment Class III devices for which the FDA has not yet required a PMA are cleared through the 510(k) process. The PMA process is more demanding than the 510(k) premarket notification process. In a PMA application, the manufacturer must demonstrate that the device is safe and effective, and the PMA application must be supported by extensive data, including data from preclinical studies and human clinical trials. The PMA application must also contain a full description of the device and its components, a full description of the methods, facilities, and controls used for manufacturing, and proposed labeling. Following receipt of a PMA application, the FDA determines whether the application is sufficiently complete to permit a substantive review. If the FDA accepts the application for review, it has 180 days under the FDCA to complete its review of a PMA application, although in practice, the FDA's review often takes significantly longer, and can take up to several years. An advisory panel of experts from outside the FDA may be convened to review and evaluate the application and provide recommendations to the FDA as to the approvability of the device. The FDA may or may not accept the panel's recommendation. In addition, the FDA will generally conduct a pre-approval inspection of the applicant or its third-party manufacturers' or suppliers' manufacturing facility or facilities to ensure compliance with the QSR. PMA devices are also subject to the payment of user fees.

The FDA will approve the new device for commercial distribution if it determines that the data and information in the PMA application constitute valid scientific evidence and that there is reasonable assurance that the device is safe and effective for its intended use(s). A PMA may include post-approval conditions intended to ensure the safety and effectiveness of the device, including, among other things, restrictions on labeling, promotion, sale and distribution, and collection of long-term follow-up data from patients in the clinical study that supported the PMA or requirements to conduct additional clinical studies post-approval. The FDA may condition PMA approval on some form of post-market surveillance when deemed necessary to protect the public health or to provide additional safety and efficacy data for the device in a larger population or for a longer period of use. In such cases, the manufacturer might be required to follow certain patient groups for a number of years and to make periodic reports to the FDA on the clinical status of those patients. Failure to comply with the conditions of approval can result in material adverse enforcement action, including withdrawal of the approval.

Certain changes to an approved device, such as changes in manufacturing facilities, methods, or quality control procedures, or changes in the design performance specifications, which affect the safety or effectiveness of the device, require submission of a PMA supplement. PMA supplements often require submission of the same type of information as a PMA, except that the supplement is limited to information needed to support any changes from the device covered by the original PMA and may not require as extensive clinical data or the convening of an advisory panel. Certain other changes to an approved device require the submission of a new PMA, such as when the design change causes a different intended use, mode of operation, and technical basis of operation, or when the design change is so significant that a new generation of the device will be developed, and the data that were submitted with the original PMA are not applicable for the change in demonstrating a reasonable assurance of safety and effectiveness. None of our products are currently marketed pursuant to a PMA.

*De novo Classification*

Medical device types that the FDA has not previously classified as Class I, II or III are automatically classified into Class III regardless of the level of risk they pose. To market low to moderate risk medical devices that are automatically placed into Class III due to the absence of a predicate device, a manufacturer may request a de novo down-classification. This procedure allows a manufacturer whose novel device is automatically classified into Class III to request classification of its medical device into Class I or Class II on the basis that the device presents low or moderate risk, rather than requiring the submission and approval of a PMA application. A medical device may be eligible for de novo classification if the manufacturer first submitted a 510(k) premarket notification and received a determination from the FDA that the device was not substantially equivalent or a manufacturer may request

17

de novo classification directly without first submitting a 510(k) premarket notification to the FDA and receiving a not substantially equivalent determination. The FDA is required to classify the device within 120 calendar days following receipt of the de novo application, although in practice, the FDA's review may take significantly longer. During the pendency of the FDA's review, the FDA may issue an additional information letter, which places the de novo request on hold and stops the review clock pending receipt of the additional information requested. In the event the de novo requestor does not provide the requested information within 180 calendar days, the FDA will consider the de novo request to be withdrawn. If the manufacturer seeks reclassification into Class II, the manufacturer must include a draft proposal for special controls that are necessary to provide a reasonable assurance of the safety and effectiveness of the medical device. In addition, the FDA may reject the de novo request for classification if it identifies a legally marketed predicate device that would be appropriate for a 510(k) or determines that the device is not low to moderate risk or that general controls would be inadequate to control the risks and special controls cannot be developed. In the event the FDA determines the data and information submitted demonstrate that general controls or general and special controls are adequate to provide reasonable assurance of safety and effectiveness, the FDA will grant the de novo request for classification. When the FDA grants a de novo request for classification, the device is granted marketing authorization and further can serve as a predicate for future devices of that type, through a 510(k) premarket notification.

*Breakthrough Device Program*

The FDA has implemented a Breakthrough Device Program that is intended to help patients receive more timely access to breakthrough medical technologies that have the potential to provide more effective treatment or diagnosis for life-threatening or irreversibly debilitating diseases or conditions. A device also must meet one of the following criteria: (i) it represents breakthrough technology; (ii) there is no approved or cleared alternative; (iii) it offers significant advantages over existing cleared or approved devices; or (iv) availability of the device is in the best interest of patients. Under the program, we are eligible to receive priority review and interactive communications from the FDA regarding device development and clinical trial protocols, all the way through to commercialization decisions.

*Clinical Trials*

Clinical trials are almost always required to support a PMA and are sometimes required to support a 510(k) submission. All clinical investigations of devices to determine safety and effectiveness must be conducted in accordance with the FDA's IDE regulations which govern investigational device labeling, prohibit promotion of the investigational device, and specify an array of recordkeeping, reporting and monitoring responsibilities of study sponsors and study investigators. If the device presents a "significant risk," to human health, as defined by the FDA, the FDA requires the device sponsor to submit an IDE application to the FDA, which must become effective prior to commencing human clinical trials. A significant risk device is one that presents a potential for serious risk to the health, safety or welfare of a patient and either is implanted, used in supporting or sustaining human life, substantially important in diagnosing, curing, mitigating or treating disease or otherwise preventing impairment of human health, or otherwise presents a potential for serious risk to a subject. An IDE application must be supported by appropriate data, such as animal and laboratory test results, showing that it is safe to test the device in humans and that the testing protocol is scientifically sound. The IDE will automatically become effective 30 days after receipt by the FDA unless the FDA notifies the company that the investigation may not begin. If the FDA determines that there are deficiencies or other concerns with an IDE for which it requires modification, the FDA may permit a clinical trial to proceed under a conditional approval.

In addition, the study must be approved by, and conducted under the oversight of, an Institutional Review Board (IRB) for each clinical site. The IRB is responsible for the initial and continuing review of the IDE study, and may pose additional requirements for the conduct of the study. If an IDE application is approved by the FDA and one or more IRBs, human clinical trials may begin at a specific number of investigational sites with a specific number of patients, as approved by the FDA. If the device presents a non-significant risk to the patient, a sponsor may begin the clinical trial after obtaining approval for the trial by one or more IRBs without separate approval from the FDA, but must still follow abbreviated IDE requirements, such as monitoring the investigation, ensuring that the investigators obtain informed consent, and labeling and record-keeping requirements. Acceptance of an IDE application for review does not guarantee that the FDA will allow the IDE to become effective and, if it does become effective, the FDA may or may not determine that the data derived from the trials support the safety and effectiveness of the device or warrant the continuation of clinical trials. An IDE supplement must be submitted to, and approved by, the FDA before a sponsor or investigator may make a change to the investigational plan that may affect its scientific soundness, study plan or the rights, safety or welfare of human subjects.

During a study, the sponsor is required to comply with the applicable FDA requirements, including, for example, trial monitoring, selecting clinical investigators and providing them with the investigational plan, ensuring IRB review, adverse event reporting, record keeping and prohibitions on the promotion of investigational devices or on making safety or effectiveness claims for them. The clinical investigators in the clinical study are also subject to FDA regulations and must obtain patient informed consent, rigorously follow the investigational plan and study protocol, control the disposition of the investigational device, and comply with all

18

reporting and recordkeeping requirements. Additionally, after a trial begins, we, the FDA or the IRB could suspend or terminate a clinical trial at any time for various reasons, including a belief that the risks to study subjects outweigh the anticipated benefits.

*Post-market Regulation*

After a device is cleared or approved for marketing, numerous and pervasive regulatory requirements continue to apply. These include:

- establishment registration and device listing with the FDA;

- QSR requirements, which require manufacturers, including third-party manufacturers, to follow stringent design, testing, control, documentation and other quality assurance procedures during all aspects of the design and manufacturing process;

- labeling regulations and FDA prohibitions against the promotion of investigational products, or the promotion of ''off-label'' uses of cleared or approved products;

- requirements related to promotional activities;

- clearance or approval of product modifications to 510(k)-cleared devices that could significantly affect safety or effectiveness or that would constitute a major change in intended use of one of our cleared devices, or approval of certain modifications to PMA-approved devices;

- medical device reporting regulations, which require that a manufacturer report to the FDA if a device it markets may have caused or contributed to a death or serious injury, or has malfunctioned and the device or a similar device that it markets would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur;

- correction, removal and recall reporting regulations, which require that manufacturers report to the FDA field corrections and product recalls or removals if undertaken to reduce a risk to health posed by the device or to remedy a violation of the FDCA that may present a risk to health;

- the FDA's recall authority, whereby the agency can order device manufacturers to recall from the market a product that is in violation of governing laws and regulations; and

- post-market surveillance activities and regulations, which apply when deemed by the FDA to be necessary to protect the public health or to provide additional safety and effectiveness data for the device.

Our manufacturing processes are required to comply with the applicable portions of the QSR, which cover the methods and the facilities and controls for the design, manufacture, testing, production, processes, controls, quality assurance, labeling, packaging, distribution, installation and servicing of finished devices intended for human use. The QSR also requires, among other things, maintenance of a device master file, device history file, and complaint files. As a manufacturer, we are subject to periodic scheduled or unscheduled inspections by the FDA. Our failure to maintain compliance with the QSR requirements could result in the shut-down of, or restrictions on, our manufacturing operations and the recall or seizure of our products, which would have a material adverse effect on our business. The discovery of previously unknown problems with any of our products, including unanticipated adverse events or adverse events of increasing severity or frequency, whether resulting from the use of the device within the scope of its clearance or off-label by a physician in the practice of medicine, could result in restrictions on the device, including the removal of the product from the market or voluntary or mandatory device recalls.

The FDA has broad regulatory compliance and enforcement powers. If the FDA determines that we failed to comply with applicable regulatory requirements, it can take a variety of compliance or enforcement actions, which may result in any of the following sanctions:

- untitled letters, warning letters, it has come to our attention letters, fines, injunctions, consent decrees and civil penalties;

- unanticipated expenditures to address or defend such actions;

- customer notifications or repair, replacement, refunds, recall, detention or seizure of our products;

19

- operating restrictions, partial suspension or total shutdown of production;

- refusing or delaying our requests for regulatory approvals or clearances of new products or modified products;

- withdrawing a PMA that has already been granted;

- refusal to grant export approval for our products; or

- criminal prosecution.

### Current FDA Regulatory Status

We currently have regulatory clearances required to market the Tablo Hemodialysis System in the U.S. for use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility. The Tablo Hemodialysis System is also indicated for use in the home and observed by a trained individual. The Tablo Hemodialysis System is not cleared by the FDA for Continuous Renal Replacement Therapy (CRRT), a subtype of hemodialysis intended to be performed without interruption at lower flow and ultrafiltration rates for hemodynamically unstable patients who may not tolerate higher flow or ultrafiltration rates typically associated with conventional dialysis. Treatments must be administered under a physician's prescription and observed by a trained individual who is considered competent in the use of the device. The FDA's authorizations for the Tablo System and Tablo Cartridge have thus far been granted as 510(k) clearances.

While the Tablo Hemodialysis System is indicated for use in the home, the FDA notified us that the Tablo System is subject to a mandatory post-market surveillance order under Section 522 of FDCA. The FDA has required that we conduct a human factors study, as well as conduct a detailed analysis of adverse events and complaints from home users. In response to the 522 order, we submitted a simulated human factors test protocol to the agency which leveraged testing from our validation study that was initiated in 2019. In late 2020, the FDA requested additional information and notified us that we will need to conduct a new human factors study encompassing both summative and real-world data to meet the requirements of the 522 order. We responded to the FDA's requests for additional information in January 2021 and in March 2021, the FDA approved our 522 study protocol. We have made certain changes over time, including software updates, to the Tablo System, including to accommodate patient use in the home. Although we originally documented these changes in memoranda to file, we have submitted a "catch-up" 510(k) application to the FDA which covers these design changes. Once cleared, this 510(k) will be used as the baseline submission for future 510(k) applications for the Tablo System. Because this also is the version of the Tablo System and software that we plan to use in the human factors study, we intend to initiate the human factors study upon FDA clearance. Once we are able to commence, conduct and complete our study, a final report will be provided to the FDA. Should the FDA decide that use of the Tablo System in the home environment identifies new concerns related to the safety and effectiveness of the product, or if the FDA determines that the requirements of the 522 order are otherwise unmet, we may be required to make changes to our Tablo System for which we may need to submit new marketing authorization applications and obtain clearance.

We continue to seek opportunities for product improvements and feature enhancements, which will, from time to time, require FDA clearance or approval before commercial launch.

### Healthcare Fraud and Abuse Laws

Certain U.S. federal healthcare fraud and abuse laws apply by virtue of the fact that our customers will submit claims for our products and services that are reimbursed, in whole or in part, by Medicare, Medicaid, or other federal healthcare programs (as that term is defined at 42 U.S.C. § 1320a-7b(f)). The principal federal fraud and abuse laws that apply in these circumstances are discussed below.

The U.S. federal Anti-Kickback Statute is a broad criminal statute that prohibits, among other things, the knowing and willful offer, solicitation, receipt, or payment of any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, for the purpose of inducing or rewarding the order, purchase, use or recommendation of items or services that may be paid for, or reimbursed by, in whole or in part, a federal healthcare program, such as Medicare or Medicaid. This includes products, like Tablo, that are not directly reimbursed but are purchased and used in a service paid for by such programs. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation. Further, the term "remuneration" has been broadly interpreted to include anything of value. The Affordable Care Act (ACA) healthcare reform legislation specified that any claims submitted as a result of a violation of the federal Anti-Kickback Statute constitute false claims and are subject to enforcement under the federal False Claims Act, which is discussed in more detail below. Government officials have focused recent federal Anti-Kickback Statute enforcement efforts on, among other things, the sales and marketing activities of medical device manufacturers and other healthcare companies, and recently have brought cases against individuals or entities who allegedly offered unlawful

20

inducements to potential or existing customers in an attempt to procure their business. Judgments and settlements of these cases by healthcare companies have involved significant fines and, in some instances, criminal pleas and convictions. Conviction under the federal Anti-Kickback Statue results in mandatory exclusion from participation in the federal healthcare programs, meaning that federal healthcare programs will not reimburse (directly or indirectly) for products or services furnished by the excluded entity or individuals. Violators are subject to, among other things, imprisonment and significant criminal fines for each violation under the Anti-Kickback Statute, plus up to three times the remuneration involved and other civil penalties under the False Claims Act, as discussed in more detail below.

Given the breadth of the federal Anti-Kickback Statute, and to allow innocuous or beneficial arrangements that may otherwise implicate the law, there are statutory exceptions and regulatory safe harbors that protect certain arrangements from liability under the law when all elements of an applicable exception or safe harbor are met. However, these exceptions and safe harbors are narrowly drawn, and there is no exception or safe harbor for many common business activities like educational grants or reimbursement support programs. Given that the Anti-Kickback Statute is an intent-based law, the failure of a transaction or arrangement to fit precisely within an exception or safe harbor does not necessarily mean that it is illegal or that prosecution will be pursued.

Conduct and business arrangements that do not fully satisfy all elements of an applicable exception or safe harbor may result in increased scrutiny by government enforcement authorities such as the Department of Health and Human Services (HHS) Office of Inspector General (OIG). If scrutinized, arrangements that implicate the federal Anti- Kickback Statute that do not fall within an exception or safe harbor, are analyzed by the OIG and other enforcement authorities on a case-by-case basis with review based on the totality of the facts and circumstances to assess whether a given arrangement is prohibited by the federal Anti-Kickback Statute.

The federal civil False Claims Act (FCA) imposes civil penalties against individuals or entities for, among other things, knowingly presenting, or causing to be presented, claims for payment of government funds that are false or fraudulent, or knowingly making, using, or causing to be made or used a false record or statement material to an obligation to pay money to the government, or knowingly concealing or knowingly and improperly avoiding, decreasing, or concealing an obligation to pay money to the federal government. This statute also permits a private individual acting as a "qui tam whistleblower" to bring actions on behalf of the federal government alleging violations of the FCA and to share in any monetary recovery. FCA liability is potentially significant in the healthcare industry because the statute provides for treble damages and mandatory penalties for each false claim submitted or statement made. Government enforcement agencies and private whistleblowers have investigated medical device manufacturers for, or asserted liability under, the FCA for a variety of alleged inappropriate promotional and marketing activities, including those involving the provision of free product or other items of value to customers, certain financial arrangements with healthcare providers, the provision of billing, coding, and reimbursement advice, and purported "off-label" promotion of products, among other things.

Another key federal healthcare law is the federal healthcare fraud statute, which was added by HIPAA. The federal healthcare fraud statute imposes liability for, among other things, knowingly and willfully executing, or attempting to execute, a scheme to defraud any healthcare benefit program, or knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false statement, in connection with the delivery of, or payment for healthcare benefits, items or services by a healthcare benefit program, which includes both government and privately funded benefits programs. Similar to the U.S. federal Anti-Kickback Statute, a person or entity does not need to have actual knowledge of the statute or specific intent to violate them in order to have committed a violation.

The Physician Payments Sunshine Act (Sunshine Act) was enacted by Congress in 2010 as part of the Affordable Care Act and was amended in 2018 by the Substance Use-Disorder Prevention that Promotes Opioid Recovery and Treatment for Patients and Communities Act. The Sunshine Act requires us to collect and report annually certain data on payments and other transfers of value we make to U.S.-licensed physicians, teaching hospitals, and, for reporting beginning January 1, 2022, U.S.-licensed physician assistants, nurse practitioners, clinical nurse specialists, certified nurse anesthetists, anesthesiology assistants, and certified nurse-midwives. Accordingly, we are required to track certain payments and other transfers of value made to these additional covered recipients during the 2021 calendar year. Manufacturers are also required to report ownership and investment interests held by the physicians described above and their immediate family members. The data are sent to CMS for public disclosure on the Open Payments website. Failure to timely report information in accordance with the Sunshine Act may result in significant financial penalties.

In addition to these federal laws, there are often state laws and regulations, including state anti-kickback and false claims laws, that may apply to our business practices, including but not limited to, research, sales and marketing arrangements and claims involving healthcare items or services reimbursed by any third- party payor, including private insurers; state laws that require medical device companies to comply with the medical device industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the U.S. federal government, or otherwise restrict payments that may be made to healthcare providers and other potential referral sources; and state laws and regulations that require drug and device manufacturers to file reports relating to

pricing and marketing information, which requires tracking gifts and other remuneration and items of value provided to healthcare professionals and entities. In some states, applicable state anti-kickback laws apply with respect to all payors, including commercial health insurance companies.

Through our compliance efforts, we constantly strive to structure our business operations and relationships with our customers to comply with all applicable legal requirements. However, many of the laws and regulations applicable to us are broad in scope and may be interpreted or applied by prosecutorial, regulatory or judicial authorities or whistleblowers in ways that we cannot predict. Thus, it is possible that governmental entities or other parties could interpret these laws differently or assert non-compliance with respect to one or more of our business operations and relationships. Moreover, the standards of business conduct expected of healthcare companies under these laws and regulations have become more stringent in recent years, even in instances where there has been no change in statutory or regulatory language. If our operations are found to be in violation of any of these laws or any other governmental regulations that may apply to us, we may be subject to significant civil, criminal and administrative penalties, damages, fines, imprisonment, and/or exclusion from government funded healthcare programs, such as Medicare and Medicaid. In addition, we may become subject to additional oversight and reporting requirements under a corporate integrity agreement as part of a settlement to resolve allegations of non-compliance with these laws (even if we do not admit violations). We may also need to curtail or restructure our operations as a result of being found to violate these laws, having such violations asserted against us, or based on enforcement actions instituted with respect to comparable practices by others. Any of these outcomes could have an adverse effect on our financial condition and ability to conduct our operations.

*Privacy and Security*

In the course of performing our business we obtain personally identifiable information (PII), including health-related information. Numerous federal and state laws and regulations, including HIPAA, govern the collection, dissemination, security, use and confidentiality of patient-identifiable health information or personal information. Such laws and regulations relating to privacy, data protection, and consumer protection are evolving and subject to potentially differing interpretations. These requirements may be interpreted and applied in a manner that varies from one jurisdiction to another and/or may conflict with other laws or regulations. HIPAA establishes a set of national privacy and security standards for the protection of individually identifiable health information, including protected health information (PHI) for certain covered entities, including healthcare providers that submit certain covered transactions electronically, as well as their ''business associates,'' which are persons or entities that perform a function or provide certain services for, or on behalf of, a covered entity that involve creating, receiving, maintaining or transmitting PHI. HIPAA also imposes breach reporting obligations on such covered entities and their respective business associates. Penalties for failure to comply with a requirement of HIPAA vary significantly depending on the failure and could include civil monetary or criminal penalties. HIPAA also authorizes state attorneys general to file suit under HIPAA on behalf of state residents. Courts can award damages, costs and attorneys' fees related to violations of HIPAA in such cases. While HIPAA does not create a private right of action allowing individuals to sue us in civil court for HIPAA violations, its standards have been used as the basis for a duty of care claim in state civil suits such as those for negligence or recklessness in the misuse or breach of PHI. The Department of Health and Human Services Office for Civil Rights (OCR) has recently increased its enforcement efforts on compliance with HIPAA, including the security regulations (Security Rule), bringing actions against entities which have failed to implement security measures sufficient to reduce risks to electronic protected health information or to conduct an accurate and thorough risk analysis, among other violations. HIPAA enforcement actions may lead to monetary penalties and costly and burdensome corrective action plans. We are also required to report known breaches of PHI consistent with applicable breach reporting requirements set forth in applicable laws and regulations. Finally, on December 10, 2020, OCR issued proposed revisions to the Privacy Rule aimed at reducing regulatory burdens that may exist in discouraging coordination of care, including creating an exception to the minimum necessary standard for healthcare coordination, and other proposals to increase patient access to their health information, among other changes. While a final rule has not yet been issued, if adopted, these proposed changes may require us to update our HIPAA policies and procedures to comply with the new requirements.

In addition, various federal and state legislative and regulatory bodies, or self-regulatory organizations, may expand current laws or regulations, enact new laws or regulations or issue revised rules or guidance regarding privacy, data protection and consumer protection. For instance, the California Consumer Privacy Act (CCPA) became effective on January 1, 2020. The CCPA gives California residents new rights to access and delete their personal information, opt out of certain personal information sharing and receive detailed information about how their personal information is used by requiring covered companies to provide new disclosures to California consumers (as that term is broadly defined) and provide such consumers new ways to opt-out of certain sales of personal information. The CCPA provides for civil penalties for violations, as well as a private right of action for data breaches that is expected to increase data breach litigation. Although there are limited exemptions for PHI and the CCPA's implementation standards and enforcement practices are likely to remain uncertain for the foreseeable future, the CCPA may increase our compliance costs and potential liability. Additionally, a California ballot initiative, the California Privacy Rights Act (CPRA), passed in November 2020, and the majority of the provisions will take effect on January 1, 2023. The CPRA will impose additional data protection obligations on companies doing business in California, including additional consumer rights processes, limitations on data uses, new audit

requirements for higher risk data, and opt outs for certain uses of sensitive data. It also created a new California data protection agency authorized to issue substantive regulations and could result in increased privacy and information security enforcement. Additional compliance investment and potential business process changes may be required. Laws similar to the California laws have passed in Virginia and Colorado, and have been proposed in other states and at the federal level that may ultimately have conflicting requirements that would further complicate compliance. Further, new health information standards, whether implemented pursuant to HIPAA, congressional action or otherwise, could have a significant effect on the manner in which we handle health-related information, and the cost of complying with these standards could be significant. If we do not comply with existing or new laws and regulations related to patient health information, we could be subject to criminal or civil sanctions.

Additionally, the Federal Trade Commission (FTC) and many state attorneys general are interpreting existing federal and state consumer protection laws to impose evolving standards for the online collection, use, dissemination and security of health-related and other personal information. Courts may also adopt the standards for fair information practices promulgated by the FTC, which concern consumer notice, choice, security and access. Consumer protection laws require us to publish statements that describe how we handle personal information and choices individuals may have about the way we handle their personal information. If such information that we publish is considered untrue, we may be subject to government claims of unfair or deceptive trade practices, which could lead to significant liabilities and consequences. Furthermore, according to the FTC, violating consumers' privacy rights or failing to take appropriate steps to keep consumers' personal information secure may constitute unfair or deceptive acts or practices in violation of Section 5 of the FTC Act. The FTC expects a company's data security measures to be reasonable and appropriate in light of the sensitivity and volume of consumer information it holds, the size and complexity of its business, and the cost of available tools to improve security and reduce vulnerabilities. Individually identifiable health information is considered sensitive data that merits stronger safeguards. The FTC's guidance for appropriately securing consumers' personal information is similar to what is required by the HIPAA Security Rule. Enforcement by the FTC under the FTC Act can result in civil penalties or enforcement actions.

We may also be subject to laws and regulations in foreign countries covering data privacy and other protection of health and employee information that may be more onerous than corresponding U.S. laws. These regulations may require that we obtain individual consent before we collect or process any sensitive personal data, restrict our use or transfer of personal data, impose technical and organizational measures to ensure the security of personal data, add obligations to our data analytics services, and require that we notify regulatory agencies, individuals or the public about any data security breaches. As we expand our international operations, we may be required to expend significant time and resources to put in place additional mechanisms to ensure compliance with multiple robust and evolving data privacy laws as they become applicable to our business.

Our business relies on secure and continuous processing of information and the availability of our Information technology (IT) networks and IT resources, as well as critical IT vendors that support our technology and data processing operations. Security breaches, computer malware and computer hacking attacks have become more prevalent across industries and may occur on our systems or those of our third-party service providers. Attacks upon information technology systems are increasing in their frequency, levels of persistence, sophistication, and intensity, and are being conducted by sophisticated and organized groups and individuals with a wide range of motives and expertise. As a result of the COVID-19 pandemic, we may face increased cybersecurity risks due to our reliance on internet technology and the increased frequency of employees working remotely, which may create additional opportunities for cybercriminals to exploit vulnerabilities. OCR, in partnership with the Healthcare and Public Health Sector Coordinating Council, issued cybersecurity guidelines for healthcare organizations that reflect consensus-based, voluntary practices to cost-effectively reduce cybersecurity risks for organizations of varying sizes. Although these HHS-backed guidelines, entitled "Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients," are voluntary, they are likely to serve as an important reference point for the healthcare industry, and may cause us to invest additional resources in technology, personnel and programmatic cybersecurity controls as the cybersecurity risks we face continue to evolve.

We regularly monitor, defend against and respond to cyber and other security threats to our networks and other information security incidents. Despite our information security efforts, our facilities, systems, and data, as well as those of our third party service providers, may be vulnerable to privacy and information security incidents such as data breaches, viruses or other malicious code, exploitation of known or unknown vulnerabilities, coordinated attacks, data loss, phishing attacks, ransomware, denial of service attacks, or other security or IT incidents caused by threat actors, technological vulnerabilities or human error. If we, or any of our IT support vendors, fail to comply with laws requiring the protection of sensitive personal information, or fail to safeguard and defend personal information or other critical data assets or IT systems, or if our incident response, containment or mitigation measures are inadequate in the face of a particular data security incident, we may face significant business interruptions, incur reputational damage, and be subject to regulatory enforcement and fines as well as private civil actions. We may be required to expend significant resources in the response, containment, mitigation of cybersecurity incidents as well as in defense against claims that our information security was unreasonable or otherwise violated applicable laws or contractual obligations.

Failure to comply with applicable data protection laws and regulations could result in government enforcement actions (which could include civil and/or criminal penalties), private litigation and/or adverse publicity and could negatively affect our

23

operating results and business. Compliance with these laws is difficult, constantly evolving, time consuming, and requires a flexible privacy framework and substantial resources. Compliance efforts will likely be an increasing and substantial cost in the future.

***Reimbursement in the Clinic and Home Settings***

We sell our Tablo to dialysis clinics. These clinics, in turn, provide equipment and services to the patient and are reimbursed by Medicare, Medicaid, private insurers, and other third-party payors.

*Medicare*

In the clinic and home setting, the largest payor of dialysis services is Medicare, and Medicare requires all dialysis patients to be under the care of a dialysis clinic provider, whether they are in the clinic or in the home.

Most patients who require regular dialysis, that is, those with ESRD, have coverage through Medicare Part B, which, effective January 1, 2011, pays dialysis clinics through a prospective, or bundled, payment system. Reimbursement is generally provided on a per treatment basis, and it is the same whether the patient is treated in the clinic or in the home setting. We believe that the current per treatment reimbursement amount received by our customers under Medicare Part B adequately covers the amortization of the cost of capital equipment, and specifically our Tablo console, as well as the per treatment supplies and disposables cost for Tablo, whether it is in the home or the in-clinic setting. Dialysis clinics' continuing adoption of Tablo, however, will depend on whether the cost of treatments involving Tablo (including the amortized cost of the Tablo console and other capital equipment) will continue to be adequately covered by the reimbursement that the dialysis clinics receive from these third-party payors.

Under the ESRD Prospective Payment System (PPS), CMS generally makes a single bundled payment to the dialysis facility for each dialysis treatment that covers all renal dialysis services, which is broadly defined and includes home dialysis and most drugs. On October 29, 2021, CMS published the final rule for Calendar Year (CY ) 2022, which increased the base reimbursement rate per dialysis treatment to $257.90, an increase of $4.77 over the CY 2021 base rate of $253.13. CMS may adjust the base rate to account for factors that increase the cost of providing dialysis to a certain patient, for example, based on patient factors such as age, body surface area, low body mass index, and certain comorbidities, and based on facility factors like volume and geographic location. With a vast majority of U.S. ESRD patients covered by Medicare, the Medicare reimbursement rate is an important factor in a potential customer's decision to use the Tablo and limits the fees for which we can sell or rent the Tablo.

Additionally, current CMS rules limit the number of hemodialysis treatments paid for by Medicare Part B to three times a week, unless there is medical justification provided by the dialysis facility based on information from the patient's physician for additional treatments. Using currently available technology, most patients who receive home dialysis have been prescribed to receive more than three treatments per week. The Tablo system can allow providers to prescribe as few as three home dialysis treatments per week. However, to the extent that providers continue to prescribe more than three home dialysis treatments per week and Medicare contractors determine they will not pay for such additional treatments, adoption of the Tablo system could be adversely impacted. As there is not a uniform national standard for what constitutes medical justification, a clinic's decision as to how much it is willing to spend on home dialysis equipment and services will be at least partly dependent on the number of weekly treatments prescribed for home dialysis with the Tablo system and, if greater than three, the level of confidence the center has in the predictability of receiving reimbursement from Medicare for additional treatments per week based on submitted claims for medical justification.

Beginning January 1, 2021, more dialysis patients enrolled in coverage under a Medicare Advantage plan when changes from the 21st Century Cures Act went into effect. While Medicare Advantage plans must provide at least the same level of coverage for Medicare beneficiaries as traditional Medicare, reimbursement to dialysis facilities is most often higher than traditional Medicare with a wide range of variability in payment rates to providers. Reimbursement rates depend on each Medicare Advantage plan's contracts and network agreements with each dialysis facility. In CY 2021, Medicare Advantage plans overall saw a 31% increase in enrollment of ESRD patients, with the most significant increases coming from lower income patients who are dually eligible for Medicare and Medicaid.

The CY 2021 Medicare ESRD PPS final rule, among other things, encourages the development of new and innovative home dialysis machines that would give Medicare beneficiaries more dialysis treatment options in the home and improve their quality of life. Specifically, the final rule includes capital equipment in transitional add-on payment adjustments for new and innovative equipment and supplies (TPNIES). For home dialysis equipment CMS provided a pathway for capital related assets to secure TPNIES (CRA). We applied for and received CRA TPNIES in connection with the Tablo Hemodialysis System use by one patient per one machine in the home, pursuant to which Medicare will pay 65% of the Medicare Administrative Contractor-determined pre-adjusted per treatment amount for two calendar years beginning in CY 2022.

24

*Medicaid*

Many ESRD patients also have Medicaid coverage that is supplemental to Medicare coverage, that is, it helps cover Medicare Part B coinsurance and items and services not covered by Medicare Part B, but some ESRD patients may have Medicaid as their primary coverage. Because Medicaid is a state-administered program, Medicaid reimbursement for dialysis services varies by state.

*Private Insurance*

Finally, some patients may have coverage through private insurance, for example through a marketplace plan set up under the Affordable Care Act or through an employer or union group health plan. Private insurance reimbursement is generally higher than government reimbursement, but it varies by sponsor and plan.

### Reimbursement in the Critical Care Setting

For Medicare patients, both acute kidney failure and fluid overload therapies provided in an in-patient hospital setting are reimbursed under the Medicare Severity Diagnosis Related Group System (MS-DRG). Under this system, reimbursement is determined based on a patient's diagnoses, demographics, and procedures furnished during the stay, and is intended to cover all of the hospital's costs of treating the patient. Longer hospitalization stays and higher labor needs, which are typical for patients with acute kidney failure and fluid overload, must be managed for care of these patients to be cost-effective. Similar to dialysis clinics that are reimbursed by Medicare under the ESRD bundled payment methodology, we believe that there is a significant incentive for hospitals to find the most cost-efficient way to treat these patients in order to improve hospital economics for these therapies.

In the in-patient setting under Medicare, dialysis and UF are not directly reimbursed, but rather are paid for out of the in-patient MS-DRG for a patient's admission. In most cases, AKI or fluid overload requiring dialysis or ultrafiltration will increase the severity of the underlying diagnosis, and therefore could result in higher reimbursement than those cases without dialysis. Given dialysis is a "fixed cost" for providers within the MS-DRG, we believe that there is significant motivation for providers to attempt to reduce costs associated with dialysis in order to improve overall service line profitability.

### United States Health Reform

Changes in healthcare policy could increase our costs and subject us to additional legislative and regulatory requirements that may interrupt commercialization of our current and future products, decrease our revenue and adversely impact sales of, and pricing of and reimbursement for, our current and future products. The United States and some foreign jurisdictions are considering or have enacted a number of other legislative and regulatory proposals to change the healthcare system in ways that could affect our ability to sell our products profitably. Among policy makers and payors in the United States and elsewhere, there is significant interest in promoting changes in healthcare systems with the stated goals of containing healthcare costs, improving quality and/or expanding access. Current and future legislative proposals to further reform healthcare or reduce healthcare costs may limit coverage of or lower reimbursement for the procedures associated with the use of our products. The cost containment measures that payors and providers are instituting and the effect of any healthcare reform initiative implemented in the future could impact our revenue from the sale of our products.

The implementation of the Affordable Care Act in the United States, for example, has changed healthcare financing and delivery by both governmental and private insurers substantially, and affected medical device manufacturers significantly. The Affordable Care Act, among other things, implemented payment system reforms including a national pilot program on payment bundling to encourage hospitals, physicians and other providers to improve the coordination, quality and efficiency of certain healthcare services through bundled payment models. Additionally, the Affordable Care Act encouraged expanded eligibility criteria for Medicaid programs and created a new Patient-Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research.

There have been judicial and Congressional challenges to various elements of the Affordable Care Act, as well as efforts to modify certain aspects of the Affordable Care Act. For example, Congress eliminated, starting January 1, 2019, the tax penalty for not complying with the Affordable Care Act's individual mandate to carry health insurance. The Further Consolidated Appropriations Act of 2020, Pub. L. No. 116-94, signed into law December 20, 2019, fully repealed the Affordable Care Act's "Cadillac Tax" on certain high cost employer-sponsored insurance plans, the annual fee imposed on certain health insurance providers based on market share (repeal effective in 2021), and the medical device excise tax on non-exempt medical devices. The American Rescue Plan of 2021, Pub. L. No. 117-2, enacted on March 11, 2021, temporarily increased premium tax credit assistance for those eligible for subsidies for 2021 and 2022 and removed the 400% federal poverty level limit that otherwise applies for purposes of eligibility to receive premium tax credits. It is unclear efforts to challenge, or modify, or alter the implementation or interpretation of the Affordable Care Act will affect our business, financial condition and results of operations.

25

In addition, other legislative changes have been proposed and adopted since the Affordable Care Act was enacted. For example, the Budget Control Act of 2011, among other things, resulted in reductions in payments to Medicare providers of 2% per fiscal year, which went into effect on April 1, 2013 and, due to subsequent legislative amendments to the statute, will remain in effect into 2031 unless additional Congressional action is taken, with the exception of a temporary suspension of the 2% cut in Medicare payments from May 1, 2020 through March 31, 2022 due to the COVID-19 pandemic. The law provides for 1% Medicare sequestration in the second quarter of 2022 and allows the full 2% sequestration thereafter until 2030. To offset the temporary suspension during the COVID-19 pandemic, in 2030, the sequestration will be 2.25% for the first half of the year, and 3% in the second half of the year. As long as these cuts remain in effect, they could adversely impact payment for any products we may commercialize in the future. Additionally, the American Taxpayer Relief Act of 2012, among other things, reduced CMS payments to several types of providers, including hospitals, and increased the statute of limitations period for the government to recover Medicare overpayments to providers from three to five years.

Moreover, other legislative and executive actions have encouraged the development of new payment and care models for ESRD patients. For example, an executive order signed in July 2019 directed the Secretary of HHS to develop, among other things, Medicare payment models designed to identify and treat at-risk populations earlier in disease development, and in connection with the executive order, HHS announced a goal of having 80% of new ESRD patients in 2025 either receive dialysis at home or receive a transplant. CMS subsequently published a final rule on September 29, 2020, among other things, to implement the End-Stage Renal Disease Treatment Choices (ETC) Model. The ETC Model is a mandatory payment model that adjusts certain Medicare payments to selected ESRD facilities, nephrologists, and other clinicians managing beneficiaries with ESRD starting January 1, 2021 and continuing through June 30, 2027. Specifically, the ETC Model will adjust ESRD facilities' treatment base rates under the ESRD Prospective Payment System and managing clinicians' monthly Medicare capitation payments to incentivize greater use of home dialysis and kidney transplants. CMS is also preparing to implement the Kidney Care Choices Model, a voluntary Medicare payment model with four distinct payment options designed to help providers reduce costs and improve quality of care for patients with late-stage chronic kidney disease and ESRD, to delay the need for dialysis and to encourage kidney transplantation. The first performance year of the Kidney Care Choices Model began on January 1, 2022. Finally, the Chronic Kidney Disease Improvement in Research and Treatment Act was introduced in the U.S. Senate (S. 1971) on June 8, 2021 and in the U.S. House of Representatives (H.R. 4065) on June 23, 2021. The Jack Reynolds Memory Medigap Expansion Act (HR 1676) was introduced in the U.S. House of Representatives on March 9, 2021. If enacted, either bill would guarantee access to Medigap insurance policies to all ESRD Medicare beneficiaries regardless of age. The Chronic Kidney Disease Improvement in Research and Treatment Act would also, among other policy changes, allow patients with ESRD to retain private insurance as their primary payer for an additional 12 months, and require CMS to adjust the ESRD PPS bundled rate when the current rate would not cover the cost of adding a new drug, biologic, or other technology into the bundle after the transitional payment period ends. Changes to the models of patient care, including an increased focus on treatments earlier in disease progression, may adversely affect our customers' businesses and potentially decrease the demand for our product or result in additional pricing pressures. Further, with home dialysis as a growing trend in the industry and issuance of the executive order and the ETC Model final rule, a failure to implement our expansion into home dialysis could have a material adverse impact on our business.

We believe that there will continue to be proposals and other actions by legislators and other policymakers at both the federal and state levels, and by regulators and third-party payors to reduce costs and/or expand individual healthcare coverage. Changes to federal and state legislatures and executive offices following the November 2020 elections have resulted in and will likely continue to result in further healthcare policy changes. For example, on January 28, 2021, President Biden issued the "Executive Order on Strengthening Medicaid and the Affordable Care Act," which, among other things revoked certain executive orders of the previous administration, stated that it is the current administration's policy "to protect and strengthen Medicaid and the ACA and to make high-quality healthcare accessible and affordable for every American," and directed heads of relevant executive departments and agencies immediately to review agency actions to determine whether any such actions are inconsistent with this policy. Additionally, on July 9, 2021, President Biden issued an executive order to promote competition in the American economy, including in the healthcare sector. Among the provisions in the executive order was a directive to HHS to standardize plan options in the national health insurance marketplaces (i.e., the Exchanges) to facilitate improved comparison shopping for insurance plans. Other actions by the Biden administration, the Congress, state governments, and third-party payors could impact our business in ways that are difficult to predict but that could have a material adverse effect on our business and financial condition. For example, certain of these changes could impose additional limitations on the rates we will be able to charge for our current and future products or the amounts of reimbursement available for our current and future products from governmental agencies or third-party payors. Current and future healthcare reform legislation and policies could also have a material adverse effect on our business and financial condition.

**Human Capital Resources**

As of December 31, 2021, we had 444 full-time employees, with 48% in our field sales and service teams and 52% in the rest of the company. Our workforce hails from across industries, including technology, medical devices, life sciences and retail management.

26

As of December 31, 2021, our manufacturing facility in Tijuana, Mexico had 149 full-time team members on-site across quality, engineering, manufacturing, supply chain, and support functions. TACNA facilitates the hiring of new team members and is responsible for human resource functions and payroll processing.

There are no unions represented within our employee base and no members of our workforce are covered under collective bargaining agreements.

In October 2021, we published our inaugural Environmental, Social, and Governance (ESG) Report (ESG Report) which is available on our website at https://investors.outsetmedical.com/environmental-social-and-governance and includes more detailed information on our human capital programs and initiatives. Nothing contained on or accessible through our website, including our ESG Report or sections thereof, shall be deemed incorporated by reference into this Annual Report.

*Talent and Pay Philosophies*

We are committed to attracting the best talent we can find, while providing our employees with challenging work in a fast-paced environment. We recruit broadly and welcome diverse candidates. We have a principle that "everyone is a recruiter" and often hold crowd recruiting sessions to identify candidates collectively, and welcome employee referrals.

Our environment is goal-driven, and we believe in paying for outstanding performance and future potential. We offer competitive, market-based salaries, an annual cash bonus program tied to individual and company performance, a broad-based equity incentive compensation program including an employee stock purchase plan, a comprehensive benefits package, team incentives and peer incentives.

*Performance Management, Career Development and Engagement*

We believe that preparing our employees for growth and development is a key business activity and managers have two key performance conversations a year with their team members. Our year-end conversation, "Yearbook," is focused on evaluating the success and learnings of the past year. Our mid-year conversation, "Passport," is focused on skill development and future growth opportunities.

We have a formalized practice around performance development and have numerous avenues for employees to gain experience, exposure and build new skills. For example, we have invested in various training and development opportunities for our employees including programs taught by internal leaders, development sessions led by external speakers, and access to on-demand learning resources.

We strongly believe in growing from within and have numerous avenues for in-role stretch assignments, cross-group short assignments, internal mobility, and promotions. In addition, we conduct employee surveys to monitor employee engagement and identify areas of focus for our human capital management. Information on the results of these surveys is included in our ESG Report.

*Diversity, Equity and Inclusion Strategy*

We are committed to creating and nurturing an inclusive workplace, where everyone feels respected, valued, and included – not only because it's the right thing to do, but also because we strongly believe that it's vital to our success and crucial to fully support the diverse communities we serve. We embrace diversity and equal opportunity in an intentional way. We are committed to building a team that represents a variety of backgrounds, perspectives, and skills. We believe that creating an environment where employees feel comfortable to speak up and share ideas means we all do great work.

In mid-2020, we brought together an engaged group of employees to design our diversity, equity and inclusion strategy. We defined three key areas of focus: 1) raising awareness of racial disparities in kidney care, 2) impactful community outreach with students to advocate for careers in the medical device industry, and 3) providing internal education on bias. We continued to actively pursue these three areas of focus in 2021, and intend to do so moving forward.

Additional information on our diversity, equity and inclusion strategy, including data regarding our U.S. workforce and new hire demographics by gender and ethnicity, are publicly disclosed in our ESG Report.

*Employee Health and Safety*

At Outset, safety is a priority and is part of everyone's job. We are committed to providing a safe workplace and we comply with applicable health and safety laws and regulations. We strictly prohibit any violent or threatening behavior on our premises or

27

during any work-related activities. Our employees participate in applicable emergency response training and periodic drills to help maintain awareness of security, safety and emergency response protocols.

We determined early in the COVID-19 outbreak that supporting, educating and keeping our workforce safe was paramount. We moved quickly to connect with and help our employees so we could continue our business operations and provide ongoing support for our patient population. Since we qualified as an essential business, we continued to operate our facility in San Jose, California through the shelter-in-place orders, and immediately categorized our workforce based on the essentialness of working onsite. For roles that required employees to be physically onsite, such as our R&D and manufacturing technical staff, we implemented infection control procedures, social distancing protocols, increased sanitization standards, personal protective equipment, and daily temperature checks. When COVID-19 testing became available, we implemented onsite testing in our facilities. We also provided vaccination clinics at each of our facilities to make it convenient for our workforce to receive COVID-19 vaccinations once available. During the third quarter of 2021, we defined a policy requiring our customer-facing and on-site employees to be fully vaccinated by October 2021, subject to religious and medical exemptions. With nearly all our employees now vaccinated, we have begun to move toward more normal operations in accordance with local guidelines, including resuming more on-site activity to increase productive collaboration while continuing to prioritize employee safety. For employees working on-site, we continue to follow masking protocols consistent with evolving health and safety guidelines, facilitate social distancing and practice increased sanitizing standards.

## Corporate Information

We were incorporated in the State of Delaware in 2003 under the name Home Dialysis Plus, Ltd. We changed our name to Outset Medical, Inc. in January 2015. Our principal executive offices are located at 3052 Orchard Dr., San Jose, California 95134, and our telephone number is (669) 231-8200.

## Available Information

We make our Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K, and amendments to those reports, available free of charge at our website as soon as reasonably practicable after they have been filed with the Securities and Exchange Commission (SEC). Our website address is www.outsetmedical.com. Information on our website is not part of this report. The SEC maintains a website that contains the materials we file with the SEC at www.sec.gov.

## Information About Our Executive Officers

The following table sets forth information concerning our executive officers and directors as of the date of this Annual Report:

| Name | Age | Position(s) |
| --- | --- | --- |
| *Executive Officers* | | |
| Leslie Trigg | 51 | President, Chief Executive Officer and Chair of the Board |
| Nabeel Ahmed | 46 | Chief Financial Officer |
| John L. Brottem | 48 | General Counsel and Secretary |
| Stacey Porter | 47 | Chief People Officer |
| Jean-Olivier Racine | 40 | Chief Technology Officer |
| Martín Vazquez | 52 | Chief Operating Officer |
| Steve Williamson | 49 | Chief Commercial Officer |

*Leslie Trigg*

Leslie Trigg has served as our President and Chief Executive Officer and a member of our board of directors since November 2014 and as Chair of our Board since February 2022. Ms. Trigg joined the Company from Warburg Pincus, a private equity firm, where she was an Executive in Residence from March 2012 to March 2014. Prior to that, Ms. Trigg served in several roles at Lutonix (acquired by CR Bard), a medical device company, from January 2010 to February 2012, most recently as Executive Vice President, and as Chief Business Officer of AccessClosure (acquired by Cardinal Health), a medical device company, from September 2006 to June 2009. She also previously held positions with FoxHollow Technologies (acquired by ev3/Covidien), a manufacturer of devices to treat peripheral artery disease, Cytyc, a diagnostic and medical device company, Pro-Duct Health (acquired by Cytyc), a medical device company, and Guidant, a cardiovascular medical device company. Ms. Trigg has served on the board of directors of Adaptive Biotechnologies Corporation, a biotechnology company, since March 2021, and on the board of directors of ARYA Sciences Acquisition Corp IV, a special purpose acquisition company, since March 2021. Ms. Trigg also serves on the board of directors of the Medical Device Manufacturers Association. Ms. Trigg holds a B.S. degree from Northwestern University and an M.B.A. from The Haas School of Business, UC Berkeley.

*Nabeel Ahmed*

Nabeel Ahmed has served as our Chief Financial Officer since August 2021. Mr. Ahmed joined the Company in May 2020 as Vice President, Controller, was named Vice President, Finance in May 2021, and was appointed as Interim Chief Financial Officer effective July 2021. Prior to joining the Company, Mr. Ahmed served as Vice President, Finance at 8x8, Inc., a communications platform provider, from April 2019 through January 2020, and as Vice President, Finance at Vocera Communications, Inc., a provider of clinical communication and workflow solutions, from December 2014 through April 2019. Prior to that, he held various leadership positions in accounting and finance, including as CFO at Wanderful Media from 2013 to 2014, as well as Vice President, Finance and then CFO at MarketTools, Inc. from 2009 to 2012. Earlier in his career, Mr. Ahmed held various positions of increasing responsibility at Ernst & Young LLP from 1997 to 2004 and at eBay, Inc. from 2004 to 2008. Mr. Ahmed holds a Bachelor of Commerce from Laurentian University and an M.B.A. from The Wharton School, University of Pennsylvania.

*John L. Brottem*

John L. Brottem has served as our General Counsel and Secretary since May 2020. Prior to joining the Company, Mr. Brottem served in a number of roles at Omnicell, Inc., a leading provider of medication management automation solutions and adherence tools for healthcare systems and pharmacies: as Vice President, Legal and Deputy General Counsel from September 2019 to May 2020; as Vice President, Legal and Associate General Counsel from April 2016 to September 2019; and Senior Director, Legal and Associate General Counsel from November 2011 to April 2016. Prior to Omnicell, Mr. Brottem was Corporate Counsel at Brocade Communications Systems, Inc., a networking solutions company, from January 2009 to November 2011; Corporate Counsel at Foundry Networks, Inc., a networking solutions company, from February 2008 to January 2009; and Associate at Cooley Godward Kronish LLP, an international law firm, from November 2001 to February 2008. Mr. Brottem holds a B.A. from Occidental College and a J.D. from the University of California, Davis, School of Law.

*Stacey Porter*

Stacey Porter has served as our Chief People Officer since October 2021. Ms. Porter joined the Company in November 2018 as Vice President, People Operations. Prior to joining the Company, Ms. Porter served as Head of Global Talent Development at Intuitive Surgical, Inc., a manufacturer of robotic surgical systems, from October 2012 to November 2018. Prior to that, Ms. Porter held various leadership positions in talent development, including as Director, Global Talent Development at VMware, Inc. from 2011 to 2012, and as Head of Learning and Development at Roche Pharmaceuticals from 2005 to 2009. Ms. Porter holds a B.A. from University of Kentucky and a MSW from University of Louisville.

*Jean-Olivier Racine*

Jean-Olivier Racine has served as our Chief Technology Officer since June 2021. Mr. Racine joined the Company from Amazon.com, Inc., an electronic commerce and cloud computing company, where he served in a number of roles: as Head of Engineering and Science, AWS Health AI from June 2020 to June 2021, Head of Cloud Services and Alexa, Halo (a health wearable device) from October 2018 to June 2020, as Head of Digital Media Catalog Services, Fire TV from January 2013 to October 2018, and as Fluidity and Performance Lead, Fire Tablet, Launcher and Platform from November 2011 to February 2013. Prior to that, Mr. Racine was a Senior Programmer-Analyst at the Montréal Exchange from January 2011 to November 2011, and a Projects Leader at NexGen Ergonomics, Inc. from January 2008 to January 2011. Mr. Racine holds a B.Eng. degree and a M.Eng. degree from École de Technologie Supérieure.

*Martín Vazquez*

Martín Vazquez has served as our Chief Operating Officer since November 2017. Prior to joining the Company, Mr. Vazquez was Vice President of North America Operations and Global Sales and Operations Planning at Abbott Rapid Dx (formerly Alere), a rapid point-of-care diagnostics company, from July 2015 to November 2017. Prior to that, Mr. Vazquez served as Vice President, Manufacturing Management/WW Operations at Becton Dickinson, a medical technology company, from March 2012 to June 2015, and Director Operations Mexico at Smiths Medical, a manufacturer of specialty medical devices, from May 2009 to March 2012. He also previously held positions with Integer Holdings (formerly Greatbatch Medical), a medical device manufacturing company, Alcon Laboratories, a subsidiary of Novartis AG focused on eye care products, Venusa, a medical device manufacturing company, and Ethicon (J&J), a medical device company. Mr. Vazquez holds a B.S. from University of Texas at El Paso and an M.B.A. from The Marshall School of Business, University of Southern California.

*Steve Williamson*

Steve Williamson has served as our Chief Commercial Officer since November 2020. Prior to joining the Company, Mr. Williamson was Worldwide President, Peripheral Intervention at Becton, Dickinson and Company, a medical technology company, from January 2018 to November 2020, and President, Peripheral Vascular at C.R. Bard (now part of Becton, Dickinson and Company) from August 2012 to December 2017. Prior to that, he was Senior Vice President and General Manager, Gyn Surgical Products from December 2009 to August 2012 and Vice President of Sales and Marketing, Gyn Surgical Products from October 2007 to December 2009 with Hologic, Inc., a medical technology company. Mr. Williamson holds a B.B.A. from University of Massachusetts Amherst and an M.B.A. from Bentley University.

30