Nicole Lavallee (SBN 165755)
Kristin Moody (SBN 206326)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
        kmoody@bernantabacco.con
        avahdat@bermantabacco.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE OUTSET MEDICAL, INC. SECURITIES LITIGATION<br><br>_____<br><br>This Document Relates to:<br><br>ALL ACTIONS | ) Case No. 5:24-cv-06124-EJD<br>)<br>) **CLASS ACTION**<br>)<br>) **LEAD PLAINTIFF'S OPPOSITION TO**<br>) **DEFENDANTS' MOTION TO DISMISS**<br>) **THE CONSOLIDATED COMPLAINT**<br>)<br>) Date: January 22, 2026<br>) Time: 9:00 a.m.<br>) Place: Courtroom 4, 5th Floor<br>) Judge: Hon. Edward J. Davila<br>)<br>) Consolidated Complaint Filed: June 6, 2025 |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................iii

STATEMENT OF THE ISSUES TO BE DECIDED..............................................................viii

PRELIMINARY STATEMENT ............................................................................................... 1

FACTUAL OVERVIEW............................................................................................................ 2

    I.    Outset's Primary Product Tablo Is Not Cleared for CRRT, And TabloCart Requires FDA Clearance.................................................................................... 2

    II.   Outset's Management Directs Off-Label Marketing........................................... 2

    III.  Defendants Misled The Market By Failing To Disclose The Off-Label Marketing And That It Drove Outset's Success.................................................. 3

    IV.  Defendants Continue to Mislead Investors As The Truth Begins to Emerge ........... 4

ARGUMENT............................................................................................................................. 5

    I.    Plaintiff Adequately Alleges Off-Label Marketing........................................... 5

        A.    Witness Accounts Demonstrate Management-Led Off-Label Marketing............................................................................................. 7

            1.    Employee Witnesses ..................................................................... 8

            2.    Customer Witnesses...................................................................... 9

        B.    The FDA Letter Confirms the Witness Accounts of Off-Label Marketing............................................................................................. 12

        C.    Outset's Sales Declined After it Abandoned its Off-Label Marketing............................................................................................. 12

    II.   Plaintiff Pleads Actionable Misrepresentations ....................................................... 13

        A.    Statements That Outset Did Not Engage in Off-Label Promotion Were Materially False and Misleading When Made ............................. 13

        B.    Statements Concerning Outset's Strong Revenue, Growth, and Demand Were Materially False and Misleading When Made................. 14

        C.    Statements Downplaying Issues Raised by the FDA Were Materially False and Misleading When Made......................................... 18

        D.    Statements Concerning Tablo's Value Proposition Were Materially False and Misleading When Made.......................................... 21

        E.    Statements Touting TabloCart and That TabloCart is a Non-Medical Accessory Were Materially False and Misleading When Made .............................................................................................. 21

    III.  Plaintiff Sufficiently Alleges Scienter................................................................. 22

A.    The Core Operations Doctrine Demonstrates Scienter ........................... 23

B.    Defendant CEO Trigg's Direct Involvement With the Sales Team and Marketing to Customers Evidences Scienter ................................... 25

C.    The Consistent Witness Accounts of Management-Directed Off Label Marketing Evidence a Strong Inference of Scienter ...................... 25

D.    Defendants' Actions and Representations After the FDA Investigation and the FDA Letter Further Demonstrate their Scienter ................................................................................................ 28

E.    Defendants' False Narrative Regarding Tablo Sales Declines Following the FDA Letter Supports Scienter ........................................... 28

F.    Defendants' Knowledge of the Lack of FDA Clearance, Touting of Value Proposition Marketing, and Violation of Company Policy Evidences Scienter ................................................................................... 29

G.    The Insider Selling Supports Scienter ....................................................... 30

IV.   Plaintiff Adequately Alleges Loss Causation ............................................................. 32

V.    The Individual Defendants Are Liable Under Section 20(a) ................................... 34

CONCLUSION .......................................................................................................................... 35

# **TABLE OF AUTHORITIES**

Page(s)

*Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*,
756 F. Supp. 3d 852 (S.D. Cal. 2024)..................................................................................30

*Applestein v. Medivation, Inc.*,
861 F. Supp. 2d 1030 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014). .................8

*Backe v. Novatel Wireless, Inc.*,
642 F. Supp. 2d 1169 (S.D. Cal. 2009)...........................................................................31, 34

*Bajjuri v. Raytheon Techs. Corp.*,
641 F. Supp. 3d 735 (D. Ariz. 2022) ...............................................................................8, 10

*Berson v. Applied Signal Tech, Inc.*,
527 F.3d 982 (9th Cir. 2008) ..........................................................................................17, 28

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corporation*,
399 F.3d 651 (6th Circuit 2005) ...........................................................................................28

*City of Roseville Employees' Retirement Sys. v. Horizon Lines, Inc.*,
713 F. Supp. 2d 378 (D. Del. 2010).......................................................................................15

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
880 F. Supp. 2d 1045 (N.D. Cal. 2012) .................................................................................17

*Courter v. CytoDyn, Inc.*,
2025 WL 1771244 (W.D. Wash. June 25, 2025).....................................................................18

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...........................................................................................................32, 34

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .................................................................................................23

*Elias v. Hewlett-Packard Co.*,
950 F. Supp. 2d 1123 (N.D. Cal. 2013) .................................................................................21

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ...................................................................................25

*Ferraro Family Found, Inc. v. Corcept Therapeutics, Inc. ("Corcept I")*,
501 F. Supp. 3d 735 (N.D. Cal. 2020) .....................................................................................6

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc. ("Corcept II")*,
2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ...............................................................passim

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................................35

*Glazer Cap. Mgmt., L.P. v. Forescout Tech., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ........................................................................ 7, 22, 26

*Homyk v. ChemoCentryx, Inc.*,
  2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ...................................................... 15

*Howard v. Everex Sys.*,
  228 F.3d 1057 (9th Cir. 2000) ............................................................................ 34

*Immanuel Lake v. Zoogenic, Inc.*,
  2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) ...................................................... 16

*Immune Response Sec. Litig*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) .................................................................. 28

*Inchen Huang v. Higgins*,
  443 F. Supp. 3d 1031 (N.D. Cal. 2020) ................................................................ 12

*In re Acadia Pharm. Inc. Sec. Litig.*,
  2020 WL 2838686 (S.D. Cal. June 1, 2020) ......................................................... 24

*In re Amgen Inc. Sec. Litig.*,
  544 F. Supp. 2d 1009 (C.D. Cal. Feb. 1, 2008) .............................................. passim

*In re Countrywide Fin. Corp. Derivative Litig.*,
  554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................................... 25

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ............................................................................ 17

*In re Cylink Sec. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001) ............................................................... 35

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) .................................................................. 7, 30, 34

*In re Finisar Corp. Sec. Litig.*,
  2017 WL 1549485 (N.D. Cal. May 1, 2017) ........................................................ 24

*In re Fusio-io, Inc. Sec. Litig.*,
  2015 WL 661869 (N.D. Cal. Feb. 12, 2015) ........................................................ 17

*In re FVC.COM Sec. Litig.*
  32 F. App'x 338 (9th Cir. 2002) ......................................................................... 30

*In re Gilead Scis. Sec. Litig. ("Giliead I")*,
  2005 WL 181885 (N.D. Cal. Jan. 26, 2005) ...................................................... 6, 16

*In re Gilead Scis. Sec. Litig. ("Gilead II")*
  536 F.3d 1049 (9th Cir. 2008) ....................................................................... passim

*In re Gilead Scis. Sec. Litig. ("Gilead III"),*
   2009 WL 1561584(N.D. Cal. June 3, 2009) ........................................................................ 15, 17

*In re Gilead Scis. Sec. Litig. ("Gilead IV"),*
   2009 WL 3320492 (N.D. Cal. Oct. 13, 2009) ............................................................................ 26

*In re Inerlink Elec, Inc. Sec. Litig,*
   2008 WL 4531967 ...................................................................................................................... 32

*In re MannKind Sec. Actions,*
   835 F. Supp. 2d 797 (C.D. Cal. 2011) ...................................................................................... 31

*In re NVIDIA Corp. Sec. Litig.,*
   768 F.3d 1046 (9th Cir. 2014) .................................................................................................. 23

*In re Quality Sys., Inc. Sec. Litig.,*
   865 F.3d 1130 (9th Cir. 2017) ................................................................................... 8, 22, 23, 28

*In re Silicon Graphics Inc. Sec. Litig.,*
   183 F.3d 970 (9th Cir. 1999) .................................................................................................... 32

*In re Syncor Int'l Corp. Sec. Litig.,*
   239 F. App'x 318 (9th Cir. 2007) ............................................................................................. 15

*In re Thoratec Corp. Sec. Litig.,*
   2006 WL 1305226 (N.D. Cal. May 11, 2006) ........................................................................... 14

*In re VeriFone Holdings, Inc. Sec. Litig.,*
   704 F.3d 694 (9th Cir. 2012) .................................................................................................... 23

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.,*
   259 F.R.D. 490 (W.D. Wash. 2009) .......................................................................................... 34

*In re Wireless Facilities, Inc. Sec. Litig.,*
   2007 WL 9667131, at *8 (S.D. Cal. May 7, 2007) .................................................................... 10

*Khoja v. Orexigen Therapeutics, Inc.,*
   899 F.3d 988 (9th Cir. 2018) .................................................................................................... 35

*Lomingkit v. Apollo Educ. Grp. Inc.,*
   275 F. Supp. 3d 1139 (D. Ariz. 2017) ....................................................................................... 21

*Loritz v. Exide Techs.,*
   2014 WL 4058752 (C.D. Cal. Aug. 7, 2014) ............................................................................... 9

*Metzler Inv. GMBH v. Corinthian Colleges,*
   540 F.3d 1049 (9th Cir. 2008) .................................................................................................. 34

*Mulligan v. Impax Lab'ys, Inc.,*
   36 F. Supp. 3d 942 (N.D. Cal. 2014) ........................................................................................ 24

*Murphy v. Precision Castparts Corp.*,
 2020 WL 4040827 (D. Or. July 17, 2020)................................................................................35

*Oestreicher v. Alienware Corp.*,
 544 F. Supp. 2d 964 (N.D. Cal. 2008) ....................................................................................21

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
 774 F.3d 598 (9th Cir. 2014) ..................................................................................................17

*Pardi v. Tricida, Inc.*,
 2022 WL 3018144 (N.D. Cal. July 29, 2022)..........................................................................20

*Pirani v. Netflix, Inc.*,
 2024 WL 4894291 (N.D. Cal. Nov. 26, 2024) .........................................................................17

*Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*,
 717 F. Supp. 2d 1170 (E.D. Wash. 2010)................................................................................35

*Reese v. Malone*,
 747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by*
 *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
 856 F.3d 605 (9th Cir. 2017) ...................................................................................23, 24, 29

*Rihn v. Acadia Pharm. Inc.*,
 2016 WL 5076147 (S.D. Cal. Sept. 19, 2016).........................................................................24

*S. Ferry LP No. 2 v. Killinger ("S. Ferry I")*,
 399 F. Supp. 2d 1121 (W.D. Wash. 2005) ),
 *order vacated in part*, 542 F.3d 776 (9th Cir. 2008) ("*S. Ferry II*") ......................................12

*S. Ferry LP No. 2 v. Killinger ("S. Ferry II")*,
 542 F.3d 776 (9th Cir. 2008) ..................................................................................................12

*S. Ferry LP No. 2 v. Killinger ("S. Ferry III")*,
 687 F. Supp. 2d 1248 (W.D. Wash. 2009)...............................................................................31

*Schueneman v. Arena Pharm.*,
 840 F.3d 698 (9th Cir. 2016) ..................................................................................................28

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
 485 F. Supp. 3d 1113 (N.D. Cal. 2020) ..................................................................................13

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
 551 U.S. 308 (2007)....................................................................................................22, 23, 29

*Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.*,
 2025 WL 39936 (N.D. Cal. Jan. 6, 2025).................................................................................7

*Weston v. DocuSign, Inc.*,
 669 F. Supp. 3d 849 (N.D. Cal. 2023) ....................................................................................20

*Wilkof v. Caraco Pharm. Labs, Ltd.*,
  2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ................................................................ 26, 29

*Wozniak v. Align Tech., Inc.*,
  850 F. Supp. 2d 1029 (N.D. Cal. 2012) ................................................................................ 17

*Zucco Partners v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ........................................................................................ 23, 29

Statutes

15 U.S.C. §78u-4(b)(2)(A) ................................................................................................... 22

Regulations

17 C.F.R. §230.405 .............................................................................................................. 34

21 C.F.R. § 876.5665 ........................................................................................................... 22

## STATEMENT OF THE ISSUES TO BE DECIDED

1.      Whether, at the pleading stage, Defendants Outset Medical, Inc. ("Outset" or the "Company"), Leslie Trigg ("Trigg"), Rebecca Chambers ("Chambers"), and Nabeel Ahmed ("Ahmed") established a basis to dismiss on falsity grounds in their Motion[1] where Lead Plaintiff The Pension Fund Group's ("Plaintiff") Consolidated Complaint ("Complaint")[2] adequately alleges that Defendants made materially false and misleading statements and omissions between September 15, 2020 and August 7, 2024 (the "Class Period") in violation of the Securities Exchange Act of 1934 ("Exchange Act"), including: (a) representing that the Company did not engage in off-label promotion despite doing so; (b) touting Tablo's strong revenue, growth, and demand without disclosing that they were based on off-label marketing; (c) touting Tablo's strong "value proposition" without disclosing that this was fueled by and relied on off-label marketing for continuous renal replacement therapy ("CRRT"); (d) touting TabloCart without prior 510(k) clearance as a non-medical accessary; and (e) downplaying and misrepresenting the issues raised by the July 5, 2023 warning letter from the FDA to Trigg (the "FDA Letter"), asserting that Outset was off-label marketing Tablo and their impact on Outset, and its internal reaction.

2.      Whether, at the pleading stage, Defendants have established a basis to dismiss on scienter grounds where Plaintiff adequately alleges scienter for its claims based on the totality of the allegations, including: (a) that the misconduct concerned Outset's core operations; (b) Defendant Trigg's direct involvement with the sales team and marketing to customers; (c) consistent witness accounts by three former Outset employees and six Outset customers that Outset disseminated a uniform off-label marketing message that promoted Tablo for CRRT that was directed by senior executives; (d) the FDA Letter and Defendants' knowledge of the FDA investigation leading up to the FDA Letter; (e) Defendants' false narrative regarding Tablo sales

---

[1] "Motion" or "MTD" is Defendants' Motion to Dismiss the First Amended Class Action Complaint, filed on August 14, 2025 (ECF no. 55).

[2] The Complaint is cited herein as "¶__." All capitalized terms not otherwise defined herein have the same meaning as set forth in the Complaint. Unless otherwise indicated, all emphasis is added and all alterations, internal quotation marks and citations are omitted.

declines following the FDA Letter; (f) Defendants' knowledge of the lack of FDA clearance for Tablo while touting the value proposition marketing which relied on off-label marketing and violating the Company's own policy against off-label marketing; and (g) the timing and magnitude of insider sales.

3.    Whether, at the pleading stage, Defendants have established a basis to dismiss on loss causation grounds where Defendants do not challenge loss causation as to the July 7, 2023, August 2, 2023 and October 12, 2023 partial corrective disclosures and the November 7-8, 2023, May 9, 2024 and August 7, 2024 corrective disclosures further reveal the extent of the off-label issues, that Outset was forced to dramatically change its marketing to eradicate the off-label marketing, and the full impact of such changes, which led to additional declines to Outset's stock price, causing losses to Plaintiff and the Class.

4.    Whether, at the pleading stage, Defendants have established a basis to dismiss the Section 20(a) claims where Plaintiff adequately alleges control and have adequately pled primary violations of Section 10(b) of the Exchange Act.

**PRELIMINARY STATEMENT**

This case is about Outset, a medical device company, and its highest executives who, leading up to and fueling the Company's initial public offering ("IPO") and thereafter, devised a scheme to drive demand and sales for its primary product, Tablo, a hemodialysis device, by illegally marketing it off-label for CRRT. CRRT is a form of hemodialysis that is the only treatment option for certain patients. The FDA requires devices marketed for CRRT to be cleared for use for CRRT. Tablo has never received FDA clearance for CRRT.

As alleged, based on the consistent accounts of former Outset employees and customers, Outset was engaged in widespread management-directed off-label marketing of Tablo for CRRT during the Class Period. Yet, Defendants, *inter alia*, falsely touted that Outset did not engage in off-label promotion, and touted revenue, growth, and demand for Tablo without disclosing that this was driven by off-label marketing. Then, as the FDA began to uncover the off-label marketing, Defendants downplayed the issues as isolated website materials, when, in fact, the off-label marketing was widespread and Outset was forced to purge ***all*** of its marketing materials and instruct all of its staff to stop marketing Tablo for CRRT. The truth was ultimately revealed through a series of partial disclosures, including when, at the end of the Class Period, Outset announced that it significantly missed expectations, lowered revenue guidance, and finally revealed that it had to completely transform and restructure and retrain its sales organization, causing significant losses to investors.

In the face of this, and despite submitting ***over 525 pages*** in support of the Motion, Defendants advance baseless arguments and ignore and misstate the well-pled allegations. For example, Defendants completely obfuscate the issue by pointing to Defendants' public disclosures that Tablo was not cleared for CRRT. *See, e.g.*, MTD at 6. Plaintiff does not allege that Defendants misled the market that Tablo was cleared for CRRT. Rather, Defendants misled investors ***by failing to disclose Outset's management-directed off-label marketing and that this marketing drove Outset's success***. Similarly, Defendants' contention that Outset "was marketing Tablo [] to administer a range of dialysis treatments for up to 24 hours based on its FDA-cleared functions," MTD at 3, is baseless and contrary to the allegations, including witness

accounts and the FDA Letter detailing Outset's *off-label marketing of Tablo for CRRT, which is expressly outside Tablo's cleared indications.*

For all Defendants' bluster, the Motion is fatally flawed and should be denied.

## FACTUAL OVERVIEW

### I.   Outset's Primary Product Tablo Is Not Cleared for CRRT, And TabloCart Requires FDA Clearance

Tablo, Outset's primary product though which it "derive[d] substantially all of [its] revenue" during the Class Period, has never received clearance for CRRT (or to run for more than up to 24 hours).  ¶¶43, 296.  CRRT is a form of dialysis that is performed exclusively in acute care settings and utilizes lower dialysate and blood flow rates and can run continuously for 24 hours a day or more, differentiating it from other dialysis treatments. ¶34. CRRT is the only treatment option for certain patients who are hemodynamically unstable or who do not respond to other treatments, and it is traditionally complex and expensive to perform. ¶¶36, 37.  Systems not specifically cleared or approved by the FDA for CRRT raise serious safety concerns when used for CRRT treatment because failure of the systems may result in fluid and electrolyte imbalances, inadequate ultrafiltration, infection, and patient harm/death. ¶¶35, 60. As such, the FDA requires devices marketed for CRRT to be cleared for use for CRRT.

TabloCart is a medical device that attaches to Tablo to purify water used in hemodialysis in certain limited areas that suffer from water quality issues. *Id.* Because it is a medical device, FDA clearance is required before it can be legally marketed and sold. ¶¶47-48. Outset did not receive such clearance for TabloCart until May 2024.  ¶204.

### II.   Outset's Management Directs Off-Label Marketing

Leading up to and fueling the Company's IPO on September 15, 2020, the first day of the Class Period, Defendants devised a scheme to drive demand and sales for Tablo by illegally marketing it for CRRT. ¶50. Fundamental to Outset's off-label marketing pitch was that Tablo was the only device that can be used for all dialysis treatments, including CRRT, and that because Tablo was significantly less expensive and complex to operate than machines cleared for CRRT, health systems would purportedly achieve significant cost savings. ¶¶50, 63-65.

Nine witnesses, including former Outset employees and customers, consistently describe

Outset's off-label marketing during the Class Period. ¶¶61-89. For example, former employees relay that Outset's Chief Medical Officer ("CMO") Micheal Aragon and Senior Vice President, Global Sales ("SVPGS") Jamie Lewis expressly directed the sales staff to market Tablo for CRRT at sales calls and meetings and that these instructions were given at sales training sessions across the country. ¶¶ 62-63, 70, 76. As a result, Outset "aggressive[ly]" marketed, and health systems purchased, Tablo for CRRT. ¶¶67, 76. These accounts are corroborated by several Outset customers who describe that Outset employees marketed Tablo to them for CRRT and that they bought Tablo units expressly for CRRT, including replacing all of their dialysis machines that performed different treatments with Tablo units. ¶¶78-89. For example, a large hospital executive described being told by Outset that Tablo could be used for CRRT; that marketing materials provided by Outset referenced using Tablo for CRRT; that they understood that Tablo was FDA approved for CRRT based on the information provided to them by Outset; that they had discussions with both Defendant Trigg and CMO Aragon about Tablo during which neither noted Tablo's lack of clearance for CRRT; and that the hospital system subsequently purchased several Tablo units to use exclusively for CRRT, replacing its CRRT machines. ¶78. Indeed, Defendant Trigg was directly involved in marketing Tablo. ¶¶78, 290-93.

Further, the FDA found evidence of off-label promotion of Tablo for CRRT and TabloCart without clearance during an on-site inspection of Outset's facility from January 17 through February 10, 2023, and, later, on its website. ¶¶53, 55-60. Then, on March 13, 2023, Outset, including Trigg, met with the FDA and discussed Tablo's lack of CRRT clearance. ¶59.

The undisclosed off-label marketing proved successful. Tablo's sales for the acute care setting, where CRRT is performed, *grew substantially after the off-label marketing began*. *See, e.g.,* ¶115 ("[r]ecorded net revenue of $17.2 million in the fourth quarter and $49.9 million for the full year of 2020, representing 143% and 231% increases respectively, over the corresponding periods of 2019").

**III.    Defendants Misled The Market By Failing To Disclose The Off-Label Marketing And That It Drove Outset's Success**

Defendants, *inter alia*, repeatedly falsely touted to investors that Outset did not engage

in off-label promotion; touted revenue, growth, and demand for Tablo without disclosing that this was driven by illegal off-label marketing; and touted Outset's value proposition marketing pitch without disclosing that a key element of that pitch was the off-label promotion for CRRT.

**IV.    Defendants Continue to Mislead Investors As The Truth Begins to Emerge**

On July 7, 2023, five months after the FDA's site inspection at which it uncovered evidence of Outset's off-label marketing and four months after Outset and the FDA met and discussed Tablo's lack of clearance for CRRT, Outset disclosed that it received the FDA Letter, which stated that the FDA found marketing materials on Outset's website that marketed Tablo off-label for CRRT and that TabloCart was a medical device requiring FDA approval. ¶¶205. On this news, Outset's stock price fell $1.20, or 5.9%, to close at $19.26 per share. ¶209.

Although not disclosed by Outset, the FDA Letter stated that the findings were based on *both evidence reviewed at the site inspection* in early 2023 in addition to marketing materials on Outset's website. ¶57. As just an example of such off-label marketing, the FDA Letter quoted certain materials from Outset's website. ¶58. The FDA Letter also highlighted the serious health and safety risks that Outset's off-label marketing raised. ¶60.

Forced to disclose receipt of the FDA Letter, Defendants downplayed the findings by misrepresenting to investors that the marketing issues were limited to a few materials on the Outset website and that they would have no real impact. ¶¶205-08. Defendants also announced the halt of TabloCart distribution as they sought FDA clearance. ¶210. Defendants used the excuse of the distribution pause to repeatedly lower revenue expectations and guidance—attributing declining sales to the TabloCart halt, stating that customers were deferring purchasing Tablo until TabloCart received FDA clearance—but assured investors that Tablo sales would rebound once clearance was obtained. ¶¶210, 216-17, 228, 232-39, 242-49.

However, internally, after Outset received the FDA Letter, Outset began to drastically change its marketing practices to eradicate the key off-label marketing.  Outset sent out a companywide email and held an all-hands meeting instructing its sales staff to *stop referring to CRRT while marketing Tablo and to purge all prior marketing materials*, *both hard copy and electronic, that existed prior to the FDA Letter*.  ¶71. Moreover, Outset added the following

disclosure to its marketing materials: "The Tablo Hemodialysis System is not indicated for continuous renal replacement therapy (CRRT) and is cleared for use for up to 24 hours." ¶96.

On May 6, 2024, Outset received clearance for, and resumed distribution of, TabloCart. ¶250. ***Just three days later***, Outset revealed that the Company could still face negative impacts from the FDA Letter despite resuming distribution of TabloCart and despite Defendants' prior representations that they had fully addressed the FDA's concerns and that sales would recover once TabloCart was approved and shipments resumed. ¶256. On this news, Outset's stock price fell $0.86, or ***20.82***%, to close at $3.27. ¶257.

Finally, at the end of the Class Period on August 7, 2024, Outset announced 2Q 2024 financial results, a quarter during which TabloCart distribution had resumed. Defendants reported that Outset significantly missed consensus estimates and slashed full year 2024 outlook stating they needed to restructure Outset's sales organization and train them on the new sales approach, the "depth and breadth" of which would take several quarters to implement and it would not deliver on its previously promised ramp up of Tablo sales. ¶¶267-68. Indeed, it was not the TabloCart pause that impacted sales, but Outset's need to entirely restructure its sales and marketing to eradicate the off-label marketing of Tablo for CRRT. On this news, the Company's share price fell $2.33, or ***68.5%,*** to close at $1.07 per share on August 8, 2024, on heavy volume. ¶271. As a result of the multiple corrective disclosures, Plaintiff and the Class suffered substantial losses. Outset's stock price nor its revenue have recovered. ¶275.

While the Class lost hundreds of millions of dollars, insiders reaped ***almost $50 million***, with Trigg alone reaping ***$30 million*** in stock sales. Had Trigg retained the shares she sold during the Class Period, they would have been worth less than $1 million the day after the Class Period.

## ARGUMENT

### I.    Plaintiff Adequately Alleges Off-Label Marketing

The Complaint adequately alleges widespread management-led off-label marketing.[3]

---

[3] Defendants conflate adequacy of the off-label marketing allegations with scienter and misstate the scienter standard, MTD at 12, which, as discussed at Section III, *infra*, is adequately pled.

Similar to *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc. ("Corcept II")*, the allegations here from former sales personnel that they were instructed to and did market Tablo off-label for CRRT are bolstered by customer witnesses who confirmed that such off-label marketing did occur and are "sufficient at the motion to dismiss stage to allege that Defendants engaged in an off-label marketing scheme."[4] 2021 WL 3748325, at *12 (N.D. Cal. Aug. 24, 2021). The Complaint also points to corroborating evidence in the FDA Letter, similar to what the court relied on in *In Gilead Scis. Sec. Litig. ("Gilead I")*, in addition to the accounts of only two former sales representatives. 2005 WL 181885, at *9 (N.D. Cal. Jan. 26, 2005); *see also In re Amgen*, 544 F. Supp. 2d 1009, 1033 (C.D. Cal. Feb. 1, 2008 (allegations attributed to confidential witnesses that sales representatives were instructed to market off-label established an off-label marketing scheme). Indeed, contrary to Defendants' characterizations, MTD at 14, Plaintiff's allegations go further than what the courts in *Corcept II, Gilead I,* and *Amgen* found adequate. Here:

- as in *Corcept II* and *Amgen,* former Outset employees relay instructions from senior management to market Tablo off-label for use for CRRT (¶¶63-64, 70);

- as in *Corcept II* and *Amgen*, former Outset employees confirm the marketing of Tablo for CRRT consistent with management's instructions (¶¶67, 76);

- as in *Corcept II,* customer witnesses confirm the off-label marketing, relaying that Outset employees stated that Tablo could be used for CRRT, trained customers for that use and provided them with marketing materials for Tablo for CRRT and that, thereafter, the customers purchased Tablo for CRRT (¶¶78, 80, 84, 86, 88-89);

- as in *Gilead I*, the FDA Letter corroborates off-label marketing, citing to evidence found at Outset's San Jose facility and on its website (¶¶53, 56-57);

---

[4] Defendants' reliance on the prior *Corcept* ruling is misplaced. MTD at 13. There, unlike here, plaintiffs relied only on customer witnesses that provided "no insight into the instructions that Corcept sales representatives were given or Corcept's internal policy with respect to marketing Korlym off-label." *Ferraro Family Found, Inc. v. Corcept Therapeutics, Inc. ("Corcept I")*, 501 F. Supp. 3d 735, 756 (N.D. Cal. 2020). The amended complaint added allegations from former employees, providing, as here, a connection between management instructions and actual off-label marketing. *Corcept II,* 2021 WL 3748325, at *24.

- Outset management instructed sales staff to stop referring to CRRT and to purge all marketing materials after the release of the FDA Letter (¶¶71, 77); and

- once Outset was forced to do away with the off-label marketing practices (¶¶71, 77), as later admitted by Defendants (¶¶268-270, 272), Tablo sales declined and have not recovered (¶¶211, 225, 267-268, 275).

This is more than enough to allege the existence of an off-label marketing scheme.

**A. Witness Accounts Demonstrate Management-Led Off-Label Marketing**

Plaintiff justifiably relies on witnesses to support its off-label marketing allegations and need not identify its sources as they are "described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged and the complaint contains adequate corroborating details." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005); *see also Amgen,* 544 F. Supp. 2d at 1033 (witness' job titles, regions worked, and detail of information they obtained overcame any concerns about anonymity of sources). In making this determination, courts consider "the level of detail provided by the confidential witnesses, the plausibility of the allegations, the number of sources, the reliability of the sources, corroborating facts, and similar indicia of reliability." *Glazer Cap. Mgmt., L.P. v. Forescout Tech., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023).

As an initial matter, Defendants are wrong that Witnesses 1, 7, 8 and 9 should not be credited. MTD at 12-13. Witness 1's account is based on Lead Counsel's investigator's interview of Witness 1 as well as the AlphaSense interview, as evidenced by the Complaint's inclusion of details not found in Witness 1's published interview. *See, e.g.,* ¶¶63-64, 67. The remainder of Witness 1's account and Witness 8's account are based on interviews by AlphaSense. Witness 7's account is based on a TD Cowen interview, and Witness 9's account is based on their submission to the FDA. As discussed below, each of the witness accounts "are specific not only about the former employees' roles and job titles" but also about the subject matter and are "corroborated by and consistent with other sources." *Uniformed Sanitationmen's Ass'n Comp. Accrual Fund v. Equinix, Inc.,* 2025 WL 39936, at *4 (N.D. Cal. Jan. 6, 2025) (relying on

allegations based on a short-seller report quoting anonymous sources).[5]

### 1. Employee Witnesses

Former Outset employees provide adequate detail of the management-directed off-label marketing that led to purchases for off-label use. Plaintiff provides Witnesses 1, 2 and 3's job title, job description, terms of employment, and locations. *Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 749 (D. Ariz. 2022) (job titles such as "Purchasing Agent and Subcontracts Manager" and "Senior Financial Analyst" were sufficiently particular); *see also In re Quality Sys., Inc. Sec. Litig.,* 865 F.3d 1130, 1145 (9th Cir. 2017) (describing witnesses with sufficient particularity where "complaint includes each confidential witness's job description and responsibilities[.]" ). The witnesses also have firsthand knowledge of the facts they allege.

Witness 1 was a Northeast Area Sales Manager from before the Class Period until Spring 2021 responsible for marketing and business development in the New York Metro, Northern New Jersey, and Upstate New York areas. ¶62. Defendants' brief, MTD at 13, ignores that Witness 1 personally attended sales trainings led by Outset's senior leadership, including its CMO and SVPGS, who always instructed sales staff to market Tablo for CRRT. ¶63. Witness 1 also outlined Tablo's "value proposition" marketing strategy, which "marketed Tablo as being the only equipment on the market that can be used in all dialysis markets and for all dialysis procedures, ***including CRRT***."  ¶64. Contrary to Defendants' argument, MTD at 13, 15, Witness 1 marketed and sold Tablo for CRRT to several large hospitals, ¶67, and Witness 1's tenure with the Company prior to and during the beginning of the Class Period through the Spring of 2021 confirms that off-label marketing was fueling the IPO that starts the Class Period and continued thereafter.

Witness 2 was a Key Account Representative from the beginning of 2022 through the end of the Class Period whose territory was in the South covering Texas, Florida, Alabama,

---

[5] Defendants' reliance on *Applestein* is unavailing as, there, plaintiffs did not provide job titles or descriptions for the witnesses and relied on "vague hearsay." *Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1038 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014).

Louisiana, Missouri, and Arkansas. ¶69. Witness 2 corroborates the account of Witness 1, who is in the Northeast, regarding sales training to market Tablo for CRRT and describes attending two training sessions in two additional regions of the country, California and Ohio, where staff were instructed to market Tablo for CRRT. ¶70. Witness 2 also discussed the internal response after Outset received the FDA Letter. ¶71. On an all-hands call led by the Senior Director of Marketing and the Senior Director of Product Management, and in a companywide email, Outset leadership instructed employees to stop using the term CRRT in marketing Tablo and to purge all prior marketing material, hard copy and electronic, that existed prior to the FDA Letter. *Id*.

Witness 3 worked as a clinical trainer, a role that included sales as well as training customers, from before the Class Period until early 2023, and then worked in sales as a territory manager in the Dallas-Ft. Worth metroplex, New Mexico, and Arizona areas through the end of the Class Period. ¶75. Witness 3 confirmed the marketing described by Witnesses 1 and 2, stating that sales personnel marketed Tablo and the XT upgrade for CRRT, and Outset was "aggressive" in such marketing. ¶76. In fact, Witness 3 was not aware that selling Tablo for CRRT was illegal until after the FDA Letter. *Id*. Witness 3 confirmed a meeting after the FDA Letter where attendees were told not to use the term CRRT.[6] ¶77.

These witnesses are pled with "sufficient particularity to establish their reliability and personal knowledge" by specifically describing their roles and tenure and corroborating each other's statements. *Loritz v. Exide Techs.*, 2014 WL 4058752, at *10 (C.D. Cal. Aug. 7, 2014).

### 2. Customer Witnesses

The Customer Witnesses corroborate the off-label marketing through their consistent accounts that Outset employees marketed Tablo for CRRT (¶¶78, 84, 88-89), trained hospital personnel on the use of Tablo for CRRT (¶80), and that the customers purchased Tablo to use for CRRT (¶¶78, 79, 84, 86). Defendants' argument that the Customer Witnesses "have no basis

---

[6] While Witness 3 did not relay being personally told to market Tablo for CRRT, MTD 13, Witness 3 corroborates Witness 1 and 2's statements that off-label marketing occurred and relays being personally told not to market for CRRT after the FDA Letter.

to know about the internal workings of Outset" is unavailing. MTD at 13. Customer accounts can substantiate allegations of the off-label marketing scheme as the scheme was directed at them. As in *Corcept II,* customers who "report[ed] that Corcept clinical specialists marketed Korlym off-label during the Class Period" bolstered allegations of an off-label marketing scheme. 2021 WL 3748325, at *16. Each of the Customer Witnesses are described with sufficient particularity to assure the Court of their reliability and describe their first had accounts with Tablo being marketed and used for CRRT. *Bajjuri,* 641 F. Supp. 3d at 749.  Defendants' attempts to misstate and ignore their accounts fail.

Witness 4 has been an executive of a large health care system in New York since before the Class Period. ¶78. Defendants misstate their account by stating Witness 4 "believed" there was language about CRRT in Outset materials "before" the Class Period. MTD at 15. Witness 4 affirmatively stated that Outset employees told them that Tablo could be used for CRRT with the XT upgrade (which was during the Class Period as XT did not launch until Q3 2020 when the Class Period begins) and that Outset marketing materials also stated Tablo could be used for CRRT. ¶78.[7] Witness 4 "believed" that a purchase proposal also contained language about upgrading Tablo for CRRT. *Id.* Witness 4 also relayed discussions with Trigg and CMO Aragon (who as Witness 1 relayed, instructed staff to market for CRRT), during which FDA clearance for CRRT was not disclaimed. *Id.* Thereafter, Witness 4's system purchased Tablo units for CRRT and disposed of their CRRT machines. *Id*. Witness 4 also stated they "believed 100%," based on information received from Outset, that Tablo was approved for CRRT. *Id.*

Witness 5 was a Nurse Manager in the CCU/ICU for a hospital in New York from prior to the Class Period until early 2024. ¶79. Witness 5 provided specific details about being trained by Outset employees to use Tablo for CRRT and that their hospital replaced all of its CRRT machines with Tablo and did so to reduce costs. ¶¶79, 80. Like Witness 4, Witness 5 was not

---

[7] Even if this had occurred just prior to the start of the Class Period, this would still provide a "consistent theme" of alleged problems.  *In re Wireless Facilities, Inc. Sec. Litig.*, 2007 WL 9667131, at *8 (S.D. Cal. May 7, 2007).

aware Tablo did not have FDA clearance for CRRT. ¶81.

Witness 6 was a licensed practical nurse and then Director of Nursing with a nationwide healthcare system located in Massachusetts from prior to the Class Period though early 2024. ¶83. Witness 6 stated that in 2021, when Witness 6's facility received four Tablo units, Outset employees stated Tablo was capable of CRRT. ¶84. Witness 7 has been employed since 2013 by a health system with 20 hospitals in Illinois, Indiana, and Kentucky. ¶85; Dkt. 57-25. Witness 7 stated that the system purchased 7 Tablo units dedicated to CRRT only after Outset employees presented to the hospital's board of decision-makers, and that it did so as a cost saving measure. ¶86. She also relayed that as of the Spring of 2023, her hospital system was considering expanding its use of Tablo for CRRT. ¶87. Witness 8 has worked as a nephrologist in the Boston area since 2017, serving as Chief of Nephrology at South Shore Health since 2022, and relayed using Tablo at hospitals where Witness 8 works. ¶88. Based on that experience, Witness 8 understood that Outset marketed Tablo for CRRT. *Id*.

Witness 9 is a physician who submitted a complaint to the FDA concerning Tablo. ¶89. Similar to other Customer Witnesses, Witness 9 stated that Outset "initially sold [T]ablo hemodialysis devices to our institution with the statement that they could be used for…crrt (continuous renal replacement therapy)," and the institution stopped using traditional CRRT machines to use Tablo with XT for CRRT instead "under this pretense and based on [Outset's] statements." *Id*. This occurred during the Class Period but prior to the FDA Letter as Witness 9 further relayed that they raised concerns with Outset after the FDA Letter was disclosed. *Id.*

Contrary to Defendants' assertion, the witness statements evidence a systematic effort to promote Tablo for CRRT. MTD at 14. These accounts establish that senior management, including Outset's CMO and SVPGS, instructed sales staff to market and sell Tablo off-label, that Outset marketed Tablo off-label consistent with these directives, and that this resulted in purchases for off-label use. While Plaintiff need not present witnesses that cover every corner of the country, their accounts do in fact cover regions across the country from the West Coast to the Midwest to the East Coast and the South. *See, e.g. Amgen,* 544 F. Supp. 2d at 1033 (three former sales representatives' accounts was enough to establish existence of off-label marketing

strategy). "[C]onsistent and interlocking nature of the evidence provided by each witness bolsters the evidence's reliability and credibility." *S. Ferry LP No. 2 v. Killinger* ("*S. Ferry I*"), 399 F. Supp. 2d 1121, 1140 (W.D. Wash. 2005), *order vacated in part*, 542 F.3d 776 (9th Cir. 2008) ("*S. Ferry II*").[8]

### B. The FDA Letter Confirms the Witness Accounts of Off-Label Marketing

The FDA Letter further confirms these accounts. The FDA found Outset was off-label marketing Tablo for CRRT not only due to "customer testimonials that the FDA found on Outset's website," MTD at 14, but also due to "evidence reviewed at the inspection." ¶57. The FDA Letter also cited to a meeting between the FDA and Defendant Trigg in March 2023 shortly after the FDA found evidence of Outset's off-label marketing for CRRT at which Trigg "confirmed that CRRT is distinct from the cleared indications for use." ¶53.

### C. Outset's Sales Declined After it Abandoned its Off-Label Marketing

After the FDA Letter, Outset management directed its staff to stop off-label marketing for CRRT.  ¶¶71, 77. Despite having significant growth as of and after the IPO, immediately upon receiving the FDA Letter and eliminating off-label marketing, revenue declined. ¶¶225, 253, 267-268, 275. Defendants, however, assured the public that sales and revenue would rebound following TabloCart clearance. ¶¶217, 228, 236, 242, 244, 247-250, 254. Yet once Outset resumed TabloCart sales, revenue continued to decline, ¶267, and Defendants were forced to disclose the need for a full-scale sales restructuring. ¶¶267-268. Outset's revenue has not recovered, ¶275, further evidencing its prior off-label marketing.

---

[8] Defendants' cases are inapposite. MTD at 13. For example, in *Inchen Huang v. Higgins*, plaintiff failed to allege an off-label scheme because, unlike here, there were no allegations that employees engaged in off-label marketing. 443 F. Supp. 3d 1031, 1046 (N.D. Cal. 2020).

## II.    Plaintiff Pleads Actionable Misrepresentations[9]

Plaintiff sufficiently pleads material misrepresentations, including: (a) that Outset did not off-label promote despite doing so; (b) touting Outset's strong revenue, growth, and demand without disclosing reliance on off-label marketing; (c) touting Tablo's strong "value proposition" marketing without disclosing that a key element was off-label marketing; (d) touting TabloCart without FDA clearance as a non-medical accessary; and (e) downplaying and misrepresenting the issues raised by the FDA Letter, their impact on Outset, and its internal reaction.[10]

### A. Statements That Outset Did Not Engage in Off-Label Promotion Were Materially False and Misleading When Made

Defendants' statements that Outset refrained from off-label marketing were materially false and misleading when made because Outset was engaged in widespread off-label marketing, as detailed above. ¶¶102, 143, 196. In each annual report throughout the Class Period, Outset repeated: "our policy is to refrain from statements that could be considered off-label promotion of Tablo." ¶102. Defendants further stated that "all claims with respect to Outsets products must be consistent with approved labeling…" ¶143. As in *Amgen*, where statements that Amgen markets "in a manner 'consistent with the FDA label'" were actionable, these statements were false and misleading due to the undisclosed, off-label promotion scheme.[11] 544 F. Supp. 2d at 1032-4.

Contrary to Defendants' attempt to confuse the issue, MTD at 16, Plaintiff does not allege

---

[9] Defendants repeatedly conflate scienter with falsity and misstate the scienter standard as actual knowledge. MTD at 14, 15, 16, 18, 19. In any event, Plaintiff has alleged scienter. *See* Section III, *infra*.

[10] The Court need only find one actionable statement to find falsity adequately alleged pled. *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1131 (N.D. Cal. 2020).

[11] Defendants claim that Plaintiff does not allege facts to show they believed or knew their conduct was off-label marketing at the time the statements were made likewise fails. MTD at 18-19. Such allegations are not required to allege falsity. Regardless, scienter is likewise adequately alleged. *See* Section III, *infra*.

Defendants misled investors that Tablo was cleared for CRRT. Instead, Outset was illegally marketing Tablo off-label for CRRT despite assurances to investors otherwise.  Indeed, this marketing was concealed.  Defendants argue that "customers were being marketed and sold Tablo to use in the acute setting, for treatments that required lower flow rates and that could run up to 24 hours." MTD at 17; *see also* 3, 16. ***But that is not the marketing Plaintiff alleges***. As alleged, ***Outset was expressly and widely marketing Tablo off-label for CRRT, which is outside its FDA label***. ¶¶63-64, 67, 70, 73, 76, 78-79, 84, 86, 88. When Outset was training its staff, marketing to customers, and distributing its marketing materials, it was specifically and expressly directing the marketing of, and was marketing, Tablo for CRRT. ¶¶63-64, 67, 70, 73, 76. As such, their truth on the market defense, which, in any event, is an affirmative defense inappropriate on a motion to dismiss, likewise fails. *Amgen*, 544 F. Supp. 2d at 1025 (truth on the market defense "is intensely fact-specific, so courts rarely dismiss...on this basis," "defendants bear a heavy burden of proof."); *In re Thoratec Corp. Sec. Litig.*, 2006 WL 1305226, at \*10 (N.D. Cal. May 11, 2006) (defendants must show "the information that was withheld or misrepresented was transmitted to the public with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by insider's one-side representation.").[12]

Defendants repeated statements that Outset refrained from off-label marketing were false and misleading when made.[13]

### B. Statements Concerning Outset's Strong Revenue, Growth, and Demand Were Materially False and Misleading When Made

Defendants' statements concerning Outset's revenue,  growth and demand for Tablo, such as that Outset's revenue and growth were due to "expansion within the acute care setting" (¶132), or touting dramatic increases in revenue (¶¶130, 138, 144), were materially false and

[12] Defendants' identical arguments regarding the value proposition and revenue, growth and demand statements likewise fail. MTD at 17-18.

[13] Defendants do not challenge materiality as to these misrepresentations. In any event, they are material, as discussed in Section II(B), *infra.*

misleading when made because they failed to disclose that the revenue and growth relied on the undisclosed off-label marketing. ¶¶106-107, 115-117, 119, 124-126, 130-133, 138-141, 144-147, 155-157, 161, 163-166, 172-173, 185-187, 191-192, 211-212, 243.

Courts routinely find such statements actionable. *Amgen*, 544 F. Supp. 2d at 1034 ("Defendants misled investors by implicitly and falsely warranting that there were no illegal practices contributing to the success;" "misrepresentations concerning these market practices deceived investors as to the quality and nature of Amgen's earnings and revenues."); *City of Roseville Employees' Retirement Sys. v. Horizon Lines, Inc.,* 713 F. Supp. 2d 378, 389 (D. Del. 2010) (statements that "attribute Horizon's rate increases and revenue growth to purely legitimate business practices" "and "fail to mention that revenue growth and rate increases were driven, in part, by the price-fixing conspiracy" were false). Indeed, the Ninth Circuit has consistently held that statements attributing revenues "solely to legitimate practices" when "illegal [business practices] were in fact a significant reason for" a company's success are false and misleading. *In re Syncor Int'l Corp. Sec. Litig.,* 239 F. App'x 318, 320 (9th Cir. 2007) (illegal payments were significant reason for company's overseas revenues); *see also In re Gilead Scis. Sec. Litig. ("Gilead III")*, 2009 WL 1561584, at *13 (N.D. Cal. June 3, 2009) (finding falsity and rejecting defendants' argument that press releases were factually accurate and revenue met forecasts and that that they had no duty to disclose the alleged off-label marketing, because "a statement that is literally true can be misleading and thus actionable under the securities laws.'"); *In re Gilead Scis. Sec. Litig. ("Gilead II")* 536 F.3d 1049, 1052 (9th Cir. 2008).

Moreover, as Outset derived substantially all of its revenue from Tablo sales, its marketing and legal compliance regarding the product and the source of such revenue are of significant importance to investors. While determinations regarding materiality are generally improper at the pleading stage unless the statements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance," the allegations demonstrate materiality. *See Gilead III,* 2009 WL 1561584 at *3 (finding materiality of the undisclosed off-label marketing); *see also Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *8 (N.D. Cal. Feb. 23, 2023). Contrary to Defendants' assertions, MTD at 18,

Plaintiff's allegations demonstrate a connection between the undisclosed off-label marketing of Outset's primary product and revenue driver and the increased revenue. Company sales personnel confirmed that they marketed *and sold* Tablo for CRRT as directed by management. ¶¶63, 70. Outset customers verified that these practices occurred, and that they then purchased Tablo to use for CRRT. ¶¶78, 84, 86-88. Moreover, the fact that Outset's sales for the acute care setting, where CRRT is performed, *grew substantially after the off-label marketing began* reflects this strategy's success *See, e.g.,* ¶115 ("[r]ecorded net revenue of $17.2 million in the fourth quarter and $49.9 million for the full year of 2020, representing 143% and 231% increases respectively, over the corresponding periods of 2019"); ¶125 ("194% year-over-year growth" in Tablo revenue from Q1 2020 to Q1 2021 "driven by higher placement to our acute customers"); ¶133 (115% year-over-year" revenue growth from Q2 2020 to Q2 2021 "driven primarily by increased console shipments to acute customers"). Likewise, 81% and 77% of Tablo installs in 2020 and 2021, respectively, occurred in acute facilities. ¶297. By 2022, Trigg confirmed relationships with "7 of the 8 largest national health systems" were driven by acute adoption. ¶¶144–45.[14] This is also not fraud by hindsight as Plaintiff relies on these contemporaneous allegations, which are corroborated by Outset's revenue decline after changing its marketing to eradicate the off-label marketing. MTD at 18, *citing Immanuel Lake v. Zoogenic, Inc.,* 2020 WL 3820424, at *8 (N.D. Cal. Jan. 27, 2020) (inapposite as plaintiff alleged no "concrete information in Zogenix's possession that contradicted public statements").[15]

Defendants are also wrong that some of these statements are puffery, opinion, or forward-looking, and they fundamentally obscure the statements by focusing on a few phrases without context. MTD at 23-24, 25. Here, unlike any of the cases Defendants rely on, these are statements

---

[14] *Gilead I*, relied on by Defendants, MTD at 17-18, is inapposite as, there, the court did not find materiality because plaintiffs had not alleged *any* sales were the result of off-label marketing. 2005 WL 181885, at *9

[15] Defendants' identical materiality and fraud by hindsight arguments regarding the value proposition statements likewise fails. MTD at 17-18.

of purported current objective fact touting the reasons for Outset's then present revenue and growth and demand for Tablo. *Berson v. Applied Signal Tech, Inc.*, 527 F.3d 982, 990 (9th Cir. 2008) (descriptions of "past or present" are not forward-looking). For example, Defendants cherry pick the phrase, "we are confident in our positioning for consistent strong performance in 2021 and beyond," MTD at 23, but, the complete statement and context is:

> On May 5, 2021, the Company issued a press release announcing first quarter results and stating, "[r]ecorded net revenue of $22.9 million in the first quarter of 2021, a 219% increase compared to $7.2 million in the first quarter of 2020." Outset again touted its strong revenue performance and growth without disclosing its off-label promotion of Tablo. Defendant Trigg stated, "[o]ur first quarter was marked by strong revenue performance, continued operational execution, and substantial progress across our strategic initiatives, … With strong interest in Tablo, a robust backlog and clear visibility on the timing of console placements, we are confident in our positioning for consistent strong performance in 2021 and beyond.

¶124. Plaintiff alleges this was materially false and misleading when made ***not***, as Defendants suggest, because they were not "confident in our positioning for consistent strong performance in 2021 and beyond." Rather, in stating the reasons for the revenue and growth ("continued operational execution," "substantial progress on strategic initiatives," "strong interest in Tablo," and "a robust backlog"), Defendants failed to disclose the then present off-label marketing driving revenue and growth.  Such statements are routinely found to be actionable. *See, e.g. Amgen*, F. Supp 2d at 1034; *Gilead III,* 2009 WL 1561584 at *3.

Defendants' cases do not hold otherwise. *Pirani v. Netflix, Inc.*, 2024 WL 4894291, at *6 (N.D. Cal. Nov. 26, 2024) ("statements of fact concerning present or historical metrics or business conditions" such as "the underlying business metrics are really healthy" not forward-looking); *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1037 (N.D. Cal. 2012) (statements such as "we are very pleased" are puffery); *In re Fusio-io, Inc. Sec. Litig.*, 2015 WL 661869, at *15 (N.D. Cal. Feb. 12, 2015) (same); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (statements did not include current objective fact and "merely express[ed] confidence in [defendant's] business and outlook"); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) ("we believe our employee relations are good" did not implicate statements of current fact); *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) ("statements of objective verification not puffery").

### C. Statements Downplaying Issues Raised by the FDA Were Materially False and Misleading When Made

Defendants misled investors by misrepresenting the scope and impact of the issues raised in the FDA Letter, the breadth of the off-label marketing, and the Company's internal reaction to the FDA Letter. ¶¶205-207, 210,[16] 213-217, 219, 222, 228, 234, 236, 238-239, 242, 244, 246-250, 254. Defendants' statements "gave reasonable investors an impression of a state of affairs that differed in a material way from the one that existed." *Courter v. CytoDyn, Inc.*, 2025 WL 1771244, at *6 (W.D. Wash. June 25, 2025).

Defendants repeatedly minimized the off-label marketing and the full scope of Outset's reaction to the FDA Letter as the remediation went further than simply removing certain material from its website and filing a 510(k) application. ¶¶214, 222, 234. Since the undisclosed off-label marketing strategy was widespread and pervasive as detailed above, after receipt of the FDA Letter, Outset held an all-hands meeting and sent out a companywide email, which instructed employees to cease marketing Tablo for CRRT, to stop referring to CRRT, and to purge all previous marketing materials. S*ee* ¶¶71, 76. This material information was not disclosed, and Defendants did not reveal the extent of Outset's widespread off-label marketing, contrary to Defendants' assertions. MTD at 20. Defendants also lowered revenue expectations and guidance blaming the TabloCart shipping pause pending clearance, rather than these undisclosed directives to employees to abandon the off-label marketing, and falsely assured investors that revenue would rebound once TabloCart received clearance and resumed shipping. TabloCart's subsequent clearance failed to jumpstart Outset's business despite those assurances and, instead, Defendants immediately lowered guidance again. ¶¶247, 267. In truth, it was the undisclosed complete restructuring of its sales organization to eradicate off-label marketing that caused the lowered sales and guidance, not the temporary shipment pause on TabloCart, as Defendants

---

[16] The Complaint inadvertently omits ¶210 in the discussion of false statements due to a typographical error. Consistent with the allegations, the statement is an alleged false statement.

finally disclosed at the end of the Class Period. ¶¶268, 270, 272.[17]

For example, after disclosing receipt of the FDA Letter and in discussing the TabloCart shipment pause and accompanying lowered revenue expectations, Defendant Ahmed represented that "nothing has structurally changed" and that "sales of both TabloCart with prefiltration will resume once we get our clearance and that any Tablo orders that may defer will also come back once we get our 510(k) clearance." ¶217. Likewise, an Outset press release stated that the lowered revenue guidance expectations was "as a result of the [TabloCart] shipment pause." ¶210. In discussing the response to the FDA issues, Defendant Trigg also represented the FDA "had some commentary about some customer testimonials on our website. Those have been long removed. And then we did choose to take the step of filing on TabloCart and then voluntarily said, hey, what we'll just push the pause button on the cart to continue to be a good corporate citizen and a good partner to FDA. So all of that is now behind us," ¶222 and stated that Outset removed the materials the FDA flagged as examples from the website and  "our action plan has addressed this finding and expect no impact with the customers from this remediation," ¶214.  Defendants' statements misrepresented the extent of the issues and Outset's reaction to them. They also in no way "clearly explained" the drivers of the revenue declines, MTD at 3-4, as Defendants falsely attributed the declines to customers delaying purchases of Tablo pending the TabloCart pause.

Further, although repeatedly ignored by Defendants, the FDA Letter outlined an investigation of Outset that began in January 17, 2023 that not only found evidence of off-label marketing on Outset's website but also on-site in San Jose. ¶55, 57. The letter clearly prefaces

[17] Contrary to Defendants' assertions, MTD at 20, the failure of Tablo sales to rebound when TabloCart clearance was obtained as promised, is not the "sole evidence" of the falsity of the statements falsely attributing the declines to the TabloCart pause. Falsity is also shown by Outset's pervasive off-label marketing, Outset's undisclosed internal reaction and elimination of these marketing practices, which coincided with drop in sales, and Defendants' own Class Period ending admissions.

its discussion of off-label materials on its website with "for example." ¶58; Dkt. 57-17. Defendants never disclosed the FDA Letter but only inaccurately summarized it. *See, e.g.,* ¶¶205-207, 222.[18] The FDA put the letter on its website on July 18, 2023. Contrary to Defendant's assertion, MTD at 20, neither the letter itself nor Defendants' discussion of it revealed the extent of the pervasive off-label marketing, and Defendants' discussion of the letter further distorts the true facts. The Company "was obligated to share" the entirety of the issues. *Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *13 (N.D. Cal. July 29, 2022); *see also Gilead II,* 536 F.3d at 1053 ("the public continued to misunderstand the significance of the Warning Letter…..Although the Form 10-Q did briefly address the Warning Letter, it failed to reveal the activities that gave rise to that letter, or the impact the letter would have on sales.").

Defendants' futile attempt to argue that six of these statements that the lowered guidance was based on the then-current TabloCart pause and would rebound after clearance was obtained or falsely describing Outset's remediation efforts are puffery or opinion also fails. MTD at 24-25; *See also* Section II.B discussing cases. Nor are any of the statements that the lowered revenue guidance was based on the TabloCart pause and that revenue would rebound after the pause was lifted forward-looking. Defendants' challenge fundamentally misstates the allegations and the statements. MTD at 26 *citing Weston v. DocuSign, Inc.,* 669 F. Supp. 3d 849, 879 (N.D. Cal. 2023) (addressing wholly inapposite forecasting statements based on a then-unpredictable end to the pandemic). Defendants affirmatively stated that they were lowering revenue guidance because customers were deferring Tablo pending the then-present TabloCart pause and revenue would recover after the pause was lifted, when, in truth, the lowered guidance was based on the

---

[18] Defendant Trigg also stated that the Letter did not implicate safety. ¶215. Yet, contrary to Defendants' assertions, the FDA stated that "[s]ystems that cannot safely and reliably perform CRRT raise serious public health concerns when used for CRRT treatment, because failure of dialysis systems performing CRRT may result in fluid and electrolyte imbalances, inadequate ultrafiltration, infection, and patient harm/death." *Id.*; MTD at 20. Five witnesses describe malfunctions and other issues running Tablo. ¶¶68, 74, 78, 82, 89.

then-current undisclosed key sales and marketing change to remove the off-label marketing and the TabloCart clearance would not cause sales to rebound.

### D. Statements Concerning Tablo's Value Proposition Were Materially False and Misleading When Made

Defendants' statements touting, *inter alia*, Tablo's "value proposition" and that, *e.g.* Tablo is a "single enterprise solution" that allows institutions to "down select to one device" were materially false and misleading when made because Defendants did not disclose that a key undisclosed element of the "value proposition" was the off-label marketing of Tablo for CRRT. ¶¶103-104, 108-110, 113-114, 118-119, 126, 128-131, 136-137, 149, 152, 154, 156-157, 160, 165, 170-171, 174-176, 186, 192. Defendants' attempts to recast these statements as an effort in transparency fail. MTD at 16, 17. As discussed above, ***Outset was engaged in undisclosed widespread marketing of Tablo off-label for CRRT, and this was fundamental to the touted value proposition***. ¶¶63-64, 67, 70, 73, 76, 78-79, 84, 86, 88. Yet, Defendants ***did not disclose*** this off-label marketing or that it was a key element of the "value proposition" pitch. *See also* Section II(A), *supra.*

Nor are the challenged statements puffery or opinion. Defendants misconstrue both the statements and why they are false. MTD at 22-23. Here, the challenged statements touting Outset's purported current objective fact regarding its value proposition strategy were materially false or misleading when made because they failed to disclose the value proposition relied on the then present companywide off-label marketing. Defendants' cited cases are thus inapposite. *See Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1160 (D. Ariz. 2017) (plaintiff failed to attribute "objectively verifiable meanings" to challenged statements); *Elias v. Hewlett-Packard Co.*, 950 F. Supp. 2d 1123, 1134 (N.D. Cal. 2013) (in consumer case under California Unfair Competition Law, statements were "devoid of any factual assertions that are capable of being proved false"); *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008), aff'd, 322 F. App'x 489 (9th Cir. 2009) (same).

### E. Statements Touting TabloCart and That TabloCart is a Non-Medical Accessory Were Materially False and Misleading When Made

Defendants began marketing TabloCart without the proper FDA clearance in November

2022 and falsely described it as a "non-medical accessory" that did not require FDA clearance. ¶¶167, 189-190, 193. Defendants sole challenge to such statements that they are fraud by hindsight, fails. MTD at 19. These statements were false and misleading when made because the FDA expressly defines a "water purification system for hemodialysis" like TabloCart to be a medical device requiring prior clearance, 21 C.F.R. § 876.5665, and Defendants consistently described TabloCart's "pre-filtration capabilities" for Tablo, a hemodialysis device, for sites that suffer from poor water quality. ¶¶47, 167. Thus, by Defendants' then-current description, TabloCart meets the definition of a "medical device" that required FDA approval or clearance.

Moreover, as the FDA found, the evidence and marketing materials reviewed at the inspection which ended no later than February 10, 2023 and on the Outset website on March 15, 2023, show that the TabloCart is a medical device. ¶¶55-56, Dkt. 57-17. Yet, Defendants continued to market TabloCart and describe it as "non-medical accessory" even after this, until it was forced to disclose the existence of the FDA Letter. ¶¶189-190, 193.

In sum, the challenged statements in each category are adequately pled.[19]

## III.    Plaintiff Sufficiently Alleges Scienter

To allege scienter, a plaintiff need only "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A); *Tellabs*, *Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 314 (2007). Defendants misstate the requisite state of mind. MTD at 27. While state of mind can be an intent to deceive,

_____

[19] Were the Court to find statements Defendants argue are opinion or forward-looking, to be so, they were made with the requisite state of mind. *See*, *infra,* section III. Further, the safe harbor does not afford protection for false or misleading statements about current or past facts or "about current or past facts [that are] combine[d]…with a forward-looking statement." *Quality Sys.*, 865 F.3d at 1142. Nor does the purported cautionary language, MTD at 26-27, protect any purported forward-looking statements as the cautionary language was "not meaningful [as] it discusses as a mere *possibility* a risk that has already materialized." *Glazer*, 63 F.4th at 781. Indeed, some of the purported "cautionary language" contain misrepresentations.

manipulate, or defraud, deliberate recklessness also suffices. *Quality Sys.*, 865 F.3d at 1144. Plaintiff need not allege Defendants "actually knew" they were making false statements. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012). Moreover, scienter is adequately pled if "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Corcept II*, 2021 WL 3748325, at *23 (quoting *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014)). "The inference … need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the "most plausible of competing inferences." *Tellabs,* 551 U.S. at 324; *Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 1006 (9th Cir. 2009).  Here, Plaintiff alleges particularized facts that establish that Defendants knew of, or were deliberately reckless to, the falsity of their statements. Defendants' "competing inference" is irreconcilable with Plaintiff's well-pled allegations and contradicted by the facts. *Tellabs*, 551 U.S. at 314 (competing inferences must be "rationally drawn from the facts alleged"). Plaintiff's inference is far more compelling—and plausible—than Defendants' alternative. Even with a coin flip (which this is not), "a tie goes to the plaintiff[]." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

## A.  The Core Operations Doctrine Demonstrates Scienter

The Ninth Circuit recognizes that scienter may be inferred when an alleged fraud concerns a company's core operations. *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). Under this doctrine, scienter is supported where all of the allegations "read together" raise a cogent and compelling inference, *or* may ***independently*** suffice where the allegations show executives had actual access to the disputed information *or* where the matter was so prominent that it would be "absurd" to suggest management was unaware. *Id*. Thus, core operations allegations alone can be dispositive of scienter.

Here, the misconduct involved Outset's primary product and revenue driver, which Defendants do not deny. Indeed, Defendants repeatedly acknowledged that Outset "derive[s] substantially all of [its] revenue from the sale of Tablo" and was "highly dependent" on Tablo's success. ¶296.  Moreover, the Individual Defendants are Outset's top executives who signed

SEC filings, led analyst calls, and repeatedly discussed Outset's revenue drivers. In addition, Trigg's direct role in marketing Tablo to customers, including discussing how Tablo can provide savings for customers, is supported by her admissions and corroborating witness statements, ¶¶78, 290-93. *Reese,* 747 F.3d at 575. Indeed, it strains credulity to suggest that Trigg, who had "clarity and conviction around the growth drivers," (¶145) and Chambers and Ahmed, who directly tied revenue growth to the demand for Tablo (¶¶125, 141, 145, 147, 156) were unaware of how their primary product was marketed, particularly where such marketing emanated from senior management. Courts routinely find scienter in such situations. *See e.g., Corcept II*, 2021 WL 3748325, at *23 (finding core operations dispositive of scienter where it was absurd to suggest that management was not aware of Corcept's widespread off-label marketing scheme of Korlym, the sole revenue driver); *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 969 (N.D. Cal. 2014) (finding core operations dispositive of scienter where reasonable to infer executives' awareness of widespread compliance issues where manufacturing and quality control were central to the company's success and had drawn FDA scrutiny); *see also In re Acadia Pharm. Inc. Sec. Litig.,* 2020 WL 2838686, at *8 (S.D. Cal. June 1, 2020) (scienter supported where drug at issue was defendant's only drug); *In re Finisar Corp. Sec. Litig.*, 2017 WL 1549485, at *7 (N.D. Cal. May 1, 2017) ("even if [executives] were not directly involved … they were either aware or should have been aware of this materially relevant business information. And if for some reason they were not, … as the leaders of the company, both [defendants] had access to it and could have sought it out"); *Rihn v. Acadia Pharm. Inc.*, 2016 WL 5076147, at *9 (S.D. Cal. Sept. 19, 2016) (core operations theory supported scienter where most advanced drug candidate was "critical to the company's success").

Defendants' cases are unavailing. Here, all of the Individual Defendants spoke to the revenue drivers, and Trigg personally joined sales meetings and pitches to hospital executives, corroborated by Witnesses 4 and 10, thereby "bridg[ing] the gap" Defendants claim is missing, MTD at 28-29 (citing cases). Moreover, the FDA Letter, inspections, witness accounts, and executives' own statements supply detailed, contemporaneous evidence that contradict Defendants' statements.

While these allegations alone are sufficient to plead scienter, they also contribute to a holistic review of the allegations, discussed below, which collectively adequately plead scienter.

**B. Defendant CEO Trigg's Direct Involvement With the Sales Team and Marketing to Customers Evidences Scienter**

Trigg's direct role in marketing Tablo to customers—confirmed by her own admissions and corroborating witness statements that Defendants largely ignore—provides strong evidence of scienter. While Defendants state that Trigg refers to herself as a "commercial focus CEO," MTD at 29, they overlook Witness 10's statement aptly describing her as a "customer-focused CEO" who frequently joined sales meetings, walked hospital floors, and presented directly to hospital executives. ¶290. Witness 4, the CEO of a large health system that purchased Tablo consoles to replace its CRRT machines in order to perform CRRT exclusively with Tablo, confirmed Trigg personally visited and discussed Tablo with the system (¶78), but never stated that Tablo was not cleared for CRRT. ¶78. Trigg spent significant "time in the field" (¶293) and admitted her frontline role in the sales cycle stating that, once hospitals "moved past stage one" in the sales cycle, she "tend[ed] to go to those meetings" because Outset had a "really nice ROI tool" that could help them "save millions," further underscoring her involvement in pitching the value proposition that relied on marketing Tablo off-label for CRRT. ¶292. Defendants' attempt to cast this allegation as "vague" because it refers to unspecified meetings, MTD at 28-29, is unfounded because the statement came from Trigg herself. Likewise Trigg repeatedly discussed the sources of Outset's revenue and admitted her "clarity and conviction around the growth drivers" (¶145). Trigg's intimate knowledge of Tablo's market adoption and regulatory status makes it "at least deliberately reckless not to investigate the accuracy" that adoption was driven by legitimate sales rather than off-label marketing. *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019).

**C. The Consistent Witness Accounts of Management-Directed Off Label Marketing Evidence a Strong Inference of Scienter**

Three former employees and six customer witnesses, spanning different times throughout the Class Period, multiple geographic regions across the country covering at least 16 states, and different roles, consistently confirmed that Outset disseminated a uniform off-label marketing

message that promoted Tablo for CRRT that was directed by senior executives. ¶¶61-89. *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058–59 (C.D. Cal. 2008) (scienter supported where CWs across five states described consistent misconduct throughout the class period, spanning different levels within the company). All the while, Defendants were touting, *inter alia*, that Outset refrained from off-label marketing. After the FDA Letter, Defendants downplayed the off-label issues and falsely attributed repeated revenue downgrades to a temporary TabloCart shipment pause, when in fact, as detailed by former employees, internally Outset was purging the pervasive off-label marketing materials. ¶¶71-72, 76-77, 210, 216-17, 228, 232-39, 242-249. Once Defendants obtained FDA approval and resumed TabloCart shipments, they claimed demand for Tablo was "never higher"—only to quickly reverse course—revealing the need for "sales team restructuring," and went on to slash guidance yet again. ¶¶ 250, 254, 256, 267-68. This is classic scienter. *See Wilkof v. Caraco Pharm. Labs, Ltd.*, 2010 WL 4184465 (E.D. Mich. Oct. 21, 2010), at *1, *6 (the court contrasted the CWs' statements describing the poor conditions and manufacturing problems at the company's Detroit facility with the company's statements to the public that minimized the scope and significance of these problems, and concluded that such allegations also contribute to a strong inference of scienter); *Glazer*, 63 F.4th at 772 (holding that CW accounts describing internal facts contradicting executives' positive public statements about sales pipeline and deals contributed to a strong inference of scienter).

The Employee Witnesses independently describe training and instructions from Outset management and executives to promote Tablo for CRRT, and that such marketing and sales of Tablo occurred before the FDA Letter was issued (¶¶62-77), supporting a strong inference of scienter. *In re Gilead Scis. Sec. Litig. ("Gilead IV")*, 2009 WL 3320492, at *2 (N.D. Cal. Oct. 13, 2009) (scienter inferred where CWs reported that company "used the training department" to push off-label marketing).

Witness 1, employed during Trigg and Chambers tenure, stated SVPGC Lewis and CMO Aragon led meetings where employees were instructed to promote Tablo for CRRT (¶¶62-63), akin to *Gilead IV*, where the non-defendant sales VP directed off-label marketing strategies,

supporting scienter. 2009 WL 3320492, at *2-3. Witness 2, employed during Trigg and Ahmed's tenure, likewise described two separate training sessions in California and Ohio where sales staff were trained to tell customers that Tablo could be used for CRRT. ¶70. Moreover, Witness 3, who worked during each Individual Defendant's tenure, admitted that before the FDA Letter, sales staff specifically promoted the XT upgrade as performing "CRRT," ¶76, and Witnesses 1 and 2 also relayed that Tablo was marketed and sold for CRRT. ¶¶62-64, 70.

Witnesses 2 and 3 also confirmed that immediately after the FDA Letter, management directed *all* employees to stop using the term CRRT when marketing Tablo and to purge *all* marketing materials that existed prior to the FDA Letter (¶¶71, 77)—further demonstrating that the scheme was coordinated by management, and not isolated misconduct. *Amgen*, 544 F. Supp. 2d at 1033–34 (scienter inferred where scheme "emanated from [the] national office[.]"). This company-wide directive also reveals that Defendants' explanation to investors that revenue declines stemmed solely from a temporary TabloCart pause (¶¶210, 216-17, 228, 232-39, 242-49) was pretextual because the real issue was the halt of the Company's unlawful CRRT marketing scheme.

Customer Witnesses corroborate the employee accounts. Witness 4, a senior executive of a large New York health system, stated that Outset employees told them that the Tablo with upgrade (XT) could be used for CRRT and that Outset marketing materials stated Tablo could be used for CRRT. ¶78. Witness 4 also had direct discussions with Trigg and CMO Aragon (who instructed employees to market for CRRT) about how the health system would be using Tablo, but neither Trigg nor Aragon noted Tablo's lack of clearance for CRRT. *Id*. Thereafter, the system bought Tablo units to perform CRRT exclusively with Tablo. *Id*. Witness 5 was trained by Outset personnel to use Tablo for CRRT and reported that their hospital used *all* purchased units for CRRT. ¶¶79-80. Witness 7's hospital acquired seven Tablo units dedicated to CRRT. ¶¶85-87. Witnesses 6 and 9 likewise confirmed, and witness 8 understood, that Outset marketed Tablo for CRRT. ¶¶ 84, 88-89. Courts routinely find such accounts probative of scienter. *See Corcept II*, 2021 WL 3748325, at *24 (scienter supported where multiple physician CWs consistently described off-label promotion during the class period).

These consistent accounts of Outset's deliberate, widespread, management-driven off-label marketing, and post FDA Letter companywide directed purge of the off-label marketing, are entirely absent from Defendants' purported "competing inference" of scienter.

### D. Defendants' Actions and Representations After the FDA Investigation and the FDA Letter Further Demonstrate their Scienter

Although ignored by Defendants, Trigg and Ahmed were aware the FDA's investigation was focused on Outset's off-label marketing months before disclosure of the FDA Letter. ¶¶55, 57, 287. Indeed, by February 10, 2023, the FDA found evidence of off-label marketing of Tablo for CRRT and of TabloCart without clearance at Outset's San Jose facility, ¶¶55, 57, followed by the March 13, 2023 conference call where Trigg and the FDA discussed Tablo's lack of CRRT clearance ¶¶53-59. Despite this, Defendants Trigg and Ahmed assured investors that Outset was not engaged in such unlawful conduct. ¶102 (Form 10-K filed February 13, 2023). *See Schueneman v. Arena Pharm.*, 840 F.3d 698, 709–10 (9th Cir. 2016) (scienter supported where executives were aware of FDA concerns but continued making contrary statements).

Defendants' assertion that the FDA Letter was limited to certain website testimonials (¶208) is belied by the FDA Letter itself and witness accounts of companywide instructions to all employees to cease marketing for CRRT and purge *all* prior marketing materials (¶¶71, 77). Such contemporaneous awareness of and/or access to facts contradicting their statements is classic scienter. *See Quality Sys.*, 865 F.3d at 1145; *Berson*, 527 F.3d at 988 n.5; *Immune Response Sec. Litig*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) (scienter adequately pled where defendants had access to reports or statements containing contrary facts and described meetings where issues were discussed); *City of Monroe Emps. Ret. Sys. v. Bridgestone*, 399 F.3d at 684 ("[t]here was … at least a seeming disregard, of the most current factual information before making statements" where defendant falsely stated that its tires were "high quality" and "safe" despite contemporaneous knowledge of facts indicating otherwise).

### E. Defendants' False Narrative Regarding Tablo Sales Declines Following the FDA Letter Supports Scienter

Defendants' shifting narrative for declining revenue following the FDA Letter also supports scienter. Outset paused TabloCart shipments while seeking FDA clearance, repeatedly lowered

revenue guidance, and told investors the pause caused customers to defer Tablo purchases until clearance was obtained and that sales would rebound once shipments resumed following TabloCart clearance. ¶¶210, 216-17, 228, 232-39, 242-49. On March 5, 2024, Trigg and Ahmed stressed that TabloCart clearance would be a growth catalyst, yet just two months later when TabloCart was granted clearance—and *one day after* declaring "demand for Tablo has never been higher"—Defendants reversed course, stating the FDA Letter caused ongoing issues with Tablo revenue. ¶¶247-50, 254, 256. Then *just three months later*, Outset *cut* its revenue guidance a third time (¶267), attributing the cuts to "sales team and process restructuring." ¶268. The temporal proximity between the Defendants' falsehoods and subsequent disclosures also supports scienter. *Wilkof*, 2010 WL 4184465, at *5; *Reese*, 747 F.3d at 574.

### F. Defendants' Knowledge of the Lack of FDA Clearance, Touting of Value Proposition Marketing, and Violation of Company Policy Evidences Scienter

Scienter is also supported by Defendants' (a) admitted knowledge that Tablo was not cleared for CRRT, (b) touting Outset's "value proposition" strategy (¶¶90-92), and (c) off-label promotion despite Outset's explicit policies prohibiting such conduct (¶¶305–06).[20] Defendants' primary argument that Tablo's clearance was publicly disclosed, MTD at 31, fails because Plaintiff does not allege that the Defendants misled investors about the absence of CRRT clearance, but that they concealed the widespread management-directed off-label marketing for CRRT that was the cornerstone of Outset's marketing, revenue, and growth. Throughout the Class Period, Trigg, Chambers, and Ahmed repeatedly touted the value proposition marketing strategy without disclosing it relied on marketing Tablo for CRRT, in violation of its FDA label

---

[20] Defendants' assertion that these arguments are "untethered to scienter pleading requirements," MTD at 31, is unfounded as the fact-specific allegations directly address the fraud at issue, and inform both the individual and holistic scienter analyses required under *Tellabs*. *Zucco*, 552 F.3d at 992.  In addition, Defendants mischaracterize Plaintiff's allegations as limited to Trigg, MTD at 31 n. 5, when in fact Plaintiffs allege them against all Individual Defendants, ¶¶300-04, 306.

and Outset's own policies, which "sufficiently support[s] an inference of scienter." *Amgen*, 544 F. Supp. 2d at 1034; *see also Daou*, 411 F.3d at 1023 (scienter supported where executives acted contrary to internal policies and monitoring practices).

Defendants mischaracterize these allegations as hindsight, MTD at 31, but they go directly to falsity at the time: Defendants concealed that off-label CRRT marketing was fundamental to Outset's value proposition despite knowing Tablo lacked FDA clearance and that such promotion violated FDA rules and Outset's own policies, while falsely assuring investors otherwise. *In re FVC.COM Sec. Litig.*, 32 F. App'x 338, 340 (9th Cir. 2002) is inapposite because unlike there, Plaintiff alleges contemporaneous admissions, corroborated witness accounts, and direct contradictions between Defendants' knowledge and their public statements.

### G. The Insider Selling Supports Scienter

The timing, nature and magnitude of insider sales also provide evidence of scienter. While the Class lost hundreds of millions of dollars, insiders, including the Individual Defendants, reaped almost $50 million in proceeds on their Class Period trading. Indeed, Trigg alone reaped proceeds of over $30 million during the Class Period, almost all of which was prior to the initial corrective disclosure of the existence of the FDA Letter. Moreover, while Defendants attempt to persuade the Court otherwise, MTD at 30, 32, the sales during the FDA's inspection but prior to disclosure of the existence of the FDA Letter are extremely suspicious. Indeed, beginning in January 2023 through early July 2023—during the FDA's investigation of Outset's off-label marketing—Defendants Trigg and Ahmed and other insiders engaged in accelerated and unusually timed trading in unusually large amounts. ¶¶307-23.

Defendants misstate the law regarding trading plans, MTD at 29, as sales pursuant to a 10b5-1 trading plan can certainly support an inference of scienter where, as here, the plans were adopted after the alleged fraud began. *See, e.g.*, *Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 756 F. Supp. 3d 852, 877 (S.D. Cal. 2024) (scienter supported where trading plans not adopted until after becoming aware of flawed study results that would impact FDA approval). Defendants also attempt to absolve insider trading allegations by arguing that certain trades were made pursuant to trading plans that were adopted after Outset disclosed the FDA inspection.

MTD at 30, 32. While the FDA inspection was disclosed in the Form 10-K filed on February 13, 2023, it made no mention of the FDA's off-label marketing findings which the FDA determined from "evidence reviewed *at the inspection*" which ended February 10, 2023 (¶57)—the exact material non-public information that Defendants assert is lacking, MTD at 30. The letter also notes that "[y]our response dated March 3, 2023, does not address these violations." Dkt. 57-17 at 4. Trigg, Ahmed, and other insiders adopted new Rule 10b5-1 trading plans in February 2023, just days after the FDA's onsite inspection concluded, but months before the FDA Letter was disclosed. ¶¶309, 311, 319. Defendants' argument that it was impossible to adopt a trading plan prior to the Class Period, MTD at 30, fails to acknowledge that courts recognize that amending a trading plan *during* a class period is suspicious where the timing suggests opportunism. *Compare Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1185–86 (S.D. Cal. 2009) (finding allegations sufficient to allege scienter where plaintiff alleged that defendant had amended 10b–5 plan in order to sell more stock) *with In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 814 (C.D. Cal. 2011) (scienter not supported where amended trading plan was "pre-determined" and identical to previous trading plan 11 months earlier).

Defendants' contention that Plaintiff's allegations are conclusory, MTD at 29, 32, ignores that Plaintiff explains *why* the timing and volume of sales were suspicious. For example, although pre-class period data is unavailable, Defendant Trigg reaped over $29.5 million in proceeds in the two years before the disclosure of the FDA Letter, but in stark contrast, sold less than $785,000 in the year after. ¶311. Further, between January and July 2023, Trigg sold 152,258 shares for $3.46 million, including 30,000 shares just weeks after the FDA's site inspection concluded at which it found evidence of off-label marketing and less than two weeks before Trigg's meeting with the FDA. ¶313. She also disposed of 20,000 shares *the day before* disclosing the lowered guidance under the guise of the TabloCart pause—avoiding a 10.2% drop that followed the announcement. ¶¶313, 315.[21]

---

[21] Defendants' claim that Trigg's stock sales were made for benign purposes unrelated to scienter, MTD at 31, is also unavailing and unsubstantiated. "As a consequence, the stock sales

Defendants also ignore specific timing allegations against Defendant Ahmed, MTD at 32, who sold 10,999 shares for $268,255.71 between January and June 2023, including his largest Class Period sale just ten days after the FDA began its site inspection of Outset. ¶318. Nearly 47% of his proceeds from stock sales was from sales during that six-month window. *Id*.

These clustered, accelerated sales—many through trading plans adopted after the FDA inspection began—are "unusual or suspicious" in timing and volume and strongly support scienter. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999).

## IV.   Plaintiff Adequately Alleges Loss Causation

To plead loss causation, a plaintiff need only provide a "short and plain statement" that "provide[s] a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-7 (2005).  Loss causation is generally a question of fact for the jury and "normally inappropriate to rule on" at the pleading stage. *Gilead II*, 536 F.3d at 1057. Moreover, Defendants concede that loss causation is adequately alleged for the first three partial corrective disclosures.  MTD at 34 (challenging only the subsequent three dates). This alone should end the Court's inquiry. *See In re Inerlink Elec, Inc. Sec. Litig*, 2008 WL 4531967 at *4 ("Plaintiffs have adequately pled loss causation as to at least one date, and the Court need not address the others").

While the first three partial disclosures began to reveal the truth, they did not reveal the full extent of the off-label issues, the resulting need to overhaul Outset's sales practices, or the impact of such changes. Defendants continued issuing false statements that downplayed FDA findings and misattributed poor Tablo sales to the TabloCart pause. ¶¶205-207, 213-217, 219, 222, 228, 234, 236, 238-239, 242, 244, 246-250, and 254. Defendants are therefore wrong that the subsequent corrective disclosures merely reaffirm information already known. MTD at 34.

On November 7-8, 2023, Defendants announced initial 2024 guidance below expectations and attributed this to the "recent Warning Letter" and the "distribution pause on

---

may be considered in *Tellabs* holistic review." *S. Ferry LP No. 2 v. Killinger ("S. Ferry III")*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009).

TabloCart." ¶¶233-34, 238. On this news, the Company's share price fell 14.4%. ¶240. This is a disclosure of new corrective information as it reveals a greater impact on Outset due to the off-label issues than previously disclosed. *See Gilead II*, 536 F.3d at 1053-54; ¶241. Moreover, Defendants also continued to issue false statements downplaying the off-label issues and falsely blaming the poor Tablo sales on the halt on TabloCart shipments. ¶¶ 234-36, 238-39.

Thereafter, on May 9, 2024, immediately after Outset received TabloCart clearance and resumed shipments, Outset disclosed that it "may continue to experience disruptions as a result of the warning letter and our prior distribution pause on TabloCart." ¶256. On this news, the stock price fell 20.82%. ¶257. This was a disclosure of new corrective information as it reveals an even greater impact on Outset due to the off-label issues and begins to reveal *for the first time* that it was not the TabloCart pause that was adversely affecting Tablo sales.

Finally, on August 7, 2024, Outset announced it significantly missed estimates and slashed its 2024 outlook, citing sales team and process restructuring and admitted it could not deliver the previously promised Tablo sales ramp. ¶¶267-68. On this news, the Company's share price fell 68.5%. ¶271. This final disclosure revealed for the first time new corrective information that Outset had to completely restructure its sales processes and fully reveals that the halt pending clearance of TabloCart was not the cause of the poor Tablo sales. Analysts expressed their shock at these new disclosures. Stifel Nicolaus stated "[l]ooking back at [Trigg's] comments last quarter, it felt like with TabloCart in hand orders that had been delayed could now be sold… and we would see an acceleration." ¶269. RBC Capital stated "Q2 disappointed once again even as Tablo Cart [sic] is now approved" and noted the "[l]ack of execution and low visibility." ¶273. BTIG noted that it was "disappointed and wary." ¶274.

Contrary to Defendants' assertion, the August 7, 2024 disclosure is tied to the off-label marketing. MTD at 34-5. While previously downplaying the impact of the FDA Letter, depicting the off-label marketing as just a few materials on the website and blaming poor sales and demand for Tablo on the TabloCart halt pending clearance, internally and undisclosed to the public and as supported by witnesses, Outset completely revamped its sales and marketing to do away with the off-label marketing for CRRT. ¶¶71, 77. Yet, it wasn't until this final corrective disclosure

that Outset finally revealed this complete sales process and approach restructuring and that the TabloCart pause was not the cause of the drop in Tablo sales. ¶¶267-68. Moreover, it is well established that "[a] disclosure need not explicitly correct the prior misrepresentation." *In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 508 (W.D. Wash. 2009). Nor must it concede that a fraud occurred. *See Metzler Inv. GMBH v. Corinthian Colleges,* 540 F.3d 1049, 1064 (9th Cir. 2008) (citing *Dura Pharms.*, 544 U.S. at 346 & *Daou*, 411 F.3d at 1025).

## V.     The Individual Defendants Are Liable Under Section 20(a)

The Complaint states a Section 20(a) claim as it alleges a 10(b) violation and that Defendants Trigg, Chambers, and Ahmed exercised control over Outset's internal operations and public statements. ¶¶357-62. *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Control is defined as the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person. 17 C.F.R. §230.405; *Howard*, 228. F.3d at 1065 n.9. Whether a defendant is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions. *Id.* at 1065. Moreover, contrary to Defendants' assertion, MTD at 35, the Ninth Circuit has held that, "in order to make out a prima facie case, it is not necessary to show actual participation or the exercise of actual power." *Id.*

In any event, here, Plaintiff alleges, *inter alia*, that as Outset's CEO and CFOs, the Individual Defendants had intimate knowledge and direct involvement in operations and access to documents containing the false statements, giving them the power and authority to influence and control, ***and did influence and control***, Outset's decision-making and the dissemination of misleading statements. ¶¶358–59. The Individual Defendants also all made alleged false statements, signed SEC filings, and participated and spoke at earnings calls and conferences in which the alleged false statements were made. ¶¶100-76, 185-96, 205-57. The Complaint further alleges Trigg's direct involvement in the marketing of Tablo. ¶¶289-94. Numerous courts have found similar or lesser allegations sufficient for Section 20(a) liability at the motion to dismiss stage. *See, e.g. Backe*, 642 F. Supp. 2d at 1192 (control person allegations sufficiently pled based upon executives' "positions and their power to control public statements about Novatel" and

access to confidential information concerning company"); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1089 (N.D. Cal. 2001) (allegation that defendants "by virtue of their executive and managerial positions had the power to control and influence" sufficient to state a control claim).

Finally, courts have found 20(a) liability sufficiently pled for defendants who were present when another defendant made an oral false and misleading statement. *See, e.g., Plumbers Union Local No. 12 Pension Fund v. Ambassador's Grp.*, 717 F. Supp. 2d 1170, 1180 (E.D. Wash. 2010) (finding both 10(b) and 20(a) liability adequately alleged against defendant "for the misleading statements his co-defendant made to public stock analysts during a conference call at which he was present."); *see also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 195 (S.D.N.Y. 2010) ("each of the Individual Defendants is liable for the others' statements made at conference calls in which they participated"). Defendants' authority is unavailing. For example, *Murphy v. Precision Castparts Corp.*, a summary judgment decision with an inapplicable standard here, underscores that whether Defendants exercised control is a fact-intensive issue generally not suitable for resolution at the pleading stage. 2020 WL 4040827, at *25 (D. Or. July 17, 2020). The *Murphy* court rejected control liability for the statements at issue, not because they were oral, but because evidence obtained during discovery revealed that the CFO lacked "meaningful control" over what the CEO said. *Id*. In any event, the Individual Defendants are also liable for the numerous written false and misleading statements.

Accordingly, Plaintiff has sufficiently alleged 20(a) liability.[22]

## **CONCLUSION**

For these reasons, Plaintiff respectfully requests that the Court deny the Motion. However, should the Court find otherwise, Plaintiff respectfully requests leave to amend. *See Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1011 (9th Cir. 2018).

---

[22] Plaintiff does not bring Section 20(a) claims against Ahmed or Chambers for statements made during a time that they were not employed as Outset's CFO, respectively.

Dated: October 6, 2025

Respectfully submitted,

**BERMAN TABACCO**

By:    */s/ Kristin J. Moody*
          Kristin J. Moody

Nicole Lavallee
Alexander Vahdat
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
          kmoody@bernantabacco.con
          avahdat@bermantabacco.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*