Sara B. Brody (SBN 130222)
sbrody@sidley.com
Jaime A. Bartlett (SBN 251825)
jbartlett@sidley.com
Sarah E. Gallo (SBN 335544)
sgallo@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: (415) 772-1200

*Attorneys for Defendants*
*Outset Medical, Inc., Leslie Trigg,*
*Nabeel Ahmed, and Rebecca Chambers*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE OUTSET MEDICAL, INC. SECURITIES LITIGATION | Case No.  5:24-cv-06124-EJD<br>Assigned to: Hon. Edward J. Davila<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Date:  January 22, 2026<br>Time:  9:00 a.m.<br>Place:  Courtroom 4, 5th Floor<br><br>AC Filed: June 6, 2025 |

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................................1

ARGUMENT .................................................................................................................................2

    I.       PLAINTIFF HAS NOT PLED SUFFICIENT FACTS TO SHOW UNDISCLOSED WIDESPREAD OFF-LABEL MARKETING...........................................................2

        A.    Plaintiff's Authorities Demonstrate the AC's Deficiencies.............................2

        B.    No Alleged Facts Show Off-Label Conduct Drove Outset's Success ...............4

            1.    *Outset's Reported Revenue Does Not Show that Off-Label Marketing Drove Outset's Success* ................................................................4

            2.    *The CWs Do Not Show that Off-Label Marketing Drove Success* .........5

            3.    *The AC Does Not Distinguish Outset's Disclosed Marketing of Tablo's FDA Approved Uses From the Alleged Off-Label Marketing* ...............5

            4.    *Plaintiff's Authorities Do Not Demonstrate That the AC Allegations are Sufficient* .................................................................................6

        C.    Plaintiff Glosses Over Holes in the CW Allegations Regarding Defendants' Knowledge of Off-Label Marketing ...................................................8

    II.      PLAINTIFF'S SHIFTING THEORY OF FALSITY FOR THE TABLOCART STATEMENTS SHOULD BE REJECTED ...........................................................9

    III.    PLAINTIFF'S ATTEMPT TO PORTRAY THE FDA WARNING LETTER STATEMENTS AS MISLEADING FAILS................................................................9

    IV.    PUFFERY, OPINION, OR FORWARD-LOOKING STATEMENTS ARE NOT ACTIONABLE .......................................................................................11

    V.      PLAINTIFF FAILS TO PLEAD FACTS CREATING A STRONG INFERENCE OF SCIENTER ............................................................................................14

        A.    Plaintiff Fails to Plead Facts Creating a Strong Inference of Scienter by Defendant Trigg ...............................................................................14

        B.    Plaintiff Fails to Plead Facts Creating a Strong Inference of Scienter Against Defendants Ahmed and Chambers.................................................18

    VI.    PLAINTIFF IS NOT ENTITLED TO EXTEND THE CLASS PERIOD WITH INADEQUATELY PLED CORRECTIVE DISCLOSURES....................................19

    VII.   THE SECTION 20(A) CLAIMS FAIL ................................................................20

CONCLUSION.............................................................................................................................20

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT – CASE NO. 5:24-CV-06124-EJD

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alger Dynamic Opportunities Fund v. Acadia Pharmaceuticals, Inc.*,
    756 F. Supp. 3d 852 (S.D. Cal. 2024)......................................................................16

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (D. Ariz. 2010) ................................................ 3-4 7, 8, 12

*In re Aqua Metals Inc. Sec. Litig.*,
    2019 WL 3817849 (N.D. Cal. Aug. 14, 2019) .......................................................13

*Backe v. Novatel Wireless, Inc.*,
    642 F. Supp. 2d 1169 (S.D. Cal. 2009)..................................................................17

*City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*,
    880 F. Supp. 2d 1045 (N.D. Cal. 2012) .................................................................12

*Colyer v. AcelRx Pharms., Inc.*,
    2015 WL 7566809 (N.D. Cal. Nov. 25, 2015) .......................................................17

*Elias v. Hewlett-Packard Co.*,
    950 F. Supp. 2d 1123 (N.D. Cal. 2013) .................................................................13

*Evanston Police Pension Fund v. McKesson Corp.*,
    411 F. Supp. 3d 580 (N.D. Cal. 2019) .............................................................15, 19

*Ferraro Family Foundation, Inc. v. Corcept Therapeutics, Inc.*,
    2021 WL 3748325 (N.D. Cal. Aug. 24, 2021) ("*Corcept II*")............................ 3, 8, 14, 18-19

*Ferraro Family Foundation, Inc. v. Corcept Therapeutics, Inc.*,
    501 F. Supp. 3d 735 (N.D Cal. 2020) ("*Corcept I*")...............................................20

*In re Gilead Scis. Sec. Litig.*,
    2009 WL 3320492 (N.D. Cal. Oct. 13, 2009) ("*Gilead IV*").................................3, 7

*In re Gilead Scis. Sec. Litig.*,
    526 F.3d 1049 (N.D. Cal. 2005) ("*Gilead I*") ................................................. *passim*

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ("*Gilead II*").................................................6, 7, 10

*In re Hansen Natural Corp. Sec. Litig.*,
    527 F. Supp. 2d 1142 (C.D. Cal. 2007) .................................................................20

*Homyk v. Chemocentryx, Inc.*,
    2023 WL 3579440 (N.D. Cal. Feb. 3, 2023) ...........................................................8

ii

*Hong v. Extreme Networks, Inc.*,
2017 WL 1508991 (N.D. Cal. Apr. 27, 2017) ..........................................................................12

*Immanuel Lake v. Zogenix, Inc.*,
2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) .............................................................................5

*Janus Capital Grp., Inc. v. First Deriv. Traders*,
564 U.S. 135 (2011).............................................................................................................1, 20

*Lomingkit v. Apollo Educ. Grp. Inc.*,
275 F. Supp. 3d 1139 (D. Ariz. 2017) .............................................................................. 12-13

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ..................................................................................14, 19

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
774 F.3d 598 (9th Cir. 2014) ...............................................................................................12

Pardi *v. Tricida, Inc.*,
2022 WL 3018144 (N.D. Cal. Jul. 29, 2022)..........................................................................10

*Pirani v. Netflix, Inc.*,
2024 WL 4894291 ..............................................................................................................11, 12

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d at 1051, 1062 (9th Cir. 2014; *Prodanova v. H.C. Wainwright & Co.*,
LLC, 993 F.3d 1097, 1111 (9th Cir. 2021)) .........................................................................14

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*,
802 F. Supp. 2d 1125 (C.D. Cal. 2011) ...............................................................................19

*In re Syncor Int'l Corp. Sec. Litig.*,
239 F.App'x 318 (9th Cir. 2007) ............................................................................................7

*Xiaojiao Lu v. Align Technology, Inc.*
417 F. Supp. 3d 1266 (N.D. Cal. 2019) ................................................................................13

**Statutes & Rules**

17 C.F.R. § 240.10b-5...................................................................................................15, 16, 19

Pub. L. No. 104–67, 109 Stat. 737 (1995)
(Private Securities Litigation Reform Act ("PSLRA")) .........................................10, 13, 19, 20

**INTRODUCTION**

Plaintiff's 88 page/362 paragraph Amended Complaint ("AC") attempts to tell a tale of a four-year fraud to conceal off-label marketing and thus inflate Outset's revenue. It fails to plead facts to support this story. Instead, the AC's facts, and those judicially noticeable, depict a far simpler story: that Outset marketed Tablo and TabloCart as an innovative alternative dialysis treatment system that would allow hospitals to in-source dialysis at lower cost and with better patient care. Outset was successful in the target market for Tablo's FDA-approved uses and disclosed its successes. However, in July 2023, the FDA sent a Warning Letter (the "Letter") observing that some materials found in a January to February 2023 inspection of Outset and on its website improperly referred to CRRT and that the Company should have obtained FDA clearance for TabloCart. Upon receipt of the Letter, Outset promptly disclosed the FDA's observations to investors, took immediate steps in response by removing references to CRRT, and sought FDA clearance for TabloCart. This does not add up to a four-year fraudulent off-label scheme.

Lacking a plausible theory for its expansive set of challenged statements and Class Period, Plaintiff goes for bulk. But more isn't necessarily better. Plaintiff's Opposition does not solve the deficiencies identified in the Motion and instead spotlights the two most glaring holes in the AC, each of which is an independent basis to dismiss this matter in full:

*First*, the AC simply does not allege widespread off-label marketing in the Class Period that led to significant sales of Tablo. The FDA did not observe conduct by the Individual Defendants to promote Tablo for off-label use, did not find that the improper materials had been used (let alone dating back to 2020), and had no conclusions about sales of Tablo based upon improper materials. If certain individual salespersons promoted Tablo for CRRT, the AC does not establish a widespread campaign to do so or Class Period sales that resulted from such conduct or materially impacted Outset's business. This is important because, absent facts demonstrating that the purported off-label promotion actually impacted results in the sixteen quarters of challenged statements, Plaintiff has not alleged how the challenged statements were materially false or misleading.

*Second*, Plaintiff does not deny that there is not a single allegation that the Individual Defendants engaged in or directed anyone to engage in off-label marketing. There also are no

1

allegations that they were aware of such conduct. And, Plaintiff has also not alleged facts from which scienter can be inferred for any Individual Defendant. Plaintiff's broad-brush accusations of core operations and stock sales are inadequate as to each of the Individual Defendants. Scienter is a separate reason the AC should be dismissed in full.

The other pleading deficiencies discussed in Defendants' Motion reflect the bloated overreach and conclusory nature of the claims and are also inadequately addressed in the Opposition. Plaintiff gives a cursory response to two-thirds of the challenged statements that are inactionable puffery, opinion or forward looking and concedes in a footnote that, notwithstanding its 20(a) claim and allegations lodged almost entirely against "Defendants," it is not seeking to hold Chambers or Ahmed liable for statements made when they were not serving as CFO. Plaintiff's shifting theory of falsity in defense of the three TabloCart statements is conclusory and the claims should not be permitted to proceed as to those statements either. As to loss causation, Plaintiff argues that having adequately pled other earlier in time purported corrective disclosures, it need not meet the pleading standards as to three other alleged corrective disclosure made between November 2023 and August 2024. This is absurd—Plaintiff may not extend the alleged Class Period by ten months with insufficient allegations of additional loss.

## ARGUMENT

### I.     PLAINTIFF HAS NOT PLED SUFFICIENT FACTS TO SHOW UNDISCLOSED WIDESPREAD OFF-LABEL MARKETING.

The AC does not adequately allege undisclosed widespread off-label marketing from September 2020 through July 2023. Mot. at 12-14. Plaintiff also does not plead that any Individual Defendant participated in, directed, or had knowledge of off-label marketing. *Id*. at 14–16; 27–32. To deflect attention from these deficiencies, the Opposition leans into a handful of cases where substantially more specific allegations were found sufficient. The AC allegations are distinguishable from those found sufficient in Plaintiff's cited authorities, as Plaintiff has failed to plead the necessary concealed conduct to render the challenged statements materially false or misleading.

#### A.     Plaintiff's Authorities Demonstrate the AC's Deficiencies

Plaintiff relies heavily on three cases in which courts found wide spread off-label marketing

2

adequately pled to support securities claims. These cases are instructive and make clear that the AC's allegations do not come close to the mark.

In *Gilead I*, two former employee CWs alleged specific dates and locations of meetings attended by defendants at which instructions were given to use off-label information to push sales of Viread. *In re Gilead Scis. Sec. Litig.*, 526 F.3d 1049, at *8 (N.D. Cal. 2005) ("*Gilead I*"). One of the FDA letters that corroborated the allegations of off-label marketing was sent **before** the Class Period yet notwithstanding knowledge that the FDA had found off-label marketing, defendants continued the conduct and made the challenged statements. *Id.* at *3. Even so, the court did not find falsity adequately pled until the Fifth Amended Complaint, where plaintiffs alleged facts showing that off-label marketing occurred during the quarter in which the challenged statements were made. *In re Gilead Scis. Sec. Litig.,* 2009 WL 3320492, at *4 (N.D. Cal. Oct. 13, 2009) ("*Gilead IV*"). *Gilead I* is distinguishable on several key points, including that the CWs here do not specify when they were instructed to engage in off-label marketing, CW 2 does not specify by whom they were told Tablo was "okay" for CRRT, and no former employee CWs allege any details about the marketing materials or information they were given to purportedly effectuate off-label promotion. ¶¶ 64-89. Furthermore, no CWs contend that Defendants Trigg, Chambers, or Ahmed were present for any discussion of off-label marketing. *Id.* Finally, Plaintiff does not allege that off-label marketing occurred after Outset received the Letter.

*Corcept II* and *Amgen* are similarly distinguishable. The former Corcept employee CWs each alleged specific details of conversations with defendants and other executives involving instructions to engage in off-label promotion or instances of actual off-label promotion. *Ferraro Family Foundation, Inc. v. Corcept Therapeutics, Inc.*, 2021 WL 3748325, at *13–14 (N.D. Cal. Aug. 24, 2021) ("*Corcept II*"). They also described specific materials provided to clinical specialists to facilitate the off-label promotion. *Id.* In *Amgen* the former employee CWs described in detail the materials that they were given, including color coded spreadsheets, PowerPoints, and sales aids designed to facilitate the off-label promotion of the product, in addition to several other tactics used to promote the off-label uses of the Amgen drugs, such as financial incentives and sponsorship of speaker programs for doctors, clinic managers, and pharmaceutical directors to advance off-label

3

uses. *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1020–21, 33 (D. Ariz. 2010). No such details are alleged in the AC. And, although Plaintiff asks the court to infer that Outset's marketing materials were rife with off-label promotion, notably no former employee CW says this, let alone describes how they were used. ¶ 71. Far from assisting Plaintiff, these cases demonstrate the distinction between a sufficiently pled complaint and the AC.

**B.     No Alleged Facts Show Off-Label Conduct Drove Outset's Success.**

To adequately allege a securities claim, Plaintiff can not merely allege that someone, at some point in the Class Period, promoted Tablo for off-label use. *Huang,* 443 F. Supp. 3d at 1053. Instead, Plaintiff "must allege facts that show a relationship between the off-label marketing of [the product], related sales of [the product], and the manner in which those sales affected" Outset's business for each quarter in which the challenged statements were made. *Gilead I,* 2005 WL at \*9. Plaintiff asserts that off-label marketing of Tablo "for CRRT" "drove Outset's success" (Opp. at 1), but the facts alleged in the AC do not support this contention.

**1.     *Outset's Reported Revenue Does Not Show that Off-Label Marketing Drove Outset's Success.***

To argue that off-label sales "drove" Outset's success, Plaintiff relies on sales growth in the acute market. *See* e.g., ¶ 125, Opp. at 3. But, acute sales are not equal to sales made from off-label promotion for CRRT. ***CRRT is one of many modalities of treatment performed in the acute care setting and Tablo had FDA approval for such other modalities***. ¶ 34, Ex. 1 at 38, 98. As noted in the AC (¶13) and Outset's public statements (e.g., Ex. 1 at 3), Tablo was sold for use in the acute setting as an all in one treatment solution. Mot. at 5. Thus Plaintiff's statistics about revenue growth in the acute market or installs in acute facilities and acute adoption (Opp. at 16) cannot be assumed to represent sales derived from off-label promotion as opposed to Outset's disclosed marketing strategy for on-label uses. Mot. at 16. Furthermore, no facts alleged show when purported off-label conduct began other than the conclusory assertion that it started at or around the time of Outset's IPO (which, notably coincides with the heart of COVID, whose externalities and impact on patient preferences made Tablo's efficiency and versatility even more valuable). ¶ 50; Ex. 1 at 83; Ex. 3 at 21. The Court need not accept Plaintiff's conclusion that Tablo's sales for the acute care setting

4

"*grew substantially after the off-label marketing began.*" (emphasis in original) Opp. at 3. *Immanuel Lake v. Zogenix, Inc.*, 2020 WL 3820424, at *8 (N.D. Cal. Jan. 27, 2020).

The decline in revenue after Outset disclosed the Letter also does not support Plaintiff's conclusion. Defendants Trigg and Ahmed discussed the effect of the Letter on multiple occasions, explaining the delay in purchases by customers waiting for TabloCart approval, market confusion generated by the Letter and aided by competitors, and other changes in customer dynamics that the Company came to understand in 2024. ¶¶ 216, 217, 219, 222, 228, 248. Plaintiff does not allege a single fact to refute these explanations, let alone any facts demonstrating that Tablo sales declined because it was not being marketed off-label for use as a CRRT treatment. As noted in the Motion, it is also pure speculation to contend that the decline in revenue in 2023 is evidence of the revenue impact of the off-label sales made each quarter going back to 2020. Mot. at 18.

### 2. The CWs Do Not Show that Off-Label Marketing Drove Success.

No former employee CW alleges Outset's sales improved (much less by how much) due to customers deciding to buy Tablo for CRRT following promotion of it for that use. To the contrary, CW 1 admitted that his marketing efforts were unsuccessful in his region. Ex. 24.

Fundamentally, the AC does not plead facts establishing that off-label promotion occurred in the Class Period. With respect to CW 1, Plaintiff's linchpin source, the AC has no allegations about when CW 1 was purportedly instructed to sell Tablo for CRRT and does not state when CW 1 purportedly sold Tablo for CRRT to three hospitals. ¶¶ 64–67. CWs 2 and 3 did not sell Tablo. And, no customer CWs state when Tablo was purchased by their facilities. Because Plaintiff does not allege any specific facts to demonstrate when the purported off-label marketing began, or when purchases occurred, there is no way to know if any such purchases occurred during the Class Period.

### 3. The AC Does Not Distinguish Outset's Disclosed Marketing of Tablo's FDA Approved Uses From the Alleged Off-Label Marketing.

The customer CWs do not distinguish between Outset's marketing of Tablo for FDA approved uses and the alleged off-label marketing in their purchasing decisions and are thus also inadequate to show that off-label marketing drove Outset's success.

To the contrary, the customer CWs state that they purchased Tablo as part of cost savings

5

measures and that it facilitated hospitals in-sourcing dialysis treatment. ¶¶ 78–79, 85–87. The customer CWs also state that they used Tablo for multiple treatment modalities. For example CW 4 stated that Tablo replaced dialysis machines "including"—not exclusively—those used for CRRT and CW 4 does not state the reason Tablo was selected. ¶ 78. Similarly, CWs 7 and 9 both described use of Tablo for treatment modalities other than CRRT. ¶¶ 86, 89. Indeed CW 7 said 20 of 27 Tablo units purchased were not used for CRRT. ¶ 86.[1] These customer CW statements reflect purchases made for precisely the benefits of the FDA-approved uses of Tablo that Outset openly discussed with investors. *See* Ex. 1 at 99 (the "compelling value proposition" of Tablo in the acute care setting to include "[increasing] hospital operating margins by lowering the overall cost of dialysis-related supplies, infrastructure and labor by up to 80% in the ICU" and "[reducing] operational complexity by eliminating the need for multiple dialysis machines and streamlining documentation and compliance."); *id.* at 3 ("Tablo can accommodate a wide range of treatment modalities, durations and flow rates, allowing for broad clinical applications"); *id.* ("Tablo is an all-in-one device"); ¶¶ 109, 149 (promoting "whole house conversions" to Tablo); ¶ 149 & Ex. 21 at 7 ("we are going after the whole thing. Companies that have talked about acute dialysis in the past, their devices can only be used in the ICU. They can only be used for these longer treatments called SLED or CRRT, or they have a device that can only be used for short treatments…Tablo is the only device available that can treat across the entire spectrum, sort of from zero to 24 hours. And therefore, we can go after all of the different types of treatments that are delivered in a hospital.").

Moreover, as Plaintiff does not dispute, it was not illegal for healthcare providers to choose to use Tablo for an off-label purpose. Here, absent specific allegations (of which there are none), it is impossible to say that in any quarter alleged off-label marketing led to increased sales of Tablo as opposed to effective on-label promotion of Tablo as an all-in-one solution for acute care facilities.

### 4. *Plaintiff's Authorities Do Not Demonstrate That the AC Allegations are Sufficient.*

Again, the very cases Plaintiff cites show why the AC is inadequate. The *Gilead* plaintiffs'

---

[1] CWs 6 and 8 do not state what treatments Tablo was used for or why it was purchased.

Fifth Amended Complaint (in which the court found materiality adequately pled) alleged substantial sales specifically resulting from the off-label marketing during the quarter in which the challenged statements were made. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1051 (9th Cir. 2008) ("*Gilead II*") ("75% to 95% of Viread sales resulted from off-label marketing efforts."), 1052 n. 4 ("Investors concluded that between $86.7 million and $109.82 million of Viread's $115.6 million in domestic sales during the second quarter of 2003 could be attributed to off-label marketing.").[2] In *Amgen* specific allegations demonstrated that off-label sales had a substantial effect on revenue: (1) in one year more than $500 million in annual sales for one of the drugs at issue were from sales for the off-label use (*Amgen* AC ¶ 110), and (2) CW and documentary evidence showed that in one region as much as 20% of sales were for off-label use (*id.* ¶ 90). In contrast, the AC contains no such facts.

Plaintiff's law outside of the off-labeling context also spotlights what is missing from the AC. A CW cited in the complaint in *In re Syncor Int'l Corp. Sec. Litig.*, 239 F.App'x 318, 320 (9th Cir. 2007) alleged that two officer defendants privately admitted that the alleged illegal conduct in that case had increased revenue in the class period. And, the complaint in *City of Roseville Employees' Retirement Sys. v. Horizon Lines, Inc.* alleged substantial detail regarding the specific rate increases on shipping lines that were the subject of the alleged price-fixing scheme and how those rate increases effected the company's reported revenue in each year of the class period. Reply Ex. 2 ¶ 84. There as well, several executives had already pled guilty to criminal charges admitting to the duration of the conspiracy and a civil antitrust complaint had been settled for $20 million, further

---

[2] The facts alleged in the Fourth Amended Complaint were discussed by the Ninth Circuit in *Gilead II*, even though the finding of materiality was made by the District Court in *Gilead III. Gilead II*, 536 F.3d at 1050; *Gilead III*, 2009 WL 1561584, at *3. And, it was not until the Fifth Amended Complaint that plaintiffs adequately alleged all the necessary facts to plead off-label marketing that substantially impacted revenue during the quarter in which the challenged statements took place. *Gilead IV,* 2009 WL 3320492 at * 2; *see also* Reply Ex. 1 ¶ 9.

7

evidencing the specific impact of the illegal conduct. *Id.* ¶ 3, 5. [3] Despite the AC's 362 paragraphs in this case, it fails to demonstrate the impact of the alleged off-label marketing. [4]

**C.     Plaintiff Glosses Over Holes in the CW Allegations Regarding Defendants' Knowledge of Off-Label Marketing.**

Beyond the lack of facts showing widespread undisclosed off-label marketing, no CW alleges that Defendants Trigg, Chambers, or Ahmed engaged in off-label marketing themselves, directed others to engage in off-label marketing, or knew off-label marketing was occurring. The Opposition obfuscates by referring to discussions between CW 4 and Trigg where "FDA clearance for CRRT was not disclaimed." Opp. at 10. This is artful drafting. CW 4 does not allege that CRRT was discussed with Trigg (or Outset's CMO) *at all*. ¶ 78. And, Plaintiff admits it was publicly disclosed that Tablo was not FDA cleared for CRRT. Opp. at 1. Trigg had nothing to disclaim. Indeed, it strains credibility that the President of a large healthcare system made a substantial capital purchase of medical devices without knowing for what uses those devices were FDA cleared.

This is an additional reason that the AC is deficient and distinguishable from *Gilead I, Amgen,* and *Corcept II.* In each of those cases the complaint made specific allegations of the defendants' knowledge of and involvement in the alleged off-label marketing. *Gilead I*, 526 F.3d 1049, at *8; *Amgen*, 544 F. Supp. 2d 1008, 1033; *Corcept II*, 2021 WL 3748325, at *24.

Because Plaintiff has failed to allege the necessary underlying facts of a widespread off-label marketing scheme that drove Outset's success at any point in the Class Period, let alone for its

---

[3] *Homyk v. Chemocentryx, Inc.*, 2023 WL 3579440 (N.D. Cal. Feb. 3, 2023) is inapplicable. It did not involve any alleged omission from revenue statements or any alleged off-label marketing. At issue was allegedly materially misleading statements regarding drug trial results where defendants did not disclose that the FDA had already expressed concerns regarding the trial's design and results.

[4] Plaintiff does not appear to base its challenged of the Revenue or Value Proposition Statements on purported off-label sales of TabloCart and it would be futile to do so in any event. *See* Ex. 11. ("TabloCart, an accessory to the Tablo System, launched in the third quarter of 2022 and sales to date have not been material to the Company's financial results.").

8

entirety, Plaintiff has not adequately pled that any challenged statement was materially false or misleading and the entire case should be dismissed on this basis. As explained below in Section V, complete dismissal is independently proper because Plaintiff has not adequately alleged scienter.

## II.    PLAINTIFF'S SHIFTING THEORY OF FALSITY FOR THE TABLOCART STATEMENTS SHOULD BE REJECTED.

Plaintiff has pled no facts demonstrating that the TabloCart statements were false when made. Instead Plaintiff relies entirely on hindsight to contend Defendants knowingly misrepresented that TabloCart was a non-medical accessory. Mot. at 19. Indeed there is no allegation in the AC that Defendants knew or had reason to believe that TabloCart required FDA clearance before the Letter. And, Plaintiff cites no law in the Opposition to support its fraud by hindsight argument. Recognizing this failure to meet the pleading burden, Plaintiff pivots, arguing that "Defendants"[5] continued to market TabloCart and describe it as a non-medical accessory after the FDA inspection ended and until the disclosure of the Letter, apparently implying that Trigg or Ahmed had some new information in that five-month window. Opp. at 22. This is pure lawyer speculation. No allegations in the AC demonstrate that Trigg or Ahmed knew anything about the observations that the FDA would make before the Company received the Letter on July 5, 2023.

## III.    PLAINTIFF'S ATTEMPT TO PORTRAY THE FDA WARNING LETTER STATEMENTS AS MISLEADING FAILS.

In the Opposition, Plaintiff contends the FDA Warning Letter Statements were false or misleading because they "gave reasonable investors an impression of a state of affairs that differed in a material way from the one that existed" when Outset disclosed the Letter and in the twelve months thereafter. Opp. at 18 (citation omitted). The facts pled in the AC refute this argument.

Just days after receipt of the Letter, Outset disclosed it, including that the Letter observed "certain materials reviewed by the FDA and found on the Company's website promote continuous renal replacement therapy (CRRT), a modality outside of the current indications for the Tablo®

---

[5] Plaintiff's reference to "Defendants" is further indicative of the lax pleading used. Chambers left Outset in 2021, before TabloCart even launched and long before the Letter.

Hemodialysis System." Ex. 11. Outset also disclosed that "labeling and promotional changes [were] already underway" to address the FDA's observation. *Id.* Plaintiff cites no law to support its contention that Outset was required to disclose more, such as the specific details of its instructions to employees about references to CRRT. Opp. at 20. *Gilead II* has no such requirement. In that case, the FDA and not the company disclosed the warning letter identifying off-label marketing, the company did not at that time discuss its response to the FDA's finding, and there was no stock price reaction when the FDA made its disclosure. *Gilead II*, 536 F.3d at 1053. On those facts, and in discussing loss causation (not falsity), the court concluded that the market had not appreciated the full meaning of the FDA's letter. *Id.* Those are not the circumstances here and Plaintiff does not credibly refute that from the July 7, 2023 disclosure of the Letter, a reasonable investor would understand that the FDA had found what it believed was off-label marketing of Tablo for CRRT in early 2023 and that Outset was taking steps to remove and revise its materials and website in response.[6]

Plaintiff runs into the same pleading issue with respect to the subsequent challenged FDA Warning Letter Statements – namely, Plaintiff argues that Outset substantially altered its sales organization because of the Letter, but pleads no facts to support this argument or to refute the explanation Outset gave in August 2024 (a full year later) about the need for it to restructure its sales and marketing to better speak to a changing demographic of decisions makers for the customers it was then reaching. Ex. 19. And, Plaintiff argues it was false for Outset to state that it expected sales to pick up once TabloCart was approved, but does not allege that Trigg or Ahmed had any knowledge or reason to believe that was not true when they spoke. For example, Plaintiff has not alleged that sales pipeline data showed contrary information nor do any former employee CWs allege any facts refuting Trigg and Ahmed's stated beliefs. For these additional reasons, Plaintiff has

---

[6] *Pardi v. Tricida, Inc.*, 2022 WL 3018144, at *13 (N.D. Cal. Jul. 29, 2022) is also inapposite. In that case, the company disclosed positive information about a meeting with the FDA, while withholding other negative information conveyed by the FDA in that same meeting. *Id.* In contrast, Outset explicitly disclosed the FDA's negative observations.

10

failed to allege both falsity and scienter as to the FDA Warning Letter Statements.

## IV.    PUFFERY, OPINION, OR FORWARD-LOOKING STATEMENTS ARE NOT ACTIONABLE.

In their Motion, Defendants showed that nearly two thirds (56) of the challenged statements are inactionable because they were either (1) made with the textbook language of non-actionable opinion and corporate puffery statements, or (2) the exact type of forward-looking statements—accompanied by meaningful cautionary language—that the PSLRA safe harbor was enacted to protect. Mot. at 21–27. Plaintiff responds with conclusory, scattershot retorts that underscore the pleading failures, addressing Defendants' arguments just enough to avoid conceding them outright.

In trying to refute Defendants' arguments, Plaintiff only specifically addresses one of the fifty-six statements, a long Revenue statement excerpt from the Q1 2021 earnings press release:

> On May 5, 2021, the Company issued a press release announcing first quarter results and stating, "[r]ecorded net revenue of $22.9 million in the first quarter of 2021, a 219% increase compared to $7.2 million in the first quarter of 2020." Outset again touted its strong revenue performance and growth without disclosing its off-label promotion of Tablo. Defendant Trigg stated, "[o]ur first quarter was marked by strong revenue performance, continued operational execution, and substantial progress across our strategic initiatives, … With strong interest in Tablo, a robust backlog and clear visibility on the timing of console placements, we are confident in our positioning for consistent strong performance in 2021 and beyond.

Statement 14, Opp. at 16–17 (quoting AC ¶ 124). Plaintiff claims Defendants "cherry-picked" the phrase "we are confident in our positioning for consistent strong performance in 2021 and beyond," to argue this statement is a non-actionable opinion. Opp. at 17. Plaintiff now asserts the preceding sentence ("continued operational execution," "substantial progress on strategic initiatives," "strong interest in Tablo," and "a robust backlog") is misleading because it touts reasons for growth without disclosing the alleged off-label marketing scheme. *Id.* Not only is that language textbook puffery, but the AC does not allege that this part of the statement is misleading. ¶ 124.

Plaintiff's attempts to distinguish Defendants' authorities fare no better. Rather than offering any substantive analysis, Plaintiff simply strings together a series of parentheticals without explaining how they apply to its arguments or to any specific statement at issue. For example, Defendants cited *Pirani v. Netflix, Inc.*, 2024 WL 4894291, at *6 to show why Statements 14 & 41 are forward-looking. *See* Mot. at 32. Each contained the same structure and phrasing as those

11

dismissed in *Pirani*—for instance, "we are confident in our positioning for consistent strong performance in 2021 and beyond" compared with "we're optimistic about our long-term growth prospects." *Id.* In response, Plaintiff attempts a "gotcha," citing *Pirani* for its unremarkable holding that "statements of fact concerning present or historical metrics or business conditions," such as "the underlying business metrics are really healthy," are not forward-looking. Opp. at 27. Yet Plaintiff never identifies any language in any challenged statement it contends *Priani* is relevant to.

Plaintiff's reliance on other cases is equally misplaced. Its citation to *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014), for the proposition that "statements of objective verification [are] not puffery" (Opp. at 17) fails because Plaintiff identifies no such objectively verifiable language here. It offers no example—let alone authority—showing that phrases like "continued operational execution," "substantial progress," "strong interest," or a "robust backlog" are anything other than the sort of vague, optimistic puffery courts consistently deem non-actionable. *See City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (statements like "our demand indicators are strong, our product portfolio is robust" are nonactionable corporate optimism); *Hong v. Extreme Networks, Inc.*, 2017 WL 1508991, at *11 (N.D. Cal. Apr. 27, 2017) (statements that company "had substantial success" integrating the sales teams of company and business it acquired are nonactionable corporate optimism).[7]

With respect to the FDA Warning Letter Statements (64, 68, 74, 82, 85, 87), Plaintiff again relies on the same paragraph-long string cite it used for the Revenue Statements (3–4, 9, 11, 13–14, 19, 20, 25, 30–31, 37, 42–43, 49, 56–58, 61–62), without tying any authority to the language at issue. It simply asserts, without explanation, that Defendants are incorrect. *See* Opp. at 30–31. That is insufficient. As for the Value Proposition Statements (2, 5–8, 12-13, 16–18, 23-24, 34, 36, 38–40, 43, 46, 50, 51, 57, 62, 70, 71, 73, and 75), Plaintiff contends that Defendants misconstrue them and

---

[7] Plaintiff argues that courts routinely deem such statements actionable when defendants fail to disclose an off-label marketing scheme driving revenue and growth, again citing *Amgen* and *Gilead*. Opp. at 13–15. But the AC lacks the specific allegations present in those cases and, without more, cannot transform this classic corporate speak into fraud. *See supra* § I.A.

12

that *Lomingkit* and *Hewlett-Packard* support its position because those cases involved statements not "objectively verifiable" or "capable of being proved false." Opp. at 21 (*citing Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1160 (D. Ariz. 2017); *Elias v. Hewlett-Packard Co.*, 950 F. Supp. 2d 1123, 1134 (N.D. Cal. 2013)). Missing however, is an explanation of how the Value Proposition Statements are objectively verifiable. Accordingly, that argument too fails.

Plaintiff's footnote on forward-looking statements misstates Defendants' position.[8] Defendants do not contend that statements of current or past fact are immunized merely because they appear alongside forward-looking statements. *See* Opp. at 22 n.19 (citing *Quality Sys.*, 865 F.3d at 1142). The problem, rather, remains Plaintiff's own failure to identify which portions of its block quotations are supposedly false or misleading—a defect that continues to obscure the issues for both sides.[9] Plaintiff's reliance on *Glazer* fares no better. Its assertion that Outset's cautionary language was "not meaningful" because it described "as a mere *possibility* a risk that had already materialized" is wrong. Opp. at 22. The risks Outset disclosed had not materialized when the challenged statements were made. The possibility that the FDA might act on Outset's Tablo marketing did not materialize until the agency actually sent its letter. And the subsequent statements expressing expectations for renewed growth were expressly qualified by risk disclosures noting that revenue depended primarily on Tablo sales. *See* Ex. 1 at 13, 45.

---

[8] Defendants contend that Statements 9, 13–14, 19, 25, 30–31, 37, 41, 43, 46, 61–62, 64, 67, 77–79, 81, 83, and 85 are forward-looking statements subject to the PSLRA safe harbor. Mot. at 25.

[9] Courts in this Circuit routinely reject such "puzzle pleadings." *See Xiaojiao Lu v. Align Technology, Inc.* 417 F. Supp. 3d 1266, 1274–75 (N.D. Cal. 2019) (dismissing complaint that "quote[d] and discusse[d] paragraph-long statements and selectively bold[ed] and italicize[d] certain sentences" without identifying which specific statements were allegedly false); *In re Aqua Metals Inc. Sec. Litig.*, 2019 WL 3817849, at *7–*8 (N.D. Cal. Aug. 14, 2019) (same, where plaintiff provided "broad, general explanations [as to why statements were false or misleading] that largely fail to identify the specific statements to which they apply").

13

## V.    PLAINTIFF FAILS TO PLEAD FACTS CREATING A STRONG INFERENCE OF SCIENTER.

Absent specific allegations of each Individual Defendants' knowledge of the purported fraud—of which there are none—Plaintiff must allege particularized facts creating a strong inference of scienter. Mot. at 27–28. The AC does not do so. *Id.* Acknowledging as much, Plaintiff repackages the AC's allegations—that scienter can be inferred from the "core operations" principle, stock sales, and Defendants' conduct during the Class Period—but does not do so with a level of specificity that creates the strong inference required. Mot. at 27. These allegations fail as to each group of challenged statements and each Individual Defendant, and they also fail when viewed holistically.

### A.    Plaintiff Fails to Plead Facts Creating a Strong Inference of Scienter by Defendant Trigg.

***Core Operations***. As explained in the Motion, Plaintiff's vague, repetitive allegations do not support a core-operations inference as to Trigg. They do not show her "detailed involvement in the minutiae of [the] company's operations," and the CWs' claims about her participation in sales meetings identify no specific time or discussion during which she supposedly delivered or received any specific marketing message, let alone information about the magnitude of sales derived from purported off-label marketing (which magnitude, as discussed above, is not itself pled either). Mot. at 28-29 (citing *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d at 1051, 1062 (9th Cir. 2014; *Prodanova v. H.C. Wainwright & Co.*, LLC, 993 F.3d 1097, 1111 (9th Cir. 2021)).

Plaintiff ignores Defendants' authorities and instead devotes several pages to two overextended points: (1) that Trigg's knowledge can be inferred because Tablo was Outset's primary "revenue driver," and (2) that her participation in customer sales meetings shows she was involved in the day-to-day operations of the sales and marketing teams. Neither point withstands scrutiny.

Plaintiff's first theory contends that because Tablo was Outset's "primary product and revenue driver," and because CEO Trigg had "clarity and conviction around the growth drivers," she must have known how Tablo was marketed "on the ground" in every instance. Opp. 23–24 (quoting AC ¶ 145). Plaintiff's contention that the alleged off-label marketing scheme "emanated" from other senior management (Opp. at 3, 24) is not sufficient to infer Trigg's knowledge under this theory. In

14

*Corcept II*, the court found it "absurd" to think management was unaware of the misconduct where multiple confidential witnesses alleged that the VP of Sales "openly pushed" off-label promotion and at least one reported concerns about off-label promotion directly to the CEO. *Corcept II*, 2021 WL 3748325, at *5, *24. Comparable facts are not pled here. Plaintiff's analogy to *Mulligan* is equally unavailing. There, the court found it "absurd" that management could be unaware of manufacturing defects because the FDA had repeatedly notified the company of those problems over several years. *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 969 (N.D. Cal. 2014). Here, by contrast, Plaintiff identifies no comparable link between Trigg—or any Individual Defendant—and any report or notice of off-label marketing concerns before the Letter. A CW's allegation that one executive purportedly instructed salespeople to promote Tablo for CRRT does not, without more, impute knowledge of an off-label marketing scheme to the rest of management.

Plaintiff's argument that Trigg's involvement with customer sales establishes knowledge is equally unconvincing. The limited allegations—that she "spent a lot of time in the field," attended late-stage sales meetings where hospitals were "super excited" about ROI, and described herself as a "commercial focus CEO" eager to "walk patient floors"—say nothing about her awareness of any off-label marketing or of sales, if any, that resulted from that marketing. Mot. at 28-29. Plaintiff's added details about the witnesses who made allegations regarding Trigg's involvement do not strengthen the inference. *See* Opp. at 25. That CW4 "confirmed Trigg personally visited and discussed Tablo with the [health] system (¶ 78), but *never* stated that Tablo was *not* cleared for CRRT," proves nothing. *Id.* (emphasis added). Fraud by double negative is not a theory recognized in this Circuit—or anywhere else. Plaintiff's reliance on *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019), is also misplaced. There, executives personally vouched for their knowledge of drug pricing data that was central to the alleged fraud of a drug pricing antitrust conspiracy. *Id.* Here, Trigg merely expressed enthusiasm for visiting hospitals and attending late-stage sales meetings. None of that suggests she knew—or should have known—how rank-and-file sales staff were trained, whether they engaged in off-label marketing, or whether that marketing led to actual sales. The comparison fails.

***Stock Sales.*** Plaintiff's response to the many flaws in its use of Trigg's stock sales to allege

15

scienter, which jumps arbitrarily across the relevant time period to obfuscate what actually occurred, offers only confusion. What is clear is that Trigg's trades were executed under a Rule 10b5-1 trading plan, which courts recognize may weaken, not support, an inference of scienter. See Mot. at 29 (citing authorities). Nor does Plaintiff allege that, when Trigg adopted the plan, she possessed any material nonpublic information regarding the FDA's assessment of Outset or its marketing practices.

Plaintiff's Opposition fixates on Trigg's stock sales between January and July 2023—the period spanning the FDA's inspection through the disclosure of the Letter—but the AC alleges no facts suggesting Trigg possessed any nonpublic information that would make the timing of her plan adoption suspicious. Opp. at 30-32. The FDA's inspection lasted from January 17 to February 10, 2023, and Outset publicly disclosed it in its Form 10-K filed February 13, 2023. Ex. 17 at 2; Ex. 5 at 13. There is no allegation that when Trigg adopted her updated Rule 10b5-1 trading plan on February 23, 2023, she had access to any material nonpublic information about the inspection. *See* AC ¶¶ 311–316. To imply that Trigg "must have known" certain facts in February 2023, Plaintiff relies on excerpts from the Letter—issued nearly four months later, on July 7, 2023—which states that the FDA's findings were based in part on "evidence reviewed at the inspection" and that Outset's March 3, 2023 responses to the FDA's observations did not address the marketing of Tablo for CRRT. Opp. at 31. But Plaintiff alleges no facts describing what the inspectors observed or what, if anything, was communicated to Trigg or Outset during or after the inspection. This contrasts with *Alger Dynamic Opportunities Fund v. Acadia Pharmaceuticals, Inc.*, 756 F. Supp. 3d 852, 856-57 (S.D. Cal. 2024), where the court found scienter allegations plausible because the complaint specifically alleged that the majority of defendants' sales occurred under plans adopted after they had received critical, nonpublic study results showing that the company's drug was unlikely to be approved by the FDA. Here, Plaintiff alleges no comparable facts. And, indeed, the fundamentally more plausible read of the facts is that Trigg amended her plan after Outset *disclosed* the original observations from the FDA's inspection because that disclosure reflected the full extent of her knowledge on the issue. Mot. at 30. Accordingly, it is merely Plaintiff's unsupported conclusion that Trigg's February 2023 adoption of the trading plan was "opportunistic." *See* Opp. at 31.

Plaintiff cherry-picks individual transactions and arbitrarily groups sales without offering any

16

coherent comparison between Trigg's trades under her February 2023 plan and those made under her prior plan. In fact, Plaintiff's own allegations undermine the idea that Trigg's 2023 sales were suspicious: her alleged total sales during the first half of 2023 totaled $3.46 million—only 12% of the $29.5 million in total sales Plaintiff alleged during the two years preceding the disclosure of the Letter—even though that six month period represented roughly 25% of the total timeframe. *See* Opp. at 31.[10] This bears no resemblance to *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1191 (S.D. Cal. 2009), upon which Plaintiff relies, where the defendants each sold more stock in the months leading up to the corrective disclosure than they had in the three years preceding the class period. Here, Plaintiff identifies no specific pattern, volume, or number of shares sold that would make her sales suspicious in timing or amount. At most, Plaintiff's allegations describe ordinary, pre-planned sales by a corporate executive—not misconduct, and certainly not fraud.

**Other Scienter Theories**. Defendants identified the defects of Plaintiff's patchwork of other miscellaneous allegations; Plaintiff renews these theories in its Opposition to no greater avail.

Plaintiff's theory regarding Trigg's actions after the FDA investigation and Letter fails for the same reasons as her stock-sale allegations: it speculates about what Trigg knew in February 2023 based on findings the FDA did not share until July. None of the cited AC paragraphs (¶¶ 53–59, 287) alleges what Trigg actually knew before the Letter. Even if the FDA discussed Tablo's indications and marketing during the March 13, 2023 call with Outset, that does not show that Trigg concealed unlawful conduct or made statements inconsistent with her knowledge. Knowing information that a plaintiff later claims should have been disclosed is not the same as intending to deceive investors by withholding it. *Colyer v. AcelRx Pharms., Inc.*, 2015 WL 7566809, at *13 (N.D. Cal. Nov. 25, 2015). Plaintiff also fails to show how Outset's post-Letter instruction to remove marketing materials referencing CRRT reflects fraudulent intent; the far more compelling inference is that Outset acted to comply with the FDA's guidance once it became aware of it. *See* ¶ 71; Opp. at 28.

The remainder of Plaintiff's scienter arguments fail because they are untethered to the

---

[10] As noted in the Motion, Plaintiff's entire premise on the magnitude of Trigg's sales is faulty for several reasons including that sales were made pursuant to mandates sales to cover taxes. Mot. at 31.

17

applicable pleading standards. Plaintiff first contends that Defendants' "shifting narrative" regarding declining revenue following disclosure of the FDA Warning Letter "supports scienter." Opp. at 28–29. But while Plaintiff recounts various explanations Trigg or Outset offered for lowering guidance, he never explains what those statements reveal about Trigg's contrary knowledge or how they demonstrate scienter. *See id.* Plaintiff next contends that scienter is "supported" by Trigg's "(a) admitted knowledge that Tablo was not cleared for CRRT, (b) touting Outset's 'value proposition' strategy (¶¶ 90–92), and (c) off-label promotion despite Outset's explicit policies prohibiting such conduct (¶¶ 305–06)." Opp. at 29. This argument is circular. Plaintiff claims these points "support scienter" because Trigg "touted the value proposition marketing strategy without disclosing that it relied on marketing Tablo for CRRT, in violation of its FDA label and Outset's own policies." *Id.* at 29-30. In doing so, Plaintiff assumes the very fact he must prove—namely, that Trigg knew Outset's marketing strategy depended on off-label promotion. Without particularized allegations showing that Trigg actually possessed such knowledge, Plaintiff's theory collapses under its own logic.

### B. Plaintiff Fails to Plead Facts Creating a Strong Inference of Scienter Against Defendants Ahmed and Chambers.

*Core Operations***.** Plaintiff blurs its allegations against the three Individual Defendants to mask the absence of substantive allegations against Chambers and Ahmed. Although Plaintiff claims scienter can be inferred under a core operations theory as to all three Defendants, the only allegations concerning Chambers and Ahmed are that they knew Outset depended on Tablo's success, signed SEC filings, and led analyst calls discussing that dependence. Opp. at 23-24. Plaintiff asserts that it "strains credulity" to suggest that Chambers and Ahmed—who "directly tied revenue growth to demand for Tablo" (¶¶ 125, 141, 145, 147, 156)—were unaware of how the product was marketed, particularly when that marketing purportedly "emanated from senior management." *Id*. at 24. But these allegations fall far short of establishing an inference of scienter for the same reasons discussed with respect to Trigg. *See supra* § V.A. Beyond the absence of facts showing pervasive off-label marketing, there are no CW allegations that Chambers or Ahmed attended sales trainings, discussed sales strategy, participated in Tablo sales or customer discussions, or received data linking Tablo sales to off-label marketing—unlike the detailed, defendant-specific

18

allegations in *Corcept II, Mulligan*, and Plaintiff's other cited authorities. *See* Opp. at 24.

**Stock Sales.** First, Plaintiff is silent as to Chambers' sales, thus conceding that her stock sales are not indicative of scienter. *See Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue").

Plaintiff instead focuses on a time period after Chambers had left the Company: January to July 2023. Plaintiff alleges Ahmed adopted a new 10b5-1 trading plan at the same time as Trigg, following the FDA's inspection and Outset's disclosure of the same in February 2023. Opp. at 31. As discussed above, absent specific allegations that Ahmed possessed material nonpublic information when he adopted his plan, the timing alone does not support an inference of scienter. *See supra* § V.A. Plaintiff further claims that Ahmed's stock sales were suspicious because "nearly 47% of his proceeds from stock sales were from during that six-month window." *Id*. at 32. But Plaintiff offers no comparison to Ahmed's trading activity before this period or other relevant context—such as when he became CFO or when he first entered a Rule 10b5-1 plan. Without such information, there is no basis to infer anything unusual or suspicious about his sales that could support scienter.

**Other Scienter Theories.** Plaintiff's arguments concerning (1) Ahmed's actions and statements following the FDA investigation and Letter; (2) his participation in the alleged "shifting narratives" regarding Outset's revenue guidance after the Letter; and (3) Ahmed's and Chambers's purported "touting" of the value proposition without disclosing its alleged reliance on off-label marketing of Tablo all fail for the same reasons they do with respect to Trigg. *See supra* § V.A.

Even viewed collectively, Plaintiff's allegations do not give rise to any plausible inference of scienter—much less the cogent and compelling inference required under the PSLRA.

### VI. PLAINTIFF IS NOT ENTITLED TO EXTEND THE CLASS PERIOD WITH INADEQUATELY PLED CORRECTIVE DISCLOSURES.

Plaintiff argues that because Defendants have not challenged the adequacy of three of the alleged corrective disclosures, the Court should disregard the deficient pleading as to the subsequent three alleged corrective disclosures, which extend the alleged Class Period by ten months. Opp. at 32-33. That is not the law. The Court can, and should evaluate each alleged corrective disclosure to

19

ensure that Plaintiff is not permitted to litigate an expanded Class Period with no basis for the allegations made. And, courts routinely rule on loss causation allegations on a corrective disclosure basis, just as the court acts as a gatekeeper for the adequacy of each challenged statement. *See McKesson*, 411 F. Supp. 3d at 602; *Ferraro Family Foundation, Inc. v. Corcept Therapeutics, Inc.*, 501 F. Supp. 3d 735, 772-73 (N.D Cal. 2020) (*"Corcept I"*).

The alleged corrective disclosures in November 2023 and May 2024 merely acknowledged the continued revenue decline that Outset had already disclosed after the Letter. Mot. at 32-34. The August 2024 disclosure bears no factual link to the alleged off-label marketing—only Plaintiff's speculation. *Id.* Plaintiff fails to plead loss causation for any corrective disclosures after July 2023.

## VII.    THE SECTION 20(A) CLAIMS FAIL.

A section 20(a) claim only survives if Plaintiff has adequately alleged an underlying violation of Section 10(b). Plaintiff has not. And, as Plaintiff now concedes, it cannot rely on Section 20(a) to hold Chambers or Ahmed liable for statements made when they were not CFO. As to Chambers this means the 20(a) claim cannot be based on challenged statements made after August 2021. As to Ahmed, this means the 20(a) claim cannot be based on statements made before August 2021. More fundamentally, Plaintiff's allegations about Chambers and Ahmed are so thin that nothing beyond their role is pled to support the conclusory assertion that they had control over statements made by Trigg. That is not sufficient to plead Section 20(a) control person liability. Mot. at 35. Furthermore, Plaintiff's reliance on *Freudenberg v. E\*Trade Financial Corp.,* to argue that the Individual Defendants can be held liable for oral statements they did not make is completely off base. 712 F. Supp. 2d 171, 195 (S.D.N.Y. 2010); Opp. at 35. The holding Plaintiff cites was not with respect to Section 20(a), is from out of circuit, and, critically, reflects legal conclusions rejected by courts in this circuit and the Supreme Court in *Janus Capital Grp., Inc. v. First Deriv. Traders*, 564 U.S. 135, 142 (2011), which affirmed that Section 10(b) liability attaches only to the "maker" of a challenged statement. *See also In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153-54 (C.D. Cal. 2007) (group pleading did not survive the PSLRA).

## CONCLUSION

The Court should dismiss Plaintiff's claims in their entirety.

20

Date:  November 17, 2025

Respectfully submitted,

**SIDLEY AUSTIN LLP**

By: */s/ Jaime A. Bartlett*
    Sara B. Brody (SBN 130222)
    Jaime A. Bartlett (SBN 251825)
    Sarah E. Gallo (SBN 335544)

    *Attorneys for Defendants*
    *Outset Medical, Inc., Leslie Trigg,*
    *Nabeel Ahmed, and Rebecca Chambers*

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION
COMPLAINT – CASE NO. 5:24-CV-06124-EJD