# Reply
# Exhibit 1

Laurence D. King (SBN 206423)
    lking@kaplanfox.com
KAPLAN FOX & KILSHEIMER LLP
350 Sansome Street, Suite 400
San Francisco, CA 94104
Telephone: 415-772-4700
Fax: 415-772-4707

*Liaison Counsel for Plaintiffs*

David J. George (*admitted pro hac vice*)
    dgeorge@csgrr.com
Robert J. Robbins (*admitted pro hac vice*)
    rrobbins@csgrr.com
Holly Kimmel (*admitted pro hac vice*)
    hkimmel@csgrr.com
COUGHLIN STOIA GELLER RUDMAN
    & ROBBINS LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone: 561-750-3000
Fax: 561-750-3364

Joshua H. Vinik (*admitted pro hac vice*)
    jvinik@milberg.com
Lori G. Feldman (*admitted pro hac vice*)
    lfeldman@milberg.com
Ross Brooks (*admitted pro hac vice*)
    rbrooks@milberg.com
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119-0165
Telephone: 212-594-5300
Fax: 212-868-1229

*Co-Lead Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re GILEAD SCIENCES SECURITIES LITIGATION | Master File No.  C-03-4999-SI |
| | CLASS ACTION |
| This Document Relates To: | **FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** |
| ALL ACTIONS. | DEMAND FOR JURY TRIAL |

## SUMMARY AND OVERVIEW

1.     Lead Plaintiffs Trent St. Clare and Terry Johnson ("Plaintiffs") bring this federal securities class action individually, and on behalf of a proposed class (the "Class") of all purchasers of the publicly traded securities of Gilead (NASDAQ: GILD) between July 14, 2003 and October 28, 2003, inclusive (the "Class Period"), against Gilead Sciences, Inc. ("Gilead" or the "Company") and certain of its top officers seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Gilead, based in Foster City, California, is a biopharmaceutical company that discovers, develops, and commercializes pharmaceutical treatments for life-threatening diseases. According to Gilead's Forms 10-Q for the periods ending June 30, 2003 and September 30, 2003, the Company has six approved commercial products, including Viread, an antiretroviral agent used in combination with other drugs for the treatment of HIV infection.  At all relevant times, Viread product sales are approximately 65% of Gilead's total revenues.

3.     As stated in Gilead's Form 10-K for the period ending December 31, 2002 ("2002 10-K"), filed with the United States Securities and Exchange Commission ("SEC") on March 14, 2003, Gilead's commercial teams "promote Viread . . . through direct field contact with physicians, hospitals, clinics and other healthcare providers who are involved in the treatment of patients with HIV."

4.     Throughout the Class Period, Defendants knowingly and affirmatively misrepresented the most important measurement of Gilead's performance and prospects to the investing public: the nature and cause of its increased sales of Viread.  Wall Street analysts looked to sales of Viread, Gilead's most important and most promoted drug, to gauge whether the Company's business was on track and growing.  If Gilead failed to publicly report healthy, growing Viread sales, its stock price would be greatly diminished.

5.     Indeed, in an October 28, 2003 press release, Defendant and CEO John C. Martin ("Martin") addressed Gilead's need to obtain "higher prescription volumes" for Viread and identified the "important demand indicators" for Viread as being "new and total prescriptions." Thus, according to the 2002 10-K, Gilead had to "maintain and expand its position in the

1

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                    Case No.: C-03-4999-SI

marketplace" (2002 10-K at 24) in the following areas: "efficacy; safety; tolerability; acceptance by doctors; patient compliance; patent protection; ease of use; price; insurance and other reimbursement coverage; distribution; marketing; and adaptability to various modes of dosing." *See* 2002 10-K at 18.

6.     In an October 27, 2003 *Forbes* article, Defendant Martin acknowledged that in order for Gilead to reach its goal of increasing new and total prescriptions, it had to convince physicians to switch patients from a competitor's drugs to Gilead's Viread drug regimen. According to the article, Defendant Martin "concedes this is driven by marketing: 'The AIDS market is driven by data.'" Thus, according to the author, "Gilead, lacking a big ad budget, woos doctors by putting out a slew of data showing Viread to be more effective than [competitor drugs], with fewer nasty side effects."

7.     In accordance with their business plan, Defendants made certain that Gilead reported extremely impressive Viread sales results during the Class Period. Unfortunately for investors, these results were attained through Defendants' campaign of false and misleading promotional activities for Viread found to be in violation of the Federal Food, Drug and Cosmetic Act and its implementing regulations by the U.S. Food and Drug Administration ("FDA"). This off-label marketing scheme materially (albeit artificially) increased Viread sales and created a false demand for Viread. This skewed demand, in turn, motivated wholesalers to overstock massive amounts of Viread in anticipation of an announced price increase.

8.     To successfully implement their campaign of false and misleading promotional activities, both prior to and during the Class Period, Defendants engaged in a systematic plan to market Viread using clinical studies and other materials that had not received FDA approval and by inducing Gilead sales and marketing representatives to make false and misleading statements concerning Viread's safety and efficacy to physicians, health care professionals and others. Such tactics are generally referred to as "off-label marketing." In doing so, Defendants minimized important risk information regarding Viread, promoted Viread on the basis of unproven and untested theories, and illegally "broadened the indication" for prescribing Viread to patients in violation of FDA regulations by, among other things: (1) promoting it for use in patients with Hepatitis B co-infection, despite the fact that it was not approved for such use; and (2) promoting Viread as an

2

"initial" or first-line treatment for HIV, even though, as discussed in more detail below, the FDA did not approve Viread for such treatment until late 2003. On two occasions, the FDA ordered Gilead to cease and desist this practice. Gilead blatantly ignored the FDA's first warning (in a March 2002 FDA Untitled Letter) and thus received the second, more dire, warning from the FDA in July 2003 (during the Class Period). Defendants' false, misleading, and illegal promotional practices resulted in materially increased sales of Viread during, at least, the Class Period.

9. Indeed, Gilead's off-label and illegal promotional practices led to increased prescriptions which enabled Defendants to create the false and misleading impression that demand for Viread was much stronger than it actually was during the Class Period. As acknowledged by Defendants, increased Viread prescriptions were the primary indicator of strong Viread demand. Defendants, however, misled the market as to the true demand for Viread by failing to disclose that between 75% - 95% of all sales of Viread were caused by off-label marketing. Given Gilead's domestic Viread sales of $115.6 million and $59.4 million during the second and third quarters of 2003, respectively, this means that between $86.7 million and $108.92 million (second quarter 2003) and between $44.5 million and $56.43 million (third quarter 2003) of domestic Viread sales reported during the Class Period were attributable to the off-label marketing scheme. In short, the market was not told that off-label marketing was the cornerstone of demand and defined the culture of the Company. This mistaken impression of demand led to, among other things, wholesaler overstocking in reaction to an anticipated price increase. When the truth about Defendants' off-label marketing was disclosed, however, Defendants could no longer maintain the sales growth levels that investors had come to expect, and Gilead's stock price dropped accordingly.

10. At the beginning of the Class Period, Gilead announced that overall sales doubled during Second Quarter of 2003, year-over-year, largely on the strength of Viread sales. The news caused Gilead's stock price to rise $7.97 in one day, to a near-record high of $67.25.

11. However, securities analysts observed that the apparent strong demand for Viread resulted in part from wholesalers stocking up on the drug ahead of a price increase announced by Gilead in June 2003. The analysts were concerned that in future quarters demand for Viread would be met by inventory stocked by the wholesalers, rather than by new sales.

3

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT          Case No.: C-03-4999-SI

12. Indeed, in order to sell their stock at artificially inflated prices and to sustain the false and misleading impression that demand for Viread was strong, Defendants unequivocally rebutted the analysts' concerns. Defendants represented that the strong Second Quarter 2003 Viread sales were due to "an increase in prescriptions, not inventory stocking" and that "increased stocking by U.S. wholesalers accounted for $25-$30 million of Viread sales." Because Defendants did not reveal that the "demand" for Viread was the result of off-label marketing, Defendants' rebuttal masked the fact that they would not be able to keep up sales growth at the same rate that investors had come to expect. Thus, as wholesalers drew down their overstocking in response to decreased demand, results would ultimately be worse than the market anticipated.

13. Defendants' inflated claims about Viread had their intended effect of maintaining Gilead's stock price long enough for Defendants to dump their Gilead shares on an unsuspecting market.

14. In just twenty-four days (between August 5, 2003 and August 29, 2003), Defendants sold in excess of 300,000 shares of Gilead stock at artificially inflated prices, reaping gross proceeds in excess of $20 million. This was the first and only time when all of the Defendants sold their stock during one coordinated time period. Notably, Defendants' selling spree took place just days after they had received FDA notification (sent to Gilead, care of Defendant Martin on July 29, 2003, but not made public until August 7, 2003) – for the second time since the launching of Viread – that their Viread promotional campaign and off-label marketing practices violated federal law. As set forth below, the disclosure of the existence of the FDA Warning Letter set in motion events that would impede Viread's sales growth and ultimately result in a sharp drop in Gilead's stock price.

15. At the end of the Class Period Defendants announced that sales of Viread in Third Quarter 2003 would be materially less than previously indicated. During the Third Quarter of 2003, wholesalers, responding to decreased demand for Viread after the disclosure of the FDA Warning Letter, drew down the entire amount of overstock and their existing supplies rather than purchase additional Viread. In short, demand for Viread was not nearly as strong as Defendants had led the market to believe.

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT          Case No.: C-03-4999-SI

165. According to CW1 and CW2, Defendants Martin, Milligan, Bischofberger, Lee, and Perry, among others, were in the room when these instructions were given.

166. As described above, CW5 recalled that in the months prior to April 2003, Gilead had been losing ground on Viread sales. As such, a "re-launch" of Viread was necessary, and a planned, executed off-label strategy was required to make up this lost ground. As detailed in the April 2003 slide in question, at least part of the off-label marketing strategy for Viread entailed marketing Viread for patients co-infected with Hepatitis B, including promoting Viread as a treatment for Hepatitis B to gastroenterologists who treated HIV-infected patients. This strategy was facilitated by the Gilead Sales Analytics team, including gastroenterologists on the marketing lists for the Company's HIV Therapeutic Specialists. CW5 recalled that Dr. Cazen was one particular gastroenterologist in the San Francisco, California area who treated co-infected patients and to whom Gilead marketed Viread as a treatment for Hepatitis B during the Class Period.

167. In May 2003, CW2 was required to attend a meeting with Packard, one of Gilead's regional directors, at the Westin Hotel in downtown Atlanta. During this meeting, Packard criticized CW2 for his or her continued refusal to maximize his or her utilization of off-label materials to sell Viread. Thus, throughout CW2's career at Gilead, CW2 experienced first-hand Gilead's constant pressure to participate in its scheme to increase Viread sales through off-label marketing tactics.

168. CW3 recalled that in early 2003, the Company almost doubled its Viread sales force, adding at least 40 new Therapeutic Specialists in approximately mid-2003, and divided the eight existing sales territories into 12 regions. Further, there became a very obvious use of Viread in treatment naïve HIV patients. Although the increase in the number of Therapeutic Specialists should have increased sales, it should not have led to a change in the way Viread was being prescribed – not without off-label marketing. CW3 stated that beginning in the first half of 2003, there was a dramatic switch in numbers – or a notable change in the way Viread was being prescribed. CW3 stated that sales skyrocketed as a result of increased prescriptions to the treatment naïve patient market – for which Viread was not approved at the time. CW3 stated the treatment naïve market was extremely important for Gilead, but was difficult to penetrate for several reasons. First, Gilead did not have approval for a treatment naïve indication until late 2003. Second, practitioners would

50

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT | Case No.: C-03-4999-SI

typically want to test out Viread in experienced patients before prescribing it to treatment naïve patients. To accomplish this, Therapeutic Specialists marketed Viread as having a better safety profile than was indicated on the Package Labeling and marketed it as being as having no side effects.

169.   CW3 estimated that prior to and during the Class Period, the segmentation of HIV patients was approximately 60% experienced patients, 30% naïve patients, and 10% salvage patients. Although the experienced segment of the market was larger, it was a more limited market niche, and represented easy sales for Gilead because experienced patients often developed mutations and resistance profiles that required practitioners to try other treatments. In other words, experienced patients were more likely to switch from using Viread to another drug in a shorter period of time than treatment naïve patients. The naïve market niche was more difficult to penetrate, but very important to Gilead and the growth of sales and market share pertaining to Viread. CW6 confirmed Viread sales representatives sold the drug as a first line therapy to treatment naïve patients "all the time" and that if they did not do so, they would be fired.

170.   Penetrating the treatment naïve market is where Defendants' off-label marketing scheme came into play, and the Company used its training department as the sacrificial lamb to get more off-label information to the sales representatives about off-label indications for Viread, including favorable study results regarding the naïve indication. Moreover, despite CW3's attempts to implement her/his own controls in the distribution of off-label training materials, those controls faced stiff objections and were circumvented. Thus, off-label sales to the treatment naïve market skyrocketed. Indeed, CW6 was provided with off-label promotional materials to push Viread sales to the treatment naïve market, and estimated that *at least 70%* of her/his Viread sales were for off-label, treatment naïve use. CW6 stated the Company was pushing sales to treatment naïve patients because if Gilead got Viread to a treatment naïve patient, that patient was likely to take Viread for a very long time. In other words, access to the off-label treatment naïve market meant not only increased prescriptions, but increased renewals of those prescriptions for a period of many, many years.

51

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                    Case No.: C-03-4999-SI

171.    Similarly, CW5 recalled there was definitely a drive within the Company to get doctors to prescribe Viread to treatment naïve HIV patients, prior to its approval for such use, during the Class Period. CW5 stated this was done as a means to rejuvenate the growth in sales of Viread. For example, CW5 stated the entire Therapeutic Specialist team was aware that the Study 903 data (on Viread's use in treatment naïve patients) was coming down the pipeline. CW5 stated that Gilead had to expand the scope of indications to include promoting Viread for off-label purposes in order to continue to gain market share and increase sales during the Class Period.

172.    On June 23-27, 2003, CW2 attended a Gilead national meeting in San Francisco (the "San Francisco National Meeting") during which Gilead continued to instruct its sales staff on how to effectively use off-label materials to market Viread. Specifically, Gilead presenters instructed Gilead's sales staff, including CW2, on how to overcome the following four objections that potential customers raise regarding Viread: (1) "So Viread is now causing renal problems . . . I knew this would happen"; (2) "I am concerned about my NRTI options when my patients fail Viread"; (3) "I don't believe in qd regimens"; and (4) "My patients tolerate Zerit and I don't see the lipoatrophy develop in them."

173.    In order to combat these objections, during the San Francisco National Meeting, Gilead provided its sales staff, including CW2, with a memorandum which included off-label talking points to be utilized in order to convince potential customers to look past these objections and purchase Viread (the "Off-Label Talking Points"). *See* Exhibit E attached hereto (a true and correct copy of the Off-Label Talking Points).

174.    On CW2's information and belief, Meyers and Rich were present in the room at the San Francisco National Meeting when Gilead's presenters provided the sales staff, including CW2, with the Off-Label Talking Points. Further, on CW2's information and belief, Inouye and Defendants Martin, Milligan, Perry, and Lee, were present at the meeting (which was attended by all Medical Science Liaisons, Regional Directors, and National Account Managers) although they were not physically present in the room for the distribution of the Off-Label Talking Points.

175.    CW2's knowledge and belief of Defendants' scienter is further supported by her/his knowledge of Gilead's standard protocol regarding preparation for regional and national meetings.

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT          Case No.: C-03-4999-SI

176. According to CW2, it was standard practice for all of Gilead's Regional Directors, prior to each national and regional meeting, to travel to Gilead's corporate headquarters in Foster City, California to meet with Gilead's senior management. During these meetings, which included, at various times, Defendants Martin and Perry, as well as Meyers, Weisbrich, Rich, and Helen Harris, the Regional Director of the Mid-Atlantic Region, Gilead's senior management would instruct Gilead's Regional Directors on what training was to be provided to Gilead's sales staff, including training on the use of off-label marketing materials.

177. Just like it did on a daily basis ever since Viread's approval in October 2001, as well as in December 2001, in the Second Quarter 2003 Gilead continued to minimize important risk information (including failing to disclose potentially fatal risks) and broaden the indication for Viread. This time, Gilead's improper and illegal campaign of lies led the FDA, through the DDMAC, to issue a warning letter.

178. On March 31-April 2, 2003, during the 15th National HIV/AIDS Update Conference in Miami, Florida, Gilead made additional off-label oral representations concerning Viread – this time to an FDA employee who was monitoring sales practices -- which minimized important risk information (including potentially fatal risks) and broadened the indication for Viread. As a result, on July 29, 2003, Second Quarter 2003 – the beginning of the Class Period – the FDA issued a warning letter to Gilead (the "FDA Warning Letter"). *See* Exhibit F attached hereto (a true and correct copy of the FDA Warning Letter).

179. According to the FDA's website and the FDA's Regulatory Procedures Manual, warning letters such as this are written communications from the FDA's DDMAC, to a company notifying the company that the DDMAC considers one or more promotional pieces or practices to be illegal. If the company does not take appropriate and prompt action to correct the violation, as requested in the warning letter, there may be further enforcement actions without further notice. Warning letters are issued by the DDMAC Division Director and receive concurrence from appropriate officials in the Center for Drug Evaluation and Research. A warning letter is much more serious than an untitled letter.

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT          Case No.: C-03-4999-SI

180. The FDA Warning Letter, issued during the Class Period and addressed to defendant Martin, stated that Gilead's illegal acts were "particularly troubling because the more than 1,500 attendees of [the 15th National HIV/AIDS Update Conference] included social workers, AIDS educators, and patients with HIV/AIDS."

181. As stated in the FDA Warning Letter, Gilead's lies were so outrageous that Gilead had created a new "intended use" for Viread, causing it to be misbranded.

182. According to the FDA Warning Letter, Gilead's *repeated* omissions and misrepresentations regarding Viread caused "significant public health and safety concerns," and led the FDA to require Gilead to respond with a plan to address the "repetitive promotional activities."

183. Defendants either specifically directed Gilead's sales force to engage in the fraudulent, misleading, and illegal promotional and marketing activities identified in the FDA Warning Letter or, at the very least, knew of the improper and illegal promotional and marketing activities but allowed them to take place.

184. In response to Gilead's repeated misconduct, the DDMAC requested in the FDA Warning Letter that Gilead take "action to disseminate accurate and complete information to the audience(s)" that received the misleading Viread promotional information. Thus, on November 7, 2003, Defendant Martin purported to write an open letter to all attendees of the 15th National HIV/AIDS Update Conference in Miami, Florida, entitled "IMPORTANT CORRECTION OF DRUG INFORMATION" (the "Correction Letter"). *See* Exhibit G attached hereto (a true and correct copy of the Correction Letter).

185. In the Correction Letter, Defendant Martin stated that the DDMAC instructed Gilead to contact conference attendees (there were over 1,500) because of misleading oral statements Gilead made in the promotion of Viread. The purpose of the Correction Letter was to provide "accurate information about Viread and [to correct] certain information as cited in the Warning Letter."

186. More specifically and contrary to what Gilead represented at the conference, Defendant Martin described how Viread: (1) does indeed have serious, potentially fatal, side effects; (2) is a "nucleotide," but belongs to the same class of drugs as "nucleosides"; (3) is a nucleotide, but that fact does not make it better or safer than other HIV drugs and does not make it more potent with

54

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                    Case No.: C-03-4999-SI

fewer side effects (an important clinical distinction the FDA determined Gilead failed to make); (4) is approved only for use in combination with other anti-HIV medicines to treat people with HIV-1 infection; and (5) has not been proven to lower cholesterol levels.

187. As indicated by the Confidential Witnesses, Defendant Martin and the other Defendants knew, prior to the Correction Letter, that Gilead's sales and marketing team was consistently instructed and trained to market Viread with off-label information that, among other things, misrepresented Viread's safety profile by minimizing critical risk information, illegally promoted Viread as a first-line therapy for treatment naïve patients, and illegally promoted Viread as a treatment for Hepatitis B-infected patients.

188. As a result of the activities identified, criticized, and rejected in the FDA Warning Letter as well as the consistent promotion of Viread by way of off-label information, Gilead caused a substantial increase in its sales of Viread during Second Quarter 2003. CW1 and CW2 state that 75% to 95% of Viread sales, including sales during the Class period, were caused by off-label marketing.

189. According to CW2 and CW5, the FDA Warning Letter was a result of comments made by Augustino "Tino" Quintero, one of Gilead's Therapeutic Specialists, at the 15th National HIV/AIDS Update Conference in Miami, Florida. In accordance with Gilead's sales force training, Quintero utilized off-label information when responding to inquiries regarding Viread. Unfortunately for Gilead, the questions Quintero was asked were posed by FDA representatives who were attending the conference specifically to monitor Gilead's sales and marketing tactics.

190. Amazingly, but not surprisingly, Gilead did not fire Quintero for making the off-label comments that he was taught to make by Gilead. Instead, subsequent to making those comments and subsequent to the issuance of the FDA Warning Letter, Gilead rewarded Quintero with membership in Gilead's "President's Club," a distinction reserved for Gilead's top sales producers. According to CW5, Quintero remains employed by Gilead, which would be impossible at other companies where off-label sales are grounds for termination.

191. CW1's and CW2's accounts of the numerous meetings and presentations attended by them, including national and regional meetings, provide a telling and disturbing snapshot of Gilead's

55

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT          Case No.: C-03-4999-SI

sales practices and culture. All of the Confidential Witnesses' collective accounts of the significant details of Gilead's systematic presentation of off-label information to market Viread, and the stunning impact the use of that off-label information had on Viread sales, are virtually identical. At regional meetings, Gilead encouraged CW1, CW2, and other sales team members to aggressively sell Viread with off-label information. At national meetings, Gilead instructed its entire Viread sales force to market Viread with off-label studies and information that were deliberately provided by the Company's training department, as described by CW3 and CW5. Indeed, CW1 and CW2's detailed accounts of the national meetings strongly suggest that their experiences at Gilead were neither atypical nor uncommon; rather, their experiences were the norm. Gilead's sales people were required to and did utilize off-label marketing materials to sell Viread. Both CW1 and CW2 discussed the use of off-label marketing with other members of Gilead's sales force who confirmed their use of off-label information and the fact that their use of such information stimulated sales. It is, therefore, reasonable to infer that 75% to 95% of Viread sales during the Class Period were caused by off-label marketing as the impact is equally applicable to other Gilead salespeople as it is to CW1, CW2, and CW6.

192. At the various meetings described above, Gilead also provided its Viread sales force, including the Confidential Witnesses described herein, with numerous slides, posters, and presentation materials that came directly from the Company's training department. These posters and presentations detailed the off-label clinical information presented at a given meeting. Typically, pharmaceutical manufacturers stamp all such materials with a designation that they should not be used in sales and marketing presentations – that they contain clinical research not approved by the FDA. Defendants did not do this and circumvented CW3's attempts to do this precisely because they intended that these off-label materials would be used to market Viread. As described by CW6, any attempt to restrict use of these off-label materials was a "joke." CW6 also had access to PowerPoint presentations from the Company's Medical Science Liaisons, and the slides could be and were used in sales calls. Based on repeated directives to use off-label data to sell Viread, CW1 recalls that there was not one day that went by during the course of CW1's selling of Viread that CW1 was not utilizing data that was not yet approved by the FDA.

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                    Case No.: C-03-4999-SI

193.   According to CW1 and CW2, often the posters would be distributed with an accompanying memorandum describing them as off-label; however, the posters themselves would completely lack any off-label designation. CW6 recalled that if the off-label materials did have any special designation, it was stamped on the bottom or in the margins, such that the designations could easily be eliminated during photocopying. This would enable Gilead's sales and marketing team members to use the information in sales presentations without the customer realizing that he or she was seeing off-label information. Therefore, as it did in national and regional meetings, Gilead was able to continue its "wink and nod" tactics even with off-label posters. As recounted by CW3, the Company's training department was tasked with disseminating off-label materials to the sales force.

**D.     Defendants' Off-Label Promotion Increased Sales of Viread**

194.   At all times relevant to the Class Period, Defendants' continued use of off-label marketing of Viread worked, causing physicians to prescribe more Viread. In addition, Defendants' off-label marketing caused physicians to prescribe Viread for purposes other than those approved by the FDA. Thus, off-label marketing had its intended impact – Defendants significantly increased Viread sales.

195.   CW3 stated there was definitely a "wink and nod" strategy to promote Viread off-label both before and during the Class Period. This strategy was driven by the desire for increased growth in the sales of Viread, as well as the premise that the HIV market was centered on a "dynamic disease," for which new data was regularly emerging. And, as CW3 confirmed, Gilead's strategy to market for off-label indications followed the tone from the top, as set by Defendant Martin, who routinely spoke about Viread off-label. Through following Martin's lead and observing Martin's off-label promotion of Viread, the Therapeutic Specialists learned that such behavior was the acceptable and expected practice.

196.   In the Washington state region to which CW3 was assigned when she/he was a Therapeutic Specialist, Martin often spoke to doctors with practices that entailed the treatment of 200 to 500 HIV patients and key opinion leaders to promote Viread for off-label indications. CW3 explained there were doctors who were heads of large HIV departments or who led regional medical centers, and who typically would not agree to see a Therapeutic Specialist. These more high profile

57

HIV practitioners, however, would allow appointments from a Gilead Medical Science Liaison or Martin. When a Medical Science Liaison or Martin visited the more high profile HIV practitioners, the nature of the visit was typically a sales call and CW3 stated that off-label information was often disseminated in such sales calls.

197.    While Martin's observed off-label promotion of Viread occurred prior to the start of the Class Period, CW3 confirmed the Company's off-label promotion of Viread continued into the Class Period. As set forth above, during the Class Period, CW3 was directed to write-up and develop training materials for the sales force that included off-label details regarding Viread. CW3 received a clear message from Meyers to include such information in the training materials for incumbent and incoming Therapeutic Specialists.

198.    According to CW1, approximately 50-60% of HIV patients were included in an initial therapy group of patients who were using an HIV drug regimen for the first time. Another 30-40% were part of a second therapy group of patients who were making their first switch to a different HIV treatment regimen. Only approximately 20% of patients (*i.e.*, those who were not part of the initial or second therapy groups) were in a rescue situation, looking for a drug that would control their viral load after the virus developed a resistance to other combinations of HIV drug therapies.

199.    In other words, as a result of the manner in which Viread was approved by the FDA, roughly 60% of the available HIV patient pool was unavailable to Defendants. However, Viread was aggressively and illegally marketed in order to open up the maximum potential patient pool. As a result, Viread was prescribed off-label to these patients. Therefore, according to several Confidential Witnesses, including CW1, Defendants instructed Viread sales representatives to promote studies (*i.e.*, Study 903) on the effect of Viread on initial or first-line therapy patients to foster increased sales. Defendants further publicized new studies on Viread and provided them to their sales and marketing staff in an attempt to change physicians' views on the drug and achieve sales beyond the patients authorized by the FDA.

200.    Defendants' off-label campaign succeeded. CW1 sold approximately $3 million of Viread during his tenure at Gilead. According to CW1, approximately 85% to 95% of all of CW1's Viread sales arose from off-label promotion. In fact, CW1 did not have a single sales contact where

58

off-label information was not used to market Viread. According to CW1, the Company provided so much off-label data and was so forceful in instructing sales representatives to utilize off-label information that off-label information was the cornerstone of Gilead's Viread marketing efforts. This unequivocal sentiment was echoed by several other Confidential Witnesses. According to many Confidential Witnesses, off-label marketing took three forms: (1) marketing to HIV patients co-infected with Hepatitis B; (2) marketing Viread as a first-line or initial therapy for HIV infection; and (3) marketing against Viread's safety profile.

201. CW2's experiences mirror CW1's and CW2 corroborates CW1's analysis of the material impact of off-label marketing on Gilead's sales of Viread. To be sure, CW2's Viread sales were also based, in very large measure, on off-label marketing. CW2's sales analysis can be divided into two parts: before and after Georgia, CW2's territory, added Viread to its formulary list for the federal AIDS Drug Assistance Program ("ADAP") system.

202. According to the U.S. Department of Health and Human Services, ADAP provides medications for the treatment of HIV disease. The program is funded through Title II of the Ryan White CARE Act, which provides grants to States and Territories. Through ADAP, grants are awarded to all 50 States. Specifically, Congress earmarks funds that must be used for ADAP. The ADAP "earmark" has increased more than 1,000 percent over the past five years, from $52 million in 1996 to $639 million in 2002. But, total ADAP spending is even higher, since State ADAPs also receive money from their respective States, other CARE Act programs, and through cost-savings strategies.

203. Approximately 128,078 people received medications through ADAP in 2000. None had adequate health insurance or the financial resources necessary to cover the cost of medications. On average, 73,000 clients are served each month. The ADAP in each State and Territory is unique in that it decides which medications will be included in its formulary, and how those medications will be distributed. Each State and Territory establishes its own eligibility criteria. All require that individuals document their HIV status. Fifteen States have established income eligibility at 200% or less of the Federal Poverty Level ("FPL"). Nationally, more than 80% of ADAP clients have incomes at 200 percent or less of the FPL. *See* http://hab.hrsa.gov/programs/factsheets/adap1.htm.

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT          Case No.: C-03-4999-SI

204.    According to CW2, inclusion in the ADAP formulary means that all AIDS/HIV patients covered by the program receive the drug and sales increase exponentially. Prior to Viread's inclusion in the Georgia ADAP formulary, CW2 sold approximately between $10 million and $15 million of Viread.  Of those sales, CW2 estimates that 85%-90% were a result of off-label marketing. After inclusion of the Georgia ADAP formulary (late 2002 through early 2004), CW2 sold approximately between $15 million and $20 million of Viread. Again, CW2 states that 85%-90% of those sales were caused by off-label marketing. Like other Confidential Witnesses, CW2's off-label marketing involved: (1) marketing to HIV patients co-infected with Hepatitis B; (2) marketing Viread as a first-line or initial therapy; and (3) marketing against Viread's safety profile.

205.    Based on his/her own off-label Viread sales, CW1 believes that 75%-95% of all sales of Viread in the United States were the result of off-label marketing.  Indeed, one has only to compare Gilead's explosive growth from 2002 to 2003 to see the effect that off-label marketing had. Viread sales in the first quarter of 2002 were $27.1 million, compared with $107 million in the first quarter of 2003.  Viread sales in the second quarter of 2003 were a whopping $167 million – up from $44.7 million in the second quarter of 2002.  Indeed, CW3 recalled that treatment naïve sales grew dramatically as the Company made a push to increase sales through off-label marketing at the end of 2002 and beginning of 2003.

206.    CW6's experience selling Viread off-label in the New York City market led her/him to estimate that at least 70% of her/his sales were off-label for use by treatment naïve patients. Adding in the fact that she/he was also encouraged to market Viread off-label to Hepatitis patients, and CW6's experiences corroborate CW1 and CW2's estimates of the extent of Gilead's off-label sales.  Specifically, CW6 stated her/his total sales of Viread for the 2003 timeframe were approximately $400,000 to $500,000 per month.  Thus, during 2003, CW6 sold approximately between $4,800,000 and $6,000,000 of Viread, of which at least between $3,360,000 and $4,200,000 (*i.e.*, 70%) resulted from off-label marketing and sales.  Taking out the dramatic impact of off-label marketing to treatment naïve patients, CW6 would have only sold between $120,000 and $150,000 of Viread per month during 2003, for a total of between $1,440,000 and $1,800,000 for all of 2003.

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                Case No.: C-03-4999-SI

207.    Moreover, Gilead's domestic Viread sales were \$115.6 million in the second quarter of 2003, compared with \$29.2 million in the second quarter of 2002. Based on CW1's information, which is bolstered by the accounts of all the Confidential Witnesses, off-label sales accounted for between \$86.7 million and \$109.82 million in the second quarter of 2003. The staggering impact of off-label marketing is underscored by the seriousness of the off-label marketing as described in the Untitled Letter and the FDA Warning Letter.

208.    As set forth by many Confidential Witnesses, the use of off-label marketing of Viread was pervasive. According to CW1, sales representatives would discuss amongst themselves which off-label materials and marketing tactics were generating the most sales. CW1 knows this because of CW1's experiences on the Gilead Field Marketing Advisory Committee, which exposed CW1 to Therapeutic Specialists and Gilead executives from all regions of the United States. In addition, CW1 would discuss sales techniques with successful Therapeutic Specialists in other regions of the country in an effort to find out what methods worked best for them. These discussions included descriptions of off-label marketing techniques. In addition, according to a former Therapeutic Specialist who was part of Viread's launch and with the Company through June 2002, the sales force was supplied with documents listing physicians and a profile of the drugs they prescribed. The list would allow sales representatives to tailor their Viread pitch to suit the prescribing patterns of the various doctors and explain why Viread was superior to the drugs the physician had been prescribing.

209.    As a result of Defendants' off-market labeling, physicians prescribed Viread for purposes not specifically approved by the FDA. For example, according to an AIDS-specialist physician who treats between 2,000 and 2,500 AIDS patients in the Western United States, he routinely uses Viread off-label to treat Hepatitis B co-infected HIV patients. In addition, this physician began using Viread as a first line antiretroviral therapy in early 2003, before it was approved by the FDA in late 2003 for this purpose, in response to unsolicited data this physician received from Gilead concerning Study 903 and the use of Viread in treatment naïve patients.

210.    As described above, during the Class Period Viread was never indicated for treatment in patients who are co-infected with HIV and Hepatitis B – the FDA had not approved such a use of

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                    Case No.: C-03-4999-SI

Viread and thus prohibited any marketing of Viread for treatment of co-infected patients. In fact, the FDA warned against this practice, as described above, in a black box warning – the strongest warning possible – in the Viread label.[4]

211.   Additional data supports the accounts of the Confidential Witnesses. According to the "HIV Therapy Audit," a quarterly physician survey designed to monitor HIV+/AIDS patients who are seeking treatment and their associated drug and non-drug therapy that was conducted by Verispan, LLC,[5] HIV patients co-infected with Hepatitis B first began using Viread in the third quarter of 2002. At that time, 55.5% of co-infected patients surveyed used Viread. By the third quarter of 2003, 72.7% of co-infected patients surveyed were using Viread, despite the fact that: (1) no data existed that conclusively demonstrates that Viread effectively treats Hepatitis B infection, with or without HIV co-infection; (2) the FDA had never approved of the use of Viread in HIV and Hepatitis B co-infected patients and, indeed, specifically warned against it; and (3) HIV resistance to antiretrovirals, such as Viread, leads HIV positive patients to change their drug regimens, exposing co-infected patients using Viread to severe acute exacerbations of Hepatitis B infection.

212.   The 72.7% from the third quarter of 2003 figure translates into roughly 26,000 patients, based on the fact that roughly 10% of the HIV infected population are co-infected with Hepatitis B, and approximately 360,000 HIV patients receive antiretroviral treatment such as Viread. *See* United States Centers for Disease Control's ("CDC") Morbidity and Mortality Weekly Report ("MMWR") (available through the CDC's website (http://www.cdc.gov/mmwr); *see also*

_____

[4] The FDA warning label for Viread also advised healthcare professionals to check HIV patients for Hepatitis B co-infection, prior to the patients taking any Viread, to prevent instances of liver failure in the event an HIV patient has to change his or her drug regimen and stop taking Viread due to HIV resistance.

[5] Verispan describes itself as "revolutionary health care information company" that "is the leading provider of patient-centric, longitudinal data delivered in near real time as well as one of the major providers of health care information overall." "Verispan has secured rights to data from more than half of all U.S. prescriptions and over 20% of all U.S. electronic medical transactions annually. Verispan captures at least 25% of all prescriptions from 98% of all three-digit zip codes and at least 45% of all prescriptions from almost 80% of all zip codes. This pervasive data coverage means that Verispan can provide better insight into prescription and medical activity at the national, regional and individual prescriber level than ever before possible." *See* http://www.verispan.com/about/.

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                    Case No.: C-03-4999-SI

http://www.gilead.com/wt/ltd_slideshow/hiv.[6] This data is bolstered by the account of CW7, who stated that 10% of her/his total Viread sales were to Hepatitis B infected patients.

213. Defendants also increased Viread sales by improperly marketing Viread as a first-line (initial) therapy for treatment naïve HIV patients, before Viread was indicated for these patients. Until late 2003, Viread was not indicated for use in treatment naïve patients. Not content to await FDA approval of Viread as a first-line antiretroviral drug, Defendants immediately used off-label marketing to sell Viread as a first-line HIV therapy upon launching Viread in October 2001.

214. According to an Infectious Disease Specialist in the Southeast United States with a large AIDS practice that comprises 40% to 45% of his total practice, he began to receive unsolicited advice on using Viread as a first line HIV therapy from Gilead sales representatives shortly after Viread was launched in October 2001. He then began to use Viread as a first line therapy in 2002. A second Infectious Disease Specialist in the Southeast United States also received unsolicited material from Gilead representatives on the use of Viread as first line therapy upon Viread's October 2001 launch. The second Infectious Disease Specialist began using Viread as a first line therapy in 2001.

215. According to the HIV Therapy Audit, in the fourth quarter of 2001 (shortly after its launch), approximately 11.2% of patients taking Viread in the U.S. were using it as a first-line treatment. By the third quarter of 2003, Defendants' improper off-label marketing had increased that number had to 23.8%. Thus, out of roughly 83,000 patients on Viread by the third quarter of 2003 (according to the HIV Therapy Audit), almost 20,000 were using Viread as a first-line therapy.

216. Gilead also marketed Viread against its safety label. Gilead sales representatives routinely represented that Viread had no side effects and was as safe as placebo. Martin called it a "miracle product." According to the Medical Director of a large AIDS clinic in Washington, D.C. who uses Viread routinely in patients, Gilead representatives told him that Viread was completely safe – as safe as placebo. In particular, the Medical Director said that the Gilead representatives

---

[6] Likewise, an informal survey of AIDS physicians resulted in reported co-infection rates of between 5% and 30%.

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT Case No.: C-03-4999-SI

marketed Viread as completely safe with regard to renal function. The Medical Director stated that based on these false representations (off-label marketing), he wrote prescriptions for Viread. Since prescribing Viread based on false safety marketing, the Medical Director has had patients develop renal (kidney) failure due to Viread and is now cautious about using Viread. This Medical Director stated that he felt he had been deceived about Viread's safety profile by Gilead drug sales representatives.

217. Similarly, an AIDS specialist from the Western United States was told by Gilead representatives that Viread was a safe drug without nephrotoxicity (risk of renal problems). This AIDS specialist has since found that nephrotoxicity is a problem with Viread – contrary to what Gilead sales representatives told her. Likewise, a Doctor of Pharmacy practicing in the Mid-West United States, who has 20% of the patients in her AIDS clinic on Viread, was told by Gilead sales representatives that Viread had a safety profile similar to placebo. Since then, she has seen increasing frequency of renal insufficiency in patients on Viread – in direct contravention to Gilead's off-label marketing tactics.

218. The Verispan data, the data collected from public sources, and the estimates of confidential sources, including many physicians, demonstrate that extraordinary amounts of Viread were prescribed as a direct result of Defendants' off-label marketing. Extrapolating from Verispan's survey data, nearly 20,000 patients were taking Viread as a first-line therapy, 26,000 co-infected patients were taking Viread, and certainly large numbers of Viread patients were obtained by marketing against the safety label. This data, which includes the Verispan data, is therefore in line with and corroborates all of the Confidential Witnesses' estimates that off-label marketing formed the basis for the Company's sales culture, including CW1 and CW2's estimates that 75% to 95% of Viread sales during the Class Period were caused by off-label marketing, and CW6's estimate that at least 70% of her/his Viread sales were caused by off-label marketing to treatment naïve patients.

219. The Verispan data is based on surveys of physicians. As a result, it is not a complete picture of Viread's use as a result of off-label marketing. Gilead's financial statements in their SEC filings, however, corroborate the Verispan data. Gilead's financial data shows Viread sales growing from its launch through the Class Period from revenue of $13 million to revenue of $115 million. At

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                    Case No.: C-03-4999-SI

Case 3:03-cv-04999-SI Document 234-2 Filed 07/10/09 Page 22 of 39

the same time, Viread sales became a larger percentage of Gilead's total sales from 22.1% at the fourth quarter of 2001 to 59.5% at the third quarter of 2003.

220. Whether using the data extrapolated from Verispan, whether using the 75% to 95% estimate of Viread sales resulting from off-label marketing as calculated by CW1 and CW2, the 70%-plus estimate calculated by CW2, or whether taking into account the collective experiences of all of the Confidential Witnesses, the results are not only material, but stunning.

221. Defendants will likely (because they have in the past) argue that the fact that 75% - 95% of CW1's and CW2's sales of Viread, as well as at least 70% of CW6's sales of Viread, were a direct result of off-label marketing (amounts that Gilead cannot dispute are material) does not mean that 75% - 95% of Gilead's Viread sales were caused by off-label marketing. However, taking all of the allegations of this Complaint as true, it is clear that the Court should draw an inference that Gilead's company-wide Viread sales were materially artificially inflated as a direct result of off-label marketing.

222. The inference that Gilead's Viread sales were materially artificially inflated by off-label marketing is supported by, among other things: (1) the intensity and frequency with which Gilead ordered its sales force to use off-label marketing; (2) the pressure put on all of the Confidential Witnesses to disseminate and actually utilize off-label marketing; (3) the volume of CW1, CW2, and CW6's Viread sales caused by off-label marketing; (4) the fact that off-label marketing materials were deliberately delivered to the sales force through the Company's training department; (5) the FDA letters, which corroborate the Confidential Witness allegations that there was a deliberate, covert effort to engage in systemic off-label marketing; (6) the statistical evidence of the levels of off-label sales; and (7) the familiarity that CW1 (especially as part of the Field Advisory Board) and CW2 have with other Gilead sales people and their knowledge that other Gilead sales people use off-label marketing to sell Viread.

223. Indeed, every indication is that the use and impact of the off-label marketing was across-the-board. Even if the Court were to, for the sake of argument, cut CW1's and CW2's estimates in half, to 35% - 45%, the impact of off-label marketing is material.

---

65

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT         Case No.: C-03-4999-SI

dissemination of the various statements which Plaintiffs contend are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

297.   In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

298.   As set forth above, Gilead and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, each of the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price decline on or about October 28, 2003 when artificial inflation was released from Gilead stock.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief and judgment, as follows:

A.   Declaring that this action is a proper class action, and certifying Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel for proposed Class;

B.   Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court deems appropriate.

89

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT                    Case No.: C-03-4999-SI

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: July 10, 2009                    KAPLAN FOX & KILSHEIMER LLP


                                        /s/ LAURENCE D. KING
                                        LAURENCE D. KING

                                        350 Sansome Street, Suite 400
                                        San Francisco, CA 94104
                                        Telephone: 415-772-4700
                                        Fax: 415-772-4707
                                        email: lking@kaplanfox.com

                                        *Liaison Counsel for Plaintiffs*

                                        Joshua H. Vinik (*admitted pro hac vice*)
                                           jvinik@milberg.com
                                        Lori G. Feldman (*admitted pro hac vice*)
                                           lfeldman@milberg.com
                                        Ross Brooks (*admitted pro hac vice*)
                                           rbrooks@milberg.com
                                        MILBERG LLP
                                        One Pennsylvania Plaza
                                        New York, NY 10119-0165
                                        Telephone: 212-594-5300
                                        Fax: 212-868-1229

                                        David J. George (*admitted pro hac vice*)
                                           dgeorge@csgrr.com
                                        Robert J. Robbins (*admitted pro hac vice*)
                                           rrobbins@csgrr.com
                                        Holly Kimmel (*admitted pro hac vice*)
                                           hkimmel@csgrr.com
                                        COUGHLIN STOIA GELLER RUDMAN &
                                           ROBBINS LLP
                                        120 E. Palmetto Park Road, Suite 500
                                        Boca Raton, FL  33432
                                        Telephone: 561-750-3000
                                        Fax: 561-750-3364

                                        *Co-Lead Counsel for Plaintiffs*

90

FIFTH CONSOLIDATED AMENDED CLASS ACTION COMPLAINT          Case No.: C-03-4999-SI