# Reply
# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE**

| | |
|---|---|
| CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br><br>Plaintiff,<br><br><br>v.<br><br><br>HORIZON LINES, INC., HORIZON LINES, LLC, CHARLES G. RAYMOND, MARK URBANIA, JOHN V. KEENAN, JOHN W. HANDY, BRIAN TAYLOR, GABRIEL SERRA, R. KEVIN GILL, and GREGORY GLOVA,<br><br><br>Defendants. | No. 08-969(HB)<br><br>(Securities Class Action)<br><br>Hon. Harvey Bartle, III<br><br><br><br>ELECTRONICALLY FILED<br><br><br><br>**JURY TRIAL DEMANDED** |

<u>**AMENDED CONSOLIDATED SECURITIES CLASS ACTION COMPLAINT**</u>

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ................................................................................ 1

II.   JURISDICTION AND VENUE ........................................................................ 8

III.   PARTIES ............................................................................................................ 8

     A.    Lead Plaintiff ......................................................................................... 8

     B.    Defendants ............................................................................................. 9

IV.   CLASS ACTION ALLEGATIONS ................................................................ 15

V.    DEFENDANTS' FRAUDULENT SCHEME ................................................ 17

     A.    Competition in Horizon's Trade Lines ............................................... 17

     B.    Horizon's September 26, 2005 IPO .................................................... 21

     C.    Ongoing Criminal Antitrust Investigation and Defendants' Guilty Pleas ............ 23

     D.    Horizon is A Defendant in an Antitrust Class Action in Puerto Rico .................. 26

     E.    Information Relevant to this Action is Particularly Within Defendants' Control ...... 27

         1)    The Ongoing DOJ Investigation Has Restricted Lead Plaintiff's Access to Witnesses and Information .................. 27

         2)    Horizon Has Prevented Lead Plaintiff From Gaining Access to Information Provided By Horizon as Part of its Settlement Agreement in the Puerto Rico Action ...................... 29

         3)    Horizon Has Specifically Barred Lead Plaintiff from Accessing Information the Company Provided Pursuant to a Delaware Books and Records Request ....................... 30

     F.    Horizon's Fraudulent Price-Fixing Scheme in Its Puerto Rico Trade Line and Defendants' Scienter ............................ 31

VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................. 47

     A.    Misstatements and Omissions Related to the Sources of Horizon's Revenues and Financial Performance ....................... 48

     B.    Misstatements and Omissions Related to Pricing, the Market and Competition ............................ 66

C.      Materially Misleading Statements and Omissions Related to the Puerto Rican Market and Its Post-Cartel Exposure Earnings Guidance ........................ 98

D.      Misstatements in Sarbanes-Oxley Certifications ................................. 105

VII.    ADDITIONAL STATEMENTS DEMONSTRATING AUTHORITY TO SPEAK ON BEHALF OF HORIZON BY DEFENDANT SERRA ................................. 107

VIII.   ADDITIONAL ALLEGATIONS RELEVANT TO SCIENTER ................................. 109

A.      The Senior Management Defendants Had A Duty to Monitor Horizon's Compliance With the U.S. Antitrust Laws Prohibiting Price-Fixing and Ignored Red Flags Alerting Them To the Need to Investigate ........................ 109

B.      Defendants Serra, Gill and Glova Have Already Admitted Their Scienter and Confirmed Horizon's Participation in the Price-Fixing Conspiracy ........... 112

C.      Defendants Raymond, Urbania, Keenan, Taylor and Handy Acted With Scienter ................................................................. 113

D.      Defendants Were Motivated By a Desire to Make Millions of Dollars in the IPO and Then to Sell Their Inflated Shares of Common Stock Throughout the Class Period ................................................. 121

IX.     LOSS CAUSATION ................................................................. 130

X.      INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................................. 133

XI.     PRESUMPTION OF RELIANCE ................................................................. 134

XI.     CLAIMS FOR RELIEF ................................................................. 135

COUNT ONE:  For Violations Of Section 10(b)  Of The Exchange Act, Against All Defendants ................................................................. 135

COUNT TWO: For Violations Of Section 20(a) Of The  Exchange Act Against Horizon Lines, Inc. ................................................................. 136

COUNT THREE: For Violations Of Section 20(a) Of The Exchange Act  Against Defendants Raymond, Urbania, Keenan, Handy, Taylor, Serra and Gill ........... 138

XII.    JURY TRIAL DEMAND ................................................................. 140

XIII.   PRAYER FOR RELIEF ................................................................. 140

Case 1:08-cv-00969-HB   Document 86-2   Filed 12/23/09   Page 5 of 32

The Police and Fire Retirement System of the City of Detroit ("Detroit P&F," "Lead Plaintiff," or "Plaintiff") brings this federal securities law class action on behalf of itself and all other persons and entities, other than Defendants and their affiliates as specified below, who purchased or acquired publicly traded shares of common stock of Horizon Lines, Inc. between September 26, 2005 and April 25, 2008, inclusive (the "Class Period"), and based on the conduct of Defendants asserted herein, were injured thereby.

## I.   NATURE OF THE ACTION

1.      This case arises from an admitted antitrust price-fixing conspiracy that took place at one of the United States' leading ocean container shipping companies—Defendant Horizon Lines, Inc. and its subsidiaries Defendant Horizon Lines, LLC, Horizon Logistics Holdings, LLC and Horizon Lines of Puerto Rico, Inc. (unless otherwise specified, referred to herein collectively as, "Horizon" or the "Company")—over a period of at least five years.  During the Class Period, Defendants misled investors about the most fundamental aspects of the Company's business, including the legality and sustainability of its pricing practices, and the underlying reasons for the Company's reported competitive advantages, earnings and financial growth.

2.      By knowingly breaking the law, making false and misleading misrepresentations and omissions to investors, and placing the Company at the heart of an ongoing criminal investigation—as a result of which, to date, three of Horizon's executives (named as Defendants here) were sentenced to a collective 83 months in prison—Defendants caused hundreds of millions of dollars in investor losses.  By contrast, the price-fixing conspiracy allowed Horizon to conduct an initial public offering ("IPO") on favorable terms at the start of the Class Period and to thereafter artificially inflate the value of its common stock until the conspiracy was revealed.  The IPO and the Company's artificially inflated stock price personally enriched the individual executives at Horizon by millions of dollars.

3.      Horizon's illegal price-fixing scheme is the subject of continuing criminal investigations and its full contours are yet to be revealed.  It is clear, however, that the conspiracy was centered on the core operations of the Company and that the unlawful behavior was widespread and extended to the highest levels of management.  Indeed, Horizon has agreed to pay $20 million dollars to settle a civil antitrust class action in the District of Puerto Rico (and to cooperate extensively with those plaintiffs pursuant to a confidentiality agreement.  The limited information that has been made available to date confirms that, beginning no later than 2002, Horizon entered into unlawful and secret agreements with its three Puerto Rican competitors to allocate customers amongst themselves.  The Company and its competitors then conspired to fix shipping rates by insuring that each conspirator's allocated customer would receive meaningful rate quotes from only one company.  Horizon and its co-conspirators also agreed to fix fuel and surcharge rates to unlawfully boost revenues and meet earnings expectations.  As a result of this unlawful conspiracy, Horizon's investors were deceived into believing that Horizon's profits in Puerto Rico and elsewhere were improving, or, later in the Class Period, at least remaining stable, despite a poor, or "soft" market.  As investors later learned, this was not the case.

4.      Throughout the Class Period, Horizon and its senior executives made public and material misstatements and omissions related to Horizon's pricing practices, the competitive market for Horizon's services, Horizon's historical and projected revenues and the Company's business prospects in the Puerto Rico ocean shipping market and elsewhere.  For instance, the pricing figures and reports that were the direct product of the antitrust conspiracy were generated by the Puerto Rico division led by Defendant Serra and incorporated into Horizon's reported revenues and EBITDA in the Company's financial statements.  Moreover, in the second quarter

of 2007, Defendants reassured investors that, notwithstanding the weakness in the Company's vital Puerto Rican market, the Company was "continuing to get rate increases that are slightly ahead of what [their] inflationary costs are." Again and again, during calls with investors announcing Horizon's financial results, Defendants disclosed "increase[d] tradable rates" in Puerto Rico of 3%-4% despite the negative outlook in the Puerto Rican market. Rather than attribute these rate increases to the Company's illegal price fixing conspiracy, Horizon insisted that rates increased despite volume softness because, among other things, "[t]here's been good discipline in the market between [Horizon] and [its] competitors." Although Horizon and its senior executives told investors that the Company's revenue growth, competitive advantages, and stability were the result of negotiated contracts, rate improvements, "strong customer relationships" and high service levels, these statements were false and were designed to conceal the real reason for Horizon's revenue growth: an admitted criminal price-fixing conspiracy.

5.      On April 17, 2008, the truth about Horizon was partially revealed when the Department of Justice ("DOJ") Antitrust Division and the Federal Bureau of Investigation ("FBI") executed search warrants on Horizon and its co-conspirators, revealing to the public that Horizon was at the center of a scandal involving price-fixing and bid-rigging in the Puerto Rico ocean shipping market. To date, three Horizon executives—Defendants Gabriel Serra, Gregory Glova and R. Kevin Gill—have pled guilty to criminal conspiracy to suppress and eliminate competition by rigging bids, fixing prices and allocating customers in violation of the Sherman Act. According to the DOJ, Defendant Serra had regular and "direct communications with a number of other senior executives" at Horizon and represented only the "middle" of the hierarchy involved in the conspiracy. Moreover, in the DOJ's sentencing memorandum for Defendant Gill, the DOJ stated that "[Gill] has provided evidence, in the form of statements and

3

documents, against his superiors within [Horizon], including presently uncharged co-conspirators." All of Defendant Gill's "superiors" at the Company that were involved in the Puerto Rico trade lane are named as Defendants in this action, as are those Horizon officers senior to Serra.

6. Following the announcement that the DOJ and FBI were investigating Horizon, Defendants were faced with the reality that their price-fixing scheme was no longer viable. Without this illegal activity, Defendants knew that they could not sustain their financial performance in a competitive market. One week after the announcement of the DOJ investigation, Horizon reported its first quarter 2008 results and announced a material reduction in its earnings guidance. Rather than admitting the truth, Defendants attempted to blame this reduction on "softness" in the Puerto Rico market. During the Class Period, however, Horizon had repeatedly described the Puerto Rico market as soft, but had consistently stated that the "soft market" did not prevent Horizon from effectively managing costs, developing customer relationships and increasing its shipping rates in the face of what investors were told was a freely-competitive marketplace for Horizon's services. The Company's disclosure—one week after the revelation of the DOJ and FBI investigations—that the softness of the market would lead to lower earnings and revenue implicitly confirmed that the Company's illegal price fixing scheme was the true reason for much of Horizon's Class Period earnings. In fact, reported rate increases decreased from $14.44 million in "general rate increases" in the second quarter of 2007 to just $933,000 in "general rate increases" in the third quarter of 2009, after the conspiracy was disclosed and halted.

7. The Company's disclosures caused a severe decrease in the price of Horizon's publicly traded securities, which traded at a high of over $34 per share during the Class Period.

4

Case 1:08-cv-00969-HB   Document 88-2   Filed 12/17/25   Page 8 of 195

Following the April 17, 2008 disclosure of the criminal investigation, the Company's stock dropped from $18.23 to $14.70 per share, a nearly 20% decrease. The next week, on April 25, 2008, following Horizon's disclosure that its revenue and earnings were not sustainable, Horizon's shares fell an additional 23%, from $15.08 to $11.25 per share. In total, Horizon's disclosures led to the loss of 38% of the value of Horizon's shares in little over one week. As evidenced by the precipitous decline of Horizon's stock price upon public disclosure of the DOJ investigation and subsequent disclosures, the rate-fixing scheme at Horizon caused hundreds of millions of dollars in losses to Horizon's shareholders.

8.      Since April 2008, as noted above, Defendants Serra, Gill and Glova have pled guilty to a price-fixing conspiracy and have been sentenced to a collective six and a half years in prison. During the Class Period, Horizon announced publicly that Defendant Serra worked very closely with the other senior executives named as defendants herein. For instance, in the IPO prospectus dated September 26, 2005, pursuant to which Horizon sold $125 million shares of stock to investors in an initial public offering, Horizon touted as one of its "competitive strengths" the "cohesiveness" of its senior management team – *i.e.*, the "cohesiveness" between Serra and the five other senior executives named as Defendants herein—stating: "our senior management has a long history of working together as a team, with six of our eight most senior managers" "having continuing direct involvement with multiple aspects of our business, including servicing our largest customers and the operation of our shipping and logistics services." Indeed, at Serra's sentencing, the federal prosecutor stated in open court that "there are others higher than Mr. Serra who are certainly of interest to the government" and that Serra was "in the middle" of the hierarchy of the conspiracy.

5

9.     As an important member of Horizon's executive management team, Serra was also instrumental in the formulation and dissemination of false and misleading statements made by Horizon and other senior executive Defendants. During and prior to the Class Period, Serra himself was repeatedly authorized by Horizon to speak to the public regarding core aspects of the Company's business. Among other things, and as discussed in more detail below, Serra publicly spoke on behalf of Horizon with respect to Horizon's financial performance and the rates it charged to customers. For instance, in an extensive article in the Journal of Commerce, dated January 31, 2005, which focused on the "end" of "rate-cutting" by ocean shipping carriers operating between Puerto Rico and the United States mainland, Serra was identified as the "vice president and general manager" of Horizon and was cited as providing specific information about Horizon's rates and operations, including by being directly quoted as saying that "Horizon's rates are up an average of 5 to 6 percent" and "the rate recovery has continued, and we feel more comfortable with the net port-to-port rate." In that January 31, 2005 article, Serra also falsely attributed Horizon's "rate increases" to "cost recovery" initiatives (rather than Horizon's illegal price fixing conspiracy).

10.     In addition, Serra spoke directly to the public during the Class Period, including in a lengthy marketing article published in the Journal of Commerce on September 25, 2006. This article was commissioned by Horizon itself and, in a section titled "Investing For The Future," prominently featured a color photograph of Serra (identifying him as the Vice President and General Manager of Horizon). In the article, Serra was extensively quoted regarding Horizon's cargo mix and operating costs, and purported reasons why "customers consistently confirm" that Horizon had advantages and "important differentiators" over its competitors. Serra made other false and misleading statements to the public during the Class Period as well, and

6

was repeatedly authorized by Horizon to provide quotes for public news stories. Serra was also referenced on public conference calls held by Defendants as the source for information that other senior executives were providing to investors during the Class Period. Serra's statements during the Class Period did not reveal the antitrust price-fixing conspiracy being carried out at Horizon and were materially false and misleading.

11.     Serra was not the only Guilty Plea Defendant authorized by Horizon to speak to the public during the Class Period. The same September 25, 2006 Journal of Commerce article that featured Serra also contained a color photograph of Gill, with a caption identifying him as the "Vice President of Marketing, Horizon Lines." Gill was similarly quoted in the article as stating that "we have let our customers in . . . opened up information in our terminals . .. **Our competitors are still trying to catch up.**" Given that Gill has pled guilty to involvement in an anticompetitive price-fixing conspiracy that was ongoing at this time, his statement was materially false and misleading. These are not isolated statements, as each of the Individual Defendants made numerous public and materially false and misleading statements throughout the Class Period.

12.     Horizon has entered into a settlement agreement in the antitrust class action filed in the District of Puerto Rico. *See In re Puerto Rican Cabotage Antitrust Litigation*, 08-MD-1960 (DRD) (D.P.R.). Pursuant to this agreement, Horizon has agreed to cooperate in the civil plaintiffs' investigation by, among other things, providing documents and witnesses to plaintiffs in that action in support of their claims against Horizon's co-conspirators. Lead Plaintiff, however, presently has no access to those documents because of a restrictive confidentiality agreement in effect in that litigation. Moreover, as described below, Horizon has taken active steps to deprive Lead Plaintiff of access to information that has been provided to others and

7

which may help Lead Plaintiff plead its claims in this case. As the investigation continues and Horizon's cooperation with the antitrust case begins, more details concerning the full extent of the price fixing scheme in all of Horizon's markets and at the highest levels of the Company will be revealed.

## II.    JURISDICTION AND VENUE

13.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 because this is a civil action arising under the laws of the United States.

15.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).   Horizon is incorporated in this Judicial District, and this Court has previously ruled that venue in this District is proper.

16.    In connection with the acts, conduct, and other wrongs alleged in this Amended Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiff

17.    Plaintiff Police & Fire Retirement System of the City of Detroit ("Detroit P&F") is a retirement system maintained for the benefit of current and former policemen, firemen and their families.  Detroit P&F manages over $3.5 billion in assets and has its principal office and place of business located in Detroit, Michigan.  As set forth in a sworn certification previously

8

fiduciary duties by the officers and directors of the Company in connection with its Puerto Rican shipping route."

76.    After Smith and Horizon met and conferred, they submitted, and the Delaware Court ultimately entered, on October 8, 2009, a Stipulation and Order Governing the Treatment of Documents in that case ("Confidentiality Order"), that limits the information obtained through Smith's books and record request to the sole purpose of prosecuting a derivative action against Horizon for breach of fiduciary duties or other state law duties.  The Confidentiality Order sharply limits who can access the information produced by Horizon to  information, and **expressly singles out the parties, attorneys, and class members in the instant action**, among others, as being prohibited from accessing the documents:

> This prohibition [on disclosing, publishing, or transmitting this information] expressly precludes, without limitation, the production, disclosure, or sharing of the Records or the information therein to the parties, attorneys, or putative class members in the class action lawsuit currently pending in the United States District Court for the District of Delaware captioned *City of Roseville Employees' Retirement Systems v. Horizon Lines, Inc.*, No. 08-969 (HB) . . . .

77.    Horizon's actions in this regard are consistent with "non-disparagement" and "confidentiality" agreements they have entered into with numerous former employees.  As a result of Horizon's own efforts to single out and restrict Lead Plaintiff from gaining information, Lead Plaintiff has been entirely unable to access the information Horizon produced to Smith relating to the antitrust conspiracy in Horizon's Puerto Rican cabotage market and to mismanagement by Horizon's officers and directors.

**F.    Horizon's Fraudulent Price-Fixing Scheme in Its Puerto Rico Trade Line and Defendants' Scienter**

78.    Horizon has operated a Puerto Rico trade line for more than 50 years.  This trade line is very important to the overall financial health of the Company.  Confidential Witness

31

("CW") 1, a member of Horizon's Fleet Administration department from 2001 to 2003, stated that the Puerto Rican trade line was very important "to maintain customer loyalty and brand identification." Puerto Rico ports are a gateway to other larger ports, such as those in Micronesia, according to CW 2, an Horizon Operations Manager based out of California from 2007-2008. Additionally, throughout the Class Period, Defendant Serra resided in Puerto Rico and all of the Individual Defendants spent significant time doing business in Puerto Rico for Horizon throughout the Class Period.

79.     It is clear that the Puerto Rican market was an integral and material source of revenue for the Company during the Class Period. In the Company's 2006 Form 10-K, filed on March 2, 2007, Horizon stated, in relevant part:

> In 1958 we introduced container shipping to the Puerto Rico
> Market.
>
> * * * * *
>
> **Over 90% of our revenue** is generated from our shipping and
> logistics services in markets where the marine trade is subject to
> the coastwise laws of the United States, also known as the Jones
> Act, or other U.S. maritime cabotage laws.

80.     During the Class Period, the Company itself refused to publicly disclose the percentage of its revenues by trade lane, despite requests from investors. As Defendant Urbania stated on a November 2, 2005 conference call "going forward we're not going to break down revenue and earnings by trade lane. We will give you general guidance." Nonetheless, independent analysts that report on Horizon estimated the breakdown of the Company's revenues by trade lane. For example, in its March 14, 2007 analyst report, Morgan Keegan reported, in relevant part:

> In 2006, the company reported $1.2 billion in revenue, and we
> estimate that approximately 41% was generated in Hawaii and

32

Guam, **35% in the Puerto Rico trade** and the remaining 24% from the company's Alaska business.[1]

81.     Similarly, in its July 4, 2008 analyst report, Columbine Capital stated, in relevant part:

> Horizon Lines, Inc. (HRZ) is a container shipping and logistics company. **It accounts for approximately 37% of total marine container shipments from continental U.S. to the four noncontiguous markets — Alaska, Hawaii, and Puerto Rico, as well as Guam. These markets account for approximately 23%, 41%, and 36% of the firm's revenues, respectively. . .** The company garnered revenues of $1.2 billion in fiscal year 2007.

82.     In 2001, the Puerto Rican cabotage market was directly impacted by the bankruptcy and closing of Navieras de Puerto Rico, at that time the largest provider of shipping services to Puerto Rico.  According to CW 3, a member of Horizon's Customer Service Department for over 30 years until CW 3's departure in 2008, before Navieras declared bankruptcy, the company had severely cut its shipping rates, undercutting Horizon and the other competitors.  With the demise of Navieras de Puerto Rico, the market became highly concentrated between Horizon (at the time known as CSX Lines LLC), Sea Star, Crowley and Trailer Bridge.  According to CW 3, Horizon immediately began to devise unlawful ways to raise its shipping rates.

83.     In fact, the Puerto Rico shipping market had experienced a steady and significant decline in its shipping rates since the 1990s.  According to a 2006 report by the U.S. Department of Transportation Maritime Administration (MARAD), "freight rates have declined in real terms" in the Puerto Rico, Alaska, Hawaii and Guam markets in which Horizon operated, with Puerto Rico suffering the greatest decline.  (MARAD Report, Competition in the Noncontiguous

---

[1] Unless otherwise noted, all emphases are added.

33

Domestic Maritime Trades (May 2006)). Relying upon data provided to MARAD by the U.S. Army Corps of Engineers, and a study by the analyst firm Reeve & Associates prepared for the Maritime Cabotage Task Force (an organization for which Defendant Raymond has sat on the Board of Directors since at least 2002) titled "Competitiveness in the United States Domestic Noncontiguous Liner Shipping Markets, June 2004," "MARAD was able to measure, compare, and analyze liner competition" in the Jones Act markets within which Horizon operates. MARAD concluded that, since 1991, after adjusting for inflation, average revenue in the Puerto Rico trade line, based on shipping rates, declined 4% annually, or 39% overall, Alaska trade line revenue declined 23%, Hawaii trade line revenue declined 14% and Guam trade line revenue declined 23%.

84.     Horizon was eager to reverse this trend, but was unable to do so lawfully. At some time during 2002, Defendants hatched their fraudulent price-fixing scheme with Horizon's competitors, which was ongoing until the DOJ announced its investigation in April 2008. The scheme was a success for Horizon—allowing the Company to conduct an IPO resulting in millions of dollars for the Individual Defendants. From the onset of the price-fixing conspiracy, Horizon reported consistent revenue growth and profitability—despite an often "soft" market for its shipping services in Puerto Rico—with its reported annual operating revenues increasing 11.8% from 2004 to 2005, another 5.5% from 2005 to 2006, and an additional 4.3% from 2006 to 2007. The increase in operating revenue was achieved from steady and significant increases in shipping rates across all lines which offset an equally steady and significant decrease in the volume of containers being shipped, particularly in Puerto Rico:

| Year End Financial Statement: | Total Operating Revenue (in thousands): | Revenue container volume (in thousands): | Revenue from general rate increases (in thousands) |
|---|---|---|---|
|  |  |  |  |

34

| 2004 | $980,328 | $53,351 | $16,700 |
| 2005 | $1,096,156 | ($1,567) | $42,345 |
| 2006 | $1,156,892 | ($35,650) | $44,443 |
| 2007 | $1,206,515 | ($36,980) | $51,578 |
| 2008 | $1,265,789 | ($35,156) | $29,918 |

85.    The combination of these starkly declining volumes being offset by rate increases in a supposedly "competitive" environment was highly suspicious and should have alerted Horizon's senior executives to the potential that Horizon and its competitors were illegally colluding to set prices and allocate customers.  Indeed, investors repeatedly asked questions on conference calls during the Class Period attempting to understand how rates could be increasing as volumes softened.  As described below, the Defendants gave a number of false explanations for these increases (including by portraying Horizon as having "competitive advantages" and "differentiators" over its competitors).  As Defendants Gill, Glova and Serra indisputably knew, the rate increases – which were implausible in a truly competitive environment that was experiencing volume softness – were actually the result of the anticompetitive price-fixing conspiracy Horizon was engaged in throughout the Class Period.  The other Individual Defendants, who made numerous statements to investors about these rate increases, either knew that the unlawful conspiracy was the source of the improbable rate increases, or should have been alerted to the possibility that something was amiss due to the suspicious nature of these rate increases and volume declines.

86.    These revenue figures should have raised red flags to all Defendants, and imposed a duty upon Senior Management Defendants to inquire further as to the reasons behind these remarkable rate increases despite the dramatic decrease in the volume of containers being shipped.  For example, for the year ended December 24, 2006, Horizon reported a $35.65 million

35

loss in revenue "due to overall soft market conditions in Puerto Rico as well as a strategic shift away from lower margin automobile cargo to more refrigerated cargo and other higher margin freight." Despite this significant decrease in revenue, however, Horizon offset that loss and increased its overall revenue by 5.5% because of an increase of $44.44 million due solely to "general rate increases."[2] Likewise, for the year ended December 24, 2007, Horizon reported a $36.98 million loss in revenue "due to the revenue container volume declines [] primarily due to overall soft market in Puerto Rico and decelerating growth in Hawaii." Despite this significant decrease in revenue, however, Horizon offset that loss and increased its overall revenue by 4.3% because of an increase of $51.58 million due to "general rate increases."

87.     The "general rate increases" responsible for Horizon's consistently improving revenues included rate increases within the "soft" Puerto Rico trade line. For instance, on March 2, 2007, Raymond told investors that "the pricing I don't think suffered. I believe we're still gaining in terms of real dollar increases in our prices in Puerto Rico. I don't see that stopping. I believe we still have a little bit of a ways to go there." Again, on April 26, 2007, Raymond, in response to an investor question regarding "any other kind of color or insights on the rate picture?" stated "I think number one, we have stability. . . I would say that in the case of Puerto Rico, even though that market is a little light, we're continuing to get rate increases that are slightly ahead of what our inflationary costs are. So in terms of real rate benefit in the Puerto Rico trade, that march that we've been on now since 2002, continues."

88.     As discussed above, Horizon's three Jones Act trade routes—which constitute 85% of Horizon's revenues—consist of a small group of competitors offering the same service

---

[2] Until the price-fixing conspiracy, Horizon attributed the increases to (among other things) "general rate increases" and an undefined and overly general term: "favorable cargo mix." Once the conspiracy was revealed, Horizon attributed that reported figure to "general rate increases" only.

with pricing rates being the main defining factor amongst competitors. In a "slow" market with dramatically decreasing cargo volume, those small groups of competitors would naturally cut prices to gain a foothold over each other. Moreover, as noted by the U.S. Department of Transportation Maritime Administration (MARAD), "Ocean liner companies [like Horizon and its competitors] provide similar services, and thus are viewed by shippers as close substitutes for each other, which makes competition more likely to occur." MARAD Report, Competition in the Noncontiguous Domestic Maritime Trades (May 2006).

89.     A recent study found that the median price overcharge for all types of cartels is 25%, and the mean overcharge is 43.4%. John M. Connor, PRICE-FIXING OVERCHARGES: SECOND EDITION (Draft Report, April 2009). This figure is confirmed by Horizon's post-conspiracy rate increase figures, which dropped 41% from the end of 2007 ($51.6 million) to the end of 2008 ($29.9 million).

90.     The rate increases achieved in Puerto Rico as a direct result of the price-fixing conspiracy helped offset the Company's considerable losses in operating revenue for 2006 and 2007. The Senior Management Defendants knew of, or were reckless in not monitoring, the Puerto Rico pricing and revenue figures, which constituted nearly one-third of Horizon's total operating revenue and EBITDA (Earnings Before Interest, Taxes, Depreciation and Amortization). Not only did Defendant Raymond make public statements about pricing in Puerto Rico, but Horizon's financial statements specifically state that Horizon's management had access to and used Horizon's EBITDA "to facilitate internal comparisons to competitors' results and the marine container shipping and logistics industry in general." The Senior Management Defendants also used EBITDA to "evaluate [Horizon's] operating performance," "make day-to-day operating decisions,' and to determine the "payment of discretionary bonuses to certain

37

Case 1:08-cv-00969-HB   Document 88-2   Filed 12/23/09   Page 20 of 195

members" of management."   Moreover, in August of 2007, Horizon "entered into a credit agreement providing for a $250.0 million five year revolving credit facility and a $125.0 million term loan with various financial lenders (the "Senior Credit Facility"). The Senior Credit Facility contains covenants that requires the Company to maintain certain interest expense coverage and leverage ratios, which contain EBITDA as a component, and restrict certain cash payments if certain ratios are not met.  Therefore, the Senior Management Defendants also use EBITDA to "monitor compliance with such covenants."  Rates achieved through the price-fixing conspiracy were a significant component of Horizon's EBITDA, a figure used regularly by the Senior Management Defendants.

91.      Prior to the disclosure of the price-fixing conspiracy, even if Defendants Raymond, Urbania, Keenan, Handy and Taylor were not knowing participants in the conspiracy, as the top five executive management officers at Horizon,  with decades of experience in the Jones Act shipping markets and as signatories to Horizon's Code of Ethics, they  were under a special duty to investigate these unusual and improbable rate increases to ensure that the rates were secured in compliance with the anti-price-fixing laws.  This duty was heightened because of their false public statements affirmatively and falsely explaining the Puerto Rico rate increases as the result of "[t]he breadth and depth of our relationships with our customers" and the Company's "long-standing customer relationships and our cross-selling efforts."

92.      Only in 2008, the year in which the price-fixing conspiracy was disclosed, did Horizon's rate increases fail to offset its losses in volumes.  Further demonstrating the impact of the disclosure of the antitrust price fixing conspiracy, Horizon's general rate increases have continued to decline in 2009 (as compared to the corresponding quarter in 2008) following the disclosure of the illegal conspiracy:

38

Case 1:08-cv-00969-HB   Document 86-2   Filed 12/23/09   Page 21 of 32

| Quarterly Financial Statement: | Revenue container volume (in thousands): | Revenue from general rate increases (in thousands) |
|---|---|---|
| **First Quarter 2009** | ($18,442) | $10,192 |
| **Second Quarter 2009** | ($27,688) | $9,229 |
| **Third Quarter 2009** | ($13,365) | $933 |

93.     According to former Sea Star executive Peter Baci, in his January 26, 2009 sentencing memorandum filed in the criminal action against him, the price-fixing conspiracy amongst Horizon, Sea Star and their two other competitors began as early as May 2002 when Defendant Serra along with a representative of Sea Star, "hatched the idea of collusion with the other carriers" that resulted in the plan to suppress and eliminate competition by rigging bids, fixing prices and allocating customers in violation of the law.  As a result of this plan, Baci was ordered to work with Defendant Gill, the Marketing and Pricing Director for Horizon, and later with Defendant Glova (who replaced Gill) in order to implement the price fixing and bid-rigging scheme.

94.     According to CW 4, a former Pricing Manager at Sea Star who reported to Baci, Baci attended meetings at Horizon's offices at least three times a year.

95.     Defendant Serra has admitted to being involved in the price fixing conspiracy.  At his sentencing, Serra also said that he had "direct communications with a number of other senior executives" at Horizon Line, Inc. about the conspiracy.  Indeed, it is clear that Serra did not organize the price-fixing scheme without input and direction from his superiors, Defendants Raymond, Urbania, Keenan, Handy and Taylor.  As CW 1 confirmed, no one in Puerto Rico could unilaterally set prices without direction from the main Horizon headquarters in Charlotte,

North Carolina. CW 1 stated that all rates, surcharges and fees were determined by the sales department and authorized by the CEO, at all relevant times, Defendant Raymond, or his equivalent. This information from CW 1 is corroborated by Horizon's own public filings, which stated that "all pricing activities are also coordinated from Charlotte . . . enabling us to manage our customer relationships." At Serra's sentencing, the federal prosecutor stated "there are others higher than Mr. Serra who are certainly of interest to the government" and "[Serra] is essentially -- I don't want to use middle management in terms of the conspiracy, but he's in the middle . . ." Since Serra was a Senior Vice President at Horizon, and one of its top officers, the prosecutor's statements indicate that at least one of Serra's superiors (all of whom are named as Defendants herein) was also involved in the conspiracy.

96.     Defendants Raymond, Urbania, Keenan, Handy and Taylor participated in all aspects of the Puerto Rican cabotage business. For example, on April 26, 2007, during a first quarter 2007 earnings conference call, Defendant Raymond stated that he, along with other executives, had travelled to Puerto Rico earlier that month and "had a lot of discussions with our key customers." Later, on October 26, 2007, during a third quarter 2007 conference call, Defendant Raymond stated that he and Defendant Keenan had been in Puerto Rico "all week" and that Defendant Keenan had "been working with customers," and assured investors that the Company was renewing contracts with customers at "favorable rates." Furthermore, Handy directly supervised Serra, and Taylor directly supervised Gill, and in an October 30, 2006 conference call, Handy explicitly stated that he had recently discussed the health of the Puerto Rico trade lane with Serra. Each of those Defendants publicly discussed the Puerto Rico trade line in public conference calls. On information and belief, and based on Defendant Serra's role in Horizon's operations in Puerto Rico, as well as public statements during the Class Period

40

demonstrating that Serra was the source of information from Puerto Rico that other Defendants disseminated to the public, Defendants Raymond and others also met with Defendant Serra during these travels to Puerto Rico. These visits to Puerto Rico indisputably involved interaction with the Puerto Rico executives about the rates charged to customers—indeed, Keenan admitted as much.

97.     Defendant Gill, in his position as Marketing and Pricing Director for Horizon's Puerto Rico division, and, later, Horizon's Vice President of Marketing, and as described in the DOJ's sentencing memorandum in the criminal action against Gill, engaged in discussions and attended meetings with representatives from Horizon's competitors where it was agreed to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers. As stated at his Sentencing Hearing, Gill has also provided information to the DOJ in support of its ongoing investigation against Horizon and his former superiors at Horizon, among others, not only through statements but "with contemporaneous documents evincing his and others' involvement" in the conspiracy from the time the conspiracy was hatched.

98.     According to the DOJ sentencing memorandum in the criminal action against Defendant Glova, Glova, who took over as Marketing and Pricing Director for Horizon's Puerto Rico division when Gill was promoted to Vice President, also engaged in discussions and attended meetings with representatives from Horizon's competitors where it was agreed to allocate customers, rig bids submitted to government and commercial buyers, and to fix the prices of rates, surcharges and other fees charged to customers. Glova made and recorded several consensual telephone calls to others at Horizon that further evidence the conspiracy. Lead Plaintiff believes that once the content of these recorded telephone calls is revealed, some

41

Case 1:08-cv-00969-HB   Document 86-2   Filed 12/23/09   Page 24 of 32

or all of the uncharged Individual Defendants will be implicated as co-conspirators. As stated at his Sentencing Hearing, Defendant Glova played "an indispensible role in dealing with senior executives involved in the conspiracy," and has provided useful information to the DOJ in furtherance of the government's investigation.

99.     The DOJ stated that "[Gill] has provided evidence, in the form of statements and documents, against his superiors within [Horizon], including presently uncharged co-conspirators." As stated above, all of Defendant Gill's "superiors," i.e., "presently uncharged co-conspirators," at the Company that were involved in the Puerto Rican trade lane are named Defendants in this action.

100.    Documents evidencing the conspiracy have been released to the DOJ in relation to its investigation, but they are not yet public. However, it was revealed at the Sentencing Hearing that the conspiracy was well-documented and "conducted in significant part through e-mails and spreadsheets." Moreover,

> th[ose] spreadsheets contained detailed market-share information, customer information and contact information that were circulated between the co-conspirators. Those spreadsheets contained the information that were at risk for the amount of the conspiracy. Based on the numbers in those spreadsheets, the decision makers made the decisions about the steps that the conspiracy would take. Additionally, the information contained in those spreadsheets was used as a method of policing the conspiracy, to make sure that everybody was doing what they committed to do as part of the conspiratorial agreement.

101.    The existence and use of those spreadsheets by Horizon and its co-conspirators was confirmed by a former Sea Star manager. Included among the documentation that was used to both facilitate the conspiracy and to analyze, calculate and report Horizon's annual and quarterly financial statements, were pricing reports listing each company's pricing information. In the cabotage industry, pricing reports are critical to a company's financial success and, as a

42

Case 1:08-cv-00969-HB   Document 66-2   Filed 12/23/09   Page 46 of 195

result, typically garner significant interest from top executives, such as the Senior Management Defendants. According to CW 6, a former manager of Specialty Cargo & Projects at Sea Star from 2002-2004 and sales manager for the Southeast Region from 1997-2002, reports about pricing in the cabotage industry were regularly submitted to Sea Star's top executives, including the CEO and CFO. CW 6 described how subordinates of Peter Baci – the Sea Star Vice President of Yield Management who is serving a 48-month sentence in federal prison after pleading guilty to violating the Sherman Act – would create weekly and monthly reports of competitors' pricing information based on bills of lading and on repeated inquiries Baci made to Horizon and other competitors. These reports went to the top executives at Sea Star, including the CFO and CEO.

102.    CW 6 stated that these pricing reports would have had to be incorporated into Sea Star's general ledger because pricing numbers were broken down into the average price for each container size and were included in this format in the company's financial statements. As a result, CW 6 said that the accounting personnel who prepared Sea Star's financial statements would certainly have received reports on the average price per container in each category of container sizes. According to CW 6, "[t]he bottom line is that[] [average price per container is] what drives the compan[ies] in this industry, more so than harping on receivables." Upon information and belief, Horizon compiled and relied upon similar pricing reports for purposes of monitoring and continuing the illegal price-fixing conspiracy and in order to provide pricing information to be used in the preparation of Horizon's financial statements.

103.    The illegal price-fixing cartel succeeded in raising shipping rates in Puerto Rico, despite a weak market. As Defendant Raymond stated on April 2007, "in the case of Puerto Rico, even though that market is a little light, we're continuing to get rate increases that are

43

slightly ahead of what our inflationary costs are. So in terms of real rate benefit in the Puerto Rico trade, that march we've been on now since 2002, continues." Moreover, Defendant Urbania stated, in Horizon's fourth quarter 2007 guidance call on February 1, 2008, that the Company was able to achieve price increases in Puerto Rico in 2007 "even though volume softness existed in 2007," and that there was "no reason for us to believe that that will change in 2008." Unbeknownst to investors, the only way that Horizon was able to raise rates in the weak Puerto Rico economy was through its illegal agreement to allocate customers, rig bids and fix prices within the Puerto Rico cabotage market.

104.    The disclosure of the DOJ investigation presumably ended the price fixing cartel, and had a direct and immediate impact on the Company's pricing outlook in Puerto Rico. In fact, on April 25, 2008, a week after the Company disclosed that it was the subject of the DOJ investigation into its pricing practices, the Company announced that "the outlook for our Puerto Rico market in particular is somewhat softer than we had originally anticipated," and lowered its earnings guidance for 2008. The rationale for the Company's lowered guidance, however, was an effort to conceal the fact that the Horizon had been able to raise the rates in Puerto Rico during the Class Period only because of the price-fixing cartel. The market in Puerto Rico had been "soft" for years, *see, infra* ¶¶ 215-220. The only new development between Horizon's last positive outlook and April 25, 2008 was the DOJ investigation that abruptly terminated the price-fixing cartel.

105.    As of the date of this Amended Complaint, the DOJ investigation is open and ongoing. Defendants Serra, Gill and Glova, along with former Sea Star executives Baci and Chisholm, have provided information to the DOJ that will likely support future indictments against additional senior executives of Horizon, potentially including the Senior Management

44

Defendants. For instance, in Serra's sentencing memorandum, he stated that he "has provided significant information regarding individuals not otherwise implicated in the conspiracy, which will likely lead to further prosecutions." At the Sentencing Hearing, "the government . . . [said] that given Mr. Glova's position at the company and his indispensible role in dealing with senior executives involved in the conspiracy, the information he provided has been useful in building cases against others," and that Gill has "given statements, documents, other evidence against those who are yet to be charged, including potentially superiors of his, according to the government's filing." Moreover, in the DOJ's sentencing memorandum for Defendant Gill, the DOJ stated that "[Gill] has provided evidence, in the form of statements and documents, against his superiors within [Horizon], including presently uncharged co-conspirators." All of Gill's "superiors" in Horizon's Puerto Rico-based business who are uncharged in the conspiracy have been named as Defendants herein. Similarly, according to the Government, Serra has implicated others at Horizon in the conspiracy who are above him. Only, Raymond, Urbania, Keenan and Handy held positions above Serra at Horizon during the Class Period.

106. As discussed above, many of the participants in, or those with firsthand knowledge of, Horizon's role in the price-fixing conspiracy are unable to discuss the issues until the DOJ completes its investigation. However, the details provided by several CWs, Defendants Serra, Gill and Glova, along with Sea Star former executives Baci and Chisholm, illustrate how the scheme was hatched in 2002, how representatives from Horizon met with representatives of Sea Star, Trailer Bridge and Crowley on many occasions, how the companies divided up and allocated potential customers and agreed on fixed prices to charge these customers, and how the companies colluded to prevent those customers from receiving competitive bids for their necessary cabotage services. Further, it is evident that this scheme was well-documented with

45

Case 1:08-cv-00969-HB    Document 66-2  Filed 12/23/09  Page 45 of 195

emails and spreadsheets containing detailed market-share information, customer information and contact information.

107.    The information provided by Defendants Serra, Gill and Glova, and non-parties Baci and Chisholm has been corroborated by targets of the price-fixing conspiracy.

108.    According to Jorge Mayendia, President of Central Produce El Jibarito, Inc. ("Central Produce"), one of the largest distributors of fruits, vegetables and eggs in Puerto Rico, Central Produce was a victim of Horizon's illegal price-fixing scheme.[3] Between 2002 and 2008, Central Produce shipped an estimated 7,000 containers via ocean transportation services purchased directly from Horizon and Sea Star.

109.    Horizon and its competitors would allocate customers in the Puerto Rico market amongst themselves.  After such allocation, that customer would find it impossible to secure competitive rates from the market competitors, would be forced to accept business from only one company and that would be captive to the rates and surcharges offered by that company.

110.    In 2002, Central Produce was a customer of Sea Star.  But, according to Mr. Mayendia, sometime in 2002, Sea Star approached Central Produce with a "prohibitively expensive contract for the transportation of cargo" compared to the prices being offered by Horizon, and demanded that Sea Star invoices be paid in half the time Horizon allowed. Unbeknownst to Central Produce, these actions were the result of the antitrust conspiracy under which Central Produce business was to be allocated to Horizon.

---

[3] Mr. Mayendia's account of his relationship with Horizon is detailed in an individual complaint filed by Central Produce in the Puerto Rican antitrust action.  *See Central Produce El Jibarito, Inc. v. Horizon Lines, LLC, at al.*, Case No. 09-1096, Master Docket No. 08-md-1960 (DRD) (D.P.R.).

111.   Over the next five years, from 2003 through 2008, Central Produce continued to attempt to secure ocean transportation services from Sea Star, but Sea Star never altered its unreasonable demands until the conspiracy was revealed in April 2008.

112.   Through this organized conspiracy, Horizon, in collusion with Sea Star, Trailer Bridge and Crowley, forced companies like Central Produce to become and remain Horizon's client because those companies had allocated Central Produce to Horizon.  Moreover, because Sea Star and the other companies offered only ridiculously high rates for their services to clients allocated to Horizon, Horizon could increase the rates, fees and charges it demanded of Central Produce because those rates were still cheaper than the unlawful rates offered by Sea Star. Without the antitrust conspiracy, Horizon and its competitors would have been forced to charge lower rates and compete for business, weakening the Company's inflated earnings.

113.   CW 5, a former Marine Supervisor for Horizon in Puerto Rico, also confirmed the "tricks" that Horizon carried out in order to manipulate the cabotage out of Puerto Rico.  CW 5 stated that Horizon "would work with Sea Star" by allocating some it its clients' containers to Sea Star without the clients' knowledge.

## VI.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS

114.   Throughout the Class Period, the Company made a series of statements to the public that were materially misleading and/or failed to disclose information concerning Defendants' unlawful price fixing activities.  Rather than remaining "silent," Defendants chose to make a series of affirmative statements to the market that were either flatly false or were rendered materially misleading by Defendants' failure to disclose Horizon's unlawful activity. These misstatements and material omissions all relate to the Company's long-standing, but undisclosed, participation in an illegal horizontal cartel with its competitors, in which price-

47

fixing buoyed the Company's reported results of operations via illegal and unsustainable means. The misstatements and omissions can generally be grouped into the following categories:

(a) Misstatements and omissions related to revenue, earnings, and other financial results, including false explanations for why revenue was remaining "stable" or increasing;

(b) (b) Misstatements and omissions related to pricing and market dynamics, including the competitive situation in the market, and false explanations for these conditions;

(c) (c) Misstatements and omissions related to the nature of the Puerto Rican market and the cause of its reduced earnings guidance after the exposure of the illegal cartel; and

(d) (d) Misstatements and omissions in Defendants' Sarbanes-Oxley Certifications.[4]

115. The misrepresentations and omissions are ubiquitous throughout the Company's public statements. They arise throughout the Class Period in the Company's quarterly and annual reports, in its press releases, in quarterly earnings conference calls, as well as other periodic conference calls, and in presentations accompanying those calls.

**A.    Misstatements and Omissions Related to the Sources of Horizon's Revenues and Financial Performance**

116. The Company and the Individual Defendants, during the Class Period, made a number of materially misleading statements or omissions relating to the causes of Horizon's rising or steady revenues, both historical and projected. In making these statements, Horizon and the Individual Defendants failed to disclose that the Company's revenue growth and/or stability

---

[4] In deference to the Court's holding that the Consolidated Securities Class Action Complaint failed to establish the falsity of certain portions of the Sarbanes-Oxley certifications relating to the accuracy of financial figures and the adequacy of Horizon's internal controls, Lead Plaintiff has removed all allegations about these provisions from this amended pleading. However, to preserve these allegations for a possible appeal, Lead Plaintiff includes these statements in Appendix A.

48

## XII. JURY TRIAL DEMAND

309. Plaintiff, on behalf of itself and the Class, hereby demands a trial by jury.

## XIII. PRAYER FOR RELIEF

310. WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for relief and

judgment as follows:

A. Determining that this action is a proper class action and certifying Lead Plaintiff, Detroit P&F, as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' violations in an amount to be proven at trial, together with interest thereon;

C. Awarding rescission and/or rescissory damages in favor of Plaintiff and the members of the Class;

D. Awarding prejudgment interest and/or opportunity cost damages in favor of Plaintiff and the other members of the Class;

E. Awarding Plaintiff and the Class the fees and expenses incurred in the prosecution of this action, including attorneys' fees and expert fees; and

F. Granting such other and further relief as the Court may deem just and proper.

Dated: December 23, 2009                    Respectfully submitted,

                                            _____/s/ Sean M. Brennecke_____
                                            Andre Bouchard  (#2504)
                                            Sean M. Brennecke (#4686)
                                            **BOUCHARD MARGULES &
                                            FRIEDLANDER, P.A.**
                                            222 Delaware Avenue, Suite 1400
                                            Wilmington, Delaware 19801
                                            (302) 573-3500

                                            *Liaison Counsel*

                                            John C. Browne
                                            Lauren A. McMillen
                                            Sean O'Dowd

140

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1285 Avenue of the Americas, 38th Floor
New York, New York 10019
Telephone: 212-554-1400
Facsimile: 212-554-1444

Peter S. Linden
Ira M. Press
David Kovel
Steven D. Cohn

**KIRBY McINERNEY LLP**
825 Third Avenue, 16th Floor
New York, New York 10022
(212) 371-6600

*Co-Lead Counsel for Lead Plaintiff the Police &
Fire Retirement System of the City of Detroit*

141