IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE OUTSET MEDICAL, INC.          )   CV-24-6124-EJD
SECURITIES LITIGATION               )
                                    )   SAN JOSE, CALIFORNIA
                                    )
                                    )   JANUARY 22, 2026
                                    )
                                    )   PAGES 1 - 46
                                    )
                                    )
_____     )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EDWARD J. DAVILA
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFF:       BERMAN TABACCO
                         425 CALIFORNIA STREET, STE 2300
                         SAN FRANCISCO, CA 94104
                    BY:  **KRISTIN MOODY**
                         **ALEXANDER VAHDAT**

FOR THE DEFENDANT:       SIDLEY AUSTIN, LLP
                         555 CALIFORNIA STREET, STE 2000
                         SAN FRANCISCO, CA 94104
                    BY:  **SARA BRODY**
                         **JAIME BARTLETT**

ALSO PRESENT FOR DEFENDANT:   OLIVIA BALLARD
OUTSET MEDICAL

OFFICIAL COURT REPORTER:      SUMMER FISHER, CSR, CRR
                              CERTIFICATE NUMBER 13185

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

SAN JOSE, CALIFORNIA                    JANUARY 22, 2026

P R O C E E D I N G S

(COURT CONVENED AT 9:08 A.M.)

THE COURT:  LET'S CALL 24-6124.  THIS IS OUTSET SECURITIES LITIGATION.

LET ME FIRST CAPTURE APPEARANCE OF THE PARTIES.  FOR PLAINTIFF, PLEASE.

MS. MOODY:  KRISTIN MOODY OF BERMAN TABACCO FOR THE PLAINTIFF.

THE COURT:  THANK YOU.  GOOD MORNING.

AND FOR THE DEFENSE.

OH, I'M SORRY, I MISSED SOMEONE FOR PLAINTIFFS.  YES, I APOLOGIZE.

MR. VAHDAT:  ALEX VAHDAT FROM BERMAN TABACCO FOR PLAINTIFF.

THE COURT:  GOOD MORNING.  THANKS FOR JOINING.

AND FOR THE DEFENDANTS?

YOU KNOW, WE NEED TO ADJUST YOUR MICROPHONE, MS. BRODY.

DO YOU HAVE ANY TEENAGERS IN YOUR OFFICE JUST NOW THAT CAN --

(PAUSE IN PROCEEDINGS.)

THE COURT:  WE WILL GO OFF-THE-RECORD UNTIL MS. BRODY GETS THINGS GOING.

(PAUSE IN PROCEEDINGS.)

THE COURT:  WE ARE BACK ON THE RECORD.  THANK YOU.

SO WHY DON'T YOU STATE YOUR APPEARANCE.

**MS. BRODY:** SURE.

SARA BRODY, SIDLEY AUSTIN, ON BEHALF OF THE DEFENDANTS.

AND WITH ME IN THE CONFERENCE ROOM HERE AT SIDLEY TODAY ARE MY COLLEAGUES, JAIME BARTLETT AND SARAH GALLO.  AND ALSO ON THE LINE IS THE ASSISTANT GENERAL COUNSEL OF OUR CLIENT, OLIVIA BALLARD, SHE'S IN A SEPARATE LOCATION.

THE COURT:  THANK YOU.  THANK YOU FOR JOINING IN, MS. BRODY.  I ALSO EXTENDED GRATITUDE TO ALL OF YOU FOR AGREEING TO APPEAR REMOTELY, I HOPE IT IS OF SOME BENEFIT TO YOU.

SO WE ARE HERE TO DISCUSS THE DEFENDANT'S MOTION TO DISMISS THE COMPLAINT HERE, MS. BRODY.  AND I'VE READ YOUR PLEADINGS, BOTH OF THE OPERATIVE PLEADINGS, THE OPPOSITION, THE REPLY.  YOU SAW MY MOTION ABOUT THE APPENDIX, I DON'T REALLY NEED TO TAKE A LOOK AT THAT.

ALSO THE MOTION TO TAKE JUDICIAL NOTICE, YOU KNOW, I CAN AND I WILL TAKE JUDICIAL NOTICE OF THOSE PLEADINGS, I THINK THOSE ARE APPROPRIATE FOR JUDICIAL NOTICE PURPOSES.  NOW WHETHER OR NOT THEY ARE COMING INTO DISCUSSION HERE, I UNDERSTAND THEY ARE FILED AS A REFERENCE AND ALL OF THAT, I DON'T THINK WE NEED TO GO THROUGH, FOR COMPARATIVE PURPOSES, THE DECISIONS, THOUGHTS THAT WERE MADE IN THOSE CASES AS MUCH.

I APPRECIATE THE ATTENTION DRAWN TO THEM, BUT I'M HAPPY TO HEAR FROM YOU, MS. BRODY.  ONE OF THE -- A COUPLE OF THE THINGS THAT I WOULD LIKE TO HAVE DISCUSSION ABOUT IS SCIENTER.  I

WOULD LIKE TO KNOW A LITTLE BIT ABOUT THE SCIENTER ISSUE AND THEN ALSO THE QUESTION ABOUT WHETHER OR NOT HOW MANY ALLEGATIONS HAVE TO BE ALLEGED.

MY SENSE IS THERE ARE SENTENCES THE DEFENSE OBJECT TO, YOU ARE NOT CONCEDING THEM, AND I THINK THERE ARE OTHER STATEMENTS AND OTHER WITNESSES, WHETHER OR NOT WE NEED TO CONSIDER A TOTALITY OF SIX OF THEM, SO I WANT TO ASK YOU SOME QUESTIONS ABOUT THAT AS WELL.

AND ALSO I'M INTERESTED IN THE CIRCUMSTANCES OF THE STOCK SALES, WHAT DOES THAT -- THE CONNECTION OF THE STOCK SALES, AND WHAT DOES THAT TELL US, IF ANYTHING?

SO THOSE ARE THE ISSUES THAT I'M REALLY INTERESTED IN, BUT I'M ALSO INTERESTED IN WHAT YOU WOULD LIKE TO PRESENT, BOTH SIDES.

YOU WILL ALSO DISCUSS -- I'M SURE WE WILL TALK ABOUT MS. TRIGG'S INVOLVEMENT AND WHAT PUTS HER ON NOTICE, AT LEAST AS FAR AS PLAINTIFFS ARE CONCERNED, AND WHAT IS NOT SUFFICIENT AS FAR AS I THINK DEFENDANTS ARE ASKING FOR.

SO THOSE STATEMENTS I'M TALKING ABOUT ARE THE SIX DISCLOSURES REGARDING LOSS CAUSATION, I THINK YOU UNDERSTOOD THAT.

SO WITH THAT, MS. BRODY, WHAT WOULD YOU LIKE ME TO KNOW?

**MS. BRODY:**  THANK YOU, YOUR HONOR.

I WILL START WITH SCIENTER, WHICH I THINK IS -- WHICH WHEN I WAS PREPARING FOR TODAY WAS WHERE I THOUGHT I WOULD START

BECAUSE I THINK IT IS SO FUNDAMENTAL TO A SECURITIES CASE, PARTICULARLY HERE.  AND IN THIS CASE, I THINK IT'S FUNDAMENTAL UNDERLYING ISSUE THAT IS SIMPLY NOT SUFFICIENTLY PLED IN THE COMPLAINT.

SO FOR THERE TO BE SCIENTER FOR ANY DEFENDANT, THERE NEED TO BE SPECIFIC ALLEGATIONS AS TO THAT DEFENDANT.  HERE, IT REALLY HAS TO BE ALLEGATIONS OF, IF NOT INVOLVEMENT, AT LEAST KNOWLEDGE.

WE WILL START WITH MS. TRIGG WHO IS THE CEO, AND I THINK PROBABLY WE CAN ALL AGREE IS THE MOST CENTRAL TO THE DEFENDANTS.  THE TWO CFO'S, I THINK ARE MUCH MORE ANCILLARY, AND THE SCIENTER ALLEGATIONS ARE EVEN LIGHTER THAN THE ONES AS TO MS. TRIGG.

SO THE PRIMARY ALLEGATIONS AS TO MS. TRIGG DEAL WITH TRYING TO PULL HER IN TO SCIENTER THROUGH A CORE OPERATIONS ANALYSIS, AND THAT SIMPLY HAS NOT BEEN PLED HERE.

WHAT THE PLAINTIFFS ALLEGE, EFFECTIVELY, IS SHE WAS THE CEO, SHE WAS AN INVOLVED CEO, SHE MUST HAVE KNOWN.  AND THAT'S NOT WHAT THE CASE LAW SAYS.

SO IF YOU START WITH INTUITIVE SURGICAL AS KIND OF LAYING THE FOUNDATION FOR WHAT ONE MUST ACTUALLY PLEAD, IT KIND OF SETS THE BASELINE.  YOU NEED TO ACTUALLY SHOW DETAILED INVOLVEMENT AND THE COMPLAINT DOES NOT DO THAT.  AND BY DETAILED INVOLVEMENT, THE CEO THAT WAS ACTUALLY RUNNING HER COMPANY, THAT WOULD BE TOO EASY AND THAT WOULD BE IN ALL CASES

WHERE SOMEBODY LIKE A CEO, YOU WOULD GET OVER THE SCIENTER HURDLE.

AND THAT'S JUST NOT THE LAW, YOU NEED TO ACTUALLY SHOW ALLEGATIONS THAT SHE'S INVOLVED, TIED IN, KNOWS ABOUT THE ALLEGED OFF-LABEL MARKETING.

NOW WE ARE NOT CONCEDING AT ALL IN THIS DISCUSSION THAT THERE EVEN IS OFF-LABEL MARKETING, SO OBVIOUSLY PUT THAT TO ONE SIDE, BUT WHEN YOU LOOK AT THE CASES WHERE THERE ARE ALLEGATIONS OF OFF-LABEL MARKETING AND WHERE THE COURT DOES FIND SCIENTER, THE CONTRAST IS QUITE STARK.

THE TWO CASES THAT I THINK ARE MOST IMPORTANT HERE ARE THE GILEAD -- WELL, FOUR CASES ACTUALLY, OR FOUR DECISIONS, TWO CASES.

**THE COURT:**  I THINK THE GILEAD CASE WENT ON FOREVER, RIGHT.

**MS. BRODY:**  EXACTLY, AND ALSO --

**THE COURT:**  IT'S A TOOL FOR ALL OF US.

**MS. BRODY:**  RIGHT.  FIVE ROUNDS.  AND THE CORCEPT CASE.  AND THE YOU CAN LOOK AT THE DECISIONS FOR BOTH OF THOSE WHERE THE COURT FOUND THERE WAS NOT SUFFICIENT DETAILED ALLEGATIONS FOR A CORE OPERATIONS THEORY AND COMPARE THOSE TO THE ALLEGATIONS WE HAVE HERE.

THE ALLEGATIONS WE HAVE HERE DO NOT EVEN COME CLOSE TO WHAT'S BEEN ALLEGED IN GILEAD OR CORCEPT.  AND THEN YOU HAVE THE LATER DECISIONS IN THOSE CASES WHERE THE COURT SAID, OKAY,

THAT IS ENOUGH. BUT WE DON'T EVEN MEET THE HURDLE OF THE FIRST SET OF COMPLAINTS IN THOSE TWO CASES IN TERMS OF THE SPECIFICITY OF WHAT'S BEEN ALLEGED AND THE TIE-IN TO MS. TRIGG OR ANY OF THE OTHER EXECUTIVES.

IN THOSE CASES THERE'S DETAILED ALLEGATIONS OF TRAINING, OF SALES MATERIALS -- YOU MIGHT ALSO WANT TO LOOK THERE AT THEIR IMPACT, AND IN AMGEN. IN AMGEN, FOR EXAMPLE, YOU HAVE POWERPOINTS, YOU HAVE COLOR-CODED CHARTS, THEY TIE THEM BACK TO THE NATIONAL OFFICE AND TO THE SENIOR EXECUTIVES. AND THAT'S A SITUATION WHERE YES, YOU CAN FIND CORE OPERATIONS.

WE DON'T HAVE ANY OF THAT HERE. WHAT WE HAVE -- AND THIS IS GETTING PROBABLY TO YOUR HONOR'S QUESTION ABOUT THE CONFIDENTIAL WITNESSES, SO LET ME KIND OF TIE THAT IN HERE AS WELL. WHAT WE HAVE ARE A GROUP OF CONFIDENTIAL WITNESSES. OF THOSE, WITNESSES 4 THROUGH 9 ARE ALL CUSTOMERS, AND SO WHEN YOU LOOK AT THE LAW ON USING CUSTOMERS AS CONFIDENTIAL WITNESSES IN THESE KINDS OF CASES, THEY DON'T KNOW AND CAN'T KNOW AND DON'T ALLEGE WHAT IS KNOWN BY THE SENIOR EXECUTIVES, THEY JUST DON'T HAVE VISIBILITY INTO THAT. AND SO CONFIDENTIAL WITNESSES 4 THROUGH 9 REALLY ARE OF NO VALUE.

THERE ARE THREE FORMER EMPLOYEE WITNESSES THAT THE PLAINTIFFS ALLEGE IN THE COMPLAINT. THE ONE THEY LEAN INTO HEAVILY IN MY READING OF THE COMPLAINT IS CONFIDENTIAL WITNESS 1, BUT CONFIDENTIAL WITNESS 1 DOESN'T HELP THEM EITHER. CONFIDENTIAL WITNESS 1 IS AN UNKNOWN PERSON WHO PLAINTIFFS

DON'T EVEN TALK TO DIRECTLY.  THIS COMES OUT OF A REPORT DONE BY SOMEONE ELSE, NOT BY PLAINTIFF'S COUNSEL.  WHAT WE KNOW IS THAT THAT INDIVIDUAL WAS ONLY EMPLOYED AT THE VERY BEGINNING OF THE ALLEGED CLASS PERIOD, NOT LATER, THAT THAT PERSON ONLY WORKED IN THE NEW YORK AREA, SO IT DOESN'T TELL YOU WHAT'S HAPPENING IN A COMPLETE GLOBAL WAY, AND THE PERSON SAYS THEY WERE NOT VERY SUCCESSFUL IN SALES.

SO GIVEN THAT, AND I KNOW I'M KIND OF JUMPING AHEAD TO TALKING ABOUT THE ALLEGATIONS OF OFF-LABEL MARKETING, BUT GIVEN WHAT THEY NEED THESE CONFIDENTIAL WITNESSES TO SAY IS WE WERE TOLD TO DO OFF-LABEL MARKETING, IT CAME FROM THE SENIOR EXECUTIVES, THEY GAVE US SPECIFIC MATERIALS AND SUPPORT ON HOW TO DO IT, WE DID IT AND IT IMPACTED THE COMPANY'S SALES WHICH IMPACTED THE RESULTS WHICH THEN IS HOW YOU SUPPORT OR HOW THE PLAINTIFFS WOULD SUPPORT THE CHALLENGED STATEMENT AS BEING FALSE AND MISLEADING.

THE COURT:  SO MS. BRODY, PARDON ME FOR INTERRUPTING YOU, IF THE ONE WITNESS TESTIFIES THAT SHE OR HE WERE TRAINED BY SOME STAFF, WHATEVER IT MIGHT BE, TO MARKET IN THE WAY THAT THEY DID, IS THAT -- WHAT DOES THAT DO?  DOES THAT CREATE SUFFICIENT EVIDENCE TO GO FORWARD, NONETHELESS?  AND THEN THE QUESTION IS -- I THINK WHAT YOU ARE SAYING IT'S ATTENUATED AS TO THE C-SERIES INDIVIDUALS, THERE IS NO EVIDENCE THAT ANY OF THEM ACTUALLY GAVE DIRECTIVES.  IS THAT --

MS. BRODY:  WELL THAT'S CERTAINLY CORRECT ON THE

SECOND PART OF THAT, AND I DON'T THINK THAT IN ONE WITNESS SAYING THAT IN FOR SOME SHORT PERIOD OF TIME IN THEIR GEOGRAPHY, WHEN IN FACT THEY ALSO SAY THEY ARE NOT SUCCESSFUL IN SALES, WOULD BE ENOUGH.

THE COURT:  WELL WE DON'T HAVE TO SHOW THEY WERE SUCCESSFUL, DO WE?  IS THAT A NECESSARY COMPONENT?

MS. BRODY:  I THINK THAT YOU DO BECAUSE I THINK YOU ACTUALLY HAVE TO SHOW THAT THERE WERE SALES BASED ON THE OFF-LABEL MARKETING.

SO WHEN YOU HAVE AN INDIVIDUAL WHO SAYS, I WASN'T SUCCESSFUL -- I WASN'T VERY SUCCESSFUL IN TELLING, THEN -- YOU KNOW, I UNDERSTAND WHY YOUR HONOR WOULD BE CONCERNED IF IN FACT THEY HAD ALL THOSE OTHER DETAILS ABOUT THE TRAINING AND ALL OF THAT, THAT WOULD BE HELPFUL FOR THE PLAINTIFFS.  THEY DON'T HAVE THOSE, BUT THAT WOULD BE A STARTING PLACE, IT WOULDN'T GET YOU ALL THE WAY THERE.

AND THE REASON WHY IT WOULDN'T GET YOU ALL THE WAY THERE IS BECAUSE IT WOULD NOT MAKE LARGE SWATHS OF THE ALLEGED FALSE AND MISLEADING STATEMENTS FALSE AND MISLEADING.

IF ONE SALES PERSON, AND WE DON'T EVEN KNOW THAT WE HAVE ONE, BUT IF ONE SALES PERSON WAS OUT DOING OFF-LABEL MARKETING AND WASN'T ACTUALLY SELLING, OR EVEN IF THEY WERE, TO THEN SAY THAT THOSE SALES HAD AN IMPACT ON THE STATEMENTS THAT THE DEFENDANTS MADE ABOUT HOW THE COMPANY WAS PERFORMING OR WHAT ITS FUTURE PROSPECTS MIGHT BE, YOU DON'T TIE IT ALL THE WAY

THROUGH.

AND SO IF YOU LOOK AT WHAT GETS ALLEGED IN AMGEN, GILEAD CORCEPT, IN THE GILEAD AND CORCEPT CASES, THE COMPLAINTS THAT FINALLY GET THROUGH, YOU SEE THAT THEY ALLEGE THE TIE-IN ALL THE WAY THROUGH THAT PROCESS.  AND IN FACT, THE GILEAD DECISION, THE SECOND GILEAD DECISION ON THE FIFTH AMENDED COMPLAINT, THE COURT SAYS TO THE PLAINTIFFS, YOU FINALLY DID IT BECAUSE YOU PUT THE PIECES TOGETHER, AND YOU NOT ONLY HAD THE ALLEGATIONS OF OFF-LABEL MARKETING AND THAT IT WAS WIDESPREAD AND THAT IT WAS DIRECTED AT A SENIOR LEVEL, BUT THEY TIE THE SPECIFIC ALLEGATIONS THAT ARE COMING FROM THE CONFIDENTIAL WITNESSES, THE FORMER EMPLOYEES, TO ACTUAL REVENUE IN THE QUARTERS IN WHICH THE STATEMENTS ARE MADE.

AND SO IT'S VERY TIGHT AND VERY TIED IN, AND WE DON'T HAVE ANY OF THAT HERE.

THE COURT:  OKAY.

SO ON THE STOCK SALES, I THINK THAT I HAVE ANSWERED ON SCIENTER, I THINK I'VE ANSWERED THE CORE OPERATIONS DISCUSSION. THE OTHER DISCUSSION OF COURSE, ON SCIENTER, IS STOCK SALES.

SO INTERESTINGLY ENOUGH, REBECCA CHAMBERS, THEY REALLY -- THE PLAINTIFFS REALLY JUST ABANDONED THE STOCK SALES ALLEGATIONS AS TO HER.  FOR NABEEL AHMED, THEY LEAN IN, FOR HIM AND FOR MS. TRIGG, TO THE FACT THAT IN FEBRUARY OF 2023, THERE'S A NEW 10B5-1 PLAN THAT GETS ADOPTED, AND THAT IS DONE A NUMBER OF DAYS AFTER THE COMPANY DISCLOSES THAT THERE HAD BEEN

AN FDA INSPECTION AND BEFORE THE WARNING LETTER.

AND SO THE PLAINTIFF ARGUES THAT THAT SHOWS -- THAT YOU CAN DRAW INFERENCES FROM THAT 10B5-1 PLAN AND THE SALES THAT COME FROM THAT. WE WOULD SAY EXACTLY THE OPPOSITE.

WHEN WE LOOK AT THE FACTS IN THE ALLEGED COMPLAINT, YOU SEE THAT IN JANUARY AND EARLY FEBRUARY THERE IS THIS FDA INSPECTION THAT HAPPENS, AND THEN THE COMPANY DISCLOSES THE FACT OF THAT INSPECTION. AND SO A BETTER INFERENCE TO DRAW FROM THE SENIOR EXECUTIVES THAN ENTERING INTO 10B5-1 PLANS IS THAT, IN THEIR MIND, THEY HAVE NOW TOLD THE WORLD THAT THERE WAS THIS FDA INSPECTION.

I'M SORRY, AM I UNFROZEN?

THE COURT: THAT WAS BY JULY 7TH.

MS. BRODY: NO, NO, THE WARNING LETTER IS JULY 7TH. I'M SORRY, YOUR HONOR, THE WARNING LETTER IS JULY 7TH AND THE FDA INSPECTION IS JANUARY AND FEBRUARY. IT'S DISCLOSED, I THINK ON FEBRUARY 10, AND A COUPLE OF -- ABOUT TEN DAYS LATER THEY ENTER INTO THE PLANS.

SO WHEN THEY ENTER INTO THOSE PLANS, EVERYTHING THAT THE COMPANY KNOWS AND THEY KNOW HAS BEEN DISCLOSED TO THE MARKET. SO UNLESS THE PLAINTIFFS ARE ABLE TO SHOW THAT IN FACT THE SENIOR EXECUTIVES HAD INFORMATION FROM THOSE INSPECTIONS THAT THEY DID NOT DISCLOSE WHEN THEY ENTERED INTO THOSE PLANS, THEN THEY CAN'T USE THOSE PLANS AS A BASIS FOR SCIENTER.

THE COURT: OKAY. LET ME JUST GET A TIMING HERE. SO

JANUARY 17TH AND FEBRUARY 10 OF 2023, THE FDA CONDUCTS ITS ON-SITE INSPECTION.

**MS. BRODY:**  I HAD THE DATES WRONG.  JANUARY 20TH THROUGH FEBRUARY 7TH, THE FDA CONDUCTS ITS INSPECTION. FEBRUARY 11TH, THE COMPANY DISCLOSES IN AN SCC FILING THAT THERE HAS BEEN THIS INSPECTION AND WHAT THEY KNOW ABOUT IT, AND THERE WERE NO ALLEGATIONS THAT THEY WERE NOT ACCURATELY MAKING THAT DISCLOSURE OR ANYTHING ABOUT THAT.

**THE COURT:**  WAS THE FORM 10-K FILED FEBRUARY 13, 2023?

**MS. BRODY:**  CORRECT.

**THE COURT:**  AND THAT DID NOT MENTION ANYTHING ABOUT ALLEGED OFF-LABEL MARKETING ANYTHING ABOUT THAT?

**MS. BRODY:**  OTHER THAN IN THE RISK FACTORS, IT DID NOT, BECAUSE THERE IS NO ALLEGATION THAT THE FDA AT THAT POINT HAS TOLD THE COMPANY THAT THEY BELIEVE THERE'S BEEN ANY OFF-LABEL MARKETING.

**THE COURT:**  THAT OCCURRED MARCH 13TH.

**MS. BRODY:**  CORRECT -- WELL, WE DON'T KNOW THAT, WE KNOW THERE IS A MEETING ON MARCH 13TH AND WE KNOW THAT THE WARNING LETTER COMES IN JULY.

**THE COURT:**  JULY 5, THE WARNING LETTER COMES OUT. IT'S BY OUTSET ON JULY 7.

**MS. BRODY:**  CORRECT.

**THE COURT:**  AND JULY 18TH, THE FDA PUTS THE LETTER ON

THEIR WEBSITE.

MS. BRODY:  CORRECT.

THE COURT:  AND LET ME CIRCLE BACK.  WE ARE TALKING ABOUT THE STOCK SALES NOW.  WHEN DID THE PARTIES ENGAGE IN THEIR STOCK SALES PLAN; THAT WAS IN FEBRUARY, WASN'T IT?

MS. BRODY:  FEBRUARY 23RD, YOUR HONOR.

THE COURT:  IT WASN'T BEFORE THAT, IT WAS THE 23RD?

MS. BRODY:  I BELIEVE IT'S THE 23RD OF FEBRUARY.

THE COURT:  I THOUGHT I HAD READ, AND THANK YOU FOR THAT HELP, I THOUGHT I HAD READ THAT THEIR STOCK PLAN WAS ENGAGED SOME TIME CLOSER TO THE BEGINNING OF FEBRUARY.

MS. BRODY:  NO, I BELIEVE THE NEW STOCK PLANS ARE ENTERED INTO ON FEBRUARY 23RD.

THE COURT:  OKAY.  THANK YOU, THANKS FOR THAT.

MS. BRODY:  SO FROM OUR REVIEW OF THE TIMELINE AND THE ALLEGATIONS IN THE COMPLAINT, THE NEW 10B5-1 PLANS FOR THE CFO AND CEO AT THAT MOMENT ARE PUT IN AFTER THE COMPANY HAS DISCLOSED THAT THERE HAS BEEN THIS FDA INSPECTION AND BEFORE THEY HAVE ANY INFORMATION THAT THE FDA IS CONCERNED ABOUT SOME OF THE CUSTOMER TESTIMONIALS ON THE WEBSITE.

THE COURT:  OKAY.

MS. BRODY:  SO THERE'S NO INFERENCE THAT CAN BE DRAWN FROM THE 10B5-1 PLANS AND IT'S QUITE DIFFERENCE FROM SOME OF THE CASES THAT WE HAVE CITED IN OUR PAPERS WHERE THERE IS AN EXAMPLE, I THINK IT WAS EITHER THE ACADIA OR THE IMPAX CASE

WHERE THERE IS AN EXAMPLE WHERE THE COMPANY IS GETTING A LOT OF DETAILED INFORMATION FROM THE FDA AND THEY ARE TOLD THERE ARE DEFECTS IN THEIR MANUFACTURING PROCESS, AND THEN THEY DO THE SALES AND THEY LET THAT INFORMATION OUT.

THIS IS NOT THE FACT PATTERN THAT'S HAPPENED HERE.

**THE COURT:**  OKAY.  TELL US ABOUT THE PERCENTAGE OF SALES VIS A VI THE INDIVIDUAL HOLDINGS, IS THAT A FACTOR WE SHOULD LOOK AT?

**MS. BRODY:**  I THINK IT IS HELPFUL, PARTICULARLY WITH RESPECT TO MS. TRIGG BECAUSE WE CAN SEE SHE HOLDS A TREMENDOUS AMOUNT OF VESTED SHARES DURING THAT TIME PERIOD, AND WE TALK ABOUT THAT SPECIFICALLY IN LOOKING AT IT IN COMPARISON TO SILICON GRAPHICS.  SO I THINK IT IS HELPFUL.  IT'S A LITTLE LESS HELPFUL HERE THAN IN SOME CASES BECAUSE THE CLASS PERIOD, WHICH IS FOUR YEARS LONG, STARTS EFFECTIVELY WITH THE IPO.

**THE COURT:**  RIGHT.  THAT'S ESSENTIALLY WHAT PLAINTIFFS ARE ASSERTING -- PARDON ME FOR CUTTING YOU OFF -- BUT PLAINTIFFS ARE ESSENTIALLY ASSERTING THAT SINCE THE IPO, THE COMPANY ENGAGED IN THE CONDUCT OF OFF-LABEL MARKETING, DIDN'T CLOSE, AND CONTINUED THAT, AND WHEN THEY MADE SOME CORRECTIVE STATEMENTS, THAT'S WHEN YOUR PLAINTIFF SUGGESTS THAT THAT'S WHEN THE SCHEME WAS DEVELOPED.

AND I ALSO WANT TO ASK YOU ABOUT THE SCHEME, AND PLAINTIFFS WILL ANSWER THAT QUESTION FOR US, BUT WHAT'S THE EVIDENCE OF THE SCHEME ITSELF AND WHAT IS THAT?  BUT I AM

TAKING YOU OFF TOPIC HERE.

**MS. BRODY:** NO, NO, NO, THAT'S FINE. THAT'S ABSOLUTELY FINE. THERE ISN'T EVIDENCE OF THE SCHEME AND THAT'S THE PROBLEM.

SO AS I SAID AT THE BEGINNING, THERE ARE TWO SORT OF FUNDAMENTAL CORE DEFICIENCIES IN THE COMPLAINT. ONE IS THEY DON'T HAVE SCIENTER, AND THE OTHER IS THEY HAVE NOT ALLEGED A SCHEME.

AND AGAIN, YOU CAN COMPARE WHAT GETS ALLEGED IN AMGEN, GILEAD, CORCEPT WHERE THERE'S VERY SPECIFIC ALLEGATIONS OF TRAINING AND MARKETING, AND GOING UP TO THE HIGHEST LEVELS, AND REVENUE IMPACT. AND HERE WE DON'T HAVE ANY OF THAT. WE HAVE A COUPLE OF PEOPLE WHO MAY OR MAY NOT ACTUALLY EVEN BE INVOLVED OF MARKETING AND SELLING TO THE ACUTE PORTION OF THE MARKET, WHICH WOULD BE THE HOSPITALS, WHICH WOULD WHERE IF ONE WERE TO HAVE OFF-LABEL MARKETING, IT WOULD HAPPEN.

AND THE PEOPLE WHO ARE SAYING, WELL I HEARD THAT MAYBE THERE WAS A MARKETING FOR CRRT, THERE IS ONE CONFIDENTIAL WITNESS, DOESN'T EVEN WORK IN THAT AREA, I BELIEVE THAT'S CONFIDENTIAL WITNESS 2, SO NOT SOMETHING THAT THEY WOULD ACTUALLY KNOW FROM THEIR JOB. SO THERE'S JUST A COMPLETE LACK OF ACTUALLY SHOWING ANYTHING.

WHAT THE PLAINTIFFS HAVE SIMPLY IS THREE QUARTERS OF THE WAY THROUGH THE CLASS PERIOD, A WARNING LETTER FROM THE FDA WHICH IS PARTICULARLY FOCUSED ON SOME TESTIMONIALS ON THE

WEBSITE WHERE CUSTOMERS ARE SAYING WE REPLACED CRRT WITH THIS, BUT REPLACING IT DOESN'T MEAN IT WAS BEING MARKETED FOR OFF-LABEL, BECAUSE AS WE EXPLAIN THE WAY DIALYSIS WORKS, THERE IS THIS WHOLE RANGE OF DIFFERENT KINDS OF PROCESSES AND TIMING. AND SO THE COMPANY SAYS ALL ALONG THAT TABLO CAN GET USED FOR UP TO 24 HOURS, NEVER SAYS IT CAN GET USED FOR MORE THAN 24 HOURS. AND IN FACT, THE ONE STATEMENT WE HAVE THAT'S IN THE COMPLAINT FROM MS. TRIGG IS WHEN SHE'S CORRECTING SOMEBODY TO SAY, NO, NO, TABLO IS NOT CRRT.

SO THERE JUST IS NOT EVIDENCE OF THIS SCHEME IN THIS COMPLAINT.

THE COURT: OKAY. THERE'S ALLEGATIONS THAT SALES REPS AND OTHERS WERE EITHER TRAINED TO AND THEN DID MARKET TO HOSPITALS AND OTHERS THAT TABLO WAS CRRT COMPLIANT. THOSE ARE THE ALLEGATIONS, I BELIEVE.

MS. BRODY: SO THERE ARE CONCLUSIONS BY THE PLAINTIFF'S LAWYERS IN THE COMPLAINT THAT THAT'S WHAT'S HAPPENING. WHAT IS MISSING ARE ACTUAL STATEMENTS FROM ANY FORMER EMPLOYEE CONFIDENTIAL WITNESSES TO SAY THAT THAT WAS HAPPENING.

SO THERE ARE CONCLUSORY STATEMENTS BEING DRAWN FROM OTHER THINGS TO INFER OR ASSUME THAT THAT'S HAPPENING, BUT THERE ARE NOT THE SPECIFIC ALLEGATIONS THAT ARE NEEDED TO ACTUALLY UNDERPIN THOSE CONCLUSIONS. THAT'S WHAT'S MISSING.

THE COURT: OKAY. SO WE ARE LOOKING FOR STRONG

INFERENCES.  SUPPORT FOR A STRONG INFERENCE.  AND IS THERE INTENTIONAL OR IS THERE DELIBERATE RECKLESSNESS HERE?  DO YOU THINK THAT THERE'S -- ANY OF THE EVIDENCE SUPPORTS THAT?

MS. BRODY:  NO, YOUR HONOR, I DO NOT.  THERE'S NO EVIDENCE TO SHOW INTENTIONAL OR DELIBERATE RECKLESSNESS ON BEHALF OF THE DEFENDANTS BECAUSE THERE'S NOTHING TO SHOW THAT THEY EVEN KNEW OR -- NOTHING TO SHOW IT WAS ACTUALLY HAPPENING.

A FEW INDIVIDUAL INSTANCE THAT AREN'T REALLY SUPPORTED THAT IT WAS ACTUALLY HAPPENING, FOR EXAMPLE CONFIDENTIAL WITNESS 2 THAT DOESN'T EVEN WORK IN THAT AREA, ARE NOT ENOUGH AND NONE OF IT GETS TIED UP TO THE SENIOR EXECUTIVES.

THE COURT:  THERE WAS AN ALLEGATION THAT MS. TRIGG IS A HANDS-ON OFFICER, SHE'S ON THE FLOOR, SHE'S WALKING SHE ATTENDS MEETINGS, SHE SIGNS ALL THE SCC DOCS AND EVERYTHING, SO SHE'S ATTRIBUTED TO HAVE THAT TYPE OF KNOWLEDGE AND RESPONSIBILITY, AND I SUPPOSE PLAINTIFFS WILL TELL US THAT, MS. MOODY WILL HELP US WITH THIS QUESTION, BUT IS THAT SUFFICIENT?  DO WE SAY, WELL A HANDS-ON CEO, SHE SHOULD HAVE KNOWN?  IS THAT RECKLESSNESS OR WHAT DO WE MAKE OF THAT?

MS. BRODY:  WE DON'T MAKE ANYTHING OF THAT IN TERMS OF ESTABLISHING KNOWLEDGE FOR SCIENTER.  IF THAT WAS THE STANDARD, THEN ANY TIME YOU HAD A CEO THAT WAS DOING THEIR JOB, YOU WOULD GET OVER PLEADING HURDLES, AND THAT CANNOT BE THE CASE.

SO YOU HAVE TO START WITH THE FUNDAMENTALS OF ARE THERE

SUFFICIENT DETAILED ALLEGATIONS THAT THIS ACTIVITY, OFF-LABEL MARKETING HERE, IS ACTUALLY OCCURRING AND IS IT OCCURRING IN A WIDESPREAD WAY AND DIRECTED OR KNOWN ABOUT BY SENIOR MANAGEMENT THAT IT HAS AN IMPACT ON THE COMPANY'S PERFORMANCE SUCH THAT IT MAKES THE CHALLENGED STATEMENTS FALSE?

IN TERMS OF SHOWING RECKLESSNESS, YOU HAVE TO FIRST SHOW THAT THERE IS SOMETHING FOR THAT EXECUTIVE TO BE RECKLESS ABOUT, WHICH ISN'T DONE HERE, AND THEN YOU ACTUALLY HAVE TO SHOW THAT THEY HAVE KNOWLEDGE OF THAT.  AND SIMPLY GOING TO MEETINGS OR WALKING A HOSPITAL FLOOR OR BEING HANDS-ON OR CARING ABOUT WHAT'S GOING ON IN YOUR COMPANY DOESN'T SHOW KNOWLEDGE.

YOU HAVE CASES WHERE THERE IS KNOWLEDGE SHOWN BECAUSE A CONFIDENTIAL WITNESS, FORMER EMPLOYEE, SAYS I WAS IN A MEETING WITH THESE PEOPLE AND THIS IS WHAT WAS DISCUSSED.  AND WE HAVE NONE OF THAT HERE.

**THE COURT:**  I APOLOGIZE MS. BRODY, AGAIN, THE PLAINTIFFS SUGGEST AGAIN, I BELIEVE IN ONE POINT IN THEIR PLEADINGS, THAT DEFENDANT TRIGG'S DIRECT INVOLVEMENT WITH THE SALES TEAM IN MARKETING WITH THE COMMERCE.  WHAT'S THE EVIDENCE OF THAT?  THAT'S A HEADS UP FOR MS. MOODY TO ANSWER, BUT WHAT'S YOUR ANSWER TO THAT QUESTION?

**MS. BRODY:**  THE FACT THAT SHE ATTENDS SOME MEETINGS WITH CUSTOMERS DOESN'T MEAN SHE'S AWARE OF ANY OF THIS ACTIVITY IF THERE ISN'T EVIDENCE OF THE ACTIVITY OR EVIDENCE THAT IT WAS

HAPPENING IN THOSE MEETINGS.

AGAIN, THAT'S WHAT YOU SEE IN THESE OTHER CASES.

THE COURT:  SURE.

MS. BRODY:  IT'S INTERESTING, THERE IS ONE MEETING WHICH IS DISCUSSED WHERE SHE ATTENDS WITH A CLIENT, AND WHAT THE PLAINTIFFS SAY IS THAT IN THAT MEETING, SHE DID NOT DISCLAIM THAT TABLO COULD NOT BE USED FOR CRRT.

SO IN OTHER WORDS, THE PLAINTIFFS ARE PUTTING THE BURDEN ON HER BEFORE THERE IS EVEN THE SECURITIES CASE TO GO AROUND AND SAY, WE ARE NOT OFF-LABEL MARKETING TO PEOPLE.

AND THAT SIMPLY -- THAT DOESN'T MAKE ANY SENSE THAT SHE WOULD GO INTO A MEETING AND HAVE TO TAKE THAT KIND OF AFFIRMATIVE ACTION, SO IT REALLY SORT OF TURNS EVERYTHING ON ITS HEAD.

THE COURT:  OKAY.

MS. BRODY:  YOU HAD SOME QUESTIONS ABOUT LOSS CAUSATION?

THE COURT:  YES, TELL ME ABOUT THAT.

MS. BRODY:  SO THE -- I THINK YOU WERE TALKING ABOUT CHALLENGED STATEMENTS STARTING IN NOVEMBER.

THE COURT:  CORRECT.

MS. BRODY:  YEAH.  AND SO --

THE COURT:  MAY 9TH AND AUGUST 7TH.

MS. BRODY:  CORRECT.  YEAH.

AND SO THOSE CHALLENGED STATEMENTS OR CORRECTIVE

DISCLOSURES ARE SIMPLY REAFFIRMING PRIOR DISCLOSURES FROM THE FDA FILINGS AND TALKING ABOUT THE NEGATIVE IMPACT OF THE FDA LETTER, THEY'RE NOT TELLING ANYBODY ANYTHING NEW.  SO THEY SIMPLY DO NOT WORK AS CORRECTIVE DISCLOSURES.

AND YOU KNOW, I THINK THAT THERE ARE SOME REALLY FUNDAMENTAL PROBLEMS, AS WE HAVE TALKED ABOUT WITH THIS COMPLAINT, AMONG THE REAL FUNDAMENTAL PROBLEMS IN THE COMPLAINT, THE ALLEGED CLASS PERIOD -- WE DON'T THINK THE CASE SHOULD GO FORWARD AT ALL, BUT THE ALLEGED CLASS PERIOD IS SUBSTANTIALLY TOO LONG.

SO THEY START RIGHT AT THE VERY BEGINNING OF THE IPO AND THEY GO TEN MONTHS AFTER, IF THERE IS A CORRECTIVE DISCLOSURE, AND AGAIN OBVIOUSLY WE ARE NOT CONCEDING THAT, THEY GO TEN MONTHS AFTER THAT TO JUST SORT OF CAPTURE MORE TIMES WHEN THE STOCK PRICE MOVES.

AND THAT DOESN'T WORK, IT DOESN'T TIE UP.  AND IF YOU LOOK AT WHAT ALL THE VARIOUS CHALLENGE STATEMENTS AND YOU LOOK AT THE SCIENTER ALLEGATIONS AND YOU LOOK AT THE ALLEGED CORRECTIVE DISCLOSURES, IT'S KIND OF A MISHMASH AND IT JUST SIMPLY DOES NOT TIE UP SO THAT IT IS ONE SORT OF COMPREHENSIVE COHERENT THEORY, THEY WOULD HAVE TO ALLEGE ALL SORTS OF DIFFERENT KINDS OF SCIENTER, FOR EXAMPLE, OR CORRECTIVE DISCLOSURES TO PULL IN ALL OF THE CHALLENGE STATEMENTS THAT THEY ARE TRYING TO INCLUDE IN THIS CASE.

**THE COURT:**  THERE WAS AN E-MAIL THAT WAS APPARENTLY

SENT COMPANY-WIDE THAT TALKED ABOUT CEASE MARKETING TABLO FOR CRRT, TO STOP REFERRING TO CRRT AND TO PURGE ALL PREVIOUS MARKETING MATERIALS.

TELL ME ABOUT THAT.  WHAT IS THAT EVIDENCE, IF ANYTHING?

**MS. BRODY:**  IF ANYTHING, THAT IS EVIDENCE OF THE COMPANY, UPON RECEIVING THE FDA WARNING LETTER, TAKING ACTIONS TO MAKE SURE IF SOMEBODY IS DOING SOMETHING THEY ARE NOT SUPPOSED TO BE DOING, THEY ARE NOT DOING IT ANY WRONGER.

SO THE FACT THAT THE COMPANY DOES THE RIGHT THING WHEN THE FDA GETS THE WARNING LETTER, DOES NOT SHOW THAT THEY WERE DOING THE WRONG THING BEFORE, AND IT CERTAINLY DOES NOT SHOW THAT THERE IS ANY GOING OF ONGOING WRONGFUL BEHAVIOR AFTER THAT. IT'S THE COMPANY STEPPING UP TO DO THE RIGHT THING TO BE SURE THAT THEY ARE COMPLYING.

**THE COURT:**  RIGHT.

IF THE FDA LETTER IS JULY 5, THEN I THINK WE HAVE DETERMINED THAT ON JULY 7, OUTSET DISCLOSES THE RECEIPT OF THE LETTER TO THE PUBLIC.

AND THE CONDUCT I JUST MENTIONED, I LOOKED AT IT AND I THOUGHT, WELL IS THIS CONSCIOUSNESS OF GUILT?  OR IS IT AS YOU SAY, A PROTOCOL BY A COMPANY TO REDIRECT, REFRAME OR DO WHATEVER IT NEEDS TO DO IN LIGHT OF THE INFORMATION?

USUALLY IT'S THE LATTER.

**MS. BRODY:**  YES, YOUR HONOR.  I SAY THAT IT'S THE LATTER.

AND FOR THE PLAINTIFFS TO ALLEGE THAT IT'S THE FORMER, THEY WOULD NEED TO TELL US A LOT MORE, THEY CAN'T SIMPLY SAY, OH THEY SENT A LETTER OUT OR A MEMO TO THEIR EMPLOYEES TO SAY WE GOT THIS LETTER, DO THE RIGHT THING, GO DO THESE THINGS, AND THEN SAY THAT MEANS THEY MUST HAVE BEEN DOING IT.

YOU WOULD ACTUALLY HAVE TO HAVE A CONFIDENTIAL WITNESS COME FORWARD AND SAY THIS IS WHAT WAS GOING ON, WHICH THEY DON'T HAVE, OR YOU WOULD HAVE TO HAVE SOMEONE SAY THEY MADE THE DECISION TO SEND THIS BECAUSE THEY KNEW ABOUT IT, OR I WAS IN A MEETING WHERE THEY TALKED ABOUT IT.  THERE IS NONE OF THOSE ALLEGATIONS.

SO I THINK THE BETTER INFERENCE IS THIS IS A COMPANY TRYING TO DO THE RIGHT THING IN A COMPLICATED INDUSTRY WITH COMPLICATED PRODUCTS, AND THAT YOU CAN'T DRAW -- THEY SIMPLY DO NOT HAVE THE FACTS TO DRAW THE INFERENCES THEY WOULD LIKE TO DRAW.

**THE COURT:**  OKAY.  I JUST WANT TO ASK ON A LITTLE ANCILLARY ISSUE THAT CAME UP, AND IT'S ABOUT THE TABLO CART, ON MARCH 13TH A WEBSITE SHOWED, I BELIEVE, TABLO CART IS A MEDICAL DEVICE, AND THE ALLEGATIONS ARE THAT YOUR CLIENT MARKETED IT AS A NONMEDICAL ACCESSORY.  AND THAT HAS SIGNIFICANCE BECAUSE THERE HAS TO BE FDA APPROVAL IF IT'S BEING OFFERED AS ONE AND NOT FOR THE OTHER.  AND THERE SEEMS TO BE SOME ALLEGATION THAT TABLO CART SALES AND/OR MARKETING WAS ALSO PART OF THE PROBLEMS THAT YOUR CLIENT ENGAGED IN.

CAN YOU JUST TALK A LITTLE BIT ABOUT THAT?

**MS. BRODY:**  SURE.

SO OUTSET, WHEN IT STARTED TO MARKET TABLO CART, WHICH IT DID IN NOVEMBER OF 2022 UNTIL FEBRUARY OF 2023, DID NOT BELIEVE THAT IT NEEDED FDA APPROVAL FOR TABLO CART, AND THAT'S WHAT IT SAID.

AND WHAT TABLO CART IS IS IT'S SOMETHING THAT IS AN ACCESSORY THAT GOES ON TO TABLO AND IS USED AS A WATER FILTRATION.

**THE COURT:**  IT'S A WATER FILTER, RIGHT?

**MS. BRODY:**  EXACTLY.  AND SO IT DID NOT BELIEVE THAT IT NEEDED FDA APPROVAL FOR THE WATER FILTER.

AND IT NEVER -- IT DID NOT SAY DURING THAT TIME THAT IT HAD FDA APPROVAL; IN FACT, IT SAID IT DID NOT HAVE FDA APPROVAL.

COMING OUT OF THE INSPECTION IN LATE JANUARY AND EARLY FEBRUARY, OUTSET LEARNED THAT THE FDA HAD A DIFFERENT VIEW ON IT, AT WHICH POINT OUTSET STARTED THE PROCESS OF GETTING FDA APPROVAL AND STOPPED SELLING TABLO CART.

IT'S AS SIMPLE AS THAT.  IT IS AGAIN AN EXAMPLE OF A COMPANY THAT WAS CLEAR ABOUT WHAT IT WAS DOING, UP FRONT WITH EVERYONE ABOUT WHAT IT BELIEVED WAS TRUE WITH RESPECT TO THIS PARTICULAR ACCESSORY, WAS TOLD SOMETHING DIFFERENT BY THE FDA, TOLD THE WORLD THAT IT HAD LEARNED SOMETHING DIFFERENT THAN THE FDA, STARTED THE PROCESS OF GETTING APPROVAL.

SO IT IS COMPLETELY DIFFERENT THAN THE SITUATIONS WHERE -- AND IT HAD RISK FACTORS ABOUT ALL OF THIS AS WELL, SO EVERYBODY WAS ALERTED TO THAT FACT.  COMPLETELY DIFFERENT THAN THE SITUATIONS WHERE YOU HAVE IN SOME OF THE CASES THE PLAINTIFFS LEAN INTO, WHERE INSTEAD A COMPANY LEARNS THAT THINGS ARE GOING ON, LEARNS THAT THE FDA IS CONCERNED ABOUT THINGS AND THEN DOESN'T TELL PEOPLE.

SO IT'S EXACTLY THE OPPOSITE.  I THINK IT SHOWS LACK OF SCIENTER AND THAT THE STATEMENTS ABOUT TABLO CART ARE NOT FALSE.

**THE COURT:**  OKAY.

MS. MOODY IS GOING TO HELP ME WITH THIS BECAUSE I THINK HER ARGUMENT IS, OR HER CLIENT'S ARGUMENT IS THAT THE TABLO CART ISSUE AFFORDED THE -- AND I'M USING JUST MY LANGUAGE, NOT HERS, JUST TO HOPEFULLY MAKE IT UNDERSTANDABLE -- THE TABLO CART ISSUE PROVIDED, THEN, YOUR CLIENT AN OPPORTUNITY TO USE THAT AS AN EXCUSE FOR THE REVENUES REPORTING AND THE DISCREPANCIES IN THEIR REVENUE REPORTING AND SAYING THAT, WELL WE ARE WAITING FOR THE FDA APPROVAL AND THAT'S WHY WE HAD -- WE DIDN'T MEET OUR GUIDELINES, OUR GUIDANCE, AND ONCE WE GET IT APPROVED, THINGS ARE GOING TO GO WELL; AS OPPOSED TO THEIR ALLEGATION SEEMS TO BE, YOUR COLLEAGUE OPPOSITE'S ALLEGATION SEEMS TO BE THAT THE REAL ISSUE WAS, AND THE REAL LOSS, WAS BECAUSE OF THE LABELING ISSUE AND THE PROBLEMS WITH THE OFF-MARKET LABELING.

I THINK THAT SEEMS TO BE WHAT THEIR ALLEGATIONS ARE, THEY ARE BUILT ON THAT, THAT'S HOW TABLO CART COMES IN?

**MS. BRODY:**  I BELIEVE THAT IS, PLUS I JUST THINK THEY HAVE A NUMBER OF CHALLENGE STATEMENTS THAT WHAT WAS SAID ABOUT TABLO CART IN THE YEAR PERIOD WHERE IT WAS BEING SOLD WERE FALSE.

BUT AGAIN, IT'S A SITUATION WHERE PLAINTIFFS HAVE TAKEN SOME FACTS AND THEN DRAWN A LOT OF INFERENCES FROM THEM BUT THEY HAVE NO FACTS TO SUPPORT THEIR INFERENCES.

SO THEY HAVE NO FACTS, NO WITNESSES, NO DOCUMENTS, NO NOTHING, TO SHOW THAT DURING THE TIME THAT THE COMPANY WAS MARKETING TABLO CART, YOU KNOW, FROM THE END OF 2022 INTO 2023, THAT THEY KNEW THAT IT NEEDED TO HAVE FDA APPROVAL.

IN FACT, THE ALLEGATIONS WE HAVE ABOUT IT AND EVERYTHING IT SAID ABOUT IT IS JUST THE OPPOSITE.  AND THERE ARE NO FACTS TO SUPPORT THE ALLEGATIONS THAT THIS WAS BEING USED AS A SUBTERFUGE FOR WHY THE REVENUE WENT DOWN AND NOTHING TO SHOW THAT, IN FACT, THE DEFENDANTS BELIEVED OTHERWISE.

SO AGAIN, YOU KNOW, THE PLAINTIFFS HAVE DONE A LOT.  THEY HAVE GOT A LOT OF PAGES, THEY HAVE A LOT OF PARAGRAPHS, AND THEY HAVE A LOT OF CONJECTURE THAT THEY ARE PULLING FROM THINGS BUT THEY DON'T HAVE THE UNDERPINNING FACTUAL ALLEGATIONS TO SUPPORT IT.

**THE COURT:**  THANK YOU.

SHOULD YOUR CLIENT HAVE KNOWN PRIOR TO THE FDA TELLING

THEM ABOUT WHETHER IT'S A NONMEDICAL ACCESSORY OR WHETHER IT'S A MEDICAL DEVICE, SHOULD THEY HAVE KNOWN THAT?

MS. BRODY:  WELL I'M NOT AN FDA REGULATORY LAWYER, SO FROM MY PERSPECTIVE, WHAT I KNOW AND UNDERSTAND IS THAT IT'S AN AREA WHERE PEOPLE HAVE DIFFERENT VIEWS AND THAT THEY HONESTLY HAD A DIFFERENT BELIEF THAT THEY COULD SELL IT WITHOUT GETTING FDA APPROVAL.

THE COURT:  THAT'S MY --

MS. BRODY:  I'M NOT A REGULATORY LAWYER --

THE COURT:  I GUESS A BETTER FRAMING OF THAT QUESTION WOULD BE WHAT'S THE SIGNIFICANCE, IF ANY, OF THEM NOT KNOWING THAT?

MS. BRODY:  I THINK IF THEY DON'T KNOW IT, THEY ARE NOT MAKING KNOWING FALSE STATEMENTS.  AND SO UNLESS THE PLAINTIFFS CAN SHOW THAT IN FACT THEY KNEW THEY NEEDED THAT APPROVAL AND THEY WENT AHEAD AND MARKETED IT AND TALKED ABOUT IT THEN TRIED TO USE IT LATER ON TO EXPLAIN WHERE THE REVENUE DROPPED, THAT WOULD BE DIFFERENT; BUT THEY DON'T HAVE THOSE ALLEGATIONS, IT'S JUST MISSING.

THE COURT:  IT'S NOT INTENTIONAL IGNORANCE.

MS. BRODY:  I'VE SEEN NO EVIDENCE OF THAT AND THERE IS NOTHING IN THE COMPLAINT TO SHOW THAT.

THE COURT:  OKAY.

GREAT.  ANYTHING ELSE?

MS. BRODY:  ONE THING ON THAT, YOUR HONOR.

THE COURT:  YEAH, PLEASE.

MS. BRODY:  IN THINKING ABOUT THAT, IF IT WAS -- IF IT WAS SO KNOWN TO THE MARKET THAT YOU WOULD HAVE TO HAVE THIS, I WOULD HAVE EXPECTED THAT YOU WOULD SEE STATEMENTS OUT THERE FROM OTHER PEOPLE SAYING THAT, AND THAT'S MISSING TOO.

AND THAT WOULD BE AVAILABLE TO THE PLAINTIFFS, YOU KNOW, THEY DID A LOT OF WORK FOR THIS AMENDED COMPLAINT, THEY WOULD HAVE FOUND SOMETHING LIKE THAT, BUT IT'S NOT THERE.

THE COURT:  OKAY.  GREAT ANYTHING ELSE YOU WOULD LIKE ME TO KNOW OR ANYTHING YOU WOULD LIKE TO WRAP UP WITH?

MS. BRODY:  NO, I THINK WE HAVE DONE A VERY THOROUGH JOB COVERING ALL OF THIS.  AGAIN, I JUST THINK FUNDAMENTALLY, THIS COMPLAINT DOESN'T HOLD TOGETHER.

AND THEN OBVIOUSLY THERE ARE PROBLEMS WITH A LOT OF SPECIFIC CHALLENGE STATEMENT, SORT OF PUFFY OR FORWARD LOOKING WITH RESPECT TO ALL OF THAT BUT I DON'T THINK YOU EVEN HAVE TO GET TO THAT AT THIS JUNCTURE BECAUSE I THINK THERE ARE THESE FUNDAMENTAL PROBLEMS.

THE COURT:  OKAY.  WELL LET'S ASK MS. MOODY IF SHE CONCEDES THE MOTION.

MS. MOODY:  THERE IS A LOT OF DISAGREEMENT.

THE COURT:  MS. MOODY.

MS. MOODY:  THANK YOU, YOUR HONOR.

SO YEAH, AS YOU MENTIONED, YOU ARE INTERESTED IN SCIENTER SO I WILL START THERE AS WELL.

WE HAVE SEVERAL DIFFERENT INDICIA OF SCIENTER, AND ONE IS CORE OPERATIONS, WHICH YOU KNOW SOME COURTS HAVE FOUND IN AND OF ITSELF CAN SATISFY SCIENTER.

HERE WE HAVE, IT'S UNDISPUTED WE HAVE THE TABLO WHICH IS OUT SETS PRIMARY PRODUCT, PRIMARY REVENUE DRIVER, IT BASICALLY IS THE COMPANY.  AND THE FALSE STATEMENTS THAT WE ARE ALLEGING GO TO THE MARKETING OF THAT PRODUCT AND THE REVENUE DRIVERS OF THAT PRODUCT THAT THEY ARE FAILING TO DISCLOSE THIS OFF-LABEL MARKETING.

SO NOT ONLY IS IT THIS SORT OF CORE PRODUCT, BUT THE STATEMENTS THE DEFENDANTS ARE MAKING GO TO THE ESSENTIAL -- YOU KNOW, THE ESSENCE OF THE COMPANY, THE REVENUE DRIVERS AND THE MARKETING OF THEIR MAIN PRODUCT.

BUT EVEN -- BUT THAT'S JUST ONE PIECE OF THE PUZZLE.  AND THE SORT OF -- I THINK WHAT THE BRIEFING AND NOW TODAY KEEPS BEING IGNORED IS THAT WE DO HAVE SUBSTANTIAL ALLEGATIONS OF OFF-LABEL MARKETING.  AND WHILE MS. BRODY SAYS THAT CUSTOMER ACCOUNTS ARE TO BE DISCREDITED, THAT'S NOT TRUE, CORCEPT SAID THEY WEREN'T ENOUGH WITHOUT EMPLOYEES SPEAKING TO THAT ISSUE BUT THEY CERTAINLY CORROBORATED WHAT THE EMPLOYEES ARE SAYING.

AND WE HAVE SEVERAL EMPLOYEES SAYING SPECIFICALLY, AND THIS IS AGAIN IGNORED, BUT THEY ARE IN TRAINING MEETINGS AND BEING TOLD DIRECTLY, NOT INDIRECTLY, BY SENIOR MANAGEMENT TO MARKET TABLO FOR CRRT.

THE COURT:  SO WHAT DOES -- YES.  I READ THAT AND I

SAW SOME OF THE WITNESSES WHO SAY SPECIFICALLY, I WAS AT TRAINING, I RECEIVED THIS TRAINING AND THEN LATER ON WE WERE TOLD WE WERE UNTRAINED, WE WERE TOLD TO DO SOMETHING ELSE.

BUT FOR THIS TRAINING, AND AS YOU SAY, EXECUTIVE BRANCH, I DON'T MEAN TO PULL YOU OFF, BUT WE NEED TO TALK ABOUT HOW HIGH DOES THAT EXECUTIVE BRANCH GO AND IS THERE ATTENUATION FOR MS. TRIGG AND MR. AHMED AND OTHERS IN THAT SERIES?  AND IF THERE ARE, IF THESE WITNESSES ARE TO BE BELIEVED, IS THAT SUFFICIENT FOR WHAT?  WHAT DOES THAT DO FOR US?  IF YOU UNDERSTAND MY QUESTION.

**MS. MOODY:**  YEAH.  SO FOR EXAMPLE AMGEN, THE INDIVIDUAL DEFENDANTS WERE NOT TIED DIRECTLY TO THE OFF-LABEL MARKETING, AND THAT WASN'T EVEN A CORE PRODUCT.

HERE WE HAVE THE CHIEF MEDICAL OFFICER, THE VICE PRESIDENT OF GLOBAL SALES TELLING SALES STAFF IN NO UNCERTAIN TERMS, MARKET THIS PRODUCT FOR CRRT WHICH IS AN OFF-LABEL USE WHICH IS UNDISPUTED.

AND THEN WE HAVE THE DEFENDANTS ALSO TALKING ABOUT THIS VALUE PROPOSITION MARKETING STRATEGY BUT NOT SAYING FUNDAMENTAL TO THAT STRATEGY WAS THIS OFF-LABEL MARKETING FOR CRRT, WHICH IS WHAT WITNESS ONE 1 TO.  AND THAT WITNESS ACTUALLY SAYS, THEY SOLD TO SEVERAL HOSPITALS TABLO FOR CRRT AFTER MARKETING IT AS CRRT, AND THAT WAS DURING THE CLASS PERIOD.

AND THE CUSTOMER WITNESSES CORROBORATE THAT.  THEY DON'T SAY, LIKE IN AMGEN, THAT THEY WERE PROMPTED OR WERE -- LIKE IN

AMGEN WHERE THE EMPLOYEES WERE TAUGHT TO KIND OF PROMPT THE DOCTORS TO ASK ABOUT OFF-LABEL USE, WE HAVE MORE THAN THAT, WE HAVE THEM SAYING MARKET IT FOR CRRT WHICH IS OFF-LABEL.  AND WE DO HAVE MATERIALS, THEY SPEAK TO MATERIALS THAT THEY WERE GIVEN BY OUTSET.  MULTIPLE CUSTOMERS CORROBORATE THAT THEY WERE TOLD BY OUTSET TO MARKET OFF-LABEL.  AND CW4 HAD CONVERSATIONS WITH DEFENDANT TRIGG, HAD CONVERSATIONS WITH THE CMO, THAT SAME CMO WHO TOLD ITS STAFF TO MARKET OFF-LABEL.  THAT CUSTOMER ALSO WAS TOLD BY OTHER EMPLOYEES ABOUT THAT, THAT IT COULD BE USED FOR CRRT.

          THE COURT:  I'M SORRY, SO CW4 WOULD TESTIFY THAT MS. TRIGG TOLD HER DIRECTLY TO MARKET?

          MS. MOODY:  NO, NO, NO, NO, SORRY.  THAT SHE HAD DISCUSSIONS WITH DEFENDANT TRIGG AND WITH DEFENDANT -- SORRY.  WITH THE CMO, THAT SHE WAS TOLD BY CERTAIN OUTSET EMPLOYEES THAT TABLO COULD BE USED FOR CRRT.

          THE COURT:  OKAY.  SO SHE, THE WITNESS, TOLD THE CMO AND MS. TRIGG THAT THIS IS WHAT HER TRAINING WAS?

          MS. MOODY:  NO, NO, NO, NO, I'M SORRY.

          THE COURT:  THANK YOU.

          MS. MOODY:  LET ME CLARIFY.  WE HAVE EMPLOYEE WITNESSES SAYING THEY WERE TRAINED TO MARKET FOR CRRT.

          THE COURT:  RIGHT.

          MS. MOODY:  THEN WE HAVE CUSTOMER WITNESSES, INCLUDING CW4, WHO SAID THEY WERE THEN TOLD BY OUTSET

EMPLOYEES, THIS COULD BE USED FOR CRRT, AND THEN THEY PURCHASED THEM FOR CRRT.

CW4 IS ONE OF THOSE CUSTOMER WITNESSES WHO SAID THEY WERE MARKETING THAT WAY AND THEY ALSO HAD DISCUSSIONS WITH DEFENDANT TRIGG AND THE CMO.

THE COURT:  TELL ME ABOUT THOSE DISCUSSIONS.  WHAT DOES THAT WITNESS ALLEGE?

MS. MOODY:  THERE IS NOT A LOT OF DETAIL ABOUT THOSE DISCUSSIONS BUT THE SPECIFIC STATEMENTS ABOUT TABLO BEING USED FOR CRRT CAME FROM OTHER EMPLOYEES.

THE COURT:  RIGHT.

MS. MOODY:  BUT THEY WERE NEVER -- BUT THE HOSPITAL THEN BOUGHT THESE UNITS SPECIFICALLY FOR CRRT.

THE COURT:  AND SOME OF THEM SOLD THEIR OLD EQUIPMENT IN FAVOR OF --

MS. MOODY:  RIGHT.  THEY DITCHED THE OLD STUFF AND REPLACED IT FOR CRRT.

THE COURT:  MY QUESTIONS ABOUT THOSE WITNESSES AND WHAT THEY SAID IN THEIR CONVERSATIONS WERE REALLY RELATED TO ATTENUATION OF MS. TRIGG'S AND THE CMO AND OTHERS.  THAT'S WHAT I'M TRYING TO SEE, IS THERE ATTENUATION THERE THAT YOUR CLIENT OPPOSITE, YOUR COLLEAGUE OPPOSITE, MS. BRODY SUGGESTS, IT DOESN'T PERMIT THAT INFERENCE.

MS. MOODY:  WELL, YOU KNOW, IT CERTAINLY SHOWS THAT TRIGG WAS INVOLVED IN MARKETING, THAT SHE WAS TALKING TO

PEOPLE, THAT WE KNOW THAT SHE TOUTED THE VALUE PROPOSITION MARKETING STRATEGY TO THE MARKET WHICH THEN WE HAVE WITNESSES SAYING MARKETING FOR CRRT UNDERLIES THAT.  WE HAVE THIS WITNESS WHO ACTUALLY BOUGHT THESE UNITS FOR CRRT AND ACTUALLY THOUGHT THAT IT WAS CLEARED FOR CRRT.  AND WE HAVE EMPLOYEES AND OTHER CUSTOMERS SAYING THAT TOO.

BUT NO, THERE IS NOT THE DIRECT LINK THAT MS. TRIGG TOLD SOME SPECIFIC CUSTOMER THAT IT COULD BE MARKETED FOR CRRT.

**THE COURT:**  IS THERE A STRONG INFERENCE?  I KEEP TALKING ABOUT THAT.

**MS. MOODY:**  YES, I THINK THERE IS A STRONG INFERENCE THAT MAYBE SHE WASN'T MAKING THOSE STATEMENTS BUT WAS AWARE THAT THIS WAS THE MARKETING STRATEGY.  AND THIS IS CONSISTENT, IT'S NOT -- AGAIN, IT'S NOT THE SORT OF GRAY AREA.  THESE WITNESSES AGAIN, AND AGAIN, AND AGAIN ARE SAYING WE WERE TOLD TABLO COULD BE USED FOR CRRT, NOT THAT IT COULD BE USED FOR ITS CLEARED INDICATIONS WITHIN 24 HOURS.  THAT'S JUST NOT WHAT THEY ARE SAYING, SO THAT CERTAINLY ADDS TO A STRONG INFERENCE OF SCIENTER.

YOU KNOW, WE HAVE ALSO GOT A SORT OF SHIFTING NARRATIVE OF THE TABLO CART THAT YOU RAISED.  YOU KNOW, THERE IS A SMALL SUBSET OF FALSE STATEMENTS THAT ARE -- YOU KNOW, THEY WERE CALLING TABLO CART A NONMEDICAL ACCESSORY AND MARKETING IT WITHOUT CLEARANCE EVEN THOUGH IT MEETS THE TEXTBOOK DEFINITION BY FDA OF WHAT A MEDICAL DEVICE IS, A WATER PURIFICATION SYSTEM

FOR A HEMODIALYSIS DEVICE.

BUT YOUR HONOR BROUGHT THIS UP, BUT MORE AS TO SCIENTER, FOR THE SORT OF OFF-LABEL MARKETING, THERE WAS THIS SHIFTING NARRATIVE.  ONCE THEY HAD TO DISCLOSE THE OFF-LABEL MARKETING, THE FDA FINDINGS OF OFF-LABEL MARKETING, AND THEY TOLD THEIR EMPLOYEES INTERNALLY, THEY DIDN'T DISCLOSE IT PUBLICLY, STOP DOING THAT, PURGED ALL MARKETING MATERIALS, WHICH SUGGESTS THERE IS A STRONG INFERENCE THAT THERE WAS A LOT OF CRRT MARKETING IN THOSE MATERIALS.  AND THEN THE SALES OF TABLO WHICH HAD BEEN GROWING, GROWING, GROWING DURING THIS OFF-LABEL MARKETING THEN FLATLINED AND STOPPED THIS GROWTH.

AND WHAT DEFENDANTS SAY IS OH, WELL THAT'S BECAUSE WE WERE PUTTING A PAUSE ON TABLO CART, SO SINCE WE CAN'T SELL THIS ACCESSORY MEDICAL DEVICE THAT'S ATTACHED TO TABLO FOR JUST CERTAIN AREAS THAT HAVE POOR WATER QUALITY, WE THINK PEOPLE ARE GOING TO COMPLETELY DEFER ON BUYING TABLO UNTIL WE GET THIS CLEARANCE.

WELL WHAT HAPPENS WHEN THEY GET THAT CLEARANCE?  JUST DAYS LATER THEY SAY OH, NO, NO, NO, WE ARE STILL GETTING THE EFFECTS OF THE OFF-LABEL ISSUES RAISED IN THE FDA LETTER, AND COMPLETELY INCONSISTENT WITH WHAT THEY PROMISED, THE SALES DON'T REBOUND.

SO THAT SORT OF SHIFTING NARRATIVE IS ALSO INDICATIVE OF SCIENTER.

**THE COURT:**  WELL I THINK THAT'S WHAT I WAS RAISING

AND ASKING MS. BRODY, IS MY SENSE IS YOUR ALLEGATION IS THAT MS. BRODY'S WORD WAS A SUBTERFUGE, AND SHE SAID IT WASN'T, THE EVIDENCE DOESN'T SUPPORT THE TABLO CART ISSUE AND THE WAITING FOR THE FDA APPROVAL OF THAT WAS NOT A SUBTERFUGE.  AND I THINK WHAT YOU ARE SAYING IS, WELL ACTUALLY IT WAS AND THAT'S WHAT THE STATEMENTS THAT WERE RELEASED BY THE COMPANY SUGGESTED, WE HAVE TO WAIT, WE HAVE TO WAIT.  BUT REALLY WHAT WAS GOING ON, ARE YOU SAYING THAT BEHIND THE SCENES, BEHIND THE CURTAIN WAS THIS COMPLETE REORGANIZATION?  BECAUSE I THINK YOU SAY SOMEWHERE IN HERE IN YOUR PLEADINGS THAT THE SCHEME, AND I NEED YOU TO HELP ME WITH WHAT THE SCHEME IS, BUT WAS SLOWLY BEING BROUGHT TO LIGHT THAT THE OFF MARKET -- OFF-LABEL MARKETING WAS HAPPENING AND THAT'S WHAT THEY WERE TRYING TO HIDE.  IS THAT THE ESSENCE OF YOUR ALLEGATION?

**MS. MOODY:**  THIS IS A MISREPRESENTATION CASE, NOT A SCHEME CASE, THE SCHEME BEING THE OFF-LABEL MARKETING. FUNDAMENTAL TO OUR MARKETING PITCH IS TELLING CUSTOMERS THAT THIS CAN BE USED FOR CRRT AND THEY CAN REPLACE THEIR CRRT MACHINES, WHICH ARE MORE EXPENSIVE AND COMPLICATED TO RUN, WITH TABLO, AND DO THIS SORT OF WHOLE HOUSE CONVERSION, ONE STOP SHOP, GET RID OF IT ALL BECAUSE IT DOESN'T JUST DO INTERMITTENT HEMODIALYSIS, IT DOES CRRT AS WELL.

SO THAT WAS THE OFF-LABEL MARKETING SCHEME, THE OFF-LABEL -- THAT'S WHAT I MEAN BY THE SCHEME.

AND THAT YES, ONCE THEY WERE FOUND OUT BY THE FDA, STARTED

TO KIND OF SNIFF AROUND AND FIND SOME, THEN THEY REALIZED THEY HAD TO GET RID OF THAT, BUT THEN BLAMED IT ON THE TABLO CART POPS, WHICH THE DEFENDANTS ADMIT WAS AN IMMATERIAL AMOUNT OF THEIR SALES, IT'S REALLY JUST AN ACCESSORY THAT SOME USERS MIGHT BUY.  AND THEN WHEN THEY GOT THE CLEARANCE, SALES NEVER RECOVERED.

AND THEN THEY FINALLY ADMITTED AT THE END OF THE CLASS PERIOD FOR THE FIRST TIME, YOU KNOW, THE THREE DISCLOSURES THEY DON'T CHALLENGE, DON'T GET TO THE FACT THAT THE TABLO CART STATEMENTS ABOUT THE REASON FOR THE DECLINE IN SALES WERE ACTUALLY FALSE, THAT'S DISCLOSED LATER.

AND FINALLY AT THE END OF THE CLASS PERIOD, WITHOUT BEING ABLE TO HIDE BEHIND TABLO CART, THEY SAY THIS WAS THIS COMPLETE RE-MARKETING AND WE ARE NOT GOING TO BE ABLE TO DELIVER THE PROMISED RAMP-UP THAT WE HAD PREVIOUSLY PROMISED.

SO -- AND THEN -- SO INSIDER SELLING, WE ALSO BELIEVE SUPPORT SCIENTER.  AND NONE OF THESE INDICIA IN ISOLATION NEED TO BE SUFFICIENT, BUT TAKEN AS A WHOLE, ALL THESE THINGS GOING ON, WHEN YOU PUT THE PIECES TOGETHER, THEY RAISE A STRONG INFERENCE OF SCIENTER.

AND WE HAVE DEFENDANT TRIGG, YOU KNOW, THE HANDS-ON MARKETING CEO, WHO, NO, WE DON'T HAVE PRE-CLASS PERIODS SALE BECAUSE IT STARTS WITH THE IPO, BUT TWO YEARS BEFORE THEY DISCLOSE THE EXISTENCE OF THE FDA LETTER, SHE SELLS ALMOST $30 MILLION WORTH OF STOCK AND ALMOST NOTHING AFTER THAT.  THAT

STOCK, THE DAY AFTER THE CLASS PERIOD, WOULD BE WORTH LESS THAN A MILLION DOLLARS, AND TODAY THE SAME.

WE HAVE DEFENDANT AHMED SOLD LESS BUT 50 PERCENT OF ITS SALES WERE FROM THAT -- BETWEEN THE TIME PERIOD AND THE FDA INSPECTION AND WHEN THEY ACTUALLY DISCLOSED THE FDA FINDINGS IN JULY.

AND THE TRADING PLANS WERE AMENDED RIGHT AFTER THAT IS SUSPICIOUS BECAUSE THE FDA'S LETTER SAYS, THE FINDINGS AT THE INSPECTION IN JANUARY AND EARLY FEBRUARY, WE FOUND OFF-LABEL PROMOTION OF CRRT.

THAT'S -- THE DEFENDANTS DON'T DISCLOSE THAT WHEN THEY DISCLOSE THEIR INSPECTION.  THEY'RE NOT FORCED TO DISCLOSE IT UNTIL THEY GET THE WARNING LETTER FROM THE FDA.  AND SO IN BETWEEN THAT TIME, THERE IS A TREMENDOUS AMOUNT, MORE STOCK SALES THAN AFTER.

SO TAKEN ALL TOGETHER, WE THINK THE COMPLAINT MORE THAN SATISFIES A STRONG INFERENCE OF SCIENTER.

**THE COURT:**  OKAY.  THANK YOU.

**MS. MOODY:**  YOUR OTHER QUESTION WAS ABOUT LOSS CAUSATION WHICH I TOUCHED ON A LITTLE BIT.

AND YOU KNOW, I THINK THE DEFENDANTS, IN THEIR BRIEFING AT LEAST, TOOK ISSUE WITH US SAYING YOU DON'T EVEN HAVE TO REACH THE FIRST THREE BECAUSE YOU CONCEDED THE -- I MEAN, THE LAST THREE BECAUSE YOU CONCEDED THE LAST THREE, AND THAT'S WHAT INTERLINK DOES, IT SAYS THE FIRST DISCLOSURE IS WELL PLEAD SO

I'M NOT REACHING THE OTHER.

WE ARE NOT SAYING THAT, THEY DON'T HAVE TO BE WELL PLEAD, AND THEY ARE, AND IF YOUR HONOR WANTS TO REACH THEM ALL, WE BELIEVE THAT THEY ALL SATISFY THE PLEADING REQUIREMENT.

IN FACT, IT WOULD HAVE BEEN IMPOSSIBLE FOR THOSE EARLIER DISCLOSURES TO EVEN DISCLOSE ALL OF THE INFORMATION IN THE FOLLOWING THREE DISCLOSURES BECAUSE A LOT OF IT HAS TO DO WITH WHAT THE COMPANY DOES AFTER THEY DISCLOSE THE FDA LETTERS. INTERNALLY THEY TELL EVERYONE TO STOP MARKETING FOR CRRT, BUT EXTERNALLY, AS WE HAVE DISCUSSED, BLAME THE DECLINING SALES ON THE TABLO CART.

THOSE FALSE STATEMENTS AND THE BREADTH OF THE OFF-LABEL ISSUES, THEY CONTINUE TO MISLEAD THE MARKET ABOUT EVEN AFTER THAT OCTOBER 2023 DISCLOSURE.

SO WE HAVE GOT NOVEMBER 2023 WHERE DEFENDANTS ANNOUNCE THAT 2024 GUIDANCE WAS GOING TO BE LOWER THAN EXPECTED, AND AGAIN ATTRIBUTED IT TO THE RECENT -- THE WARNING LETTER, AND PRETEXTUALLY TO THE TABLO CART PAUSE.  AND THAT'S NEW INFORMATION ABOUT THE IMPACT OF THE OFF-LABEL MARKETING, AND THE STOCK DROPS 14 PERCENT.

THEN IN MAY, 2024, THEY FINALLY GET TABLO CART CLEARANCE. THAT'S MAY 6, 2024.  JUST THREE DAYS LATER, OUTSET -- THE FIFTH CORRECTIVE DISCLOSURE, OUTSET REVEALS THAT THERE'S STILL -- EVEN THOUGH THEY HAVE RESUMED THEIR TABLO CART SALES, THEY ARE STILL SUFFERING FROM NEGATIVE IMPACTS OF THE FDA LETTER AND THE

STOCK DROPS OVER 20 PERCENT.

THAT'S THE FIRST TIME THEY GIVE ANY HINT THAT THAT TABLO CART EXPLANATION WAS PRETEXTUAL.  AND FINALLY, AT THE END OF THE CLASS PERIOD, AUGUST 7, 2024, THEY REVEAL FOR THE FIRST TIME THAT THEY ARE GOING TO HAVE TO TOTALLY REVAMP THEIR MARKETING AND AGAIN LOWER GUIDANCE AND ADMIT THAT THE SALES THEY HAD PREVIOUSLY PROMISED WOULD RAMP UP AFTER THE TABLO CART CLEARANCE AREN'T GOING TO BE DELIVERED UPON.

**THE COURT:**  SO ARE YOU SAYING THAT -- PARDON ME.  ARE YOU SAYING THAT BEHIND THE CURTAIN, WHAT WAS GOING ON WAS THE SCRAMBLING AROUND TO CHANGE THE NARRATIVE FROM, I THINK WHAT YOU WOULD ARGUE IS RECOGNITION THAT THERE WAS OFF-LABEL MARKETING AND THAT THEY ARE CHANGING THAT AND THAT'S THE REAL REASON THAT THE GUIDANCE WERE LOWER AS PERTAINS TO TABLO CART.

**MS. MOODY:**  EXACTLY.  EXACTLY.

**THE COURT:**  AND INTENTIONALLY HIDDEN IN THEIR DISCLOSURES AND FROM THE PUBLIC IN THEIR DISCLOSURES UNTIL AUGUST 7TH.  THE WAY YOU WOULD PHRASE IT, I GUESS IS, WELL YOU KNOW, IT'S ALL OUT NOW SO LET'S COME CLEAN, SO TO SPEAK.  AND IT'S NOT WHAT THEY SAID, NOT WHAT YOU SAID, BUT I'M JUST USING THAT FOR DISCUSSION PURPOSES.

**MS. MOODY:**  SURE, SURE, YES.  THAT'S CORRECT.  THAT THEY COULD NO LONGER HIDE BEHIND THIS TABLO CART PAUSE BECAUSE IT WASN'T PAUSED ANYMORE, THEY GOT THE CLEARANCE.  SO WHAT'S THE REAL REASON THESE SALES HAVE NOW FLATLINED?

AND ANALYSTS WERE SHOCKED BECAUSE THAT WAS COMPLETELY DIFFERENT THAN WHAT THE COMPANY WAS SAYING EVEN NOT THAT LONG BEFORE THAT AND THE STOCK PLUMMETS ALMOST 70 PERCENT AND IT STILL HASN'T RECOVERED TO THIS DAY.

SO THAT IS WHY, YOU KNOW, WE HAVE THESE THREE ADDITIONAL CORRECTIVE DISCLOSURES AND WHY THE CLASS PERIOD RUNS UNTIL AUGUST 2024.

THE COURT:  OKAY.  WHAT ABOUT THE TOP EXECUTIVES AND GOING FURTHER ABOUT -- WHAT'S YOUR CONNECTION TO THEM AGAIN?  I GUESS I'M GOING BACK A LITTLE BIT TO THE SCIENTER ARGUMENT. YOU SUGGEST THAT THEY SIGNED THE SCC FILINGS, THEY PARTICIPATED IN ANALYST CALLS AND THOSE TYPES OF THINGS.  WHAT'S THE EVIDENCE THAT MS. TRIGG WAS -- HAD A DIRECT ROLE IN MARKETING? IS THERE ANY EVIDENCE OF THAT?

MS. MOODY:  WELL WE KNOW SHE HAD A DIRECT ROLE IN MARKETING, IN AND OF ITSELF, BECAUSE SHE SAID SHE DOES THAT. WE HAVE GOT EMPLOYEES THAT SAY SHE DOES THAT, WE'VE GOT CUSTOMERS THAT SAY SHE DOES THAT.

BUT IF -- IF WE ARE GOING TO SCIENTER, EACH OF THE DEFENDANTS MADE SPECIFIC REPEATED STATEMENTS ABOUT THEIR FUNDAMENTAL, REALLY THEIR SOLE PRODUCT, HOW IT WAS MARKETED AND WHAT WAS DRIVING THE REVENUES.

AND SO THAT WAS -- THAT WAS, YOU KNOW, THE KEY, NOT ONLY A KEY IMPORTANCE TO THE COMPANY, BUT IT'S WHAT THEY SPOKE ABOUT.

SO IF THEY DIDN'T KNOW THAT ALL OF THIS WAS FUELED BY

OFF-LABEL MARKETING THEN THEY WERE DELIBERATELY RECKLESS IN NOT KNOWING.

AND YOU KNOW, WE HAVE ALL THE OTHER INDICIA WE WENT THROUGH BUT THAT'S WHAT CONNECTS THEIR STATEMENTS.

THE COURT:  OKAY.  THANK YOU.

MS. BRODY, ARE YOU STILL WITH US?  WE DON'T HAVE YOU ON SCREEN BUT I'M HOPING YOU WERE ABLE TO HEAR ALL OF THIS.

MS. BRODY:  YES, YOUR HONOR.  I DON'T KNOW WHAT HAPPENED, OUR CAMERA JUST SORT OF DROPPED OFF.  WE ARE MOVING OUR OFFICES IN A WEEK AND I'M AFRAID THAT THINGS MAY HAVE STARTED TO BE DISASSEMBLED HERE ALREADY.

THE COURT:  THAT HAPPENS.  YES, THAT DOES HAPPEN. IT'S HAPPENED IN OUR COURTROOM A FEW WEEKS AGO, I THINK EVERY SCREEN IN EVERY COURTROOM HERE IN SAN JOSE WAS JUST NONFUNCTIONING.

MS. BRODY:  YEAH, THAT'S THE PROBLEM WITH TECHNOLOGY, WHEN IT WORKS, IT'S GREAT, AND SOMETIMES IT DOESN'T.

THE COURT:  YEAH, WELL THERE'S SOME OF US OLD TIMERS WHO LOVE MAGIC MARKERS AND PAPER EASELS IN THE COURTROOM, THEY ARE FAR MORE EFFICIENT.

OKAY, WHAT ELSE YOU WOULD LIKE ME TO KNOW?

MS. MOODY:  I THINK I HAVE ANSWERED YOUR QUESTIONS AND I THINK I'VE COVERED EVERYTHING I WANTED TO SORT OF HIGHLIGHT.

THE COURT:  GREAT.  THANK YOU.  THEN LET ME TURN BACK

TO MS. BRODY, IT'S HER MOTION AND SHE GETS THE LAST WORD.

**MS. BRODY:**   THANK YOU, YOUR HONOR.

I WILL BE BRIEF BECAUSE I THINK WE HAVE REALLY COVERED A LOT THIS MORNING.  I THINK IN LISTENING TO MY COLLEAGUE SPEAK ABOUT HER VIEW OF THE CASE, IT BECOMES CLEAR WHAT YOU AND I WERE TALKING ABOUT WHICH IS THAT THE SPECIFIC FACTS THAT UNDERPIN ALL OF THIS AND THAT TIE IT TOGETHER ARE MISSING.

AND SO I THINK THAT PLAINTIFF'S COUNSEL HAS WORKED HARD TO PUT TOGETHER A WHOLE COMPLICATED PUZZLE PLEADING OF DIFFERENT BITS AND PIECES, BUT THE PIECES DON'T TIE TOGETHER AND THE FACTS DON'T TIE TOGETHER.

SO FOR EXAMPLE, THE FACT THAT A CUSTOMER SPOKE TO MS. TRIGG JUST SHOWS THAT MS. TRIGG TALKED TO CUSTOMERS, IT DOES NOT SHOW THAT MS. TRIGG EITHER MARKETED TO THE CUSTOMER FOR CRRT OR KNEW THAT THAT WAS GOING ON OR THAT THAT WAS GOING ON.  SO THOSE PIECES JUST SIMPLY DO NOT TIE TOGETHER.

ANOTHER EXAMPLE OF THAT WOULD BE THE FACT THAT THE ONLY TIME THAT MS. TRIGG ACTUALLY SAYS ANYTHING PUBLICLY ABOUT CRRT THAT IS CITED IN THE COMPLAINT IS WHEN SHE CORRECTS AN ANALYST WHO SUGGESTS THAT YOU COULD USE THIS FOR CRRT AND SHE SAYS, NO, NO, THIS IS NOT FOR CRRT.

WHAT GETS DISCLOSED ALL THE WAY THROUGH THE PERIOD -- OH I SEEM TO BE BACK -- WHAT GETS DISCLOSED ALL THE WAY THROUGH THE CLASS PERIOD IN THE COMPANY'S PUBLIC STATEMENTS, AND WE LIST A WHOLE BUNCH OF THIS AT PAGE 16 AND 17 OF OUR MOTION, IS THAT

THE COMPANY HAS ALWAYS TOLD THE MARKET THAT ITS MARKETING PLAN AND THE VALUE PROPOSITION IS THAT YOU CAN DO WHAT THEY CALL A WHOLE HOUSE CONVERSION USING TABLO, WHICH MEANS IT CAN ADDRESS ALL OF THE DIFFERENT SITUATIONS THAT THE PATIENTS NEED.

THAT DOESN'T MEAN THAT IT IS THEN MARKETED FOR CRRT, AND THE COMPANY IS VERY SPECIFIC ABOUT THAT.  WHAT IT MEANS IS THAT CAN BE USED INTERMITTENTLY UP TO 24 HOURS AND THAT THAT SHOULD BE SUFFICIENT, AND IT'S UP TO THE DOCTORS TO DECIDE AND THE MEDICAL PROFESSIONALS ON HOW THEY ARE GOING TO EMPLOY IT.

SO AGAIN, ALL THE SPECIFIC FACTS THAT WOULD TIE THIS TOGETHER ARE SIMPLY MISSING FROM THE COMPLAINT.

AND THE FINAL EXAMPLE OF THAT WOULD BE AROUND WHAT HAPPENS BETWEEN THE INSPECTION AND THE WARNING LETTER.  YOU HAD THE INSPECTION IN LATE JANUARY/FEBRUARY, YOU HAVE DISCLOSURE OF THAT, INCLUDING THE FACT THAT THE FDA AT THAT POINT TELLS THE COMPANY, YOU KNOW, YOU CANNOT -- YOU NEED TO GET FDA APPROVAL FOR TABLO CART.  THERE IS NO FACTS ALLEGED THAT THE COMPANY IS AWARE AT THAT MOMENT THAT THE FDA IS ALSO CONCERNED ABOUT OFF-LABEL MARKETING.  IT'S JUST NOT ALLEGED, IT'S NOWHERE.

THE PLAINTIFFS CAST BACK FROM THE FACT THAT THERE IS A WARNING LETTER IN JULY AND SAY THE COMPANY MUST HAVE KNOWN THAT, BUT THE SITUATIONS WHERE -- IN THE OTHER CASES WHERE THE COMPANY IS FOUND TO HAVE -- IT'S FOUND TO HAVE BEEN SUFFICIENTLY PLED BECAUSE THE COMPANY IS AWARE OF IT, IT'S BECAUSE THE FDA TOLD THEM.  AND WE DON'T HAVE THAT HERE, SO WE

ARE JUST MISSING, THERE IS A BIG HOLE, AND THAT'S THE PROBLEM THROUGHOUT THIS COMPLAINT.

THE COURT:  THE INSPECTION WAS IN JANUARY TO FEBRUARY 10TH OF '23?

MS. BRODY:  CORRECT.

THE COURT:  AND THEN THE LETTER, THE WARNING LETTER COMES OUT IN JULY, SOME MONTHS LATER, FOUR OR FIVE MONTHS LATER.  AND THEN THERE WAS A MEETING, I THINK IN MARCH, WITH THE FDA AND TRIGG AND THE FDA, THEY DISCUSSED THE LACK OF TABLO AND THE CRRT ISSUE, I BELIEVE.

MS. BRODY:  SO THERE'S NO EVIDENCE THAT THAT WAS DISCUSSED AT THAT MEETING.

THE COURT:  THERE WAS A DISCUSSION.

MS. BRODY:  THERE WAS A MEETING BUT THERE IS NO EVIDENCE ABOUT WHAT IS SAID AT THE MEETING.  AND THAT'S AGAIN THE MISSING PIECE, AND THE INFERENCE THAT'S BEING DRAWN.

THE COURT:  OKAY.  AND THEN ON FEBRUARY 13TH, DO I HAVE THIS RIGHT, OF '23, THEN OUTSET FILED THEIR FORM 10-K.

MS. BRODY:  CORRECT.

THE COURT:  AND THEY DIDN'T MENTION ANY OF THE OFF-LABEL OR ANYTHING, AND YOUR RESPONSE WOULD BE, WELL THEY DIDN'T KNOW, JUDGE.

MS. BRODY:  RIGHT.  THAT'S RIGHT.

SO THEY CONTINUED TO HAVE THEIR RISK FACTORS BUT THEY DON'T KNOW THAT THE FDA IS CONCERNED ABOUT OFF-LABEL AT THE

TIME.

THE COURT:  I WANT TO ASK MS. MOODY ABOUT THAT, JUST TO TALK MS. MOODY ABOUT THAT.

ANYTHING SIGNIFICANT ABOUT THE FED13 10-K FILING?

MS. MOODY:  WELL WE KNOW THAT BEFORE THAT, BASED ON THE FDA'S WARNING LETTER, THAT THEY DID FIND EVIDENCE OF OFF-LABEL MARKETING DURING THAT INSPECTION BEFORE THAT TIME. AND WE KNOW THAT THE DEFENDANTS WERE IN TALKS WITH THE FDA.

AND MS. BRODY SAYS THAT WE DON'T KNOW WHAT HAPPENED AT THAT MARCH '23 MEETING, BUT THE FDA LETTER SAYS THAT YOU -- AND THE LETTER WAS ADDRESSED TO DEFENDANT TRIGG -- THAT YOU VERIFIED THAT, TABLO IS NOT CLEARED FOR CRRT.  SO THEY WERE TALKING ABOUT TABLO'S LACK OF CLEARANCE FOR CRRT, AND THIS WAS AFTER THE INSPECTION AT THE SITE.

SO THERE IS A STRONG INFERENCE THAT THEY WERE IN DISCUSSIONS FROM THE TIME OF THE INSPECTION AND WELL BEFORE, WE KNOW AT LEAST AS OF MARCH, WELL BEFORE THE WARNING LETTER WAS ISSUED, THERE WERE DISCUSSIONS ABOUT TABLO'S CLEARANCE.

THE COURT:  AND I JUST SPOKE ON THE 10-K FILING.  THE FEBRUARY 13TH 10-K FILING.

MS. MOODY:  RIGHT.

THE COURT:  WHAT YOU ARE TALKING ABOUT IS A LITTLE BIT LATER, I THINK.

MS. MOODY:  YES, YES, I'M TALKING ABOUT BOTH.  I WAS CORRECTING SOMETHING.

BUT AS OF -- YES -- WHAT WE KNOW IS THE DEFENDANTS, BEFORE THAT 10-K FILING, HAD FOUND EVIDENCE ON SITE AT OUTSET.  THAT'S WHAT WE KNOW.  AND THE INFERENCE IS THAT BECAUSE OF THESE ONGOING DISCUSSIONS, THAT MIGHT HAVE BEEN BROUGHT TO THE ATTENTION OF THE COMPANY, YOU KNOW, BECAUSE IT'S A SERIOUS ISSUE AND IT RAISES SERIOUS SAFETY CONCERNS.

THE COURT:  OKAY.  THANK YOU.

MS. BRODY, THIS WAS ABOUT THE 10-K FILING.

MS. BRODY:  CORRECT.  AND THERE'S NO FACTS ALLEGED THAT THERE IS ANYTHING FALSE OR MISLEADING ABOUT THE 10-K FILING OR THAT THE COMPANY WILL BE ALERTED BY THE FDA ABOUT CONCERNS ABOUT OFF-LABEL MARKETING AT THAT POINT, THERE'S SIMPLY NO FACTS ALLEGING THAT, AND I THINK THAT'S KIND OF THE PROBLEM THROUGHOUT THE COMPLAINT.

THE COURT:  GOT IT.

WHAT ELSE, MS. BRODY?  ANYTHING ELSE YOU WOULD LIKE ME TO KNOW?

MS. BRODY:  UNLESS YOUR HONOR HAS OTHER QUESTIONS, I THINK WE HAVE COVERED A LOT THIS MORNING.

THE COURT:  GREAT.  THANK YOU.

AND THANKS AGAIN FOR AGREEING TO PARTICIPATE REMOTELY.  I KNOW BOTH OF YOU ARE COURTROOM LAWYERS, YOU LIKE TO BE IN COURT POUNDING A LECTERN, ET CETERA, BUT YOU HAVE BEEN VERY HELPFUL THIS MORNING TO ME AND I APPRECIATE YOUR ATTENTION TO MY QUESTIONS AND ALL OF YOUR HELP, AND THE MATTER IS UNDER

SUBMISSION.

THANK YOU VERY MUCH.   THANK YOU.

**MS. BRODY:**   THANK YOU, YOUR HONOR.

**MS. MOODY:**   THANK YOU VERY MUCH.

**[!EZ SPEAKER 08]:**   THANK YOU, YOUR HONOR.

(PROCEEDINGS CONCLUDED AT 10:22 A.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____

SUMMER A. FISHER, CSR, CRR
CERTIFICATE NUMBER 13185

DATED:  JANUARY 26, 2026