UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE OUTSET MEDICAL, INC. SECURITIES LITIGATION | Case No.   24-cv-06124-EJD<br><br>**ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT**<br><br>Re: ECF No. 55 |

Court-appointed Lead Plaintiff the Pension Fund Group brings this federal securities class action for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. (the "Exchange Act") and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), on behalf of all persons or entities who purchased or otherwise acquired Outset securities between September 15, 2020, and August 7, 2024, inclusive, (the "Class Period") against Defendants Outset Medical ("Outset"), Chief Executive Officer ("CEO") Leslie Trigg, and former Chief Financial Officers ("CFO") Nabeel Ahmed and Rebecca Chambers ("Defendants").  Consolidated Complaint ("Compl."), ECF No. 50.  Before the Court is Defendants' motion to dismiss under Rule 12(b)(6) for failure to state a claim.  Motion to Dismiss ("Mot."), ECF No. 55.  Plaintiff filed an Opposition, and Defendants filed a Reply.  Opposition ("Opp."), ECF No. 58; Reply, ECF No. 63.  The parties appeared before the Court on January 22, 2026.  ECF No. 74.  For the reasons explained below, the Court GRANTS IN PART Defendants' motion to dismiss with leave to amend.

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
1

## I.     BACKGROUND

### A.     Parties

Lead Plaintiff the Pension Fund Group is comprised of Plymouth County Retirement Association ("Plymouth County") and Sheet Metal Workers' Pension Plan of Southern California, Arizona and Nevada ("SMWPP").  Compl. at 1.  Plymouth County is the retirement system for the benefit of employees of Plymouth County, Massachusetts.  *Id.* ¶ 22.  SMWPP is a union pension fund that provides pension benefits to sheet metal workers.  *Id.* ¶ 23.

Defendant Outset is a medical device company.  *Id.* ¶ 24.  It is incorporated in Delaware and its principal place of business is in San Jose, California.  *Id.*  Defendant Leslie Trigg ("Defendant Trigg") is and was at all relevant times the CEO of Outset and was elected Chair of Outset's Board of Directors in 2022.  *Id.* ¶ 25.  Defendant Rebecca Chambers ("Defendant Chambers") was the CFO of Outset at all relevant times until July 16, 2021.  *Id.* ¶ 27.  Defendant Nabeel Ahmed ("Defendant Ahmed") took over as CFO in August 2021 and held that position until June 3, 2025.  *Id.* ¶ 26.

### B.     Factual Background

#### 1.     Hemodialysis

Hemodialysis is a procedure used to treat kidney failure by removing waste products and excess fluid from a patient's blood using an external dialysis machine.  Mot. at 4.  The various types of dialysis fall into two broad categories: intermittent or continuous.  *Id.*  Intermittent hemodialysis operates for a predetermined period up to 24 hours and includes treatments such as IHD (which runs for 2–4 hours) and SLED, PIRRT, and PIKRT (which run for 6–24 hours).  *Id.*  By contrast, continuous hemodialysis (such as CRRT) runs without interruption until discontinued by the medical care provider and is not constrained by a time limit.  *Id.*

Both continuous and intermittent dialysis are done by dialysis machines.  Traditional dialysis machines are cumbersome and expensive to operate; hospitals often maintain multiple types of machines to administer the full range of treatments, plus industrial water treatment rooms or pre-filled bags of dialysate.  Compl. ¶ 45.

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2.    Tablo, Tablo XT, and TabloCart

Outset Medical, Inc. developed Tablo, a dialysis machine.  Unlike other dialysis machines, which can only do one type of dialysis, Tablo can perform many treatment modalities for different lengths of time.  Compl. ¶ 43.  Tablo also produces dialysate "on demand" through an integrated water purification system that works with tap water, eliminating the need for costly water treatment infrastructure.  *Id.* ¶ 45.  In 2014, the Food and Drug Administration ("FDA") cleared Tablo for use in hospital and clinical settings to provide intermittent hemodialysis treatments (including IHD, SLED, PIRRT, and Isolated Ultrafiltration).  *Id.* ¶ 43.  Tablo is not cleared for CRRT.  *Id.*

Outset also sells two optional enhancements for Tablo.  One is the Tablo XT (now Tablo Pro+), a software upgrade that operates Tablo at a lower flow rate for up to 24 hours, expanding the length of time that intermittent treatments can be administered.  *Id*. ¶ 44.  Tablo XT launched in 2020.  *Id.*  The other is the TabloCart, an accessory that removes impurities from water to extend the life of Tablo's internal filters in areas with poor water quality.  *Id.* ¶ 47.  This launched in October 2022.  *Id.*

### 3.    Defendants' Alleged Misrepresentations, the FDA Inspection, and Defendants' Response

Plaintiff alleges that throughout the Class Period, Defendants Outset, Trigg, Chambers, and Ahmed made material misrepresentations about Tablo's capabilities.  They claim that at conferences and in investor materials, public filings, and sales communications Defendants implied or outright claimed that Tablo—especially as enhanced by Tablo XT—could be used for CRRT.  *Id.* ¶¶ 109, 152, 174–75.  Since the FDA had only approved Tablo for intermittent

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
3

dialysis, Plaintiff believes this constituted off-label marketing; they also believe it misrepresented the value proposition of the Tablo device.

Plaintiff also alleges that beginning in October 2022, Outset marketed and distributed the TabloCart as a water purification system for hemodialysis, without seeking or receiving FDA clearance to do so. *Id*. ¶ 93. Plaintiff believes this marketing was false because the TabloCart was a medical device and thus required FDA approval. *Id*.

"No later than January 17, 2023," the FDA began an inspection of Outset's San Jose facility. *Id.* ¶ 8. On March 13, 2023, the FDA and Outset had a teleconference during which they discussed that Tablo was not cleared for CRRT. *Id*. On July 5, 2023, the FDA issued a Warning Letter ("Warning Letter") to Outset; it stated that Outset was promoting Tablo for CRRT, which it was not cleared for, and that the TabloCart required FDA clearance for marketing authorization. *Id*.

On Friday, July 7, 2023, Outset publicly disclosed the Warning Letter. *Id.* ¶ 9. In response to the letter's warning that Tablo was not cleared for CRRT, Outset changed its website and marketing materials to clarify that "The Tablo Hemodialysis System is not indicated for continuous renal replacement therapy (CRRT) and is cleared for use for up to 24 hours." *Id.* ¶ 96. At the time, Defendants said they did not expect the change in marketing would affect sales. *Id.* ¶ 94. Outset also stated that it "intends to work collaboratively with the FDA" regarding TabloCart, including "potentially submitting a 510(k)" application for clearance. *Id.* ¶ 54.

Over the ensuing quarters, Outset's revenue was lower than expected. *Id.* ¶¶ 201, 225. On May 6, 2024, Outset received FDA clearance for the TabloCart, but even then, Outset's earnings did not rebound. *Id.* ¶ 98. According to Plaintiff, the continued shortfalls reveal that the restriction on marketing Tablo for CRRT—not TabloCart's temporary removal from the market— had weakened sales. *Id.* On August 8, 2024, following the announcement of the second quarter

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
4

financial results, Outset's stock price fell $2.33, or 68.5%, to close at $1.07 per share. *Id.* ¶ 271.

### C.   Challenged Statements

Plaintiff challenges the below statements. The portions of the statements alleged to be false or misleading are bolded and italicized as they appear in the Consolidated Complaint.[1] The Court has organized the statements by theory of falsehood. Because Plaintiff alleges that some of the statements were false for two reasons, some of the statements appear in the below list twice.

**Off-Label Marketing Risk Statements**

**Statement 1:** "[a]lthough *our policy is to refrain from statements that could be considered off-label promotion of Tablo*, the FDA or another regulatory agency could disagree and conclude that we have engaged in off-label promotion." Compl. ¶ 102 (repeated throughout the Class Period in the following documents: the Q3 2020 Form 10-Q, the FY 2020 Form 10-K, the SPO Offering Documents, the FY 2021 Form 10-K, the FY 2022 Form 10-K, and the FY 2023 Form 10-K ("Public Documents")).

**Statement 2:** "Outset has adopted a promotional material procedure to define acceptable and unacceptable advertising, sales support, training, and other promotional practices for Outset medical devices in the United States. Included in this procedure is Outset's policy that *all claims with respect to Outset products must be consistent with approved labeling, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence (i.e., instructions-for-use, verification and validation testing, clinical study report, or any other report requiring a similar rigorous process of review and approval). In addition, without exception, promotional material may be neither false nor misleading (either in terms of a specific product claim or the overall net impression conveyed by the promotional material) and must comply with all specific conditions of approval for the product being promoted. Furthermore, promotional materials for a cleared or approved product may not promote, discuss, or refer to uncleared, unapproved, or off-label use.*" Compl. ¶ 143 (stated by Outset on November 8, 2021, in its 2021 Environmental, Social, and Governance ("ESG") Report).

**Statement 3:** "Outset has adopted an *ethical marketing procedure* that defines acceptable and unacceptable advertising, sales support, training, and other promotional practices for Outset medical devices in the United States. Included in this procedure is Outset's policy that *all claims with respect to Outset products must be consistent with approved labeling, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence* (i.e., instructions-for-use, verification and validation testing, clinical study report, or any other report requiring a similar rigorous process of review and approval).

---

[1] Some of the statements contained no bolded and italicized portions. In these cases, the Court assumed Plaintiff was alleging the whole statement was false or misleading. If Plaintiff chooses to amend the complaint, Plaintiff should clarify which portions of those statements are allegedly false or misleading.

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
5

In addition, without exception, promotional material or statements made by Outset sales representatives may not promote, discuss, or refer to uncleared, unapproved, or off-label use. This means that all promotional activities may be neither false nor misleading (either in terms of a specific product claim or the overall net impression conveyed by the promotional material) and must comply with all specific conditions of approval for the product being promoted." Compl. ¶ 196 (stated by Outset on June 30, 2023, in its 2023 ESG Report).

**Growth and Revenue Statements**

**Statement 4:** "*[o]ur commercial momentum continued to accelerate in the third quarter as we signed new contracts with some of the largest national and regional health systems in the country.*" Compl. ¶ 106 (stated by Defendant Trigg in November 11, 2020, press release regarding Form 8-K).

**Statement 5:** "'[O]ur traction in the acute market continues to grow and we are really pleased with the pace and the scale of commercial adoption. New contracts with national and regional health systems in addition to expansion within our existing customer base drove our strong Q3 results.' Defendant Trigg similarly stated, '[o]ur revenue achievement exceeded our initial expectations for the quarter as Tablo adoption continues to accelerate within the acute market.'" Compl. ¶ 107 (stated by Defendant Trigg during November 11, 2020, earnings call).

**Statement 6:** "In the fourth quarter our team continued to outperform while building a solid foundation for growth through 2021 and beyond." Compl. ¶ 115 (stated by Defendant Trigg in March 9, 2021, press release).

**Statement 7:** "[F]ourth quarter revenue grew 143% year-over-year to $17.2 million, driven by the impact of our HHS lease agreement, higher console shipments, *the launch of our Tablo XT products* and continued growth in consumables and services tied to our larger installed base. Our full-year revenue equaled $49.9 million, an increase of 231% over the prior-year period. ***
Console revenue grew 96% year-over-year to $10.6 million, driven by an increase in Console shipments, higher HHS leasing revenue and recognition of XT
upgrade revenue." Compl. ¶ 116 (stated by Defendant Chambers during March 9, 2021, earnings call).

**Statement 8**: "During the fourth quarter, *we continued to build commercial momentum, particularly within the acute market, with total revenue exceeding our expectations*." Compl. ¶ 117 (stated by Defendant Trigg during March 9, 2021, earnings call).

**Statement 9:** Outset was "*really excited about the acute market and the value proposition of Tablo* and the success we have had and the success we continue to plan to have." Compl. ¶ 119 (stated by Defendant Chambers during March 9, 2021, earnings call).

**Statement 10:** "Our first quarter was marked by strong revenue performance, continued operational execution, and substantial progress across our strategic initiatives, … *With strong interest in Tablo, a robust backlog and clear visibility on the timing of console placements, we are confident in our positioning for consistent strong performance in 2021 and beyond*."

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
6

United States District Court
Northern District of California

Compl. ¶ 124 (stated by Defendant Trigg in May 5, 2021, press release).

**Statement 11:** "Console revenue equaled $14.8 million or 194% year-over-year growth, *driven by higher placement to our acute customers as well as the recognition of XT upgrade revenue*." Compl. ¶ 125 (stated by Defendant Chambers during May 5, 2021, earnings call).

**Statement 12:** "[T]he installed base in both the acute and sub-acute markets show that Tablo's '*value proposition is resonating quickly following console deployment*.' Defendant Trigg also touted Tablo's ability to be a single enterprise solution: the way that we design Tablo and *our design goal from a technology standpoint from the beginning, really was the notion of an enterprise solution that health systems would no longer need to buy and maintain two, three, four different types of machines*, each of which did only one type of dialysis. And so the design vision was, "Hey, *could we build a single hardware platform that really could perform the functionality of all these machines for all types of acuity patients*." And so in delivering on that promise – that design promise, *we're able to approach a health system – a given health system and talk to them about down selecting now to Tablo for use anywhere from the ICU to home. So that's kind of part one and the idea behind the enterprise solution*.'" Compl. ¶ 126 (stated by Defendant Trigg during May 5, 2021, earnings call).

**Statement 13**

    (a) Outset "[r]ecorded net revenue of $25.2 million in the second quarter of 2021, a 115% increase compared to $11.7 million in the second quarter of 2020." Compl. ¶ 130 (stated by Outset in an August 5, 2021, press release announcing second quarter results).

    (b) **"*[i]n the first half of 2021, we delivered best-in-class revenue growth and steady gross margin improvement driven by a team that is dedicated to, and united around, transforming the dialysis experience for patients and providers, …* With new home console bookings up substantially in the second quarter, and both current and new customers purchasing Tablo for acute use, *our integrated commercial strategy is working as expected.* We remain confident in our ability to execute on each of our key strategic initiatives for 2021 and in our long-term growth prospects." Compl. ¶ 130 (stated by Defendant Trigg in August 5, 2021, press release).

**Statement 14:** "Defendant Trigg emphasized Tablo's 'value proposition' to health systems and touted it as 'an enterprise solution that reduces the cost and complexity of dialysis and helps hospitals expand their margin. . . And that's the *value proposition* that we saw up through 2020, both the highs and the lows of the pandemic, to be just as resonant with health system executives.'" Compl. ¶ 131 (stated by Defendant Trigg during August 5, 2021, earnings call).

**Statement 15:** "Defendant Trigg again discussed the Company's 'strong revenue growth and substantial progress in achieving our top strategic initiatives for 2021' and attributed the growth, in part, to '*expansion within the acute setting*.'" Compl. ¶ 132 (stated by Defendant Trigg during August 5, 2021, earnings call).

**Statement 16:** "Second quarter revenue grew 115% year-over-year to $25.2 million, *driven primarily by increased console shipments to acute customers*, higher consumable shipments, our HHS lease agreements, and increased services to support our growing installed base." Compl. ¶ 133 (stated by Defendant Ahmed during August 5, 2021, earnings call).

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
7

United States District Court
Northern District of California

**Statement 17:** "***Our strong third quarter performance further reinforces our confidence in our business and in our expectations for growth***."  Compl. ¶ 138 (stated by Defendant Trigg in November 3, 2021, press release).

**Statement 18:** "Top line growth continues to be driven by our commercial success in the acute market."  Compl. ¶ 139 (stated by Defendant Trigg during November 3, 2021, earnings call).

**Statement 19:** "***continued strength in our XT attachment rate in the third quarter.***"  Compl. ¶ 140 (stated by Defendant Trigg during November 3, 2021, earnings call).

**Statement 20:** "***Revenue grew 91.3% year-over-year in the third quarter to $26.3 million, driven primarily by increased console shipments to acute customers***, higher consumable shipments, ***the impact of XT upgrades***, increased services to support our growing installed base and our HHS lease agreements.
\*\*\*
Console revenue grew by 71% year-over-year to $15.4 million driven by higher console placements and increased [average selling price] ***given the availability of and demand for Tablo XT***."  Compl. ¶ 141 (stated by Defendant Ahmed during November 3, 2021, earnings call).

**Statement 21:** "***Our entire team contributed to an exceptional 2021, driving record revenue growth, meaningful progress toward our long-term gross margin goal and excellent visibility into 2022… Our established relationships with 7 of the 8 largest national health systems and one-third of the largest 100 regional health systems puts us in a strong position for growth this year in both the acute and home settings.***"  Compl. ¶ 144 (stated by Defendant Trigg in February 16, 2022, press release).

**Statement 22:** "As we look to 2022, ***we have clarity and conviction around the growth drivers that will continue to distinguish Outset Medical, namely, expanding our acute care business from the beachhead we established last year***."  Compl. ¶ 145 (stated by Defendant Trigg during February 16, 2022, earnings call).

**Statement 23:** "Defendant Trigg specifically noted Tablo XT's impact on the Company's growth that quarter noting the 'strong XT attachment rate.'"  Compl. ¶ 146 (stated by Defendant Trigg during February 16, 2022, earnings call).

**Statement 24:** "Our fourth quarter revenue grew 63% year-over-year to $28.2 million, driven primarily by increased console shipments to acute customers, higher consumable shipments, increased services to support our growing installed base ***and the impact of XT upgrades***.
\*\*\*
Console revenue grew by 70% year-over-year to $18.1 million, driven by higher console placements and increased ASP given the availability of and demand for Tablo XT. Similar to prior quarters, we continue to see better uptake of our XT upgrade than we had initially projected."  Compl. ¶ 147 (stated by Defendant Ahmed during February 16, 2022, earnings call).

**Statement 25:** "[t]he first quarter of 2022 was marked by strong revenue growth and gross margin expansion, ***which resulted from the momentum we see among both acute care customers*** and

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
8

providers expanding access to Tablo at Home . . . As interest for Tablo accelerates across all market segments, we continued to expand gross margins, invest in innovation, and deliver consistent and predictable financial and operational results, increasing our confidence for sustained strong performance through 2022 and beyond." Compl. ¶ 155 (stated by Defendant Trigg in May 4, 2022, press release).

**Statement 26:**
(a) "*Our first quarter revenue grew 33% year-over-year to $30.6 million, driven primarily by higher consumable shipments, increased console shipments to acute and home customers*, and increased services to support our growing installed base.  Product revenue grew 41% year-over-year to $25.7 million."
(b) "We continue to see better uptake of our XT upgraded than we had initially projected, *which highlights Tablo's clinical versatility and the clinical [community's] recognition of Tablo's ability that capably treat the very sickest population of patients in the ICU*." Compl. ¶ 156 (stated by Defendant Ahmed during May 4, 2022, earnings call).

**Statement 27:** "*the strength that we saw in the quarter leading to strong performance on the top-line revenue side, really came again from the core Tablo value proposition in the acute* around significant cost reduction.  Those supplies cost reduction, labor cost reduction and operating efficiencies for the hospital customers that are choosing to adopt it." Compl. ¶ 157 (stated by Defendant Trigg during May 4, 2022, earnings call).

**Statement 28:** "[a]s we look to the second half of the year, we see no change *in underlying demand for Tablo*." Compl. ¶ 161 (stated by Defendant Trigg in August 1, 2022, press release).

**Statement 29:** "third quarter results reflect *the value Tablo is delivering in both the acute and home settings, with console shipments exceeding our initial expectations*… we believe our continued expansion in the acute setting and our strong start to rebuilding the home patient pipeline *reflects patient preference for Tablo and strong demand across end markets*." Compl. ¶ 164 (stated by Defendant Trigg in November 8, 2022, press release).

**Statement 30**
(a) "In summary, our strong *Q3 was driven by significant expansion in the acute setting* and a home pipeline that is rebuilding ahead of expectations. It is clear to us that Tablo remains a highly differentiated solution in one of the largest, most expensive recession-proof areas of healthcare. ***
(b) In summary, *we had a strong Q3 that demonstrated Tablo's value proposition* in our large acute and home end markets and we have a high degree of confidence in our team's ability to execute as we round out 2022 and set ourselves up for 2023, to continue to deliver on our promise to dialysis patients and providers." Compl. ¶ 165 (stated by Defendant Trigg during November 8, 2022, earnings call).

**Statement 31**: "[w]e saw console ASPs increase again year-over-year, driven primarily by the demand for Tablo XT which continues to exceed our initial projections." Compl. ¶ 166 (stated by Defendant Ahmed during November 8, 2022, earnings call).

**Statement 32:** "Revenue in the fourth quarter is expected to be approximately $31.5 million, a

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
9

United States District Court
Northern District of California

13% increase compared to $27.8 million in the third quarter of 2022.  Revenue for 2022 is expected to be approximately $115 million, a 12% increase compared to $102.6 million in 2021." Compl. ¶ 172 (stated by Outset in January 9, 2023, press release).

**Statement 33:** "[T]he prior year was 'an important year for Outset' and '[Outset] *significantly increased the number of Tablo consoles in hospitals and homes*.'"  Compl. ¶ 173 (stated by Defendant Trigg in January 9, 2023, press release).

**Statement 34**: "*[g]rowth in the fourth quarter exceeded our expectations as we saw Tablo's economic and clinical advantages continue to gain traction with dialysis providers and their patients across our end markets*."  Compl. ¶ 185 (stated by Defendant Trigg in February 13, 2023, press release).

**Statement 35:**
**(a)** "Turning now to our results in the acute end market, the fourth quarter was also marked by strong growth, including sequential revenue growth each quarter from Q2 through Q4.  ***Broadly, we saw the macro acute care environment largely stable over the course of the fourth quarter and through the first several weeks of this year***.
***
**(b)** ***And we're also keeping a close watch on hospital capital spending, which can affect the timing of deals, but to-date has not proven to be a meaningful headwind for us given Tablo's strong value proposition.***"  Compl. ¶ 186 (stated by Defendant Trigg during February 13, 2023, earnings call).

**Statement 36:** "Our fourth quarter revenue increased approximately 15.3% sequentially and 13.7% year-over-year to $32 million. Product revenue was up 21.3% from the prior quarter and increased 11.5% year-over-year to $26.4 million. Console revenue grew 22.8% from the third quarter and increased by 1.5% year-over-year to $18.4 million. ***We saw console ASPs increase again year-over-year, driven primarily by the ongoing demand for Tablo XT and by demand for TabloCart***, our new accessory launched in the fourth quarter of 2022."  Compl. ¶ 187 (stated by Defendant Ahmed during February 13, 2023, earnings call).

**Statement 37:** "Defendant Trigg attributed these [first quarter financial] results to the Company's sales and marketing strategy, stating that the 'momentum we had exiting 2022 carried through the first quarter of 2023 ***with the benefits of Tablo continuing to resonate with acute-care and home providers***.'"  Compl. ¶ 191 (stated by Defendant Trigg in May 3, 2023, Form 8-K press release).

**Statement 38:**
**(a)** Defendant Trigg touted Outset's financial performance, especially in the acute care setting, without disclosing that the Company achieved these results through off-label promotion of Tablo for CRRT: "***Our acute progress is a direct testament to the strong economic value proposition of Tablo***. In any climate, direct, measurable cost reduction is valuable to hospitals, but never more so than it is today.
***
**(b)** Another important element of our commercial strategy is to ***drive utilization across the installed base***, and we were pleased to see positive trends in treatment volume during the quarter, in line with our expectations. We also saw ASPs rise, both on consoles and consumables, which

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
10

*serves as strong validation of Tablo's clinical and economic value proposition versus our competitors*.

**(c)** Our ASPs benefited again from better-than-expected uptake of Tablo add-ons, including *good early demand for our TabloCart new product accessory*.
***

**(d)** Just in terms of the – the cumulative number of conversations that our team is now having with health systems that want to look at *a full enterprise solution*, *as we call it, using Tablo from the ICU all the way to home*. We are having many, many, many more conversations than we had, let's say, this time last year, about deploying a home program, in tandem with an acute program." Compl. ¶ 192 (stated by Defendant Trigg during May 3, 2023, earnings call).

**Statement 39:**
**(a)** "[T]he Company issued a press release and disclosed that due to the FDA Warning Letter and as the TabloCart had never received FDA clearance to be marketed, 'it ha[d] paused the shipment of TabloCart with Prefiltration, an accessory for the Tablo System, pending the Food and Drug Administration's clearance of a 510(k) the Company plans to submit later this month.' In the press release the Company also announced lowered expectations for FY 2023 telling investors that it 'now expects to be at the low end of [revenue guidance] as a result of the shipment pause.'"
**(b)** "The press release quoted Defendant Trigg highlighting the Company's 'momentum entering 2023 carried through the second quarter, *led by the strong demand from hospitals due to the value realized from insourcing dialysis with Tablo*' and that Defendants 'expect our strong momentum both in the acute and home end markets to continue to drive the business.'" Compl. ¶¶ 210–11 (stated by Outset and Defendant Trigg in August 2, 2023, press release).

**Statement 40:** "On the acute side, we've been encouraged to see more customers recognizing Tablo's strong economic value proposition and make the decision to in-source inpatient dialysis with Tablo.
***
With the first half of 2023 now behind us, we retain our strong conviction in the fundamentals of our business with confidence grounded particularly by a healthy pipeline and backlog with interest in and demand for Tablo is strong and growing.
***
In terms of end market performance, beginning with acute care, we were pleased to see strong console growth, once again driven predominantly by momentum with insourcing initiatives. Through 2023, we have seen more and more customers recognizing the cost savings associated with bringing Tablo in-house, and this continues to be a driving factor for health system administrators." Compl. ¶ 212 (stated by defendant Trigg during August 2, 2023, earnings call).

**Statement 41:** "2023 revenue [of] $130.4 million, a 13% increase compared to $115.4 million in 2022" . . . "*reflect[ing] the scale we have built in the acute setting* and progress we are making to expand Tablo's use at home, with our growth in both end markets contributing to a 34% increase in the Tablo installed base and nearly 50% growth in consumable revenue." Compl. ¶ 243 (stated by Outset in February 21, 2024, press release).

**Value Proposition Statements**

**Statement 9:** Outset was "*really excited about the acute market and the value proposition of*

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
11

*Tablo* and the success we have had and the success we continue to plan to have." Compl. ¶ 119 (stated by Defendant Chambers during March 9, 2021, earnings call).

**Statement 12:** "[T]he installed base in both the acute and sub-acute markets show that Tablo's '*value proposition is resonating quickly following console deployment*.' Defendant Trigg also touted Tablo's ability to be a single enterprise solution: the way that we design Tablo and *our design goal from a technology standpoint from the beginning, really was the notion of an enterprise solution that health systems would no longer need to buy and maintain two, three, four different types of machines*, each of which did only one type of dialysis. And so the design vision was, "Hey, *could we build a single hardware platform that really could perform the functionality of all these machines for all types of acuity patients*." And so in delivering on that promise – that design promise, *we're able to approach a health system – a given health system and talk to them about down selecting now to Tablo for use anywhere from the ICU to home. So that's kind of part one and the idea behind the enterprise solution*.'" Compl. ¶ 126 (stated by Defendant Trigg during May 5, 2021, earnings call).

**Statement 13**
(a) Outset "[r]ecorded net revenue of $25.2 million in the second quarter of 2021, a 115% increase compared to $11.7 million in the second quarter of 2020." Compl. ¶ 130 (stated by Outset in an August 5, 2021, press release announcing second quarter results).
(b) "*[i]n the first half of 2021, we delivered best-in-class revenue growth and steady gross margin improvement driven by a team that is dedicated to, and united around, transforming the dialysis experience for patients and providers, …* With new home console bookings up substantially in the second quarter, and both current and new customers purchasing Tablo for acute use, *our integrated commercial strategy is working as expected.* We remain confident in our ability to execute on each of our key strategic initiatives for 2021 and in our long-term growth prospects." Compl. ¶ 130 (stated by Defendant Trigg in an August 5, 2021, press release).

**Statement 14:** "Defendant Trigg emphasized Tablo's 'value proposition' to health systems and touted it as 'an enterprise solution that reduces the cost and complexity of dialysis and helps hospitals expand their margin. . . And that's the *value proposition* that we saw up through 2020, both the highs and the lows of the pandemic, to be just as resonant with health system executives.'" Compl. ¶ 131 (stated by Defendant Trigg during August 5, 2021, earnings call).

**Statement 26:**
(a) "*Our first quarter revenue grew 33% year-over-year to $30.6 million, driven primarily by higher consumable shipments, increased console shipments to acute and home customers*, and increased services to support our growing installed base. Product revenue grew 41% year-over-year to $25.7 million."
(b) "We continue to see better uptake of our XT upgraded than we had initially projected, *which highlights Tablo's clinical versatility and the clinical [community's] recognition of Tablo's ability that capably treat the very sickest population of patients in the ICU*." Compl. ¶ 156 (stated by Defendant Ahmed during May 4, 2022, earnings call).

**Statement 27:** "*the strength that we saw in the quarter leading to strong performance on the top-line revenue side, really came again from the core Tablo value proposition in the acute* around significant cost reduction. Those supplies cost reduction, labor cost reduction and

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
12

United States District Court
Northern District of California

operating efficiencies for the hospital customers that are choosing to adopt it." Compl. ¶ 157 (stated by Defendant Trigg during May 4, 2022, earnings call).

**Statement 30**

**(a)** "In summary, our strong ***Q3 was driven by significant expansion in the acute setting*** and a home pipeline that is rebuilding ahead of expectations. It is clear to us that Tablo remains a highly differentiated solution in one of the largest, most expensive recession-proof areas of healthcare. ***

**(b)** In summary, ***we had a strong Q3 that demonstrated Tablo's value proposition*** in our large acute and home end markets and we have a high degree of confidence in our team's ability to execute as we round out 2022 and set ourselves up for 2023, to continue to deliver on our promise to dialysis patients and providers." Compl. ¶ 165 (stated by Defendant Trigg during November 8, 2022, earnings call).

**Statement 35:**

**(a)** "Turning now to our results in the acute end market, the fourth quarter was also marked by strong growth, including sequential revenue growth each quarter from Q2 through Q4. ***Broadly, we saw the macro acute care environment largely stable over the course of the fourth quarter and through the first several weeks of this year***. ***

**(b)** ***And we're also keeping a close watch on hospital capital spending, which can affect the timing of deals, but to-date has not proven to be a meaningful headwind for us given Tablo's strong value proposition.***" Compl. ¶ 186 (stated by Defendant Trigg during February 13, 2023, earnings call).

**Statement 38:**

**(a)** Defendant Trigg touted Outset's financial performance, especially in the acute care setting, without disclosing that the Company achieved these results through off-label promotion of Tablo for CRRT: "***Our acute progress is a direct testament to the strong economic value proposition of Tablo***. In any climate, direct, measurable cost reduction is valuable to hospitals, but never more so than it is today. ***

**(b)** Another important element of our commercial strategy is to ***drive utilization across the installed base***, and we were pleased to see positive trends in treatment volume during the quarter, in line with our expectations. We also saw ASPs rise, both on consoles and consumables, which ***serves as strong validation of Tablo's clinical and economic value proposition versus our competitors***.

**(c)** Our ASPs benefited again from better-than-expected uptake of Tablo add-ons, including ***good early demand for our TabloCart new product accessory***. ***

**(d)** Just in terms of the – the cumulative number of conversations that our team is now having with health systems that want to look at ***a full enterprise solution***, ***as we call it, using Tablo from the ICU all the way to home***. We are having many, many, many more conversations than we had, let's say, this time last year, about deploying a home program, in tandem with an acute program." Compl. ¶ 192 (stated by Defendant Trigg during May 3, 2023, earnings call).

**Statement 40:** "On the acute side, we've been encouraged to see more customers recognizing

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
13

United States District Court
Northern District of California

Tablo's strong economic value proposition and make the decision to in-source inpatient dialysis with Tablo.

***

With the first half of 2023 now behind us, we retain our strong conviction in the fundamentals of our business with confidence grounded particularly by a healthy pipeline and backlog with interest in and demand for Tablo is strong and growing.

***

In terms of end market performance, beginning with acute care, we were pleased to see strong console growth, once again driven predominantly by momentum with insourcing initiatives. Through 2023, we have seen more and more customers recognizing the cost savings associated with bringing Tablo in-house, and this continues to be a driving factor for health system administrators." Compl. ¶ 212 (stated by Defendant Trigg during August 2, 2023, earnings call).

**Statement 42:**

**(a)** "***Tablo is an all-in-one device***" with a "compelling value proposition" in the ICU "by ***eliminating the need for multiple dialysis machines***," a[nd] that "Tablo's clinical flexibility enables providers to standardize to ***a single platform across all care settings***."

***

**(b)** "We designed Tablo from the ground up to be a single enterprise solution that can be utilized across the ***continuum of care, allowing dialysis to be delivered anytime, anywhere and by anyone***."

***

**(c)** "Unlike existing hemodialysis machines, which have limited clinical versatility across care settings and are generally burdened by specialized and expensive infrastructure, ***Tablo is a single enterprise dialysis solution that can be seamlessly utilized across different care settings and for multiple clinical needs***."

***

**(d)** "Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and ***allows providers to standardize to a single technology platform from the hospital to the home***." Compl. ¶¶ 103–04 (repeated throughout the Class Period in the Public Documents).

**Statement 43:** Tablo "was designed as ***a complete enterprise solution*** to enable dialysis to be done by anyone, anytime, anywhere" and "Tablo uniquely enables the management of dialysis across ***the entire care continuum from the hospital to the home with a single device platform***, which has never been done before." Compl. ¶ 108 (stated by Defendant Trigg during November 11, 2020, earnings call).

**Statement 44:** "As part of the earnings call, Outset presented a slide deck in which it displayed a graphic exhibiting various dialysis machines being replaced by Tablo and claiming '***Tablo is an enterprise solution that delivers easier, lower-cost dialysis***.' ***One of the machines shown being replaced by Tablo was the Baxter Prismaflex, a device that is only indicated for CRRT***."



Compl. ¶¶ 109–110 (statement made by Outset in slide deck used in November 11, 2020, earnings call; March 2021 investor presentation; May 5, 2021, earnings call; August 6, 2021, earnings call; and November 2021 investor presentation).

**Statement 45:** "[Defendant Trigg] touted Tablo as enabling hospitals to "'***down select to one machine*** Tablo, because Tablo is so mobile and also Tablo does not require any infrastructure to use it.'  She touted Tablo as an '***Enterprise Solution, Value Proposition … we uniquely offer health systems, one device platform across the spectrum of care***. So that's what we do uniquely well.'"  Compl. ¶ 113 (stated by Defendant Trigg on November 12, 2020, at Morgan Stanley Conference Presentation).

**Statement 46:**
**(a)** "And so that intrigued us, and to us created an opportunity or a question. Could we design ***one machine that could really do it all? Could you allow health systems to down select [ph] just to one device platform that would deliver all of this functionality***, whether that treatment was being done in the hospital or the ICU? Why would you want to manage a bunch of different things, all of which do one narrow slice of what a health system has to deliver, which is enterprise-wide dialysis?
\*\*\*
**(b)** So we set out to deliver an ***enterprise-wide solution***, and that's the device we call Tablo. Our mantra is anywhere, anytime, anyone. This should be and is a device that could be used anywhere."  Compl. ¶ 114 (stated by Defendant Trigg on November 19, 2020, at Stifel Virtual Healthcare Conference).

**Statement 47:** "But the common denominator is ***the interest in an enterprise solution***.  That's the driver here. And so it starts with the economic efficiencies, the operational efficiencies of a ***health system being able to down select to one device***, managing that patient from the acute setting all the way to the home. Whereas today, when they deliver dialysis across their enterprise it's requiring them to buy and maintain a number of different machines which obviously is more cumbersome and more costly."  Compl. ¶ 118 (stated by Defendant Trigg during March 9, 2021, earnings call).

**Statement 48:** "The engineering team here has been busy and worked hard to actually add

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
15

incremental features that enables ***Tablo's use really across any and all patient populations served anywhere in the hospital***, again, bedside dialysis maybe with short treatments all the way to long treatments in the ICU. So we ***don't see any limit to our ability to penetrate that full $2.2 billion acute market here in the U.S.***" Compl. ¶ 128 (stated by Defendant Trigg on May 11, 2021, at the Bank of America Securities Virtual Health Care Conference).

**Statement 49:** "***a single device hardware platform that can deliver dialysis anywhere anytime and virtually by anyone… And so, our technology vision really became one of a classic technology rollout. Could we design a single hardware platform that could perform the functionalities of all of those different types of dialysis machines plus could we also integrate a thousand square foot water treatment room in a box and that's exactly what we did***." Compl. ¶ 129 (stated by Defendant Trigg on June 9, 2021, at the Goldman Sachs Global Healthcare Virtual Conference).

**Statement 50:** "***We specifically designed Tablo, as we say, kind of like as an enterprise solution where we can – that same device platform can be used for dialysis on the floor or in the ICU.*** About 85% of the treatments performed in the acute setting are actually kind of run-of-the-mill regular dialysis 3 or 4 hour treatments done bedside at the floor, we can do those. The 15% are much sicker patients, much more complicated patients in the ICU, running longer, slower dialysis up to 24 hours, Tablo also can serve those patients. ***And so we have the ability to capture 100% of all the treatment volume*** that any given hospital across the country is doing on an annual basis. And so that's what leads to such a big opportunity specific to Outset and our technology." Compl. ¶ 136 (stated by Defendant Trigg on September 13, 2021, at Morgan Stanley Healthcare Conference).

**Statement 51:** "[Tablo is the] ***only device*** on the market or coming that can treat from 0 to 24 hours. ***You absolutely need that to be an enterprise solution in the hospital***." Compl. ¶ 137 (stated by Defendant Trigg on September 13, 2021, at Morgan Stanley Healthcare Conference).

**Statement 52:** ". . . I think what's really, really different about the way we're approaching the acute market is that ***we are going after the whole thing***. Companies that have talked about acute dialysis in the past, their devices can only be used in the ICU. ***They can only be used for these longer treatments called SLED or CRRT, or they have a device that can only be used for short treatments.***
\*\*\*
. . . Tablo is the only device available that can treat across the entire spectrum, sort of from zero to 24 hours. And therefore, we can go after all of the different types of treatments that are delivered in a hospital.
\*\*\*
. . . [the hospital] start[s] offering dialysis, those longer treatments, and they didn't before because the device is so easy . . .With a simpler device, now they're doing dialysis in the ICU for longer -- treating more critical patient. . . decide to do what we would call ***whole house conversion*** . . . over time, when they're more comfortable with it, confident and everybody's trained, ***they'll go to a whole house conversion where they're only using the Tablo machines to deliver treatment***. And that could be another reason why utilization grows." Compl. ¶ 149 (stated by Defendant Trigg on February 18, 2022, at SVB Leerink Global Healthcare Conference).

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
16

United States District Court
Northern District of California

**Statement 53:** "Outset included a graphic indicating that the Tablo could replace three 'traditional hemodialysis machines,' one of which was the Fresenius MultiFiltrate Pro, a dialysis machine indicated for only CRRT."



Compl. ¶ 152 (stated by Outset on February 23, 2022, in FY 2021 Form 10-K).

**Statement 54:** "[T]he Company touted that Tablo could replace all acute care dialysis machines and thus reduce health system costs. Trigg emphasized '***the core value proposition of Tablo that I think continues to fuel and did fuel the backlog coming into 2022 and continues to fuel our pipeline***.'" Compl. ¶ 154 (stated by Defendant Trigg on March 8, 2022, at the TD Cowen Healthcare Conference).

**Statement 55:** "in the acute setting, today, pre-Tablo, a hospital may need multiple dialysis devices to do ICU training or floor training, meaning bedside training rather or treatment rather. ***And with Tablo, you can have one device that will do dialysis in the ICU. It will do dialysis at the bedside. It will do dialysis sort of everywhere you need***." Compl. ¶ 160 (stated by Defendant Ahmed on May 24, 2022, at UBS Global Healthcare Conference).

**Statement 56:** "Tablo's '***value proposition remain[ed] strong***, and we have a lot of confidence in our ability to grow as we move forward in time.'" Compl ¶ 170 (stated by Defendant Ahmed on November 15, 2022, at the Stifel Healthcare Conference).

**Statement 57:** ***"On the clinical and operational benefits, Tablo is one device that can do dialysis from the ICU to the bedside. Where today a hospital may have multiple devices, a couple in the ICU, a different one at the bedside, and potentially different devices to do long treatment."*** Compl. ¶ 171 (stated by Defendant Ahmed on November 17, 2022, at the Jefferies LLC London Healthcare Conference).

**Statement 58:** "It is the first single hardware platform, same device, whether you're using it in the ICU or whether you're using it in the home, that's never been done before.
\*\*\*
That really enabled the healthcare provider to, again down select operational efficiency, ***down select to 1 device that their nurses and their clinicians can use in the ICU*** that, folks can use in the subacute space and that consumers can use in the home . . . It is an opportunity for 1 device across multiple markets." Compl ¶ 174 (stated by Defendant Trigg on January 11, 2023, at J.P.

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

Morgan Annual Healthcare Conference).

**Statement 59:** "During the conference, Outset presented a slide touting Tablo as 'an all-in-one solution that replaces multiple machines and a water treatment room with a single device' and *displayed a graphic with Tablo superimposed over a variety of dialysis machines that it would replace including the Baxter Prismaflex, which is only indicated for CRRT*."



An all-in-one solution that replaces multiple machines and a water treatment room with a single device

Compl. ¶¶ 175–76 (stated by Outset in slides used on January 11, 2023, at J.P. Morgan Annual Healthcare Conference; FY 2022 earnings call; Q1 2023, earnings call; Q2 2023 earnings call; October 12, 2023, earnings call; November 7, 2023, earnings call; January 8, 2024, 42nd Annual J.P. Morgan Healthcare Conference; and the February 21, 2024, earnings call).

**Statement 60:** "Tablo's '*value proposition remains very much intact*.'"  Compl. ¶ 224 (stated by Defendant Trigg on September 12, 2023, at Morgan Stanley Annual Global Healthcare Conference).

**Statement 61 (71):** "Tablo's 'economic value proposition remains resonant and differentiated.'" Compl. ¶ 227 (stated by Defendant Trigg in October 12, 2023, Form 8-K press release).

**Statement 62 (73):** "Outset's '*customers are not turning away from Tablo and its value proposition*. In fact, they continue to embrace Tablo's proven financial and operational benefits and move towards the advantages of an in-source model.'"  Compl. ¶ 229 (stated by Defendant Trigg during October 12, 2023, earnings call).

**Statement 63 (75):** "Outset's 'pipeline continues to expand and *our value proposition remains compelling*.' The 'value proposition' to "save[] health care providers money, simplify their operations and improve the quality of living for patients' *remained 'evergreen.*'"  Compl. ¶ 235 (stated by Defendant Trigg during November 7, 2023, earnings call).


**TabloCart Statements**


Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

**Statement 64:** "To that end, we are pleased to introduce ***TabloCart, which is a new accessory for Tablo***. TabloCart provides additional maneuverability around the hospital and incremental pre-filtration capabilities for sites that suffer from water quality that is far worse than the national drinking water standards. TabloCart will be sold separately at an expected margin accretive ASP. We closed Q3 exceeding our internal projections for TabloCart orders indicating strong early demand for this innovative accessory." Compl. ¶ 167 (stated by Defendant Trigg during November 8, 2022, earnings call).

**Statement 65:** "Outset described TabloCart as a 'non-medical accessory' in the FY 2022 Form 10-K. Outset repeated this statement in its April 13, 2023, Proxy Statement to shareholders." Compl. ¶¶ 189–90 (stated by Outset in February 13, 2023, FY 2022 Form 10-K and in April 13, 2023, Proxy Statement).

**Statement 66:** "From a product innovation standpoint, we are very ***pleased with demand for TabloCart, a new product accessory*** we introduced in Q3 of last year that provides additional maneuverability around the hospital, and ***incremental water prefiltration capabilities***. TabloCart is sold separately and is gross margin accretive ASP and is proving to be a valuable solution to many of our acute care customers." Compl. ¶ 193 (stated by Defendant Trigg during May 3, 2023, earnings call).

**FDA Statements**

**Statement 67:**
**(a)** "The [FDA] Warning Letter raises two additional observations. The first observation asserts that certain materials reviewed by the FDA and found on the Company's website promote continuous renal replacement therapy (CRRT), a modality outside of the current indications for the Tablo® Hemodialysis System. The Company believes this concern has been effectively addressed through labeling and promotional changes already underway.

The second observation asserts that the TabloCart with Prefiltration (the "TabloCart"), requires prior 510(k) clearance for marketing authorization. TabloCart, an accessory to the Tablo System, launched in the third quarter of 2022 and sales to date have not been material to the Company's financial results. The Company intends to work collaboratively with the FDA to resolve this observation, including potentially submitting a 510(k) on TabloCart." Compl. ¶ 205 (stated by Defendant Outset on July 7, 2023, in its Form 8-K. Plaintiff alleges that Outset repeated these statements in Q2 2023 Form 10-Q, Q3 2023 Form 10-Q, FY 2023 10-K, Q1 2024 Form 10-Q, and Q2 2024 Form 10-Q.).

**(b)** "The Company further stated 'it intends to fully cooperate with the FDA, including by responding within 15 business days, to expeditiously and completely resolve the Warning Letter.'" Compl. ¶ 207 (stated by Defendant Outset in July 7, 2023, Form 8-K).

**Statement 68:**
**(a)** "After Outset received the FDA Warning Letter, it rebranded 'Tablo XT' to 'Tablo Pro+.' During the earnings call, the Company began referring to the software as Tablo Pro+." Compl. ¶ 213 (stated by Outset during August 2, 2023, earnings call).

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
19

United States District Court
Northern District of California

**(b)** "Moreover, Defendant Ahmed touted Pro+ as being in the 'substantial majority of our acute consoles' for the prior quarter." Compl. ¶ 213 (stated by Defendant Ahmed during August 2, 2023, earnings call).

**Statement 69:** "[T]he 'first observation pertained *to content on our website* that referenced to a Continuous Renal Replacement Therapy, or a CRRT, a modality not currently included in Tablo's indications for use. To be fully reflective of our most recently cleared indications for use, we've *removed these materials*. *We believe that our action plan has addressed this finding and expect no impact with the customers from this remediation*.'" Compl. ¶ 214 (stated by Defendant Trigg during August 2, 2023, earnings call).

**Statement 70:** "Defendant Trigg went on to state that the FDA Warning Letter and the issues it flagged did not raise safety and other concerns stating, 'I want to emphasize that neither of these two additional observations pertain to safety, efficacy or quality.'" Compl. ¶ 215 (stated by Defendant Trigg during August 2, 2023, earnings call)

**Statement 71:** "as we look at the second half, we're just thinking about, hey, if there are any new customers in these really bad water areas, they might choose to push back their console purchase until TabloCart is available. And so, for that reason, we contemplated that in the guidance that we talked about today." Compl. ¶ 216 (stated by Defendant Trigg during August 2, 2023, earnings call).

**Statement 72:** "[O]ur expectation is that sales of both TabloCart with prefiltration will resume once we get our clearance and that any Tablo orders that may defer will also come back once we get our 510(k) clearance. So, as we think about 2024, nothing has structurally changed." Compl. ¶ 217 (stated by Defendant Ahmed during August 2, 2023, earnings call).

**Statement 73:** "We timely submitted a response to the FDA in late July 2023.  As communicated in our response, we believe we have taken or committed to take appropriate measures to resolve the matters raised in the Warning Letter.  We believe the concern raised by the first observation regarding CRRT promotion has been effectively addressed through labeling and promotional changes that have already been completed.  With regard to the second observation, we have agreed to submit a 510(k) application for TabloCart with Prefiltration." Compl. ¶ 219 (stated by Defendant Outset in August 3, 2023, Q2 2023 Form 10-Q).

**Statement 74:** "And our response effectively was strategically, yes, and so we -- I don't foresee that there's anything controversial in our response which we are choosing to take a very, very collaborative approach. They had some commentary about some customer testimonials on our website. Those have been long removed. And then we did choose to take the step of filing on TabloCart and then voluntarily said, hey, what we'll just push the pause button on the cart to continue to be a good corporate citizen and a good partner to FDA. *So all of that is now behind us."* Compl. ¶ 222 (stated by Defendant Trigg on September 12, 2023, at Morgan Stanley Annual Global Healthcare Conference).

**Statement 75:** "the shortfall to the guidance we provided in August was driven by *a larger-than expected impact in the field from the recent FDA warning letter*, which served to elongate our sales cycle in several ways. First, *we observed more customers than we anticipated, choosing to*

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

*defer their Tablo console purchasing and installation until TabloCart with prefiltration is available again*. Second, we experienced a strong competitive response, which served to create marketplace confusion, particularly regarding Tablo's use in the ICU.'" Compl. ¶ 228 (stated by Defendant Trigg during October 12, 2023, earnings call).

**Statement 76:** "competitive activity around TabloCart not being available by our choice and some competitive noise making around the other aspect of the warning letter around some case studies that were on our website. We feel that we have fully satisfied the FDA's concerns around the website." Compl. ¶ 234 (stated by Defendant Trigg during November 7, 2023, earnings call).

**Statement 77:** [Once Outset received clearance for TabloCart, business would] "grow at a high-teens rate annually after 2024 as we gain scale, adjusted to capital spending environment, and achieve TabloCart with pre-filtration clearance.
***
[G]iven that we expect TabloCart with prefiltration to get cleared in the second half, this first half-second half effects will be a little bit more pronounced and *you'll see more growth in the back half of the year.*" Compl. ¶ 236 (stated by Defendant Ahmed during November 7, 2023, earnings call).

**Statement 78:** "During the third quarter of 2023, several factors served to elongate our sales cycle and the timing of delivery and installations which, in turn, had an adverse impact on our bookings and revenues for the quarter. *These factors related to our recent Warning Letter, our distribution pause on TabloCart with Prefiltration and certain macroeconomic impacts on our customers. We observed more customers than we anticipated choosing to defer their Tablo console purchasing and installation until TabloCart with Prefiltration becomes available again. In addition, the Warning Letter created a certain amount of marketplace confusion (exacerbated, we believe, in some cases by our competitors) particularly regarding Tablo's use in the intensive care unit (ICU). We anticipate that the negative impacts from the Warning Letter and our distribution pause will continue through at least the end of 2023.* If the FDA's review of our pending 510(k) application for TabloCart with Prefiltration and the current distribution pause continues for an extended period of time, if the FDA ultimately does not grant clearance of our 510(k) application, or if we are otherwise unable to overcome the adverse impact in the field from the Warning Letter and our distribution pause for a prolonged period of time, our revenues could be materially and adversely impacted. Finally, during the third quarter of 2023, we began to observe an increasing number of our existing and prospective customers deferring their decisions to purchase Tablo in an environment of rising interest rates and more cautious capital spending. These deferrals served to further elongate our sales cycle and the timing of delivery and installations, which we expect to continue into 2024." Compl ¶¶ 238–39 (stated by Outset on November 8, 2023, in Q3 2023 Form 10-Q. Plaintiff alleges that similar statements were repeated on February 21, 2024, in Outset's FY 2023 Form 10-K).

**Statement 79:** "The Company would 'accelerate to high teens' growth in 2024 because, in part, the Company was 'expecting approval on one of our products, TabloCart with prefiltration.'" Compl. ¶ 242 (stated by Defendant Ahmed on November 16, 2023, at the Jefferies London Healthcare Conference).

**Statement 80:** "'Additionally, on the regulatory submission front, we remain in interactive review

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
21

United States District Court
Northern District of California

with FDA on the TabloCart 510(K) submission and continue to forecast sales of TabloCart with pre filtration resuming during the second-half of 2024,' suggesting that Tablo sales would ramp up once TabloCart received FDA clearance, which would serve as a 'positive catalyst' for the Company." Compl. ¶ 244 (stated by Defendant Trigg during February 21, 2024, earnings call).

**Statement 81:** Outset "provided monthly updates to the FDA as to the status of these Warning Letter-related workstreams since July 2023 and ***believe we have taken appropriate measures to resolve the matters raised in the Warning Letter.***" Compl. ¶ 246 (stated by Outset on February 21, 2024, in FY 2023 Form 10-K).

**Statement 82:** "Defendant Trigg again characterized the potential TabloCart clearance as a '***clear catalyst***' for the Company's growth." Compl. ¶ 247 (stated by Defendant Trigg on March 5, 2024, at TD Cowen Healthcare Conference).

**Statement 83:** "Defendant Ahmed also characterized Outset's customers as simply 'waiting for [Tablo]Cart' to finalize their purchases. He went on to note that '***those customers are still very much in our pipeline. They are still very much waiting for [Tablo]Cart. What we're really pleased with is that nobody has dropped out. Nobody has said, look, I don't want the product anymore.***'" Compl. ¶ 248 (stated by Defendant Ahmed on March 5, 2024, at TD Cowen Healthcare Conference).

**Statement 84:** "when [TabloCart's] back and we have a benefit of offering it to customers, yeah, ***we expect it to be nicely adopted***." Compl. ¶ 249 (stated by Defendant Trigg on March 5, 2024, at TD Cowen Healthcare Conference).

**Statement 85:** "The FDA 'has granted 510(k) clearance of TabloCart with prefiltration," and "Outset has resumed distribution of TabloCart with prefiltration and has product available to ship to customers." Compl. ¶ 250 (stated by Outset in May 6, 2024, press release).

**Statement 86:** "'[w]ith our most challenging recent headwind now behind us with the FDA clearance of TabloCart, ***demand for Tablo that has never been higher***.' Defendant Trigg also characterized the TabloCart clearance as 'finally putting wind in the sales [*sic*] of Tablo again.'" Compl. ¶ 254 (stated by Defendant Trigg during May 8, 2024, earnings call).

## II.    REQUESTS FOR JUDICIAL NOTICE OR INCORPORATION BY REFERENCE

Before turning to the motion to dismiss, the Court first sets the scope of the record.

### A.    Legal Standard

In general, a court may not consider material beyond the pleadings when ruling on a Rule 12(b)(6) motion. *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998 (9th Cir. 2018). The only exceptions to this rule are documents that are the subject of judicial notice, appended to the

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

complaint, or incorporated by reference.  *Id.*

Judicial notice permits courts to consider facts that are not subject to reasonable dispute. *Id.* at 999 (quoting Fed. R. Evid. 201).  A court may also consider matters that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Roca v. Wells Fargo Bank, N.A.*, 2016 WL 368153, at *3 (N.D. Cal. Feb. 1, 2016) (quoting Fed. R. Evid. 201(b)).

Incorporation by reference permits courts to treat an extrinsic document as if it were "part of the complaint itself," but only if the complaint "refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja*, 899 F.3d at 1002 (citing *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).  This "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Id.* (citation omitted).  Courts may incorporate documents or portions thereof that are not expressly referenced in the complaint if the claims depend on documents' contents. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (affirming incorporation by reference of webpages surrounding photographs to provide crucial context for defamation claims).  Once incorporated, the Court may assume the entire document is true for purposes of a motion to dismiss. *Ritchie*, 342 F.3d at 908.  But the Court should not assume the truth of facts in an incorporated document "if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Khoja*, 899 F.3d at 1003.

### B.    Discussion

Before the Court are two sets of requests for judicial notice and/or incorporation by reference: (1) Defendants' Request for Judicial Notice ("RJN"), ECF No. 56, and (2) Defendants' Reply and Supplemental Request for Judicial Notice ("Reply and Supp. RJN"), ECF No. 65.  The Court addresses the two requests in turn.

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
23

### 1.     Defendants' Request for Judicial Notice

Defendants request judicial notice and/or incorporation by reference of Exhibits 1 through 26 to the Declaration of Jaime A. Bartlett.  RJN; Bartlett Decl. Exs. 1–26, ECF No. 57.  Plaintiff opposes the judicial notice and/or incorporation by reference of Exhibits 6, 7, 8, and 9.  Pl. Opp. to RJN, ECF No. 59 at 4.  Plaintiff does not oppose the judicial notice and/or incorporation by reference of the remaining twenty-two exhibits, but Plaintiff argues that those documents may not be offered for the truth of the matter asserted therein or any other improper purpose.  *Id.* at 3–4.

***Exhibits 6, 7, 8, and 9*** are excerpts from Outset's Schedule 14A Definitive Proxy Statements filed with the SEC in 2021, 2022, 2023, and 2024, respectively.  Defendant contends all four exhibits are offered "for the purpose of providing the context relevant to stock sales to which Plaintiff refers in ¶ 308."  RJN at 3.  These exhibits are SEC filings and thus proper subjects of judicial notice.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).

The Complaint does not refer to Exhibits 6, 7, or 9, let alone refer to them "extensively" as required for incorporation by reference.  *Khoja*, 899 F.3d at 1002 (citation omitted).  Nor do Plaintiff's claims "depend on the documents' contents."  *Knievel*, 393 F.3d at 1076; Pl. Opp. to RJN at 4; Compl. ¶ 308.  As a result, Exhibits 6, 7, and 9 are not subject to incorporation by reference.

The Complaint does, however, refer to Exhibit 8 in alleging that Outset described TabloCart as a "non-medical accessory."  Pl. Opp. to RJN at 4; Compl. ¶ 190.  Defendant offers Exhibit 8 to provide "the context relevant to stock sales to which Plaintiff refers."  RJN at 3.  Exhibit 8 is not subject to incorporation by reference for this purpose, because this is not the reason for which Plaintiff referred to the document—the stock sale claims do not depend on its contents.  Defendants also offer Exhibit 8 to "demonstrate what Outset said to the market about

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
24

United States District Court
Northern District of California

United States District Court
Northern District of California

TabloCart." *Id.*  That is, Defendants wish to incorporate the context surrounding the statement upon which Plaintiff relies.  Since the incorporation by reference doctrine exists to prevent plaintiffs from surviving a motion to dismiss using selective citation, *Khoja*, 899 F.3d at 1002, the Court incorporates Exhibit 8 by reference.

*Exhibits 1–5 and 10–26* are Outset's SEC filings (Exs. 1–5, 10–16), the Warning Letter (Ex. 17), transcripts from Outset's earnings calls (Exs. 18, 19, 22), transcripts from Defendants' presentations at two healthcare conferences (Exs. 20 and 21), the full text of interviews with the confidential witnesses cited in the complaint (Exs. 23–25), and a Manufacturer and User Facility Device Experience ("MAUDE") report submitted to the FDA by a physician on whom Plaintiff relies as a confidential witness (Ex. 26).  Plaintiff cites to and relies upon all of these documents in the Complaint to form the basis of the claims.  As such, Plaintiff concedes that these exhibits are proper subjects of judicial notice and/or incorporation by reference.  Plaintiff contends, however, that the Court should not consider these exhibits for the truth of the matter asserted therein or any improper purpose.  Pl. Opp. to RJN at 3–4.  But Defendants are not referencing these documents for the truth of the matters stated therein, nor are they attempting to contradict Plaintiff's allegations or resolve factual disputes at the motion to dismiss stage.  RJN at 2–6, Reply and Supp. RJN at 1.  Rather, Defendants offer the documents to show the complete context of the statements Plaintiff references in the complaint.  *See Khoja*, 899 F.3d at 1002.  And whether Defendants are asserting a truth-on-the-market defense goes to the substance of the motion, not the admissibility of evidence.  *See Bos. Ret. Sys. v. Uber Techs., Inc.*, No. 19-CV-06361-RS, 2020 WL 4569846, at *3 (N.D. Cal. Aug. 7, 2020).

### 2.      Defendants' Supplemental Request for Judicial Notice

Defendants cite two additional exhibits in their Reply in Support of Defendants' Motion to

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

Dismiss.  They request judicial notice of Reply Exhibit 1 and Reply Exhibit 2 to the Declaration of Jaime A. Bartlett.  Supp. RJN, ECF No. 65; Bartlett Decl. to Supp. RJN, Reply Exs. 1–2, ECF No. 64.

*Reply Exhibit 1* is excerpts from the Fifth Consolidated Amended Class Action Complaint, ECF No. 234, *In re Gilead Sciences Sec. Litig.*, No. 3:03-cv-04999-SI (N.D. Cal. July 10, 2009).  Similarly, *Reply Exhibit 2* is excerpts from the Amended Consolidated Securities Class Action Complaint, ECF No. 88, *City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc. et al*, No. 1:08-cv-00969-HB (D. Del. Dec. 23, 2009).  Defendants offer Reply Exhibit 1 to provide additional context regarding the *Gilead* plaintiffs' allegations of an off-label marketing scheme and Reply Exhibit 2 to provide additional context regarding the *Horizon* plaintiffs' allegations of a price-fixing scheme.

Both exhibits are "court filings and other matters of public record" whose authenticity cannot be disputed.  See Fed. R. Evid. 201(b); *Duke v. City College of San Francisco*, 445 F. Supp. 3d 216, 224 (N.D. Cal. 2020) (holding that a state court complaint was noticeable because "the court may judicially notice court documents already in the public record and filed in other courts").  Consequently, the Court takes judicial notice of Reply Exhibit 1 and Reply Exhibit 2.

## III.    MOTION TO DISMISS SECTION 10(B) AND RULE 10B-5 CLAIM

### A.    Legal Standard

Usually, a complaint will survive a Rule 12(b)(6) motion to dismiss if it alleges enough facts that, accepted as true, state a plausible claim.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  But securities fraud claims under Sections 10(b) and 20(a) of the Exchange Act must meet the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act (PSLRA).  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014).  To comply with Rule 9(b), a plaintiff must plead the "who, what, when, where, and how" of the

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

United States District Court
Northern District of California

alleged fraud. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 964 (9th Cir. 2018) (quoting *United States ex rel. Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011)). The PSLRA requires similar levels of particularity for allegations of falsity but imposes stricter particularity requirements for scienter. *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876–77 (9th Cir. 2012). Namely, the plaintiff must establish a *strong* inference of scienter. *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

### B.    Discussion

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1140 (9th Cir. 2017) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)). Defendants argue that Plaintiff fails to satisfy the first, second, and sixth elements.

#### 1.    Falsity

Plaintiff alleges that during the Class Period, Defendants Outset, Trigg, Ahmed, and Chambers made eighty-six false or misleading statements in several contexts, including SEC filings, press releases, earnings calls, slide decks, conferences, and ESG reports. The Court analyzes the alleged falsity of the statements in the five categories set forth above: off-label marketing risk statements, growth and revenue statements, value proposition statements, TabloCart Statements, and FDA statements. *See supra* Part I.C.

##### a.    Statements Regarding Risk of Off-Label Marketing (Statements 1–3)

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
27

Plaintiff alleges that Statements 1–3 were false or misleading because, at the very same time that Outset was claiming that it did not engage in off-label promotion of Tablo, the company was engaging in a scheme to market Tablo for off-label usage in CRRT. Compl. ¶ 50. In moving to dismiss, Defendants argue that Statements 1–3 were not false because there was no widespread off-label marketing scheme. Mot. at 12–16. Failing that, Defendants contend that the truth was on the market. Mot. at 16–17. The Court assesses both arguments in turn.

###### i.      Existence of an Off-Label Marketing Scheme

To bolster the allegation of a widespread off-label marketing scheme, Plaintiff cites to statements offered by nine confidential witnesses ("CW"). Compl. ¶¶ 61–89. As a threshold matter, the Court must decide whether it may rely on these witnesses. Defendants contend that the Court may not rely on confidential witnesses 1, 7, 8, and 9 because they do not meet the indicia of credibility: they are unnamed people quoted in interviews not conducted by Plaintiff's counsel. Mot. at 12. Plaintiff believes that the Court may rely on the confidential witnesses. Opp. at 2–3.

To satisfy the PSLRA's pleading requirements, Plaintiff's CW statements must satisfy two prongs: one, the CWs themselves must be "described with sufficient particularity to establish their reliability and personal knowledge," and two, the CW's statements must be "indicative of the elements in question." *Huang v. Higgins*, 2019 WL 1245136, at *6 (N.D. Cal. Mar. 18, 2019) (citation modified).

As to the first prong, the CWs are described with sufficient particularity. CW 1 was a Northeast Area Sales Manager at Outset from before the Class Period until Spring 2021. Compl. ¶ 62. CW 2 was a Key Account Representative Home/Chronic from the beginning of 2022 through the end of the Class Period. *Id.* ¶ 69. CW 3 worked for Outset as a clinical trainer and then in sales as a territory manager from before the Class Period through the end of the Class Period. *Id.* ¶ 75. CW 4 has been the President and CEO of a large health care system in New York since 2023;

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

28

United States District Court
Northern District of California

before that, CW 4 was the Executive Vice President and Chief Business Development Officer of the same healthcare system.  *Id.* ¶ 78.  CW 5 worked as the nurse manager of a critical care unit within a New York hospital from before the Class Period until early 2024.  *Id.* ¶ 79.  CW 6 worked as a licensed practical nurse and later the Director of Nursing at a nationwide healthcare system in Massachusetts from before the Class Period through early 2024.  *Id.* ¶ 83.  CW 7 worked at a non-profit community healthcare system based in Evansville, Indiana.  *Id.* ¶ 85.  CW 8 has been the Chief of Nephrology at South Shore Health in the Boston area since July 2022; before that, CW 8 worked as a nephrologist at other institution(s) in the greater Boston area.  *Id.* ¶ 88.  Finally, CW 9 is a physician who submitted a complaint to the FDA regarding Tablo.  *Id.* ¶ 89.  Defendant objects that the Court may not credit CWs 1, 7, 8, or 9 because Plaintiff did not interview these CWs.  Mot. at 12–13; Compl. ¶¶ 62 n.5, 85, 88 n.4, 89.  Though courts have found that counsel's failure to interview confidential witnesses personally can be a factor in determining witness credibility, that factor alone is not dispositive.  *See Applestein v. Medication, Inc.*, 861 F. Supp. 2d 1030, 1038 (N.D. Cal. 2012), *aff'd,* 561 F. App'x 598 (9th Cir. 2014) (finding confidential witness statements unreliable because they directly contradicted each other *and* because plaintiffs' counsel never spoke to two of the witnesses).  Defendants have offered no other reason for the Court to find these statements unreliable.  Consequently, Plaintiff has met this prong.

As to the second prong, the Court finds the CWs' statements elucidate the element in question: falsity and materiality.  All of the statements describe alleged off-label marketing of Tablo and/or use of Tablo for CRRT.  Though some of the CWs report hearsay—that Outset employees told them to market the Tablo for CRRT—that does not automatically disqualify their statements from the calculus at this stage.  *Id*. (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 998 n.4 (9th Cir. 2009*), as amended* (Feb. 10, 2009)).  Thus, the Court will consider all nine CW statements in determining whether Plaintiff credibly alleged a widespread off-label

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
29

United States District Court
Northern District of California

marketing scheme.

Next, Defendants argue that even if the Court considers the CW statements, Plaintiff still does not adequately plead that Outset employees were told to promote Tablo for off-label use. Mot. at 13–14.  The former employees' CW statements are as follows.

CW 1 was a sales manager for Outset in the New York, northern New Jersey, and upstate New York areas from before the Class Period through Spring of 2021.  Compl. ¶ 62.  CW1 recalls that Outset's Chief Medical Officer ("CMO") Michael Aragon and Senior Vice President, Global Sales ("SVPGS") Jamie Lewis directed the sales staff during sales calls and meetings to promote and sell Tablo for CRRT.  *Id*. ¶ 63.  Presumably acting on these instructions, CW1 marketed and sold Tablo for CRRT to the New York City Medical Center, the Nassau University Medical Center, and the Brooklyn Veterans Administration Hospital.  *Id.* ¶ 67.

CW 2 was an account representative for home and chronic care for Outset serving Texas, Florida, Alabama, Louisiana, Missouri, and Arkansas from the beginning of 2022 through the end of the Class Period.  *Id.* ¶ 69.  CW 2 alleges that at two sales and operational training sessions in San Diego, California, and Columbus, Ohio, CW 2 received marketing training "to say that Tablo was okay for CRRT."  *Id.* ¶ 70.

CW 3 was a clinical trainer for Outset until early 2023; that job involved training customers and sales.  *Id.* ¶ 75.  Then CW 3 went into sales as a territory manager for the Dallas-Fort Worth area, New Mexico, and Arizona through the end of the Class Period.  *Id.*  CW 3 alleges that a colleague told CW 3 that "Outset was specifically marketing Tablo for CRRT in Florida" and that before that point, CW 3 "did not know that representing that Tablo could be used for CRRT was wrong."  *Id.* ¶ 76.

To plausibly allege an off-label marketing scheme, courts in this circuit generally require that plaintiffs plead "facts illustrating that sales representatives were instructed by managers or

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
30

other members of the firm leadership to engage in off-label marketing." *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, No. 19-CV-01372-LHK, 2021 WL 3748325, at *12 (N.D. Cal. Aug. 24, 2021) ("*Corcept II*"). In *In re Gilead Sciences Securities Litigation*, for example, the court found an off-label marketing scheme where confidential witnesses alleged that they personally "attended various meetings at which Gilead's sales and marketing team received specific instructions to market Viread off-label." 2005 WL 181885, at *9 (N.D. Cal. Jan. 26, 2005). In *Corcept II*, the court found an off-label marketing scheme where four confidential witnesses, including a sales specialist, a clinical specialist, a clinical sales specialist, and a regional manager alleged that company leadership was instructing them to market Korlym off-label. *Corcept II*, 2021 WL 3748325, at *13–14. In *Huang v. Higgins,* by contrast, the court found that the plaintiffs failed to plausibly allege an off-label marketing scheme because confidential witness former employees "[did] not provide the details of any individual meetings, nor allege that they received specific instructions to market NUCYNTA for off-label uses." 2019 WL 1245136, at *6–8 (N.D. Cal. Mar. 18, 2019).

As Defendants point out, CW 3 does not state that he or she was ever told to market Tablo as a CRRT treatment. The Court agrees with that assessment of CW 3's statement. But even without CW 3's allegations, the Court finds that CW 1 and CW 2's allegations fall closer to the sufficient allegations in *In re Gilead* than the insufficient allegations in *Higgins*. CW 1's statement clearly alleges both that they were instructed to engage in off-label marketing and that Outset's leadership told them to do so. And CW 2 states that trainings in two different cities instructed employees "to say that Tablo was okay for CRRT." Compl. ¶ 70.

The statements of three customer CWs and the Warning Letter provide further support to Plaintiff's allegations. CW 4, the executive of a large healthcare system in New York, remembers that both Outset employees and marketing materials indicated Tablo could be used for CRRT. *Id*.

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

United States District Court
Northern District of California

¶ 78.  CW 6, a nurse, recalled Outset employees stating that Tablo was capable of CRRT.  *Id.* ¶ 84. CW 9, a physician, also stated that Outset sold Tablo to CW 9's institution with the statement that Tablo could be used for CRRT.  *Id.* ¶ 89.  Furthermore, the Warning Letter noted that Outset's website promised that Tablo "eliminated the need for several types of dialysis machines . . . including intermittent hemodialysis (IHD) in the dialysis unit and continuous renal replacement therapy (CRRT) in critical care."  Bartlett Decl. Ex. 17 at 2–3.  Alone, neither the customers' statements nor the Warning letter would be enough to infer a campaign of off-label promotion. But taken alongside the statements offered by the employee CWs, they bolster the allegation that Outset was marketing Tablo for off-label uses.

### ii.    Truth-on-the-Market Defense

Defendants contend that they disclosed the relevant facts about off-label marketing in other statements to investors.  Mot. at 16–17.  Plaintiff argues that this is a truth-on-the-market defense that the Court should not consider at the motion to dismiss stage, but that if the Court does, that Plaintiff has adequately pled that Defendants materially misled investors.  Opp. at 13–14.  From the cases Defendants cite, the Court infers that Defendants are asserting a truth-on-the-market defense.  *See* Mot. at 16 (citing *In re Kalobios Pharms, Inc. Sec. Litig.*, 258 F. Supp. 3d 999, 1007–08 (N.D. Cal. 2017); *Rubin v. Trimble*, 1997 WL 227956, at *7 (N.D. Cal. Apr. 28, 1997)). The Court finds that defense unavailing for two reasons.

First, the truth-on-the-market defense is generally not available at the motion to dismiss stage.  This defense excuses a defendant's failure to disclose material information where the information was made available to the public by other sources "with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insider's one-sided representations."  *Provenz v. Miller*, 102 F.3d 1478, 1493 (9th Cir. 1996) (internal quotations and citation omitted).  It is ordinarily unavailable to defendants at the motion

to dismiss stage because it refutes an alleged misrepresentation's materiality, which is a fact-intensive inquiry. *See Bos. Ret. Sys.*, 2020 WL 4569846, at *6.

Second, even if the Court were to consider the truth-on-the-market defense at this stage, it would be clear that Defendants have not met the heavy burden of demonstrating it is appropriate on these facts. Defendants contend that (1) Outset disclosed to investors that Tablo did not have FDA clearance for CRRT, and (2) that Outset also described Tablo to investors as an "all-in-one device," Compl. ¶ 103, a "complete enterprise solution," *id.* ¶ 108, having the ability to "capture 100% of all treatment volume" *id.* ¶ 136, and so on. See Mot. at 16. Defendants seem to believe that investors should have put these two statements together and deduced that Defendants were engaged in off-label marketing. That logical leap is not the type of clear disclosure that could "effectively counterbalance any misleading impression created by the insider's one-sided representations." *Provenz*, 102 F.3d at 1493. Furthermore, "investors are not generally required to look beyond a given document to discover what is true and what is not." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008). The allegedly false or misleading statements were made in the Public Documents and in the 2021 and 2023 ESG Reports. Some of the statements that Defendants say revealed the truth were in those same reports, *see, e.g.,* Compl. ¶ 103, but some were not, *see, e.g., id.* ¶¶ 108, 136, 171, 222. Investors should not be required to look beyond the Public Documents and the 2021 and 2023 ESG Reports to find the truth.

*** 

In conclusion, the Court finds that Plaintiff has adequately alleged that Outset was engaged in an off-label marketing campaign, and that Statements 1–3 were thus false or misleading.

### b. Growth and Revenue Statements (Statements 4–41)

Plaintiff alleges that Statements 4–41 were false or misleading because they failed to disclose that Outset's growth and revenue allegedly relied on the claimed undisclosed off-label

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
33

<div style="writing-mode: vertical">United States District Court
Northern District of California</div>

marketing.  In moving to dismiss, Defendants make several arguments, including that some of the statements are puffery, that other statements are forward-looking and protected by the PSLRA safe harbor, and finally that Plaintiff did not adequately plead that the statements were materially misleading.  The Court begins by addressing whether the alleged misstatements regarding growth and revenue were puffery.  Then it considers whether they were protected by the PSLRA.  Finally, the Court considers whether the statements were materially misleading.

### i.      Puffery

Defendants contend that many of the growth and revenue statements are non-actionable puffery.  Mot. at 21–24.  These include Statements 4–6, 8–10, 13–14, 17, 21–22, 25, 29–30, and 33.  Mot. at 23.  Plaintiff disagrees, arguing that the cited statements are "statements of purported current objective fact touting the reasons for Outset's then present revenue growth and demand for Tablo."  Opp. at 16–17.

At its heart, corporate puffery involves a statement of opinion that is not capable of objective verification.  *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1098–99 (9th Cir. 2022) (citing *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017)).  Such "vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers, are not actionable because professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives."  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (internal quotations and citation omitted).

Six of the statements—Statements 4, 8, 25, 37, 39(b), and 40—generally refer to Tablo's "momentum" or "strong and growing" demand for Tablo.  Defendants contend that these statements are so abstract as to be puffery.  Mot. at 24.  Plaintiff disagrees, arguing that these statements constitute objectively factual claims about growth and demand for Tablo—claims that were misleading because "Defendants failed to disclose the then present off-label marketing driving revenue and growth."  Opp. at 17.  The Court agrees with Defendants.  Statements that claim "commercial momentum" (Statements 4, 8), "which resulted from the momentum we see . .

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
34

United States District Court
Northern District of California

." (Statement 25), "momentum . . . carried through . . . with the benefits of Tablo continuing to resonate" (Statement 37), "strong demand" (Statement 39(b)), and "demand for Tablo is strong and growing" (Statement 40) are merely generalized and vaguely optimistic assessments of Outset's revenue and demand for Tablo.  They are not "capable of objective verification."  *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).  Because these statements were not factual claims, they cannot form the basis of a Securities Act claim.

Defendants claim that Statements 5–6, 9–10, 13–14, 17, 29–30, and 33 are also non-actionable puffery.  The Court finds that some of these statements are completely puffery, some are a mix of puffery and non-puffery, and some of them contain no puffery.

Statements 6, 9, 10, 14, 17, and 29 are puffery.  In Statement 6, Defendant Trigg stated that in the prior quarter, "our team continued to outperform while building a solid foundation for growth through 2021 and beyond."  Compl. ¶ 115.  In Statement 9, Defendant Chambers stated during an earnings call that the company was "really excited about the acute market and the value proposition of Tablo," *id.* ¶ 119, and in Statement 14, Defendant Trigg emphasized the "value proposition" of Tablo's "complete enterprise solution."  *Id.* ¶ 131.  In Statement 10, Defendant Trigg stated that there is "strong interest" in Tablo and that "we are confident in our positioning for consistent strong performance."  *Id*. ¶ 124.  Statement 17 similarly expresses general, unmeasurable confidence.  *Id.* ¶ 138.  The Ninth Circuit has found such statements to be "mildly optimistic, subjective assessment[s]" that—coming from corporate executives—most investors know to devalue.  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010) (citing *VeriFone Sec. Litig.,* 784 F.Supp. 1471, 1481 (N.D. Cal. 1992), *aff'd,* 11 F.3d 865 (9th Cir. 1993)).  In Statement 29, Defendant Trigg said that third quarter results reflect "the value Tablo is delivering . . . with console shipments exceeding our expectations . . . reflect[ing] patient preference for Tablo and strong demand across end markets."  Compl. ¶ 164.  Here, though it might be possible to compare expected to actual console shipments, the crux of the statement is that patients prefer Tablo and Tablo delivers "value."  These are, again, subjective statements that the Court cannot objectively verify.  Statements 6, 9, 10, 14, 17, and 29 are thus non-actionable puffery.

United States District Court
Northern District of California

Statements 5 and 13(b) contain a mix of puffery and non-puffery. In Statement 5, Defendant Trigg stated, "we are really pleased with the pace and the scale of commercial adoption. New contracts with national and regional health systems in addition to expansion within our existing customer base drove our strong Q3 results. . . [o]ur revenue achievement exceeded our initial expectations for the quarter as Tablo adoption continues to accelerate within the acute market." *Id.* ¶ 107. As discussed above, "we are really pleased" is a statement of corporate confidence that constitutes puffery. *In re Cutera*, 610 F.3d at 1111. Given the right evidence, however, it would be possible to measure whether new contracts and the existing customer base bolstered results; similarly, it would be possible to measure the increase in Tablo's adoption in the acute market. This portion of the statement is thus not puffery. Statement 13(b) contains a similar mix of unverifiable corporate optimism—"we delivered best-in-class revenue growth," "driven by a team that is dedicated to, and united around, transforming the dialysis experience for patients and providers," and "our integrated commercial strategy is working as expected"—and objectively-measurable facts—"steady gross margin improvement." Compl. ¶ 130. (Plaintiff does not allege that Statement 13(a) is false.) Thus, the Court considers only certain portions of Statements 5 and 13(b) to be puffery, and other portions to be non-puffery.

Finally, the Court finds Statements 30(a) and 33 to be non-puffery. In Statement 30(a), Plaintiff challenges a portion of Defendant Trigg's statement during an earnings call in which she said, "our strong Q3 was driven by significant expansion in the acute setting." *Id.* ¶ 165. Here, though the word "significant" is vague, one could theoretically measure the number of sales made to providers operating in acute settings and compare that number to the total overall sales. That makes this statement objectively verifiable and, thus, not puffery. Similarly, Plaintiff challenges a portion of Statement 33 in which Defendant Trigg notified the press that Outset had "significantly increased the number of Tablo consoles in hospitals and homes." *Id.* ¶ 173. This is not a statement of opinion: one could count the number of Tablos in hospitals and homes and compare to the number at some earlier date. Statement 33, like Statement 30(a), is not puffery.

In sum, the Court finds that Statements 4, 6, 8–10, 14, 17, 25, 29, 37, and 39(b)–40 are

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
36

vague statements about "momentum" and other forms of corporate optimism that cannot form the basis of Plaintiff's claim. Portions of Statements 5 and 13(b) are also puffery, but other portions are not. And Statements 30(a) and 33 are not puffery.

### ii.    PSLRA Safe Harbor

Defendants also argue that Statements 6, 9–10, 13, 17, 21–22, 25, 28, 30(a), and 39(b)–40 are non-actionable forward-looking statements protected by the PSLRA's safe harbor. Because the Court has already found that some Statements are non-actionable puffery, the Court will only consider this argument so far as it pertains to Statements 13, 21–22, 28, and 30.

The PSLRA creates a safe harbor for "forward-looking statements." Forward-looking statements are not actionable if they are identified as such and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement." *See* 15 U.S.C. § 78u–5(c)(1)(A)(i). A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.,* 320 F.3d 920, 936 (9th Cir. 2003). "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera Sec. Litig.,* 610 F.3d 1103, 1112 (9th Cir. 2010).

Statements 22 and 28 are purely forward looking. Statement 22 promises "clarity and conviction around the growth drivers that will continue to distinguish Outset Medical," and Statement 28 projects "no change in the underlying demand for Tablo" over the second half of 2022. Compl. ¶¶ 145, 161.

Statements 13 and 21 combine backward- and forward-looking elements. Statement 13 looks forward—"we remain confident in our ability to execute on each of our key strategic initiatives"—but Plaintiff alleges the backward-looking portion is false. *Id.* ¶ 130. Statement 21

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
37

*United States District Court*
*Northern District of California*

similarly mixes backward- and forward-looking elements: "Our entire team contributed to an exceptional 2021, driving record revenue growth, meaningful progress toward our long-term gross margin goal and excellent visibility into 2022. . . Our established relationships with 7 of the 8 largest national health systems and one-third of the largest 100 regional health systems puts us in a strong position for growth this year in both the acute and home settings." *Id*. ¶ 144.  The PSLRA does not protect statements of current or past facts combined with a forward-looking statement, but only "if the allegation of falsehood relates to non-forward-looking aspects of the statement." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017).  That means Statement 13, where Plaintiff alleges the non-forward-looking aspect of the statement was misleading, does not fall within the safe harbor.  But it does protect the forward-looking portion of Statement 21, regarding how Outset's relationships with health systems "puts us in a strong position for growth this year."  Compl. ¶ 144.

In Statement 30(a), Defendant Trigg said "our strong Q3 was driven by significant expansion in the acute setting."  This reflects on the past quarter, and thus does not fall under PSLRA's safe harbor.

Statements 22, 28, and a portion of Statement 21 are thus forward-looking statements that are not actionable if they were accompanied by "meaningful cautionary statements." *See* 15 U.S.C. § 78u–5(c)(1)(A)(i).  Defendants contend they were.  Mot. at 26.  Statement 22 was made during a February 16, 2022, earnings call.  In the November 11, 2020, earnings call, Defendants cautioned listeners about forward-looking statements. *See* Bartlett Decl. Ex. 18 at 5 ("All forward-looking statements are based upon our current estimates and various assumptions. These statements involve material risks and uncertainties that could cause actual results or events to materially differ from those anticipated or implied by these forward-looking statements.").  Defendants analogize to *Kipling v. Flex Ltd.*, in which the court found similar language triggered the safe harbor.  Mot. at 55 (citing *Kipling v. Flex Ltd.*, 2020 WL 2793463, at *11–12 (N.D. Cal. May 29, 2020)).  But in that case, the cautionary language appeared in the same documents as the forward-looking statements. *Kipling*, 2020 WL 2793463, at *11 ("The referenced SEC filings in

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
38

turn contain cautionary language . . ."). Here, Defendants did not request judicial notice or incorporation by reference for a transcript of the February 16, 2022, call. As a result, the Court cannot confirm whether Statement 22 was accompanied by a cautionary statement. The analysis is the same for Statements 28 and 21: Defendants made these statements in press releases, but Defendants did not request judicial notice of these press releases, and so the Court cannot say whether they were accompanied by cautionary statements. In sum, Defendants have not shown that Statements 21, 22, and 28 were accompanied by cautionary language.

Even without cautionary language, forward-looking statements may still fall under the PSLRA safe harbor if "the plaintiff fails to prove that the forward-looking statement was made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). Here, Plaintiff has failed to plead scienter for Statements 21, 22, and 28. *See infra* Part III.B.2.

Consequently, the forward-looking portion of Statement 21, Statement 22, and Statement 28 are protected under PSLRA's safe harbor and cannot form the basis of Plaintiff's claim.

### iii.    Materially Misleading

The Court now turns to consider whether Plaintiff adequately pled that the non-puffery portion of Statement 5; Statements 7 and 11; the non-puffery portion of Statement 13(b); Statements 15–16 and 18–20; the backward-looking portion of Statement 21; and Statements 23–24, 26–27, 30(a), 32–36, 38, and 41 were materially false or misleading. Plaintiff alleges that these statements were misleading because Defendants failed to disclose that the company's growth and revenue allegedly relied on the off-label marketing scheme.

To make this case, Plaintiff must adequately plead that the off-label marketing scheme substantially increased revenue. Under Plaintiff's theory, Outset sales personnel marketed and sold Tablo for CRRT, Compl. ¶¶ 63 (citing CW 1), 70 (citing CW 2); customers purchased Tablo at least in part for CRRT, *id.* ¶¶ 78, 84, 86–88; and as a result, Outset's sales increased, *id.* ¶¶ 115, 125, 133, 297.

Defendants argue that Plaintiff has failed to link the alleged off-label marketing to the

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
39

increased sales. They say the Complaint does not allege "for a single quarter (across the 16 challenged quarters) anything about the revenue generated by sales of Tablo from alleged off label marketing versus the revenue generated from sales for use of Tablo in its cleared modalities." Mot. at 18. But that is more than what is required. Plaintiff does not have to compare the different revenue sources. Plaintiff simply must plead facts indicating that off-label marketing significantly affected sales. *See, e.g., In re Gilead Scis. Sec. Litig.,* 536 F.3d 1049, 1051 (9th Cir. 2008) ("*Gilead II*") ("75% to 95% of Viread sales resulted from off-label marketing efforts."), *id.* at 1052 n.4 ("Investors concluded that between $86.7 million and $109.82 million of Viread's $115.6 million in domestic sales during the second quarter of 2003 could be attributed to off-label marketing."). Because, under Plaintiff's theory, many customers purchased Tablo to use for approved *and* off-label purposes, Plaintiff does not need to show that a significant portion of sales were for off-label purposes alone. But Plaintiff must show that the ability to use Tablo for off-label purposes played a role in customers' decisions to buy the device.

Plaintiff has cleared that bar. Plaintiff points to statements where Defendants asserted that increased sales were "driven by higher placement to our acute customers" or were "driven primarily by increased console shipments to acute customers." Compl. ¶ 125 (Statement 11), ¶ 133 (Statement 16). Plaintiff also notes that in 2020, 81% of Tablos were installed in acute facilities; in 2021, that number was 77%. Compl. ¶ 297. The issue here is that acute care facilities administer both CRRT (for which Tablo was not approved) and IHD and SLED/PIRRT (for which Tablo was approved). Mot. at 5. Defendants say that because acute care facilities may have purchased Tablo for IHD or SLED/PIRRT, sales to those facilities "cannot be assumed to represent sales derived from off-label promotion." Reply at 4. Plaintiff, on the other hand, infers that acute care facilities purchased Tablo for CRRT. Opp. at 16. Because a 12(b)(6) motion requires a court to draw all inferences in the light most favorable to the plaintiff, *Retail Prop. Trust v. United Bd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014), the Court accepts the inference that acute care facilities purchased Tablo for CRRT. And since these facilities accounted for a substantial portion of Tablo sales, Plaintiff has adequately pled that the

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

alleged off-label marketing scheme significantly affected sales.

***

To summarize, the Court finds that Statements 4, 6, 8–10, 14, 17, 25, 29, 37, 39(b), 40, and portions of Statements 5 and 13 are puffery and cannot form the basis of a Securities Act claim. The Court also finds that Statements 22, 28, and the forward-looking portion of Statement 21 fall under the PSLRA's safe harbor provision and cannot form the basis of a Securities Act claim. But the Court finds that Plaintiff has adequately pled that the remaining statements—the non-puffery portion of Statement 5; Statements 7 and 11; the non-puffery portion of Statement 13(b); Statements 15–16 and 18–20; the backward-looking portion of Statement 21; and Statements 23–24, 26–27, 30(a), 31–36, 38, and 41—were false or misleading with respect to their claims about Outset's growth and revenue.[2]

### c.      Value Proposition Statements (Statements 9, 12–14, 26–28, 30(b), 35(b), 40, 42–63)

Plaintiff alleges that portions of Statements 9, 12–14, 26–28, 30(b), 35(b), and 40 and all of Statements 42–63 were false or misleading because they failed to disclose that a key element of Tablo's "value proposition" was its off-label marketing for CRRT. In moving to dismiss, Defendants contend that many of those statements constitute non-actionable puffery or opinions, that others are forward-looking statements protected by the PSLRA's safe harbor, and that the remaining statements are not materially misleading. The Court addresses each argument in turn.

### i.      Puffery or Opinion

Defendants maintain that many of the value proposition statements are non-actionable puffery or opinion. Mot. at 22–23. These include Statements 9, 12, 26–27, 30(b), 38, 40, 42–52, 54–56, 58–59, 60–63, 73. Plaintiff disputes that characterization, arguing that these statements "tout[] Outset's purported current objective fact regarding its value proposition strategy." Opp. at

---

[2] Plaintiff seems to allege that Statement 12 was misleading in terms of the source of Outset's growth and revenue and its value proposition. The Court cannot find any language about growth and revenue in Statement 12 and so has analyzed its falsity with the other Value Proposition Statements

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
41

21.

The Court has already found that Statement 9 is non-actionable puffery, *see supra* Part III.B.1.b.i.  The analysis for the remaining statements is similar as it was for the growth and revenue statements, *see id.*, but to reiterate, corporate puffery involves a statement of opinion that is not capable of objective verification.  *Macomb Cnty. Employees' Ret. Sys.*, 39 F.4th at 1098–99.

***Statements 12, 35(b), 56, 60, 61, and 63***: In Statement 12, Defendant Trigg conjectured that recent sales demonstrated that Tablo's "value proposition is resonating quickly following console deployment."  Compl. ¶ 119.  Presumably, this is corporate speak to say that customers appreciated Tablo's unique ability to perform multiple forms of dialysis.  Though the language is inartful, it is not actionable because there is no clear way to measure the "resonance" of a value proposition.  Statement 35(b) ("hospital capital spending . . .has not proven to be a meaningful headwind for us given Tablo's strong value proposition"), Statement 56 (Tablo's "value proposition remained strong"), Statement 60 (Tablo's "value proposition remains very much intact"), Statement 61 (Tablo's "economic value proposition remains resonant and differentiated"), and Statement 63 ("our value proposition remains compelling" and "evergreen") all face the same issues.  The speaker did not define what the "value proposition" was, and the Court does not know how to measure whether it was "strong," "compelling," or "evergreen."  In sum, the Court finds that a portion of Statement 12, 35(b), 56, 60, 61, and 63 are corporate puffery.

In ***Statement 26(b)***, Defendant Ahmed offered his assessment that sales of Tablo XT "highlights Tablo's clinical versatility and the clinical [community's] recognition of Tablo's ability that capably treat the very sickest population of patients in the ICU."  Compl. ¶ 156.  Here again, it is not clear to the Court how one would objectively verify "clinical versatility" or a community's "recognition" of Tablo's uses.  Nor does Plaintiff propose any such method.  The Court finds Statement 26(b) to be puffery.

***Statements 13(b), 27, 30(b), 38(a)–(b), 40, 54, 62:*** In Statement 27, Defendant Trigg assessed that "the strength that we saw in the quarter leading to strong performance on the top-line revenue side, really came again from the core Tablo value proposition in the acute around

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
42

significant cost reduction." Compl. ¶ 157. It seems Defendant Trigg was saying that Tablo's value proposition—that it would reduce costs for acute care—drove sales that quarter. At first blush, this seems similar to the claim that "our strong Q3 was driven by a significant expansion in the acute setting," which the Court determined was not puffery. *See supra* Part III.B.1.b.i. (quoting Compl. ¶ 165). But that statement could be verified by comparing sales in acute settings to sales in other settings. Here, however, it is not clear how one would verify that customers purchased Tablo to reduce costs rather than for any other reason. Statement 13(b) ("our integrated commercial strategy is working as expected"), Statement 30(b) ("we had a strong Q3 that demonstrated Tablo's value proposition"), Statement 38(a)–(b) ("Our acute progress is a direct testament to the strong economic value proposition of Tablo," "We saw ASPs rise . . .which serves as a strong validation of Tablo's clinical and economic value proposition"), Statement 40 ("we've been encouraged to see more customers recognizing Tablo's strong economic value proposition"), Statement 54 ("the core value proposition of Tablo that I think continues to fuel and did fuel the backlog coming into 2022 and continues to fuel our pipeline"), and Statement 62 ("customers are not turning away from Tablo and its value proposition") all face the same issue as Statement 27. In each statement, Defendants conjecture that customers bought Tablo because of its "value proposition," usually defined as saving customers money. But since customers may have purchased Tablo for any other number of reasons, these statements are opinion rather than fact. As such, Statement 27, Statement 13(b), Statement 30(b), Statement 38(a)–(b), Statement 40, Statement 54, and Statement 62 are non-actionable puffery.

***Statements 42(b), 46(b), 49***: In Statement 46(b), Defendant Trigg described Outset's goal in creating Tablo: "So we set out to deliver an enterprise-wide solution. . . . Our mantra is anywhere, anytime, anyone." Compl. ¶ 114. As Plaintiff would have it, Defendant Trigg promised anyone could use Tablo for any form of dialysis, whether at home or in the hospital. But that is not what she said. Alone, the description "enterprise-wide" is vague, and the modification "anywhere, anytime, anyone" is so broad as to be meaningless. This vague description of Tablo's invention cannot support liability under the Securities Act. *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
43

United States District Court
Northern District of California

687, 708 (9th Cir. 2021).  The same analysis applies to Statement 42(b) ("anytime, anywhere, anyone"), Statement 42(c) ("Tablo is a single enterprise dialysis solution that can be seamlessly utilized across different care settings and for multiple clinical needs"), and the first portion of Statement 49 ("a single device hardware platform that can deliver dialysis anywhere anytime and virtually by anyone").  Those statements are puffery.

*Statements 12, 38(d), 42(a), 42(d), 43, 45, 46(a), 47, 48, 49, 50–53, 55, 57, 58*: In these statements, Defendants more clearly define what Tablo's "value proposition" or "single enterprise solution" is.  In Statement 46(a), for instance, Defendant Trigg described the thought process behind Tablo's invention.  "Could we design one machine that could really do it all?  Could you allow health systems to down select just to one device platform that would deliver all of this functionality?"  Compl. ¶ 114.  If it stood alone, the statement "do it all" would likely be puffery.  But here, Defendant Trigg explained that for Tablo, "doing it all" meant allowing health systems to "down select" to "just one device platform." *Id.*  That is a claim "capable of objective verification," and thus does not constitute corporate puffery.  *Macomb Cnty. Employees' Ret. Sys.*, 39 F.4th at 1098–99.

The same analysis that applies to Statement 46(a) also applies to the following statements: part of Statement 12 ("an enterprise solution that health systems would no longer need to buy and maintain two, three, four different types of machines"), Statement 38(d) ("a full enterprise solution . . . using Tablo from the ICU all the way to home"), Statement 42(a) ("Tablo is an all-in-one device" that "eliminat[es] the need for multiple dialysis machines" and "enables providers to standardize to a single platform across all care settings"), Statement 42(d) (Tablo "allows providers to standardize to a single technology platform from the hospital to the home"), Statement 43 ("a complete enterprise solution" for "dialysis across the entire care continuum from the hospital to the home with a single device"), Statement 45 ("Enterprise Solution, Value Proposition … we uniquely offer health systems, one device platform across the spectrum of care"), Statement 47 ("down select to one device"),  Statement 48 ("across any and all patient populations"), the second portion of Statement 49 ("a single hardware platform that could perform

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
44

United States District Court
Northern District of California

the functionalities of all those different types of dialysis machines . . ."), Statements 50–53, Statement 55, Statement 57, and Statement 58 ("down select to 1 device that their nurses and their clinicians can use"). These statements are verifiable and thus not puffery.

***Statements 14, 44, and 59***: Statements 44 and 59 are graphics that show a picture of Tablo alongside multiple other dialysis machines. In Statement 44, text is superimposed on the image, stating "Tablo is an enterprise solution that delivers easier, lower-cost dialysis." Compl. ¶¶ 109–110. The claim that something is "easier" is puffery because it is not clear how to measure it—it is "generalized boasting." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1145 (9th Cir. 1997). The statement "lower-cost" alone would be puffery. Indeed, that is how it appears in Statement 14—"an enterprise solution that reduces the cost and complexity of dialysis"—which the Court finds to be non-actionable. In Statement 44, however, the accompanying image of Tablo next to other machines makes the claim more specific: it implies Tablo costs less than the other machines in the picture. This claim could be objectively verified, and thus is not puffery. The graphic in Statement 59, meanwhile, features text advertising Tablo as "an all-in-one solution that replaces multiple machines and a water treatment room with a single device." *Id*. ¶¶ 175–76. Again, "an all-in-one solution" is meaningless puffery. But the question of whether Tablo could "replace[] multiple machines and a water treatment room" is capable of objective verification. The Court finds that Statements 44 and 59 are not puffery, but Statement 14 is puffery.

***

In conclusion, the Court finds that part of Statement 12; Statements 13(b), 14, 26(b), 27, 30(b), 35(b), 38(a)–(b), 40, 42(b)–(c), and 46(b); the first portion of Statement 49; and Statements 54, 56, and 60–63 are non-actionable puffery and may not form the basis of a Securities Act Claim.

### ii. PSLRA Safe Harbor

Defendants also argue that Statements 30, 40, and 56 are non-actionable forward-looking statements protected by the PSLRA's safe harbor. Because the Court has already found that these

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

statements are non-actionable puffery, the Court will not consider whether they also fall under the safe harbor.

### iii.    Materially False or Misleading

After the foregoing analysis, the following Value Proposition Statements remain at issue: Statement 42(a), Statement 42(d), Statements 43–46(a), Statement 47, Statement 48, the second portion of Statement 49, Statements 50–53, Statement 55, Statement 57, and Statements 58–59. As with the Growth and Revenue Statements, Plaintiff alleges that the Value Proposition Statements were misleading because Defendants failed to disclose that the "value proposition"— the notion that Tablo could replace all dialysis machines—relied on the alleged scheme to market Tablo for CRRT.  Opp. at 21.  In moving to dismiss, Defendants make the same argument that they did for the Growth and Revenue Statements: that Plaintiff failed to link the alleged off-label marketing to increased sales.  Mot. at 18.  The Court rejected that argument as to the Growth and Revenue Statements, *see supra* Part III.B.1.b.iii., and rejects it for the same reasons as to the Value Proposition Statements.  Defendants offer no other reason why the Court should find the Value Proposition Statements materially false or misleading.

\*\*\*

To summarize, the Court finds that part of Statement 12; Statements 13(b), 14, 26(b), 27, 30(b), 35(b), 38(a)–(b), 40, 42(b)–(c), and 46(b); the first portion of Statement 49; and Statements 54, 56, and 60–63 are non-actionable puffery.  But the Court finds that Plaintiff has adequately pled that the remaining statements—part of Statement 12, Statement 42(a), Statement 42(d), Statements 43–46(a), Statements 47–48, the non-puffery portion of Statement 49, Statements 50–53, Statement 55, and Statements 57–59—were false or misleading with respect to their claims about Tablo's value proposition.

### d.    TabloCart Statements (Statements 64–66)

Plaintiff alleges that Statements 64–66 were false because they described the TabloCart as

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
46

a "non-medical accessory" when, in fact, it required FDA clearance.

Defendants claim that when Defendants Outset and Trigg said the TabloCart was a non-medical accessory, they did not know it needed FDA clearance. Mot. at 19. They say they did not learn otherwise until they received the FDA Warning Letter on July 5, 2023—months after they made the challenged statements. *Id*. According to Defendants, this hindsight-based attack cannot support a claim of securities fraud. *Id*. (citing *In re Verifone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993)).

Plaintiff contends that because the FDA expressly defines a "water purification system for hemodialysis" as requiring prior clearance, 21 C.F.R. § 876.5665, and because TabloCart filtered water for Tablo, Defendants should have known that TabloCart met the definition of a medical device that required FDA approval. Opp. at 21. As a normative judgment, that may be true. But Plaintiff does not plead any facts indicating that, before the FDA inspection, Defendants did not genuinely or reasonably believe that FDA clearance was not required, nor that Defendants were aware of undisclosed facts that would undermine the accuracy of the statements. *In re VeriFone Sec. Litig.*, 11 F.3d 865, 870 (9th Cir. 1993) (*citing Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992)). This argument thus fails as to Statement 64, which was made on November 8, 2022.

Plaintiff also argues that since the FDA inspection of Outset's facilities ended on February 10, 2023, and Defendants made Statement 65 on February 13, 2023, (and repeated it on April 13, 2023) and Statement 66 on May 3, 2023, Defendants knew that TabloCart was a medical device when they made Statements 65 and 66. Compl. ¶ 53. Here, Plaintiff has established an inference that by March 3, 2023, Defendants had learned the FDA believed TabloCart required FDA clearance. *See infra* Part III.B.2.e. As a result, Statement 65 was false when it was made on April 13, 2023, and Statement 66 was false when it was made on May 3, 2023.

The Court finds that Plaintiff has not adequately pled that Statement 64 was false or misleading when made, but has adequately pled that Statements 65–66 were false or misleading when made.

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

47

United States District Court
Northern District of California

e.      **FDA Statements (Statements 39(a) and 67–86)**

Defendants made Statements 39(a) and 67–86 to investors between July 2023 and May 2024.  Plaintiff alleges these statements were false or misleading because they "significantly downplayed and misrepresented the FDA's findings, Outset's pervasive off-label marketing, the Company's internal reaction and changes to its marketing practices, and the impact on the Company and sales of Tablo."  Compl. ¶ 261.  The Court analyzes each of the four alleged misrepresentations in turn.

i.      **Puffery or Opinion**

Defendants argue that Statements 69, 73, 76, 81, 84, and 86 are "textbook puffery or opinion."  Mot. at 24.

To reiterate, corporate puffery involves a statement of opinion that is not capable of objective verification.  *Macomb Cnty. Employees' Ret. Sys.*, 39 F.4th at 1098–99; *see also supra* Parts III.B.1.b.i, III.B.1.c.i.  In Statement 84, Defendant Trigg said that when TabloCart was back on the market, "we expect it to be nicely adopted."  Compl. ¶ 249.  It is not clear how one would measure whether something has been "nicely adopted."  Statement 84 is classic puffery.  Statement 86 does contain some puffery: Defendant Trigg described TabloCart's clearance as "putting wind in the sales [*sic*] of Tablo again."  Compl. ¶ 254.  But the sentence before that, in which Defendant Trigg claimed that "demand for Tablo . . . has never been higher," is not puffery: one could compare Tablo sales at different points to see if demand had, in fact, never been higher.  *Id*.  The Court finds that Statement 84 and part of Statement 86 are puffery.

Like puffery, "a sincere statement of pure opinion" is also not "an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).  The second half of Statement 69 ("we believe that our action plan has addressed this finding"), Statement 73, Statement 76 ("we feel that we have fully satisfied the FDA's concerns"), and Statement 81 all express Defendants' opinion that they were addressing or had addressed the FDA's concerns.  A statement of pure opinion can be actionable if the plaintiff shows that it was not sincerely held, but

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
48

Plaintiff has pled no such facts here.

In sum, the Court finds that portions of Statements 69 and 86 and all of Statements 73, 76, 81, and 84 are non-actionable puffery or opinion.

### ii. PSLRA Safe Harbor

Defendants contend that Statements 72, 77–80, 82, and 84 are non-actionable forward-looking statements protected by the PSLRA safe harbor. Since the Court has already found that Statement 84 is puffery, that statement is excluded from the analysis below.

As previously explained, *supra* Part III.B.1.b.ii, the safe harbor provides that "forward-looking statements" are not actionable if they are identified as such and accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement." *See* 15 U.S.C. § 78u–5(c)(1)(A)(i). A forward-looking statement is "any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer–Teamster Joint Council Pension Trust Fund*, 320 F.3d at 936.

Statements 72, 77, 79, and 82 are all wholly forward-looking statements. Statement 72 says, "[O]ur expectation is that . . . any Tablo orders that may defer will also come back once we get our 510(k) clearance." Compl. ¶ 217. Statement 77 predicts that business would "grow at a high-teens rate annually after 2024 as we . . . achieve TabloCart with pre-filtration clearance. . . you'll see more growth in the back half of the year." *Id.* ¶ 236. Statement 79 explained that growth would "accelerate to high teens" because Outset was "expecting approval on one of our products, TabloCart." *Id.* ¶ 242. And in Statement 82, Defendant Trigg characterized TabloCart's potential clearance as a "clear catalyst" for growth. *Id.* ¶ 247. These are all forward-looking statements about financial projections, future economic performance, and the assumptions underlying or related to financial projections and future economic performance.

Statements 78 and 80 are partially forward looking. Statement 78 begins by describing past performance, naming factors that affected sales in the previous quarter. *Id.* ¶ 238. But then it

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
49

United States District Court
Northern District of California

continues on to say, "We anticipate that the negative impacts from the Warning Letter and our distribution pause will continue through at least the end of 2023." *Id.* Statement 80 reports that Outset "remains in interactive review with the FDA," but then reported that the company "continue[s] to forecast sales of TabloCart with pre filtration resuming during the second-half of 2024" which would be a "positive catalyst." *Id.* ¶ 244. Only the second half of Statements 78 and 80 are forward looking.

The Court thus finds that Statement 72, Statement 77, the forward-looking portion of Statement 78, Statement 79, the forward-looking portion of Statement 80, and Statement 82 are forward looking. "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera Sec. Litig.*, 610 F.3d at 1112. Here, however, Defendants did not request judicial notice or incorporation by reference for the documents that contain any of Statements 72, 77, 78–80, or 82. Thus, the Court cannot determine whether these statements were accompanied by cautionary language. *See supra* Part III.B.1.b.ii. The PSLRA safe harbor may nonetheless protect these statements if "the plaintiff fails to prove that the forward-looking statement was made with actual knowledge . . .that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). Here, Plaintiff has failed to plead scienter for all of the forward-looking FDA statements. *See infra* Part III.B.2. Consequently, Statement 72, Statement 77, the forward-looking portion of Statement 78, Statement 79, the forward-looking portion of Statement 80, and Statement 82 are protected by PSLRA's safe harbor.

### iii.    Materially False or Misleading

Defendants also argue that the FDA Statements were not materially false. According to Defendants, they did not know that the end of off-label marketing, rather than the pause on TabloCart, had hurt Tablo sales until TabloCart came back on the market but Tablo sales failed to rebound.

### 1.    Alleged Misrepresentation of the FDA's Findings

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
50

United States District Court
Northern District of California

Plaintiff alleges that Defendants misrepresented the FDA's findings in the Warning Letter. Statements 67(a), 70, and 73 characterize the contents of the Warning Letter. The Court has already found Statement 73 to be non-actionable opinion, so the following analysis pertains to Statements 67(a) and 70.

First, Defendants say that the Warning Letter was public, so investors could "look at what it said and draw their own conclusions." Mot. at 20. The Court interprets this to be a truth-on-the-market defense. As explained earlier, *supra* Part III.B.1.a.ii., this defense excuses a defendant's failure to disclose material information where it was made available to the public by other sources "with a degree of intensity and credibility sufficient to effectively counterbalance any misleading impression created by the insider's one-sided representations." *Provenz*, 102 F.3d at 1493. It is ordinarily unavailable to defendants at the motion to dismiss stage. *See Bos. Ret. Sys.*, 2020 WL 4569846, at *6. Here, Defendants seem to believe that the Warning Letter informed the market of the truth, regardless of anything else Defendants might have said about the FDA's findings. But Defendants do not mount an argument that the Warning Letter sufficiently counterbalanced Defendants' own statements. Nor do they provide case law as guidance. As a result, the Court finds that Defendants did not meet their burden on this defense.

Second, Defendants maintain that Defendant Trigg did not misrepresent the Warning Letter. Mot. at 20. The Warning Letter stated that Outset was promoting Tablo for CRRT, which it was not cleared for, and that using Tablo for CRRT could be unsafe or ineffective. Bartlett Decl. Ex. 17 at 4. The letter also stated that TabloCart required FDA clearance. *Id.* at 2–3. Defendants believe that Defendant Trigg's statements were consistent with both aspects of the letter.

Statement 67(a) simply describes the Warning Letter. Compl. ¶ 205. It states that the letter "asserts that certain materials reviewed by the FDA and found on the Company's website promote [CRRT] for the Tablo" system, and that it "asserts that the TabloCart . . . requires prior 510(k) clearance." *Id.* This is consistent with the contents of the Warning Letter and is not misleading.

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
51

In Statement 70, Defendant Trigg said of the Warning Letter, "I want to emphasize that neither of these two additional observations pertain to safety, efficacy, or quality." *Id*. ¶ 215. The Warning Letter, however, stated that Tablo was not cleared for CRRT treatment, and that "[s]ystems that cannot safely and reliably perform CRRT raise serious public health concerns when used for CRRT treatment, because failure of dialysis systems performing CRRT may result in . . . patient harm/death." Bartlett Decl. Ex. 17 at 4. Nonetheless, Defendants argue that the Warning Letter did not "pertain to" safety issues because the letter did not find that Tablo actually was being used unsafely—just that it *would* be unsafe if it *were* used for CRRT. Mot. at 19. The Court finds that Plaintiff has the better argument. Though the Warning Letter did not say that Tablo was being used unsafely, its observations did "pertain to" safety—it noted that off-label use could harm or kill patients. Plaintiff has plausibly alleged that Statement 70 was false or misleading.

## 2.    Alleged Misrepresentation of Off-Label Marketing

Next, Plaintiff alleges that the FDA statements were false or misleading because they misrepresent "Outset's pervasive off-label marketing." *Id.* ¶ 261. "In truth," Plaintiff writes, "Outset's marketing [was] not limited to a few materials on Outset's website." *Id.*

The Court has identified references to the Warning Letter's admonition against off-label marketing in the first half of Statements 69 and 74 and Statement 76. Since the Court has already found Statement 76 to be non-actionable opinion, the Court excluded Statement 76 from the following analysis.

In Statement 69, Defendant Trigg described the FDA's concerns as "pertain[ing] to content on our website that referenced . . . CRRT, a modality not currently included in Tablo's indications for use." Compl. ¶ 214. In Statement 74, Defendant Trigg similarly noted that the Warning Letter had "some commentary about some customer testimonials on our website." *Id.* ¶ 222. The Warning Letter, for its part, stated, "the evidence reviewed at the inspection and marketing materials found on your website . . . show promotion of the Tablo Hemodialysis System for continuous renal replacement therapy (CRRT) treatment. For example, materials on your website

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
52

state that two large hospitals converted to a program consisting solely of the Tablo Hemodialysis System . . ." Bartlett Decl. Ex. 17 at 3. The statements said the Warning Letter expressed concern about off-label promotion on Outset's website, and that is exactly what the Warning Letter did. The statements were not false.

But Plaintiff argues that even if the statements were not technically false, they were nonetheless misleading because the FDA mentioned the website as a mere "example" of the promotion of Tablo for CRRT. Opp. at 19. Plaintiff seems to infer that evidence found at inspection in San Jose alerted the FDA to a broader off-label marketing scheme. To avoid misleading investors, Plaintiff insists, Defendants should have disclosed that the FDA's concerns derived not just from the website but from "evidence reviewed at the inspection."

The parties disagree over whether a defendant misleads investors when she discloses some—but not all—negative information. Plaintiff analogizes to *Pardi v. Tricida*, *Inc.*, in which the court found that disclosing positive information while withholding negative information misled investors. 2022 WL 3018144, at *13 (N.D. Cal. Jul. 29, 2022). Defendants distinguish that case, arguing that here, Defendant Trigg disclosed negative information about the website. To be sure, Rule 10b-5 does not contain "a freestanding completeness requirement." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). To survive a motion to dismiss under the standards of the PSLRA, a plaintiff's complaint "must specify the reason or reasons why the statements . . . were misleading or untrue, not simply why the statements were incomplete." *Id.*

Here, Plaintiff argues that the statements were incomplete because they do not disclose that the FDA offered the website as a mere example of the agency's broader concern about the off-label marketing of Tablo. And Plaintiff submits that the statements were misleading because they would have given investors the impression that the FDA only found off-label marketing on the website, when in fact they also found it on-site in San Jose. Opp. at 19. The Court agrees. The information that Outset did provide—that the FDA had found a few CRRT testimonials on Outset's website—would not put an investor on notice of a potentially more serious issue: that the

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
53

FDA had found evidence of off-label marketing during the on-site inspection. *Cf. Brody*, 280 F.3d at 1007 (finding that the information provided was consistent with the information omitted, and that it would have put the investor on notice).

Thus, the Court finds that Plaintiff has adequately pled that the first half of Statements 69 and 74 were misleading.

### 3.    Alleged Misrepresentation of Outset's Internal Reaction and Changes to Marketing Practices

In Statement 67(b), portions of Statement 73, and Statement 81, Defendants told investors that they had responded to the Warning Letter by removing references to CRRT from Outset's website and filing a 510(k) application for TabloCart. Because the Court has already found Statements 73 and 81 to be non-actionable opinion, the Court confines its analysis to Statement 67(b).

Statement 67(b) describes Outset's plan to "fully cooperate with the FDA, including by responding within 15 business days, to expeditiously and completely resolve the Warning Letter." Compl. ¶ 207. Plaintiff contends that this statement misled investors because it failed to mention that Outset also sent a company-wide email and held a company-wide call instructing employees to cease marketing Tablo for CRRT and to remove references to CRRT from marketing materials. Opp. at 18 (citing Compl. ¶ 71). But Statement 67(b) promises to "completely resolve" the Warning Letter. That broad statement could include any number of actions, including, but not limited to, updating the website and seeking approval for TabloCart. Statement 67(b) was not false or misleading.

### 4.    Alleged Misrepresentation of the Impact on the Company and Sales of Tablo

In Statements 68; 71–72; the second half of Statement 74; and Statements 75, 77–80, and 82–86, Defendants claimed that Tablo sales were slow because customers wanted to purchase Tablo and TabloCart together, and/or that the problems raised by the FDA letter were taken care of. The Court has already found Statement 84 and the second half of Statement 86 to be puffery. *See supra* Part III.B.1.e.i. The Court has also found that Statement 72, Statement 77, the forward-

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
54

looking portion of Statement 78, Statement 79, the forward-looking portion of Statement 80, and Statement 82 are protected by PSLRA's safe harbor. *See supra* Part III.B.1.e.ii. The following analysis thus applies to Statements 68 and 71; the second half of Statement 74; Statement 75; a portion of Statement 78; the non-forward-looking portion of Statement 80; Statements 81, 83 and 85; and the first half of Statement 86.

It is not clear why Plaintiff believes Statement 68 is false or misleading. Statement 68(a) simply says that the Company changed the name of the Tablo XT software to Tablo Pro+. This seems to be a simple statement of fact, and is thus not false or misleading. And in Statement 68(b), Defendant Ahmed says that Tablo Pro+ was in a "substantial majority of our acute consoles." Compl. ¶ 213. Plaintiff does not mount any argument as to why this claim was false or misleading. As a result, the Court finds that Plaintiff has not pled falsity as to this statement.

In the remaining statements, Defendants said or implied that once TabloCart received 510(k) clearance, Tablo sales would rebound. *See, e.g.,* Compl. ¶¶ 216 ("if there are any new customers in these really bad water areas, they might choose to push back their console purchase until TabloCart is available"), 217 ("[O]ur expectation is that . . . Tablo orders that may defer will also come back once we get our 510(k) clearance"), 254 ("[w]ith our most challenging recent headwind now behind us with the FDA clearance of TabloCart, demand for Tablo that has never been higher."). Of course, this did not happen: in the first quarter after TabloCart was cleared, Outset missed consensus estimates for that quarter and significantly lowered guidance for fiscal year 2024. Compl. ¶ 15.

Plaintiff alleges that these statements were false or misleading because "it was the change in marketing strategy"—halting the off-label marketing of Tablo for CRRT—"that impacted the company's financial results and demand for Tablo, not the temporary shipment pause on TabloCart." *Id*. ¶ 261. Defendants argue that Plaintiff is alleging fraud by hindsight. Mot. at 20–21. According to Defendants, they genuinely believed that TabloCart's pause had depressed sales of Tablo. *Id.* Only when TabloCart went back on the market and sales failed to recover did Defendants realize that the problem might lie elsewhere. *Id*. Plaintiff rejects this notion,

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
55

contending that Defendants knew all along that it was "pervasive off-label marketing," not the TabloCart, that had been creating demand for Tablo.  Opp. at 19 n.17.

A projection or statement of belief may be actionable under the federal securities laws to the extent that one of three implied factual assertions is inaccurate: "(1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir. 1992).  The Court has already accepted Plaintiff's inference that a significant portion of acute facilities purchased Tablo for CRRT.  *See supra* Part III.B.1.b.iii.  But here, Plaintiff wants the Court to further infer Defendants knew a significant portion of Tablo purchases were for CRRT.  Though a 12(b)(6) motion requires a court to draw all inferences in favor of the plaintiff, *Retail Prop. Trust*, 768 F.3d at 945, here, Plaintiff has not pled adequate facts for the Court to infer that Defendants knew a significant portion of Tablo purchases were for CRRT, and thus that sales would not rebound when TabloCart returned to the market.  Statement 71; the second half of Statement 74; Statement 75; the non-forward-looking portion of Statement 80; and Statement 81 are all projections or statements of belief, and Plaintiff has failed to plead that the speaker did not genuinely or reasonably believe those statements.  They cannot form the basis of a Securities Act claim.

The first half of Statement 78, Statement 83, Statement 85, and the first half of Statement 86, however, are not projections or statements of belief.  Statements 78 and 83 describe then-current sales.  In Statement 78, Outset explained slower sales: "We observed more customers than we anticipated choosing to defer their Tablo console purchasing and installation until TabloCart with Prefiltration becomes available again."  Compl. ¶ 238.  In Statement 83, Defendant Ahmed stated that customers "are still very much in our pipeline.  They are still very much waiting for [Tablo]Cart.  What we're really pleased with is that nobody has dropped out.  Nobody has said, look, I don't want the product anymore."  *Id.* ¶ 248.  Plaintiff has not offered sufficient facts to indicate that either statement is false.  With respect to Statement 78, Plaintiff would need to plead facts showing that the same or fewer customers than expected were deferring their Tablo purchase

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

until TabloCart became available again.  And with respect to statement 83, Plaintiff would need to offer facts indicating that customers in the "pipeline" had changed their minds about their purchase.  Plaintiff does not do so.

In Statement 85, Outset informed the market that the FDA had granted 510(k) clearance of TabloCart, and "Outset has resumed distribution of TabloCart with prefiltration." *Id.* ¶ 250.  The FDA did grant 510(k) clearance of TabloCart, so this statement is not false.

Finally, in Statement 86, Defendant Trigg claimed that following the FDA's clearance of TabloCart, "demand for Tablo . . . has never been higher." *Id*. ¶ 254.  Since Outset missed consensus estimates in the first quarter after TabloCart returned to market, this statement is plausibly false. *Id.* ¶ 15.

The Court thus finds that Plaintiff has adequately pled that Statement 86 is false.

\*\*\*

To summarize, the Court finds that of the FDA statements, Plaintiff has adequately pleaded that the first half of Statement 69, all of Statement 70, the first half of both Statement 74 and 86 were false or misleading.  Plaintiff has failed to plead that any of the other FDA statements were false or misleading.

### 2.     Scienter

To survive a motion to dismiss, a complaint must also create a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2) ("[T]he complaint shall ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.").  This means that the "inference of scienter ... must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).  In other words, courts ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Webb v. Solarcity Corp.*, 884 F.3d 844, 850 (9th Cir. 2018).  A plaintiff can meet this standard by alleging facts demonstrating an "intent to deceive, manipulate, or defraud" or "deliberate recklessness." *Id.* at 851 (quoting *In re Quality Sys.*, 865 F.3d at 1144).  "An actor is deliberately

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
57

United States District Court
Northern District of California

reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *Reese*, 747 F.3d at 569 (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010)).

Here, Plaintiff asserts a core operations theory of scienter against Defendants Trigg, Chambers, and Ahmed. Plaintiff argues that other allegations in the complaint also give rise to or strengthen the inference of scienter. Finally, Plaintiff contends that Individual Defendants' stock sales give rise to an inference of scienter.

### a.    Core Operations

Under the core operations theory of scienter, "[a]llegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may [ ] create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)). Plaintiff argues that the core operations theory establishes scienter here because (1) Tablo was a core operation of Outset, and (2) Defendants Trigg, Chambers, and Ahmed were aware that Outset was marketing Tablo for CRRT.

The first prong is clearly met. In public filings and through the Individual Defendants, Outset repeatedly affirmed that Tablo sales were central to the company's success. For instance, in every Form 10-K filed during the Class Period, Outset stated that it "derive[s] substantially all of [its] revenue from the sale of Tablo and associated consumables and [is] therefore highly dependent on Tablo for [its] success." Compl. ¶ 296. Moreover, Defendants do not contest that Tablo sales were a core operation; they merely argue that that fact alone does not create an inference of scienter. Mot. at 28. Accordingly, the Court finds that Tablo was a core part of Outset's business.

The main disagreement between the parties is over the second prong: whether Defendants

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
58

United States District Court
Northern District of California

Trigg, Chambers, and Ahmed were aware that Outset was marketing Tablo for CRRT. Plaintiff claims that they were because they "signed SEC filings, led analyst calls, and repeatedly discussed Outset's revenue drivers," Opp. at 22–23, and because they "directly participated in the management of the company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to information regarding Tablo and Outset's marketing and promotion of Tablo," Compl. ¶ 299. But this is not a "detailed and specific allegation[]" about the Individual Defendants' "exposure to factual information within the company." *City of Dearborn Heights*, 856 F.3d at 620. These general allegations do not establish scienter as to any of the Individual Defendants.

Plaintiff does offer more specific allegations with respect to Defendant Trigg. Confidential Witness 4, the President and CEO of a large healthcare system, describes discussing Tablo with Defendant Trigg and receiving an in-person visit from Defendant Trigg at CW 4's healthcare system. Compl. ¶ 291. CW 10, a former director at Outset, described Defendant Trigg as a "customer-focused CEO" who would say "let's go walk a patient floor" or who enjoyed attending big meetings. *Id.* ¶ 290. Finally, Plaintiff points to Defendant Trigg's own comments. At one healthcare conference, Defendant Trigg said she "tend[ed] to go" to later-stage sales meetings with hospitals where Tablo's "really nice ROI tool" would be discussed because "I know they're going to go really well." *Id.* ¶ 292. She also stated that she has "spent a lot of time in the field." *Id*. ¶ 293.

There are two inferences that one could draw from this set of facts. Plaintiff argues that because Defendant Trigg was occasionally involved in marketing activities for Tablo, she must have been aware that Tablo was being marketed for CRRT. Resisting this conclusion, Defendants counter that none of these facts suggest that "she knew—or should have known—how rank-and-file sales staff were trained, whether they engaged in off-label marketing, or whether that marketing led to actual sales." Reply at 15. The Court finds Defendants' argument more persuasive. Defendant Trigg visited hospitals that had purchased Tablo. But even if Defendant Trigg saw hospitals using Tablo for CRRT, that would not put her on notice of an off-label

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
59

United States District Court
Northern District of California

marketing scheme: off-label use, without off-label marketing, is perfectly legal. Plaintiff also pleads that Defendant Trigg enjoyed attending late-stage sales meetings. But Plaintiff does not plead that Outset marketed Tablo for CRRT at those meetings—just that that the parties discussed how much money the hospital would save. Compl. ¶ 292. On these allegations, the Court cannot infer that Defendant Trigg was aware of the off-label marketing scheme.[3]

Though Plaintiff fails to allege particularized facts establishing scienter, the analysis does not end there. In rare circumstances, core operations allegations may suffice to establish scienter even without accompanying particularized allegations "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *Reese v. Malone*, 747 F.3d 557, 576 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017). Plaintiff argues that it would be absurd to suggest that the Individual Defendants did not know that Tablo was being marketed for CRRT. As the argument goes, off-label marketing was critical to Tablo's success, and Tablo's success was critical to Outset's business, so the Individual Defendants must have known about the off-label marketing.

This argument misses the mark. The parties agree that Tablo was critical to Outset's success, and the Court has found that Plaintiff has adequately alleged a significant portion of acute facilities were using Tablo for CRRT. *See supra* Part III.B.1.b.iii. Plaintiff alleges that this was because the Chief Medical Officer and the Senior Vice President of Global Sales were directing an off-label marketing scheme. Compl. ¶ 63. But that fact alone is not enough to have put the CEO and CFOs on notice of the scheme. Other courts have required much more when considering whether a corporate officer was on notice under the core operations doctrine. In *Corcept II*, for instance, the court found it absurd to suggest that the defendants were not aware of the off-label marketing scheme when they themselves participated in sales calls and oversaw sales staff

---

[3] This argument overlaps with the theory of scienter that Plaintiff presents on page 25 of the Opposition—that Defendant Trigg was directly involved with the sales and marketing of Tablo, and her involvement demonstrates scienter. Opp. at 25. The Court rejects that argument for the same reasons.

United States District Court
Northern District of California

education. 2021 WL 3748325, at *23–24. Here, Plaintiff does not allege that the CEO or CFOs participated in the scheme. And in *Mulligan v. Impax Lab'ys, Inc*, the court found it absurd to suggest that the defendants were unaware of multiple Form 483s and FDA warning letters. 36 F. Supp. 3d 942, 969 (N.D. Cal. 2014). Here, Plaintiff claims that the marketing scheme was prominent within Outset before the Warning Letter arrived. The facts here do not establish that the marketing scheme was prominent within the company.

In sum, the core operations doctrine does not establish scienter as to any of the Individual Defendants.

### b.    Witness Accounts

The Court has already found that the CW accounts credibly allege an off-label marketing scheme. *See supra* Part III.B.1.a.i. Now, Plaintiff contends that these accounts also establish scienter. Opp. at 26. As the argument goes, at the very same time that the Individual Defendants were "downplay[ing] the off-label issues and falsely attribut[ing] repeated revenue downgrades to a temporary TabloCart shipment pause," they were rushing to dismantle the off-label marketing scheme. *Id.* From these facts, Plaintiff infers that the Individual Defendants knew about the marketing scheme. But, as explained above, Plaintiff has not offered facts indicating that the Individual Defendants were aware of the scheme that the CWs describe. *See supra* Part III.B.2.a. As a result, the Court does not find scienter on these grounds.

### c.    Responses to FDA Investigation

Next, Plaintiff alleges that the FDA statements, specifically, were made with scienter. The Court analyzes this argument only with respect to the FDA statements that remain at issue: the first half of Statement 69, all of Statement 70, and the first half of both Statement 74 and 86—all of which were made by Defendant Trigg. *See supra* Part III.B.1.e.iii.4.

In the first half of Statement 69, Statement 70, and the first half of Statement 74, Defendant Trigg describes the Warning Letter as having an issue with off-label marketing on the website, failing to disclose that the website was just one "example" of off-label marketing. *Id.* Plaintiff argues that these statements were made with scienter because Defendant Trigg had the

United States District Court
Northern District of California

Warning Letter and knew what it said, yet she described it inaccurately.  Opp. at 28 (citing *Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) (scienter adequately pled where defendants had access to reports or statements containing contrary facts)).  From this, Plaintiff infers that she intended to downplay the contents of the Warning Letter.  Defendants counter that knowing information is not the same as intending to deceive investors by withholding it.  Reply at 17 (citing *Colyer v. AcelRx Pharms., Inc.*, 2015 WL 7566809, at *13 (N.D. Cal. Nov. 25, 2015)).  Plaintiff's inference is more compelling: it was at the very least deliberately reckless of Defendant Trigg not to describe the Warning Letter in full.  The Court finds that Plaintiff has adequately pled scienter as to the first half of Statement 69, Statement 70, and the first half of Statement 74.

In the first half of Statement 86, Defendant Trigg declared—upon TabloCart receiving clearance—that "demand for Tablo has never been higher." Compl. ¶ 254.  The next day, however, Outset filed its Q1 2024 Form 10-Q with the SEC.  *Id.* ¶ 255.  It cautioned that "if we are unable to sufficiently recover from [the Warning Letter] . . . we may experience further disruptions which could include adverse impacts on our backlog, our ability to expand customer relationships or attract new customers, as well as reduced demand for . . . Tablo." *Id*. ¶ 256.  Plaintiff argues that the speed with which Defendants reversed course supports scienter.  The Court agrees.  Defendant Trigg said demand had never been higher, and a day later the 10-Q warned that Outset may not recover from the Warning Letter.  Those two statements are not compatible.  This creates an inference that Defendant Trigg knew her statement was false or misleading.  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 n.5 (9th Cir. 2008) (SEC disclosure two weeks after a misleading statement "bolsters the inference" that defendants had knowledge when they made the statement).  The Court thus finds Plaintiff has adequately pled scienter as to the first half of Statement 86.

          **d.**       **Knowledge of Lack of FDA Clearance, Touting of Value Proposition Marketing, and Violation of Company Policy**

Plaintiff also contends that since Defendants knew the FDA had not cleared Tablo for

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
62

CRRT, touted the "value proposition" strategy, and promoted Tablo for off-label use despite company policy prohibiting off-label promotion, they must have known their statements were false. Compl. ¶¶ 90–92, 305–06; Opp. at 29–30. That is, because Defendants allegedly violated FDA rules and company policies against off-label promotion, they must have known they were violating FDA rules and company policies against off-label promotion.

The cases Plaintiff cites are inapposite. In *In re Daou Sys., Inc.*, 411 F.3d 1006, 1023 (9th Cir. 2005), the plaintiffs alleged with specificity that top executives directed the fraud; here, there is no such specific allegation. And *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1033 (C.D. Cal. 2008) does not establish a general rule. Rather, that case followed the proposition that scienter can be inferred when "major transactions or core information" are at issue, with the critical caveat that a court must "examine[] the specific facts of the case to determine the strength of the inference." *In re Ramp Networks, Inc. Sec.*, 201 F. Supp. 2d 1051, 1076 (N.D. Cal. 2002).

The Court finds the specific facts here insufficient for such a finding. Plaintiff's argument assumes knowledge—the very thing Plaintiff must plead.

### e.     Stock Sales

Finally, Plaintiff alleges that the Individual Defendants' stock sales during the Class Period create a strong inference of scienter. The Individual Defendants made these sales pursuant to Rule 10b5-1 trading plans, which may not be used to support an inference of scienter unless the defendant adopted the plan after the motive and opportunity to mislead investors allegedly arose. *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008); *Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 756 F. Supp. 3d 852, 877 (S.D. Cal. 2024).

A reminder of the timeline of events is useful here. Between March 25, 2021, and June 24, 2021, Defendant Chambers sold 66,908 shares of stock. Compl. ¶ 317. Almost two years later, "[n]o later than January 17, 2023," the FDA began its inspection. *Id.* ¶ 8. On January 27, Defendant Ahmed made his largest sale of stock during the Class Period. *Id.* ¶ 318. On February 10, the inspection ended. *Id.* ¶ 57. On February 13, Outset disclosed the FDA's inspection observations to the market in its Form 10-K; those disclosures centered on a failure to timely

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
63

United States District Court
Northern District of California

report adverse events and route customer complaints to the formal investigation system. Bartlett Decl. Ex. 5 at 13. On February 17, Defendant Ahmed adopted a revised Rule 10b5-1 trading plan. *Id.* ¶ 319. On February 23, Defendant Trigg updated her trading plan. *Id.* ¶ 314. On March 1, Defendant Trigg sold 30,000 shares of stock. *Id*. ¶ 313. On March 3, Outset sent a response letter to the FDA. Bartlett Decl. Ex. 17. On March 13, the FDA had a teleconference with Outset and discussed that Tablo was not cleared for CRRT. Compl. ¶ 8. Between May 3 and July 3, Defendant Trigg sold 82,962 shares of stock. *Id*. ¶ 313. Between May 3 and September 1, Defendant Ahmed sold 7,502 shares of stock. *Id.* ¶ 319. On July 5, 2023, the FDA issued the Warning Letter.

Defendants Trigg, Ahmed, and Chambers were under trading plans from the beginning of the Class Period. Plaintiff seems to believe that all three knew about the off-label marketing scheme from the beginning of the Class Period, and thus trades under those earlier plans may be used to support the inference of scienter. But Plaintiff has not alleged sufficient facts to support the inference that any of the Individual Defendants possessed material non-public information during that period. *See supra* Part III.B.2.a–d. As a result, the Court will not consider trades made under those plans. This eliminates Defendant Chambers from the analysis. It also eliminates the stock sale Defendant Ahmed made on January 27, 2023—his largest of the class period. *Id.* ¶ 318.

Defendants Ahmed and Trigg, however, adopted new plans on February 17, 2023, and February 23, 2023, respectively—soon after the FDA inspection ended. The question is whether Defendants Ahmed and Trigg had material non-public information about the FDA inspection when they adopted those plans.

Plaintiff argues that they did. On February 13, Outset disclosed the FDA's inspection observations to the market in its Form 10-K, but the disclosure did not say that the FDA had observed off-label marketing or that TabloCart required FDA approval. *See* Bartlett Decl. Ex. 5 at 13. On March 3, Outset sent a letter to the FDA addressing the investigator's observations. Bartlett Decl. Ex. 17 at 2. It is not clear whether the letter addressed off-label marketing, either.

United States District Court
Northern District of California

But the July 5 Warning Letter offers a clue: it says "[w]e address this response below, in relation to each of the noted violations"—and then continues on to discuss the alleged off-label marketing and the need to receive clearance for the TabloCart. *Id.* at 1. From this information, Plaintiff infers that Outset's March 3 letter responded to concerns about off-label marketing and the TabloCart needing FDA clearance. A 12(b)(6) motion requires a court to draw all inferences in favor of the plaintiff, *Retail Prop. Trust*, 768 F.3d at 945, so the Court accepts this inference.

But that inference still leaves a gap in Plaintiff's timeline. Even if, by March 3, Defendants knew that the FDA had concerns about off-label marketing, that does not answer whether Defendants Ahmed and Trigg knew about the FDA's concerns by February 17 and February 23, respectively, when they adopted their new trading plans. Plaintiff has not pled facts to support this further inference. Consequently, the Court accepts Defendants' competing inference: that Defendants Ahmed and Trigg adopted their new trading plans in response to the inspection observations that Outset disclosed to the public days earlier.

Plaintiff has not provided sufficient facts to infer that Defendants Ahmed and Trigg possessed material non-public information when they adopted their trading plans. As a result, the Court does not reach the *In re Silicon Graphics* test for whether the sales give rise to an inference of scienter. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999).

### i.    Scienter as to TabloCart Statements

Those same facts do, however, adequately plead that Defendants made Statements 65 and 66 with scienter. In its February 13, 2023, FY 2022 10-K and its April 13, 2023, proxy statement, Outset described TabloCart as a "non-medical accessory." Compl. ¶¶ 189–90. And during a May 3, 2023, earnings call, Defendant Trigg described TabloCart as a "new product accessory." *Id.* ¶ 193. The Court has already accepted the inference that Outset's March 3, 2023, letter acknowledged the FDA's concerns about TabloCart needing FDA clearance. That would mean that on April 13 and May 3, 2023, when Defendant Outset and Defendant Trigg described TabloCart as a medical accessory, they plausibly knew those statements were false. The Court thus finds Plaintiff adequately pled scienter as to Statement 65 (made on April 13, 2023) and

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
65

Case 5:24-cv-06124-EJD   Document 79   Filed 03/30/26   Page 66 of 71

Statement 66.

###### f.   Holistic Analysis

The Supreme Court has emphasized that courts must review all the allegations holistically when determining whether scienter has been sufficiently pled. *Tellabs*, 551 U.S. at 323. That means that even "a series of less precise allegations" may be "read together to meet the PSLRA requirement." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Even then, however, the inference of scienter must still be "at least as compelling as an alternative innocent explanation." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1006 (9th Cir. 2009), *as amended* (Feb. 10, 2009).

Here, Plaintiff has adequately pled scienter as to the first half of Statement 69, Statement 70, and the first half of both Statement 74 and Statement 86. Defendant Trigg made Statements 69 and 70 on August 2, 2023, and Statement 74 on September 12, 2023; these statements misrepresent the contents of the FDA letter. But because these statements only spoke to the contents of the FDA letter, scienter here does not strengthen the inference proposed by the CW accounts that the Individual Defendants knew about a long-running off-label marketing scheme. Defendant Trigg made Statement 86 on May 8, 2024; this statement says that demand for Tablo had never been higher—a statement that Outset contradicted a day later when it warned that it may not recover from the Warning Letter. But it would be unreasonable to project the inference of scienter here backward onto statements made months or years earlier.

*** 

In sum, Defendant Trigg's responses to the FDA investigation establish a strong inference of scienter as to the first half of Statement 69, Statement 70, and the first half of both Statement 74 and Statement 86. And Outset's March 3, 2023, letter creates a strong inference of scienter as to Statements 65 and 66. Plaintiff has failed to plead scienter as to the remaining statements.

###### 3.   Loss Causation

To satisfy the loss causation requirement, a plaintiff must allege that defendant's misstatements, as opposed to some intervening event, caused the loss for which the plaintiff seeks

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

United States District Court
Northern District of California

to recover damages.  15 U.S.C. § 78u-4(b)(4); *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–44 (2005).  "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'"  *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014)).  In the Ninth Circuit, however, there are many other ways to meet the pleading standard.  Loss causation is simply a variant of proximate cause, so "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss."  *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (citations omitted).

Because Plaintiff has adequately pleaded falsity and scienter only as to Statements 65 (made on April 13, 2023), 66, 69, 70, 74, and 86, the Court only analyzes whether the corrective disclosures corrected the alleged falsity in those statements.  Plaintiff alleges that there were six corrective disclosures: on July 7, 2023, ¶¶ 205, 209; August 2, 2023, ¶ 210; October 12, 2023, ¶¶ 225–30; November 7–8, 2023, ¶ 233–34; May 9, 2024, ¶ 256; and August 7, 2024, ¶¶ 267–68.  The July 7, 2023, Form 8-K revealed that the Warning Letter observed the off-label marketing of Tablo and the need for FDA clearance for TabloCart.  Compl. ¶ 205.  The August 2, 2023, press release stated that Outset was pausing shipment of TabloCart and lowering revenue expectations due to the Warning Letter.  *Id*. ¶ 184(a).  The October 12, 2023, press release and earnings call noted a larger-than-expected impact from the warning letter.  *Id.* ¶¶ 225–30.  In its November 8, 2023, 10-Q, Outset discussed "several factors" that were reducing revenue, including "the recent Warning letter and our distribution pause on TabloCart with prefiltration."  Compl. ¶ 329(d).  Similarly, the May 9, 2024, 10-Q, stated that Outset "may continue to experience disruptions as a result of the warning letter and our prior distribution pause on TabloCart."  Compl. ¶ 329(e).  Finally, on August 7, 2024, Outset released its financial results for the second quarter of 2024—the first quarter after which TabloCart was back on the market.  The release reported disappointing results, revised revenue projections downward, and said that "new console placements were below

our expectations." *Id.* ¶ 267.

Statements 65, made on April 13, 2023, and 66, made on May 3, 2023, described TabloCart as a "non-medical accessory" or a "product accessory," when in fact it was a medical device that required FDA clearance. Defendants admit that the July 7, August 2, and October 12 statements disclosed that (1) the FDA had identified off-label promotional conduct, (2) the FDA had found that TabloCart is a device not an accessory and that Outset had determined to halt sales of Tablo Cart while it sought FDA clearance, and (3) Outset's revenue was negatively impacted to a degree greater than expected by the FDA Warning Letter. Mot. at 34. These statements are thus corrective disclosures for Statements 65 and 66, and Plaintiff has adequately pled loss causation.

Statements 69, 70, and 74 misrepresented the content of the Warning Letter by implying that the FDA's concerns about off-label marketing were limited to Outset's website. The July 7, 2023, disclosure predated Statements 69, 70, and 74, and cannot serve as a corrective disclosure. The August 2, 2023; October 12, 2023; November 8, 2023; and May 9, 2024, disclosures, meanwhile, do not correct the misconception made by Statements 69, 70, and 74: they state that the warning letter was affecting sales, but they do not clarify the contents of the warning letter. Consequently, the August 2, October 12, November 8, and May 9 disclosures did not correct Statements 69, 70, or 74.

Statement 86, made on May 8, 2024, misrepresented demand for Tablo, claiming that demand had never been higher. The May 9, 2024, and August 7, 2024, disclosures, however, revealed that demand for Tablo was not, in fact, as high as promised. As Defendants would have it, these statements "at most merely reaffirm information that the market already had." Mot. at 34. But the other four corrective disclosures predate Statement 86. As a result, the Court finds that the May 9, 2024, and August 7, 2024, disclosures corrected Statement 86.

*** 

To summarize, the Court finds that the July 7, 2023; August 2, 2023; and October 12, 2023, disclosures corrected the falsity of Statements 65 and 66. The July 7, 2023, disclosure, however, predates Statements 69, 70, and 74, and thus was not a corrective disclosure as to those

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
68

United States District Court
Northern District of California

statements.  The August 2, 2023; October 12, 2023; November 8, 2023; and May 9, 2024, disclosures only spoke in general terms about the Warning Letter, and thus did not correct the misconception created by Statements 69, 70, or 74.  But the May 9, 2024, and August 7, 2024, disclosures did correct the falsehood in Statement 86.  Plaintiff successfully pleaded falsity, scienter, and loss causation for Statements 65, 66, and 86.

## IV.    CONTROL PERSON LIABILITY UNDER SECTION 20(A) OF THE EXCHANGE ACT

Section 20(a) of the Securities Exchange Act of 1934 establishes control person liability. To state a claim against a defendant under Section 20(a), a plaintiff "must show that a primary violation was committed and that the defendant 'directly or indirectly' controlled the violator." *In re Tesla, Inc. Sec. Litig.*, 477 F. Supp. 3d 903, 935 (N.D. Cal. 2020) (citing *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996)).

Here, Plaintiff has pled a primary violation under Section 10(b) and Rule 10b-5 based on Statements 65 (made by Outset), 66 (made by Defendant Trigg), and 86 (made by Defendant Trigg).

Defendant Trigg made Statement 66 on May 3, 2023, and Statement 86 on May 8, 2024, when Defendant Ahmed was CFO.  Compl. ¶ 254.  But Plaintiff does not allege that Defendant Ahmed controlled Defendant Trigg at any time, including when she made Statements 66 and 86. Plaintiff has not established control person liability for these statements.

Defendant Outset made Statement 65 in a written proxy statement on April 13, 2023, when Defendant Trigg was CEO and Defendant Ahmed was CFO.  Defendants raise a number of arguments regarding control person liability: that it does not extend to oral statements, that there are insufficient allegations that Defendant Trigg controlled Defendant Ahmed or vice versa, and that Defendant Ahmed did not serve as CFO for the entire Class Period.  Mot. at 35.  None of those arguments are relevant here: the proxy was a written statement, made while Defendant Ahmed was CFO, and the issue is not whether Defendants Ahmed and Trigg controlled each other but rather whether they controlled Outset.  The burden is on Defendants Ahmed and Trigg to show

United States District Court
Northern District of California

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT

that they "acted in good faith and did not directly or indirectly induce the violations." *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990).  Here, Defendants have not done so.

Plaintiff has adequately pled control person liability for Defendants Trigg and Ahmed as to Statement 65.

## V.    CONCLUSION

To summarize, the Court has found that Plaintiff failed to plead falsity as to the following statements: a portion of Statement 5; Statements 6, 9, 10, 13–14, and 17; the forward-looking portion of Statement 21; Statements 22, 26(b), 27–29, 30(b), 35(b), 38(a)–(b), 40, 42(b)–(c), and 46(b); the first portion of Statement 49; Statements 54, 56, 60, 61, 62, 63, 64, 67(b), 69, 72–73, and 76–77; the forward-looking portion of Statement 78; Statement 79; the forward-looking portion of Statement 80; Statements 81–82 and 84; and a portion of Statement 86.  The claims are **DISMISSED** insofar as they are based on these statements.  Dismissal is with **LEAVE TO AMEND**, though the Court is highly skeptical that any additional facts will cure the defects of the statements the Court found to be puffery.  *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (the "court should grant leave to amend . . . unless it determines that the pleading could not possibly be cured by the allegation of other facts.").

Next, the Court found that Plaintiff failed to plead scienter as to all the remaining statements except Statements 65–66, 69–70, 74, and 86.  The Court **DISMISSES** the claims for failure to plead scienter insofar as the claims are based on those remaining statements.  Dismissal is with **LEAVE TO AMEND**.

Finally, the Court found that Plaintiff failed to plead loss causation for Statements 69–70 and 74, but adequately pled loss causation for Statements 65–66 and 86.  The Court **DISMISSES** the claims for failure to plead loss causation insofar as the claims are based on Statements 69–70 and 74.

Since Plaintiff adequately pled falsity, scienter, and loss causation for Statements 65–66 and 86; the Section 10(b) and Rule 10b-5 claim may **PROCEED** on those bases.  The Section 20(a) claim may **PROCEED** insofar as it is based on Statement 65.

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
70

If Plaintiff intends to file an amended complaint, Plaintiff shall do so within **twenty-one (21) days of this order.**

**IT IS SO ORDERED.**

Dated: March 30, 2026

_____
EDWARD J. DAVILA
United States District Judge

Case No.: 24-cv-06124-EJD
ORDER GRANTING IN PART MOTION TO DISMISS CONSOLIDATED COMPLAINT
71