Nicole Lavallee (SBN 165755)
Kristin Moody (SBN 206326)
Alexander S. Vahdat (SBN 284963)
**BERMAN TABACCO**
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
       kmoody@bernantabacco.con
       avahdat@bermantabacco.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE OUTSET MEDICAL, INC. SECURITIES LITIGATION | ) Case No. 5:24-cv-06124-EJD |
| | ) **CLASS ACTION** |
| | ) |
| | ) **AMENDED CONSOLIDATED** |
| This Document Relates to: | ) **COMPLAINT FOR VIOLATIONS OF** |
| ALL ACTIONS | ) **THE FEDERAL SECURITIES LAWS** |
| | ) |
| | ) Ctrm:    4 – 5th Floor |
| | ) Judge:    Hon. Edward J. Davila |

[No. 5:24-cv-06124-EJD] AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ..................................................................................1

II.     SUMMARY OF THE ACTION ................................................................................2

III.    JURISDICTION AND VENUE..............................................................................10

IV.     INTRADISTRICT ASSIGNMENT .......................................................................10

V.      PARTIES .................................................................................................................10

    A.    Lead Plaintiff – The Pension Fund Group ..........................................................10

    B.    Defendants ..........................................................................................................11

VI.     OVERVIEW OF HEMODIALYSIS AND OUTSET AND ITS PRODUCT
        OFFERINGS ...........................................................................................................15

    A.    Hemodialysis Treatment .....................................................................................15

    B.    FDA Regulatory Overview...................................................................................17

    C.    The Company And Its Reliance On Tablo, Its Primary Product....................18

VII.    WITNESS ACCOUNTS..........................................................................................20

VIII.   DURING THE CLASS PERIOD, DEFENDANTS ENGAGED IN A SCHEME
        TO DEFRAUD THE MARKET..............................................................................30

    A.    The Scheme Defendants Developed And Touted A Marketing Vision
              Fueled By Undisclosed Companywide Off-Label Marketing They
              Created, Engaged In And Directed In Furtherance Of The Scheme.............31

    B.    The Speaking Defendants Issued False And Misleading Statements In
              Furtherance Of The Scheme ...............................................................................33

        i.      The Speaking Defendants' Misrepresentations In Outset's IPO
                      And Thereafter.......................................................................................34

        ii.     Outset Releases Tablocart Without FDA Authorization And
                      Continues To Mislead The Market .......................................................49

        iii.    The FDA Begins And Inspection Of Outset As Outset Continues
                      To Mislead The Market..........................................................................52

        iv.     While The Truth Begins To Be Revealed, The Speaking
                      Defendants Continue To Mislead The Market.....................................55

        v.      While The Speaking Defendants Publicly Downplay The
                      Importance Of The FDA Warning Letter, Internally, Outset
                      Modifies Its Marketing Practices For Tablo And Continues To
                      Mislead The Market ...............................................................................58

      vi.     The Truth Is Finally Revealed ...............................................................66

IX.     THE SPEAKING DEFENDANTS' STATEMENTS WERE MATERIALLY FALSE AND MISLEADING WHEN MADE ...................................................70

    A.     The Speaking Defendants Issued Materially False And Misleading Statements Regarding Outset's Ability to Capture The Entire Acute Dialysis Market And Of Tablo To Replace All Of A Health System's Dialysis Devices So That It Could Down Select Just To One Device For All Treatments...................................................................................70

    B.     The Speaking Defendants Issued Materially False And Misleading Statements Regarding The Drivers Of Outset's Financial Results, Concealing That Off-label Marketing Was A Main Reason For Those Results ......................................................................................................81

    C.     The Speaking Defendants Issued Materially False And Misleading Statements Representing That The Company Did Not Engage In Any Off-Label Marketing ................................................................................94

    D.     The Speaking Defendants Issued False And Misleading Statements Downplaying And Misrepresenting The Issues Raised By The FDA Warning Letter...........................................................................................100

    E.     The Speaking Defendants Issued False And Misleading Statements Touting TabloCart As A Non-Medical Accessory. ...........................109

X.     ADDITONAL SCIENTER ALLEGATIONS ...............................................110

    A.     Given The Nature Of Outset's Marketing Vision And The Individual Defendants' Knowledge That Tablo Was Not Approved For CRRT, Defendants Knew Or Should Have Known That The Statements That Tablo Could Replace All Dialysis Machines And Capture The Entire Acute Market Were Materially False And Misleading ...................................110

    B.     Numerous Red Flags Support A Strong Inference That The Individual Defendants Either Knew Or Recklessly Disregarded That Outset Was Engaging In Off-Label Marketing, Further Supporting A Strong Inference Of Scienter With Respect To The False And Misleading Statements And The Fraudulent Scheme ...........................................112

    C.     Various Individual Defendants' Active Participation In The Off-Label Marketing Scheme Further Evidences Their Scienter ...................................117

    D.     The Individual Defendants' Knowledge Of The FDA Investigation And Actions Taken In The Months Leading Up To The FDA Warning Letter And After Further Supports Scienter ...................................................120

    E.     The Individual Defendants' Knowledge Of The Lack Of FDA Clearance For Tablocart Evidences Scienter As To The False And Misleading Statements Regarding Tablocart...................................122

    F.     The Fact That The Individual Defendants Violated The Company's Own Policies Further Supports Scienter ......................................................122

G.    **The Core Operations Theory Further Bolsters The Strong Inference Of Scienter**..................................................................................................................123

H.    **The Individual Speaking Defendants' Massive Insider Selling At Artificially Inflated Prices Furthers Bolsters The Strong Inference Of Scienter**..................................................................................................................125

**XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR**.....................................129

**XII.    LOSS CAUSATION**..................................................................................................130

**XIII.    APPLICABILITY OF PRESUMPTION OF RELIANCE**.......................................132

**XIV.    CLASS ACTION ALLEGATIONS**.........................................................................134

**XV.    COUNTS AGAINST DEFENDANTS**.....................................................................135

**XVI.    PRAYER FOR RELIEF**...........................................................................................142

**XVII. JURY DEMAND**.....................................................................................................142

Court-appointed Lead Plaintiff the Pension Fund Group, which is comprised of Plymouth County Retirement Association ("Plymouth County") and Sheet Metal Workers' Pension Plan of Southern California, Arizona and Nevada ("SMWPP"), by and through its attorneys, alleges the following upon information and belief, except as to allegations concerning Lead Plaintiff, which are alleged upon personal knowledge, against Defendants Outset Medical ("Outset" or the "Company"), Chief Executive Officer Leslie Trigg, former Chief Financial Officer Nabeel Ahmed, former Chief Financial Officer Rebecca Chambers, General Counsel John Brottem, and Chief Medical Officer Michael Aragon ("Defendants"). Lead Plaintiff's information and belief are based upon, among other things, its counsel's investigation, which includes, without limitation: (a) review and analysis of public filings made by Outset with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, earnings and other conference calls, and other public statements; (c) discussions with Outset former employees and Outset customers; and (d) review and analysis of securities analyst reports, news and media reports, published insights about the Company, and Outset's website.

## I.    PRELIMINARY STATEMENT

1.    Lead Plaintiff files this Amended Consolidated Complaint ("AC") following the Court's determinations in its March 30, 2026 Order Granting in Part Motion to Dismiss Consolidated Complaint (ECF No. 79) (the "Order"). The Order determined that Lead Plaintiff had adequately established off-label marketing, Order at 32, and adequately established the material falsity of many of the alleged false and misleading statements, including in each of the five categories of statements alleged to be false, Order at 41. The Order further found that Lead Plaintiff had sufficiently alleged scienter as to six of those statements and, of those six, sufficiently alleged loss causation as to three of those statements, which are from two of the categories of statements alleged to be false, and sustained the claims arising from those statements. The Court also partially sustained the control person claims.

2.    This AC makes the following amendments to the prior complaint, which includes addressing certain of the Court's determinations in the Order: (a) removes allegations concerning certain of the statements the Court determined were not actionable on falsity grounds, including

those the Court found were inactionable puffery, opinion, or forward-looking statements; (b) retains allegations concerning statements the Court determined were adequately alleged to be materially false and misleading; (c) provides numerous additional facts and describes red flags supporting a strong and compelling inference of scienter; (d) clarifies the loss causation allegations; (e) adds additional information from one witness in the prior complaint and adds four new witness accounts; (f) adds a scheme liability claim; (g) adds two defendants; (h) adds additional statements that are consistent with the statements the Court found to be adequately alleged to be false; and (i) adds a section that organizes and lists the false and misleading statements by category followed by explanations of why they are false.[1]

## II.    SUMMARY OF THE ACTION

3.    Lead Plaintiff brings this federal securities class action for violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. (the "Exchange Act") and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), on behalf of all persons or entities who purchased or otherwise acquired Outset securities between September 15, 2020, and August 7, 2024, inclusive (the "Class Period") against the Defendants.

4.    At its core, this securities fraud class action alleges a widespread scheme to mislead the investing public including: (i) regarding the ability of the Company's primary product and revenue driver, the Tablo Hemodialysis System ("Tablo"), a dialysis device, to replace all other dialysis devices so that health systems could down select just to one device for all dialysis treatments and could capture the entire acute dialysis market; (ii) misrepsenting the drivers of Outet's financial results and concealing that Outset's strong financial results were the result of companywide off-label marketing; and (iii) touting that the Company did not engage in off-label marketing.  When the FDA began to uncover Outset's illegal off-label marketing of Tablo, the scheme further evolved to include misrepresenting to investors the extent of the off-label

---

[1] Attached as Exhibit A is a red-line document showing the changes made to the previously filed Consolidated Class Action Complaint (ECF No. 44).

marketing, the impact on and internal response by the Company, and the reasons for the subsequent declining sales of Tablo.  Outset also touted TabloCart as a "non-medical accessory" and promoted and sold it without the requisite FDA authorization.

5.    Outset first received clearance from the FDA for Tablo in 2014 for use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility.  On April 1, 2020, Tablo was cleared for home use by the FDA, however demand for Tablo for the home had been low.  Significantly, at no point has Tablo received clearance for continuous renal replacement therapy ("CRRT"), which use must be expressly cleared by the FDA.  Indeed, using devises not cleared for CRRT raises serious safety concerns.  As the FDA has stated, "[p]atients who require CRRT are typically hospitalized with acute illness resulting in acute kidney injury and possible severe hemodynamic instability, and the devices that provide CRRT treatment have unique features to enable continuous treatment (> 24 hours) for this patient population."  Moreover, "[s]ystems that cannot safely and reliably perform CRRT raise serious public health concerns when used for CRRT treatment, because failure of dialysis systems performing CRRT may result in fluid and electrolyte imbalances, inadequate ultrafiltration, infection, and patient harm/death."

6.    In the third quarter of 2020, Tablo released an optional software upgrade for Tablo called XT which mechanically enabled Tablo to run for up to 24 hours.

7.    Shortly thereafter, the Company went public in its Initial Public Offering ("IPO") on September 15, 2020, the first day of the Class Period.  Leading up to and fueling the IPO, as there was little demand for Tablo in the home market and with the release of XT the Defendants devised and embarked on a scheme to mislead investors and analysts regarding Outset's ability to capture the *entire* over $2 billion acute care market where CRRT is performed by representing that Tablo could replace *all* of a health system's dialysis devices so that it could *down select to just one device for all dialysis treatments*.  Indeed, in the IPO Offering Documents and thereafter, Outset emphasized Tablo's "compelling value proposition," stating that, *inter alia*, "in the acute care setting, Tablo lowers the cost of dialysis by up to 80% in the ICU by reducing treatment supplies cost and enabling labor cost reduction.  Tablo also *reduces complexity by eliminating*

*the need for multiple dialysis machines*."[2]  Indeed, Trigg stressed that "*we don't see any limit to our ability to penetrate that full $2.2 billion acute*" and "we have the ability to *capture 100% of all the treatment volume* that any given hospital across the country is doing."

8.    As Tablo is not FDA cleared for CRRT, unknown to investors, defendants, including Trigg, Aragon, and Brottem, furthered the scheme by developing and instituting the top-down companywide off-label marketing of Tablo for CRRT to customers.  According to the marketing pitch that Outset developed, because Tablo was significantly less expensive to operate than traditional dialysis machines, health systems would purportedly achieve significant cost savings if they replaced all of their dialysis devises with Tablo, including CRRT machines, which are the most expensive to operate.  Indeed, Outset's marketing strategy for Tablo relied significantly on expressly marketing Tablo for CRRT.

9.    The consistent accounts of former Outset employees from various time periods, locations, and roles, confirm that Outset's top management developed the off-label marketing pitch and directed and instructed the sales staff to market Tablo for CRRT leading up to the start of the Class Period and thereafter.  For example, former employees relay that Outset management, including Defendant Aragon directed and instructed the sales staff to market Tablo for CRRT uses, including at sales training sessions, calls, and meetings. Further, Trigg and Aragon and other executives were present and spoke at every annual sales kickoff meeting, where management, including Trigg, went over slides that showed images of Tablo replacing CRRT machines.  Sales staff were required by management to use, without altering, the same marketing package and materials companywide.  They relay that the marketing materials were prepared by management and approved by Medical Affairs, which is overseen by defendant Aragon, and the Legal Department, which is overseen by defendant Brottem.  This marketing message and the marketing materials included expressly marketing Tablo for CRRT, touting to customers the costs they would save with Tablo, including expressly for CRRT, and using slides in presentations to customers that showed Tablo replacing machines that were cleared for CRRT.  Indeed, former

---

[2] Emphasis in quotations added unless otherwise stated.

Outset employees relay that Outset "aggressively" marketed Tablo for CRRT, the instruction from management was always to sell Tablo for CRRT, and that Outset did, in fact, make significant sales of Tablo for CRRT.

10.    Moreover, Outset customers relay that Outset personnel told them that Tablo could perform CRRT and could replace their CRRT devices. They further relayed that, based on Outset's consistent representations, they were not aware that Tablo did not have FDA clearance for CRRT. Outset customers also relay that the marketing materials and sales proposals provided by Outset for Tablo reference CRRT and that the customers replaced their CRRT machines with Tablo because of their belief that Tablo could be used for CRRT. Indeed, one such customer, a health system executive, had direct conversations with Defendants Aragon and Trigg and converted their health system to Tablo by replacing all devises including CRRT devices with Tablo after consistent messaging from Outset that Tablo could perform CRRT. The witness relayed that neither Aragon nor Trigg ever told them that Tablo is not cleared for CRRT despite the fact that both were well aware that the system's reason for considering Tablo was standardization and cost savings, which included using Tablo for CRRT. Moreover, Trigg asked this witness to speak with other potential customers about their system's experience with Tablo. This witness further relayed that, had they known Tablo was not cleared for CRRT, they would not have replaced their CRRT devices with it and probably would not have converted to Tablo or replaced any of their dialysis machines with Tablo.

11.    TabloCart, the Company's second device, was first released for sale in October 2022 without the requisite FDA authorization. TabloCart is a water purification system that is used with the Tablo console. Outset promoted and sold TabloCart as a "non-medical accessory" and without FDA authorization, despite the FDA expressly classifying "water purification systems for hemodialysis" as medical devices that require premarket notification.

12.    The scheme proved to be a success. Tablo sales, particularly in the acute care setting where CRRT is performed, grew substantially, including 100-200% growth year-over-year, after the off-label marketing began. Yet, while the Speaking Defendants repeatedly touted that Outset's strong financial results were driven primarily by increased Tablo console sales to

acute customers, this was misleading because they did not disclose that the illicit off-label marketing scheme was driving the financial results. In fact, they repeatedly assured the market that Outset was not engaged in off-label marketing. And as a result, Outset's stock price soared on the IPO and continued to be artificially inflated while the fraud was concealed. Analysts took note, highlighting, *inter alia*, Tablo's "unique value proposition," health systems' "whole house conversion" to Tablo, and "Tablo's ability to address 100% of the hospital market."

13. Then, and unknown to investors: (a) no later than January 17, 2023, the FDA began an inspection of Outset's facilities, where the executive offices were located, during which it found evidence of Outset's off-label promotion of Tablo for CRRT and of TabloCart without the required FDA approval or clearance; (b) Outset had a meeting with the FDA on March 13, 2023 at which they discussed the fact that Tablo was not cleared for CRRT; and (c) in May 2023, the FDA reviewed Outset's website and found marketing materials promoting Tablo for CRRT.

14. Then, on Friday, July 7, 2023, almost four months after Outset and the FDA expressly discussed Tablo's lack of clearance for CRRT, Outset disclosed that it had received a warning letter from the FDA (the "FDA Warning Letter" or "FDA Letter"). Specifically, the Company stated the following and attempted to downplay the issues and their impact:

> The first observation asserts that certain materials reviewed by the FDA and found on the Company's website promote continuous renal replacement therapy (CRRT), a modality outside of the current indications for the Tablo® Hemodialysis System. The Company believes this concern has been effectively addressed through labeling and promotional changes already underway.

> The second observation asserts that the TabloCart with Prefiltration (the "TabloCart"), requires prior 510(k) clearance for marketing authorization. TabloCart, an accessory to the Tablo System, launched in the third quarter of 2022 and sales to date have not been material to the Company's financial results. The Company intends to work collaboratively with the FDA to resolve this observation, including potentially submitting a 510(k) on TabloCart.

15. In fact, the FDA Warning Letter states that Outset was marketing Tablo off-label for CRRT and was marketing and distributing TabloCart without the requisite FDA clearance. Specifically, as to Tablo, the FDA Warning Letter states that "evidence reviewed at the [January 17, 2023 through February 10, 2023] inspection and marketing materials found on [Outset's] website [www.outsetmedical.com] on May 11, 2023 show promotion of the Tablo

Hemodialysis System for continuous renal replacement therapy (CRRT) treatment," and also states that, "you confirmed that CRRT is distinct from the cleared indications for use" at the March 13, 2023 meeting.

16. As an example of such off-label marketing for CRRT, the FDA Warning Letter quotes certain materials from Outset's website:

> For example, materials on your website state that two large hospitals converted to a program consisting solely of the Tablo Hemodialysis System and state, "This major conversion eliminated the need for several types of dialysis machines for different clinical needs, including intermittent hemodialysis (IHD) in the dialysis unit and continuous renal replacement therapy (CRRT) in critical care."

> Other materials on your website state that multiple hospitals who had established CRRT treatment programs "converted those CRRT programs over to Tablo with Extended Therapy" and states, "They also replaced their CRRT machines with Tablo with XT…"

17. The FDA Warning Letter also highlights the serious health and safety concerns that Outset's off-label marketing raised, including that the "failure of dialysis systems performing CRRT may result in fluid and electrolyte imbalances, inadequate ultrafiltration, infection, and patient harm/death."

18. The Speaking Defendants misrepresented and downplayed the significance of the FDA Warning Letter, including stating that the Tablo off-label marketing issues were limited to a few materials on the Outset website and would have no real impact on the Company. The Speaking Defendants also announced that Outset would pause distribution of TabloCart while it sought FDA clearance for TabloCart and lowered revenue expectations for full year 2023, but stressed that the reason for the lowered guidance was that customers may defer purchasing Tablo until TabloCart becomes available again and that growth would resume once TabloCart received FDA clearance. On September 11, 2023, Outset submitted its application to the FDA for clearance for TabloCart. Thereafter, on October 12, 2023, Outset lowered its 2023 revenue guidance to $130 million and, on November 7, 2023, the Company announced initial 2024 guidance below consensus expectations, each time attributing the lower guidance to TabloCart not being available and now blaming "marketplace confusion" created by "competitive noise."

19.    On May 6, 2024, Outset received FDA clearance for TabloCart, which the Speaking Defendants had previously promised would result in increased Tablo sales. Yet, just days later, Outset revealed it could still face a negative impact and reduced demand for Tablo due to the FDA Warning Letter and the pause on TabloCart distribution, even though the pause had ended.

20.    However, in truth, the off-label marketing of Tablo as being able to replace all other dialysis devices, including CRRT, machines had driven the increased sales of Tablo consoles and permeated Outset's marketing. Now that it was uncovered by the FDA, Outset needed to systemically change its marketing practices to fix the illegal marketing and customers no longer wanted to convert to Tablo due to Outset's illegal marketing and Tablo not being cleared for CRRT. Indeed, internally, as relayed by former employees, after Outset received the FDA Warning Letter, Outset held meetings instructing its sales staff to stop referring to CRRT while marketing Tablo and to purge all prior marketing materials, both hard copy and electronic, that existed prior to the FDA Warning Letter. Moreover, former employees further relay that after customers became aware of the FDA Letter they no longer wanted to purchase Tablo, sales declined significantly, and sales representatives did not make their quotas.

21.    Thus, while Outset downplayed the import of the violations publicly, it had to significantly change its marketing and no longer instructed its sales staff to market for CRRT, a key element of its marketing strategy, now that the FDA was aware of Outset's off-label marketing for CRRT.

22.    Finally, at the end of the Class Period, on August 7, 2024, Outset announced its financial results for the second quarter of 2024, during which TabloCart was cleared, and: (a) significantly missed consensus estimates for the quarter; (b) lowered guidance for fiscal year ("FY") 2024 significantly; and (c) announced an entire sales team and marketing process restructuring. Thus, it was not the lack of availability of TabloCart or market confusion but Outset's inability to continue to aggressively and unlawfully market Tablo for CRRT and customers no longer wanting to purchase Tablo given the issues raised in the FDA Letter, that impacted sales after the FDA Warning Letter. At the end of the Class Period, the market finally

understood that Outset could not capture the entire acute market, despite its representations to the contrary.

23.    As a result of Defendants' false and misleading statements and fraudulent scheme, Outset shares were artificially inflated during the Class Period, trading as high as $64.00 per share.  On August 8, 2024, the day after the Class Period ends, Outset shares closed at $1.07 per share, causing Lead Plaintiff and the Class to suffer substantial losses.  To date, Outset's share price has not recovered.  On April 30, 2026, Outset shares closed at $0.28 per share.[3]

24.    Moreover, while the Class lost hundreds of millions of dollars, several defendants reaped almost $39 million in proceeds on their Class Period trading.  Indeed, the ***vast majority—85%—***of these defendants' Class Period insider trading, which reflects ***97%*** of the gross proceeds they made from such trading, was done before the first corrective disclosure.  Indeed, Trigg alone reaped proceeds of over $30 million during the Class Period, almost all of which was prior to the disclosure of the FDA Warning Letter.  For example, had Defendant Trigg retained the shares she sold during the Class Period, they would have been worth approximately $1 million the day after the Class Period ends and approximately $250,000 today, far less than the $30+ million she reaped during the Class Period.

25.    Moreover, Outset's business still has not recovered.  For example, the Company's Q2 2023 revenue, the quarter ending immediately before disclosure of the FDA Warning Letter, was $36.04 million.  Now, Outset's most recent revenue for Q4 2025 was $28.9 million, a nearly 20% decline.  And significantly, the Company's recurring revenue (revenue for supplies and services and not Tablo consoles), as a percentage of total revenue versus Tablo console sales has increased drastically, making up the vast majority of Outset's revenue further highlighting the declining Tablo sales.  Recurring revenue accounted for 74% revenue for both FY 2024 and FY 2025, as compared to 45% for the quarter prior to the FDA Letter. Tellingly, Outset now describes Tablo to investors as a "complement" to CRRT devices.  Indeed, in June, 2025 Trigg stated,

---

[3] On March 20, 2025, well after the Class Period ended, Outset completed a 15-for-1 reverse stock split.  All share prices cited in the AC, including the April 30, 2026 closing share price, reflect the pre-stock split pricing.

"[t]here are other machines on the market that do CRRT really, really well. . . . And those would be machines manufactured by ex-Baxter, now Vantive, for example.  So in that sense, [Tablo is] *complementary*."

## III.   JURISDICTION AND VENUE

26.   Lead Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 (a), (b) and (c) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5(a), (b) and (c).

27.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In connection with the acts, transactions, conduct, and other wrongs alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the U.S. Mail, interstate telephone communications, and the facilities of national securities markets.

28.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because many of the acts and practices that give rise to this Complaint, including the preparation and dissemination of materially false and misleading statements, substantially occurred in this District.  Additionally, Defendant Outset's principal place of business is located in this District at 3052 Orchard Drive, San Jose, California.

## IV.   INTRADISTRICT ASSIGNMENT

29.   Pursuant to Northern District of California Civil Local Rules 3-2(c) and 3-5(b), assignment to the San Jose Division of this District is proper because a substantial part of the events or omissions that give rise to the claims asserted herein occurred in Santa Clara County, California and Outset's principal place of business is located, in San Jose, California.

## V.   PARTIES

### A.   Lead Plaintiff – The Pension Fund Group

30.   Established in 1937, Plymouth County Retirement Association is the retirement system for the benefit of employees of cities, towns, districts, and authorities within Plymouth County, Massachusetts.  As of December 31, 2024, Plymouth County had assets under management with a market value of over $1.5 billion.  As set forth in its Certification previously

submitted in support of the motion for lead plaintiff (ECF No. 18-3), Plymouth County purchased Outset's common stock during the Class Period and was damaged as a result.

31. Established in 1958, Sheet Metal Workers' Pension Plan of Southern California, Arizona and Nevada is a union pension fund that provides pension benefits to thousands of sheet metal workers. As of December 31, 2023, SMWPP had assets with a market value of approximately $1.3 billion. As set forth in its Certification previously submitted in support of the motion for lead plaintiff (ECF No. 18-3), SMWPP purchased Outset's common stock during the Class Period and was damaged as a result.

**B.    Defendants**

32. Defendant Outset is a medical device company originally founded as HD+ in 2003 and incorporated under the laws of Delaware with its headquarters and principal executive offices in San Jose, California. The company is based at 3052 Orchard Drive in San Jose where its R&D, operations, manufacturing activities, and executive offices are all located. In 2015, the Company changed its name to Outset Medical. Outset engages in the development and sale of the Tablo Hemodialysis System. Outset's common stock trades on the Nasdaq Global Select Market (the "NASDAQ") under the ticker symbol "OM." The Company was taken public at the beginning of the Class Period on September 15, 2020, selling 10.29 million shares of common stock to the public at a price of $27. On April 13, 2021, the Company held a secondary public offering ("SPO"), selling approximately 2.95 million shares of common stock to the public at a price of $53.50 per share.

33. Defendant Leslie L. Trigg ("Trigg") has served as Outset's Chief Executive Officer ("CEO") at all relevant times and was elected as Chair of Outset's Board of Directors in 2022. Throughout the Class Period, Defendant Trigg made materially false and misleading statements and signed filings with the SEC, including every Form 10-Q, Form 10-K, and Prospectus. In addition to making false statements, Trigg also participated in the Company's unlawful scheme by developing the Company's marketing vision and by training salespeople to promote and market Tablo for CRRT.

34.    Defendant Nabeel Ahmed ("Ahmed") served as Outset's Chief Financial Officer ("CFO") from August 2021 until June 3, 2025.  Defendant Ahmed joined Outset in May 2020 and served as a Vice President and Controller.  On July 1, 2021, the Company filed with the SEC a Form 8-K reporting Defendant Ahmed had been appointed as the Company's Interim CFO.  In a subsequent Form 8-K filed with the SEC on August 5, 2021, the Company announced Defendant Ahmed had transitioned to the permanent role of CFO, Principal Financial Officer, and Principal Accounting Officer, effective July 30, 2021.  From then on, Defendant Ahmed made materially false and misleading statements and signed filings with the SEC, including every Form 10-Q, Form 10-K, Form 8-K, and Prospectus from July 30, 2021 through the end of the Class Period. All references to him as a Speaking Defendant are expressly limited to his tenure at Outset.

35.    Defendant Rebecca Chambers ("Chambers") was Outset's CFO at all relevant times until July 16, 2021.  In a Form 8-K filed with the SEC on July 1, 2021, the Company announced that Defendant Chambers notified the Company on June 28, 2021, of her decision to resign from Outset effective July 16, 2021.  Until her resignation, Defendant Chambers made materially false and misleading statements and signed filings with the SEC, including every Form 10-Q, Form 10-K, Form 8-K, and Prospectus from September 15, 2020 through July 16, 2021. All references to her as a Speaking Defendant are expressly limited to her tenure at Outset.

36.    Defendant Michael Aragon ("Aragon") has served as Outset's Chief Medical Officer ("CMO") at all relevant times since joining the company in September 2018.  Defendant Aragon participated in the Company's unlawful scheme by participating in and approving the off-label marketing of Tablo during the Class Period.

37.    Defendant John Brottem ("Brottem") has served as Outset's General Counsel at all relevant times since joining the company in May 2020.  Defendant Brottem participated in the Company's unlawful scheme by participating in and approving the off-label marketing of Tablo during the Class Period.  Additionally, he further participated in the scheme to defraud because, as General Counsel, Brottem would have reviewed and approved prepared remarks on earnings calls, including the slides showing Tablo as a replacement for CRRT approved machines, and statements in the Company's Forms 10-Q and Forms 10-K regarding Tablo.  All references to him

as a Speaking Defendant are expressly limited to his false and misleading statements in Outset's April 13, 2023 Proxy Statement.

38.     Defendants Trigg, Ahmed, Chambers, and Brottem are collectively referred to as the "Individual Speaking Defendants."  The Individual Speaking Defendants with the Company are referred to as the "Speaking Defendants."  Defendants Trigg, Aragon, and Brottem, are referred to as the "Individual Scheme Defendants."  The Individual Scheme Defendants and Ouset are referred to as the "Scheme Defendants."  The Individual Speaking Defendants and the Individual Scheme Defendants are referred to as the "Individual Defendants."

39.     The Individual Speaking Defendants participated in the drafting, preparing, and/or approving SEC filings and public communications complained of herein during their tenure at the Company.  Moreover, in addition to making and signing Forms 10-Q, Forms 10-K, Forms 8-K and/or Prospectus issued during their tenure, Defendants Trigg, Ahmed, and Chambers also participated in and made statements and representations in each earnings calls with analysts and at conferences during their Class Period tenure at the Company.  Specifically, (a) Trigg attended and made statements at the Q3 2020 earnings call, the Q4 2020 earnings call, the Q1 2021 earnings call, the Q2 2021 earnings call, the Q3 2021 earnings call, the Q4 2021 earnings call, the Q1 2022 earnings call, the Q2 2022 earnings call, the Q3 2022 earnings call, the Q4 2022 earnings call, the Q1 2023 earnings call, the Q2 2023 earnings call, the Q3 2023 Earnings Preannouncement Call; the Q3 2023 earnings call, the Q4 2023 earnings call, the Q1 2024 earnings call; the Q2 2024 earnings call, and the Q3 2024 earnings call; (b) Ahmed attended and made statements at the Q2 2021 earnings call, the Q3 2021 earnings call, the Q4 2021 earnings call, the Q1 2022 earnings call, the Q2 2022 earnings call, the Q3 2022 earnings call, the Q4 2022 earnings call, the Q1 2023 earnings call, the Q2 2023 earnings call, the Q3 2023 Earnings Preannouncement Call; the Q3 2023 earnings call, the Q4 2023 earnings call, the Q1 2024 earnings call; the Q2 2024 earnings call, and the Q3 2024 earnings call; and (c) Chambers attended and made statements at the Q3 2020 earnings call, the Q4 2020 earnings call, and the Q1 2021 earnings call.  Moreover, (a) Trigg attended and made statements at the Stifel Virtual Healthcare Conference on November 19, 2020, the Bank of America Securities Virtual Health Care Conference on May 11, 2021, the Goldman

Sachs 42nd Annual Global Healthcare Virtual Conference on June 9, 2021, the 19th Annual Morgan Stanely Healthcare Conference on September 13, 2021, the 11th Annual SVB Leerink Global Healthcare Conference on February 18, 2022; the TD Cowen Healthcare Conference on March 8, 2022, the J.P. Morgan 41st Annual Healthcare Conference on January 11, 2023, the Morgan Stanley 21st Annual Global Healthcare Conference on September 2023, and the 2024 TD Cowen Healthcare Conference on March 5, 2024; (b) Ahmed attended and made statements at the 19th Annual Morgan Stanely Healthcare Conference on September 13, 2021, the 11th Annual SVB Leerink Global Healthcare Conference on February 18, 2022, the TD Cowen Healthcare Conference on March 8, 2022, the UBS Global Healthcare Conference on May 9, 2022, the Stifel Healthcare Conference on November 15, 2022, the Jefferies LLC London Healthcare Conference on November 17, 2022, the Jefferies London Healthcare Conference on November 16, 2023; and (c) Chambers attended and made statements at the Stifel Virtual Healthcare Conference on November 19, 2020, the Bank of America Securities Virtual Health Care Conference on May 11, 2021, and the Goldman Sachs 42nd Annual Global Healthcare Virtual Conference on June 9, 2021.

40. The Individual Defendants' wrongdoing during the Class Period alleged herein violated their specific responsibilities and obligations regarding the accuracy of the public reports, releases, and other statements. Accordingly, each of the Individual Defendants is liable, directly and as control persons, for the dissemination of the materially false and misleading statements alleged herein that deceived purchasers of Outset's common stock during the Class Period.

41. The Individual Defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. The Individual Defendants were in possession of and had access to material non-public information and documents. Each was a senior executive officer of Outset and, thus, controlled the information disseminated to the investing public in the Company's press releases and SEC filings. As a result, each could falsify the information that reached the public about the Company's business and performance.

42. In engaging in the wrongdoing alleged herein, including making the materially misleading statements and/or engaging in the deceptive or manipulative act in furtherance of the

alleged scheme complained of herein, the Individual Defendants, who were senior officers and controlling persons of Outset, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by and each of the deceptive or manipulative acts committed by the Individual Defendants is attributable to the Company.

## VI.    OVERVIEW OF HEMODIALYSIS AND OUTSET AND ITS PRODUCT OFFERINGS

### A.    Hemodialysis Treatment

43.    Dialysis is a medical procedure to treat kidney disease and kidney failure that filters the blood when the kidneys are unable to function properly, removing waste, excess fluid, and minerals from the blood. It acts as a replacement for kidney function, helping to maintain a balance in the body's chemical makeup when kidneys are failing.

44.    Hemodialysis, which is what Tablo is used for, is the most common form of dialysis treatment. It is a process by which waste products and excess fluid are directly removed from a patient's blood using an external dialysis machine. Blood from the patient is routed to a dialyzer, also known as an artificial kidney, where toxins are removed by diffusion across the dialyzer's semipermeable membrane into a dialysate solution, usually comprised of purified water and electrolytes, also known as dialysate concentrate. Cleansed blood from the dialyzer is then returned to the patient. The specific type of dialysis treatment utilized for a patient varies depending on the patient's level of acuity and the care setting.

45.    There are multiple types of hemodialysis treatments, which differ both in terms of how they operate and the types of patients they treat, but they all fall into one of two categories, either continuous or intermittent. Continuous renal replacement therapy ("CRRT") differs from intermittent hemodialysis in several respects, including that it utilizes lower dialysate and blood flow rates, typically 1-2 liters per hour ("L/h") and 100-250 milliliters per minute ("mL/min"), respectively, and can run continuously for 24 hours a day or more. The slower blood flow rates allow it to run continuously and avoid rapid, stressful fluid shifts of traditional, shorter dialysis, making it safer for critically ill, hemodynamically unstable patients. Moreover, CRRT uses vast quantities of specialized, manufactured sterile fluid bags whereas intermittent dialysis often uses

purified water mixed on-site which makes CRRT substantially more expensive than intermittent treatments. Intermittent treatments include: (a) IHD, which generally lasts for approximately 3-4 hours at a time utilizing higher dialysate and blood flow rates, typically 30 L/h and 300-400 mL/min, respectively; (b) prolonged intermittent renal replacement therapy ("PIRRT"); and (c) sustained low-efficiency dialysis ("SLEDD" or "SLED") that operate at flow rates lower than IHD but higher than CRRT and can run for longer durations, but not continuously like CRRT. For example, SLEDD treatments generally last 6-12 hours per day and utilize a dialysate flow rate of 6-12 L/h and a blood flow rate of 100-150 mL/min. Machines that are approved for only intermittent use, even if SLED or PIRRT, cannot be marketed for continuous use or CRRT.

46. CRRT is the only treatment option for certain patients who are hemodynamically unstable, such as critically ill patients with unstable blood pressure, low blood flow, or other circulatory problems, and patients who do not respond to other treatments as higher flow rates can exacerbate patient instability. Thus, CRRT is generally used in acute settings and intensive care units ("ICU").

47. Devices that provide CRRT treatment have unique features to enable continuous treatment for this patient population and devices that cannot safely and reliably perform CRRT raise serious public health concerns when used for CRRT treatment, because failure of dialysis systems performing CRRT may result in fluid and electrolyte imbalances, inadequate ultrafiltration, infection, and patient harm or even death. As such, the FDA requires dialysis machines marketed for CRRT to be specifically approved or cleared for use for CRRT. Such devices have unique features that enable them to perform the treatment. Two commonly used devices for CRRT are the Baxter International, Inc. ("Baxter") Prismaflex and the Fresenius SE & Co. KGaA ("Fresenius") MultiFiltrate Pro, both of which are cleared for use for CRRT.

48. Traditional hemodialysis machines, including those that are expressly cleared for CRRT, generally require a healthcare center to operate a separate water treatment system to produce dialysate or use pre-filled bags of dialysate, which can be very expensive. For example, building and maintaining a water treatment room costs approximately $250,000 to build and $25,000 to $50,000 per year to maintain.

49.     CRRT is the most expensive form of hemodialysis and is also resource-intensive and complex, whether a healthcare system insources or outsources the treatment. CRRT is also labor intensive, requiring those administering it to have specific expertise and requiring multiple bags to hold and transport the dialysate fluid. CRRT costs over three times more to perform per day compared with IHD. The cost for CRRT treatment is approximately $900 to $1200 a day compared to approximately $300 for IHD treatment on a traditional machine.

**B.     FDA Regulatory Overview**

50.     As a manufacturer of dialysis machines, Outset functions in a highly regulated industry and must comply with, *inter alia*, the Federal Food, Drug, and Cosmetic Act (the "FDCA") 21 U.S.C. § 301, *et seq.* The FDA plays a critical role in protecting public health by ensuring the safety, efficacy, and quality of regulated products. Under the FDCA, to commercially distribute a new medical device or introduce a significantly modified device, a company must obtain approval or clearance from the FDA through one of three main pathways: a premarket authorization ("PMA"), a de novo classification request, or a premarket notification ("510(k) Clearance").

51.     The 510(k) Clearance process, which is what Outset used for Tablo and ultimately utilized for TabloCart, is somewhat analogous to the generic drug concept in that it is used to obtain marketing clearance for a device that is substantially equivalent in safety and effectiveness to another lawfully marketed device or to a standard recognized by the FDA when used for the same intended purpose(s). In order to be eligible for 510(k) Clearance, the new device must exhibit roughly the same safety and effectiveness characteristics as the comparison or "predicate" device. It is not an "approval" process. Rather, because of the nature of the laws underlying this process, a successful submission is deemed to be "cleared" and granted permission to market the new device—but ***only for the cleared indications for use***.

52.     It is illegal to market, promote, or advertise a medical device for any use other than its FDA-approved or cleared use. 21 U.S.C. § 331(a)-(b). For example, making any false or misleading statements in the labeling of a device constitutes improper "misbranding." 21 C.F.R. § 801.6; 21 U.S.C. § 352(a). A device is also considered "misbranded" if the device is introduced

into the marketplace for a particular use for which it has not received either a 510(k) Clearance or a PMA. 21 U.S.C. § 352(o).  Any such marketing is considered illegal "off-label" marketing or promotion.  Off-label marketing includes any promotional, educational, and training materials, activities, or representations for anything beyond the cleared uses.  While customers may use a device for an off-label use, it is illegal for the device manufacturer to market the device for an off-label use.

53.     If the FDA determines that a company has engaged in off-label marketing, it may, among other things, request that a company modify its training, educational, or promotional materials and activities, or subject the company to regulatory or enforcement actions, including the issuance of warning letters, fines, penalties, injunctions, or seizures, including banning the product from the market.

54.     Off-label marketing is also associated with increased risk of adverse effects, including death, in patient populations, increased harm to third-party payers like Medicare and Medicaid, and reduced innovation in the marketplace.

**C.     The Company And Its Reliance On Tablo, Its Primary Product**

55.     Since its founding, Outset has focused solely on developing and marketing Tablo, a hemodialysis machine which is the Company's primary revenue source.  Outset first received 510(k) Clearance for Tablo in 2014 for use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility.  On April 1, 2020, Tablo was first cleared for home use by the FDA.  Significantly, at no point has Tablo received clearance for CRRT.  Indeed, from the start of the Class Period and continuing throughout it, Outset's SEC filings acknowledge that Tablo "is not cleared by the FDA for CRRT."[4]  Since the third quarter of 2020, Tablo has offered an optional software upgrade called Tablo XT which mechanically enabled Tablo to run for up to 24 hours at a lower dialysate flow rate.  In the second half of 2023, after the FDA issued its Warning Letter, Outset rebranded the Tablo XT upgrade to Tablo Pro+.

---

[4] *See*, *e.g.,* September 16, 2020 Prospectus.

[No. 5:24-cv-06124-EJD] AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                                                    18

56.     To this day, Tablo is still not cleared for CRRT.  Instead, its clearance is currently limited as follows:

> The Tablo Hemodialysis System and TabloCart is indicated for use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility. Treatments must be administered under a physician's prescription and observed by a trained individual who is considered competent in the use of the device. The Tablo Hemodialysis System is also indicated for use in the home. Treatment types available include Intermittent Hemodialysis (IHD), Sustained Low Efficiency Dialysis (SLED/ SLEDD), Prolonged Intermittent Renal Replacement Therapy (PIRRT), and Isolated Ultrafiltration.

57.     It was not until June 21, 2023, in response to Outset's 501(k) application for Tablo which requested "a specification change for intermittent therapy up to a maximum of 24 hours," that Tablo's 510(k) indication included the specific treatments listed in its clearance above: IHD, SLED/ SLEDD and PIRRT.  Prior to that, its indication was for "use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility," and, as of April 2020, also for "use in the home."  But, Tablo has never been cleared for CRRT, for continuous use, or for use for more than 24 hours.

58.     Unlike traditional dialysis machines, Tablo does not require industrial water treatment rooms, separate water purification machines, or pre-filled bags of dialysate.  It produces dialysate "on demand" through its integrated water purification system that purifies water directly from the water source connected to Tablo, typically a simple tap water faucet.  Then, the purified water is mixed with the dialysate concentrate contained in a disposable cartridge to produce dialysate specific to a patient's prescription.  Because Tablo does not require a separate water purification system or prebagged dialysate, it is less expensive, costing on average $100 to $200 for treatments.

59.     The TabloCart with Prefiltration ("TabloCart"), the Company's second device, was released in October 2022 without FDA clearance.  TabloCart is a water purification system that is used with the Tablo hemodialysis system to filter and remove carbon, sediment, and minerals from water before it enters Tablo for dialysate production.  TabloCart enhanced Tablo's usage in areas that suffer from water quality issues.

60.    Despite TabloCart being a medical device that requires premarket FDA clearance, the Company did not seek either a PMA or 510(k) Clearance from the FDA prior to marketing and selling TabloCart.  Indeed, TabloCart qualifies as a Class II device requiring FDA clearance as it is a "water purification system for hemodialysis" which is defined as "a device that is intended for use with a hemodialysis system and that is intended to remove organic and inorganic substances and microbial contaminants from water used to dilute dialysate concentrate to form dialysate."  21 C.F.R. § 876.5665.

## VII.    WITNESS ACCOUNTS

61.    The consistent accounts of former Outset employees and Outset customers from various time periods, locations, and roles who are familiar with Outset's marketing of Tablo provide both red flags confirming the management-led companywide off-label marketing scheme and provide actual facts regarding certain defendants' actual participation in the fraudulent scheme throughout the Class Period.  These facts and red flags demonstrate that the off-label marketing went far beyond the examples identified in the FDA Warning Letter.

62.    **Witness 1**[5] was employed by Outset as a Northeast Area Sales Manager from before the Class Period until Spring 2021 and was responsible for marketing and business development in the New York Metro, Northern New Jersey, and Upstate New York areas.

63.    Witness 1 said that Witness 1 and other sales staff members were instructed by Outset to market Tablo for CRRT.  Witness 1 attended sales calls and meetings with Outset leadership where the instructions were always to promote and sell Tablo for CRRT.  Witness 1 said Defendant Aragon and Jamie Lewis, Senior Vice President of Global Sales ("SVPGS"), led these meetings.  Witness 1 further relayed that Outset marketed Tablo as a "Swiss Army Knife" of dialysis that could be used for all applications, including for CRRT.  According to Witness 1,

---

[5] Witness 1 was interviewed by AlphaSense Expert Insights, a subscription-based system, on February 4, 2022, and their interview was published on the AlphaSense platform on February 8, 2022.  This account includes information from that interview in addition to Lead Counsel's direct discussions with this witness.

neither the FDA nor FDA approval of Tablo was ever discussed on these calls or meetings, and they were just told to market Tablo for CRRT.

64. Witness 1 also discussed Tablo's "value proposition." Witness 1 said it was based on pitching Tablo as being the only equipment on the market that can be used in all dialysis markets and for all dialysis procedures, including CRRT, because dialysis on traditional machines is more expensive and complex to set up than Tablo. Moreover, CRRT requires different equipment and different skills and/or staff than other dialysis.

65. Witness 1 explained that the infrastructure required to source the water for traditional machines is extremely expensive. Healthcare centers usually require a built-in water room with reverse osmosis and filters to purify the water, and these rooms are very expensive to build and maintain.

66. Witness 1 further explained that CRRT machines are also extremely complex to set up and require more supplies, including 5-liter bags of dialysis. Nurses have to hang anywhere from eight to 15 of those bags throughout the course of CRRT on traditional machines. Witness 1 noted that it is extremely complex to string the lines on the machine and can take about an hour to accomplish for someone who is skilled at it.

67. Witness 1 relayed that Witness 1 marketed and sold Tablo for CRRT to the New York City Medical Center, the Nassau University Medical Center, and the Brooklyn Veterans Administration Hospital.

68. Witness 1 also stated that Tablo consoles were prone to issues, including unpredictable flow rates.

69. **Witness 2** was employed by Outset as a Key Account Representative Home/Chronic from the beginning of 2022 through the end of the Class Period. Witness 2's territory covered several southern states including Texas, Florida, Alabama, Louisiana, Missouri, and Arkansas.

70. Witness 2 relayed that, prior to contacting customers, Witness 2 received sales and operational training from Outset consisting of two training sessions, one in San Diego, California and another in Columbus, Ohio. The marketing training Witness 2 received was to say that Tablo

was okay for CRRT.  Witness 2 said that Outset marketed Tablo as an extended care option capable of CRRT.

71.     Witness 2 said that, after receiving the FDA Warning Letter, Outset sent out a companywide email and conducted an all-hands call instructing everyone to stop referring to CRRT while marketing Tablo.  Witness 2 was on the all-hands call which was led by several members of Outset's management group, including Jen Buchan Sipe, former Senior Director, Marketing, and Jennifer Schuler, former Senior Director of Product Management.  Witness 2 said the instruction from Outset management was to stop using the term CRRT when selling and marketing Tablo.  The staff was also instructed to purge all prior marketing materials, both hard copy and electronic, that existed prior to the FDA Warning Letter.  Witness 2 does not recall any instance during the all-hands call when Outset management stated, or even inferred, the FDA Warning Letter was wrong or inaccurate concerning Tablo and CRRT.

72.     Witness 2 further relayed that following the all-hands call, Tablo XT, or Extended Therapy, was rebranded as Tablo Pro+.

73.     Witness 2 said that Defendant Trigg made misleading statements about revenue and growth.

74.     Witness 2 also relayed that Tablo had problems functioning in acute facilities, including problems with patient blood extraction and replacement.

75.     **Witness 3** worked at Outset from before the Class Period through the end of the Class Period.  Witness 3 worked as a clinical trainer, a role which included training customers and sales, until early 2023.  Witness 3 was then in sales as a territory manager in the Dallas-Ft. Worth metroplex, New Mexico, and Arizona areas through the end of the Class Period.

76.     Witness 3 said that right around the time Outset received the FDA Warning Letter, a colleague told Witness 3 that Outset was specifically marketing Tablo for CRRT in Florida.  Before that, Witness 3 did not know that representing that Tablo could be used for CRRT was wrong.  Witness 3 also said that in selling the XT/Extended Therapy upgrade for Tablo, some sales staff referred to it as performing CRRT.  Witness 3 said that, before the FDA Warning

Letter, Outset was "very aggressive" in marketing for CRRT, which is what led to the FDA Warning Letter.

77.    Witness 3 said that it was not until after the FDA Warning Letter that Outset began training personnel on what could not be represented to customers about the Tablo, including about CRRT. Consistent with Witness 2's account, Witness 3 relayed that, shortly after the FDA Warning Letter, a meeting was held in which attendees were told not to use the term CRRT.

78.    **Witness 4** has been the President & CEO of a large health care system in New York since 2023 and was previously its Executive Vice President and Chief Business Development Officer and held this position since before the Class Period. Witness 4 relayed that the health care system looked into Tablo as a cost saving measure for dialysis. As part of this exploration, Witness 4 relayed that Outset employees stated that Tablo could be used for CRRT but it required the XT upgrade to do so. Witness 4 also relayed that the marketing materials from the Company for Tablo indicated that Tablo could be used for CRRT. Witness 4 said the health system received a proposal for the Tablo units from Outset in 2020 and there was language contained in the proposal about upgrading the Tablo for CRRT.

79.    Witness 4 said Outset provided them information on savings Tablo would provide. The presentation included slides showing Tablo could replace CRRT machines. Witness 4 said the system conducted an analysis on the cost savings Tablo would provide to verify the information provided by Outset. That analysis included line items for CRRT specific savings. The system worked with Outset representatives in conducting this analysis and Outset assisted them with the analysis.

80.    Witness 4 said they had several calls with Defendant Aragon about how the system was going to use Tablo and Aragon never said the unit was not FDA approved for CRRT. Aragon also held group calls with the hospitals' staff. Witness 4 also had discussions with Defendant Trigg about Tablo, including an in person visit from Defendant Trigg at Witness 4's healthcare system. Trigg asked Witness 4 to speak with other potential customers about their system's experience with Tablo. The witness relayed that Trigg never told them that Tablo is not cleared

for CRRT and that Trigg was aware that the system's reason for considering Tablo was standardization and cost savings, which included using Tablo for CRRT.

81.     Witness 4 stated that no one from Outset ever mentioned that Tablo was not approved by the FDA for CRRT.  In fact, Witness 4 believed "100%," based on information received from Outset, that Tablo was FDA approved for CRRT.  Witness 4 said they spoke with many different people at Outset and even though there was significant turnover among salespeople pitching Tablo to them, they were all consistent about using Tablo for CRRT.

82.     Witness 4 relayed that the system ultimately leased Tablo units to replace all of the system's dialysis machines, including those that were used for CRRT, including for ICU patients.  They disposed of the prior CRRT machines and used Tablo for CRRT exclusively.  They entered into a contract with Outset and transitioned to Tablo during the Class Period but before the FDA Letter.

83.     Witness 4 further relayed that Outset prepared an article discussing their system's conversion to Tablo and its elimination of all other dialysis machines, including in "continuous renal replacement therapy (CRRT) in critical care," that Outset posted on its website.  That version of the article is no longer on Outset's website.

84.     Witness 4 relayed that had they known Tablo was not approved for CRRT, they would not have replaced their CRRT devices with it and probably would not have converted to Tablo or replaced any of their dialysis machines with Tablo at all because the benefit of Tablo was to standardize its dialysis treatment and achieve staffing and supplies savings.

85.     Witness 4 relayed that the system has experienced issues with the Tablo units breaking down.

86.     **Witness 5** was a Nurse Manager, critical care unit ("CCU")/ICU with a hospital in New York from prior to the start of the Class Period until early 2024.  Witness 5 said that the hospital had eight Tablo machines, six of which were used in medical surgery and two were used in the CCU/ICU.  Witness 5 said all Tablo units were used for CRRT and that Tablo replaced the traditional CRRT machines.  Witness 5 said that the Tablo units were seen as a cost reduction measure.

87.    Witness 5 said that Outset personnel provided training to Witness 5 on the operation of the units for CRRT.  Witness 5 said the training was described as "Training the Trainers."  Outset trained Witness 5 who then was responsible for training other personnel at the hospital.

88.    Witness 5 was unaware that Outset had not received FDA clearance for Tablo to be used for CRRT.

89.    Witness 5 stated that, when running the Tablo for CRRT, Tablo would stop running, and Witness 5's hospital would need to bring in different dialysis machines to replace Tablo.

90.    **Witness 6** was employed at a nationwide healthcare system in Massachusetts from before the Class Period through early 2024.  Witness 6 started with the facility as a licensed practical nurse and then, from Summer 2022 and thereafter, Witness 6 was the Director of Nursing.

91.    Witness 6 said that they believed that the facility that they worked at was the first location within the system to receive the Tablo.  Sometime in 2021 the facility received four Tablo units.  These units were a capital purchase made by the healthcare system's headquarters.  Outset also sold Tablo units to other locations within the system.  Witness 6 recalled Outset technicians and other Outset employees stating that Tablo was capable of CRRT.

92.    **Witness 7** was interviewed by TD Cowen[6] analysts, as reflected in an April 25, 2023 TD Cowen report.  As stated in the report, Witness 7 worked for a not-for-profit community health system that has a corporate base in Evansville, Indiana.  The system serves patients in Illinois, Indiana, and Kentucky, covering approximately 51 counties and comprising 20 hospitals.  Witness 7 stated that she transitioned her hospital system from outsourced dialysis to an in-sourced model with Tablo.

93.    Witness 7 said that her hospital had been using DaVita, Inc., a nationwide company that provides dialysis services, to outsource dialysis, but when its contract came up for

---

[6] "TD Cowen" refers to both TD Cowen and its predecessor firm Cowen, Inc.

renewal, the cost was going to increase significantly, so the system looked at other options for dialysis, including Outset.  During this process, Outset made presentations to her system's board of decision-makers.  Thereafter, the system opted to purchase 27 Tablo units, seven of which were dedicated to CRRT.

94.    Witness 7 further stated that she "is inclined to increase her use of [Tablo] for the system's other dialysis needs.  These potentially include greater utilization in CRRT, where Tablo has replaced [Baxter's] PrisMax," a traditional CRRT machine.  Witness 7 further stated that expanding use for CRRT was to be done either in the fourth quarter of 2023 or the first quarter of 2024.

95.    **Witness 8**[7] has been the Chief of Nephrology at South Shore Health since July 2022 and has been a nephrologist in the Greater Boston Area since November 2017.  Witness 8, who uses Tablo at some of the hospitals that they work in, relayed that Witness 8 believes that Outset was marketing Tablo for CRRT.

96.    **Witness 9**[8] is a physician who submitted a complaint regarding Tablo to the FDA in April 2024 stating that problems, such as numerous alarms going off, the need for filter changes, and the machines shutting down, occurred with Tablo when running dialysis treatments longer than eight hours.  According to the physician's complaint, prior to the disclosure of the FDA Warning Letter, Outset told their institution that Tablo could be used for CRRT:

> ***Outset medical initially sold tablo hemodialysis devices to our institution with the statement that they could be used for*** intermittent, pirt (prolonged intermittent renal replacement therapy)/sledd (sustained low-efficiency dialysis) ***or crrt (continuous renal replacement therapy).***  We stopped using traditional crrt and replaced with tablo xt for 22 hours under this pretense and based on their statements regarding its successful use in the icu (intensive care unit) setting.  When the fda (food and drug administration) warning stating that tablo could not

---

[7] Witness 8 was interviewed by AlphaSense Expert Insights on January 11, 2024, and their interview was published on the AlphaSense platform on July 9, 2024.

[8] MAUDE Adverse Event Report: Outset Medical, Inc. Tablo Hemodialysis System; Dialyzer, High Permeability With or Without Sealed Dialysate System, accessdata.fda.gov, https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/detail.cfm?mdrfoi__id=19152767 &pc=KDI (last visited Jun 5, 2025).

be used for crrt came out, we raised concerns but were told that it is pirt when used for 22 hours.[9]

97.    **Witness 10**[10] is a former Director at Outset from August 2020 until June 2021 who worked directly with Defendant Trigg. Regarding Defendant Trigg, Witness 10 relayed that, "[s]he does call herself a commercial focus CEO. I would put a little spin on it. She's a customer-focused CEO. She would hop out. I'd call her and say, 'Leslie, we've got a big meeting.' She's like, 'Tell me what airport to fly into and pick me up at the airport.' Without any baggage around her, she'd show up and she would do anything." Witness 10 further relayed that Defendant Trigg would say, " [l]et's go walk a patient floor" or "[w]e need to present to CEOs? All right. I'm ready to go."

98.    **Witness 11** was employed at Outset as a Head of Contracts and Renewals responsible for sales and service contracts from Spring of 2022 until after the Class Period ends. Witness 11 said that prior to the FDA Letter, Outset sales staff sold Tablo as capable of performing CRRT. Witness 11 further said that Outset's brochures, slides, and other promotional materials stated Tablo was acceptable for CRRT. These materials included marketing slides stating that Tablo could replace devices used exclusively for CRRT, including the Baxter PrismaFlex device.

99.    Witness 11 said that all Outset marketing and promotional materials were required to be reviewed and approved by Outset's Legal Department and Medical Affairs, which was overseen by Aragon. Witness 11 said the sales staff were not allowed to create their own promotional materials and all slides needed to be approved. Witness 11 stated that to their knowledge Outset sales staff did not create their own materials or use unapproved materials.

---

[9] In fact, however, as discussed above, CRRT has different flow rates and other features that make it different from PIRRT and other forms of dialysis beyond just being able to run for over 24 hours.

[10] Witness 10 was interviewed by AlphaSense Expert Insights on January 20, 2023, and their interview was published on the AlphaSense platform on January 24, 2023.

100.    Witness 11 said that following the FDA Letter, the sales staff was instructed not to refer to CRRT when promoting Tablo.  Witness 11 further relayed that, after the FDA Letter, the materials referencing CRRT were removed and no longer used.

101.    Witness 11 said that shortly after the FDA Letter, Witness 11 virtually attended a meeting where the new promotional materials for Tablo were discussed including no longer using the term CRRT when discussing Tablo and that Trigg, Aragon, the Chief Commercial Officer, the Senior Vice President of Sales, and all the company directors, were present either in person or virtually.  Witness 11 said at no time during the meeting did any of Outset's leadership disagree with the FDA's determination that Outset was marketing Tablo for CRRT nor did they seem surprised by the FDA Letter.

102.    Witness 11 said following that meeting, Trigg and Aragon conducted an all hands meeting to discuss the FDA Letter at which the sales staff was instructed that they could no longer refer to CRRT when promoting Tablo.

103.    Witness 11 said after the FDA letter, hospitals were reluctant to use Tablo and sales dropped.

104.    **Witness 12** was employed at Outset as a Sales Territory Manager covering the Southeast from Winter 2023 until after the Class Period ends.  Witness 12 said that before the FDA Letter, Outset "100%" promoted and marketed Tablo for use as CRRT device to hospitals and other customers.  Witness 12 described attending several sales conferences at Outset both virtually and in person where Aragon and Trigg spoke to the sales staff and instructed them that Tablo was an all-in-one device that could replace all other devices and was an appropriate replacement for CRRT devices.

105.    Witness 12 said that the Tablo marketing materials included slide decks showing pictures of other firms' devices such as Baxter's Prismaflex that were only used for CRRT and that the sales staff was instructed to say the Tablo could replace those machines. Witness 12 said all marketing and promotional materials were approved by both Medical Affairs, overseen by Aragon, and the Legal Department at Outset before they could be used and that the sales staff were not allowed to create their own materials or slide decks.

106.    Witness 12 said that shortly after the FDA Letter, Outset held an in person sales training conference in Tampa, FL where Trigg and Aragon spoke to the group and said that the sales staff could no longer use the term CRRT.  Witness 12 said they never heard Trigg, Aragon, or any other Outset executive say that the FDA's findings were wrong and that the company had not been promoting the device for CRRT.

107.    Witness 12 said that, after the FDA Letter, sales of Tablo crashed and that customers were no longer comfortable purchasing Tablo.

108.    **Witness 13** was employed as a Clinical Sales Representative at Outset throughout the Class Period. Witness 13 stated that they sold Tablo XT as an option for CRRT.

109.    Witness 13 said that Trigg and Aragon and other executives were present and spoke at every annual sales kickoff meeting.  Witness 13 said that at these sales meetings, Trigg repeated that Tablo was a whole house replacement device for renal therapies and that company executives, including Trigg, went over slides that showed images of Tablo replacing CRRT-specific machines such as the Baxter Prismaflex and Fresenius Multifiltrate Pro.  Witness 13 relayed that Outset provided slide decks, including such images, to the sales staff for marketing and promoting Tablo, and that the decks were approved for use by both the Legal Department and Medical Affairs.  Witness 13 stated that while salespeople could customize the slides for specific clients, they were not permitted to change the data associated with the device.

110.    Witness 13 said that Aragon frequently spoke with potential customers on sales calls, including to discuss Tablo implementation in the ICU.  On these calls, Aragon frequently cited two studies to support his sales pitch that Tablo was an appropriate replacement for CRRT devices.  Witness 13 said that Aragon also met with the medical staff, usually those working in nephrology, for all of Outset's customers.

111.    Witness 13 said that, shortly after the FDA Letter, Trigg and Aragon held an all-hands meeting and told the sales staff that they could no longer use the term CRRT when promoting Tablo.  Further, after the letter, Outset scrubbed all marketing materials removing any mention of CRRT, including in brochures, slide presentations, and the company website, and references to Tablo being a replacement for competing devices that only performed CRRT were

removed from slide presentations.  Witness 13 also said that, after the FDA Letter, Aragon stopped using the two studies in his sales pitch.

112.    Witness 13 relayed that, following the FDA Letter, sales of Tablo were bad, the sales representatives did not make their sales quotas, and almost all of Outset's revenue was from recurring revenue from consumable items.  Witness 13 also said that many nephrologists were upset after learning from the FDA Letter that Tablo was not FDA approved for CRRT.

113.    **Witness 14** was a National Accounts Sales Representative during the Class Period before the FDA Letter.  Witness 14 said they were instructed to and did market Tablo for CRRT. Witness 14 said they were provided with promotional materials and slides prepared by Outset, which included a slide stating that Tablo could replace Prismaflex and NxStage dialysis machines, which are CRRT machines. Witness 14 confirmed that promotional materials and slides were prepared by the Company and provided to salespeople.

## VIII.    DURING THE CLASS PERIOD, DEFENDANTS ENGAGED IN A SCHEME TO DEFRAUD THE MARKET

114.    Leading up to the IPO, as there was little demand for Tablo in the home market and with Outset's release of the XT software upgrade, Defendants devised a scheme to mislead investors regarding Outset's ability to capture the entire over $2 billion acute care market where CRRT is performed, by representing Tablo as a "value proposition" and "enterprise solution" that could replace *all* of a health system's dialysis devices so that it could *down select just to one device for all dialysis treatments*.

115.    In an interview[11] right after the IPO, Defendant Trigg describes how Outset devised its message to investors that Tablo "would enable health systems and providers to down select just to one machine" which they "ended up calling and describing to investors as an 'enterprise solution for dialysis.'"  Trigg stated:

> And if you could do that, then, you would really simplify the complexity of dialysis from the health system point of view. You could really simplify that by enabling them to down select to one device platform, one hardware platform. And, and then

[11]https://podcasts.apple.com/us/podcast/outset-ceo-leslie-trigg-discusses-zoom-powered-%24278m/id690269746?i=1000491755399

again provide an enterprise solution kind of same device, whether it's being used in the ICU or at home, which is gonna provide a lot of operating efficiency and, um and cost reduction. So that's the, that's really the principal way in which the vision evolved.

116. Trigg further describes how SVPGS Lewis had "championed this idea for a long time" and had Trigg visit a hospital where she saw "all these different machines all over the hospital, they all required, you know, one had to be connected to like a water treatment room, one was requiring like hundreds of bags of dialysate fluid, in order to be operated, then I saw, like, some required portable water purification equipment to operate, and I saw, you know, two nurses required to, like, move this equipment down the hospital hallways, and it could barely fit the patient's room." Trigg states that after that, she emailed Lewis and said, "I get it."

**A.      The Scheme Defendants Developed And Touted A Marketing Vision Fueled By Undisclosed Companywide Off-Label Marketing They Created, Engaged In And Directed In Furtherance Of The Scheme**

117. As Tablo is not FDA cleared for CRRT, the most expensive form of dialysis which is used for patients that are often critically ill, the Scheme Defendants furthered their scheme by developing and instituting the top-down companywide off-label marketing of Tablo for CRRT, as detailed in with witness accounts above. Defendants Trigg, Aragon, and Brottem were each direct participants in the scheme. According to the marketing pitch that the Scheme Defendants developed, because Tablo was significantly less expensive to operate than traditional dialysis machines, health systems would purportedly achieve significant cost savings if they replaced all of their dialysis devises with Tablo, while specifically telling customers that Tablo could do CRRT and could replace devices cleared for CRRT. This became known as Outset's "value proposition" marketing strategy to market the Tablo for CRRT and convince health systems to replace all of their dialysis machines and outsourcing with Tablo, including CRRT and CRRT machines, despite the fact that Tablo has never been cleared for CRRT. Indeed, Outset's marketing strategy for Tablo relied significantly on expressly marketing Tablo for CRRT.

118. Defendants Aragon and SVPGS Lewis expressly directed the sales staff to market Tablo for CRRT at sales calls and meetings across the country. At annual sales kick off meetings attended by Defendants Trigg and Aragon, slides were used showing Tablo replacing CRRT machines. Outset provided marketing materials to its sales staff, which were approved by

Defendant Aragon's and Brottem's departments, which promoted Tablo for CRRT and promoted the replacement of all of a system's machines with Tablo, and which staff were instructed not to alter.

119.    As instructed and armed with the misleading marketing materials that they were obligated to use, sales staff touted that Tablo could replace all machines, including machines approved for CRRT.  Some of these salespersons even relayed that they did not even know that Tablo was not approved for CRRT.  As part of the pitch, Outset would detail the specific cost savings a health system would have by replacing all of its machines with Tablo, including specifically for CRRT.

120.    Moreover, Aragon and Trigg also directly promoted Tablo for CRRT uses to customers.  Aragon was involved in many sales calls with customers and used studies to support his CRRT pitch.

121.    Trigg likewise directly spoke with customers, including asking them to discuss their system's experience (which included using Tablo for CRRT) with other potential customers to promote Tablo.  A colleague referred to her as "a customer-focused CEO" always ready to meet with customers.  She has publicly touted her involvement in discussing cost savings directly with customers.  For example, during the March 8, 2023 TD Cowen Healthcare Conference, Defendant Trigg stated:

> When a hospital is -- now, they've moved past stage one and our sales cycle is giving them -- we have a really nice ROI tool, and we get through the financials, kind of the before and after picture, and everybody loves that.  I tend to go to those meetings, because I know they're going to go really well.  So, everybody gets it fun.  They're fun meeting.  Like, oh, my gosh, we're going to save millions, and everybody is super excited.

Likewise, during an August 7, 2024 earnings call, she relayed that, "I have spent a lot of time in the field."

122.    As a result, Outset "aggressive[ly]" marketed, and health systems purchased, Tablo for CRRT.  Outset customers describe that Outset employees marketed Tablo to them for CRRT, including with materials that discussed using it for CRRT, and that they bought and leased

Tablo units expressly for CRRT, including replacing all of their dialysis machines that performed different treatments with Tablo units.

123.    Without disclosing that it was pervasively off-label marketing to customers behind the scenes, publicly, the Company explained its "value proposition" and "enterprise solution" to investors as Tablo costing less than traditional machines and/or outsourcing and was the only machine necessary for health systems because it could purportedly perform all dialysis treatments. For example, from the IPO Offering Documents and thereafter, Outset emphasized Tablo's "compelling value proposition" in the ICU "by eliminating the need for multiple dialysis machines." Outset also repeatedly relayed to investors that its strong financials were driven by strong customer demand due to the core Tablo value proposition in the acute market around significant cost reduction. However, Defendants concealed from the market that widespread off-label marketing was fundamental to its value proposition and cost savings pitch. In fact, Outset repeatedly said it did not engage in off-label marketing.

124.    The scheme proved to be a success. Tablo sales, particularly in the acute care setting where CRRT is performed, grew substantially, including 100-200% growth year-over-year, after the off-label marketing began. As Outset relayed to investors, "Our acute progress is a direct testament to the strong economic value proposition of Tablo." Yet, while Outset repeatedly attributed the strong financial results to Tablo's ability to perform all dialysis treatments allowing health systems to down select to one device and increased sales to acute customers, they did not disclose that the illicit off-label marketing was driving the financial results. As a result, Outset's stock price soared on the IPO and remained artificially inflated while the fraud was concealed. Analysts also took note, highlighting, *inter alia*, Tablo's "unique value proposition" and health system's "whole house conversion" to Tablo and "Tablo's ability to address 100% of the hospital market."

**B.     The Speaking Defendants Issued False And Misleading Statements In Furtherance Of The Scheme**

125.    In furtherance of the fraudulent scheme, the Speaking Defendants mislead the investing public regarding (i) the ability of Tablo to replace all other dialysis devices so that health

systems could down select just to one device for all dialysis treatments and that Outset could capture the entire acute dialysis market; (ii) concealing that Outset's strong financial results were the result of off-label marketing; (ii) touting that the company did not engage in off-label marketing; (iv) after the Company disclosed the existence of the FDA Letter, downplaying and misrepresenting the issues raised by the FDA Warning Letter, their impact on the Company, and the reasons for declining Tablo sales; and (v) touting TabloCart without prior 510(k) Clearance as a non-medical accessory.

i.    **The Speaking Defendants' Misrepresentations In Outset's IPO And Thereafter**

126.    The Class Period begins on September 15, 2020, when Outset's common stock began trading on the NASDAQ pursuant to the Company's IPO of 10,293,777 shares at the IPO price of $27 per share.[12]

127.    From the very start of the Class Period and thereafter, Outset touted Tablo's value proposition and its purported ability to replace all other dialysis devices so that health systems could down select just to one device for all dialysis treatments and patients.

128.    Indeed, in the IPO Offering Documents and thereafter during the Class Period, the Company emphasized the "value proposition" and that they "designed Tablo from the ground up to be a single enterprise solution that can be utilized across the continuum of care, allowing dialysis to be delivered anytime, anywhere and by anyone." Outset touted that "Tablo's clinical flexibility enables providers to standardize to a single platform across all care settings" and that:

> Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows providers to standardize to a single technology platform from the hospital to the home.

_____

[12] In connection with the IPO, the Company filed with the SEC a Registration Statement on Form S-1 on August 21, 2020, Amendment No. 1 to the Registration Statement on Form S-1/A on September 9, 2020, and a Form S-1MEF on September 14, 2020 (together, the "IPO Registration Statement"). On September 16, 2020, the Company filed a Prospectus on Form 424B4 (the "IPO Prospectus") (together, the IPO Registration Statement and IPO Prospectus are the "IPO Offering Documents"). Defendants Trigg and Chambers signed the IPO Offering Documents.

129.    The IPO Documents further stated:

Tablo's unique features offer a compelling value proposition across both acute and home settings. In the acute care setting, Tablo lowers the cost of dialysis by up to 80% in the ICU by reducing treatment supplies cost and enabling labor cost reduction. Tablo also reduces complexity by eliminating the need for multiple dialysis machines and by streamlining documentation and compliance.

130.    In the IPO Offering Documents and thereafter during the Class Period, the Company also represented that it did not engage in off-label marketing, stating that "[a]lthough our policy is to refrain from statements that could be considered off-label promotion of Tablo, the FDA or another regulatory agency could disagree and conclude that we have engaged in off-label promotion."

131.    On September 15, 2020, the day of its IPO, Outset's $27 offering price rose another $33.68, or 124.7%, to close at $60.68 per share.  In an October 11, 2020 note, investment firm Goldman Sachs initiated coverage with a "buy" rating and highlighted the representations about Tablo's ability to allow hospitals to "standardiz[e] to one dialysis system."

132.    On November 11, 2020, the Company held an earnings call attended by Defendants Trigg and Chambers to discuss its third quarter 2020 results, its first results as a public company, of net revenue of $13.8 million, a 423% increase compared to $2.6 million in the third quarter of 2019.  They touted the reasons for Outset's financial performance and success with health systems without disclosing that the Company achieved these results through off-label promotion of Tablo for CRRT.  Specifically, Defendant Trigg stated, "New contracts with national and regional health systems in addition to expansion within our existing customer base drove our strong Q3 results" and that "[o]ur revenue achievement exceeded our initial expectations for the quarter as Tablo adoption continues to accelerate within the acute market."

133.    Defendant Chambers:

third quarter revenue grew 423% year-over-year to $13.8 million. This result was driven by strong acute adoption including the impact of our HHS contracts and COVID-related orders that we received during the second quarter as well as growth in consumables and services tied to our larger installed base.

Product revenue grew 349% year-over-year to $10.8 million. Console revenue equaled $9 million compared to $1.9 million in the prior-year period. Consumable revenue grew 263% to equal $1.8 million driven by our larger installed base and increased ASP as compared to the prior-year period.

[No. 5:24-cv-06124-EJD] AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                                                                    35

134.    During the call, Defendant Trigg emphasized Tablo's ability to provide all dialysis treatments in the hospital setting, stating that Tablo "was designed as a complete enterprise solution to enable dialysis to be done by anyone, anytime, anywhere" and "Tablo uniquely enables the management of dialysis across the entire care continuum from the hospital to the home with a single device platform, which has never been done before."

135.    As part of the earnings call, Outset presented a slide deck in which it displayed a graphic exhibiting various dialysis machines being replaced by Tablo and claiming "Tablo is an enterprise solution that delivers easier, lower-cost dialysis":



136.    One of the machines shown being replaced by Tablo in this slide is the Baxter Prismaflex, a device that is only indicated for CRRT, yet Outset never relayed this to investors or the fact that it was marketing off-label to customers.

137.    Analysts and the market again relied on these representations. On November 11, 2020, in a note to investors, SVB Leerink started coverage of Outset at an "outperform" rating and highlighted Outset's "unique value proposition." In a November 11, 2020 report, Goldman Sachs discussed the "positive" quarter and Outset's "accelerating momentum" in the acute market. The firm maintained its "buy" rating.

138.    On November 12, 2020, the Company filed with the SEC the 3Q 2020 Form 10-Q signed by Defendants Trigg and Chambers ("3Q 2020 Form 10-Q"), which stated that "Tablo's

clinical flexibility enables providers to standardize to a single platform across all care settings"

and that:

> Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows providers to standardize to a single technology platform from the hospital to the home.

139.    The 3Q 2020 Form 10-Q also repeated the Company's assertion that it does not engage in off-label marketing, stating that "our policy is to refrain from statements that could be considered off-label promotion of Tablo."

140.    The 3Q 2020 Form 10-Q also discussed the alleged basis for the Company's financial results:

> Product revenue increased by $8.4 million, or 349% for the three months ended September 30, 2020 as compared to the three months ended September 30, 2019. The increase was primarily due to higher console revenue ($7.1 million) driven by new customer adoption, fleet expansion across existing customers, sales that we believe were attributable to COVID-19 driven demand, and increased console leasing revenue ($0.7 million). In addition, sales of Tablo consumables for the three months ended September 30, 2020 increased by $1.3 million given our higher console installed base as compared to the prior year period.

141.    On November 12, 2020, Defendant Trigg presented at the Morgan Stanley Life After COVID Thematic Conference on behalf of Outset, where Defendant Trigg stated that Tablo enabled hospitals to "down select to one machine Tablo, because Tablo is so mobile and also Tablo does not require any infrastructure to use it." She touted Tablo as an "Enterprise Solution, Value Proposition … we uniquely offer health systems, one device platform across the spectrum of care. So that's what we do uniquely well."

142.    Defendant Trigg made similar claims during the November 19, 2020 Stifel Virtual Healthcare Conference, which was also attended by Defendants Trigg and Chambers from Outset:

> And so that intrigued us, and to us created an opportunity or a question. Could we design one machine that could really do it all? Could you allow health systems to down select [ph] just to one device platform that would deliver all of this functionality, whether that treatment was being done in the hospital or the ICU? Why would you want to manage a bunch of different things, all of which do one narrow slice of what a health system has to deliver, which is enterprise-wide dialysis?

> So we set out to deliver an ***enterprise-wide solution***, and that's the device we call Tablo. Our mantra is anywhere, anytime, anyone. This should be and is a device that could be used anywhere.

143. On November 19, 2020, the Company filed with the SEC a draft registration statement signed by Defendants Trigg and Chambers and on December 2, 2020, the Company filed with the SEC a prospectus both of which stated that "Tablo's clinical flexibility enables providers to standardize to a single platform across all care settings" and that:

> Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows providers to standardize to a single technology platform from the hospital to the home.

144. On March 9, 2021, the Company held an earnings call attended by Defendants Trigg and Chambers from Outset to discuss the fourth quarter and full-year results of net revenue of $17.2 million in the fourth quarter and $49.9 million for the full year of 2020, representing 143% and 231% increases respectively, over the corresponding periods of 2019. Defendant Chambers touted the reason for the results without discussing the off-label marketing:

> [F]ourth quarter revenue grew 143% year-over-year to $17.2 million, driven by the impact of our HHS lease agreement, higher console shipments, the launch of our Tablo XT products and continued growth in consumables and services tied to our larger installed base. Our full-year revenue equaled $49.9 million, an increase of 231% over the prior-year period.
>
> Product revenue grew 111% year-over-year to $13.2 million. Console revenue grew 96% year-over-year to $10.6 million, driven by an increase in Console shipments, higher HHS leasing revenue and recognition of XT upgrade revenue.

145. Further, Defendant Trigg stated, "If anything, the customers we're adding on now often are full house conversions and those tend to – while it takes some time, those tend to be very high utilizing acute customers."

146. Defendant Trigg also maintained that Tablo could serve all of a health system's dialysis needs:

> But the common denominator is the interest in an enterprise solution. That's the driver here. And so it starts with the economic efficiencies, the operational efficiencies of a health system being able to down select to one device, managing that patient from the acute setting all the way to the home. Whereas today, when they deliver dialysis across their enterprise it's requiring them to buy and maintain

a number of different machines which obviously is more cumbersome and more costly.

147.    As part of the earnings call, Outset presented the same slide as at the November 11, 2020 earnings call, in paragraph 135, supra.

148.    Analysts and the market continued to positively react to these representations.  On March 10, 2021, the next trading day, Outset's stock price rose $4.37, or 9.02%, to close at $52.81.  Further, in a March 10, 2021 note to investors, SVB Leerink reiterated its "outperform" rating and stated "OM's Tablo Hemodialysis System is a game-changer from a technology perspective, with a unique value proposition to both healthcare providers and patients."  Similarly, in a March 10, 2021 report, Goldman Sachs was "encourage[ed]" by Outset's transactions with health systems opting for a "whole house conversion" to Tablo.

149.    On March 22, 2021, Outset filed with the SEC the FY 2020 Form 10-K signed by Defendants Trigg and Chambers ("FY 2020 Form 10-K"), which stated that "Tablo's clinical flexibility enables providers to standardize to a single platform across all care settings" and that:

> Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines.  The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows providers to standardize to a single technology platform from the hospital to the home.

150.    The FY 2020 Form 10-K further stated:

> Tablo's unique features offer a compelling value proposition across both acute and home settings. In the acute care setting, Tablo lowers the cost of dialysis by up to 80% in the ICU by reducing treatment supplies cost and enabling labor cost reduction. Tablo also reduces complexity by eliminating the need for multiple dialysis machines and by streamlining documentation and compliance.

151.    The FY 2020 Form 10-K also repeated the Company's assertion that it does not engage in off-label marketing, stating "our policy is to refrain from statements that could be considered off-label promotion of Tablo."

152.    The FY 2020 Form 10-K also discussed the Company's financial results:

> Product revenue increased by $25.9 million, or 188%, for the year ended December 31, 2020 as compared to the year ended December 31, 2019. The increase was primarily due to a $21.2 million increase in console revenue driven by new customer adoption, fleet expansion across existing customers, sales that we believe were attributable to COVID-19 driven demand, and increased console

leasing revenue ($2.6 million). In addition, sales of Tablo consumables, including cartridges, for the year ended December 31, 2020 increased by $4.7 million given our larger console installed base as compared to the prior year period.

153. In March and April 2021, in connection with Outset's SPO, the Company filed with the SEC a Draft Registration Statement on Form S-1 on March 25, 2021, a Registration Statement on Form S-1 on April 6, 2021, and a Form S-1MEF on April 8, 2021 (together the "SPO Registration Statement"). On April 12, 2021, the Company filed a Prospectus on Form 424B4 (the "SPO Prospectus") (together, the SPO Registration Statement and SPO Prospectus are the "SPO Offering Documents"). Defendants Trigg and Chambers signed the SPO Offering Documents which stated that "Tablo's clinical flexibility enables providers to standardize to a single platform across all care settings" and that:

Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows providers to standardize to a single technology platform from the hospital to the home.

154. The SPO Offering Documents further stated:

Tablo's unique features offer a compelling value proposition across both acute and home settings. In the acute care setting, Tablo lowers the cost of dialysis by up to 80% in the ICU by reducing treatment supplies cost and enabling labor cost reduction. Tablo also reduces complexity by eliminating the need for multiple dialysis machines and by streamlining documentation and compliance.

155. The SPO Offering Documents also repeated the Company's assertion that it does not engaged in off-label marketing, stating "our policy is to refrain from statements that could be considered off-label promotion of Tablo."

156. On May 5, 2021, Defendants Trigg and Chambers attended Outset's earnings call to discuss its first quarter 2021 results of net revenue of $22.9, a 219% increase compared to $7.2 million in the first quarter of 2020. Defendant Chambers discussed the Company's staggering yearly revenue growth: "Product revenue grew 207% year-over-year to $18.2 million. Console revenue equaled $14.8 million or 194% year-over-year growth, driven by higher placement to our acute customers as well as the recognition of XT upgrade revenue." Again, the Company failed

to discuss its off-label promotion of Tablo for CRRT drove the "higher placement" with acute care clients.

157.    Defendant Trigg further noted that the installed base in both the acute and sub-acute markets show that Tablo's "value proposition is resonating quickly following console deployment." Defendant Trigg also touted Tablo's ability to be a single enterprise solution:

> [T]he way that we design Tablo and our design goal from a technology standpoint from the beginning, really was the notion of an enterprise solution that health systems would no longer need to buy and maintain two, three, four different types of machines, each of which did only one type of dialysis. And so the design vision was, 'Hey, could we build a single hardware platform that really could perform the functionality of all these machines for all types of acuity patients.'

> And so in delivering on that promise – that design promise, we're able to approach a health system – a given health system and talk to them about down selecting now to Tablo for use anywhere from the ICU to home. So that's sort of part one and the idea behind the enterprise solution.

158.    As part of the earnings call, Outset presented the same slide as at the November 11, 2020 earnings call, in paragraph 135, supra.

159.    On May 6, 2021, the Company filed with the SEC the 1Q 2021 Form 10-Q signed by Defendants Trigg and Chambers ("1Q 2021 Form 10-Q"), which stated that "Tablo's clinical flexibility enables providers to standardize to a single platform across all care settings" and that:

> Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows providers to standardize to a single technology platform from the hospital to the home.

160.    The 1Q 2021 Form 10-Q also discussed the Company's financial results:

> Product revenue increased by $12.3 million, or 207% for the three months ended March 31, 2021 as compared to the three months ended March 31, 2020 driven by a $9.7 million increase in consoles revenue and a $2.6 million increase in consumables revenue. The increase in consoles revenue was driven by new customer adoption, fleet expansion across existing customers, and a $0.7million increase in console leasing revenue. The increase in consumables revenue was driven by our growth in console installed base and higher utilization of the installed base.

161.    On May 11, 2021, Defendants Trigg and Chambers presented at the Bank of America Securities Virtual Health Care Conference on behalf of Outset. Defendant Trigg touted

that they would be able to take the entire acute market: "[t]he engineering team here has been busy and worked hard to actually add incremental features that enables Tablo's use really across any and all patient populations served anywhere in the hospital, again, bedside dialysis maybe with short treatments all the way to long treatments in the ICU.  So we don't see any limit to our ability to penetrate that full $2.2 billion acute market here in the U.S."

162.    Defendants Trigg and Chambers attended the June 9, 2021 Goldman Sachs 42nd Annual Global Healthcare Virtual Conference, at which Defendant Trigg stated, "Could we design a single hardware platform that could perform the functionalities of all of those different types of dialysis machines plus could we also integrate a thousand square foot water treatment room in a box and that's exactly what we did."

163.    On August 5, 2021, Defendants Trigg and Ahmed held Outset's earnings call to discuss Outset's the second quarter of 2021 financial results of net revenue of $25.2 million, a 115% increase compared to $11.7 million in the second quarter of 2020 and the reason for the results.  Defendant Trigg discussed the Company's "strong revenue growth and substantial progress in achieving our top strategic initiatives for 2021" and attributed the growth, in part, to "expansion within the acute setting."

164.    Defendant Ahmed, Outset's new CFO, stated:

[S]econd quarter revenue grew 115% year-over-year to $25.2 million, driven primarily by increased console shipments to acute customers, higher consumable shipments, our HHS lease agreements, and increased services to support our growing installed base.  Product revenue improved 115% year-over-year to $20.6 million.  Console revenue grew by 106% year-over-year to $16.9 million, driven by higher console placements and increased ASP, given the availability of Tablo system.

165.    As part of the earnings call, Outset presented the same slide as at the November 11, 2020 earnings call, in paragraph 135, supra.

166.    On August 6, 2021, the Company filed with the SEC the 2Q 2021 Form 10-Q signed by Defendants Trigg and Ahmed ("2Q 2021 Form 10-Q"), which stated that "Tablo's clinical flexibility enables providers to standardize to a single platform across all care settings" and that:

Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows providers to standardize to a single technology platform from the hospital to the home.

167. The 2Q 2021 Form 10-Q also discussed the Company's financial results:

Product revenue increased by $10.9 million, or 113% for the three months ended June 30, 2021 as compared to the three months ended June 30, 2020, driven by a $8.7 million increase in consoles revenue and a $2.2 million increase in consumables revenue. The increase in consoles revenue was driven by new customer adoption, fleet expansion across existing customer sites, higher average selling prices and a $0.7 million increase in console leasing revenue. The increase in consumables revenue was driven by our growth in console installed base.

168. The Company's false and misleading statements influenced analysts to maintain their positive coverage. On August 18, 2021, TD Cowen also maintained an "outperform" rating on the Company citing Tablo's ability to function as a "single dialysis solution for every care setting" and "Tablo's ability to address 100% of the hospital market."

169. Defendants Trigg and Ahmed attended the September 13, 2021 19th Annual Morgan Stanely Healthcare Conference at which Outset continued touting Tablo for its ability to handle all dialysis treatments in the acute care setting. There, Defendant Trigg discussed results of a data analysis in touting that Tablo could perform 100% of all dialysis treatments:

We specifically designed Tablo, as we say, kind of like as an enterprise solution where we can – that same device platform can be used for dialysis on the floor or in the ICU.

About 85% of the treatments performed in the acute setting are actually kind of run-of-the-mill regular dialysis 3 or 4 hour treatments done bedside at the floor, we can do those. The 15% are much sicker patients, much more complicated patients in the ICU, running longer, slower dialysis up to 24 hours, Tablo also can serve those patients. And so we have the ability to capture 100% of all the treatment volume that any given hospital across the country is doing on an annual basis. And so that's what leads to such a big opportunity specific to Outset and our technology.

170. On November 3, 2021, Defendants Trigg and Ahmed held Outset's earnings call to discuss the third quarter 2021 financial results of net revenue of $26.3, a 91.3% increase compared to $13.8 million in the third quarter of 2020. Defendant Trigg touted that much of the Company's revenue growth was due to acute care customers, without disclosing the off-label marketing, stating that "top line growth continues to be driven by our commercial success in the

acute market." Defendant Trigg also praised the "continued strength in our XT attachment rate in the third quarter."

171.    Defendant Ahmed, further commented that:

[R]evenue grew 91.3% year-over-year in the third quarter to $26.3 million, driven primarily by increased console shipments to acute customers, higher consumable shipments, the impact of XT upgrades, increased services to support our growing installed base and our HHS lease agreements. Product revenue grew 102% year-over-year to $21.8 million in the third quarter. Console revenue grew by 71% year-over-year to $15.4 million driven by higher console placements and increased [average selling price] given the availability of and demand for Tablo XT.

172.    On November 4, 2021, the Company filed with the SEC the 3Q 2021 Form 10-Q signed by Defendants Trigg and Ahmed ("3Q 2021 Form 10-Q"), which stated that "Tablo's clinical flexibility enables providers to standardize to a single platform across all care settings" and that:

Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows providers to standardize to a single technology platform from the hospital to the home.

173.    The 3Q 2021 Form 10-Q also discussed the Company's financial results:

Product revenue increased by $11.0 million, or 102% for the three months ended September 30, 2021 as compared to the three months ended September 30, 2020, driven by a $6.4 million increase in consoles revenue and a $4.6 million increase in consumables revenue. The increase in consoles revenue was driven by new customer adoption, fleet expansion across existing customer sites, and higher average selling prices and a $0.7 million increase in console leasing revenue. The increase in consumables revenue was driven by the growth in our console installed base.

174.    On November 8, 2021, Outset issued its inaugural Environmental, Social, and Governance ("ESG") report, signed by Defendant Trigg, to discuss the Company's "ESG-related programs, priorities, goals, and performance" ("2021 ESG Report"). The 2021 ESG Report discussed the regulatory framework with which Outset must comply and claimed the Company was in compliance. The Company's 2021 ESG Report stated:

Outset has adopted a promotional material procedure to define acceptable and unacceptable advertising, sales support, training, and other promotional practices for Outset medical devices in the United States. Included in this procedure is

Outset's policy that all claims with respect to Outset products must be consistent with approved labeling, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence (i.e., instructions-for-use, verification and validation testing, clinical study report, or any other report requiring a similar rigorous process of review and approval). In addition, without exception, promotional material may be neither false nor misleading (either in terms of a specific product claim or the overall net impression conveyed by the promotional material) and must comply with all specific conditions of approval for the product being promoted. Furthermore, promotional materials for a cleared or approved product may not promote, discuss, or refer to uncleared, unapproved, or off-label use.

175.    Outset presented at the November 16, 2021 Stifel Healthcare Conference, which was attended by Defendants Trigg and Ahmed. As part of the conference, Outset presented the same slide as at the November 11, 2020 earnings call, in paragraph 135, supra.

176.    On February 16, 2022, Defendants Trigg and Ahmed held Outset's earning call to discuss the fourth quarter 2022 and full-year 2022 results of net revenue of $28.2 million in the fourth quarter of 2021, a 63.2% increase compared to $17.2 million in the fourth quarter of 2020, and $102.6 million for the full year of 2021, representing an increase of 105.5% compared to $49.9 million for 2020. Defendant Trigg specifically noted Tablo XT's impact on the Company's growth that quarter noting the "strong XT attachment rate." Defendant Trigg further noted that "[t]urning now to a review of our success in the acute market, the fourth quarter and full year 2021 exceeded our expectations with transformational progress in terms of new sales agreements, expanding within existing customers, and console shipments."

177.    Defendant Ahmed touted the purported reasons for Outset's results:

Our fourth quarter revenue grew 63% year-over-year to $28.2 million, driven primarily by increased console shipments to acute customers, higher consumable shipments, increased services to support our growing installed base and the impact of XT upgrades.

***

Product revenue grew 80% year-over-year to $23.7 million. Console revenue grew by 70% year-over-year to $18.1 million, driven by higher console placements and increased ASP given the availability of and demand for Tablo XT. Similar to prior quarters, we continue to see better uptake of our XT upgrade than we had initially projected.

178.    On February 17, 2022, the next trading day, Outset's stock price rose $4.72, or 13.79%, to close at $38.94.

[No. 5:24-cv-06124-EJD] AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                                                     45

179.    On February 18, 2022, during market hours, Defendants Trigg and Ahmed presented at the 11th Annual SVB Leerink Global Healthcare Conference on behalf of the Company.  At this conference Defendant Trigg again touted again that Tablo could replace all dialysis machines in a health system and Outset could go after the entire market:

> . . . I think what's really, really different about the way we're approaching the acute market is that we are going after the whole thing.  Companies that have talked about acute dialysis in the past, their devices can only be used in the ICU. They can only be used for these longer treatments called SLED or CRRT, or they have a device that can only be used for short treatments

> . . . Tablo is the only device available that can treat across the entire spectrum, sort of from zero to 24 hours.  And therefore, we can go after all of the different types of treatments that are delivered in a hospital.

> . . . [the hospital] start[s] offering dialysis, those longer treatments, and they didn't before because the device is so easy . . .With a simpler device, now they're doing dialysis in the ICU for longer -- treating more critical patient. . . decide to do what we would call whole house conversion . . . over time, when they're more comfortable with it, confident and everybody's trained, they'll go to a whole house conversion where they're only using the Tablo machines to deliver treatment.  And that could be another reason why utilization grows.

180.    That day, Outset's stock price rose $2.27, or 5.83%, to close at $41.21.

181.    On February 23, 2022, after the market closed, the Company filed with the SEC the FY 2021 Form 10-K signed by Defendants Trigg and Ahmed ("FY 2021 Form 10-K"), which repeated the Company's assertion that it does not engage in off-label marketing, stating "our policy is to refrain from statements that could be considered off-label promotion of Tablo."

182.    In the FY 2021 Form 10-K, Outset included a slightly different version of the language in the 3Q 2020 Form 10-Q, paragraph 138, supra, but similarly touted:

> Tablo is an all-in-one device[,] . . . offers the most compelling value proposition [b]y eliminating the need for separate infrastructure, . . . [and] Tablo's clinical flexibility enables providers to standardize to a single solution across multiple care settings.
>
> ***
>
> Typically, different types of dialysis machines are used in different care settings and for different clinical needs. Tablo is an enterprise dialysis solution that allows providers to standardize to a single technology platform.

183.    In the FY 2021 Form 10-K signed by Defendants Trigg and Ahmed, Outset included a graphic indicating that the Tablo could replace three "traditional hemodialysis

machines," one of which was the Fresenius MultiFiltrate Pro, a dialysis machine indicated for only CRRT.  Yet, Outset again never relayed that to investors or that it was off-label marketing to customers, just as when the Company used a similar slide in multiple conferences and earnings calls.

184.    The FY 2021 Form 10-K also discussed the Company's financial results:

Product revenue increased by $44.7 million, or 113%, for the year ended December 31, 2021 as compared to the prior year. The increase was primarily due to a $32.3 million increase in console revenue and a $12.4 million increase in consumables revenue. The increase in consoles revenue was driven by new customer adoption, fleet expansion across existing customer sites, a higher average selling price, and an increase in console leasing revenue. The increase in consumables revenue was driven by the growth in our Tablo installed base.

185.    On February 24, 2022, the next trading day, Outset's stock price rose $3.99, or 10.13%, to close at $43.39.

186.    On May 4, 2022, Outset held an earnings call attended by Defendants Trigg and Ahmed to discuss the first quarter of 2022 results of net revenue of $30.6 million, a 33.3% increase compared to $22.9 million in the first quarter of 2021 and an 8.5% increase compared to $28.2 million in the fourth quarter of 2021.  During the call, Defendant Trigg praised the Company's performance in the acute care setting:

We delivered our seventh consecutive quarter of strong top line growth, led by continued momentum in the acute market as we achieved continued positive

performance on gross margin expansion and made substantial progress toward our home inflection objectives for 2022.

\*\*\*

We benefited from strong console demand and strength and treatment utilization as we continue to capture share across acute care customers, accelerate home expansion and broaden our install base.

187.    Defendant Ahmed again lauded the reasons for the results without disclosing the rampant off-label marketing:

Our first quarter revenue grew 33% year-over-year to $30.6 million, driven primarily by higher consumable shipments, increased console shipments to acute and home customers, and increased services to support our growing installed base.

Product revenue grew 41% year-over-year to $25.7 million.

\*\*\*

We continue to see better uptake of our XT upgraded than we had initially projected, which highlights Tablo's clinical versatility and the clinical communities [sic] recognition of Tablo's ability that capably treat the very sickest population of patients in the ICU.

188.    On May 5, 2022, the Company filed with the SEC its Form 10-Q for the first quarter ("1Q 2022 Form 10-Q") signed by Defendants Trigg and Ahmed which discussed the Company's financial results:

Product revenue increased by $7.5 million, or 41% for the three months ended March 31, 2022 as compared to the same quarter in prior year, driven by a $3.3 million increase in consoles revenue and a $4.2 million increase in consumables revenue. The increase in consoles revenue was driven by new customer adoption and fleet expansion across existing customer sites, which was slightly offset by a $0.6 million decrease in console leasing revenue. The increase in consumables revenue was driven by the growth in our console installed base and higher average selling prices.

189.    Analysts maintained their bullish outlook on the Company and Outset's representations, including Tablo's "value proposition."  In a May 5, 2022 report, TD Cowen analysts remarked on the Company's "strong momentum in the Acute market," due to Tablo's "clinical and economic value proposition" and maintained an "outperform" rating on the Company.

190.    On May 24, 2022, Defendant Ahmed presented at the UBS Global Healthcare Conference on behalf of Outset.  Defendant Ahmed touted Tablo's ability to be the only dialysis machine a hospital would need:

in the acute setting, today, pre-Tablo, a hospital may need multiple dialysis devices to do ICU training or floor training, meaning bedside training rather or treatment rather.  And with Tablo, you can have one device that will do dialysis in the ICU. It will do dialysis at the bed side.  It will do dialysis sort of everywhere you need.

191.    On August 1, 2022, the Company held an earnings call attended by Defendants Trigg and Ahmed discussing the Company's 2Q 2022 financial results at which Defendant Ahmed stated, "Consumable revenue was $6.4 million, an increase of 69% versus the prior year, reflecting our larger installed base."

192.    On August 2, 2022, the Company filed with the SEC its Form 10-Q for the second quarter ("2Q 2022 Form 10-Q") signed by Defendants Trigg and Ahmed which discussed the Company's financial results:

Product revenue increased by $6.4 million, or 17% for the six months ended June 30, 2022 as compared to the same period in the prior year, driven by a $6.8 million increase in consumables revenue attributable to the growth in our console installed base and higher average selling price for consumables.

### ii.    Outset Releases Tablocart Without FDA Authorization And Continues To Mislead The Market

193.    Beginning in October 2022, Outset marketed and distributed the TabloCart, a water purification system for hemodialysis, without receiving, or even seeking prior to the FDA Warning Letter, FDA clearance for doing so.  Outset did so despite TabloCart being a medical device requiring such clearance.  Trigg, Ahmed, and Brottem thereafter repeatedly touted TabloCart as a "non-medical accessory" despite it clearly fitting the definition of a medical device requiring FDA authorization.  Thus, in addition to misleading the investing public by: (a) promoting the ability of Tablo to replace all other dialysis devices so that health systems could down select just to one device for all dialysis treatments and that Outset could capture the entire acute dialysis market; (b) concealing that Outset's strong financial results were the result of off-label marketing; and (c) touting that the company did not engage in off-label marketing, these Defendants also touted TabloCart as a "non-medical accessory" and promoted and sold it without the requisite FDA authorization.

194.    On November 8, 2022, Outset held an earnings call attended by Defendants Trigg and Ahmed regarding the Company's third quarter 2022 financial results of net revenue of $27.8 million, a 5.5% increase compared to $26.3 million in the third quarter of 2021 and a 10.8%

increase compared to $25.1 million in the second quarter of 2022. During the call, Defendant Trigg touted the reason for the results, stating:

> [i]n summary, our strong Q3 was driven by significant expansion in the acute setting and a home pipeline that is rebuilding ahead of expectations. It is clear to us that Tablo remains a highly differentiated solution in one of the largest, most expensive recession-proof areas of healthcare.

195. During the call, Defendant Ahmed touted Tablo XT's strong uptake, stating:

> Product revenue was up 11% from the prior quarter and roughly flat year-over-year to $21.7 million. Console revenue grew 15% from the second quarter and decreased 3% year -over-year to $15 million, as we regained momentum from the home ship hold and worked through the macro headwinds we've previously described. We saw console ASPs increase again year-over-year, driven primarily by the demand for Tablo XT which continues to exceed our initial projections.

196. During the call, Defendant Trigg also announced the release of the TabloCart to Outset's line of products, ignoring its lack of FDA clearance, stating, "[t]o that end, we are pleased to introduce TabloCart, which is a new accessory for Tablo."

197. On November 9, 2022, the Company filed with the SEC its Form 10-Q for the third quarter ("3Q 2022 Form 10-Q") signed by Defendants Trigg and Ahmed, which discussed the Company's financial results:

> Product revenue increased by $6.4 million, or 10% for the nine months ended September 30, 2022 as compared to the same period in the prior year, driven by a $7.2 million increase in consumables revenue attributable to the growth in our console installed base.

198. On the same day, Outset's stock price rose $3.43, or 29.90%, to close at $14.90.

199. On November 15, 2022, the Company presented at the Stifel Healthcare Conference, which was attended by Defendant Ahmed, where it used the same slide discussed in paragraph 135, supra.

200. On November 17, 2022, the Company presented at the Jefferies LLC London Healthcare Conference, which was attended by Defendant Ahmed. Defendant Ahmed repeated the Company's refrain that Tablo could serve every patient in the acute care setting, stating "[o]n the clinical and operational benefits, Tablo is one device that can do dialysis from the ICU to the

bedside. Where today a hospital may have multiple devices, a couple in the ICU, a different one at the bedside, and potentially different devices to do long treatment."

201. On January 9, 2023, the Company issued a press release (a copy of this press release was attached as Ex 99.1 to its January 11, 2023 Form 8-K filed with the SEC and signed by Defendant Ahmed) announcing preliminary financial results for the fourth quarter and fiscal year ended December 31, 2022. It stated that revenue in the fourth quarter is expected to be approximately $31.5 million, a 13% increase compared to $27.8 million in the third quarter of 2022 and revenue for 2022 is expected to be approximately $115 million, a 12% increase compared to $102.6 million in 2021. The press release quoted Defendant Trigg as stating that the prior year was "an important year for Outset," and touted revenue growth noting the Company "significantly increased the number of Tablo consoles in hospitals and homes."

202. On January 11, 2023, the Company presented at the J.P. Morgan 41st Annual Healthcare Conference, which was attended by Defendant Trigg. Defendant Trigg describes that Tablo "really enabled the healthcare provider to, again down select operational efficiency, down select to 1 device that their nurses and their clinicians can use in the ICU that, folks can use in the subacute space and that consumers can use in the home . . . It is an opportunity for 1 device across multiple markets."

203. During the conference, Outset presented a slide touting Tablo as "an all-in-one solution that replaces multiple machines and a water treatment room with a single device" and displayed a graphic with Tablo superimposed over a variety of dialysis machines that it would replace including the Baxter Prismaflex, which is only indicated for CRRT. Yet, Outset never relayed that to investors or that it was off-label marketing to customers, just as when the Company used a similar slide in multiple conferences and earnings calls. The Company used this same slide and image during the February 13, 2023 earnings call and the May 3, 2023 earnings call attended by Defendants Trigg and Ahmed.



An all-in-one solution that replaces multiple machines and a water treatment room with a single device

### iii.    The FDA Begins And Inspection Of Outset As Outset Continues To Mislead The Market

204.    Beginning no later than January 17, 2023 and continuing through February 10, 2023, the FDA conducted an inspection at Outset's facility located in San Jose, California where Outset's executive offices are located.  Unknown to investors, during this on-site inspection, the FDA found evidence of Outset's off-label promotion of Tablo for CRRT and that TabloCart was a medical device requiring FDA approval before it was marketed and sold.

205.    On February 13, 2023, after the FDA began the inspection of Outset that led to the FDA Warning Letter, Defendants Trigg and Ahmed held Outset's earnings call to discuss its financial results of net revenue of $32.0 million in the fourth quarter, a 15.3% increase compared to $27.8 million in the third quarter, and a 14.0% increase compared to $28.2 million in the fourth quarter of 2021, and revenue for the full year was $115.4 million, an increase of 12.4% compared to $102.6 million in 2021.  During the call, Defendant Ahmed touted reasons for the strong Tablo Tablo revenue and demand in the acute care setting without disclosing that it was driven by Outset's off-label marketing:

> Our fourth quarter revenue increased approximately 15.3% sequentially and 13.7% year-over-year to $32 million.
>
> ***
>
> Product revenue was up 21.3% from the prior quarter and increased 11.5% year-over-year to $26.4 million.  Console revenue grew 22.8% from the third quarter and increased by 1.5% year-over-year to $18.4 million.  We saw console ASPs increase again year-over-year, driven primarily by the ongoing demand for Tablo

XT and by demand for TabloCart, our new accessory launched in the fourth quarter of 2022.

206.    As part of the earnings call, the Company presented the same slide as used during the January 11, 2023 J.P. Morgan 41st Annual Healthcare Conference, in paragraph 203, supra.

207.    On February 13, 2023, the Company filed with the SEC its Form 10-K for FY 2022 ("FY 2022 Form 10-K") signed by Defendants Trigg and Ahmed, which repeated the Company's assertion that it does not engage in off-label marketing, stating "our policy is to refrain from statements that could be considered off-label promotion of Tablo."

208.    In the FY 2022 Form 10-K, Outset stated: "[t]ypically, different types of dialysis machines are used in different care settings and for different clinical needs.  Tablo is an enterprise dialysis solution that allows providers to standardize to a single technology platform."

209.    The FY 2022 Form 10-K also discussed the Company's financial results:

Product revenue increased by $9.1 million, or 11%, for the year ended December 31, 2022 as compared to the prior year. The increase was primarily due to a $9.6 million increase in consumables revenue attributable to the growth in our console installed base.

210.    In the FY 2022 Form 10-K Outset also described TabloCart as a "non-medical accessory."

211.    On March 13, 2023, unknown to investors, Outset held at least one meeting with the FDA, which included a discussion of Tablo's FDA clearance at which Defendant Trigg "*confirmed that CRRT is distinct from the cleared indications for use, device specifications, and treatment modalities for the Tablo.*"

212.    On April 13, 2023 Outset filed a Proxy Statement signed by defend Brottem which described TabloCart as a "non-medical accessory."

213.    On May 3, 2023, after the Company's undisclosed March 13, 2023 meeting with the FDA attended by Defendant Trigg and at which the fact that Tablo is not cleared for CRRT was discussed, Defendants Trigg and Ahmed held Outset's earnings call to review its financial results for the first quarter of 2023 of recorded net revenue of $33.5 million, a 9.5% increase compared to $30.6 million in the first quarter of 2022, and a 4.6% increase compared to $32.0 million in the fourth quarter of 2022, touting the reasons for the results.

214. Defendant Trigg stated the following concerning the strength of the Company's financial results: "Tablo uptake remained strong, our installed base grew in both the acute care and home markets, and we benefited from strong mix and pricing across the board."

215. Trigg further stated:

We also saw ASPs rise, both on consoles and consumables, which serves as strong validation of Tablo's clinical and economic value proposition versus our competitors. Our ASPs benefited again from better-than-expected uptake of Tablo add-ons, including good early demand for our TabloCart new product accessory.

***

Just in terms of the – the cumulative number of conversations that our team is now having with health systems that want to look at a full enterprise solution, as we call it, using Tablo from the ICU all the way to home. We are having many, many, many more conversations than we had, let's say, this time last year, about deploying a home program, in tandem with an acute program.

216. Defendant Trigg also discussed the TabloCart product launch and its strong demand:

From a product innovation standpoint, we are very pleased with demand for TabloCart, a new product accessory we introduced in Q3 of last year that provides additional maneuverability around the hospital, and incremental water prefiltration capabilities. TabloCart is sold separately and is gross margin accretive ASP and is proving to be a valuable solution to many of our acute care customers.

217. Defendant Ahmed touted the Company's financial results, stating:

Our first quarter revenue increased approximately 4.6% sequentially and 9.5% year-over-year to $33.5 million, exceeding our expectations. The year-over-year change was driven by both higher product revenue and higher service and other revenue. The ongoing increase in recurring consumables and service revenues is one of the benefits of our expanded installed base and continues to be one of the key drivers of gross margin expansion.

Product revenue was up 5.4% from the prior quarter, despite some expected capital equipment purchasing seasonality and increased 8.2% year-over-year to $27.8 million. Console revenue grew 2.7% from the fourth quarter and increased by 4.5% year-over-year to $18.9 million. We saw console ASP increase year-over-year, driven primarily by our disciplined approach to pricing and ongoing demand for Tablo accessories.

218. As part of the earnings call, the Company presented the same slide as used during the January 11, 2023 J.P. Morgan 41st Annual Healthcare Conference, in paragraph 203, supra.

219.    Analysts continued to react positively and highlighted the Speaking Defendants' statements regarding the "value proposition."  In a May 3, 2023 note, TD Cowen analysts stated that Outset did not face "headwinds from hospital capital spending slowdowns, likely due to Tablo's value proposition."  The firm maintained its "outperform" rating.

220.    On May 4, 2023, the Company filed with the SEC its Form 10-Q for the first quarter ("1Q 2023 Form 10-Q") signed by Defendants Trigg and Ahmed.  The 1Q 2023 Form 10-Q discussed the Company's financial results:

> Product revenue increased by $2.1 million or 8% for the three months ended March 31, 2023 as compared to the same period in the prior year. This increase was driven by a $1.3 million increase in consumables revenue due to the growth in our console installed base and a $0.8 million increase in consoles revenue.

221.    On June 30, 2023, the Company released its ESG report ("2023 ESG Report") signed by defendant Trigg.  In it, Outset discussed regulatory framework to which it was subject and claimed to be in compliance, including in regard to off-label marketing:

> Outset has adopted an ethical marketing procedure that defines acceptable and unacceptable advertising, sales support, training, and other promotional practices for Outset medical devices in the United States.  Included in this procedure is Outset's policy that all claims with respect to Outset products must be consistent with approved labeling, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence (i.e., instructions-for-use, verification and validation testing, clinical study report, or any other report requiring a similar rigorous process of review and approval).
>
> In addition, without exception, promotional material or statements made by Outset sales representatives may not promote, discuss, or refer to uncleared, unapproved, or off-label use.  This means that all promotional activities may be neither false nor misleading (either in terms of a specific product claim or the overall net impression conveyed by the promotional material) and must comply with all specific conditions of approval for the product being promoted.

### iv.    While The Truth Begins To Be Revealed, The Speaking Defendants Continue To Mislead The Market

222.    On July 5, 2023, the FDA sent its Warning Letter, addressed to Defendant Trigg, asserting that Tablo and TabloCart were misbranded and adulterated.

223.    Thereafter, on Friday July 7, 2023, after the market closed, Outset filed a Form 8-K signed by Defendant Ahmed disclosing that it received a warning letter from the FDA that it was engaged in off-label marketing of both Tablo and the TabloCart, stating:

The Warning Letter raises two additional observations.  The first observation asserts that certain materials reviewed by the FDA and found on the Company's website promote continuous renal replacement therapy (CRRT), a modality outside of the current indications for the Tablo® Hemodialysis System.  The Company believes this concern has been effectively addressed through labeling and promotional changes already underway.

The second observation asserts that the TabloCart with Prefiltration (the "TabloCart"), requires prior 510(k) clearance for marketing authorization. TabloCart, an accessory to the Tablo System, launched in the third quarter of 2022 and sales to date have not been material to the Company's financial results.  The Company intends to work collaboratively with the FDA to resolve this observation, including potentially submitting a 510(k) on TabloCart.

224.    On news of this partial disclosure, Outset's stock price fell $1.20, or 5.9%, to close at $19.26 per share on Monday July 10, 2023, the next trading day, on heavy volume.

225.    In fact, the FDA Warning Letter states that "[d]uring an inspection of your firm located at 3052 Orchard Drive in San Jose, CA on *January 17, 2023 through February 10, 2023*, investigators from the United States Food and Drug Administration (FDA) determined that your firm is *a medical device manufacturer of the Tablo Hemodialysis System and TabloCart with Prefiltration*."  The letter further states that:

Under section 201(h) of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. § 321(h), [both of] *these products are devices* because they are instruments, apparatuses, implements, machines, contrivances, implants, in vitro reagents, or other similar or related articles, including any component, part, or accessory, which are intended for use in the diagnosis of disease or other conditions or in the cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body.

226.    Specifically, as to TabloCart, the FDA Warning Letter states that TabloCart was both *"adulterated" and "misbranded"* as it was being marketed and distributed without FDA clearance or premarket approval stating that Tablo is a water purification system for hemodialysis under 21 C.F.R. § 876.5665, a Class II medical device subject to premarket notification:

A water purification system for hemodialysis is a device that is intended for use with a hemodialysis system and that is intended to remove organic and inorganic substances and microbial contaminants from water used to dilute dialysate concentrate to form dialysate.  This generic type of device may include a water softener, sediment filter, carbon filter, and water distillation system.

TabloCart with Prefiltration appears to meet this definition because:
-    It is intended to be used with a Hemodialysis System
-    It is intended to remove organic and inorganic substances from water used to dilute dialysate concentrate to form dialysate…

As noted above, *your firm is marketing this device without clearance or premarket approval.*

227.    As to Tablo, the FDA Warning Letter states that Tablo was both *"misbranded" and "adulterated"* because *"evidence reviewed at the [January 17, 2023 through February 10, 2023] inspection and marketing materials found on [Outset's] website [www.outsetmedical.com] on May 11, 2023 show promotion of the Tablo Hemodialysis System for continuous renal replacement therapy (CRRT) treatment,"* which is not included in Tablo's indications for use.  The letter states that Tablo's clearance is limited to:

use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility or in the home.  Treatments must be administered under a physician's prescription and observed by a trained individual who is considered competent in the use of the device.  Treatment types available include Intermittent Hemodialysis (IHD), Sustained Low Efficiency Dialysis (SLED/ SLEDD), Prolonged Intermittent Renal Replacement Therapy (PIRRT), and Isolated Ultrafiltration.

228.    As an example of such off-label marketing, the FDA Warning Letter discusses certain materials from Outset's website, stating:

[M]aterials on your website state that two large hospitals converted to a program consisting solely of the Tablo Hemodialysis System and state, 'This major conversion eliminated the need for several types of dialysis machines for different clinical needs, including intermittent hemodialysis (IHD) in the dialysis unit and continuous renal replacement therapy (CRRT) in critical care.'

Other materials on your website state that multiple hospitals who had established CRRT treatment programs 'converted those CRRT programs over to Tablo with Extended Therapy' and states, 'They also replaced their CRRT machines with Tablo with XT...'

229.    The FDA Warning Letter to Defendant Trigg also states that *"you confirmed that CRRT is distinct from the cleared indications for use*, *device specifications, and treatment modalities for the Tablo,"* citing to both meeting minutes and presentation slides from a *March 13, 2023* teleconference between Outset and the FDA and statements in Outset's 510(k) submission for Tablo.

230.    In the FDA Warning Letter, the FDA also emphasizes the *serious health and safety risks* that Outset's off-label marketing raised:

Patients who require CRRT are typically hospitalized with acute illness resulting in acute kidney injury and possible severe hemodynamic instability, and the

*devices that provide CRRT treatment have unique features* to enable continuous treatment (> 24 hours) for this patient population.

*Systems that cannot safely and reliably perform CRRT raise serious public health concerns when used for CRRT treatment, because failure of dialysis systems performing CRRT may result in fluid and electrolyte imbalances, inadequate ultrafiltration, infection, and patient harm/death*.

This change represents a significant modification outside the scope of the K223248 clearance that *could significantly affect safety or effectiveness,* resulting in a new device such that a separate, additional 510(k) premarket notification must be submitted [see 21 CFR 807.81(a)(3)(i)]. *Thus, the sale of the Tablo Hemodialysis System for CRRT is unlawful.*

231.    Indeed, in the letter, the FDA cited not only materials on the Company's website but also referred to other evidence found at the FDA's inspection in January through February 2023 in demonstrating that the Company promoted Tablo for CRRT.  The marketing materials cited in the FDA Warning Letter were but one example of Outset's pervasive off-label promotion as further evidenced by the witness accounts discussed herein.

          **v.**     **While The Speaking Defendants Publicly Downplay The Importance Of The FDA Warning Letter, Internally, Outset Modifies Its Marketing Practices For Tablo And Continues To Mislead The Market**

232.    Once the Company was forced to diclose the existence of the FDA Letter, the scheme further evolved to include misrepresenting to investors the extent of the off-label marketing, the impact on and internal response by the Company, and the reasons for the subsequent declining sales of Tablo.  Defendants Trigg and Ahmed represented that the Tablo marketing issues were limited to a few materials on the Outset website and would have no real impact.  For example, as detailed below, in August, 2023, as to the FDA's concern that Outset was promoting Tablo for CRRT, defendant Trigg stated that the Company removed the materials from its website that the FDA believed promoted CRRT and that the Company's "action plan has addressed this finding and [they] expect no impact with the customers from this remediation." Defendants Trigg and Ahmed also advised the market that Outset's FY 2023 results were expected to come in at the low end of guidance but blamed this on the TabloCart pause as Outset sought FDA clearance but that growth would resume once the Company received clearance for TabloCart.

233. However, in truth, the off-label marketing for CRRT had permeated Outset's marketing and, now that the FDA had uncovered it, Outset needed to systemically change its marketing practices to fix the illegal marketing. Indeed, internally, as described above in the accounts of Witnesses 2, 3, 11, 12, and 13, after Outset received the FDA Warning Letter, Outset held an all-hands call, sent out a companywide email, and held a meeting where management instructed everyone to stop referring to CRRT while marketing Tablo. Further, as relayed by Witness 2, the staff was also instructed to purge all prior marketing materials, both hard copy and electronic, that existed prior to the FDA Warning Letter. Likewise, Witness 13 relayed that, after the letter, Outset scrubbed all marketing materials removing any mention of CRRT.

234. Moreover, after being forced to disclose that it received the FDA Warning Letter, Outset added the following disclosure to its website and marketing materials: "The Tablo Hemodialysis System is not indicated for continuous renal replacement therapy (CRRT) and is cleared for use for up to 24 hours."

235. Thus, while Outset downplayed the import of the violations publicly, it had to significantly change its marketing now that the FDA was focused on this off-label marketing and no longer instructed its sales staff to market for CRRT, a key element of its marketing strategy. Moreover, as former employees relay, after the FDA Letter regarding Outset's illegal marketing and Tablo not being cleared for CRRT, customers no longer wanted to purchase Tablo.

236. On August 2, 2023, after the market closed, the Company issued a press release (a copy of this press release was attached as Ex 99.1 to its August 2, 2023 Form 8-K filed with the SEC and signed by Defendant Ahmed) and disclosed that due to the FDA Warning Letter and as the TabloCart had never received FDA clearance to be marketed, "it ha[d] paused the shipment of TabloCart with Prefiltration, an accessory for the Tablo System, pending the Food and Drug Administration's clearance of a 510(k) the Company plans to submit later this month." In the press release, the Company also announced lowered expectations for FY 2023, telling investors that it "now expects to be at the low end of [revenue guidance] as a result of the shipment pause."

237. On the same day, Defendants Trigg and Ahmed held the Company's earnings call. In regard to the FDA Warning Letter, during the call, Defendant Trigg portrayed the letter, the

issues raised, Outset's remediation of it, and its impact as narrow or non-existent in scope, stating that the:

> first observation pertained to content on our website that referenced to a Continuous Renal Replacement Therapy, or a CRRT, a modality not currently included in Tablo's indications for use. To be fully reflective of our most recently cleared indications for use, we've removed these materials. We believe that our action plan has addressed this finding and expect no impact with the customers from this remediation.

238.    Defendant Trigg went on to state that the FDA Warning Letter and the issues it flagged did not raise safety and other concerns stating, "I want to emphasize that neither of these two additional observations pertain to safety, efficacy or quality." However, the letter itself states that "[s]ystems that cannot safely and reliably perform CRRT raise serious public health concerns when used for CRRT treatment, because failure of dialysis systems performing CRRT may result in fluid and electrolyte imbalances, inadequate ultrafiltration, infection, and patient harm/death" and that the off-label marketing for CRRT could "could significantly affect safety or effectiveness of the device."

239.    Further, when questioned by analyst Travis Steed about the lowered expectations based on the TabloCart, specifically, "why there was a reason that you can't kind of offset that within the guidance range. And also understand like why would Tablo orders actually be deferred here when they could probably upgrade to get the Cart post the approval," Defendant Trigg responded, in part, "as we look at the second half, we're just thinking about, hey, if there are any new customers in these really bad water areas, they might choose to push back their console purchase until TabloCart is available. And so, for that reason, we contemplated that in the guidance that we talked about today."

240.    Outset also tried to assure investors that Tablo sales would ramp up once TabloCart received FDA clearance. Defendant Ahmed stated:

> our expectation is that sales of both TabloCart with prefiltration will resume once we get our clearance and that any Tablo orders that may defer will also come back once we get our 510(k) clearance. So, as we think about 2024, nothing has structurally changed.

241.    Defendant Ahmed also discussed the financial results for Q2 2023, the last quarter before the FDA Letter, of net revenue of $27.8 million in the third quarter of 2022, a 5.5% increase compared to $26.3 million in the third quarter of 2021 and a 10.8% increase compared to $25.1 million in the second quarter of 2022:

> Our second quarter revenue increased 7.7% sequentially and 43.8% year-over-year to $36 million.  The year-over-year change was driven primarily by higher console placements and the associated pull-through of consumables used for each Tablo treatment.  Product revenue was up 5.6% from the prior quarter and increased 49.5% year-over-year to $29.3 million.
>
> Console revenue grew 4.4% from the first quarter and increased by 48.8% year-over-year to $19.7 million.  We had strong console placements in both our acute and home end markets.  As Leslie indicated, ASP remained high during the quarter, driven by mix, disciplined pricing and the substantial majority of acute console shipping with our Tablo Pro Plus software.

242.    Similarly, on August 3, 2023, Outset filed with the SEC the 2Q 2023 Form 10-Q signed by Defendants Trigg and Ahmed ("2Q 2023 Form 10-Q") stated:

> Product revenue increased by $9.7 million or 49% for the three months ended June 30, 2023 as compared to the same period in the prior year. This increase was driven by a $6.5 million increase in console revenue and a $3.2 million increase in consumables revenue due to growth in our console installed base.

243.    While Outset continued to mislead the market, the market reacted negatively to the further details of the fraud and materialization of the risk.  Outset's stock price dropped $1.97, or 10.2%, to close at $17.39 per share on August 3, 2023, on heavy volume.

244.    In initiating coverage, C.L. King & Associates found "the Warning Letter to be problematic" in an August 17, 2023 report to investors.

245.    On September 12, 2023, Defendants Trigg and Ahmed presented at the Morgan Stanley 21st Annual Global Healthcare Conference on behalf of Outset.  Defendant Trigg further minimized the FDA Warning Letter:

> And our response effectively was strategically, yes, and so we -- I don't foresee that there's anything controversial in our response which we are choosing to take a very, very collaborative approach.  They had some commentary about some customer testimonials on our website.  Those have been long removed.  And then we did choose to take the step of filing on TabloCart and then voluntarily said, hey, what we'll just push the pause button on the cart to continue to be a good corporate citizen and a good partner to FDA.  So all of that is now behind us.

246. In fact, rather than "choos[ing]" to file a 510(k) application and "voluntarily" pausing shipment of TabloCart, the Company had to take these actions as the FDA had discovered that the Company was unlawfully promoting TabloCart. Moreover, despite the reference to "some commentary about some customer testimonials on our website," neither the FDA's findings regarding Outset's off-label marketing for CRRT, nor the true state of Outset's off-label marketing, were limited to some customer commentary on Outset's website.

247. On October 12, 2023, after the market closed, Outset issued a press release (a copy of this press release was attached as Ex 99.1 to its October 12, 2023 Form 8-K filed with the SEC and signed by Defendant Ahmed) preannouncing third quarter financial results, disclosing that the FDA issues had a bigger impact than previously disclosed. The Company announced "[p]reliminary revenue for the third quarter was $30.4 million" and lowered FY 2023 guidance, stating it "expects revenue for 2023 to be approximately $130 million." In the press release, Defendant Trigg disclosed that the "[g]rowth in the quarter was dampened by a larger-than-expected impact in the field from the recent FDA warning letter, and early signs of a more cautious outlook on capital spending that we see as a headwind continuing through the fourth quarter."

248. At the earnings call the same day presented by Defendants Trigg and Ahmed, Defendants further expanded on the disclosures but attempted to blame the shortfall on the TabloCart shipment hold, stating that:

> The shortfall to the guidance we provided in August was driven by a larger-than-expected impact in the field from the recent FDA warning letter, which served to elongate our sales cycle in several ways. First, we observed more customers than we anticipated, choosing to defer their Tablo console purchasing and installation until TabloCart with prefiltration is available again. Second, we experienced a strong competitive response, which served to create marketplace confusion, particularly regarding Tablo's use in the ICU.

249. On the further disclosures and materialization of the risk, the Company's share price fell $3.38, or 49.9%, to close at $3.39 per share on October 13, 2023, on heavy volume.

250. Analysts reacted strongly to the additional disclosures regarding the FDA issues. In an October 13, 2023 note, C.L. King & Associates still viewed the "Warning Letter to be problematic." On the same day, TD Cowen also lowered its revenue estimates and price target to

$9 per share due, in part, to the "larger-than-anticipated impact in the field from the FDA warning letter."

251.    On November 7, 2023, after the market closed, the Company issued a press release (a copy of this press release was attached as Ex 99.1 to its November 7, 2023 Form 8-K filed with the SEC and signed by Defendant Ahmed) reporting revenue for the third quarter of $30.4 million and reiterating its revised full year 2023 guidance of approximately $130 million.

252.    The Company held an earnings call that same day attended by Defendants Trigg and Ahmed where Defendant Trigg also revealed initial 2024 guidance calling for mid-teens revenue growth versus consensus expectations of 17.8%.

253.    During the call, it was also revealed that out of $30.4 million in total revenue, consumable revenue (cartridges and other supplies) was $11 million and service revenue was $6.8 million, meaning that $17.8 million of the $30.4 million, *59% of total revenue*, was for recurring revenue rather than the sales of consoles, a significant increase from 45% the quarter before the FDA Letter was released.

254.    Defendant Trigg attributed these results to the FDA Warning Letter while still misrepresenting and attempting to downplay the issues raised in the FDA Warning Letter and again blaming the results and low guidance on TabloCart's unavailability and competitive noise, stating that, "competitive activity around TabloCart not being available by our choice and some competitive noise making around the other aspect of the warning letter around some case studies that were on our website.  We feel that we have fully satisfied the FDA's concerns around the website."

255.    During the earnings call, Defendant Ahmed also stated that Outset's business would grow once it received clearance for TabloCart:

> grow at a high-teens rate annually after 2024 as we gain scale, adjusted to capital spending environment, and achieve TabloCart with pre-filtration clearance.
>
> ***
>
> [G]iven that we expect TabloCart to get cleared in the second half, this first half-second half effects will be a little bit more pronounced and you'll see more growth in the back half of the year.

256. On November 8, 2023, Outset filed with the SEC the 3Q 2023 Form 10-Q signed by Defendants Trigg and Ahmed ("3Q 2023 Form 10-Q") in which, the Company further disclosed the impact of the FDA Warning Letter while continuing to place blame for the impact on sales on other issues including the halt of the TabloCart, rather than Outset's dialing back its aggressive off-label marketing:

> During the third quarter of 2023, several factors served to elongate our sales cycle and the timing of delivery and installations which, in turn, had an adverse impact on our bookings and revenues for the quarter. These factors related to our recent Warning Letter, our distribution pause on TabloCart with Prefiltration and certain macroeconomic impacts on our customers. We observed more customers than we anticipated choosing to defer their Tablo console purchasing and installation until TabloCart with Prefiltration becomes available again. In addition, the Warning Letter created a certain amount of marketplace confusion (exacerbated, we believe, in some cases by our competitors) particularly regarding Tablo's use in the intensive care unit (ICU). We anticipate that the negative impacts from the Warning Letter and our distribution pause will continue through at least the end of 2023. If the FDA's review of our pending 510(k) application for TabloCart with Prefiltration and the current distribution pause continues for an extended period of time, if the FDA ultimately does not grant clearance of our 510(k) application, or if we are otherwise unable to overcome the adverse impact in the field from the Warning Letter and our distribution pause for a prolonged period of time, our revenues could be materially and adversely impacted. Finally, during the third quarter of 2023, we began to observe an increasing number of our existing and prospective customers deferring their decisions to purchase Tablo in an environment of rising interest rates and more cautious capital spending. These deferrals served to further elongate our sales cycle and the timing of delivery and installations, which we expect to continue into 2024.

257. Similar statements were repeated in the Company's FY 2023 10-K.

258. While Outset continued to mislead the market, the market reacted negatively to the further details of the fraud and materialization of the risk. On this news, the Company's share price fell $0.62, or 14.4%, to close at $3.69 per share on November 8, 2023, on heavy volume.

259. Analysts noted that the FDA issues continued to plague the Company even while the Speaking Defendants tried to downplay them. In a November 8, 2023 report, RBC Capital noted the Company's commentary that the "FDA Warning Letter is having a greater impact on sales than it originally expected."

260. At the November 16, 2023 Jefferies London Healthcare Conference attended by Defendant Ahmed, Defendant Ahmed asserted the Company would "accelerate to high teens"

growth in 2024 because, in part, the Company was "expecting approval on one of our products, TabloCart with prefiltration."

261.    On February 21, 2024, the Company held an earnings call attended by Defendants Trigg and Ahmed.  Defendant Trigg provided an update on the status of the FDA's review of TabloCart: "Additionally, on the regulatory submission front, we remain in interactive review with FDA on the TabloCart 510(K) submission and continue to forecast sales of TabloCart with prefiltration resuming during the second-half of 2024," suggesting that Tablo sales would ramp up once TabloCart received FDA clearance, which would serve as a "positive catalyst" for the Company.

262.    The same day, Outset also filed with the SEC the FY 2023 Form 10-K signed by Defendants Trigg and Ahmed ("FY 2023 Form 10-K"), which discussed the Company's financial results, including the results of the first two quarters of 2023, which were prior to the FDA Letter:

> Product revenue increased by $10.1 million, or 11%, for the year ended December 31, 2023 as compared to the prior year. The increase was primarily due to a $13.4 million increase in consumables revenue attributable to the growth in our console installed base.

263.    At a March 5, 2024 TD Cowen Healthcare Conference attended by Defendants Trigg and Ahmed, Defendant Trigg again characterized the potential TabloCart clearance as a "***clear catalyst***" for the Company's growth.

264.    Defendant Ahmed also characterized Outset's customers as simply "waiting for [Tablo]Cart" to finalize their purchases.  He went on to note that "those customers are still very much in our pipeline.  They are still very much waiting for [Tablo]Cart.  What we're really pleased with is that nobody has dropped out.  Nobody has said, look, I don't want the product anymore."

265.    Defendant Trigg concluded by noting that "when [TabloCart's] back and we have a benefit of offering it to customers, yeah, ***we expect it to be nicely adopted***."

266.    Ahead of its first quarter results for 2024, on May 6, 2024, the Company issued a press release (a copy of this press release was attached as Ex. 99.1 to its May 6, 2024 Form 8-K filed with the SEC and signed by Defendant Ahmed) announcing that the FDA "has granted 510(k) clearance of TabloCart with prefiltration," and "Outset has resumed distribution of

[No. 5:24-cv-06124-EJD] AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                                                                           65

TabloCart with prefiltration and has product available to ship to customers," the event that the Speaking Defendants had promised would result in Tablo sales ramping up.

267.    On this news, Outset's stock price rose $0.65, or 20.70%, to close at $3.79.

268.    On May 8, 2024, after the market closed, during the Company's earnings call presented by Defendants Trigg and Ahmed, Defendant Trigg touted the clearance that Outset received for TabloCart just days earlier as driving demand for Tablo stating, "[w]ith our most challenging recent headwind now behind us with the FDA clearance of TabloCart, demand for Tablo that has never been higher."

269.    On May 9, 2024, the Company filed with the SEC the 1Q 2024 Form 10-Q signed by Defendants Trigg and Ahmed ("1Q 2024 Form 10-Q"), which cautioned that, despite FDA clearance of TabloCart, the Company may still experience ongoing issues as a result of the FDA Warning Letter:

> *While we recently resumed distribution of TabloCart with Prefiltration following the FDA's clearance of our 510(k) submission, we may continue to experience disruptions as a result of the warning letter and our prior distribution pause on TabloCart with Prefiltration.*
>
> ***
>
> Even as we resume distribution of TabloCart with Prefiltration following its FDA clearance, if we are unable to sufficiently recover from these disruptions and any reputational harm at the levels or on the timeframes we anticipate, we may experience further disruptions *which could include adverse impacts on our backlog, our ability to expand customer relationships or attract new customers, as well as reduced demand for TabloCart and/or, potentially, Tablo*.

270.    On this news and materialization of the risk, Outset's stock price fell $0.86, or 20.82%, to close at $3.27.

### vi.    The Truth Is Finally Revealed

271.    On August 7, 2024, after the market closed, Outset released its second quarter 2024 financial results, significantly missing consensus estimates and lowering its full year 2024 outlook by $39 million at the midpoint.  This is despite the fact that TabloCart now had FDA clearance during most of Q2 2024 and Tablo could now lawfully market and sell it.  The press release (a copy of this press release was attached as Ex 99.1 to its August 7, 2024 Form 8-K filed with the SEC and signed by Defendant Ahmed) disclosed that the Company would be forced to

take "clear steps to improve our execution." Specifically, the press release reported, in relevant part:

> **[N]ew console placements were below our expectations and will be lower than we originally forecasted for the year**. We are taking clear steps to improve our execution and grow the business over the long term to bring the benefits of Tablo to even more providers and dialysis patients.
>
> ***
>
> Second Quarter 2024 Financial Results
>
> **Revenue for the second quarter was $27.4 million compared to $36.0 million in the second quarter of 2023, driven by a decline in product revenue to $19.2 million**.
>
> ***
>
> Full Year 2024 Financial Guidance
>
> **Outset now expects 2024 revenue to be approximately $110 million, revised from a prior range of $145 million to $153 million.**

272. On that same date, Defendants Trigg and Ahmed held Outset's second quarter 2024 earnings call to discuss the Company's financial results for the quarter. During that earnings call, Defendant Trigg disclosed the Company would have to undergo "sales team and process restructuring" and would be unable to deliver on a ramp of TabloCart as previously stated. Specifically, during the earnings call, Defendant Trigg stated:

> What we're experiencing is a temporary dislocation of converting the pipeline to revenue on our timeline due to the **changes in customer profile and process and the improvements needed in our own sales execution.**
>
> ***
>
> We have also **restructured our sales organization and trained them on our new enterprise sales approach.** Given the depth and breadth of the sales team and process restructuring, we expect it to take several quarters to fully implement and realize the many benefits that will come from it. As we look ahead to the second half of the year, we now know it will not be possible to execute this transformation given the expected accompanying disruption while simultaneously delivering on the ramp we previously forecasted. As a result, we expect the second half of 2024 will look similar to the first half with expected revenue for the year of approximately $110 million.
>
> ***
>
> While the return of TabloCart was helpful in advancing some of the acute deals in our pipeline, **the ship hold masks what we now recognize, which is the need for commercial execution changes to better position ourselves to capitalize on enterprise opportunities that typically come with a longer sales cycle.**

273. Analyst Rick Wise questioned the Company on this news, including its inconsistency with its prior message, including just three months prior, stating:

> ***Looking back at your comments last quarter, it felt like with TabloCart in hand orders that had been delayed could now be sold… and we would see an acceleration.*** Help us transition from what you were thinking and understanding about where you were in early mid-May and where we are now sort of like what happened -- what didn't materialize that you thought was materializing? … Just trying to understand how we got here …

274. In response, Defendant Ahmed stated, "[w]e did expect more of the sort of the TabloCart occluded deals for lack of better term to advance and to close in the second quarter. When they didn't, it really became pretty apparent that there probably was something more going on here."

275. On this news and materialization of the risk, the Company's share price fell $2.33, or 68.5%, to close at $1.07 per share on August 8, 2024, on heavy volume.

276. The August 7, 2024 disclosure and materialization of the risk revealed finally fully revealed the fraud and the Speaking Defendants' pretextual excuses for declining Tablo sales. Indeed, had the drop in sales and revenue truly been a result of market confusion and the temporary unavailability of TabloCart, Outset's sales would have rebounded immediately after the FDA granted 510(k) Clearance for TabloCart. Yet, even after TabloCart received clearance for TabloCart on May 6, 2024, Outset again was forced to lower guidance, as it was not the lack of availability of TabloCart that impacted sales after the FDA Warning Letter, but Outset's inability to continue to aggressively and unlawfully market Tablo for CRRT now that the FDA had cracked down on the practice and customers were no longer interested in Tablo.

277. In an August 7, 2024 report, RBC Capital stated that "operational execution remains challenging at [Outset] as evident in recent quarters, and ***Q2 disappointed once again even as Tablo Cart [sic] is now approved***" and noted the ***"[l]ack of execution and low visibility."*** RBC Capital downgraded the stock to "perform" from "outperform" and lowered its price target to $3 per share from $6.

278. On the same day, BTIG released a report noting that it was ***"disappointed and wary"*** and lowered its price target to $4 per share.

[No. 5:24-cv-06124-EJD] AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

68

279.    Outset's business still has not recovered.  For example, the Company's Q2 2023 revenue, the quarter ending immediately before disclosure of the FDA Warning Letter, was $36.04 million.  Now, Outset's most recent revenue for Q4 2025 was $28.9 million, a nearly 20% decline.

280.    Further, the Company's recurring revenue (revenue for supplies and services and not Tablo consoles), as a percentage of total revenue versus Tablo console sales has increased drastically, making up the vast majority of Outset's revenue further highlighting the declining Tablo sales.  Recurring revenue accounted for 74% revenue for both FY 2024 and FY 2025, as compared to 45% for the quarter prior to the FDA Letter.  The large increase in recurring revenue share and declining total revenue reflect the lasting impact of the Company's previously undisclosed scheme.

281.    Likewise, Outset's stock price has also not recovered from the fraud perpetrated by Defendants during the Class Period.  On April 30, 2026, Outset shares closed at $0.28 per share.

282.    Tellingly, the Company's message to investors now frames Tablo as part of a hospital's "complement" of dialysis machines, along with a hospital's CRRT machines.  For example, on June 11, 2025, Trigg stated:

> So there's two – well, yeah, maybe three, but two broad categories of the type of dialysis that's done in a hospital. One is called IHD. That's just a fancy acronym for regular dialysis. It's 3 hour to 4 hour – it's called intermittent hemodialysis. That's 3 hour to 4-hour dialysis, just actually like you find in a dialysis clinic. That's about 90% to 95% of all the treatments that are performed in a hospital are just 3 to 4-hour treatments outside the ICU.
>
> There is another modality called CRRT. That is actually a fancy acronym for long dialysis, like 24-hour dialysis or greater, and that typically is about 5% to 10% of a hospital's volume. We designed Tablo so that Tablo could deliver any – not any, but any duration within 0 to 24 hours, which has given the hospital a lot of flexibility and it's given the hospital the opportunity to down select to effectively one machine and standardize to one machine for any treatment between zero and 24-hour therapy. ***There are other machines on the market that do CRRT really, really well, those treatments that are over 24 hours. And those would be***

*machines manufactured by ex-Baxter, now Vantive, for example. So in that sense, it's complementary.*[13]

## IX.   THE SPEAKING DEFENDANTS' STATEMENTS WERE MATERIALLY FALSE AND MISLEADING WHEN MADE

283.   During the Class Period, the Speaking Defendants issued materially false and misleading statements that deceived the investing public, including: (i) regarding the ability of Tablo to replace all other dialysis machines so that health systems could down select just to one device for all dialysis treatments and capture the entire acute dialysis market; (ii) misrepresenting the drivers of Outset's financial results and concealing that the strong financial results were the result of off-label marketing; (iii) representing that the company did not engage in any off-label marketing; (iv) after the Company disclosed the existence of the FDA Letter, downplaying and misrepresenting the issues raised by the FDA Warning Letter, their impact on the Company, and the reasons for declining Tablo sales; and (v) touting TabloCart without prior 510(k) Clearance as a non-medical accessory.

### A.   The Speaking Defendants Issued Materially False And Misleading Statements Regarding Outset's Ability to Capture The Entire Acute Dialysis Market And Of Tablo To Replace All Of A Health System's Dialysis Devices So That It Could Down Select Just To One Device For All Treatments

284.   During the Class Period, the Speaking Defendants issued numerous affirmative false and misleading statements touting the ability of Tablo to replace all other dialysis machines so that health systems could down select just to one device for all dialysis treatments and that Outset could capture the entire acute market:

- Defendant Trigg, Defendant Chambers, and Defendant Ahmed: "Tablo's clinical flexibility enables providers to standardize to a single platform across all care settings."

- Defendant Trigg, Defendant Chambers, and Defendant Ahmed: "Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines.  The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows

---

[13] June 11, 2025 Goldman Sachs Global Healthcare Conference.

providers to standardize to a single technology platform from the hospital to the home."[14]

- Defendant Trigg and Defendant Chambers: "Tablo's unique features offer a compelling value proposition across both acute and home settings. In the acute care setting, Tablo lowers the cost of dialysis by up to 80% in the ICU by reducing treatment supplies cost and enabling labor cost reduction. Tablo also reduces complexity by eliminating the need for multiple dialysis machines and by streamlining documentation and compliance."[15]

- Defendant Trigg: Tablo "was designed as a complete enterprise solution to enable dialysis to be done by anyone, anytime, anywhere" and "Tablo uniquely enables the management of dialysis across the entire care continuum from the hospital to the home with a single device platform, which has never been done before."[16]

- Defendant Trigg and Defendant Chambers used a slide that stated "Tablo is an enterprise solution that delivers easier, lower-cost dialysis" and one of the machines shown being replaced by Tablo was the Baxter Prismaflex, one of the few devices cleared for CRRT:[17]

---

[14] IPO Offering Documents signed by Defendants Trigg and Chambers; November 12, 2020 10-Q signed by Defendants Trigg and Chambers; November 19, 2020 Draft Registration Statement signed by Defendants Trigg and Chambers; November 30, 2020 Prospectus; December 2, 2020 Prospectus; March 22, 2021 Form 10-K signed by Defendants Trigg and Chambers; March 30, 2021 Draft Registration Statement signed by Defendants Trigg and Chambers; SPO Offering Documents signed by Defendants Trigg and Chambers; May 5, 2021 Form 10-Q signed by Defendants Trigg and Chambers; August 5, 2021 Form 10-Q signed by Defendants Trigg and Ahmed; and November 4, 2021 Form 10-Q signed by Defendants Trigg and Ahmed.

[15] IPO Offering Documents signed by Defendants Trigg and Chambers; FY 2020 10- signed by Defendants Trigg and Chambers; and SPO Offering Documents signed by Defendants Trigg and Chambers.

[16] November 11, 2020 Q3 2020 earnings call attended by Defendants Trigg and Chambers.

[17] November 11, 2020 Q3 2020 earnings call attended by Defendants Trigg and Chambers; March 9, 2021 FY 2020 earnings call attended by Defendants Trigg and Chambers; April 2021 investor presentation attended by Defendants Trigg and Chambers; May 5, 2021 earnings call attended by Defendants Trigg and Chambers; August 5, 2021 earnings call attended by Defendants Trigg and Ahmed; and November 16, 2021 Stifel Healthcare Conference attended by Defendants Trigg and Ahmed.

- Defendant Trigg: Tablo enabled hospitals to "down select to one machine Tablo, because Tablo is so mobile and also Tablo does not require any infrastructure to use it." She touted Tablo as an "Enterprise Solution, Value Proposition … we uniquely offer health systems, one device platform across the spectrum of care. So that's what we do uniquely well."[18]

- Defendant Trigg: "And so that intrigued us, and to us created an opportunity or a question. Could we design one machine that could really do it all? Could you allow health systems to down select [ph] just to one device platform that would deliver all of this functionality, whether that treatment was being done in the hospital or the ICU? Why would you want to manage a bunch of different things, all of which do one narrow slice of what a health system has to deliver, which is enterprise-wide dialysis?"[19]

- Defendant Trigg: "But the common denominator is the interest in an enterprise solution. That's the driver here. And so it starts with the economic efficiencies, the operational efficiencies of a health system being able to down select to one device, managing that patient from the acute setting all the way to the home. Whereas today, when they deliver dialysis across their enterprise it's requiring them to buy and maintain a number of different machines which obviously is more cumbersome and more costly."[20]

- Defendant Chambers: "If anything, the customers we're adding on now often are full house conversions and those tend to – while it takes some time, those tend to be very high utilizing acute customers."[21]

- Defendant Trigg: "[T]he way that we design Tablo and our design goal from a technology standpoint from the beginning, really was the notion of an enterprise

---

[18] November 12, 2020 Morgan Stanley Life After COVID Thematic Conference attended by Defendant Trigg.

[19] November 19, 2020 Stifel Virtual Healthcare Conference attended by Defendants Trigg and Chambers.

[20] March 9, 2021 FY 2020 earnings call attended by Defendants Trigg and Chambers.

[21] *Id.*

[No. 5:24-cv-06124-EJD] AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

solution that health systems would no longer need to buy and maintain two, three, four different types of machines, each of which did only one type of dialysis. And so the design vision was, 'Hey, could we build a single hardware platform that really could perform the functionality of all these machines for all types of acuity patients.'"

"And so in delivering on that promise – that design promise, we're able to approach a health system – a given health system and talk to them about down selecting now to Tablo for use anywhere from the ICU to home. So that's sort of part one and the idea behind the enterprise solution."[22]

- Defendant Trigg: "[t]he engineering team here has been busy and worked hard to actually add incremental features that enables Tablo's use really across any and all patient populations served anywhere in the hospital, again, bedside dialysis maybe with short treatments all the way to long treatments in the ICU. So we don't see any limit to our ability to penetrate that full $2.2 billion acute market here in the U.S."[23]

- Defendant Trigg: "Could we design a single hardware platform that could perform the functionalities of all of those different types of dialysis machines plus could we also integrate a thousand square foot water treatment room in a box and that's exactly what we did."[24]

- Defendant Trigg: "We specifically designed Tablo, as we say, kind of like as an enterprise solution where we can – that same device platform can be used for dialysis on the floor or in the ICU."

"About 85% of the treatments performed in the acute setting are actually kind of run-of-the-mill regular dialysis 3 or 4 hour treatments done bedside at the floor, we can do those. The 15% are much sicker patients, much more complicated patients in the ICU, running longer, slower dialysis up to 24 hours, Tablo also can serve those patients. And so we have the ability to capture 100% of all the treatment volume that any given hospital across the country is doing on an annual basis. And so that's what leads to such a big opportunity specific to Outset and our technology."[25]

- Defendant Trigg: ". . . I think what's really, really different about the way we're approaching the acute market is that we are going after the whole thing. Companies that have talked about acute dialysis in the past, their devices can only be used in the ICU. They can only be used for these longer treatments called SLED or CRRT, or they have a device that can only be used for short treatments."

---

[22] May 5, 2021 1Q 2021 earnings call attended by Defendants Trigg and Chambers.

[23] May 11, 2021 Bank of America Securities Virtual Health Care Conference attended by Defendants Trigg and Chambers.

[24] June 9, 2021 Goldman Sachs 42nd Annual Global Healthcare Virtual Conference attended by Defendants Trigg and Chambers.

[25] September 13, 2021 Morgan Stanley Global Health Conference attended by Defendants Trigg and Ahmed.

[No. 5:24-cv-06124-EJD] AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

73

***

". . . Tablo is the only device available that can treat across the entire spectrum, sort of from zero to 24 hours.  And therefore, we can go after all of the different types of treatments that are delivered in a hospital."

***

". . . [the hospital] start[s] offering dialysis, those longer treatments, and they didn't before because the device is so easy . . .With a simpler device, now they're doing dialysis in the ICU for longer -- treating more critical patient. . . decide to do what we would call whole house conversion . . . over time, when they're more comfortable with it, confident and everybody's trained, they'll go to a whole house conversion where they're only using the Tablo machines to deliver treatment.  And that could be another reason why utilization grows."[26]

- Defendant Trigg and Ahmed: "Typically, different types of dialysis machines are used in different care settings and for different clinical needs.  Tablo is an enterprise dialysis solution that allows providers to standardize to a single technology platform."[27]

- Defendant Trigg and Defendant Ahmed: included an image indicating that the Tablo is a "single enterprise solution for hemodialysis" that could replace three "traditional hemodialysis machines," one of which was the Fresenius MultiFiltrate Pro, one of the few devices cleared for only CRRT.[28]



- Defendant Ahmed: "in the acute setting, today, pre-Tablo, a hospital may need multiple dialysis devices to do ICU training or floor training, meaning bedside training rather or treatment rather.  And with Tablo, you can have one device that

---

[26] February 18, 2022 11th Annual SV Leerink Global Healthcare Conference attended by Defendants Trigg and Ahmed.

[27] February 23, 2022 Form 10-K signed by Defendants Trigg and Ahmed; February 13, 2023 Form 10-K signed by Defendants Trigg and Ahmed.

[28] Id.

will do dialysis in the ICU.  It will do dialysis at the bed side.  It will do dialysis sort of everywhere you need."[29]

- Defendant Ahmed: "On the clinical and operational benefits, Tablo is one device that can do dialysis from the ICU to the bedside.  Where today a hospital may have multiple devices, a couple in the ICU, a different one at the bedside, and potentially different devices to do long treatment."[30]

Defendant Trigg and Defendant Chambers used a slide touting Tablo as "an all-in-one solution that replaces multiple machines and a water treatment room with a single device" that displayed a graphic with Tablo replacing a variety of dialysis machines that it would replace including the Baxter Prismaflex, which is one of the few machines cleared for CRRT. [31]



- Defendant Trigg: "[t]hat really enabled the healthcare provider to, again down select operational efficiency, down select to 1 device that their nurses and their clinicians can use in the ICU that, folks can use in the subacute space and that consumers can use in the home . . .  It is an opportunity for 1 device across multiple markets."[32]

- Defendant Trigg: "Just in terms of the – the cumulative number of conversations that our team is now having with health systems that want to look at a full enterprise solution, as we call it, using Tablo from the ICU all the way to home.  We are having many, many, many more conversations than we had, let's say, this time last year, about deploying a home program, in tandem with an acute program."[33]

---

[29] May 24, 2022 UBS Global Healthcare Conference attended by Defendant Ahmed.

[30] November 17, 2022 Jefferies LLC London Healthcare Conference attended by Defendant Ahmed.

[31] January 11, 2023 J.P. Morgan 41st Annual Healthcare Conference attended by Defendant Trigg; February 16, 2022 FY 2022 earnings call attended by Defendants Trigg and Ahmed; May 3, 2023 Q1 2023 earnings call attended by Defendants Trigg and Ahmed.

[32] January 11, 2023 J.P. Morgan 41st Annual Healthcare Conference attended by Defendant Trigg.

[33] May 3, 2023 1Q 2023 earnings call attended by Defendants Trigg and Ahmed.

285.    These affirmative statements touting, e.g., the ability of Tablo to replace all other products so that health systems could down select just to one device for all dialysis treatments and that Outset could capture the entire acute market were false and misleading when made because they failed to disclose that this sales strategy was being fueled by pervasive off-label marketing to customers of Tablo for CRRT.  These statements were material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on Tablo and the marketing of Tablo.  As set forth in Section IX.B above, analysts reacted positively to these representations.  Therefore, these statements were of significant importance to investors.  The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section XII, infra, below, further demonstrates the materiality of the statements.

286.    The truth that Outset was engaged in widespread and pervasive off-label promotion is evidenced by the consistent accounts of former Outset employee Witnesses 1, 2, 3, 11, 12, 13, and 14 that establish that, prior to the FDA Warning Letter, Outset marketed and sold Tablo for CRRT:

a. Witness 1, who was responsible for marketing and business development in New York Metro, northern New Jersey, Long Island, and parts of upstate New York, relayed that the sales team promoted Tablo for CRRT purposes and as a replacement for its competitors' CRRT products.  Witness 1 sold Tablo for CRRT to several large hospitals.  As Witness 1 further explained, marketing for CRRT was part of the value proposition strategy that formed the basis of Outset's top-down marketing vision.

b. Witness 2, who was responsible for several southern states including Texas, Florida, Alabama, Louisiana, Missouri, and Arkansas, said that Outset marketed Tablo as an extended care option capable of CRRT.

c. Witness 3, a clinical trainer and then a territory manager for the Dallas-Ft. Worth metroplex, New Mexico, and Arizona areas, stated that Outset was aggressive in marketing for CRRT and noted that Outset was promoting Tablo for CRRT use in Florida.

d. Witness 11, a senior contracts and renewals employee with Outset, said that prior to the FDA Letter, Outset sales staff sold Tablo as capable of performing CRRT.

e. Witness 12, a territory manager for southeastern U.S., also explained that Outset 100% promoted Tablo as a replacement for CRRT devices prior to the FDA Warning Letter.

f. Witness 13, who was a clinical sales representative, relayed that they sold Tablo XT as an option for CRRT. Witness 13 relayed that Outset marketed Tablo as a replacement to competitors' machines for CRRT.

287. The truth that Outset was engaged in widespread and pervasive off-label promotion is further established by employee witness accounts that Outset's marketing materials expressly promoted Tablo for CRRT and were top-down materials that salespeople were required to and did use in all marketing and promotion of Tablo:

a. Witness 12 relayed that Outset marketing slide decks showed pictures of other firms' devices such as Baxter's Prismaflex that were only used for CRRT and that the sales staff was instructed to say the Tablo could replace those machines.

b. Witness 14 confirmed that Outset's marketing material promoted that Tablo could be used instead of machines designed exclusively for CRRT. This witness further confirmed that there was a slide that said Tablo could replace Prismaflex and NxStage CRRT machines. Witness 14 relayed that promotional materials and slides were prepared by the Company and provided to salespeople.

c. Witness 11 also confirmed that brochures, slides and other promotional materials stated that Tablo was acceptable for CRRT.

d. Witnesses 11, 12, and 13 all relayed that these misleading marketing materials had to be approved by both the Legal Department and Medical Affairs.

e. Witnesses 11 and 12 further explained that sales staff were prohibited from creating their own promotional materials. Likewise, Witness 13 confirmed that, while salespeople could customize the slides for specific clients, they were not permitted to change the data associated with the device.

288. The truth that Outset was engaged in widespread and pervasive off-label promotion is further established by employee witness accounts that, until the FDA Warning Letter came out, senior management (including Defendants Trigg and Aragon) trained Outset's sales team to expressly promote Tablo for CRRT uses:

a. Witness 1 explained that, during sales calls and meetings with Outset leadership, they were trained to promote and sell Tablo for CRRT.

b. Witness 2 said that they attended two training sessions, one in San Diego, California, and one in Columbus, Ohio, during which they were trained to say that Tablo is okay for CRRT.

c. Witness 11 confirmed that sales staff was instructed to tell potential customers that Tablo was available to replace machines used solely for CRRT, including Baxter's PrismaFlex device.

d. Witness 12 relayed that they attended several sales conferences at Outset, both virtually and in person, that were attended by Trigg and Aragon, where the group was told that Tablo could replace all other devices and was an appropriate replacement for CRRT devices.

e. Witness 13 also stated that, at every annual sales kick-off, Trigg repeated that Tablo was a whole house replacement device for renal therapies and, at these sales meetings, company executives went over slides that showed images of Tablo replacing CRRT-specific machines such as the Baxter Prismaflex and Fresenius Multifiltrate.

289. The truth that Outset was engaged in widespread and pervasive off-label promotion is further established by employee witness accounts that, after the FDA Warning Letter, Outset fundamentally changed its marketing for Tablo:

a. Witnesses 3 and 11 stated that, after the FDA Warning Letter, management instructed the sales staff not to market Tablo for CRRT. Likewise, Witnesses 2, 12, and 13 relayed they were instructed not to use the term CRRT anymore. Witnesses 2, 3, 11, and 13 all confirmed that they attended an all hands-on meeting to discuss the FDA Warning Letter and staff were instructed to no longer refer to CRRT. Witness 13 specifically noted that Trigg and Aragon held the all hands-on meeting where Trigg said that sales staff could no longer use the term CRRT.

b. Witnesses 11 and 12 stated that, after the FDA Warning Letter, when senior management, including Trigg, held a company-wide meeting explaining the FDA's position, they expressed no surprise at the findings. Witness 2 likewise said they did not recall any instance when Ouset Management inferred that the FDA Warning Letter was wrong or inaccurate.

c. Witness 2 relayed that, after the FDA Warning Letter, senior management ordered that all marketing materials (hard copy and electronic) that existed prior to the FDA Warning Letter be purged. Likewise, Witness 13 relayed that, after the letter, Outset scrubbed all marketing materials removing any mention of CRRT, including in brochures, slide presentations, and the company website, and references to Tablo being a replacement for competing devices that only performed CRRT were removed from slide presentations.

d. Witness 13 stated that while Aragon had been citing studies to customers to support his sales pitch that Tablo was an appropriate replacement for CRRT devices, he ceased using those studies after the FDA Warning Letter.

290. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the Outset customer Witnesses 4, 5, 6, 7, 8, and 9's accounts:

a. Witnesses 4, 5, 6, and 9 relayed that Outset personnel told them Tablo could perform CRRT.

b. Witness 4, the president and CEO of a large health care system in New York, confirmed that they believed that Tablo was approved for CRRT and that the marketing materials and proposals they received from Outset promoted Tablo for off-label use for CRRT. They said that Outset discussed with them and provided them with an analysis of the costs savings that could be achieved by replacing all its dialysis machines with Tablo, even its CRRT machines. Witness 4 explained that Outset's messaging was consistent on this point even though there was significant turn-over among the salespeople pitching Tablo to them. During the discussions, Outset never said that Tablo was not approved for CRRT; to the contrary, Outset said that the hospital would need to acquire Tablo XT to operate Tablo for CRRT. Witness 4's hospital system replaced all of its machines, including its CRRT machines, with Tablo. Witness 4 relayed that had they known Tablo was not approved for CRRT, they would not have used it for CRRT and probably would not have converted to Tablo or replaced any of their dialysis machines with Tablo at all.

c. Witness 4 further relayed that they met with Trigg who requested that Witness 4 discuss their system's experience (which included using Tablo for CRRT) with other potential customers to promote Tablo. Witness 4 also relayed that Outset prepared an article discussing their system's conversion to Tablo and its elimination of all other dialysis machines, including CRRT, that Outset posted on its website. That version of the article is no longer on Outset's website.

d. Witness 5, a critical care nurse manager whose hospital system in New York, replaced all its CRRT machines with Tablo because of the cost savings and explained that Outset provided training to use Tablo for CRRT. Although Witness 5 was trained by Outset to then train other hospital staff, they never knew that Tablo was not approved for CRRT.

e. Witness 6 recalled discussions with Outset technicians and other employees that Tablo was capable of CRRT.

f. Witness 7 relayed that their hospital purchased Tablo for CRRT and replaced all their CRRT machines with Tablo;

g. Witness 8, a Chief of Nephrology in the Greater Boston area, also relayed that they believed that Tablo was marketed for CRRT.

h. Witness 9 confirmed that their hospital system switched from CRRT machines to Tablo because Outset represented that Tablo could be used for CRRT, not only intermittent uses such as PIRRT or SLED.

291. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the FDA inspection and July 5, 2023 FDA Warning Letter, which followed the inspection of Outset's facilities and website as well as discussions with Outset management, and which stated the FDA findings that Outset was engaged in off-label marketing, including that:

a. Tablo was "adulterated" and "misbranded" under the FDCA because Tablo was not cleared for CRRT and Outset's sale of Tablo for CRRT is unlawful;

b. The FDA's inspection of Outset beginning in January 2023 and review of the Company's website found evidence and marketing that show promotion of Tablo for CRRT, including, by way of example, certain marketing material on Outset's website, including that Outset's website state that two large hospitals converted to a program consisting solely of the Tablo Hemodialysis System and state, "This major conversion eliminated the need for several types of dialysis machines for different clinical needs, including intermittent hemodialysis (IHD) in the dialysis unit and continuous renal replacement therapy (CRRT) in critical care." The FDA Warning Letter further states that multiple hospitals who had established CRRT treatment programs "converted those CRRT programs over to Tablo with Extended Therapy" and states, "[t]hey also replaced their CRRT machines with Tablo with XT…."

292. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by Outset's own disclosures:

a. The Company's August 2, 2023 disclosure that it had paused distribution of TabloCart while it sought FDA clearance and that it was lowering revenue expectations as a result of the FDA Warning Letter;

b. The Company's November 7, 2023 disclosure that it lowered revenue guidance due to the recent FDA Warning Letter and the pause in distribution of TabloCart;

c. The Company's May 9, 2024 disclosure, just after it received clearance for TabloCart that, despite such clearance, it could still face fallout from the FDA Warning Letter despite the Company's previous representations that it had fully addressed the FDA's concerns, and that it expected sales to recover once TabloCart was cleared; and

d. The Company's August 7, 2024 disclosure that it missed revenue expectations, lowered FY 2024 guidance, sales had not recovered despite TabloCart's FDA clearance, and Ouset needed to revamp its entire sales team and process restructuring, despite Outset's prior representations that lower Tablo sales were due to TabloCart's unavailability and purported market confusion created by competitors.

293. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the fact that Outset's sales for the acute care setting, where CRRT is performed, grew substantially after the off-label marketing began. For example, Outset reported net revenue of $17.2 million in the fourth quarter and $49.9 million for the full year of 2020, representing 143% and 231% increases respectively, over the corresponding periods of 2019 and 115% year-over-year revenue growth from Q2 2020 to Q2 2021 "driven primarily by increased console shipments to acute customers." Likewise, 81% and 77% of Tablo installs in 2020 and 2021, respectively, occurred in acute facilities. However, after the FDA Letter and Ouset's cessation of the off-label marketing, Tablo sales immediately declined and have not

recovered.  For example, the Company's Q2 2023 revenue, the quarter ending immediately before disclosure of the FDA Warning Letter, was $36.04 million.  Outset's most recent reported revenue, for Q4 2025, was $28.9 million, a nearly 20% decline.  The Company's recurring revenue as a percentage of total revenue versus Tablo console sales has continued to increase drastically as well. Recurring revenue accounted for 74% revenue for both FY 2024 and FY 2025, as compared to 45% for the quarter prior to the FDA Letter.

**B.     The Speaking Defendants Issued Materially False And Misleading Statements Regarding The Drivers Of Outset's Financial Results, Concealing That Off-label Marketing Was A Main Reason For Those Results**

294.    During the Class Period, the Speaking Defendants misrepresented the drivers of Outset's financial results, concealing that off-label marketing drove those results.

295.    Discussing the Company's 3Q 2020 financial results of net revenue of $13.8 million, a 423% increase compared to $2.6 million in the third quarter of 2019:

- Defendant Trigg: "<u>New contracts with national and regional health systems in addition to expansion within our existing customer base drove our strong Q3 results…[o]ur revenue achievement exceeded our initial expectations for the quarter as Tablo adoption continues to accelerate within the acute market.</u>"[34]

- Defendant Trigg:"<u>[o]ur revenue achievement exceeded our initial expectations for the quarter as Tablo adoption continues to accelerate within the acute market.</u>"[35]

- Defendant Chambers: "third quarter revenue grew 423% year-over-year to $13.8 million.  <u>This result was driven by strong acute adoption including the impact of our HHS contracts and COVID-related orders that we received during the second quarter as well as growth in consumables and services tied to our larger installed base</u>."

  "Product revenue grew 349% year-over-year to $10.8 million. Console revenue equaled $9 million compared to $1.9 million in the prior-year period. Consumable revenue grew 263% to equal $1.8 million <u>driven by our larger installed base and increased ASP as compared to the prior-year period.</u>"[36]

- Defendants Trigg and Chambers: "Product revenue increased by $8.4 million, or 349% for the three months ended September 30, 2020 as compared to the three

[34] November 11, 2020 Q3 2020 earnings call attended by Trigg and Chambers.

[35] *Id.*

[36] *Id.*

months ended September 30, 2019.  <u>The increase was primarily due to higher console revenue ($7.1 million) driven by new customer adoption, fleet expansion across existing customers, sales that we believe were attributable to COVID-19 driven demand, and increased console leasing revenue ($0.7 million).  In addition, sales of Tablo consumables for the three months ended September 30, 2020 increased by $1.3 million given our higher console installed base as compared to the prior year period.</u>"[37]

296.   Discussing the Company 4Q2020 and FY 2020 financial results of net revenue of $17.2 million in the fourth quarter and $49.9 million for the full year of 2020, representing 143% and 231% increases respectively, over the corresponding periods of 2019:

- Defendant Chambers: "fourth quarter revenue grew 143% year-over-year to $17.2 million, <u>driven by the impact of our HHS lease agreement, higher console shipments, the launch of our Tablo XT products and continued growth in consumables and services tied to our larger installed base.</u>"

***

"Product revenue grew 111% year-over-year to $13.2 million.  Console revenue grew 96% year-over-year to $10.6 million, <u>driven by an increase in Console shipments, higher HHS leasing revenue and recognition of XT upgrade revenue.</u>"[38]

- Defendants Trigg and Chambers: "Product revenue increased by $25.9 million, or 188%, for the year ended December 31, 2020 as compared to the year ended December 31, 2019.  <u>The increase was primarily due to a $21.2 million increase in console revenue driven by new customer adoption, fleet expansion across existing customers, sales that we believe were attributable to COVID-19 driven demand, and increased console leasing revenue ($2.6 million).  In addition, sales of Tablo consumables, including cartridges, for the year ended December 31, 2020 increased by $4.7 million given our larger console installed base as compared to the prior year period.</u>"[39]

297.   Discussing the Company's 1Q 2021 financial results of net revenue of $22.9 million, a 219% increase compared to $7.2 million in the first quarter of 2020:

- Defendant Chambers: "Product revenue grew 207% year-over-year to $18.2 million. Console revenue equaled $14.8 million or 194% year-over-year growth<u>, driven by higher placement to our acute customers as well as the recognition of XT upgrade revenue.</u>"[40]

---

[37] November 12, 2020 Form 10-Q signed by Defendants Trigg and Chambers.

[38] March 9, 2021 FY 2020 earnings call attended by Defendants Trigg and Chambers.

[39] March 22, 2021 Form 10-K signed by Defendants Trigg and Chambers.

[40] May 5, 2021 1Q 2021 earnings call attended by Defendants Trigg and Chambers.

- Defendants Trigg and Chambers: "Product revenue increased $12.3 million, or 207% for the three months ended March 31, 2021 as compared to the three months ended March 31, 2020 driven by a $9.7 million increase in consoles revenue and a $2.6 million increase in consumables revenue.  The increase in consoles revenue was driven by new customer adoption, fleet expansion across existing customers, and a $0.7million increase in console leasing revenue.   The increase in consumables revenue was driven by our growth in console installed base and higher utilization of the installed base."[41]

298.    Discussing the Company's 2Q 2021 financial results of net revenue of $25.2 million, a 115% increase compared to $11.7 million in the second quarter of 2020.

- Defendant Trigg: The Company's "strong revenue growth and substantial progress in achieving our top strategic initiatives for 2021" and attributed the growth, in part, to "expansion within the acute setting."[42]

- Defendant Ahmed: The Company's "second quarter revenue grew 115% year-over-year to $25.2 million, driven primarily by increased console shipments to acute customers, higher consumable shipments, our HHS lease agreements, and increased services to support our growing installed base. Product revenue grew 115% year-over-year to $20.6 million. Console revenue grew by 106% year-over-year to $16.9 million, driven by higher console placements and increased ASP, given the availability of Tablo system."[43]

- Defendants Trigg and Ahmed: "Product revenue increased by $10.9 million, or 113% for the three months ended June 30, 2021 as compared to the three months ended June 30, 2020, driven by a $8.7 million increase in consoles revenue and a $2.2 million increase in consumables revenue.  The increase in consoles revenue was driven by new customer adoption, fleet expansion across existing customer sites, higher average selling prices and a $0.7 million increase in console leasing revenue.  The increase in consumables revenue was driven by our growth in console installed base."[44]

299.    Discussing the Company's 3Q 2021 financial results of net revenue of $26.3 million, a 91.3% increase compared to $13.8 million in the third quarter of 2020:

- Defendant Trigg: "[T]op line growth continues to be driven by our commercial success in the acute market" and touting "continued strength in our XT attachment rate in the third quarter." [45]

---

[41] May 5, 2021 Form 10-Q filed with the SEC and signed by Defendants Trigg and Chambers.

[42] August 5, 2021 2Q 2021 earnings call attended by Defendants Trigg and Ahmed.

[43] *Id.*

[44] August 5, 2021 Form 10-Q filed with the SEC and signed by Defendants Trigg and Ahmed.

[45] November 3, 2021 3Q 2021 earnings call attended by Defendants Trigg and Ahmed.

- Defendant Ahmed: "[R]evenue grew 91.3% year-over-year in the third quarter to $26.3 million, driven primarily by increased console shipments to acute customers, higher consumable shipments, the impact of XT upgrades, increased services to support our growing installed base and our HHS lease agreements. Product revenue grew 102% year-over-year to $21.8 million in the third quarter. Console revenue grew by 71% year-over-year to $15.4 million driven by higher console placements and increased [average selling price] given the availability of and demand for Tablo XT."[46]

- Defendants Trigg and Ahmed: "Product revenue increased by $11.0 million, or 102% for the three months ended September 30, 2021 as compared to the three months ended September 30, 2020, driven by a $6.4 million increase in consoles revenue and a $4.6 million increase in consumables revenue. The increase in consoles revenue was driven by new customer adoption, fleet expansion across existing customer sites, and higher average selling prices and a $0.7 million increase in console leasing revenue. The increase in consumables revenue was driven by the growth in our console installed base."[47]

300.    Discussing the Company's Q4 2021 and FY 2021 financial results of recorded net revenue of $28.2 million in the fourth quarter of 2021, a 63.2% increase compared to $17.2 million in the fourth quarter of 2020, and $102.6 million for the full year of 2021, representing an increase of 105.5% compared to $49.9 million for 2020:

- Defendant Trigg: "Turning now to a review of our success in the acute market, the fourth quarter and full year 2021 exceeded our expectations with transformational progress in terms of new sales agreements, expanding within existing customers, and console shipments" and discussed the growth as driven, in part by "strong XT attachment rate."[48]

- Defendant Ahmed: "Our fourth quarter revenue grew 63% year-over-year to $28.2 million, driven primarily by increased console shipments to acute customers, higher consumable shipments, increased services to support our growing installed base and the impact of XT upgrades."

***

"Product revenue grew 80% year-over-year to $23.7 million. Console revenue grew by 70% year-over-year to $18.1 million, driven by higher console placements and increased ASP given the availability of and demand for Tablo XT. Similar to prior quarters, we continue to see better uptake of our XT upgrade than we had initially projected."[49]

---

[46] Id.

[47] November 4, 2021 Form 10-Q filed with the SEC and signed by Defendants Trigg and Ahmed.

[48] February 16, 2022 FY 2021 earnings call attended by Defendants Trigg and Ahmed.

[49] Id.

- Defendants Trigg and Ahmed: "Product revenue increased by $44.7 million, or 113%, for the year ended December 31, 2021 as compared to the prior year. <u>The increase was primarily due to a $32.3 million increase in console revenue and a $12.4 million increase in consumables revenue. The increase in consoles revenue was driven by new customer adoption, fleet expansion across existing customer sites, a higher average selling price, and an increase in console leasing revenue. The increase in consumables revenue was driven by the growth in our Tablo installed base.</u>"[50]

301.    Discussing the Company's 1Q 2022 financial results of net revenue of $30.6 million, a 33.3% increase compared to $22.9 million in the first quarter of 2021 and an 8.5% increase compared to $28.2 million in the fourth quarter of 2021:

- Defendant Ahmed: "Our first quarter revenue grew 33% year-over-year to $30.6 million, <u>driven primarily by higher consumable shipments, increased console shipments to acute and home customers, and increased services to support our growing installed base</u>."

  "Product revenue grew 41% year-over-year to $25.7 million."

  "Console revenue grew by 22% year-over-year to $18.1 million, <u>driven by higher console placements, with ASP also increasing year-over-year given the demand for Tablo XT. We continue to see better uptake of our XT upgrade than we had initially projected, which highlights Tablo's clinical versatility and the clinical community's recognition of Tablo's ability to capably treat the very sickest population of patients in the ICU.</u>"[51]

- Defendant Trigg: "We delivered our seventh consecutive quarter of strong top line growth, led by <u>continued momentum in the acute market as we achieved continued positive performance on gross margin expansion</u> and made substantial progress toward our home inflection objectives for 2022."

  ***

  "<u>We benefited from strong console demand and strength and treatment utilization as we continue to capture share across acute care customers, accelerate home expansion and broaden our install base.</u>"[52]

- Defendants Trigg and Ahmed: "Product revenue increased by $7.5 million, or 41% for the three months ended March 31, 2022 as compared to the same quarter in prior year, <u>driven by a $3.3 million increase in consoles revenue and a $4.2 million increase in consumables revenue. The increase in consoles revenue was driven by new customer adoption and fleet expansion across existing customer sites….</u>"[53]

---

[50] February 23, 2022 Form 10-K filed with the SEC and signed by Defendants Trigg and Ahmed.

[51] May 4, 2022 1Q 2022 earnings call attended by Defendants Trigg and Ahmed.

[52] *Id*.

[53] May 5, 2022 Form 10-Q filed with the SEC and signed by Defendants Trigg and Ahmed.

302. Discussing the Company's 2Q 2022 financial results of net revenue of $25.1 million:

- Defendants Ahmed: "Consumable revenue was $6.4 million, an increase of 69% versus the prior year, reflecting our larger installed base."[54]

- Defendants Trigg and Ahmed: "Product revenue increased by $6.4 million, or 17% for the six months ended June 30, 2022 as compared to the same period in the prior year, driven by a $6.8 million increase in consumables revenue attributable to the growth in our console installed base and higher average selling price for consumables."[55]

303. Discussing the Company's 3Q 2022 financial results of net revenue of $27.8 million, a 5.5% increase compared to $26.3 million in the third quarter of 2021 and a 10.8% increase compared to $25.1 million in the second quarter of 2022:

- Defendant Trigg: "In summary, our strong Q3 was driven by significant expansion in the acute setting and a home pipeline that is rebuilding ahead of expectations. It is clear to us that Tablo remains a highly differentiated solution in one of the largest, most expensive recession-proof areas of healthcare."[56]

- Defendant Ahmed: "Product revenue was up 11% from the prior quarter and roughly flat year-over-year to $21.7 million. Console revenue grew 15% from the second quarter and decreased 3% year -over-year to $15 million, as we regained momentum from the home ship hold and worked through the macro headwinds we've previously described. We saw console ASPs increase again year-over-year, driven primarily by the demand for Tablo XT which continues to exceed our initial projections."[57]

- Defendants Trigg and Ahmed: "Product revenue increased by $6.4 million, or 10% for the nine months ended September 30, 2022 as compared to the same period in the prior year, driven by a $7.2 million increase in consumables revenue attributable to the growth in our console installed base."[58]

304. Discussing the Company's 4Q 2022 and FY 2022 financial results of net revenue in the fourth quarter of approximately $31.5 million, a 13% increase compared to $27.8 million

---

[54] August 1, 2012 1Q 2022 earnings call attended by Defendants Trigg and Ahmed.

[55] August 2, 2022 Form 10-Q filed with the SEC and signed by Defendants Trigg and Ahmed.

[56] November 8, 2022 3Q 2022 earnings call attended by Defendants Trigg and Ahmed.

[57] *Id.*

[58] November 9, 2022 Form 10-Q filed with the SEC and signed by Defendants Trigg and Ahmed.

in the third quarter of 2022 and net revenue for 2022 of approximately $115 million, a 12% increase compared to $102.6 million in 2021:

- Defendant Trigg: The Company "significantly increased the number of Tablo consoles in hospitals and homes."[59]

- Defendant Ahmed: "Our fourth quarter revenue increased approximately 15.3% sequentially and 13.7% year-over-year to $32 million[.] . . . Product revenue was up 21.3% from the prior quarter and increased 11.5% year-over-year to $26.4 million. Console revenue grew 22.8% from the third quarter and increased by 1.5% year-over-year to $18.4 million. We saw console ASPs increase again year-over-year, driven primarily by the ongoing demand for Tablo XT and by demand for TabloCart, our new accessory launched in the fourth quarter of 2022."[60]

- Defendants Tigg and Ahmed: "Product revenue increased by $9.1 million, or 11%, for the year ended December 31, 2022 as compared to the prior year. The increase was primarily due to a $9.6 million increase in consumables revenue attributable to the growth in our console installed base."[61]

305. Discussing the Company's 1Q 2023 financial results of net revenue of $33.5 million, a 9.5% increase compared to $30.6 million in the first quarter of 2022, and a 4.6% increase compared to $32.0 million in the fourth quarter of 2022:

- Defendant Trigg: "Tablo uptake remained strong, our installed base grew in both the acute care and home markets, and we benefited from strong mix and pricing across the board."[62]

- Defendant Ahmed: "Our first quarter revenue increased approximately 4.6% sequentially and 9.5% year-over-year to $33.5 million, exceeding our expectations. The year-over-year change was driven by both higher product revenue and higher service and other revenue. The ongoing increase in recurring consumables and service revenues is one of the benefits of our expanded installed base and continues to be one of the key drivers of gross margin expansion."

  "Product revenue was up 5.4% from the prior quarter, despite some expected capital equipment purchasing seasonality and increased 8.2% year-over-year to $27.8 million. Console revenue grew 2.7% from the fourth quarter and increased by 4.5% year-over-year to $18.9 million. We saw console ASP increase year-

---

[59] January 9, 2023 Press Release, attached as Ex 99.1 to the Company's January 11, 2023 Form 8-K signed by Defendant Ahmed.

[60] February 13, 2023 earnings call attended by Defendants Trigg and Ahmed.

[61] February 13, 2023 Form 10-K filed with the SEC and signed by Defendants Trigg and Ahmed.

[62] May 3, 2023 1Q 2023 earnings call attended by Defendants Trigg and Ahmed.

over-year, driven primarily by our disciplined approach to pricing and ongoing demand for Tablo accessories." [63]

- Defendants Trigg and Ahmed: "Product revenue increased by $2.1 million or 8% for the three months ended March 31, 2023 as compared to the same period in the prior year. This increase was driven by a $1.3 million increase in consumables revenue due to the growth in our console installed base and a $0.8 million increase in consoles revenue."[64]

306. Discussing the Company's 2Q 2023 financial results of net revenue of $36.0 million, a 44% increase compared to $25.1 million in the second quarter of 2022, and an 8% increase compared to $33.5 million in the first quarter of 2023:

- Defendant Ahmed: "Our second quarter revenue increased 7.7% sequentially and 43.8% year-over-year to $36 million. The year-over-year change was driven primarily by higher console placements and the associated pull-through of consumables used for each Tablo treatment. Product revenue was up 5.6% from the prior quarter and increased 49.5% year-over-year to $29.3 million.

  Console revenue grew 4.4% from the first quarter and increased by 48.8% year-over-year to $19.7 million. We had strong console placements in both our acute and home end markets. As Leslie indicated, ASP remained high during the quarter, driven by mix, disciplined pricing and the substantial majority of acute console shipping with our Tablo Pro Plus software."[65]

- Defendants Tigg and Ahmed: "Product revenue increased by $9.7 million or 49% for the three months ended June 30, 2023 as compared to the same period in the prior year. This increase was driven by a $6.5 million increase in console revenue and a $3.2 million increase in consumables revenue due to growth in our console installed base." [66]

307. Discussing the Company's FY 2023 financial results of net revenue of $130.4 million, a 13% increase compared to $115. million in 20022:

- Defendant Trigg: "reflect[ing] the scale we have built in the acute setting and progress we are making to expand Tablo's use at home, with our growth in both

---

[63] *Id.*

[64] May 4, 2023 For 10-Q filed with the SEC and signed by Defendants Trigg and Ahmed.

[65] August 2, 2023 3Q 2023 earnings call attended by Defendants Trigg and Ahmed.

[66] August 3, 2023 Form 10-Q filed with the SEC and signed by Defendants Trigg and Ahmed.

[No. 5:24-cv-06124-EJD] AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                                                88

end markets contributing to a 34% increase in the Tablo installed base and nearly 50% growth in consumable revenue."[67]

- Defendants Trigg and Ahmed: "Product revenue increased by $10.1 million, or 11%, for the year ended December 31, 2023 as compared to the prior year. The increase was primarily due to a $13.4 million increase in consumables revenue attributable to the growth in our console installed base."[68]

308. These affirmative statements touting the drivers of Outset's financial results while concealing that off-label marketing was a reason for those results were false and misleading when made because they failed to disclose that the results were dependent on the Company's undisclosed pervasive off-label promotion of Tablo for CRRT. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on sales of Tablo and the marketing of Tablo. In addition, sales to acute care facilities – where CRRT is performed – made up the vast majority of Outset's sales of Tablo and analysts responded positively to these statements. As such, the sources of its revenue were of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section XII, infra, further demonstrates the materiality of the statements.

309. The truth that Outset was engaged in widespread and pervasive off-label promotion prior to the FDA Warning Letter is evidenced by the consistent accounts of former Outset employee Witnesses 1, 2, 3, 11, 12, 13 and 14 that establish that, prior to the FDA Warning Letter, Outset marketed and sold Tablo for CRRT:

   a. Witness 1, who was responsible for marketing and business development in New York Metro, northern New Jersey, Long Island, and parts of upstate New York, relayed that the sales team promoted Tablo for CRRT purposes and as a replacement for its competitors' CRRT products. Witness 1 sold Tablo for CRRT to several large hospitals. As Witness 1 further explained, marketing for CRRT was part of the value proposition strategy that formed the basis of Outset's top-down marketing vision.

_____
[67] February 21, 2024 Press Release, attached as Ex. 99.1 to the Company's February 21, 2024 Form 8-K signed by Defendant Ahmed.

[68] February 21, 2024 Form 10-K filed with the SEC and signed by Defendants Trigg and Ahmed.

[No. 5:24-cv-06124-EJD] AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                                                89

    b. Witness 2, who was responsible for several southern states including Texas, Florida, Alabama, Louisiana, Missouri, and Arkansas, said that Outset marketed Tablo as an extended care option capable of CRRT.

    c. Witness 3, a clinical trainer and then a territory manager for the Dallas-Ft. Worth metroplex, New Mexico, and Arizona areas, stated that Outset was aggressive in marketing for CRRT and noted that Outset was promoting Tablo for CRRT use in Florida.

    d. Witness 11, a senior contracts and renewals employee with Outset, said that prior to the FDA Letter, Outset sales staff sold Tablo as capable of performing CRRT.

    e. Witness 12, a territory manager for southeastern U.S., also explained that Outset 100% promoted Tablo as a replacement for CRRT devices prior to the FDA Warning Letter.

    f. Witness 13, who was a clinical sales representative, relayed that they sold Tablo XT as an option for CRRT. Witness 13 relayed that Outset marketed Tablo as a replacement to competitors' machines for CRRT.

310. The truth that Outset was engaged in widespread and pervasive off-label promotion prior to the FDA Warning Letter is further established by employee witness accounts that Outset's marketing materials expressly promoted Tablo for CRRT and were top-down materials that salespeople were required to and did use in all marketing and promotion of Tablo:

    a. Witness 12 relayed that Outset marketing slide decks showed pictures of other firm's devices such as Baxter's Prismaflex that were only used for CRRT and that the sales staff was instructed to say the Tablo could replace those machines.

    b. Witness 14 confirmed that Outset's marketing material promoted that Tablo could be used instead of machines designed exclusively for CRRT. This witness further confirmed that there was a slide that said Tablo could replace Prismaflex and NxStage CRRT machines. Witness 14 relayed that promotional materials and slides were prepared by the Company and provided to salespeople.

    c. Witness 11 also confirmed that brochures, slides and other promotional materials stated that Tablo was acceptable for CRRT.

    d. Witnesses 11, 12 and 13 all relayed that these misleading marketing materials had to be approved by both the Legal Department and Medical Affairs.

    e. Witnesses 11 and 12 further explained that sales staff were prohibited from creating their own promotional materials. Likewise, Witness 13 confirmed that, while salespeople could customize the slides for specific clients, they were not permitted to change the data associated with the device.

311. The truth that Outset was engaged in widespread and pervasive off-label promotion prior to the FDA Warning Letter is further established by employee witness accounts

that, until the FDA Warning Letter came out, senior management (including Defendants Trigg and Aragon) trained Outset's sales team to expressly promote Tablo for CRRT uses:

     a. Witness 1 explained that, during sales calls and meetings with Outset leadership, they were trained to promote and sell Tablo for CRRT.

     b. Witness 2 said that they attended two training sessions, one in San Diego, California, and one in Columbus, Ohio, during which they were trained to say that Tablo is okay for CRRT.

     c. Witness 11 confirmed that sales staff was instructed to tell potential customers that Tablo was available to replace machines used solely for CRRT, including Baxter's PrismaFlex device.

     d. Witness 12 relayed that they attended several sales conferences at Outset, both virtually and in person, that were attended by Trigg and Aragon, where the group was told that Tablo could replace all other devices and was an appropriate replacement for CRRT devices.

     e. Witness 13 also stated that, at every annual sales kick-off, Trigg repeated that Tablo was a whole house replacement device for renal therapies and, at these sales meetings, company executives went over slides that showed images of Tablo replacing CRRT-specific machines such as the Baxter Prismaflex and Fresenius Multifiltrate.

312. The truth that Outset was engaged in widespread and pervasive off-label promotion prior to the FDA Warning Letter is further established by employee witness accounts that, after the FDA Warning Letter, Outset fundamentally changed its marketing for Tablo:

     a. Witnesses 3 and 11 stated that, after the FDA Warning Letter, management instructed the sales staff not to market Tablo for CRRT. Likewise, Witnesses 2, 12 and 13 relayed they were instructed not to use the term CRRT anymore. Witnesses 2, 3, 11 and 13 all confirmed that they attended an all hands-on meeting to discuss the FDA Warning Letter and staff were instructed to no longer refer to CRRT. Witness 13 specifically noted that Trigg and Aragon held the all hands-on meeting where Trigg said that sales staff could no longer use the term CRRT.

     b. Witnesses 11 and 12 stated that, after the FDA Warning Letter, when senior management, including Trigg, held a company-wide meeting explaining the FDA's position, they expressed no surprise at the findings. Witness 2 likewise said they did not recall any instance when Ouset Management inferred that the FDA Warning Letter was wrong or inaccurate.

     c. Witness 2 relayed that, after the FDA Warning Letter, senior management ordered that all marketing materials (hard copy and electronic) that existed prior to the FDA Warning Letter be purged. Likewise, Witness 13 relayed that, after the letter, Outset scrubbed all marketing materials removing any mention of CRRT, including in brochures, slide presentations and the company

website, and references to Tablo being a replacement for competing devices that only performed CRRT were removed from slide presentations.

d. Witness 13 stated that while Aragon had been citing studies to customers to support his sales pitch that Tablo was an appropriate replacement for CRRT devices, he ceased using those studies after the FDA Warning Letter.

313. The truth that Outset was engaged in widespread and pervasive off-label promotion prior to the FDA Warning Letter is further evidenced by the Outset customer witnesses 4, 5, 6, 7, 8 and 9's accounts:

a. Witnesses 4, 5, 6, and 9 relayed that Outset personnel told them Tablo could perform CRRT.

b. Witness 4, the president and CEO of a large health care system in New York, confirmed that they believed that Tablo was approved for CRRT and that the marketing materials and proposals they received from Outset promoted Tablo for off-label use for CRRT. They said that Outset discussed with them and provided them with an analysis of the costs savings that could be achieved by replacing all its dialysis machines with Tablo, even its CRRT machines. Witness 4 explained that Outset's messaging was consistent on this point even though there was significant turn-over among the salespeople pitching Tablo to them. During the discussions, Outset never said that Tablo was not approved for CRRT; to the contrary, Outset said that the hospital would need to acquire Tablo XT to operate Tablo for CRRT. Witness 4's hospital system replaced all of its machines, including its CRRT machines, with Tablo. Witness 4 relayed that had they known Tablo was not approved for CRRT, they would not have used it for CRRT and probably would not have converted to Tablo or replaced any of their dialysis machines with Tablo at all.

c. Witness 4 further relayed that they met with Trigg who requested that Witness 4 discuss their system's experience (which included using Tablo for CRRT) with other potential customers to promote Tablo. Witness 4 also relayed that Outset prepared an article discussing their system's conversion to Tablo and its elimination of all other dialysis machines, including CRRT, that Outset posted on its website. That version of the article is no longer on Outset's website.

d. Witness 5, a critical care nurse manager whose hospital system in New York, replaced all its CRRT machines with Tablo because of the cost savings, explained that Outset provided training to use Tablo for CRRT. Although Witness 5 was trained by Outset to then train other hospital staff, they never knew that Tablo was not approved for CRRT.

e. Witness 6 recalled discussions with Outset technicians and other employees that Tablo was capable of CRRT.

f. Witness 7 relayed that their hospital purchased Tablo for CRRT and replaced all their CRRT machines with Tablo;

g. Witness 8, a Chief of Nephrology in the Greater Boston area, also relayed that they believed that Tablo was marketed for CRRT.

> h. Witness 9 confirmed that their hospital system switched from CRRT machines to Tablo because Outset represented that Tablo could be used for CRRT, not only intermittent uses such as PIRRT or SLED.

314. The truth that Outset was engaged in widespread and pervasive off-label promotion prior to the FDA Warning Letter is further evidenced by the FDA inspection and July 5, 2023 FDA Warning Letter, which followed the inspection of Outset's facilities and website as well as discussions with Outset management, and which stated the FDA findings that Outset was engaged in off-label marketing, including that:

> a. Tablo was "adulterated" and "misbranded" under the FDCA because Tablo was not cleared for CRRT and Outset's sale of Tablo for CRRT is unlawful;
>
> b. The FDA's inspection of Outset beginning in January 2023 and review of the Company's website found evidence and marketing that show promotion of Tablo for CRRT, including, by way of example, certain marketing material on Outset's website, including that Outset's website state that two large hospitals converted to a program consisting solely of the Tablo Hemodialysis System and state, "This major conversion eliminated the need for several types of dialysis machines for different clinical needs, including intermittent hemodialysis (IHD) in the dialysis unit and continuous renal replacement therapy (CRRT) in critical care."  The FDA Warning Letter further states that multiple hospitals who had established CRRT treatment programs "converted those CRRT programs over to Tablo with Extended Therapy" and states, "[t]hey also replaced their CRRT machines with Tablo with XT…."

315. The truth that Outset was engaged in widespread and pervasive off-label promotion prior to the FDA Warning Letter is further evidenced by Outset's own disclosures:

> a. The Company's August 2, 2023 disclosure that it had paused distribution of TabloCart while it sought FDA clearance and that it was lowering revenue expectations as a result of the FDA Warning Letter;
>
> b. The Company's November 7, 2023 disclosure that it lowered revenue guidance due to the recent FDA Warning Letter and the pause in distribution of TabloCart;
>
> c. The Company's May 9, 2024 disclosure, just after it received clearance for TabloCart that, despite such clearance, it could still face fallout from the FDA Warning Letter despite the Company's previous representations that it had fully addressed the FDA's concerns, and that it expected sales to recover once TabloCart was cleared; and
>
> d. The Company's August 7, 2024 disclosure that it missed revenue expectations, lowered FY 2024 guidance, sales had not recovered despite TabloCart's FDA clearance, and Ouset needed to revamp its entire sales team and process restructuring, despite Outset's prior representations that lower Tablo sales were due to TabloCart's unavailability and purported market confusion created by competitors.

[No. 5:24-cv-06124-EJD] AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS                                                                          93

316. The truth that Outset was engaged in widespread and pervasive off-label promotion prior to the FDA Warning Letter is further evidenced by the fact that Outset's sales for the acute care setting, where CRRT is performed, grew substantially after the off-label marketing began. For example, Outset reported net revenue of $17.2 million in the fourth quarter and $49.9 million for the full year of 2020, representing 143% and 231% increases respectively, over the corresponding periods of 2019 and 115% year-over-year revenue growth from Q2 2020 to Q2 2021 "driven primarily by increased console shipments to acute customers." Likewise, 81% and 77% of Tablo installs in 2020 and 2021, respectively, occurred in acute facilities. However, after the FDA Letter and Ouset's cessation of the off-label marketing, Tablo sales immediately declined and have not recovered. For example, the Company's Q2 2023 revenue, the quarter ending immediately before disclosure of the FDA Warning Letter, was $36.04 million. Outset's most recent reported revenue, for Q4 2025, was $28.9 million, a nearly 20% decline. The Company's recurring revenue as a percentage of total revenue versus Tablo console sales has continued to increase drastically as well. Recurring revenue accounted for 74% revenue for both FY 2024 and FY 2025, as compared to 45% for the quarter prior to the FDA Letter.

**C.      The Speaking Defendants Issued Materially False And Misleading Statements Representing That The Company Did Not Engage In Any Off-Label Marketing**

317. During the Class Period, the Speaking Defendants issued numerous affirmative false and misleading statements representing that the company did not engage in any off-label marketing when it engaged in pervasive off-label marketing:

- Defendant Trigg, Defendant Chambers, and Defendant Ahmed: "<u>our policy is to refrain from statements that could be considered off-label promotion of Tablo</u>"[69]

- Defendant Trigg: "Outset has adopted a promotional material procedure to define acceptable and unacceptable advertising, sales support, training, and other promotional practices for Outset medical devices in the United States. Included in this procedure is <u>Outset's policy that all claims with respect to Outset products</u>

---

[69] IPO Offering Documents signed by Defendants Trigg and Chambers; November 12, 2020 Form 10-Q signed by Defendants Trigg and Chambers; March 22, 2021 Form 10- signed by Defendants Trigg and Chambers; SPO Offering Documents signed by Defendants Trigg and Chambers; February 23, 2022 Form 10-K signed by Defendants Trigg and Ahmed; and February 13, 2023 Form 10-K signed by Defendants Trigg and Ahmed.

must be consistent with approved labeling, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence (i.e., instructions-for-use, verification and validation testing, clinical study report, or any other report requiring a similar rigorous process of review and approval). In addition, without exception, promotional material may be neither false nor misleading (either in terms of a specific product claim or the overall net impression conveyed by the promotional material) and must comply with all specific conditions of approval for the product being promoted. Furthermore, promotional materials for a cleared or approved product may not promote, discuss, or refer to uncleared, unapproved, or off-label use."[70]

- Defendant Trigg: "Outset has adopted an ethical marketing procedure that defines acceptable and unacceptable advertising, sales support, training, and other promotional practices for Outset medical devices in the United States. Included in this procedure is Outset's policy that all claims with respect to Outset products must be consistent with approved labeling, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence (i.e., instructions-for-use, verification and validation testing, clinical study report, or any other report requiring a similar rigorous process of review and approval).

In addition, without exception, promotional material or statements made by Outset sales representatives may not promote, discuss, or refer to uncleared, unapproved, or off-label use. This means that all promotional activities may be neither false nor misleading (either in terms of a specific product claim or the overall net impression conveyed by the promotional material) and must comply with all specific conditions of approval for the product being promoted."[71]

318.    These affirmative statements that the Company did not engage in off-label promotion were false and misleading when made because the Company did, in fact, engage in pervasive off-label marketing, including expressly directing its sales force through training and marketing materials to promote Tablo for CRRT which resulted in widespread marketing of Tablo for CRRT, for which Tablo is not cleared, and marketing TabloCart without FDA clearance. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on sales of Tablo and the marketing of Tablo. Therefore, its marketing and legal compliance regarding the product were of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section XII, infra, further demonstrates the materiality of the statements.

---

[70] 2021 ESG Report signed by Defendant Trigg.

[71] 2023 ESG Report signed by Defendant Trigg.

319.    The truth that Outset was engaged in widespread and pervasive off-label promotion is evidenced by the consistent accounts of former Outset employee Witnesses 1, 2, 3, 11, 12, 13, and 14 that establish that, prior to the FDA Warning Letter, Outset marketed and sold Tablo for CRRT:

a.    Witness 1, who was responsible for marketing and business development in New York Metro, northern New Jersey, Long Island, and parts of upstate New York, relayed that the sales team promoted Tablo for CRRT purposes and as a replacement for its competitors' CRRT products. Witness 1 sold Tablo for CRRT to several large hospitals. As Witness 1 further explained, marketing for CRRT was part of the value proposition strategy that formed the basis of Outset's top-down marketing vision.

b.    Witness 2, who was responsible for several southern states including Texas, Florida, Alabama, Louisiana, Missouri, and Arkansas, said that Outset marketed Tablo as an extended care option capable of CRRT.

c.    Witness 3, a clinical trainer and then a territory manager for the Dallas-Ft. Worth metroplex, New Mexico, and Arizona areas, stated that Outset was aggressive in marketing for CRRT and noted that Outset was promoting Tablo for CRRT use in Florida.

d.    Witness 11, a senior contracts and renewals employee with Outset, said that prior to the FDA Letter, Outset sales staff sold Tablo as capable of performing CRRT.

e.    Witness 12, a territory manager for southeastern U.S., also explained that Outset 100% promoted Tablo as a replacement for CRRT devices prior to the FDA Warning Letter.

f.    Witness 13, who was a clinical sales representative, relayed that they sold Tablo XT as an option for CRRT. Witness 13 relayed that Outset marketed Tablo as a replacement to competitors' machines for CRRT.

320.    The truth that Outset was engaged in widespread and pervasive off-label promotion is further established by employee witness accounts that Outset's marketing materials expressly promoted Tablo for CRRT and were top-down materials that salespeople were required to and did use in all marketing and promotion of Tablo:

a.    Witness 12 relayed that Outset marketing slide decks showed pictures of other firms' devices such as Baxter's Prismaflex that were only used for CRRT and that the sales staff was instructed to say the Tablo could replace those machines.

b.    Witness 14 confirmed that Outset's marketing material promoted that Tablo could be used instead of machines designed exclusively for CRRT. This witness further confirmed that there was a slide that said Tablo could replace Prismaflex and NxStage CRRT machines. Witness 14 relayed that

promotional materials and slides were prepared by the Company and provided to salespeople.

c. Witness 11 also confirmed that brochures, slides and other promotional materials stated that Tablo was acceptable for CRRT.

d. Witnesses 11, 12, and 13 all relayed that these misleading marketing materials had to be approved by both the Legal Department and Medical Affairs.

e. Witnesses 11 and 12 further explained that sales staff were prohibited from creating their own promotional materials. Likewise, Witness 13 confirmed that, while salespeople could customize the slides for specific clients, they were not permitted to change the data associated with the device.

321. The truth that Outset was engaged in widespread and pervasive off-label promotion is further established by employee witness accounts that, until the FDA Warning Letter came out, senior management (including Defendants Trigg and Aragon) trained Outset's sales team to expressly promote Tablo for CRRT uses:

a. Witness 1 explained that, during sales calls and meetings with Outset leadership, they were trained to promote and sell Tablo for CRRT.

b. Witness 2 said that they attended two training sessions, one in San Diego, California, and one in Columbus, Ohio, during which they were trained to say that Tablo is okay for CRRT.

c. Witness 11 confirmed that sales staff was instructed to tell potential customers that Tablo was available to replace machines used solely for CRRT, including Baxter's PrismaFlex device.

d. Witness 12 relayed that they attended several sales conferences at Outset, both virtually and in person, that were attended by Trigg and Aragon, where the group was told that Tablo could replace all other devices and was an appropriate replacement for CRRT devices.

e. Witness 13 also stated that, at every annual sales kick-off, Trigg repeated that Tablo was a whole house replacement device for renal therapies and, at these sales meetings, company executives went over slides that showed images of Tablo replacing CRRT-specific machines such as the Baxter Prismaflex and Fresenius Multifiltrate.

322. The truth that Outset was engaged in widespread and pervasive off-label promotion is further established by employee witness accounts that, after the FDA Warning Letter, Outset fundamentally changed its marketing for Tablo:

a. Witnesses 3 and 11 stated that, after the FDA Warning Letter, management instructed the sales staff not to market Tablo for CRRT. Likewise, Witnesses 2, 12, and 13 relayed they were instructed not to use the term CRRT anymore. Witnesses 2, 3, 11, and 13 all confirmed that they attended an all hands-on meeting to discuss the FDA Warning Letter and staff were instructed to no

longer refer to CRRT.  Witness 13 specifically noted that Trigg and Aragon held the all hands-on meeting where Trigg said that sales staff could no longer use the term CRRT.

b. Witnesses 11 and 12 stated that, after the FDA Warning Letter, when senior management, including Trigg, held a company-wide meeting explaining the FDA's position, they expressed no surprise at the findings.  Witness 2 likewise said they did not recall any instance when Ouset Management inferred that the FDA Warning Letter was wrong or inaccurate.

c. Witness 2 relayed that, after the FDA Warning Letter, senior management ordered that all marketing materials (hard copy and electronic) that existed prior to the FDA Warning Letter be purged.  Likewise, Witness 13 relayed that, after the letter, Outset scrubbed all marketing materials removing any mention of CRRT, including in brochures, slide presentations, and the company website, and references to Tablo being a replacement for competing devices that only performed CRRT were removed from slide presentations.

d. Witness 13 stated that while Aragon had been citing studies to customers to support his sales pitch that Tablo was an appropriate replacement for CRRT devices, he ceased using those studies after the FDA Warning Letter.

323. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the Outset customer Witnesses 4, 5, 6, 7, 8, and 9's accounts:

a. Witnesses 4, 5, 6, and 9 relayed that Outset personnel told them Tablo could perform CRRT.

b. Witness 4, the president and CEO of a large health care system in New York, confirmed that they believed that Tablo was approved for CRRT and that the marketing materials and proposals they received from Outset promoted Tablo for off-label use for CRRT.  They said that Outset discussed with them and provided them with an analysis of the costs savings that could be achieved by replacing all its dialysis machines with Tablo, even its CRRT machines.  Witness 4 explained that Outset's messaging was consistent on this point even though there was significant turn-over among the salespeople pitching Tablo to them.  During the discussions, Outset never said that Tablo was not approved for CRRT; to the contrary, Outset said that the hospital would need to acquire Tablo XT to operate Tablo for CRRT.  Witness 4's hospital system replaced all of its machines, including its CRRT machines, with Tablo.  Witness 4 relayed that had they known Tablo was not approved for CRRT, they would not have used it for CRRT and probably would not have converted to Tablo or replaced any of their dialysis machines with Tablo at all.

c. Witness 4 further relayed that they met with Trigg who requested that Witness 4 discuss their system's experience (which included using Tablo for CRRT) with other potential customers to promote Tablo.  Witness 4 also relayed that Outset prepared an article discussing their system's conversion to Tablo and its elimination of all other dialysis machines, including CRRT, that Outset posted on its website.  That version of the article is no longer on Outset's website.

d. Witness 5, a critical care nurse manager whose hospital system in New York, replaced all its CRRT machines with Tablo because of the cost savings and

explained that Outset provided training to use Tablo for CRRT.  Although Witness 5 was trained by Outset to then train other hospital staff, they never knew that Tablo was not approved for CRRT.

e. Witness 6 recalled discussions with Outset technicians and other employees that Tablo was capable of CRRT.

f. Witness 7 relayed that their hospital purchased Tablo for CRRT and replaced all their CRRT machines with Tablo;

g. Witness 8, a Chief of Nephrology in the Greater Boston area, also relayed that they believed that Tablo was marketed for CRRT.

h. Witness 9 confirmed that their hospital system switched from CRRT machines to Tablo because Outset represented that Tablo could be used for CRRT, not only intermittent uses such as PIRRT or SLED.

324. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the FDA inspection and July 5, 2023 FDA Warning Letter, which followed the inspection of Outset's facilities and website as well as discussions with Outset management, and which stated the FDA findings that Outset was engaged in off-label marketing, including that:

a. Tablo was "adulterated" and "misbranded" under the FDCA because Tablo was not cleared for CRRT and Outset's sale of Tablo for CRRT is unlawful;

b. The FDA's inspection of Outset beginning in January 2023 and review of the Company's website found evidence and marketing that show promotion of Tablo for CRRT, including, by way of example, certain marketing material on Outset's website, including that Outset's website state that two large hospitals converted to a program consisting solely of the Tablo Hemodialysis System and state, "This major conversion eliminated the need for several types of dialysis machines for different clinical needs, including intermittent hemodialysis (IHD) in the dialysis unit and continuous renal replacement therapy (CRRT) in critical care."  The FDA Warning Letter further states that multiple hospitals who had established CRRT treatment programs "converted those CRRT programs over to Tablo with Extended Therapy" and states, "[t]hey also replaced their CRRT machines with Tablo with XT…."

c. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by Outset's own disclosures:

d. The Company's August 2, 2023 disclosure that it had paused distribution of TabloCart while it sought FDA clearance and that it was lowering revenue expectations as a result of the FDA Warning Letter;

e. The Company's November 7, 2023 disclosure that it lowered revenue guidance due to the recent FDA Warning Letter and of the pause in distribution of TabloCart;

f. The Company's May 9, 2024 disclosure, just after it received clearance for TabloCart that, despite such clearance, it could still face fallout from the FDA

Warning Letter despite the Company's previous representations that it had fully addressed the FDA's concerns, and that it expected sales to recover once TabloCart was cleared; and

g. The Company's August 7, 2024 disclosure that it missed revenue expectations, lowered FY 2024 guidance, sales had not recovered despite TabloCart's FDA clearance, and Ouset needed to revamp its entire sales team and process restructuring, despite Outset's prior representations that lower Tablo sales were due to TabloCart's unavailability and purported market confusion created by competitors.

325. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the fact that Outset's sales for the acute care setting, where CRRT is performed, grew substantially after the off-label marketing began. For example, Outset reported net revenue of $17.2 million in the fourth quarter and $49.9 million for the full year of 2020, representing 143% and 231% increases respectively, over the corresponding periods of 2019 and 115% year-over-year revenue growth from Q2 2020 to Q2 2021 "driven primarily by increased console shipments to acute customers." Likewise, 81% and 77% of Tablo installs in 2020 and 2021, respectively, occurred in acute facilities. However, after the FDA Letter and Ouset's cessation of the off-label marketing, Tablo sales immediately declined and have not recovered. For example, the Company's Q2 2023 revenue, the quarter ending immediately before disclosure of the FDA Warning Letter, was $36.04 million. Outset's most recent reported revenue, for Q4 2025, was $28.9 million, a nearly 20% decline. The Company's recurring revenue as a percentage of total revenue versus Tablo console sales has continued to increase drastically as well. Recurring revenue accounted for 74% revenue for both FY 2024 and FY 2025, as compared to 45% for the quarter prior to the FDA Letter.

**D.    The Speaking Defendants Issued False And Misleading Statements Downplaying And Misrepresenting The Issues Raised By The FDA Warning Letter**

326. During the Class Period, the Speaking Defendants issued numerous affirmative false and misleading statements downplaying and misrepresenting the issues raised by the FDA Warning Letter, their impact on the Company, and the reasons for declining Tablo sales:

- Defendant Trigg: "first observation pertained to content on our website that referenced to a Continuous Renal Replacement Therapy, or a CRRT, a modality not currently included in Tablo's indications for use. To be fully reflective of our most recently cleared indications for use, we've removed these materials."

***

"I want to emphasize that neither of these two additional observations pertain to safety, efficacy or quality."[72]

- Defendant Trigg: "And our response effectively was strategically, yes, and so we -- I don't foresee that there's anything controversial in our response which we are choosing to take a very, very collaborative approach. They had some commentary about some customer testimonials on our website. Those have been long removed."[73]

- Defendant Trigg: "First, we observed more customers than we anticipated, choosing to defer their Tablo console purchasing and installation until TabloCart with prefiltration is available again. Second, we experienced a strong competitive response, which served to create marketplace confusion, particularly regarding Tablo's use in the ICU."[74]

- Defendant Trigg: "competitive activity around TabloCart not being available by our choice and some competitive noise making around the other aspect of the warning letter around some case studies that were on our website. We feel that we have fully satisfied the FDA's concerns around the website."[75]

- Defendants Trigg and Ahmed: "During the third quarter of 2023, several factors served to elongate our sales cycle and the timing of delivery and installations which, in turn, had an adverse impact on our bookings and revenues for the quarter. These factors related to our recent Warning Letter, our distribution pause on TabloCart with Prefiltration and certain macroeconomic impacts on our customers. We observed more customers than we anticipated choosing to defer their Tablo console purchasing and installation until TabloCart with Prefiltration becomes available again. In addition, the Warning Letter created a certain amount of marketplace confusion (exacerbated, we believe, in some cases by our competitors) particularly regarding Tablo's use in the intensive care unit (ICU)."[76]

- Defendant Ahmed: Outset customers are "waiting for [Tablo]Cart" to finalize their purchases and "those customers are still very much in our pipeline. They are still very much waiting for [Tablo]Cart. What we're really pleased with is that nobody has dropped out. Nobody has said, look, I don't want the product anymore."[77]

---

[72] August 2, 2023 2Q 2023 earnings call attended by Defendants Trigg and Ahmed.

[73] September 12, 2023 Morgan Stanley 21st Annual Global Health Conference attended by Defendants Trigg and Ahmed.

[74] October 12, 2023 3Q 2023 earnings call attended by Defendants Trigg and Ahmed.

[75] November 7, 2023 earnings call attended by Defendants Trigg and Ahmed.

[76] November 8, 2023 Form 10-Q signed by Defendants Trigg and Ahmed.

[77] March 5, 2024 TD Cowen Healthcare Conference attended by Defendants Trigg and Ahmed.

- Defendant Trigg: "<u>With our most challenging recent headwind now behind us with the FDA clearance of TabloCart, demand for Tablo that has never been higher.</u>"[78]

327. These affirmative statements downplaying and misrepresenting the issues raised by the FDA Warning Letter, their impact on the Company, and the reasons for declining Tablo sales were materially false and misleading when made because they significantly downplayed and misrepresented the FDA's findings, Outset's pervasive off-label marketing, the Company's internal reaction and changes to its marketing practices, and the impact on the Company and sales of Tablo.

328. In truth, the FDA's findings and Outset's marketing were not limited to a few materials on Outset's website, the issues did implicate safety as expressly stated in the FDA Warning Letter, and Outset had to significantly change its marketing which relied on off-label marketing Tablo for CRRT, which it did internally rather than publicly. Ultimately, it was the Company's change in marketing strategy due to the inability to continue its pervasive off-label marketing that impacted the Company's financial results and sales of Tablo, not the temporary shipment pause of TabloCart or the purported market confusion created by competitors. In truth, Tablo sales would not increase once Outset received clearance for TabloCart. These statements are material because Tablo was Outset's primary product and source of revenue, and, thus, the Company is heavily dependent on Tablo and the marketing of Tablo. Therefore, these statements were of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section XII, infra, further demonstrates the materiality of the statements.

329. The truth that Outset was engaged in widespread and pervasive off-label promotion is evidenced by the consistent accounts of former Outset employee Witnesses 1, 2, 3, 11, 12, 13, and 14 that establish that, prior to the FDA Warning Letter, Outset marketed and sold Tablo for CRRT:

  a. Witness 1, who was responsible for marketing and business development in New York Metro, northern New Jersey, Long Island, and parts of upstate New York, relayed that the sales team promoted Tablo for CRRT purposes and as a

---

[78] May 8, 2024 1Q 2024 earnings call attended by Defendants Trigg and Ahmed.

replacement for its competitors' CRRT products. Witness 1 sold Tablo for CRRT to several large hospitals. As Witness 1 further explained, marketing for CRRT was part of the value proposition strategy that formed the basis of Outset's top-down marketing vision.

b. Witness 2, who was responsible for several southern states including Texas, Florida, Alabama, Louisiana, Missouri, and Arkansas, said that Outset marketed Tablo as an extended care option capable of CRRT.

c. Witness 3, a clinical trainer and then a territory manager for the Dallas-Ft. Worth metroplex, New Mexico, and Arizona areas, stated that Outset was aggressive in marketing for CRRT and noted that Outset was promoting Tablo for CRRT use in Florida.

d. Witness 11, a senior contracts and renewals employee with Outset, said that prior to the FDA Letter, Outset sales staff sold Tablo as capable of performing CRRT.

e. Witness 12, a territory manager for southeastern U.S., also explained that Outset 100% promoted Tablo as a replacement for CRRT devices prior to the FDA Warning Letter.

f. Witness 13, who was a clinical sales representative, relayed that they sold Tablo XT as an option for CRRT. Witness 13 relayed that Outset marketed Tablo as a replacement to competitors' machines for CRRT.

330. The truth that Outset was engaged in widespread and pervasive off-label promotion is further established by employee witness accounts that Outset's marketing materials expressly promoted Tablo for CRRT and were top-down materials that salespeople were required to and did use in all marketing and promotion of Tablo:

a. Witness 12 relayed that Outset marketing slide decks showed pictures of other firm's devices such as Baxter's Prismaflex that were only used for CRRT and that the sales staff was instructed to say the Tablo could replace those machines.

b. Witness 14 confirmed that Outset's marketing material promoted that Tablo could be used instead of machines designed exclusively for CRRT. This witness further confirmed that there was a slide that said Tablo could replace Prismaflex and NxStage CRRT machines. Witness 14 relayed that promotional materials and slides were prepared by the Company and provided to salespeople.

c. Witness 11 also confirmed that brochures, slides and other promotional materials stated that Tablo was acceptable for CRRT.

d. Witnesses 11, 12, and 13 all relayed that these misleading marketing materials had to be approved by both the Legal Department and Medical Affairs.

e. Witnesses 11 and 12 further explained that sales staff were prohibited from creating their own promotional materials. Likewise, Witness 13 confirmed

that, while salespeople could customize the slides for specific clients, they were not permitted to change the data associated with the device.

331. The truth that Outset was engaged in widespread and pervasive off-label promotion is further established by employee witness accounts that, until the FDA Warning Letter came out, senior management (including Defendants Trigg and Aragon) trained Outset's sales team to expressly promote Tablo for CRRT uses:

a. Witness 1 explained that, during sales calls and meetings with Outset leadership, they were trained to promote and sell Tablo for CRRT.

b. Witness 2 said that they attended two training sessions, one in San Diego, California, and one in Columbus, Ohio, during which they were trained to say that Tablo is okay for CRRT.

c. Witness 11 confirmed that sales staff was instructed to tell potential customers that Tablo was available to replace machines used solely for CRRT, including Baxter's PrismaFlex device.

d. Witness 12 relayed that they attended several sales conferences at Outset, both virtually and in person, that were attended by Trigg and Aragon, where the group was told that Tablo could replace all other devices and was an appropriate replacement for CRRT devices.

e. Witness 13 also stated that, at every annual sales kick-off, Trigg repeated that Tablo was a whole house replacement device for renal therapies and, at these sales meetings, company executives went over slides that showed images of Tablo replacing CRRT-specific machines such as the Baxter Prismaflex and Fresenius Multifiltrate.

332. The truth that Outset was engaged in widespread and pervasive off-label promotion is further established by employee witness accounts that, after the FDA Warning Letter, Outset fundamentally changed its marketing for Tablo:

a. Witnesses 3 and 11 stated that, after the FDA Warning Letter, management instructed the sales staff not to market Tablo for CRRT. Likewise, Witnesses 2, 12, and 13 relayed they were instructed not to use the term CRRT anymore. Witnesses 2, 3, 11, and 13 all confirmed that they attended an all hands-on meeting to discuss the FDA Warning Letter and staff were instructed to no longer refer to CRRT. Witness 13 specifically noted that Trigg and Aragon held the all hands-on meeting where Trigg said that sales staff could no longer use the term CRRT.

b. Witnesses 11 and 12 stated that, after the FDA Warning Letter, when senior management, including Trigg, held a company-wide meeting explaining the FDA's position, they expressed no surprise at the findings. Witness 2 likewise said they did not recall any instance when Ouset Management inferred that the FDA Warning Letter was wrong or inaccurate.

c. Witness 2 relayed that, after the FDA Warning Letter, senior management ordered that all marketing materials (hard copy and electronic) that existed

prior to the FDA Warning Letter be purged. Likewise, Witness 13 relayed that, after the letter, Outset scrubbed all marketing materials removing any mention of CRRT, including in brochures, slide presentations and the company website, and references to Tablo being a replacement for competing devices that only performed CRRT were removed from slide presentations.

d. Witness 13 stated that while Aragon had been citing studies to customers to support his sales pitch that Tablo was an appropriate replacement for CRRT devices, he ceased using those studies after the FDA Warning Letter.

333. The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the Outset customer Witnesses 4, 5, 6, 7, 8, and 9's accounts:

a. Witnesses 4, 5, 6, and 9 relayed that Outset personnel told them Tablo could perform CRRT.

b. Witness 4, the president and CEO of a large health care system in New York, confirmed that they believed that Tablo was approved for CRRT and that the marketing materials and proposals they received from Outset promoted Tablo for off-label use for CRRT. They said that Outset discussed with them and provided them with an analysis of the costs savings that could be achieved by replacing all its dialysis machines with Tablo, even its CRRT machines. Witness 4 explained that Outset's messaging was consistent on this point even though there was significant turn-over among the salespeople pitching Tablo to them. During the discussions, Outset never said that Tablo was not approved for CRRT; to the contrary, Outset said that the hospital would need to acquire Tablo XT to operate Tablo for CRRT. Witness 4's hospital system replaced all of its machines, including its CRRT machines, with Tablo. Witness 4 relayed that had they known Tablo was not approved for CRRT, they would not have used it for CRRT and probably would not have converted to Tablo or replaced any of their dialysis machines with Tablo at all.

c. Witness 4 further relayed that they met with Trigg who requested that Witness 4 discuss their system's experience (which included using Tablo for CRRT) with other potential customers to promote Tablo. Witness 4 also relayed that Outset prepared an article discussing their system's conversion to Tablo and its elimination of all other dialysis machines, including CRRT, that Outset posted on its website. That version of the article is no longer on Outset's website.

d. Witness 5, a critical care nurse manager whose hospital system in New York, replaced all its CRRT machines with Tablo because of the cost savings and explained that Outset provided training to use Tablo for CRRT. Although Witness 5 was trained by Outset to then train other hospital staff, they never knew that Tablo was not approved for CRRT.

e. Witness 6 recalled discussions with Outset technicians and other employees that Tablo was capable of CRRT.

f. Witness 7 relayed that their hospital purchased Tablo for CRRT and replaced all their CRRT machines with Tablo;

g. Witness 8, a Chief of Nephrology in the Greater Boston area, also relayed that they believed that Tablo was marketed for CRRT.

h.  Witness 9 confirmed that their hospital system switched from CRRT machines to Tablo because Outset represented that Tablo could be used for CRRT, not only intermittent uses such as PIRRT or SLED.

334.  The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the FDA inspection and July 5, 2023 FDA Warning Letter, which followed the inspection of Outset's facilities and website as well as discussions with Outset management, and which stated the FDA findings that Outset was engaged in off-label marketing, including that:

a.  Tablo was "adulterated" and "misbranded" under the FDCA because Tablo was not cleared for CRRT and Outset's sale of Tablo for CRRT is unlawful;

b.  The FDA's inspection of Outset beginning in January 2023 and review of the Company's website found evidence and marketing that show promotion of Tablo for CRRT, including, by way of example, certain marketing material on Outset's website, including that Outset's website state that two large hospitals converted to a program consisting solely of the Tablo Hemodialysis System and state, "This major conversion eliminated the need for several types of dialysis machines for different clinical needs, including intermittent hemodialysis (IHD) in the dialysis unit and continuous renal replacement therapy (CRRT) in critical care." The FDA Warning Letter further states that multiple hospitals who had established CRRT treatment programs "converted those CRRT programs over to Tablo with Extended Therapy" and states, "[t]hey also replaced their CRRT machines with Tablo with XT…."

335.  The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by Outset's own disclosures:

a.  The Company's August 2, 2023 disclosure that it had paused distribution of TabloCart while it sought FDA clearance and that it was lowering revenue expectations as a result of the FDA Warning Letter;

b.  The Company's November 7, 2023 disclosure that it lowered revenue guidance due to the recent FDA Warning Letter and the pause in distribution of TabloCart;

c.  The Company's May 9, 2024 disclosure, just after it received clearance for TabloCart that, despite such clearance, it could still face fallout from the FDA Warning Letter despite the Company's previous representations that it had fully addressed the FDA's concerns, and that it expected sales to recover once TabloCart was cleared; and

d.  The Company's August 7, 2024 disclosure that it missed revenue expectations, lowered FY 2024 guidance, and sales had not recovered despite TabloCart's FDA clearance, and that Ouset needed to revamp its entire sales team and process restructuring, despite Outset's prior representations that lower Tablo sales were due to TabloCart's unavailability and purported market confusion created by competitors.

336.    The truth that Outset was engaged in widespread and pervasive off-label promotion is further evidenced by the fact that Outset's sales for the acute care setting, where CRRT is performed, grew substantially after the off-label marketing began.  For example, Outset reported net revenue of $17.2 million in the fourth quarter and $49.9 million for the full year of 2020, representing 143% and 231% increases respectively, over the corresponding periods of 2019 and 115% year-over-year revenue growth from Q2 2020 to Q2 2021 "driven primarily by increased console shipments to acute customers."  Likewise, 81% and 77% of Tablo installs in 2020 and 2021, respectively, occurred in acute facilities.  However, after the FDA Letter and Ouset's cessation of the off-label marketing, Tablo sales immediately declined and have not recovered.  For example, the Company's Q2 2023 revenue, the quarter ending immediately before disclosure of the FDA Warning Letter, was $36.04 million.  Outset's most recent reported revenue, for Q4 2025, was $28.9 million, a nearly 20% decline.  The Company's recurring revenue as a percentage of total revenue versus Tablo console sales has continued to increase drastically as well.  Recurring revenue accounted for 74% revenue for both FY 2024 and FY 2025, as compared to 45% for the quarter prior to the FDA Letter.

337.    The truth that the findings in the FDA Warning Letter and Outset's off-label marketing, as well as their impact on the Company and its sales and marketing practices, were more significant than Outset relayed and that the Company's excuses for declining sales were pretextual is evidenced by the following:

a. Witnesses 3 and 11 stated that, after the FDA Warning Letter, management instructed the sales staff not to market Tablo for CRRT.  Likewise, Witnesses 2, 12, and 13 relayed they were instructed not to use the term CRRT anymore.  Witnesses 2, 3, 11, and 13 all confirmed that they attended an all hands meeting to discuss the FDA Warning Letter and staff were instructed to no longer refer to CRRT.  Witness 13 specifically noted that Trigg and Aragon held the all hands meeting where Trigg said that sales staff could no longer use the term CRRT.

b. Witnesses 11 and 12 stated that, after the FDA Warning Letter, when senior management, including Trigg, held a company-wide meeting explaining the FDA's position, they expressed no surprise at the findings.  Witness 2 likewise said they did not recall any instance when Ouset Management inferred that the FDA Warning Letter was wrong or inaccurate.

c. Witness 2 relayed that, after the FDA Warning Letter, senior management ordered that all marketing materials (hard copy and electronic) that existed

prior to the FDA Warning Letter be purged.  Likewise, Witness 13 relayed that, after the letter, Outset scrubbed all marketing materials removing any mention of CRRT, including brochures, slide presentations and the company website, and references to Tablo being a replacement for competing devices that only performed CRRT were removed from slide presentations.

d. Witnesses relay that when the market learned of the FDA's concerns, including regarding Tablo's lack of clearance for CRRT, customers were upset and sales fell.  Witness 11 said after the FDA Letter, hospitals were reluctant to use Tablo and sales dropped.  Witness 12 said after the FDA Letter sales of Tablo crashed and that customers were no longer comfortable purchasing Tablo.  Witness 13 likewise said that after the FDA Letter and it was known that Tablo was not FDA approved for CRRT, many nephrology doctors were upset and sales declined.

e. The findings in the July 5, 2023 FDA Warning Letter, which followed an inspection of Outset's facilities and website and discussion with Outset management.  The inspection found Outset was engaged in off-label marketing and cited to the marketing materials on the website only as an example, and the FDA Letter highlighted the "serious public health concerns" the off-label marketing implicated;

f. Outset added the following disclosure to its website and marketing materials: "The Tablo Hemodialysis System is not indicated for continuous renal replacement therapy (CRRT) and is cleared for use for up to 24 hour" after receiving the FDA Warning Letter;

g. The Company's May 9, 2024 disclosure that despite the FDA's clearance of TabloCart, it could still face fallout from the FDA Warning Letter despite the Company's previous representations that it had fully addressed the FDA's concerns, and that it expected sales to recover once TabloCart was cleared; and

h. The Company's August 7, 2024 disclosure that it missed revenue expectations, lowered FY 2024 guidance, and sales had not recovered despite TabloCart's FDA clearance, and that Ouset needed to revamp its entire sales team and process restructuring, despite Outset's prior representations that lower Tablo sales were due to TabloCart's unavailability and purported market confusion created by competitors.

i. Outset's sales for the acute care setting, where CRRT is performed, grew substantially after the off-label marketing began.  For example, Outset reported net revenue of $17.2 million in the fourth quarter and $49.9 million for the full year of 2020, representing 143% and 231% increases respectively, over the corresponding periods of 2019 and 115% year-over-year revenue growth from Q2 2020 to Q2 2021 "driven primarily by increased console shipments to acute customers."  Likewise, 81% and 77% of Tablo installs in 2020 and 2021, respectively, occurred in acute facilities.  However, after the FDA Letter and Ouset's cessation of the off-label marketing, Tablo sales immediately declined and have not recovered.  For example, the Company's Q2 2023 revenue, the quarter ending immediately before disclosure of the FDA Warning Letter, was $36.04 million.  Outset's most recent reported revenue, for Q4 2025, was $28.9 million, a nearly 20% decline.  The Company's recurring revenue as a percentage of total revenue versus Tablo console sales has continued to increase drastically as well.  Recurring revenue accounted for 74% revenue for both FY 2024 and FY 2025, as compared to 45% for the quarter prior to the FDA Letter.

### E. The Speaking Defendants Issued False And Misleading Statements Touting TabloCart As A Non-Medical Accessory.

338. During the Class Period, the Speaking Defendants issued numerous affirmative false and misleading statements touting TabloCart as a non-medical accessory:

- Defendant Trigg: "To that end, we are pleased to introduce TabloCart, which is a new accessory for Tablo."[79]

- Defendants Trigg, Ahmed, and Brottem: TabloCart is a "non-medical accessory."[80]

- Defendant Trigg: "Our ASPs benefited again from better-than-expected uptake of Tablo add-ons, including good early demand for our TabloCart new product accessory."[81]

- Defendant Trigg: "From a product innovation standpoint, we are very pleased with demand for TabloCart, a new product accessory we introduced in Q3 of last year that provides additional maneuverability around the hospital, and incremental water prefiltration capabilities. TabloCart is sold separately and is gross margin accretive ASP and is proving to be a valuable solution to many of our acute care customers."[82]

339. These affirmative statements touting TabloCart as a non-medical accessory and not a medical device were false and misleading when made because TabloCart is a medical device that required prior FDA approval or clearance, and Outset never sought FDA clearance prior to unlawfully marketing and distributing TabloCart. These statements were material because TabloCart was particularly important in promoting and selling Tablo in areas that suffered from poor water quality and such marketing also exposed the Company to regulatory action. As such, these statements were of significant importance to investors. The declines in Outset's stock price as the market learned of the truth through a series of partial disclosures, as detailed in Section XII, infra, below, further demonstrates the materiality of the statements.

---

[79] November 8, 2022 3Q 2022 earnings call attended by Defendants Trigg and Ahmed.

[80] February 13, 2023 Form 10-K signed by Defendants Trigg and Ahmed; April 13, 2023 Proxy Statement signed by Defendant John Brottem.

[81] May 3, 2023 1Q 2023 earnings call attended by Defendants Trigg and Ahmed.

[82] *Id.*

340.    The truth that TabloCart was a medical device requiring FDA clearance is evidenced by:

    a.   TabloCart is a Class II medical device requiring FDA approval or clearance as the FDA expressly classifies a "water purification system for hemodialysis" "that is intended for use with a hemodialysis system and that is intended to remove organic and inorganic substances and microbial contaminants from water used to dilute dialysate concentrate to form dialysate." 21 C.F.R. § 876.5665.

    b.   The FDA's findings that TabloCart was "adulterated" and "misbranded" under the FDCA because Outset failed to obtain 510(k) Clearance for the device and Outset was "marketing [TabloCart] without clearance or premarket authorization."

## X.    ADDITONAL SCIENTER ALLEGATIONS

341.    As alleged herein, there are a series of facts that individually and collectively support a strong inference of scienter as to each of the Individual Defendants. Since the Individual Defendants were Outset's senior management acting within the scope of their employment, scienter by each Individual Defendants is imputed to Outset. The following summarizes some of these allegations.

**A.    Given The Nature Of Outset's Marketing Vision And The Individual Defendants' Knowledge That Tablo Was Not Approved For CRRT, Defendants Knew Or Should Have Known That The Statements That Tablo Could Replace All Dialysis Machines And Capture The Entire Acute Market Were Materially False And Misleading**

342.    As senior executives of Outset, a medical device company whose revenues depended on one product line subject to FDA approval, the Individual Defendants knew or recklessly disregarded that it is illegal to market, promote, or advertise Tablo for any use other than its FDA-approved or cleared use. *See* Section VI.B above. While customers may use devices for off-label uses, off-label marketing or promotion is illegal. Off-label marketing includes any promotional, educational, and training materials, activities or representations for anything beyond the cleared uses.

343.    The Individual Defendants also knew or recklessly disregarded that the FDA did not approve or clear Tablo for CRRT. Tablo was only cleared for intermittent use, in contrast to some competitors' products that were approved for CRRT (notably, Baxter's Prismaflex and

Fresenius' Multifiltrate Pro). Thus, the Individual Defendant knew or should have known that Tablo could not be marketed for patients who required CRRT or to replace CRRT-cleared devices.

344. Yet, by the start of the Class Period, Outset had adopted a top-down marketing "vision" designed to increase sales by promoting Tablo as the only dialysis machine that customers need, even replacing CRRT machines. As Trigg explained in a September 18, 2020 podcast, the Outset team developed a Company-wide marketing vision and strategy to tout Tablo as an "enterprise solution for dialysis" that would allow hospitals to "down select to just one machine." She further stated that:

> And if you could do that, then, you would really simplify the complexity of dialysis from the health system point of view. You could really simplify that by enabling them to down select to one device platform, one hardware platform. And, and then again provide an enterprise solution kind of same device, whether it's being used in the ICU or at home, which is gonna provide a lot of operating efficiency and, um and cost reduction. So that's the, that's really the principal way in which the vision evolved.

345. Hand in hand with this marketing vision, the Individual Defendants expressly touted, or knew that Outset was touting to the investing public, the above materially false and misleading statements to the effect that Tablo was designed to cover all dialysis treatments and was an all-in-one machine that could replace all other dialysis machines including in acute care settings, including the ICU, and that Outset could capture the entire acute market. In fact, Outset included slides showing Tablo as a replacement for a variety of machines including Baxter's Primaflex and Fresenius MultiFiltrate Pro, two of the few devices cleared for CRRT, in its presentations to investors. Yet, the Company never relayed to investors that these were CRRT-specific devices or explained that promoting Tablo for CRRT uses would constate off-label marketing. Analysts reacted positively to these misrepresentations regarding Tablo.

346. As alleged above, these statements were materially false and misleading in that they did not expressly acknowledge any limitations to the use of Tablo or acknowledge that Tablo could not replace its competitors' CRRT machines. Nor did they ever disclose that off-label marketing to customers was a significant part of their marketing strategy. Indeed, it was only after the FDA Warning Letter that the Company added the following language to its marketing materials and website to address the FDA's concerns: "The Tablo Hemodialysis System is not

indicated for continuous renal replacement therapy (CRRT) and is cleared for use for up to 24 hours."

347. Additionally, as alleged, Outset, Trigg, Chambers and Ahmed continued to tout both: (i) the implementation of this vision; and (ii) increased sales and strong financial results, citing the increased commercial adoption of Tablo, without disclosing that these sales were driven by the off-label marketing for CRRT. Thus, Outset's marketing vision drove the Company's promises of sales and actual sales growth through customers' replacement of all their different dialysis machines with Tablo, without regard to or disclosure of the fact that Tablo could not be marketed or promoted to replace CRRT machines.

348. Having adopted a business plan that either required or threatened to trigger illegal off-label marketing, the Speaking Defendants acted with scienter by issuing these materially misleading statements without confirming that Outset's marketing materials and sales speech were clear that Tablo was not approved for CRRT use.

349. Moreover, as both sales personnel and customers attested to, the Individual Defendants not only were deliberately reckless about the Company's off-label marketing scheme, the Individual Defendants either knowingly encouraged off-label marketing sales or recklessly failed to prevent such conduct by Outset's salespeople further compounding their scienter as to the false and misleading statements and the fraudulent scheme.

**B.    Numerous Red Flags Support A Strong Inference That The Individual Defendants Either Knew Or Recklessly Disregarded That Outset Was Engaging In Off-Label Marketing, Further Supporting A Strong Inference Of Scienter With Respect To The False And Misleading Statements And The Fraudulent Scheme**

350. There are plethora of red flags indicating that the Individual Defendants knew or recklessly disregarded that Outset's top-down marketing vision involved off-label promotion for CRRT, including promoting, encouraging, and training customers to replace all their dialysis machines, even the ones used for CRRT, with Tablo, thereby delivering on Outset's narrative to investors and rendering the above statements to the investing public materially false and misleading.

351. Indeed, various facts, including consistent accounts of both former sales employees (whose employment spanned various time periods and locations) and Outset customers (including a nephrologist, nurse, and hospital administrators from different health systems and various time periods and geographic locations), demonstrate that: (a) Outset promoted Tablo for CRRT to customers; (b) senior management, including Defendants Trigg and Aragon, trained its sales force to do so; (c) senior management obligated salespeople to use one set of marketing materials touting that Tablo could be used for CRRT; (d) these marketing materials were top-down materials that had to be approved by the Legal Department and Medical Affairs; and (e) Outset attempted to and did have its customers promote Tablo for CRRT. Thus, fully aware of the Company's marketing vision, the Individual Defendants either knew or recklessly disregarded that Outset was promoting Tablo for off-label uses.

352. As an initial matter, consistent accounts of both former sales employees and Outset customers indicate that, prior to the FDA Warning Letter, Outset promoted Tablo as acceptable for CRRT, including in client presentations, and trained clients to use Tablo for CRRT:

 a. Sales Witness 1, who was responsible for marketing and business development in New York Metro, northern New Jersey, Long Island, and parts of upstate New York, confirmed that the sales team promoted Tablo for CRRT purposes and as a replacement for its competitors' CRRT products. Indeed, this witness sold Tablo for CRRT. As Witness 1 further explained, this was part of the value proposition that formed the basis for Outset's top-down marketing vision.

 b. Sales Witness 2, who was responsible for several southern states including Texas, Florida, Alabama, Louisiana, Missouri, and Arkansas, said that Outset marketed Tablo as an extended care option capable of CRRT.

 c. Sales Witness 3, a clinical trainer and then a territory manager for the Dallas-Ft. Worth metroplex, New Mexico, and Arizona areas, stated that Outset was aggressive in marketing for CRRT and noted that Outset was promoting Tablo for CRRT use in Florida. This Witness further admitted that they had not even realized that Tablo was not approved for CRRT until after the FDA Warning Letter was issued.

 d. Contracts Witness 11, a senior contracts and renewals person with Outset, said that prior to the FDA Letter, Outset sales staff sold Tablo as capable of performing CRRT.

 e. Sales Witness 12, a territory manager for southeastern U.S., also explained that there was no question that Outset promoted Tablo as a replacement for CRRT devices prior to the FDA Warning Letter.

f.  Sales Witness 13, who was a clinical sales representative, confirmed that they sold Tablo XT as an option for CRRT and Outset was telling hospitals that Tablo could be used for CRRT. They marketed Tablo as a replacement to competitors' machines for CRRT.

g.  Customer Witnesses 4, 5, 6, and 9 relayed that Outset personnel told them Tablo could perform CRRT. Witnesses 4 and 5 further stated they were unaware that Tablo did not have FDA clearance for CRRT. Customer Witnesses 4 and 7 stated that their health system employers purchased Tablo for use for CRRT and they replaced their CRRT machines with Tablo.

h.  Customer Witness 4, the president and CEO of a large health care system in New York, confirmed that they believed that Tablo was approved for CRRT and that Outset discussed with them and provided them with an analysis of the costs savings that could be achieved by replacing all its dialysis machines with Tablo, even its CRRT machines. Witness 4 explained that Outset's messaging was consistent on this point even though there was significant turn-over among the salespeople pitching Tablo to them. During the discussions, Outset never said that Tablo was not approved for CRRT; to the contrary, Outset said that the hospital would need to acquire Tablo XT to operate Tablo for CRRT. Witness 4 claimed that, but for Outset's representations, they would not have replaced their CRRT devices with Tablo and probably would not have converted to Tablo or replaced any of their dialysis machines with Tablo at all because the benefit of Tablo was to standardize its dialysis treatment and achieve staffing and supplies savings. Witness 4's hospital system replaced all its machines, including its CRRT machines, with Tablo.

i.  Customer Witness 5, a critical care nurse manager whose hospital system in New York, replaced all its CRRT machines with Tablo because of the cost savings and explained that Outset provided training to use Tablo for CRRT. Although Witness 5 was trained by Outset to then train other hospital staff, they never knew that Tablo was not approved for CRRT.

j.  While their hospital in Massachusetts did not have a need for CRRT, customer Witness 6 recalled discussions with Outset technicians and other employees that Tablo was capable of CRRT.

k.  Customer Witness 8, a Chief of Nephrology in the Greater Boston area, also relayed that they believed that Tablo was marketed for CRRT.

l.  Customer Witness 9 confirmed that their hospital system switched from CRRT machines to Tablo because Outset represented that Tablo could be used for CRRT, not only intermittent uses such as PIRRT or SLED.

353.  Significantly, former employee Witnesses also confirmed that, until the FDA Warning Letter came out, senior management (including Defendants Trigg and Aragon) trained Outset's sales team to expressly promote Tablo for CRRT uses:

a.  Sales Witness 1 explained that, during sales calls and meetings with Outset leadership, they were trained to promote and sell Tablo for CRRT.

b. Sales Witness 2, said that they attended two training sessions, one in San Diego, California, and one in Columbus, Ohio, during which they were trained to say that Tablo is okay for CRRT.

c. Sales Witness 12 confirmed that the salespeople were instructed to say that Tablo was an all-in-one machine that could replace all other machines. This witness further noted that they attended several sales conferences at Outset, both virtually and in person, that were attended by Trigg and Aragon, where the group was told that Tablo could replace all other devices and was an appropriate replacement for CRRT devices.

d. Sales Witness 13 also mentioned that, at every annual sales kick-off, Trigg repeated that Tablo was a whole house replacement device for renal therapies and, at these sales meetings, company executives went over slides that showed images of Tablo replacing CRRT-specific machines such as the Baxter Prismaflex and Fresenius Multifiltrate.

e. Moreover, contracts Witness 11 confirmed that sales staff was instructed to tell potential customers that Tablo was available to replace machines used solely for CRRT, including Baxter's PrismaFlex device.

354. Moreover, former employees and customers as well as the FDA establish that Outset's marketing materials (including website content, brochures, slides, and other promotional materials) expressly stated that Tablo was acceptable for CRRT:

a. Sales Witness 12 recalls marketing slide decks showing pictures of CRRT machines such as Baxter's Prismaflex, which was approved for CRRT. They further noted that all marketing and promotional materials were approved by Legal Department and Medical Affairs.

b. Sales Witness 14 confirmed that Outset's marketing material promoted that Tablo could be used instead of machines designed exclusively for CRRT. This witness further confirmed that there was a slide that said Tablo could replace Prismaflex and NxStage CRRT machines.

c. Contracts Witness 11 also confirmed that brochures, slides, and other promotional materials stated that Tablo was acceptable for CRRT.

d. Customer Witness 4 confirmed that the marketing materials and proposals they received from Outset promoted Tablo for off-label use for CRRT. Witness 4 said Outset provided them information on savings Tablo would provide. The presentation included slides showing Tablo could replace CRRT machines. Witness 4 said the system conducted an analysis on the cost savings Tablo would provide to verify the information provided by Outset. That analysis included line items for CRRT specific savings. The system worked with Outset representatives in conducting this analysis and Outset assisted them with the analysis.

e. The FDA Warning Letter makes clear that evidence from the FDA's onsite inspection and review of Outset's website demonstrated that Outset was promoting Tablo for CRRT, an off-label use.

355. Even more significantly, Outset's Material Materials were top-down materials that salespeople were required to and did use in all marketing and promotion of Tablo:

    a. Sales Witness 14 confirmed that promotional materials and slides were prepared by the Company and provided to salespeople.

    b. Sales Witnesses 12 and 13 and contracts Witness 11 all relayed that these misleading marketing materials had to be approved by both the Legal Department and Medical Affairs.

    c. Former employee Witnesses 11 and 12 further explained that sales staff were prohibited from creating their own promotional materials.

    d. Likewise, sales Witness 13 confirmed that, while salespeople could customize the slides for specific clients, they were not permitted to change the data associated with the device.

    e. Contracts Witness 11 confirmed that to their knowledge Outset sales staff did not create their own materials or use unapproved materials.

356. In addition, Outset promoted Tablo for CRRT by having customers discuss their acquisition of Tablo for CRRT purposes, including on Outset's website:

    a. The FDA Warning Letter specifically highlights that Outset's website states that two large hospitals converted to a program consisting solely of the Tablo Hemodialysis System and states, "[t]his major conversion eliminated the need for several types of dialysis machines for different clinical needs, including intermittent hemodialysis (IHD) in the dialysis unit and continuous renal replacement therapy (CRRT) in critical care."

    b. The FDA Warning Letter further states that multiple hospitals who had established CRRT treatment programs "converted those CRRT programs over to Tablo with Extended Therapy" and states, "They also replaced their CRRT machines with Tablo with XT…"

    c. While the Way Back Machine has been scrubbed for all pre-FDA Warning Letter content, Witness 4 relayed that Outset prepared an article discussing their system's conversion to Tablo and its elimination of all other dialysis machines, including CRRT, that Outset posted on its website. That version of the article is no longer on Outset's website.

    d. Customer Witness 4, who was using Tablo for CRRT, confirmed that they met with Trigg who requested that Witness 4 discuss their system's experience (which included using Tablo for CRRT) with other potential customers to promote Tablo.

357. Given these facts, red flags and their roles at the Company coupled with the Company's marketing vision, the Individual Defendants either knew or recklessly disregarded

that Outset was engaged in off-label marketing, at the direction of leadership, and that the above statements to the investing public were materially false and misleading.

358.    This strong inference is particularly strong for Defendants Trigg, Chambers, and Ahmed as they each expressly touted: (a) the Company's marketing vision; (b) that the Company experienced significant financial growth due to new contracts and strong demand in the acute market when in fact the off-label marketing drove these results; and (c) that the Company did not engage in off-label marketing.  As senior executive officers of Outset, they each controlled the information disseminated to the investing public in the Company's press releases, SEC filings, and representations made during the earnings calls or conferences noted herein.

359.    This inference is also particularly strong as to Defendants Aragon, Brottem, and Trigg because of their involvement and leadership in the marketing and promotion of Tablo. Moreover, as the following facts indicate, they each actively participated in the off-label scheme.

**C.    Various Individual Defendants' Active Participation In The Off-Label Marketing Scheme Further Evidences Their Scienter**

360.    Defendants Aragon, Brottem, and Trigg not only knew or should have known of the off-label marketing scheme, but the facts reveal that they each actively participated in Outset's off-label marketing activities.

361.    Defendant Aragon was Chief Medical Officer and oversaw clinical practice integration and physician engagement.  Numerous facts demonstrate that Aragon knew or should have known that the statements to the investing public were materially false and misleading and furthered the fraudulent scheme:

    a.  As noted, Witness 12 relayed attending several sales conferences at Outset where Aragon (and Trigg) spoke to the sales staff and instructed them that Tablo could replace all other devices and was an appropriate replacement for CRRT devices.  Likewise, Witness 13 relayed that Aragon (along with other senior management including Trigg) attended every internal annual sales kick-off at which staff was told that Tablo was a whole house replacement device for renal therapies.  Witness 13 continued that company executives went over slides that showed images of Tablo replacing CRRT-approved machines such as the Baxter Prismaflex and Fresenius Multifiltrate at these meetings.

    b.  Similarly, sales Witness 1 confirmed that Aragon was one of the senior executives who led sales meetings and calls where he instructed sales personnel to push the sale of Tablo for CRRT use.  This Witness further noted

that there were no discussions at these meetings about whether Tablo was approved by the FDA for CRRT.

c. Moreover, as sales Witness 13 explained, Aragon was frequently on sales calls with potential customers, including "to discuss Tablo implementation in the ICU." This witness said that Aragon frequently cited studies used by Outset to support that Tablo as an all-in-one replacement device on these customer calls. They further stated that Aragon used these studies to support his sales pitch that Tablo was an appropriate replacement for CRRT.

d. Sales Witness 13 also said Aragon met with the medical staff, usually those working in nephrology, for all of Outset's customers. Customer Witness 4 confirmed that Aragon held group calls with the hospital's nephrology staff.

e. Customer Witness 4 confirmed that Aragon spoke with them during the sales process and discussed how the system was going to use Tablo for CRRT. During these conversations, Aragon never told Witness 4 that Tablo was not approved for CRRT.

f. As former Outset employees Witnesses 11, 12, and 13 relayed, all marketing and promotion materials, including slides, had to be approved by both the Legal Department and Medical Affairs, which they stated was overseen by Aragon. Thus, as Chief Medical Officer, he either knew or was deliberately reckless in allowing the approval of mandatory use marketing materials that promoted Tablo for an off-label use.

362. Numerous facts demonstrate that Defendant Trigg, the CEO, knew or should have known that the statements to the investing public were materially false and misleading and knowingly or recklessly furthered the fraudulent scheme:

a. As noted above, as CEO, Trigg embraced and advanced the marketing vision to convince customers to save money by replacing all their machines with Tablo. Given this and her role as CEO, it was incumbent for her (and others) to ensure that Outset's marketing materials and sales speech were clear that Tablo was not approved for CRRT use.

b. Yet, as sales Witness 13 relayed, Trigg repeated at every annual sales kick off meeting that Tablo was "a whole house replacement device for renal therapies." At these meetings, company executives, including Trigg, went over slides that showed images of Tablo replacing CRRT-specific machines such as the Baxter Prismaflex and Fresenius Multifiltrate. Likewise, sales Witnesses 12 relayed attending several sales conferences at Outset where Trigg (and Aragon) spoke to the sales staff and instructed them that Tablo could replace all other devices and was an appropriate replacement for CRRT devices.

c. Customer Witness 4 met with Trigg who understood that the hospital system considered Tablo as an all-in-one device including for CRRT, and Trigg never said that Tablo was not approved for CRRT.

d. Trigg was also directly and intimately involved with the sales team in the field in pitching Tablo to hospitals and healthcare systems. Sales Witness 10, a former Director at Outset who worked directly with Trigg, relayed that Trigg

"does call herself a commercial focus CEO. I would put a little spin on it. She's a customer-focused CEO. She would hop out. I'd call her and say, 'Leslie, we've got a big meeting.' She's like, 'Tell me what airport to fly into and pick me up at the airport.' Without any baggage around her, she'd show up and she would do anything." Witness 10 further relayed that Defendant Trigg would say, "Let's go walk a patient floor" or "We need to present to CEOs? All right. I'm ready to go."

e. Indeed, Defendant Trigg herself has attested to this involvement. For example, during the March 8, 2023 TD Cowen Healthcare Conference, Defendant Trigg explained how she liked to attend sales meetings where Outset would explain the savings that customers could obtain by switching to Tablo, which excited the customers. Likewise, during an August 7, 2024 earnings call, she relayed that, "I have spent a lot of time in the field."

f. Yet, as the evidence above indicates, the materials and message to customers was that Tablo was a cost savings because it was a replacement for all dialysis machines. Thus, the strongest inference from her hands-on, direct involvement in marketing Tablo in the field is that she knew or should have known that Outset was promoting the use of Tablo to replace all machines, including CRRT machines.

363.    Numerous facts also demonstrate that Defendant Brottem knew or should have known that the statements to the investing public were materially false and misleading and knowingly or recklessly furthered the fraudulent scheme:

a. As General Counsel for Outset, Brottem would necessarily be fully aware of the FDA approval of Tablo and responsible for ensuring compliance with the FDA rules regarding the marketing of Tablo. Moreover, as General Counsel, he would have been intimately aware of the risks of misleading investors and customers given the Company's vision of marketing Tablo as a replacement for various dialysis machines.

b. Yet, as former employee Witnesses 11, 12, and 13 relayed, the Legal Department had to approve the Company-wide marketing materials that had to be used for the promotion and sale of Tablo and that sales personnel were not permitted to modify. Thus, as General Counsel, Brottem either was knowingly or deliberately reckless in allowing his department to approve of marketing slides to promote for an off-label use.

c. Moreover, as General Counsel, Brottem would have reviewed and approved prepared remarks on earnings calls, including the slides showing Tablo as a replacement for CRRT approved machines, and statements in the Company's Forms 10-Q and Forms 10-K regarding Tablo. These facts are even more compelling given that Outset's marketing vision was premised on the very concept that customers should replace all their existing dialysis machines, including CRRT machines, with Tablo.

364.    Thus, given these facts and the facts demonstrating that: (i) Outset's marketing materials promoted the use of Tablo for CRRT and to replace CRRT machines; (ii) the materials provided to sales targets expressly discussed the savings obtained by replacing all dialysis

machines, including, CRRT machines with Tablo; and (iii) Outset's sales force were trained by senior management to promote the use of Tablo for CRRT and to replace CRRT machines, there is a strong inference that Aragon, Trigg, and Brottem acted with the requisite scienter.

**D.    The Individual Defendants' Knowledge Of The FDA Investigation And Actions Taken In The Months Leading Up To The FDA Warning Letter And After Further Supports Scienter**

365.    The FDA commenced its on-site investigation at Outset's premises, where its executive offices were located, between January 17, 2023 and February 10, 2023.  The FDA had at least one teleconference with Outset on March 13, 2023 (at which at least Defendant Trigg was present) and apparently discussed its concerns regarding the off-label marketing of Table for CRRT, given its reference to Trigg's admission that "CRRT is distinct from the cleared indications for use, device specifications, and treatment modalities for the Tablo."  Moreover, the FDA reviewed materials on Outset's website in May 2023.[83]

366.    In their capacity as senior officers at Outset, Defendants Trigg, Ahmed, Aragon and Brottem, would have been aware of this investigation and these discussions, including that the FDA's investigation was focused on Outset's off-label promotion of Tablo for CRRT and the marketing and distribution of TabloCart without authorization, prior to the issuance of the FDA Warning Letter.

367.    Nevertheless, as set forth in Section IX above, Outset and Defendants Trigg and Ahmed continued to make false and misleading statements detailed above including that Tablo was a full enterprise system that covered the ICU and that the financial results were due to factors other than off-label marketing for several months.

368.    Additionally, the fact that the Speaking Defendants minimized the import of the FDA Warning Letter further demonstrates their scienter.  *See* Section VIII.B.v, supra.  They minimized the import of the FDA Warning Letter by: (a) advising investors that the FDA Warning Letter only focused on marketing materials on the website when in fact the focus was broader;

[83] Suspiciously, archived versions of the Company's website do not exist on the Internet Archive's Wayback Machine, which is a digital archive of the Internet that allows users to explore past versions of websites.

(b) claiming that sales would rebound once TabloCart is cleared, only to correct this shortly thereafter, and also blaming declining sales on "market confusion" created by competitors; (c) stating that neither of the FDA's observations pertain to safety or efficacy even though the FDA indicated otherwise; and (d) claiming that they had resolved the issues, when in fact, the Company had to revamp its sales process months later. Moreover, when the market learned of the FDA's concerns, including regarding Tablo's lack of clearance for CRRT, physicians were upset and sales of the Tablo console fell. Customers stopped purchasing, few sales reps made their quota, and most revenue came from recurring sales rather than from consoles. *See* Section VIII.B.vi, *supra*.

369. Moreover, the Individual Defendants' conduct after they learned of the FDA's concerns ultimately included in the FDA Warning Letter further supports a strong inference of scienter:

a. According to sales Witness 3 and contracts Witness 11, after the FDA Warning Letter management instructed the sales staff not to market Tablo for CRRT or, as Witnesses 2, 12, and 13 explained, they were instructed not to use the term CRRT anymore. Indeed, contracts Witness 11 and sales Witnesses 2, 3, and 13 all confirmed that they attended an all hands-on meeting to discuss the FDA Warning Letter and staff were instructed to no longer refer to CRRT. Sales Witness 13 specifically noted that Trigg and Aragon held the all-hands meeting where Trigg said that sales reps could no longer use the term CRRT. These facts further evidence that the Individual Defendants had been deliberately reckless in failing to ensure that Outset trained its sales personnel to avoid off-label marketing prior to the FDA's investigation.

b. As contracts Witness 11 and sales Witness 12 explained, when senior Management, including Trigg, held a company-wide meeting explaining the FDA's position, they expressed no surprise at the findings. Indeed, sales Witness 2 did not recall any instance when Ouset Management inferred that the FDA Warning Letter was wrong or inaccurate.

c. As sales Witness 2 explained, senior management ordered that all marketing materials (hard copy and electronic) that existed prior to the FDA Warning Letter be purged, thereby acknowledging that its Company-wide mandated marketing materials were misleading. Likewise, sales Witness 13 relayed that, after the letter, Outset scrubbed all marketing materials removing any mention of CRRT, including brochures, slide presentations, and the company website, and references to Tablo being a replacement for competing devices that only performed CRRT were removed from slide presentations.

d. As sales Witness 13 explained, while Aragon had been citing certain studies to customers to support Tablo as an all-in-one replacement device for their needs, he ceased to do so after the FDA Warning Letter, further evidencing his reckless participation in the scheme to defraud.

**E.    The Individual Defendants' Knowledge Of The Lack Of FDA Clearance For Tablocart Evidences Scienter As To The False And Misleading Statements Regarding Tablocart**

370.    As senior executives at a medical device company focused on one main product, Tablo, and its much-touted ancillary product, TabloCart, the Individual Defendants knew of the FDA requirements regarding clearance for medical devices.

371.    Moreover, as senior executives, the Individual Defendants had to know that TabloCart did not have the FDA clearance for TabloCart when Outset introduced TabloCart to the market on November 8, 2022.

372.    The Individual Defendants were, thus, aware of or recklessly disregarded that TabloCart is a medical device requiring FDA approval or clearance.  Indeed, the FDA expressly classifies a "water purification system for hemodialysis" "that is intended for use with a hemodialysis system and that is intended to remove organic and inorganic substances and microbial contaminants from water used to dilute dialysate concentrate to form dialysate" as a Class II medical device requiring notification and approval.  *See, e.g.*, 21 C.F.R. § 876.5665.  This is exactly what TabloCart is.

373.    Thus, there is a strong inference that the Individual Defendants knew or deliberately disregarded the fact that its statements about Tablo Cart were materially false and misleading.

374.    The inference of scienter becomes even stronger starting in early 2023 when the FDA investigated and discussed this failure with Outset.  As the FDA's Warning Letter states, the FDA conducted its on-site investigation between January 17 and February 13, 2023 and discussed its concerns at the March 13, 2023 meeting with Outset.  Accordingly, the inference of scienter is particularly strong as to the Tablo Cart statements made after February 13, 2023.

**F.    The Fact That The Individual Defendants Violated The Company's Own Policies Further Supports Scienter**

375.    The Company's IPO Prospectus and subsequent Class Period SEC filings state that Outset's "***policy is to refrain from statements that could be considered off-label promotion of Tablo.***"  The Company's ESG Reports stated that "Outset's policy [is] that ***all claims with respect***

*to Outset products must be consistent with approved labeling*, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence" and "*without exception, promotional material or statements made by Outset sales representatives may not promote, discuss, or refer to uncleared, unapproved, or off-label use*." Defendant Trigg signed the ESG report and each staff member, including each of the Individual Defendants, were required to "Review and acknowledge the Code of Business Conduct and Ethics."

376. The fact that the Individual Defendants acted contrary to the Company's own stated policies against off-label marketing or promotion of uncleared devices is additional evidence of the Individual Defendants' scienter, as it establishes a consciousness of wrongdoing. In other words, the Individual Defendants cannot plead ignorance of the policy or FDA regulations against off-label marketing set forth above.

**G.    The Core Operations Theory Further Bolsters The Strong Inference Of Scienter**

377. Finally, while the above factual allegations and red flags individually and collectively support a strong inference of scienter, this inference is bolstered by the Core Operations theory. Indeed, every aspect of the fraudulent scheme and misrepresentations stemmed from Outset's Core Operations.

378. Tablo was Outset's primary product and revenue driver and the Company emphasized its dependence on Tablo throughout the Class Period. In the IPO Offering Documents and every Form 10-K during the Class Period, Outset emphasized that it "derive[s] substantially all of [its] revenue from the sale of Tablo and associated consumables and [is] therefore highly dependent on Tablo for [its] success."

379. However, the Core Operations theory does not begin and end with the fact that the Company's success depended on the success of Tablo.

380. Tablo is a highly regulated medical device, and the Company was subject to the FDA's rules promulgated to protect public health. These rules only allowed Outset to market and promote Tablo for its approved use. Thus, the marketing and promotion of Tablo itself constituted a core operation for Outset. And, as the FDA emphasized, there are serious health and safety

risks with off-label marketing of Tablo for CRRT. Similarly, the FDA rules regarding premarket approval did not permit Outset to bring TabloCart to market without notification or clearance, which it only sought after the FDA Warning Letter and obtained on May 6, 2024.

381. This Core Operations inference is all the stronger given that the Speaking Defendants touted that the principal focus and source of the Company's class period revenues related to sales to acute care facilities insourcing dialysis in the ICU, where CRRT is performed. Throughout the Class Period, the Speaking Defendants told the market that "[d]riving adoption of Tablo in the acute care setting has been our primary focus to date." Indeed, this focus never changed as the Company made this claim in each Form 10-K and Form 10-Q during the Class Period. The number of Tablo consoles placed in acute facilities as a percentage of total Tablo installs, was 81% and 77% in 2020 and 2021, respectively.[84] In addition, Outset, Trigg, Chambers, and Ahmed touted increasing sales into the acute market during the Class Period. Thus, the bulk of sales stemmed from the marketing and promotion of Tablo for unapproved uses in violation of the FDA rules, the application of and compliance with constituted core operations.

382. Moreover, the fraudulent scheme and misrepresentations all stemmed from the Company's company-wide vision to generate revenue from the promotion of Tablo to replace all the various dialysis machines. Indeed, defendants' unlawful off-label marketing was not a mere incidental practice by lower-level employees in any one segment of the Company. They were rampant, systematic and at the heart of the top-down marketing vision adopted by the Company at the start of the Class Period, which itself became a Core Operation at Outset.

383. The fact that the fraudulent scheme and misrepresentations focused on multiple tenets of the Company's core operations supports a finding that the Individual Defendants knew or should have known of: (i) the scheme to engage in off-label marketing; (ii) the fact that the statements regarding Tablo's ability, revenue drivers, and that the Company did not engage in off-label marketing were false and misleading; (iii) the fact the statements downplaying and

---

[84] Beginning in 2022, Outset no longer separated out acute and sub-acute installs.

misrepresenting the issues raised by the FDA Warning Letter and their impact were false and misleading; and (iv) the statements regarding TabloCart were false and misleading.

384.    Moreover, the Core Operations theory does not rest upon generalized allegations regarding Outset's core business and practices.  Rather, as alleged above, there are specific red flags as well as facts regarding the Individual Defendants' knowledge or reckless disregard of the misleading nature of their statements and the scheme to defraud.  Thus, viewed holistically along with the other allegations, the Core Operations theory suggests a cogent and compelling inference of scienter.

385.    In fact, given the Company's top-down off-label marketing scheme Defendants' active participation in the scheme as well as the Individual Defendants' mandate to ensure compliance with FDA regulations, it would have be absurd to suggest that the Individual Defendants did not know or were not deliberately reckless in knowing that the representations to the market were materially misleading and that Outset engaged in off-label marketing.

**H.    The Individual Speaking Defendants' Massive Insider Selling At Artificially Inflated Prices Furthers Bolsters The Strong Inference Of Scienter**

386.    Trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter.  Here, Defendants Trigg, Chambers, Ahmed, and Brottem each engaged in suspicious insider trading during the Class Period.[85]  Thus, when considered holistically with the above compelling allegations, their insider trading further supports an inference of scienter.

387.    Here, the amount of insider trading, including Trigg's massive sales, is indicative of scienter.  Indeed, Defendants Trigg, Chambers, Ahmed, and Brottem reaped ***nearly $39 million in proceeds*** on their Class Period trading.

388.    The timing of the insider stock sales is also suspicious, as the sales were made when the stock was trading at inflated prices due to the Defendants' false and misleading

---

[85] Defendant Aragon never filed Forms 3 during the Class Period as it appears that Outset never designated them as Rule 16 insiders, 17 C.F.R. § 240.16a-2.  Thus, there is no publicly available information to evaluate whether they engaged in insider trading.

statements and fraudulent scheme. Indeed, the ***vast majority—85%—***of these Defendants' Class Period insider trading, which reflects ***97%*** of the gross proceeds they made from such trading, was done before the first corrective disclosure. Moreover, Defendants Trigg, Ahmed, and Brottem engaged in significant trading during the six months beginning in January 17, 2023 when they knew the FDA was inspecting Outset and they were engaged in discussions with the FDA regarding the fact that Tablo was not cleared for CRRT and Tablo Cart was not approved, but before Outset publicly disclosed the FDA Warning Letter on July 7, 2023.

389. In addition, while some (but not all) of these insiders' trades were made pursuant to trading plans, the plans were suspiciously adopted after the commencement of the Class Period and, in the case of Trigg, Ahmed, and Brottem, amended several times during the Class Period, including suspiciously after the FDA concluded its site investigation on February 10, 2023. Specifically, Ahmed and Brottem last amended their trading plans on February 17, 2023 and Trigg last amended her trading plan on February 23, 2023, after the FDA inspection between January 17 and February 10, 2023, but before Outset's July 7, 2023 disclosure of the FDA Warning Letter and concerns regarding off-label marketing and TabloCart.

390. The following chart shows the insider trading during the Class Period:[86]

| Insider | Total CP Shares Sold Class Period 9/15/2020-8/7/2024 (1,422 Days) | Total CP Gross Proceeds Class Period 9/15/2020-8/7/2024 (1,422 Days) |
|---|---|---|
| Trigg, Leslie (Director, Officer: President & CEO) | (883,240) | $30,366,470.71 |
| Brottem, John L. (Officer: General Counsel) | (149,908) | $4,507,578.13 |
| Chambers, Rebecca (Officer: Chief Financial Officer) | (66,908) | $3,385,037.92 |
| Ahmed, Nabeel (Officer: Interim CFO) | (52,670) | $573,814.56 |
| **Totals:** | **(1,152,726)** | **$38,832,901.32** |

---

[86] There was no trading prior to the start of the Class Period because the Class Period begins with the Company's IPO.

Defendant CEO Trigg

391.    During the Class Period, Defendant Trigg engaged in insider trading that is suspicious in both magnitude and timing.  Indeed, Defendant Trigg sold 883,240 shares of Outset common stock for proceeds of *$30,366,470.71*.  Nearly all these sales were from April 1, 2021 through July 3, 2023, right before the first partial corrective disclosure on July 7, 2023 revealing that Outset had received the FDA Warning Letter as Defendant Trigg sold a total of 778,628 shares of Outset stock for proceeds of *$29,581,539.88* during this period.

392.    Moreover, Defendant Trigg sold a large number of shares during the six months beginning January 17, 2023, when Outset was being inspected by the FDA and engaging in discussions with the FDA regarding off-label promotion of Tablo for CRRT and for the distribution and promotion of TabloCart without any authorization, but before the Company's disclosure of the FDA Warning Letter on July 7, 2023.  During this six-month period, Defendant Trigg sold a combined 152,258 shares of Outset stock for proceeds of *$3,464,094.34*.

393.    One of her large dispositions of shares during this period came on March 1, 2023, after, unbeknownst to investors, the FDA had completed its on-site inspections during which it had observed off-label marketing and just two days before Outset sent its March 3, 2023 response to the FDA.  On that day, Defendant Trigg sold 30,000 shares of Outset stock for proceeds of $674,487.

394.    Thereafter, in the two-month window between May 3, 2023 and July 3, 2023, after the FDA investigations concluded and the March 13, 2023 meeting with the FDA to discuss its concerns, but before the first corrective disclosure revealing the FDA Warning Letter, Defendant Trigg sold 82,962 shares of Outset stock for a total of $1,699,017.42, including (i) multiple sales on May 3, 2023 totaling 40,000 shares sold for gross proceeds of $800,180; and (ii) one sale on June 1, 2023 of 20,000 shares sold for gross proceeds of $421,920.

395.    On August 1, 2023, Defendant Trigg sold another 20,000 shares of Outset stock for proceeds of $404,462, just before Outset's August 3, 2023 disclosure that it would pause shipments of TabloCart until it resolved the FDA Warning Letter with a new 510(k) Clearance

application. Defendant Trigg thus avoided the ensuing 10.2% decline in the Company's share price.

396. Had Defendant Trigg retained the shares she sold during the Class Period, they would have been worth approximately $1 million the day after the Class Period ends. Even today, they would be worth far less than the $30+ plus million she reaped during the Class Period.

397. While some of these post-2022 trades were made pursuant to a trading plan, these trades remain suspicious given the circumstances of the adoption of a new trading plan. On February 23, 2023, Trigg adopted a new plan to replace an earlier plan adopted March 2, 2022, which had replaced a plan adopted December 14, 2020. This amendment was, thus, made after the FDA completed its on-site during which it found evidence of off-label marketing and months before the FDA's findings were disclosed to the public.

Defendant Former CFO Chambers

398. Defendant Chambers also engaged in suspicious insider trading. In less than three months, from March 25, 2021 through June 24, 2021, Defendant Chambers sold 66,908 shares of Outset stock for proceeds of $3,385,037.92.

Defendant Former CFO Ahmed

399. During the Class Period, Defendant Ahmed likewise engaged in suspicious insider trading. Defendant Ahmed sold 52,670 shares of Outset common stock for proceeds of $573,814.56 during the Class Period and at suspicious times.

400. For example, Defendant Ahmed sold a large number of shares after the FDA began its inspection of Outset on January 17, 2023 and prior to the Company's disclosure of the receipt of the FDA Warning Letter on July 7, 2023. In that period, Defendant Ahmed sold a combined 10,999 shares of Outset stock for proceeds of $268,255.71, which represents almost 47% of his proceeds from Class Period sales. In fact, Defendant Ahmed's largest sale of Outset stock prior to the first partial disclosure occurred on January 27, 2023, 10 days after the FDA's first inspection of Outset, when he sold 4,938 shares of Outset stock for proceeds of $137,868.96.

401. Similarly to Defendant Trigg, Defendant Ahmed's latest 10b-5 trading plan was suspiciously adopted on February 17, 2023, a week after the FDA completed its on-site inspection

at which it observed off-label marketing. After adopting the new trading plan, he disposed of 7,602 shares of Outset stock for proceeds of $143,325.07 in a four-month window between May 3, 2023 and September 1, 2023.

Defendant General Counsel Brottem

402.    Defendant Brottem also engaged in suspicious insider trading. He disposed of 149,908 shares of Outset common stock for proceeds of $4,507,578.13 during the Class Period. Moreover, the vast majority of these, 119,992, were sold for proceeds of $4,332,264.06 before Outset revealed the FDA Warning Letter on July 7, 2023.

403.    Moreover, like other insiders, Defendant Brottem also sold a large number of shares during the six months after the FDA began its inspection of Outset on January 17, 2023 but before the FDA Warning Letter was disclosed on July 7, 2023. From January 27, 2023 through June 20, 2023, Defendant Brottem sold a total of 25,291 shares of Outset stock for proceeds of $572,851.78. On February 16, 2023, six days after the FDA completed its on-site investigation, he sold 9,984 shares for proceeds of $226,527.75, and suspiciously 8,627 of these stock sales for proceeds $193,446.87 were not pursuant to any trading plan or for required tax withholding obligations. Then, on March 20, 2023, just one week after the March 13, 2023 call with the FDA, he sold 4,130 shares for proceeds of $85,986.60.

404.    Suspiciously, on February 17, 2023, the day after he sold a significant number of shares outside his existing trading plan, he adopted a new 10b-5 trading plan. Then, between February 17 and June 20, 2023, shortly before the Company disclosed the FDA Warning Letter, he sold 11,025 shares for proceeds of $226,770.59 pursuant to that new trading plan.

## XI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

405.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and/or misleading statements pleaded in this Complaint. The statements alleged to be false and/or misleading herein all relate to historical or then-existing facts and conditions.

406.    In addition, to the extent certain of the statements alleged to be false and/or misleading may be characterized as forward-looking, they were not adequately identified as

"forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

407.   Alternatively, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false and/or misleading forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Outset who knew that the statement was false when made.  In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements which later became inaccurate.

## XII.   LOSS CAUSATION

408.   As detailed herein, at all relevant times, Defendants engaged in a scheme to defraud and issued materially false and misleading statements or omissions including: (i) regarding the ability of Tablo to replace all other products so that health systems could down select just to one device for all dialysis treatments and capture the entire acute dialysis market; (ii) misrepresenting the drivers of Outset's financial results and concealing that the strong financial results were the result of off-label marketing; (iii) representing that the company did not engage in any off-label marketing; (iv) after the Company disclosed the existence of the FDA Letter, downplaying and misrepresenting the issues raised by the FDA Warning Letter, their impact on the Company, and the reasons for declining Tablo sales; and (v) touting TabloCart without prior 510(k) Clearance as a non-medical accessory.

409.   As detailed above, as the truth was revealed and the risks materialized, the Company's common stock declined as the prior artificial inflation came out of its common stock price.  The declines in Outset's common stock price were a direct result of the nature and extent of the fraud finally being revealed to investors and the market.  The timing and magnitude of the common stock price declines negate any inference that the losses suffered by Lead Plaintiff and

other members of the Class were caused solely by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. Accordingly, these false and misleading statements directly or proximately caused Lead Plaintiff and other Class members to suffer damages.

410. The truth was revealed to the market in a series of disclosures and materializations of the risk which only partially revealed the truth until the end of the Class Period, including the following:

a. On Friday July 7, 2023, after the market closed, Outset disclosed that it received the FDA Warning Letter. The Company stated that the FDA Warning Letter stated that the FDA reviewed certain materials found on the Company's website that promote CRRT, a modality outside of Tablo's current clearance and that TabloCart "requires prior 510(k) clearance for marketing authorization." On this news, Outset's stock price fell $1.20, or 5.9%, to close at $19.26 per share on Monday July 10, 2023, the next trading day, on heavy volume.

b. On August 2, 2023, after the market closed, the Company issued a press release and disclosed that due to the FDA Warning Letter and as the TabloCart had never received FDA clearance to be marketed, it "chose" to pause the shipment of TabloCart pending its intended submission to the FDA for 510(k) clearance, which it also "chose" to do. The Company also lowered expectations telling investors that it "now expects to be at the low end of [$144 million to $150 million revenue guidance] as a result of the shipment pause." On this news, Outset's stock price dropped $1.97, or 10.2%, to close at $17.39 per share on August 3, 2023, on heavy volume.

c. On October 12, 2023, after the market closed, Outset preannounced third quarter financial results, stating the Company had revenue of $30.4 million for the third quarter and lowered revenue guidance for 2023 to approximately $130 million. Defendant Trigg characterized the "dampened" growth as due, in part, to "a larger-than-expected impact in the field from the recent FDA warning letter." On this news, the Company's share price fell $3.38, or 49.9%, to close at $3.39 per share on October 13, 2023, on heavy volume.

d. On November 7, 2023, after the market closed, the Company announced initial 2024 guidance calling for mid-teens revenue growth versus consensus expectations of 17.8% and reported revenue for the third quarter of $30.4 million. Defendant Trigg attributed these figures to "competitive activity around TabloCart not being available…and some competitive noise making around the other aspect of the warning letter around some case studies that were on our website." Outset further expanded on the issues facing the Company in its November 8, 2023 filed Form 10-Q, which discussed "several factors" that elongated the Company's sales cycle leading to an adverse effect on bookings and revenue. These factors included the "recent Warning Letter and our distribution pause on TabloCart with Prefiltration." The Company stated further that it "anticipate[d] that the negative impacts from the Warning Letter and our distribution pause will continue through at least the end of

"2023." On this news, the Company's share price fell $0.62, or 14.4%, to close at $3.69 per share on November 8, 2023, on heavy volume.

e. On May 9, 2024, before the market opened, the Company filed its 1Q 2024 Form 10-Q and disclosed that despite TabloCart's recent FDA clearance, "[Outset] may continue to experience disruptions as a result of the warning letter and our prior distribution pause on TabloCart with Prefiltration." The Company further disclosed that "[e]ven as we resume distribution of TabloCart with Prefiltration following its FDA clearance, if we are unable to sufficiently recover from these disruptions and any reputational harm at the levels or on the timeframes we anticipate, we may experience further disruptions which could include adverse impacts on our backlog, our ability to expand customer relationships or attract new customers, as well as reduced demand for TabloCart and/or, potentially, Tablo." On this news, Outset's stock price fell $0.86, or 20.82%, to close at $3.27.

f. On August 7, 2024, after the market closed, Outset released its second quarter 2024 financial results, significantly missing consensus estimates and lowering its full year 2024 outlook. It lowered full year 2024 guidance by $39 million at the midpoint and stated the Company needed to "improve our execution." Later that same day during the Company's conference call to discuss results, Defendant Trigg stated Outset would undergo "sales team and process restructuring" and would be unable to deliver on its previously promised ramp up of Tablo sales. On this news, the Company's share price fell $2.33, or 68.5%, to close at $1.07 per share on August 8, 2024, on heavy volume.

411. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of Defendants' false and misleading statements and fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when the true facts started to be revealed.

**XIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE**

412. Lead Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine. At all times, the market for Outset securities was an open, well-developed, and efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities.

413. Throughout the Class Period:

a. Outset was listed and actively traded on NASDAQ, a highly efficient and automated market;

b. The market price of Outset securities reacted promptly to the determination of public information regarding the Company;

    c.  As a regulated issuer, Outset filed periodic public reports with the SEC and/or the NASDAQ during the Class Period;

    d.  Outset regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

    e.  During the Class Period, Outset was followed by between six and eight securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace;

    f.  The average weekly trading volume for Outset stock during the Class Period was approximately 209,334.80 shares; and

    g.  During the Class Period, the Company's market capitalization was as high as $2.75 billion, and the Company had between 42.7 million and 52.1 million shares outstanding.

414. Throughout the Class Period, the Company was consistently followed by the market, including securities analysts. The market relies upon the Company's statements and management to accurately present the Company. During this period, Defendants continued to participate in a scheme to defraud and pump materially false and misleading information into the marketplace regarding the Company. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of the Company's securities.

415. As a result of the misconduct alleged herein, the market for Outset's common stock was artificially inflated. Thus, the presumption of reliance available under the "fraud-on-the-market" theory applies and Class members are presumed to have indirectly relied upon the misrepresentations and omissions and fraudulent scheme for which Defendants are responsible.

416. Lead Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Outset's common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

417. Lead Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for

which there was a duty to disclose. Had Lead Plaintiff and other members of the Class known of the off-label marketing scheme, the material adverse information not disclosed by Defendants or been aware of the truth behind Defendants' material misstatements and fraudulent scheme, they would not have purchased Outset's common stock at artificially inflated prices.

## XIV.    CLASS ACTION ALLEGATIONS

418.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons and entities who purchased or otherwise acquired Outset common stock during the Class Period and were damaged as a result (the "Class"). Excluded from the Class are: (a) Defendants, (b) members of the immediate families of Defendants, (c) the subsidiaries and affiliates of Defendants, (d) any person who is an officer, director, or controlling person of Outset, (e) any entity in which any Defendant has a controlling interest, (f) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof, and (g) the legal representatives, heirs, successors, or assigns of any such excluded party.

419.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Indeed, during the Class Period, Outset had between 42.7 million and 52.1 million outstanding shares of common stock.

420.    Members of the Class may be identified from records maintained by Outset or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

421.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class, including:

    a.    whether the federal securities laws were violated by Defendants' respective acts as alleged herein;

    b.    whether Defendants engaged in a scheme to defraud;

    c.    whether the statements made were materially false or misleading, or omitted material facts;

    d.   whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

    e.   whether the prices of Outset's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

    f.   whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

422.   Lead Plaintiff's claims are typical of the claims of other members of the Class, and the other members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as alleged in this Complaint.

423.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

424.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

425.   Lead Plaintiff will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine. All purchasers of Outset's securities during the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices. A presumption of reliance therefore applies.

## XV.   COUNTS AGAINST DEFENDANTS

### COUNT I
**Violations of Section 10(b) of the Exchange Act and
Rule 10b-5(b) Promulgated Thereunder
(Against the Speaking Defendants)**

426.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

427.   During the Class Period, the Speaking Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (a) deceive the

investing public, including Lead Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintained the market price of Outset securities; and (c) cause Lead Plaintiff and other members of the Class to purchase Outset stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Speaking Defendants, and each of them, made false statements and engaged in other unlawful acts as alleged herein.

428.    The Speaking Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Outset's business, operations, and prospects, as specified herein.

429.    The Speaking Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Outset's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Outset and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.  In particular, the Speaking Defendants issued materially false and misleading statements, *inter alia*, (a) regarding the ability of Tablo to replace all other products so that health systems could down select just to one device for all dialysis treatments and capture the entire acute dialysis market; (b) misrepresenting the drivers of Outset's financial results and concealing that the strong financial results were the result of off-label marketing; (c) representing that the company did not engage in any off-label marketing; (d) after the Company disclosed the existence of the FDA Letter, downplaying and misrepresenting the issues raised by the FDA Warning Letter, their impact on the Company, and the reasons for declining Tablo sales; and (d) touting TabloCart without prior 510(k) Clearance as a non-medical accessory.

430. Each of the Individual Speaking Defendants' primary liability and controlling person liability, arises from the following facts: (a) each of the Individual Speaking Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (b) each of the Individual Speaking Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects, including its marketing and promotion of Tablo and Tablo Cart; (c) each of the Individual Speaking Defendants enjoyed significant personal contact and familiarity with the other Speaking Defendants and was advised of and had access to other members of the Company's management team, internal reports, sales reports, marketing materials, and other data and information about the Company's financial condition, products, marketing, and performance at all relevant times; and (d) each of the Individual Speaking Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

431. The Speaking Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

432. Lead Plaintiff and other members of the Class relied upon the Speaking Defendants' statements and/or on the integrity of the market in purchasing shares of Outset's common stock during the Class Period.

433. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Outset securities was artificially inflated during the Class Period.

434. In ignorance of the fact that market prices of Outset's publicly traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements disseminated by analysts following Outset, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Speaking Defendants named in this count but not

disclosed in public statements by the Speaking Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Outset securities during the Class Period at artificially inflated prices and were damaged thereby.

435. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the truth, Lead Plaintiff and other members of the Class would not have purchased their Outset securities, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

436. As a direct and proximate result of the Speaking Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

437. By virtue of the foregoing, Outset and the Individual Speaking Defendants each violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b), and are liable to Lead Plaintiff and the Class members who have been damaged as a result of such violations.

## COUNT II
**For Violations of Section 10(b) of the Exchange Act and
Rule 10b-5(a) & (c) Promulgated Thereunder
(Against the Scheme Defendants)**

438. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

439. During the Class Period, the Scheme Defendants devised and carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of Outset's common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Outset's securities at artificially inflated and distorted prices.

440.    The Scheme Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Outset's business, operations, and prospects, as specified herein.

441.    The Scheme Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct, as alleged herein.  In furtherance of this unlawful scheme, plan, and course of conduct, the Scheme Defendants, among other things, (a) adopted and implemented a marketing strategy to promote Tablo as a value proposition by engaging in off-label marketing; (b) orchestrated the off-label marketing of Tablo for CRRT, while deliberating omitting that this was an approved use; (c) touted this value proposition to investors to mislead investors regarding Tablo's ability to capture the *entire* over $2 billion acute care market where CRRT is performed; (d) misled investors about Outset's strong financials by failing to disclose that they were driven by strong customer demand due to the off-label in furtherance of the value proposition; and (e) falsely touted that Outset did not engage in off-label marketing.  These practices and courses of business operated as a fraud and deceit upon the purchasers of Outset's securities during the Class Period.

442.    Each of the Individual Scheme Defendants' primary liability and controlling person liability, arises from the following facts: (a) each of the Individual Scheme Defendants was a high-level executive and/or director at the Company during the Class Period and a member of the Company's management team or had control thereof; (b) each of the Individual Scheme Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects, including its marketing and promotion of Tablo and Tablo Cart; (c) each of the Individual Scheme Defendants enjoyed significant personal contact and familiarity with the other Scheme Defendants and was advised of and had access to other members of the Company's management team, internal reports, sales reports, marketing materials and other data and information about the Company's financial condition, products,

marketing, and performance at all relevant times; and (d) each of the Individual Scheme Defendants was aware of the Speaking Defendants' dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

443. As a result of the Scheme Defendants' fraudulent scheme and failure to disclose material facts, as set forth above, the market price for Outset's securities was artificially inflated during the Class Period.

444. In ignorance of the fact that market prices of Outset's publicly traded securities were artificially inflated or distorted, and relying directly or indirectly on the false and misleading statements disseminated by analysts following Outset, or upon the integrity of the market in which the Company's securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Scheme Defendants named in this count but not disclosed in public statements made by the Scheme Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Outset's securities during the Class Period at artificially high prices and were damaged thereby.

445. At the time these misrepresentations and omissions were made as part of the Scheme Defendants' fraudulent scheme, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding Outset, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired Outset's securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated or distorted prices at which they did.

446. As a direct and proximate result of the wrongful conduct of the Scheme Defendants named in this count, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

447. By virtue of the foregoing, the Scheme Defendants named in this count have violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) & (c)

promulgated thereunder, 17 C.F.R. § 240.10b-5(a) & (c), and are liable to Lead Plaintiff and the Class members who have been damaged as a result of such violations.

### COUNT III
#### For Violations of Section 20(a) of the Exchange Act
#### (Against the Individual Defendants)

448.  Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

449.  The Individual Defendants acted as controlling persons of Outset within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, including the fraudulent scheme and off-label marketing, and intimate knowledge of the materially false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the actions of Outset and its employees as well the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading, as well as the fraudulent scheme to promote Tablo for off-label uses.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

450.  In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and the marketing, promotion and sale of Tablo and Tablo Cart and, therefore, had the power to control or influence the actions giving rise to the securities violations as alleged herein, and exercised that power.

451.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

452. As set forth above, Outset and the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

453. By reason of the conduct of Defendants alleged in this Complaint, and by virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

a. Determining that this action is a proper class action, certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Lead Plaintiff's counsel as Class Counsel;

b. Awarding compensatory and/or rescissory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

c. Granting equitable and/or injunctive relief as permitted by law, equity, and federal law;

d. Awarding Lead Plaintiff and the Class their reasonable fees and expenses incurred in this action, including counsel fees and expert fees; and

e. Awarding such other and further relief as the Court may deem just and proper.

## XVII. JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff hereby demands trial by jury of all issues that may be so tried.

Dated: May 1, 2026

Respectfully submitted,

**BERMAN TABACCO**


By:   */s/ Kristin Moody*
       Kristin Moody

Nicole Lavallee
Alexander Vahdat
425 California Street, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: nlavallee@bermantabacco.com
      kmoody@bernantabacco.con
      avahdat@bermantabacco.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*